# 24-1895-cv

## United States Court of Appeals

*for the*

## Second Circuit

DELUX PUBLIC CHARTER, LLC, DBA JSX Air, DBA JetSuiteX, Inc.,
XO GLOBAL, LLC, BLADE URBAN AIR MOBILITY, INC.,

*Plaintiffs-Counter-Defendants-Appellants,*

– v. –

COUNTY OF WESTCHESTER, NEW YORK, a charter county,

*Defendant-Counter-Claimant-Appellee,*

APRIL GASPARRI, in her official capacity as Airport Manager,
AVPORTS, LLC,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### APPENDIX
**Volume 1 of 2 (Pages A-1 to A-280)**

JONATHAN F. COHN
SHANNON GRAMMEL
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Washington, DC 20001
(512) 693-8350

JONATHAN B. NELSON
DORF NELSON & ZAUDERER LLP
The International Corporate Center
555 Theodore Fremd Avenue
Rye, New York 10580
(914) 381-7600

*Attorneys for Plaintiffs-Counter-Defendants-Appellants*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (332113)

KYLE D. HAWKINS
LEHOTSKY KELLER COHN LLP
408 West 11th Street, 5th Floor
Austin, Texas 78701
(512) 436-3052

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ............................... A-1

Complaint, filed March 7, 2022 ............................ A-22

Declaration of David Drabinsky, for Plaintiffs, in Support of Application for Temporary Restraining Order, filed March 9, 2022 ........... A-59

Exhibit B to Drabinsky Declaration – Letter to David Drabinsky, dated November 5, 2021 ................................ A-69

Exhibit C to Drabinsky Declaration - Letter to Peter Scherrer, dated November 15, 2021 ............................. A-72

Declaration of Karoline Lozier, for Plaintiffs, in Support of Application for Temporary Restraining Order, filed March 9, 2022 ........... A-87

Exhibit I to Lozier Declaration - Letter to Melissa Tomkiel, dated November 9, 2021 ............................... A-95

Declaration of Ted Botimer, for Plaintiffs, in Support of Application for Temporary Restraining Order, filed March 9, 2022 ........... A-98

Exhibit L to Botimer Declaration - Letter to Anastasija Snicarenko, Esq., dated November 5, 2021 ............................... A-105

ii

**Page**

Exhibit 1 to Letter to the Honorable Philip M.
Halpern, filed March 9, 2022:
Complaint in The County of Westchester v.
Blade Urban Air Mobility, Inc., Westchester
County Supreme Court ....................................  A-108

Stipulation and Order, filed March 16, 2022 .......  A-140

Stipulation re: Dismissal of AvPorts, LLC and
Ms. April Gasparri and Order, filed
March 17, 2022 ......................................  A-144

Stipulation and Order re: State Court Action,
filed June 9, 2022 ................................  A-147

Answer, Demand for Jury Trial, Affirmative
Defenses, and Counterclaims, filed
June 19, 2022 ........................................  A-150

Joint Local Rule 56.1 Statement, filed
May 5, 2023 ..........................................  A-281

Exhibits to the Declaration of Sean T. Carey, in
Support of Motion for Summary Judgment,
filed November 30, 2023
(Incorporated here for reference only):

Exhibit B  -
Local Law No. 12-2004 ......................................  A-309

Exhibit C -
Local Law No. 17-2005 ......................................  A-335

Exhibit E -
Resolution No. 58-1985 .....................................  A-360

Exhibit I -
FAA Letter ............................................  A-374

iii

**Page**

[EXCERPT] Exhibit AC -
Deposition Transcript of Melissa Tomkiel....... A-385

[EXCERPT] Exhibit AD -
Deposition Transcript of Peter Scherrer .......... A-406

[EXCERPT] Exhibit AE -
Deposition Transcript of Tom Rumbarger ...... A-414

[EXCERPT] Exhibit AF -
Deposition Transcript of Jennifer Lozada ....... A-427

[EXCERPT] Exhibit AG -
Deposition Transcript of April Gasparri.......... A-445

[EXCERPT] Exhibit AH -
Deposition Transcript of David Drabinsky .... A-453

[EXCERPT] Exhibit AI -
Deposition Transcript of Joan McDonald........ A-461

Declaration of Mark Duebner, for Plaintiffs, in
    Opposition to Defendant's Motion for
    Summary Judgment, filed
    November 30, 2023 ............................................. A-475

Declaration of David Drabinsky, for Plaintiffs,
    in Opposition to Defendant's Motion for
    Summary Judgment, filed
    November 30, 2023 ............................................. A-478

Declaration of Rajat Khurana, for Plaintiffs, in
    Opposition to Defendant's Motion for
    Summary Judgment, filed
    November 30, 2023 ............................................. A-482

iv

|  | Page |
|---|---|
| Memorandum of Law, for Plaintiffs, in Opposition to Defendant's Motion for Summary Judgment, filed November 30, 2023 ............................................. | A-487 |
| Plaintiffs' Motion for a Stay or, in the Alternative, an Injunction Pending Appeal, filed July 19, 2024 ................................................. | A-517 |
| Declaration of Ken Edmondson, for Plaintiffs, in Support of Motion for a Stay or, in the Alternative, an Injunction Pending Appeal, filed July 19, 2024 ................................................. | A-521 |
| Exhibit H to Edmondson Declaration - E-mail to John Nonna, dated July 18, 2024...... | A-533 |
| Exhibit I to Edmondson Declaration - E-mail to Jon Cohn, dated July 19, 2024 .......... | A-536 |
| Exhibit J to Edmondson Declaration - Letter to David Drabinsky, dated July 19, 2024 ......................................................... | A-539 |
| Declaration of Rajat Khurana, for Plaintiffs, in Support of Motion for a Stay or, in the Alternative, an Injunction Pending Appeal, filed July 19, 2024 ................................................. | A-546 |
| Exhibit M to Khurana Declaration - Letter to Anastasija Snicarenko, Esq., dated July 19, 2024 ......................................................... | A-555 |
| Notice of Appeal, dated July 12, 2024 .................. | A-562 |

A-1

CLOSED,APPEAL,ECF

**U.S. District Court**
**Southern District of New York (White Plains)**
**CIVIL DOCKET FOR CASE #: 7:22-cv-01930-PMH**

Delux Public Charter, LLC et al v. County of Westchester, New York et al
Assigned to: Judge Philip M. Halpern
Cause: 49:41713 Airline Deregulation Actv (premp of authority over prices, routes, and service)

Date Filed: 03/07/2022
Date Terminated: 07/02/2024
Jury Demand: Both
Nature of Suit: 950 Constitutional – State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Delux Public Charter, LLC**
*doing business as*
JSX Air and JetSuiteX, Inc.

represented by **Jenna Christine Hutchinson**
Troutman Pepper Hamilton Sanders LLP
875 Third Avenue
Ste FL 17
New York, NY 10022
212-704-6034
Email: jenna.hutchinson@troutmansanders.com
*TERMINATED: 06/22/2023*

**Jonathan F Cohn**
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001
512-693-8350
Fax: 512-727-4755
Email: jon@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**Jonathan Nelson**
Dorf & Nelson LLP
555 Theodore Fremd Avenue
Rye, NY 10580
(914) 381-7600
Fax: (914) 381-7608
Email: jnelson@dorflaw.com
*ATTORNEY TO BE NOTICED*

**Nicholas J. Schuchert**
Troutman Pepper
5 Park Plaza, Suite 1400
92614
Irvine, CA 92614
949-622-2700
Fax: 949-622-2739
Email: nicholas.schuchert@troutmansanders.com
*ATTORNEY TO BE NOTICED*

**Samrah Mahmoud**
Troutman Pepper Hamilton Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92688
949-622-2751
Fax: 949-622-2739
Email: samrah.mahmoud@troutman.com
*ATTORNEY TO BE NOTICED*

**Sheila Zifu Chen**
Troutman Pepper Hamilton Sanders LLP

A-2

5 Park Plaza
Suite 1400
Irvine, CA 92688
949−622−2700
Email: sheila.chen@troutman.com
*ATTORNEY TO BE NOTICED*

**Steven D. Allison**
Troutman Pepper Hamilton Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92688
949−622−2700
Email: steven.allison@troutman.com
*ATTORNEY TO BE NOTICED*

**John Nelson Thomas**
Troutman Pepper Hamilton Sanders LLP
875 Third Ave
15th Fl.
New York, NY 10022
212−704−6102
Fax: 212−704−6288
Email: jack.thomas@troutman.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**XO Global, LLC**                    represented by **Jenna Christine Hutchinson**
                                      (See above for address)
                                      *TERMINATED: 06/22/2023*

                                      **Jonathan F Cohn**
                                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

                                      **Jonathan Nelson**
                                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

                                      **Nicholas J. Schuchert**
                                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

                                      **Samrah Mahmoud**
                                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

                                      **Sheila Zifu Chen**
                                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

                                      **Steven D. Allison**
                                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

                                      **John Nelson Thomas**
                                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**
**Blade Urban Air Mobility, Inc.**    represented by **Jenna Christine Hutchinson**
                                      (See above for address)
                                      *TERMINATED: 06/22/2023*

A-3

**Jonathan F Cohn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas J. Schuchert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samrah Mahmoud**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sheila Zifu Chen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven D. Allison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Nelson Thomas**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**County of Westchester, New York**
*a charter county*

represented by **David H Chen**
Bleakley Platt & Schmidt, LLP
One North Lexington Avenue
White Plains, NY 10601
914−287−6155
Email: dchen@bpslaw.com
*TERMINATED: 06/15/2023*

**Francesca L Mountain**
Westchester County Attorney's Office
148 Martine Ave, 6th Floor
White Plains, NY 10017
914−995−2010
Email: frmt@westchestercountyny.gov
*ATTORNEY TO BE NOTICED*

**John Nonna**
Westchester County Attorney
Law Department
148 Martine Avenue
Ste 6th Floor
White Plains, NY 10601
914−995−2690
Email: JNonna@WestchesterCountyNY.gov
*ATTORNEY TO BE NOTICED*

**Phoenix Marino**
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
212−839−6033
Email: phoenix.marino@sidley.com
*TERMINATED: 06/15/2023*

A-4

Robert P. Taglia
County of Westchester
Law Department
148 Martine Avenue
6th Floor
White Plains, NY 10601
914−995−5103
Email: rbta@westchestercountyny.gov
*ATTORNEY TO BE NOTICED*

Sean Timothy Carey
Westchester County Attorney's Office
148 Martine Avenue, Room 600
White Plains, NY 10601
(914) 995−2243
Fax: (914) 995−4581
Email: stca@westchestercountyny.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**April Gasparri**
*in her official capacity as Airport Manager*
*TERMINATED: 03/17/2022*

represented by **Brian Edward Foont**
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854
(202) 236−4851
Fax: (202) 318−9195
Email: foont@foontlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**AvPorts, LLC**
*TERMINATED: 03/17/2022*

represented by **Brian Edward Foont**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**County of Westchester, New York**
*a charter county*

represented by **David H Chen**
(See above for address)
*TERMINATED: 06/15/2023*

**John Nonna**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert P. Taglia**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Timothy Carey**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Blade Urban Air Mobility, Inc.**

represented by **Jenna Christine Hutchinson**
(See above for address)
*TERMINATED: 06/22/2023*

**Jonathan Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

A-5

**Nicholas J. Schuchert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samrah Mahmoud**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sheila Zifu Chen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven D. Allison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Nelson Thomas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Counter Defendant</u>**

**Delux Public Charter, LLC**          represented by **Jenna Christine Hutchinson**
(See above for address)
*TERMINATED: 06/22/2023*

**Jonathan Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas J. Schuchert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samrah Mahmoud**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sheila Zifu Chen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven D. Allison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Nelson Thomas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Counter Defendant</u>**

**XO Global, LLC**          represented by **Jenna Christine Hutchinson**
(See above for address)
*TERMINATED: 06/22/2023*

**Jonathan Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas J. Schuchert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samrah Mahmoud**

A-6

(See above for address)
*ATTORNEY TO BE NOTICED*

**Sheila Zifu Chen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven D. Allison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Nelson Thomas**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/07/2022 | 1 | COMPLAINT against AvPorts, LLC, County of Westchester, New York, April Gasparri. (Filing Fee $ 402.00, Receipt Number ANYSDC−25827862)Document filed by Delux Public Charter, LLC, Blade Urban Air Mobility, Inc., XO Global, LLC..(Thomas, John) (Entered: 03/07/2022) |
| 03/07/2022 | 2 | CIVIL COVER SHEET filed..(Thomas, John) (Entered: 03/07/2022) |
| 03/07/2022 | 3 | **FILING ERROR − DEFICIENT PLEADING − SUMMONS REQUEST PDF ERROR −** REQUEST FOR ISSUANCE OF SUMMONS as to Westchester County, New York, re: 1 Complaint. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) Modified on 3/8/2022 (pc). (Entered: 03/07/2022) |
| 03/07/2022 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to April Gasparri, re: 1 Complaint. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) (Entered: 03/07/2022) |
| 03/07/2022 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to AvPorts, LLC, re: 1 Complaint. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) (Entered: 03/07/2022) |
| 03/07/2022 | 6 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent JetSuite X, Inc. for Delux Public Charter, LLC. Document filed by Delux Public Charter, LLC..(Thomas, John) (Entered: 03/07/2022) |
| 03/07/2022 | 7 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent XO Holding Inc. for XO Global, LLC. Document filed by XO Global, LLC..(Thomas, John) (Entered: 03/07/2022) |
| 03/07/2022 | 8 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Blade Air Mobility, Inc. for Blade Urban Air Mobility, Inc.. Document filed by Blade Urban Air Mobility, Inc...(Thomas, John) (Entered: 03/07/2022) |
| 03/08/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney John Nelson Thomas. The party information for the following party/parties has been modified: Delux Public Charter, LLC, County of Westchester, New York. The information for the party/parties has been modified for the following reason/reasons: party text was omitted; alias party name was omitted;. (pc)** (Entered: 03/08/2022) |
| 03/08/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney John Nelson Thomas. The following case opening statistical information was erroneously selected/entered: County code Westchester;. The following correction(s) have been made to your case entry: the County code has been modified to New York;. (pc)** (Entered: 03/08/2022) |
| 03/08/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge Philip M. Halpern. Please download and review the Individual Practices of the assigned District Judge, located at |

| | | |
|---|---|---|
| | | https://nysd.uscourts.gov/judges/district−judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf−related−instructions..(pc) (Entered: 03/08/2022) |
| 03/08/2022 | | Magistrate Judge Judith C. McCarthy is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018−06/AO−3.pdf. (pc) (Entered: 03/08/2022) |
| 03/08/2022 | | Case Designated ECF. (pc) (Entered: 03/08/2022) |
| 03/08/2022 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney John Nelson Thomas to RE−FILE Document No. 3 Request for Issuance of Summons,. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the issuance of summons is not correct; party name on the summons and caption title must EXACTLY match;. Re−file the document using the event type Request for Issuance of Summons found under the event list Service of Process − select the correct filer/filers − and attach the correct summons form PDF. (pc) (Entered: 03/08/2022) |
| 03/08/2022 | 9 | ELECTRONIC SUMMONS ISSUED as to April Gasparri..(pc) (Entered: 03/08/2022) |
| 03/08/2022 | 10 | ELECTRONIC SUMMONS ISSUED as to AvPorts, LLC..(pc) (Entered: 03/08/2022) |
| 03/08/2022 | 11 | REQUEST FOR ISSUANCE OF SUMMONS as to County of Westchester, New York, a charter county, re: 1 Complaint. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) (Entered: 03/08/2022) |
| 03/08/2022 | 12 | NOTICE OF APPEARANCE by David Henry Riddle Chen on behalf of County of Westchester, New York..(Chen, David) (Entered: 03/08/2022) |
| 03/08/2022 | 13 | NOTICE OF APPEARANCE by Sean Timothy Carey on behalf of County of Westchester, New York..(Carey, Sean) (Entered: 03/08/2022) |
| 03/09/2022 | 14 | MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order*. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) (Entered: 03/09/2022) |
| 03/09/2022 | 15 | MEMORANDUM OF LAW in Support re: 14 MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order.* . Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) (Entered: 03/09/2022) |
| 03/09/2022 | 16 | DECLARATION of David Drabinsky in Support re: 14 MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order*.. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Exhibit A − Email dated 10/26/21, # 2 Exhibit B − Letter dated 11/5/21, # 3 Exhibit C − Letter dated 11/15/21, # 4 Exhibit D − Letter dated 12/2/21, # 5 Exhibit E − Letter dated 1/7/22, # 6 Exhibit F − Letter dated 2/7/22, # 7 Exhibit G − Letter dated 2/15/22).(Thomas, John) (Entered: 03/09/2022) |
| 03/09/2022 | 17 | DECLARATION of Karoline Lozier in Support re: 14 MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order*.. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Exhibit I− Letter dated 11/9/21, # 2 Exhibit J − Letter dated 11/29/21, # 3 Exhibit K − Letter dated 12/13/21).(Thomas, John) (Entered: 03/09/2022) |
| 03/09/2022 | 18 | DECLARATION of Ted Botimer in Support re: 14 MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order*.. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Exhibit L − Letter dated 11/5/21).(Thomas, John) (Entered: 03/09/2022) |

A-8

| 03/09/2022 | 19 | DECLARATION of John Thomas in Support re: 14 MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order.*. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Exhibit M− Act 07−2022, # 2 Exhibit N− Westchester Co. Municipal Code 712.462, # 3 Exhibit O− Email dated 3/8/22, # 4 Exhibit P− Email dated 3/8/22, # 5 Exhibit Q − Letter dated 3/8/22).(Thomas, John) (Entered: 03/09/2022) |
| 03/09/2022 | 20 | LETTER MOTION for Conference re: 14 MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order. request for a pre−motion conference* addressed to Judge Philip M. Halpern from Jack Thomas dated March 8, 2022. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) (Entered: 03/09/2022) |
| 03/09/2022 | 21 | LETTER addressed to Judge Philip M. Halpern from David H. Chen dated 3/9/22 re: Plaintiffs' request for pre−motion conf. on proposed OSC. Document filed by County of Westchester, New York. (Attachments: # 1 Exhibit State Court Complaint (as filed), # 2 Exhibit State Court Order).(Chen, David) (Entered: 03/09/2022) |
| 03/09/2022 | 22 | NOTICE OF APPEARANCE by Jenna Christine Hutchinson on behalf of Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Hutchinson, Jenna) (Entered: 03/09/2022) |
| 03/09/2022 | 23 | ORDER granting 20 Letter Motion for Conference. Application for a pre−motion conference granted. A telephone conference has been scheduled for March 11, 2022 at 10:00 a.m. At the time of the scheduled conference, all parties shall call the following number: (888) 398−2342; access code 3456831. Defendants, should they be so advised, may supplement their response letter concerning plaintiffs' application, discussing in particular, principles of duplicative suits, abstention, and dismissal by 12:00 p.m. on March 10, 2022. Plaintiffs may file a response to any such letter by close of business on March 10, 2022. So Ordered. Telephone Conference set for 3/11/2022 at 10:00 AM before Judge Philip M. Halpern.. (Signed by Judge Philip M. Halpern on 3/9/2022) (js) (Entered: 03/09/2022) |
| 03/09/2022 | 24 | ORDER: Due to a scheduling conflict, the telephone conference scheduled for 3/11/2022 at 10:00 a.m. is rescheduled to 11:00 a.m. that day. (HEREBY ORDERED by Judge Philip M. Halpern) (Text Only Order) (sbh) (Entered: 03/09/2022) |
| 03/09/2022 |  | Set/Reset Hearings: Telephone Conference set for 3/11/2022 at 11:00 AM before Judge Philip M. Halpern. (sbh) (Entered: 03/09/2022) |
| 03/09/2022 | 25 | ELECTRONIC SUMMONS ISSUED as to County of Westchester, New York..(pc) (Entered: 03/09/2022) |
| 03/09/2022 | 26 | **FILING ERROR − DEFICIENT DOCKET ENTRY −** MOTION for Steven Dale Allison to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25840418. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Declaration in Support of Motion for Pro Hac Vice Admission, # 2 Exhibit A. − Certificate of Good Standing, # 3 Text of Proposed Order).(Allison, Steven) Modified on 3/10/2022 (bcu). (Entered: 03/09/2022) |
| 03/10/2022 |  | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE−FILE Document No. 26 MOTION for Steven Dale Allison to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25840418. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of California. We do not naccept certificates from a state bar registrar for this state.;. Re−file the motion as a Motion to Appear Pro Hac Vice − attach the correct signed PDF − select the correct named filer/filers − attach valid Certificates of Good Standing issued within the past 30 days − attach Proposed Order.. (bcu)** (Entered: 03/10/2022) |
| 03/10/2022 | 27 | NOTICE OF APPEARANCE by Brian Edward Foont on behalf of AvPorts, LLC, April Gasparri..(Foont, Brian) (Entered: 03/10/2022) |

| 03/10/2022 | 28 | MOTION to Dismiss *Pursuant to Rule 21*. Document filed by AvPorts, LLC, April Gasparri..(Foont, Brian) (Entered: 03/10/2022) |
|---|---|---|
| 03/10/2022 | 29 | LETTER addressed to Judge Philip M. Halpern from David H. Chen dated 3/10/22 re: Plaintiffs' TRO hearing. Document filed by County of Westchester, New York..(Chen, David) (Entered: 03/10/2022) |
| 03/10/2022 | 30 | MOTION for Steven Dale Allison to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Declaration in Support of Motion for Pro Hac Vice Admission, # 2 Exhibit A. − Certificate of Good Standing, # 3 Text of Proposed Order).(Allison, Steven) (Entered: 03/10/2022) |
| 03/10/2022 | 31 | LETTER addressed to Judge Philip M. Halpern from John N. Thomas dated March 10, 2022 re: Plaintiffs' TRO Hearing. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) (Entered: 03/10/2022) |
| 03/11/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 30 MOTION for Steven Dale Allison to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 03/11/2022) |
| 03/11/2022 | 32 | NOTICE OF APPEARANCE by John Nonna on behalf of County of Westchester, New York..(Nonna, John) (Entered: 03/11/2022) |
| 03/11/2022 | 33 | ORDER granting 30 Motion for Steven Dale Allison to Appear Pro Hac Vice. (Signed by Judge Philip M. Halpern on 3/11/2022) (ate) (Entered: 03/11/2022) |
| 03/11/2022 | | Minute Entry for proceedings held before Judge Philip M. Halpern: Pre−Motion Telephone Conference held on 3/11/2022. Counsel for all parties appeared by telephone. Orders to follow. (fc) (Entered: 03/11/2022) |
| 03/11/2022 | 34 | ORDER denying without prejudice 28 Motion to Dismiss; denying 14 Motion for Order to Show Cause. Counsel for all parties appeared by telephone for a pre−motion conference at 11:00 a.m. today. For the reasons discussed on the record, the Court directed the parties to meet and confer and file a Stipulation to be so−ordered by 5:00 p.m. on March 14, 2022 concerning the promises set forth in the County's letters (Doc. 21, Doc. 29) with respect to plaintiffs' operations at the Westchester County Airport and impact on certain non−parties. The Court denied plaintiffs' application for a temporary restraining order. (Doc. 14). The Court set the balance of the briefing schedule for plaintiff's motion for a preliminary injunction: defendants' opposition to the motion, together with their arguments in support of abstention, shall be filed by April 1, 2022. Plaintiffs' reply shall be filed by April 11, 2022. The Order to Show Cause will be separately docketed. Plaintiffs shall, by 5:00 p.m. on March 14, 2022, advise the Court if they withdraw their motion for a preliminary injunction in light of the parties' Stipulation to be so−ordered. In the event plaintiffs withdraw the motion, then defendants' motion for abstention shall be filed by March 25, 2022, limited to ten pages; and Plaintiffs' opposition thereto, also limited to ten pages, shall be filed by April 1, 2022. The Court denied without prejudice the motion to dismiss under Fed. R. Civ. P. 21 filed by defendants AvPorts, LLC and April Gasparri (Doc. 28) for failure to comply with the Court's Individual Practices. The parties are directed to meet and confer to determine if AvPorts and Ms. Gasparri should be removed as defendants in this action, and advise the Court of same by 5:00 p.m. on March 14, 2022. See transcript. The Clerk of Court is respectfully directed to terminate the motions pending at Doc. 14 and Doc. 28. SO ORDERED. (Signed by Judge Philip M. Halpern on 3/11/2022) (tg) (Entered: 03/11/2022) |
| 03/11/2022 | | Set/Reset Deadlines: Motions due by 3/25/2022. Responses due by 4/1/2022 Replies due by 4/11/2022. (tg) (Entered: 03/11/2022) |
| 03/11/2022 | 35 | ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION: It is hereby ORDERED, that Defendants County of Westchester, New York, a charter county, April Gasparri, in her official capacity as Airport Manager, and Avports, LLC (collectively, the "Defendants") show cause before this Court at The Hon. Charles L. Brieant Jr. Federal Building and Courthouse, 300 Quarropas Street, Room 530, White Plains, New York 10601 on April 11, 2022 on submission only, no appearances why an order should not be issued pursuant to Rule 65 of the Federal Rules of Civil |

A-10

| | | |
|---|---|---|
| | | Procedure enjoining the Defendants from (1) enforcing Westchester County Airport Operational Policy No. 1 ("Policy No. 1"); (2) enforcing the Westchester County Municipal Code § 712.462, the Terminal Use Procedures (TUP), as applied to the Plaintiffs or any part 135 operators utilized by Plaintiffs at Westchester County Airport ("HPN"); (3) preventing or interfering with Plaintiffs continuing operations out of the Fixed Base Operators ("FBO") at HPN; and (4) indirectly violating any of the orders contained herein; and it is further ORDERED that service of a copy of this Order, together with the papers upon which it is granted, upon Defendants or their counsel has already been effectuated via ECF filing; and it is further ORDERED that the parties shall comply with the Court's directives as stated at the March 11, 2022 conference and memorialized in its Order of even date. (Signed by Judge Philip M. Halpern on 3/11/2022) (jca) (Entered: 03/11/2022) |
| 03/14/2022 | 36 | LETTER MOTION for Extension of Time *Plaintiff's Response to the Court Regarding Dismissal of AvPorts and Ms. Gasparri* addressed to Judge Philip M. Halpern from John N. Thomas dated March 14, 2022. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) (Entered: 03/14/2022) |
| 03/15/2022 | 37 | MEMO ENDORSEMENT granting 36 LETTER MOTION for Extension of Time Plaintiff's Response to the Court Regarding Dismissal of AvPorts and Ms. Gasparri. ENDORSEMENT: Application granted. Plaintiffs' letter shall be filed by 3/16/2022 at 5:00 p.m. However, the parties have failed to comply with and address the other items that were due yesterday pursuant to the Court's 3/11/2022 Order, namely the stipulation concerning plaintiffs' operations at the airport and whether plaintiffs are withdrawing their application for a preliminary injunction. Accordingly, the Court sua sponte extends the time to file the foregoing as well to 3/16/2022 at 5:00 p.m. SO ORDERED.. (Signed by Judge Philip M. Halpern on 3/15/2022) (jca) (Entered: 03/15/2022) |
| 03/15/2022 | 38 | AFFIDAVIT OF SERVICE of Summons and Complaint. County of Westchester, New York served on 3/10/2022, answer due 3/31/2022. Service was accepted by Donna Dixon. Document filed by Delux Public Charter, LLC; Blade Urban Air Mobility, Inc.; XO Global, LLC..(Thomas, John) (Entered: 03/15/2022) |
| 03/15/2022 | 39 | AFFIDAVIT OF SERVICE of Summons and Complaint. AvPorts, LLC served on 3/9/2022, answer due 3/30/2022. Service was accepted by Vincenza Cipriano. Document filed by Delux Public Charter, LLC; Blade Urban Air Mobility, Inc.; XO Global, LLC..(Thomas, John) (Entered: 03/15/2022) |
| 03/15/2022 | 40 | AFFIDAVIT OF SERVICE of Summons and Complaint. April Gasparri served on 3/9/2022, answer due 3/30/2022. Service was accepted by Stephen Ferguson. Document filed by Delux Public Charter, LLC; Blade Urban Air Mobility, Inc.; XO Global, LLC..(Thomas, John) (Entered: 03/15/2022) |
| 03/15/2022 | 41 | MOTION for Samrah Rochelle Mahmoud to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25865080. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Declaration in Support of Pro Hac Vice, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order).(Mahmoud, Samrah) (Entered: 03/15/2022) |
| 03/15/2022 | 42 | MOTION for Sheila Zifu Chen to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25865154. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Declaration in Support of Pro Hac Vice, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order).(Chen, Sheila) (Entered: 03/15/2022) |
| 03/16/2022 | 43 | PROPOSED STIPULATION AND ORDER. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) (Entered: 03/16/2022) |
| 03/16/2022 | 44 | RESPONSE in Support of Motion re: 14 MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order. Plaintiffs' Response To Court Regarding Stipulation And Preliminary Injunction.* Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, |

A-11

| | | John) (Entered: 03/16/2022) |
|---|---|---|
| 03/16/2022 | 45 | STIPULATION AND ORDER: IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiffs and Westchester, through their respective counsel of record, that neither Westchester nor any of its agents will seek to or take any action to enforce Policy No. 1 and/or section 712.462 of the Laws of Westchester County (the "TUP") against Plaintiffs and their Air Carriers without a valid court order; and IT IS FURTHER STIPULATED AND AGREED, that Westchester will not demand, request or otherwise encourage any of the FBOs−specifically, White Plains Aviation Partners, LLC, d/b/a Million Air White Plains ("Million Air"); HPN NY Holdings, LLC d/b/a Ross Aviation ("Ross Aviation"); and Signature Flight Support Corporation, Inc. ("Signature")−at the Westchester County Airport, to seek to enforce the TUP and/or Policy No. 1 against Plaintiffs without a valid court order; and IT IS FURTHER STIPULATED AND AGREED, that Westchester will provide a copy of this stipulation to the FBOs once it is so−ordered by the Court; and IT IS FURTHER STIPULATED AND AGREED, that Westchester will inform the Westchester Agents of this Stipulation and will ensure the Westchester Agents' compliance with this Stipulation. SO ORDERED. (Signed by Judge Philip M. Halpern on 3/16/2022) (jca) (Entered: 03/16/2022) |
| 03/16/2022 | 46 | PROPOSED STIPULATION AND ORDER. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Thomas, John) (Entered: 03/16/2022) |
| 03/16/2022 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 41 MOTION for Samrah Rochelle Mahmoud to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25865080. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu) (Entered: 03/16/2022) |
| 03/16/2022 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 42 MOTION for Sheila Zifu Chen to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25865154. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu) (Entered: 03/16/2022) |
| 03/17/2022 | 47 | ORDER FOR ADMISSION PRO HAC VICE granting 42 MOTION for Sheila Zifu Chen to Appear Pro Hac Vice. The motion of Sheila Zifu Chen for admission to practice Pro Hac Vice in the above captioned action is granted. (Signed by Judge Philip M. Halpern on 3/17/2022) (jca) (Entered: 03/17/2022) |
| 03/17/2022 | 48 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a Teleconference proceeding held on 03/11/2022 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Ginsberg, Darby) (Entered: 03/17/2022) |
| 03/17/2022 | 49 | ORDER FOR ADMISSION PRO HAC VICE granting 41 MOTION for Samrah Rochelle Mahmoud to Appear Pro Hac Vice. The motion of Samrah Rochelle Mahmoud for admission to practice Pro Hac Vice in the above captioned action is granted.. (Signed by Judge Philip M. Halpern on 3/17/2022) (jca) (Entered: 03/17/2022) |
| 03/17/2022 | 50 | TRANSCRIPT of Proceedings re: Teleconference held on 3/11/2022 before Judge Philip M. Halpern. Court Reporter/Transcriber: Darby Ginsberg, (914) 390−4102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/7/2022. Redacted Transcript Deadline set for 4/18/2022. Release of Transcript Restriction set for 6/15/2022..(Ginsberg, Darby) (Entered: 03/17/2022) |
| 03/17/2022 | 51 | STIPULATION RE DISMISSAL OF AVPORTS LLC AND MS. APRIL GASPARRI AND ORDER: IT IS HEREBY STIPULATED AND AGREED, that Plaintiffs will dismiss without prejudice Ms. Gasparri and Avports, pursuant to their representations and Westchester's representations that Ms. Gasparri and Avports are mere agents of |

A-12

| | | |
|---|---|---|
| | | Westchester acting on its behalf; IT IS FURTHER STIPULATED AND AGREED, that Ms. Gasparri and Avports agree to abide by and be bound by any Court order entered against Westchester; IT IS FURTHER STIPULATED AND AGREED, that Ms. Gasparri and Avports will not seek to avoid written discovery or depositions solely on the grounds that they are third parties to this action; and IT IS FURTHER STIPULATED AND AGREED, that the statute of limitations as to causes of action in this action against Ms. Gasparri and Avports will be tolled as of March 7, 2022 through the termination of this action. The Clerk of Court is respectfully directed to terminate April Gasparri and AvPorts, LLC as defendants in this action. SO ORDERED. (Signed by Judge Philip M. Halpern on 3/16/2022) AvPorts, LLC and April Gasparri (in her official capacity as Airport Manager) terminated. (ks) (Entered: 03/17/2022) |
| 03/30/2022 | 52 | DECLARATION of David H. Chen in Opposition re: 14 MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order*.. Document filed by County of Westchester, New York. (Attachments: # 1 Exhibit Transcript of 3/11 conf., # 2 Exhibit Policy No. 1, # 3 Exhibit jetBlue webpage).(Chen, David) (Entered: 03/30/2022) |
| 03/30/2022 | 53 | MEMORANDUM OF LAW in Opposition re: 14 MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order. and in support of abstention.* Document filed by County of Westchester, New York..(Chen, David) (Entered: 03/30/2022) |
| 03/31/2022 | 54 | CONSENT LETTER MOTION for Extension of Time to File Answer *pending resolution of abstention* addressed to Judge Philip M. Halpern from David H. Chen dated 3/31/2022. Document filed by County of Westchester, New York..(Chen, David) (Entered: 03/31/2022) |
| 04/01/2022 | 55 | ORDER granting 54 Letter Motion for Extension of Time to Answer re 54 CONSENT LETTER MOTION for Extension of Time to File Answer *pending resolution of abstention* addressed to Judge Philip M. Halpern from David H. Chen dated 3/31/2022. Application granted. SO ORDERED. (Signed by Judge Philip M. Halpern on 4/1/2022) (jca) (Entered: 04/01/2022) |
| 04/11/2022 | 56 | REPLY MEMORANDUM OF LAW in Support re: 14 MOTION for Order to Show Cause *for Preliminary Injunction and Temporary Restraining Order.* . Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Declaration of Steven Allison in Support of Plaintiffs' Reply in Support of Their Application for Temporary Restraining Order).(Allison, Steven) (Entered: 04/11/2022) |
| 05/23/2022 | 57 | MEMORANDUM OPINION AND ORDER: Based on the foregoing, Plaintiffs' motion for a preliminary injunction and Defendant's request to abstain in favor of the State Court Action are DENIED. Defendant shall file an answer to the Complaint within twenty days of the date of this Memorandum Opinion and Order pursuant to the Court's April 1, 2022 Order (Doc. 55). The Court will thereafter docket a Notice of Initial Conference. SO ORDERED. (Signed by Judge Philip M. Halpern on 5/23/2022) (jca) (Entered: 05/23/2022) |
| 06/08/2022 | 58 | PROPOSED STIPULATION AND ORDER. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Hutchinson, Jenna) (Entered: 06/08/2022) |
| 06/09/2022 | 59 | STIPULATION AND ORDER RE STATE COURT ACTION: In light of the foregoing, Plaintiffs and the County, by and through their counsel of record, hereby stipulate as follows: IT IS HEREBY STIPULATED AND AGREED, that the County will dismiss without prejudice the State Court Action; and IT IS FURTHER STIPULATED AND AGREED, that Plaintiffs will waive any right to attorneys' fees and costs in the State Court Action and that each party will bear its own fees and costs in the State Court Action; IT IS FURTHER STIPULATED AND AGREED, that Plaintiffs will dismiss without prejudice any right to attorneys' fees and costs in this action on their Third Cause of Action for Deprivation of Equal Protection − U.S. Const. Amend. XIV and 42 U.S.C. 1983; and IT IS FURTHER STIPULATED AND AGREED, that Defendants may have a one week extension of time to answer the Complaint in this Action, to June 20, 2022. SO ORDERED. County of Westchester, New York answer due 6/20/2022. (Signed by Judge Philip M. Halpern on 6/9/2022) |

A-13

| | | |
|---|---|---|
| | | (ate) (Entered: 06/09/2022) |
| 06/19/2022 | 60 | ANSWER to 1 Complaint with JURY DEMAND., COUNTERCLAIM against All Plaintiffs. Document filed by County of Westchester, New York..(Carey, Sean) (Entered: 06/19/2022) |
| 06/21/2022 | 61 | NOTICE OF INITIAL CONFERENCE: At the time of the scheduled conference, all parties shall call the following number: (888) 398−2342; access code 3456831. (And as further set forth herein.) Initial Conference set for 7/21/2022 at 10:00 AM before Judge Philip M. Halpern. (jca) (Entered: 06/21/2022) |
| 07/11/2022 | 62 | ANSWER to 60 Counterclaim. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Allison, Steven) (Entered: 07/11/2022) |
| 07/12/2022 | 63 | PROPOSED SCHEDULING ORDER. Document filed by Delux Public Charter, LLC..(Allison, Steven) (Entered: 07/12/2022) |
| 07/21/2022 | | Minute Entry for proceedings held before Judge Philip M. Halpern: Initial Pretrial Telephone Conference held on 07/21/2022. Counsel for all parties appeared. The Civil Case Discovery Plan and Scheduling Order discussed during the conference will be docketed separately. (fc) (Entered: 07/21/2022) |
| 07/21/2022 | 64 | CIVIL CASE DISCOVERY PLAN AND SCHEDULING ORDER: This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel and any unrepresented parties, pursuant to Fed. R. Civ. P. 16 and 26(f): All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). This case is to be tried to a jury. Amended pleadings may not be filed and additional parties may not be joined except with leave of the Court. Non−expert depositions shall be completed by January 13, 2023. The parties have conferred and their present best estimate of the length of the trial is ten (10) days. Motions due by 8/18/2022. Deposition due by 3/13/2023. Fact Discovery due by 1/27/2023. Expert Discovery due by 3/13/2023. Discovery due by 3/13/2023. Case Management Conference set for 3/27/2023 at 10:00 AM before Judge Philip M. Halpern. (And as further set forth herein.) SO ORDERED. (Signed by Judge Philip M. Halpern on 7/21/2022) (jca) (Entered: 07/21/2022) |
| 07/22/2022 | 65 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a Discovery teleconference proceeding held on 07/21/2022 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Ginsberg, Darby) (Entered: 07/22/2022) |
| 07/22/2022 | 66 | TRANSCRIPT of Proceedings re: Discovery teleconference held on 7/21/2022 before Judge Philip M. Halpern. Court Reporter/Transcriber: Darby Ginsberg, (914) 390−4102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/12/2022. Redacted Transcript Deadline set for 8/22/2022. Release of Transcript Restriction set for 10/20/2022..(Ginsberg, Darby) (Entered: 07/22/2022) |
| 10/13/2022 | 67 | NOTICE OF APPEARANCE by Jonathan Brett Nelson on behalf of Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Nelson, Jonathan) (Entered: 10/13/2022) |
| 11/07/2022 | 68 | LETTER MOTION for Discovery *request that the parties be permitted to deviate from the Court's Model Confidentiality Stipulation and Proposed Protective Order* addressed to Judge Philip M. Halpern from Samrah R. Mahmoud dated November 7, 2022. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Exhibit A − Judge Halpern's Proposed Protective Order (SDNY), # 2 Exhibit B − Judge Halpern_s Proposed Protective Order (SDNY)).(Mahmoud, Samrah) (Entered: 11/07/2022) |
| 11/08/2022 | 69 | ORDER granting 68 Letter Motion for Discovery. Application granted. The modified Stipulated Confidentiality Agreement and Protective Order will be docketed separately. SO ORDERED.. (Signed by Judge Philip M. Halpern on 11/8/2022) (kv) |

A-14

| | | (Entered: 11/09/2022) |
|---|---|---|
| 11/08/2022 | 70 | STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material... SO ORDERED. (Signed by Judge Philip M. Halpern on 11/8/2022) (kv) (Entered: 11/09/2022) |
| 11/17/2022 | 71 | LETTER MOTION for Extension of Time *of Deadline to Complete Non−Expert Depositions to February 17, 2023* addressed to Judge Philip M. Halpern from Steven D. Allison dated November 17, 2022. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC...(Allison, Steven) (Entered: 11/17/2022) |
| 11/18/2022 | 72 | ORDER granting 71 Letter Motion for Extension of Time. Application granted. The deadline to complete non−expert depositions is extended to 2/17/2023. All other deadlines set forth in the Civil Case Discovery Plan and Scheduling Order (Doc. 64) remain in effect. SO ORDERED. Non−Expert Deposition due by 2/17/2023. (Signed by Judge Philip M. Halpern on 11/18/2022) (mml) (Entered: 11/18/2022) |
| 11/23/2022 | 73 | LETTER MOTION for Discovery *Pre−Motion Conference* addressed to Judge Philip M. Halpern from Samrah R. Mahmoud and David H. Chen dated November 23, 2022. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC...(Mahmoud, Samrah) (Entered: 11/23/2022) |
| 11/28/2022 | 74 | ORDER granting 73 LETTER MOTION for Discovery Pre−Motion Conference. Application for a discovery conference granted. A telephone conference has been scheduled for 12/21/2022 at 2:30 p.m. At the time of the scheduled conference, all parties shall call the following number: (888) 398−2342; access code 3456831. SO ORDERED. (Signed by Judge Philip M. Halpern on 11/28/2022) (jca) (Entered: 11/28/2022) |
| 11/28/2022 | | Set/Reset Hearings: Telephone Conference set for 12/21/2022 at 02:30 PM before Judge Philip M. Halpern. (jca) (Entered: 11/28/2022) |
| 12/20/2022 | 75 | ORDER: Plaintiffs are directed to file, by 4:00 p.m. today, copies of Plaintiffs' document demands and Defendant's responses thereto for the Court's consideration in connection with tomorrow's discovery dispute conference. (HEREBY ORDERED by Judge Philip M. Halpern) (Text Only Order) (sbh) (Entered: 12/20/2022) |
| 12/20/2022 | 76 | LETTER addressed to Judge Philip M. Halpern from Steven D. Allison dated December 20, 2022 re: Response to Court's Order Dated 12/20/22 (ECF 75). Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC. (Attachments: # 1 Exhibit 1, First RFPs to the County of Westchester, 07−19−2022, # 2 Exhibit 2, County's Response to First RFPs, 09−01−2022).(Allison, Steven) (Entered: 12/20/2022) |
| 12/21/2022 | | Minute Entry for proceedings held before Judge Philip M. Halpern: Telephone Conference held on 12/21/2022. Counsel for all parties appeared by telephone. Order to follow. See Transcript. (AT&T Teleconference Recording) (sbh) (Entered: 12/21/2022) |
| 12/21/2022 | 77 | ORDER Counsel for all parties appeared by telephone today for a discovery dispute conference. After hearing from the parties, for the reasons stated and as discussed on the record, the Court ruled on the discovery disputes raised in the parties joint letter (Doc. 73) as follows: (1) The County shall include the 12 identified members of the committees as custodians, but their search shall be limited to the passage of Act No. 7 2022 and the identification/discussion of airlines other than Plaintiffs with respect to commencement of legal action; (2) The County shall include George Latimer as a custodian, but his search shall be limited to the passage of Section 712.462; (3) Plaintiffs application to compel responses to RFP 17 and RFP 28 is denied without prejudice to further narrowing the requests to more appropriately limited and tailored demands; (4) Plaintiffs application to take 12 depositions is granted and Plaintiffs shall endeavor to calendar and conduct the depositions of public officials in the least disruptive manner. The parties are directed to meet and confer on a regular basis to resolve any discovery issues. SO ORDERED. (Signed by Judge Philip M. Halpern on 12/21/2022) (jca) (Entered: 12/21/2022) |

| 12/22/2022 | 78 | NOTICE OF APPEARANCE by Phoenix Marino on behalf of County of Westchester, New York..(Marino, Phoenix) (Entered: 12/22/2022) |
|---|---|---|
| 01/09/2023 | 79 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a Teleconference proceeding held on 12/21/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Ginsberg, Darby) (Entered: 01/09/2023) |
| 01/09/2023 | 80 | TRANSCRIPT of Proceedings re: Teleconference held on 12/21/2022 before Judge Philip M. Halpern. Court Reporter/Transcriber: Darby Ginsberg, (914) 390–4102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/30/2023. Redacted Transcript Deadline set for 2/9/2023. Release of Transcript Restriction set for 4/10/2023..(Ginsberg, Darby) (Entered: 01/09/2023) |
| 01/17/2023 | 81 | CONSENT MOTION And *Stipulation And [Prcposea] Order Re Expert Witness Disclosure*. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC..(Allison, Steven) (Entered: 01/17/2023) |
| 01/18/2023 | 82 | STIPULATION AND ORDER RE EXPERT WITNESS DISCLOSURES In light of the foregoing, Plaintiffs and the County, by and through their counsel of record, hereby stipulate as follows: IT IS HEREBY STIPULATED AND AGREED, that Plaintiffs may offer the lay opinion testimony of the three above–named disclosed corporate representatives under Federal Rule of Evidence 701, without objection from the County based on the adequacy of their disclosure under Rule 26(a)(2) or that their testimony is improper expert testimony under Federal Rules of Evidence 702 and 703. IT IS FURTHER STIPULATED AND AGREED, that as a result of the above stipulation, neither party has disclosed or intends to call any expert witnesses or rebuttal expert witnesses. SO ORDERED. Motions terminated: 81 CONSENT MOTION for Discovery *Stipulation And [Prcposea] Order Re Expert Witness Disclosure*. filed by Delux Public Charter, LLC, Blade Urban Air Mobility, Inc.. (Signed by Judge Philip M. Halpern on 1/18/2023) (jca) (Entered: 01/18/2023) |
| 01/26/2023 | 83 | MOTION for Nicholas J. Schuchert to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–27257758. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Affidavit Declaration of Nicholas J. Schuchert, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order).(Schuchert, Nicholas) (Entered: 01/26/2023) |
| 01/27/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 83 MOTION for Nicholas J. Schuchert to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–27257758. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz)** (Entered: 01/27/2023) |
| 01/30/2023 | 84 | ORDER FOR ADMISSION PRO HAC VICE granting 83 MOTION for Nicholas J. Schuchert to Appear Pro Hac Vice. The motion of Nicholas J. Schuchert for admission to practice Pro Hac Vice in the above captioned action is granted. (Signed by Judge Philip M. Halpern on 1/30/2023) (jca) (Entered: 01/30/2023) |
| 02/10/2023 | 85 | JOINT LETTER addressed to Judge Philip M. Halpern from David H. Chen dated 2/10/2023 re: Status update. Document filed by County of Westchester, New York..(Chen, David) (Entered: 02/10/2023) |
| 03/06/2023 | 86 | LETTER MOTION for Discovery *Pre–Motion Conference* addressed to Judge Philip M. Halpern from Samrah R. Mahmoud and David H. Chen dated March 6, 2023. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Mahmoud, Samrah) (Entered: 03/06/2023) |
| 03/07/2023 | 87 | ORDER granting 86 Letter Motion for Discovery. Application for a discovery conference granted. The disputes referenced in the parties' joint letter will be addressed at the case management conference scheduled for 3/27/2023 at 10:00 a.m. in Courtroom 520. SO ORDERED. (Signed by Judge Philip M. Halpern on 3/7/2023) |

A-16

| | | |
|---|---|---|
| | | (jca) (Entered: 03/07/2023) |
| 03/07/2023 | | Set/Reset Hearings: Status Conference set for 3/27/2023 at 10:00 AM in Courtroom 520, 300 Quarropas Street, White Plains, NY 10601 before Judge Philip M. Halpern. (jca) (Entered: 03/07/2023) |
| 03/27/2023 | | Minute Entry for proceedings held before Judge Philip M. Halpern: Case Management Conference held on 03/27/2023. Counsel for all parties appeared in Courtroom 520. The Court heard argument concerning the discovery disputes raised in the parties' joint letter−motion. The Court reserved decision on the discovery disputes and directed Defendant to submit, in camera, the three subject documents for the Court's review. Defendant indicated that it intends to move for summary judgment and the parties are in the process of compliance with the Court's Individual Practices relative thereto. See transcript. (Court Reporter Darby Ginsberg) (fc) (Entered: 03/27/2023) |
| 03/27/2023 | 88 | ORDER: After reviewing the parties' joint letter, considering the arguments made by counsel at the conference, and having reviewed the documents produced in camera, the Court DENIES Plaintiffs' request to compel production. As an initial matter, these issues first arose in December 2022 when the County produced documents and its privilege log to Plaintiffs. The deadline to complete fact discovery expired on January 27, 2023. (Doc. 72). The discovery dispute was not raised with the Court until March 6, 2023. The untimeliness factor alone supports denial of the requested production. Delay notwithstanding, the Court nonetheless would not direct production of the February 28, 2019 e−mail summarizing the conclusions of a memorandum authored by the County's outside aviation counsel; the February 4, 2019 memorandum authored by the County's outside aviation counsel; and the March 15, 2019 memorandum from the County Attorney. Plaintiffs' rationale for production of these documents is that the County has taken a different position as regards applicability of the TUPs to Plaintiffs than was set forth in the 2019 memoranda and that the County's knowledge that Plaintiffs have been operating in their current manner since 2015 has been put at issue. Even if those grounds suffice as "relevant to any party's claim or defense and proportional to the needs of the case... " (Fed. R. Civ. P. 26(b))−and it is not clear to the Court they do−the documents are protected by attorney−client privilege. As discussed at the conference, the privilege applies to communications between the County Attorney and Mr. Schlactus in his capacity as chair of the Westchester County Airport Advisory Board, a statutory County body. WEST. CTY. CODE §§ 158.11(2), 277.221. "A party invoking the attorney−client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice... At issue here is the third consideration: whether the communications were made for the purpose of obtaining or providing legal advice, as opposed to advice on policy." In re Cnty. of Erie, 473 F.3d 413, 419 (2d Cir. 2007). The Court's in camera review of the subject documents reveals that the communications were "made for the purpose of obtaining or providing legal advice." Id. With respect to Plaintiffs' request for documents concerning the 2016 proposed privatization of the County Airport, in addition to the fact that the request is untimely, it is denied on the grounds the information sought is not relevant to the claims and defenses in this case and proportional to the needs of the case. The proposed privatization predated the instant litigation by six years and even if such documents generally reference "charter operations," there is no basis to conclude they concern Plaintiffs' operations or the applicability of the TUPs to those operations. In short, Plaintiffs have not overcome their burden to establish that this is anything more than an improper fishing expedition. SO ORDERED. (Signed by Judge Philip M. Halpern on 3/27/2023) (vfr) (Entered: 03/27/2023) |
| 04/10/2023 | 89 | LETTER MOTION for Conference *(pre−motion)* addressed to Judge Philip M. Halpern from David H. Chen dated 4/10/23. Document filed by County of Westchester, New York. (Attachments: # 1 Supplement Combined Local Rule 56.1 Statement).(Chen, David) (Entered: 04/10/2023) |
| 04/11/2023 | 90 | ORDER terminating 89 Letter Motion for Conference re: 89 LETTER MOTION for Conference *(pre−motion)* addressed to Judge Philip M. Halpern from David H. Chen dated 4/10/23. The Court will not accept the Rule 56.1 Statement annexed to Defendant's pre−motion letter (Doc. 89−1) for failure to comply with applicable rules. By 5/5/2023, the parties shall meet and confer and revise the Rule 56.1 Statement and responses so as to comply with the Court's rules, including limiting the Rule 56.1 |

| | | |
|---|---|---|
| | | Statement to 25 pages; setting forth any counterstatement of facts only to the extent required to address facts applicable to claims for relief or defenses, together with responses from the moving party; and to otherwise comply with the rules applicable to summary judgment motion practice. See, e.g., Emanuel v. Gap, Inc., et al., 2022 WL 3084317 (S.D.N.Y. Aug. 3, 2022). Plaintiffs' response to Defendant's pre−motion letter shall be filed with the revised Rule 56.1 Statement on 5/5/2023. SO ORDERED. (Signed by Judge Philip M. Halpern on 4/11/2023) (jca) (Entered: 04/11/2023) |
| 04/21/2023 | 91 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a Case management conference proceeding held on 03/27/2023 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Ginsberg, Darby) (Entered: 04/21/2023) |
| 04/21/2023 | 92 | TRANSCRIPT of Proceedings re: Case management conference held on 3/27/2023 before Judge Philip M. Halpern. Court Reporter/Transcriber: Darby Ginsberg, (914) 390−4102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2023. Redacted Transcript Deadline set for 5/22/2023. Release of Transcript Restriction set for 7/20/2023..(Ginsberg, Darby) (Entered: 04/21/2023) |
| 05/05/2023 | 93 | RULE 56.1 STATEMENT. Document filed by County of Westchester, New York..(Carey, Sean) (Entered: 05/05/2023) |
| 05/05/2023 | 94 | LETTER addressed to Judge Philip M. Halpern from Sean T. Carey, Sr. Assistant County Attorney dated May 5, 2023 re: Clarification Regarding the Recently Filed Joint 56.1 Statement. Document filed by County of Westchester, New York..(Carey, Sean) (Entered: 05/05/2023) |
| 05/05/2023 | 95 | LETTER addressed to Judge Philip M. Halpern from Steven D. Allison and Samrah R. Mahmoud dated May 5, 2023 re: Opposition to County's Request to File Motion for Summary Judgment. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Mahmoud, Samrah) (Entered: 05/05/2023) |
| 05/05/2023 | 96 | LETTER addressed to Judge Philip M. Halpern from Steven D. Allison and Samrah R. Mahmoud dated May 5, 2023 re: Application for Enlargement of Rule 56.1 Statement or, in the Alternative, an Order That Each Party Have Equal Space. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Mahmoud, Samrah) (Entered: 05/05/2023) |
| 05/08/2023 | 97 | MEMO ENDORSEMENT on re: 89 LETTER MOTION for Conference *(pre motion)* addressed to Judge Philip M. Halpern from David H. Chen dated 4/10/23. filed by County of Westchester, New York. ENDORSEMENT: Application for a pre−motion conference granted. A conference is scheduled for 6/29/2023 at 12:00 p.m. to be held in Courtroom 520 of the White Plains Courthouse. The Court grants an enlargement to 27 pages of the page limitations for the Rule 56.1 Statement. SO ORDERED. (Pre−Motion Conference set for 6/29/2023 at 12:00 PM in Courtroom 520, 300 Quarropas Street, White Plains, NY 10601 before Judge Philip M. Halpern.) (Signed by Judge Philip M. Halpern on 5/8/2023) (kv) (Entered: 05/08/2023) |
| 06/15/2023 | 98 | LETTER MOTION to Substitute Attorney. Old Attorney: David H. Chen & Phoenix Marino, New Attorney: Sean T. Carey addressed to Judge Philip M. Halpern from Sean T. Carey, Associate County Attorney dated June 15, 2023. Document filed by County of Westchester, New York..(Carey, Sean) (Entered: 06/15/2023) |
| 06/15/2023 | 99 | ORDER granting 98 Letter Motion to Substitute Attorney. Application granted. The Clerk of Court is respectfully directed to terminate David H. Chen and Phoenix Marino as attorneys in this action. SO ORDERED. Attorney David H Chen and Phoenix Marino terminated. (Signed by Judge Philip M. Halpern on 6/15/2023) (tg) (Entered: 06/15/2023) |
| 06/21/2023 | 100 | LETTER MOTION to Substitute Attorney. Old Attorney: Jenna C. Hutchinson, New Attorney: John Nelson Thomas , *Nicholas J. Schuchert, Samrah Mahmoud, Sheila Z.fu Chen and Stephen D. Allison* addressed to Judge Philip M. Halpern from Jenna C. |

A-18

| | | |
|---|---|---|
| | | Hutchinson dated June 21, 2023. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC..(Hutchinson, Jenna) (Entered: 06/21/2023) |
| 06/22/2023 | 101 | ORDER granting 100 LETTER MOTION to Substitute Attorney. Old Attorney: Jenna C. Hutchinson, New Attorney: John Nelson Thomas, Nicholas J. Schuchert, Samrah Mahmoud, Sheila Zifu Chen and Stephen D. Allison. Application granted. The Clerk of Court is respectfully directed to terminate Jenna C. Hutchinson as an attorney in this action. SO ORDERED. Attorney Jenna Christine Hutchinson terminated. (Signed by Judge Philip M. Halpern on 6/22/2023) (jca) (Entered: 06/22/2023) |
| 06/26/2023 | 102 | NOTICE OF APPEARANCE by Francesca L Mountain on behalf of County of Westchester, New York..(Mountain, Francesca) (Entered: 06/26/2023) |
| 06/28/2023 | 103 | LETTER MOTION for Conference *line for clients for pre–motion conference* addressed to Judge Philip M. Halpern from Jonathan B. Nelson, Esq. dated 06/28/2023. Document filed by Delux Public Charter, LLC. Return Date set for 6/29/2023 at 12:00 PM..(Nelson, Jonathan) (Entered: 06/28/2023) |
| 06/28/2023 | 104 | ORDER granting 103 Letter Motion for Conference re: 103 LETTER MOTION for Conference *line for clients for pre–motion conference* addressed to Judge Philip M. Halpern from Jonathan B. Nelson, Esq. dated 06/28/2023. Application granted. The public may dial in to the Court's AT&T conference line at the time of the scheduled conference using the following number: (888) 398–2342; access code 3456831. SO ORDERED.. (Signed by Judge Philip M. Halpern on 6/28/2023) (jca) (Entered: 06/28/2023) |
| 06/29/2023 | | Minute Entry for proceedings held before Judge Philip M. Halpern: Pre–Motion Conference held on 6/29/2023 in Courtroom 520. Counsel for all parties appeared. Court directed the parties to meet and confer concerning the elimination of Policy No. 1 from this case in light of the discussion on the record, and file an Order and Stipulation sufficient to all parties regarding same, on or before 7/6/2023. Court granted defendant leave to move for summary judgment and set the following briefing schedule: motion for summary judgment shall be served, not filed, on 8/31/2023; opposition shall be served, not filed, on 10/31/2023; reply shall be served on 11/30/2023; and all papers shall be filed on the reply date, 11/30/2023. See Transcript. (Court Reporter Angela O'Donnell) (sbh) (Entered: 06/29/2023) |
| 07/06/2023 | 105 | LETTER MOTION for Extension of Time *of the parties' deadline to file a stipulation eliminating Policy No. 1 from this case, filed by the County on behalf of all parties,* addressed to Judge Philip M. Halpern from Sean T. Carey, Associate County Attorney dated July 6, 2023. Document filed by County of Westchester, New York..(Carey, Sean) (Entered: 07/06/2023) |
| 07/07/2023 | 106 | ORDER granting 105 Letter Motion for Extension of Time. Application granted. The time to file the Order and Stipulation is extended to July 20, 2023. SO ORDERED. (Signed by Judge Philip M. Halpern on 7/7/2023) (jca) (Entered: 07/07/2023) |
| 07/19/2023 | 107 | PROPOSED STIPULATION AND ORDER. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Exhibit copy of Policy No. 1).(Nelson, Jonathan) (Entered: 07/19/2023) |
| 07/19/2023 | 108 | STIPULATION AND ORDER: It is therefore STIPULATED AND AGREED, that the County directly or indirectly, and/or through its agents including, but not limited to, Avports will not enforce Policy No. 1 without a further order from the Court; and it is further STIPULATED AND AGREED, that all sought relief concerning Policy No. 1 is hereby deemed withdrawn from this case and dismissed. SO ORDERED. (Signed by Judge Philip M. Halpern on 7/19/2023) (ks) (Entered: 07/19/2023) |
| 08/31/2023 | 109 | LETTER addressed to Judge Philip M. Halpern from Sean T. Carey, Associate County Attorney dated August 31, 2023 re: Letter Confirming Service of Motion Papers. Document filed by County of Westchester, New York..(Carey, Sean) (Entered: 08/31/2023) |
| 10/31/2023 | 110 | LETTER addressed to Judge Philip M. Halpern from Paul J. Noto dated 10/31/2023 re: Service of Plaintiffs' opposition to Defendants' Motion for Summary Judgment. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Nelson, Jonathan) (Entered: 10/31/2023) |

A-19

| 11/30/2023 | 111 | MOTION for Summary Judgment . Document filed by County of Westchester, New York..(Carey, Sean) (Entered: 11/30/2023) |
|---|---|---|
| 11/30/2023 | 112 | DECLARATION of Sean T. Carey, Associate County Attorney in Support re: 111 MOTION for Summary Judgment .. Document filed by County of Westchester, New York. (Attachments: # 1 Exhibit Ex. A − Briefing Materials, # 2 Exhibit Ex. B − Local Law No. 12−2004, # 3 Exhibit Ex. C − Local Law No. 17−2005, # 4 Exhibit Ex. D − Resolution No. 95−1984, # 5 Exhibit Ex. E − Resolution No. 58−1985, # 6 Exhibit Ex. F − Resolution No. 59−1985, # 7 Exhibit Ex. G − Resolution No. 266−1985, # 8 Exhibit Ex. H − Resolution No. 43−1989, # 9 Exhibit Ex. I − FAA Letter, # 10 Exhibit Ex. J − Policy No 1, # 11 Exhibit Ex. K − Email of Feb. 14, 2022, # 12 Exhibit Ex. L − JSX Letter of Nov. 15, 2021, # 13 Exhibit Ex. M − XO Letter of Oct. 7, 2022, # 14 Exhibit Ex. N − Email of Nov. 6, 2018, # 15 Exhibit Ex. O − Email of Jan. 23, 2019, # 16 Exhibit Ex. P − Email of Dec. 20, 2018, # 17 Exhibit Ex. Q − Email of Mar. 10, 2018, # 18 Exhibit Ex. R − Email of Mar. 25, 2021, # 19 Exhibit Ex. S − Email of Apr. 28, 2021, # 20 Exhibit Ex. T − Email of Sept. 24, 2021, # 21 Exhibit Ex. U − Email of Sept. 24, 2021, # 22 Exhibit Ex. V − Email of Jan. 21, 2022, # 23 Exhibit Ex. W − Email of Mar. 8, 2022, # 24 Exhibit Ex. X − Letter from FAA to John Wayne Airport, # 25 Exhibit Ex. Y − Transcript of Pre−Motion Conference, # 26 Exhibit Ex. Z − Kirsch Affidavit, # 27 Exhibit Ex. AA − Certification of FAA Letter, # 28 Exhibit Ex. AB − Zipkin Affidavit, # 29 Exhibit Ex. AC − Tokmiel Transcript, # 30 Exhibit Ex. AD − Scherrer Transcript, # 31 Exhibit Ex. AE − Rumbarger Transcript, # 32 Exhibit Ex. AF − Lozada Transcript, # 33 Exhibit Ex. AG − Gasparri Transcript, # 34 Exhibit Ex. AH − Drabinsky Transcript, # 35 Exhibit Ex. AI − McDonald Transcript, # 36 Exhibit Ex. AJ − 3 Fed. Reg. 2,515 (Oct. 20, 1938), # 37 Exhibit Ex. AK − In re Large Irregular Carriers, Exemptions (1950), # 38 Exhibit Ex. AL − 43 Fed. Reg. 46,742 (Oct. 10, 1978), # 39 Exhibit Ex. AM − 50 Fed. Reg. 23,944 (June 7, 1985), # 40 Exhibit Ex. AN − FAA Advisory Circular 120−12A (Apr. 24, 1986), # 41 Exhibit Ex. AO − 79 Fed. Reg. 18,755 (Apr. 3, 2014), # 42 Exhibit Ex. AP − FAA Airport Compliance Manual (Truncated)).(Carey, Sean) (Entered: 11/30/2023) |
| 11/30/2023 | 113 | MEMORANDUM OF LAW in Support re: 111 MOTION for Summary Judgment . . Document filed by County of Westchester, New York..(Carey, Sean) (Entered: 11/30/2023) |
| 11/30/2023 | 114 | DECLARATION of Sean T. Carey, Associate County Attorney in Support re: 111 MOTION for Summary Judgment .. Document filed by County of Westchester, New York. (Attachments: # 1 Exhibit AQ − 60 Fed. Reg. 65,832 (Dec. 20, 1995), # 2 Exhibit AR − 76 Fed. Reg. 7,482 (Feb. 10, 2011)).(Carey, Sean) (Entered: 11/30/2023) |
| 11/30/2023 | 115 | REPLY MEMORANDUM OF LAW in Support re: 111 MOTION for Summary Judgment . . Document filed by County of Westchester, New York..(Carey, Sean) (Entered: 11/30/2023) |
| 11/30/2023 | 116 | DECLARATION of Jonathan B. Nelson in Opposition re: 111 MOTION for Summary Judgment .. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Exhibit 1 − Joint 56.1 Statement, # 2 Exhibit 2 − Declaration of Mark Duebner, # 3 Exhibit 3 − November 2021 Correspondence, # 4 Exhibit 4 − Declaration of David Drabinsky, # 5 Exhibit 5 − Declaration of Rajat Khurana, # 6 Exhibit 6 − November 8, 2018 Email, # 7 Exhibit 7 − March 2019 Internal County Email re JetSmarter and Section 712.462, # 8 Exhibit 8 − Deposition Transcript of Nicholas Hartman, # 9 Exhibit 9 − Deposition Transcript of George Latimer).(Nelson, Jonathan) (Entered: 11/30/2023) |
| 11/30/2023 | 117 | MEMORANDUM OF LAW in Opposition re: 111 MOTION for Summary Judgment . . Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Nelson, Jonathan) (Entered: 11/30/2023) |
| 12/01/2023 | 118 | LETTER MOTION for Oral Argument *re Motion for Summary Judgment* addressed to Judge Philip M. Halpern from Jonathan B. Nelson, Esq. dated 12/01/2023. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Nelson, Jonathan) (Entered: 12/01/2023) |
| 01/23/2024 | 119 | NOTICE OF APPEARANCE by Robert P. Taglia on behalf of County of Westchester, New York..(Taglia, Robert) (Entered: 01/23/2024) |

A-20

| 07/01/2024 | 120 | OPINION AND ORDER re: 111 MOTION for Summary Judgment . filed by County of Westchester, New York, 118 LETTER MOTION for Oral Argument *re Motion for Summary Judgment* addressed to Judge Philip M. Halpern from Jonathan B. Nelson, Esq. dated 12/01/2023. filed by Delux Public Charter, LLC, Blade Urban Air Mobility, Inc., XO Global, LLC.Based on the foregoing, Defendant's motion for summary judgment is GRANTED IN PART (Doc. 111). The motion is granted to the extent that the claims for relief alleged in the Complaint and Plaintiffs' fourth affirmative defense alleged in the Answer to the Counterclaims are dismissed. Defendants motion is denied to the extent it sought summary judgment granting relief on its First Counterclaim. The Court grants summary judgment to Plaintiffs dismissing Defendant's First Counterclaim. The Court declines to exercise supplemental jurisdiction over Defendant's Second Counterclaim and dismisses it without prejudice. Plaintiffs' request for oral argument (Doc. 118) is denied as unnecessary. The Clerk of Court is respectfully requested to terminate the pending motions (Doc. 111 and Doc. 118) and close this case. (Signed by Judge Philip M. Halpern on 7/1/2024) (tro) Transmission to Orders and Judgments Clerk for processing. (Entered: 07/01/2024) |
| --- | --- | --- |
| 07/02/2024 | 121 | CLERK'S JUDGMENT re: 120 Memorandum & Opinion in favor of Blade Urban Air Mobility, Inc., County of Westchester, New York, Delux Public Charter, LLC, XO Global, LLC against Blade Urban Air Mobility, Inc., County of Westchester, New York, Delux Public Charter, LLC, XO Global, LLC. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated July 1, 2024, Defendant's motion for summary judgment is GRANTED IN PART (Doc. 111). The motion is granted to the extent that the claims for relief alleged in the Complaint and Plaintiffs' fourth affirmative defense alleged in the Answer to the Counterclaims are dismissed. Defendant's motion is denied to the extent it sought summary judgment granting relief on its First Counterclaim. The Court has granted summary judgment to Plaintiffs dismissing Defendant's First Counterclaim. The Court has declined to exercise supplemental jurisdiction over Defendant's Second Counterclaim and it is dismissed without prejudice. Plaintiffs' request for oral argument (Doc. 118) is denied as unnecessary; accordingly, the case is closed. (Signed by Clerk of Court − Acting Daniel Ortiz on 7/2/2024) (Attachments: # 1 Appeal Package) (km) (Entered: 07/02/2024) |
| 07/02/2024 | | Terminate Transcript Deadlines (km) (Entered: 07/02/2024) |
| 07/12/2024 | 122 | **FILING ERROR − WRONG EVENT TYPE SELECTED FROM MENU −** NOTICE OF APPEAL TO THE FEDERAL CIRCUIT from 120 Memorandum & Opinion,,,,, 121 Clerk's Judgment,,,,,, Form 7 and Form 22 are due within 14 days. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. Filing fee $ 605.00, receipt number ANYSDC−29595969..(Nelson, Jonathan) Modified on 7/12/2024 (nd). (Entered: 07/12/2024) |
| 07/12/2024 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Jonathan Nelson to RE−FILE Document No. 122 Notice of Appeal to the Federal Circuit,.. The filing is deficient for the following reason(s): the wrong event type was used to file the appeal;. Re−file the appeal using the event type Notice of Appeal found under the event list Appeal Documents − attach the correct signed PDF − select the correct named filer/filers − select the correct order/judgment being appealed. (nd) (Entered: 07/12/2024) |
| 07/12/2024 | 123 | NOTICE of APPEAL from 120 Memorandum & Opinion,,,,, 121 Clerk's Judgment,,,,,. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Nelson, Jonathan) Modified on 7/12/2024 (nd). (Entered: 07/12/2024) |
| 07/12/2024 | | Appeal Fee Paid electronically via Pay.gov for: 123 Notice of Appeal,. Filing fee $ 605. Pay.gov receipt number ANYSDC−29595969., paid on 7/12/2024..(nd) (Entered: 07/12/2024) |
| 07/12/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 123 Notice of Appeal,..(nd) (Entered: 07/12/2024) |
| 07/12/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 123 Notice of Appeal, filed by Delux Public Charter, LLC, Blade Urban Air Mobility, Inc., XO Global, LLC were transmitted to the U.S. Court of |

A-21

| | | |
|---|---|---|
| | | Appeals..(nd) (Entered: 07/12/2024) |
| 07/19/2024 | 124 | MOTION to Stay *or in the alternative, an injunction pending appeal*. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Nelson, Jonathan) (Entered: 07/19/2024) |
| 07/19/2024 | 125 | MEMORANDUM OF LAW in Support re: 124 MOTION to Stay *or in the alternative, an injunction pending appeal*. . Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Nelson, Jonathan) (Entered: 07/19/2024) |
| 07/19/2024 | 126 | DECLARATION of Ken Edmondson in Support re: 124 MOTION to Stay *or in the alternative, an injunction pending appeal*.. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J).(Nelson, Jonathan) (Entered: 07/19/2024) |
| 07/19/2024 | 127 | DECLARATION of Rajat Khurana in Support re: 124 MOTION to Stay *or in the alternative, an injunction pending appeal*.. Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC. (Attachments: # 1 Exhibit K, # 2 Exhibit L, # 3 Exhibit M).(Nelson, Jonathan) (Entered: 07/19/2024) |
| 07/22/2024 | 128 | ORDER: Defendant is directed to file a response setting forth its position with respect to plaintiff's motion to stay, or in the alternative, an injunction pending appeal (Doc. 124-Doc. 127) by noon tomorrow, July 23, 2024. (HEREBY ORDERED by Judge Philip M. Halpern) (Text Only Order) (sbh) (Entered: 07/22/2024) |
| 07/23/2024 | 129 | MEMORANDUM OF LAW in Opposition re: 124 MOTION to Stay *or in the alternative, an injunction pending appeal*. . Document filed by County of Westchester, New York..(Nonna, John) (Entered: 07/23/2024) |
| 07/23/2024 | 130 | DECLARATION of John Nonna in Opposition re: 124 MOTION to Stay *or in the alternative, an injunction pending appeal*.. Document filed by County of Westchester, New York. (Attachments: # 1 Exhibit e-mails re stipulation, # 2 Exhibit Blade letter).(Nonna, John) (Entered: 07/23/2024) |
| 07/23/2024 | 131 | NOTICE OF APPEARANCE by Jonathan F Cohn on behalf of Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Cohn, Jonathan) (Entered: 07/23/2024) |
| 07/23/2024 | 132 | REPLY MEMORANDUM OF LAW in Support re: 124 MOTION to Stay *or in the alternative, an injunction pending appeal*. . Document filed by Blade Urban Air Mobility, Inc., Delux Public Charter, LLC, XO Global, LLC..(Nelson, Jonathan) (Entered: 07/23/2024) |
| 07/25/2024 | 133 | ORDER denying 124 Letter Motion to Stay. Because at least the two most critical factors weigh against granting a stay, injunction, or administrative stay, the motion for a stay, injunction, and/or administrative stay pending appeal is DENIED. The Clerk of Court is respectfully requested to terminate the pending motion (Doc. 124). SO ORDERED. (Signed by Judge Philip M. Halpern on 7/25/2024) (jca) (Entered: 07/25/2024) |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR :
and JETSUITEX, INC.; XO GLOBAL, LLC; and :
BLADE URBAN AIR MOBILITY, INC.,          :       Civil Action No.:
                                         :
                Plaintiffs,              :
                                         :
        v.                               :       **COMPLAINT FOR DECLARATORY AND**
                                         :       **INJUNCTIVE RELIEF AND DEMAND**
COUNTY OF WESTCHESTER, NEW YORK, a       :       **FOR JURY TRIAL**
charter county; APRIL GASPARRI, in her official :
capacity as AIRPORT MANAGER; and         :
AVPORTS, LLC,                            :

                Defendants.

Plaintiffs Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc.; XO Global,

LLC; and, Blade Urban Air Mobility, Inc. (collectively, "Plaintiffs"), by and through their

undersigned attorneys, allege the following against Defendants County of Westchester, New

York ("County"); April Gasparri, in her official capacity as Airport Manager; and AvPorts, LLC

("AvPorts") (collectively, "Defendants"):

**PRELIMINARY STATEMENT**

1.      Plaintiffs have continuously provided safe, economical, and federally authorized

air transportation services to the public at Westchester County Airport ("HPN" or "Airport").

Plaintiffs are federally authorized direct and/or indirect air carriers that comply with all

applicable federal laws and regulations.  Plaintiffs offer a convenient alternative to the large,

well-funded air carriers (colloquially referred to as airlines) by (a) providing access to small

airports and underserved cities/markets not regularly serviced by the large airlines, and (b)

providing customers with convenient flying services the large airlines cannot offer customers,

including—a Transportation Security Administration ("TSA")-approved and compliant security

screening process that is faster and more convenient than the typical TSA process that is required

for the large airlines.

2.      Defendants, the County of Westchester and Airport Manager, April Gasparri, in her official capacity (collectively "County Defendants"), along with AvPorts, LLC ("AvPorts")—a private company that provides airport facilities management, operations, airline services, administration, accounting, and noise abatement on behalf of HPN—are unlawfully preventing Plaintiffs from operating at the Airport.

3.      Westchester County officials have publicly admitted and recognized that their local government power cannot simply regulate Plaintiffs' *flights* that depart and arrive at HPN. Notably, unlike the airlines operating out of the main passenger terminal ("Terminal") at HPN, as 14 C.F.R. Part 380 ("Part 380") operators authorized to sell tickets to the public by the U.S. Department of Transportation ("DOT"), partnering with 14 C.F.R. Part 135 ("Part 135") operators, direct air carriers certified by the Federal Aviation Administration ("FAA"), Plaintiffs' flights enplane and deplane at Fixed Base Operator spaces ("FBOs") at HPN.  This is a common form of federally licensed and approved operations and business model in the air transportation industry that has been in existence without controversy for decades.  Yet, Defendants attempt to accomplish their goal of regulating what they cannot regulate – for instance the number of Plaintiffs' flights departing from or arriving at HPN FBOs – by adopting and enforcing policies that require certain Part 380 operators (including Plaintiffs) to move their departing and arriving flights from an FBO to the Terminal.  Even if Plaintiffs could continue their operations in the Terminal, Plaintiffs would be subject to further regulations that would unlawfully restrict and eliminate Plaintiffs' flights at HPN.

4.      Specifically, Defendants' attempt to expand their local government control over federally regulated and preempted issues led to Defendants' recent adoption of the Westchester

County Airport Operational Policy No. 1 ("Policy No. 1"), which effectively prohibits Plaintiffs from operating at HPN compliant with their federally regulated and issued licenses and authorities. At the end of 2021, Defendants began enforcing the Westchester County Municipal Code § 712.462, a local ordinance codifying the County's Terminal Use Procedures ("TUP"), under a novel and erroneous interpretation to require Plaintiffs to operate out of the Terminal and enter into a Terminal Use Agreement ("TUA"). The TUA, in turn, imposed further restrictions, including subjecting users to a lottery system to determine allocation and flight capacity and requiring users to alter flight schedules to adhere to Terminal ramp allocations and passenger limitation restrictions. Although Part 380 operations at HPN have long occurred at FBOs, Defendants recently adopted Policy No. 1 in January 2022 to specifically require certain Part 380 operators to move their flights to the Terminal.

5.      But the TUP has historically and for good reason been applied only to large airlines, and not to the Plaintiffs which operate under Part 380. Plaintiffs, because of their federally regulated and authorized procedures, must operate from a non-Security Identification Display Area ("non-SIDA"). Unlike many other airports that are configured to segregate TSA-screened from non-screened passengers such that non-screened passengers can still access non-SIDA boarding, and arrival and baggage claim areas, HPN does not currently offer a non-SIDA area in the Terminal. Accordingly, Plaintiffs have each historically operated out of FBOs to enplane and deplane passengers outside of the Terminal.

6.      In fact, Plaintiffs' customers cannot, under federal regulations, enter the Terminal Boarding Area in its current configuration. This is because the Terminal is currently a SIDA-only space, and Plaintiffs' passengers who are screened through a different, but nonetheless TSA-approved screening process, cannot enter SIDA areas. Stated differently, Plaintiffs operate

a federally approved style of flying that does not require customers to pass through the standard TSA checkpoints found at most large airports. Indeed, at the core of Plaintiffs' business models is that customers can forego crowded terminals, long lines and TSA security checkpoints in favor of a non-SIDA TSA-approved security protocol. Entirely consistent with federal law, Plaintiffs' customers can arrive 20 minutes before a flight, pass through Plaintiffs' TSA-compliant and approved security procedures at the FBO, and avoid long lines and large crowds. Plaintiffs' TSA-approved security protocol also allows Plaintiffs to provide access to additional or smaller airports and underserved cities not regularly serviced by the large airlines, or in underserved airports that do not generate sufficient traffic to justify the resources required of establishing a SIDA TSA checkpoint. Plaintiffs are able to offer their federally approved services to such locations only through a non-SIDA location.

7.      Defendants know all of this. However, Defendants have issued various notices in recent months to Plaintiffs demanding that they utilize the Terminal for their operations and notifying them that they are not in compliance with Policy No. 1 if they continue to operate out of their respective FBOs. They have further refused to provide any reasonable accommodations to Plaintiffs, such as to establish a non-SIDA area in the Terminal, so that Plaintiffs can continue their operations.

8.      As a result, Defendants' Policy No. 1 effectively precludes Plaintiffs from operating at HPN and deprives Plaintiffs of reasonable and non-discriminatory access to the Airport in violation of federal law.

9.      Because of Defendants' conduct, Plaintiffs do not have a solution for reasonable access to HPN, a federally funded and regulated, public use Airport. Defendants' unlawful conduct prevents Plaintiffs from offering diverse and underserved routes and services that are

fully authorized by federal law.  Defendants' conduct was performed with the specific intent of discriminating against Plaintiffs.

10.     Defendants' conduct is unlawful for at least two reasons: (1) it is preempted by federal law; and (2) it violates Plaintiffs' right to equal protection under the law.  For both reasons, Plaintiffs seek declaratory and permanent injunctive relief to ensure that they will be able to provide air transportation services at the Airport.

## JURISDICTION

11.     This Court has original jurisdiction over the subject matter of this action pursuant to (1) 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States; (2) because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution; and (3) this Court's inherent jurisdiction to grant equitable relief for violations of the United States Constitution and the laws of the United States.

12.     This Court has personal jurisdiction over Defendants because they are domiciled in, reside in, or are a county located in New York and because their denial of Plaintiffs' rights under the United States Constitution and the laws of the United States occurred within New York.  The injuries caused by each Defendant thus occurred in New York.

13.     This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

14.     This Court also has authority to enter injunctive relief for Defendants' violation of federal law and the United States Constitution pursuant to 28 U.S.C. § 1331 under *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002), *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d.

Cir. 2016), *certiorari denied by* 137 S. Ct. 2295 (2017) and equity jurisdiction authorized by *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny.

<div align="center">**PARTIES**</div>

15.     Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("Delux") is a Delaware limited liability company with its administrative offices located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas.  Delux is a FAA-certificated, on-demand air carrier that operates commercial flights pursuant to Part 135 and holds a Commuter Air Carrier Authorization issued by the DOT.  Delux's operations are safe, legal, quieter than traditional airlines at HPN, and offer the traveling public a unique alternative to those traditional airlines.  Indeed, due to Delux's ability to facilitate a fast, terminal-free, and socially distanced boarding and travel experience, customers are able to travel with confidence even during the pandemic.  Delux has an impeccable safety record.  Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, Delux is fully compliant with all applicable federal, state, and local laws. Though Delux's operations are fully compliant with federal law, they are structured differently than the large scheduled airlines that operate out of HPN.  Delux's departure times, departure locations, and arrival locations are specifically negotiated with its sole customer, JetSuiteX, Inc.

16.     Plaintiff JetSuiteX, Inc. ("JetSuiteX") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas. JetSuiteX is the parent corporation of Delux.  JetSuiteX is an indirect air carrier that sells tickets for Delux flights pursuant to authority granted by DOT. Under this federally authorized arrangement, JetSuiteX sells tickets to the traveling public, JetSuiteX charters an entire Delux flight, and then Delux operates the flight using the time, location, and destination designated by JetSuiteX.  Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, JetSuiteX is fully compliant with all applicable

federal, state, and local legal obligations.  Collectively, JetSuiteX and Delux will be referred to as "JSX" unless otherwise noted.

17.     Plaintiff XO Global, LLC ("XO Global") is a limited liability company registered under the laws of Delaware with its principal place of business located at 1901 West Cypress Creek Road, Suite 6B in Fort Lauderdale, Florida.  XO Global's parent company is XO Holding Inc., whose parent company is Vista Global Holding Limited.  XO Global is an indirect air carrier that offers on-demand charter, priority access to a private jet fleet, and other programs to meet private aviation needs, as well as products for flyers who have demanding schedules and minimal flexibility around how and when they fly.  XO Global partners with various Part 135 Air Carriers, such as Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

18.     XO Global's flights have an impeccable safety record, as not a single operator XO Global has worked with has had any safety incidents at HPN.  Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, XO Global is also fully compliant with all applicable federal, state, and local laws.

19.     Plaintiff Blade Urban Air Mobility, Inc. ("Blade") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 499 East 34th Street, New York, New York.  Blade is a wholly-owned subsidiary of Blade Air Mobility, Inc., a publicly traded company.  Blade is a technology-powered, global air mobility platform committed to reducing travel friction by enabling cost-effective air transportation alternatives to some of the most congested ground routes in the U.S. and abroad.  Blade arranges on-demand charter and scheduled flights across a diverse accessible fleet of helicopters, jets, turboprops, and

seaplanes.  Blade is an indirect air carrier that furnishes air transportation pursuant to authority granted by DOT.  Blade's flights have an impeccable safety record, and Blade has not experienced any passenger or employee safety incidents at HPN.  Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, Blade is fully compliant with all applicable federal, state, and local legal obligations.  Blade partners with Part 135 operators, such as Contour, to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

20.     Consistent with HPN's badging process, Blade employees are also required to complete a security clearance and undergo a badging process conducted by HPN consistent with procedures in the Terminal.  Blade's employees at HPN are further required to complete a formal safety training with the FBO that it operates out of at HPN, White Plains Aviation Partners LLC d/b/a Million Air ("Million Air").

21.     Defendant County of Westchester, New York ("County"), is a municipal corporation located in the Southern District of New York, with capacity to sue and be sued.  The County is the owner of the Airport.  The Airport, a division of the County, is a commercial and general aviation airport located at 240 Airport Road, White Plains, New York, within the Southern District of New York.  The Airport is the only commercial service airport in the County and the primary provider of general aviation services and facilities in the County.  The acceptance and receipt of federal grant money obligates the airport sponsor, *i.e.*, the County, to comply with statutorily enumerated obligations, known as "Grant Assurances."  Here, the County receives federal grant money to operate and finance investment at the Airport and, as a result, is obligated by the Grant Assurances and federal statutes to operate in a reasonable, non-discriminatory, and financially self-sustaining manner.

22.     The County operates and maintains the Airport as a governmental function for the primary purpose of providing air transportation to the public.  The County's Airport operations are managed by nine current members and two ex-officio members who make up the Westchester County Airport Advisory Board ("Board").  The Board, and each of its individual members, are representatives, agents, and employees of the County and the scope of their duties includes, among other things, adopting Policy No. 1.  The County is a person within the meaning of 42 U.S.C. § 1983.

23.     Defendant April Gasparri ("Ms. Gasparri" or "Airport Manager"), is named in her official capacity as the Airport Manager of HPN.  At all times relevant to this complaint, Ms. Gasparri (or alternatively her predecessor(s)) was and is an agent and employee of the County, responsible for developing airport policies and administering all activities associated with the operation of a medium hub commercial airport.  Ms. Gasparri reports to the County and is responsible for carrying out policies, procedures, and duties regarding the Airport authorized by the Board.  Ms. Gasparri is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this Complaint.  Ms. Gasparri's official residence is at HPN, which is located in Westchester County, New York, within the Southern District of New York.

24.     Defendant AvPorts, LLC, on information and belief, is a Virginia limited liability company with its headquarters at 45025 Aviation Drive, Suite 100, Dulles, VA 20166.  AvPorts is a private company that provides airport facilities management, operations, airline services, administration, accounting, and noise abatement on behalf of the Airport.  On information and belief, AvPorts is responsible for the promulgation and enforcement of certain policies regarding the Airport, including the policies at issue here.  As an agent for the County, overseeing the management and operation of the Airport, AvPorts is engaged in state action and thus also liable

for the violations at issue.

## ALLEGATIONS

### Plaintiffs' Operations At HPN Are Federally Authorized, Safe, And Quiet

25.     Plaintiffs' operations are fully compliant with federal law, but they are structured differently than the large scheduled airlines that operate at HPN.  Plaintiffs offer a type of service that federal regulations classify as "on-demand" services.  *See* 14 C.F.R. Part 110.2 (defining "on demand" operations).  Under applicable regulations and their respective TSA-approved security plans, Plaintiffs' flights can operate from non-SIDA portions of HPN, such as an FBO (discussed *infra*) and have not experienced any passenger safety incidents since the beginning of their operations at HPN.  Consistent with federal regulations, Plaintiffs do not need to operate from an FBO, but their operations must take place from a non-SIDA portion of the Airport with access to the airfield.

26.     Blade's flights have been operating from FBOs at HPN since 2015, and Blade's flights are currently offered out of Million Air's FBO.  Blade is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

27.     Blade is a technology-powered, global air mobility platform committed to reducing travel friction by enabling cost-effective air transportation alternatives to some of the most congested ground routes in the U.S. and abroad.  Since 2015, Blade has offered service between HPN and Miami-Opa Locka Executive Airport ("OPF"), and due to increasing popularity, Blade introduced service between HPN and Palm Beach International Airport ("PBI") in 2021.  Blade has never had any passenger or employee safety incidents or accidents at HPN.

28.     Blade's operations at HPN directly employ more than 11 individuals who live in or near the County.  Blade's operations at HPN also indirectly support numerous other local jobs,

including its Part 135 operating partners and local catering, shuttle, and car service businesses. In addition to significant marketing investments regarding its services at HPN, Blade has invested over $200,000 in improvements at Million Air and pays approximately $60,000 per year to rent a dedicated lounge at Million Air to service its passengers.  Blade and/or its Part 135 operating partners also pay the Airport various fees associated with the operation of Blade flights, including landing, facility, parking, RON, shuttle, charter, hanger, after hours and valet parking fees.  Blade expects to fly approximately 165 Part 380 flights between HPN and OPF or PBI during the November 2021 through April 2022 season.

29.     XO Global, and its related company, JetSmarter, Inc., has been offering flights out of various FBOs at HPN since 2015.  In the last twelve months, XO Global organized more than one thousand flights and transported more than 12,000 passengers to and from HPN.  XO Global is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.  Since it began operations at HPN, XO Global has been partnering with various Part 135 operators and operating from various FBOs.

30.     XO Global has offered flights from HPN to Van Nuys, Oakland, and various locations in South Florida.  XO Global's flights have an impeccable safety record as not a single operator XO Global worked with had any safety incidents at HPN.

31.      XO has likewise spent time and money in building its operations at HPN and contributing to the local economy.

32.     JSX began operating 30-seat aircraft from an FBO at HPN in June of 2020 with flights to Pinehurst, NC.  In November 2021, it began HPN's only service to Miami International

Airport (MIA) with 5 flights a week, from an FBO.[1]  Delux is an FAA-certificated air carrier that is authorized by federal law to fly customers for compensation or hire under the FAA's operating rules contained in Part 135.  Delux holds a commuter air carrier authorization issued by the DOT, and JetSuiteX is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.  Since it began operations at HPN, JSX has been operating from an FBO.

33.    JSX currently offers flights from HPN to Miami.  In addition to the route currently offered, JSX also intended to offer many more routes in 2022.  JSX has never had a safety incident or accident at HPN or elsewhere in its over five-year operating history.  JSX enjoys a perfect safety record, the highest customer satisfaction of any air carrier in the United States, was named #1 air carrier in North America by APEX (the Airline Passenger Experience Association), and it is the only Five-Star Rated Regional Air Carrier in the World named by APEX for the last four consecutive years.

34.    Additionally, JSX's operations at HPN directly employ 5 individuals who live in or near the County.  Numerous additional jobs are supported indirectly.  JSX spent significant resources investing in the HPN market, estimating at least $2 million, and JSX has paid significant amounts in fees.

35.    Unlike traditional airlines, Plaintiffs' flights follow a TSA-approved "Twelve-Five" Security Plan,[2] which is a regulatory protocol that permits its passengers to bypass TSA

---

[1] From November 15 to December 31, 2021, JSX reduced its operations from 30 passengers to 9 passengers per flight under a reservation of rights in response to demands from HPN until a more permanent solution could be reached.

[2] The "Twelve-Five" Security Plan refers to a category of TSA-approved security plan applicable to the operation of certain aircraft with a maximum certificated takeoff weight of 12,500 pounds or more.  *See* 49 C.F.R. § 1550.7.

security checkpoints in the Terminal. Plaintiffs maintain a rigorous TSA-approved and monitored security plan, but passengers flying with Plaintiffs are not processed through the main terminal's TSA checkpoints. Instead, the "Twelve-Five" Security Plan is uniquely available for Part 135 operators and allows Plaintiffs' flights to enplane and deplane passengers at non-SIDA locations, and as a result, Plaintiffs' customers do not have to enter the terminal of an airport to do so. Under the "Twelve-Five" federally authorized regulatory protocol, Plaintiffs' passengers are able to bypass large crowds, long lines, typical time spent waiting for an airplane to board and depart. The result is a faster, safer, and crowd-free airport experience that is fully compliant with federal safety regulations.

36.    By contrast, customers of large airlines who board from terminal buildings are required to pass through a TSA security checkpoint in order to enter the Terminal (which is exclusively a SIDA location) at HPN. The TSA security checkpoints—and the crowds, frustration, and delays associated with them—are ubiquitous for the average airport user, and in HPN they are particularly crowded and congested and provide no opportunity for social distancing protocols or a quick experience from car to airplane.

37.    Plaintiffs provide a level of safety, convenience, and a socially distanced flying experience that is not otherwise available to customers of large traditional airline customers in any class of service. Plaintiffs' services are safe, federally authorized, and especially well-suited for individuals who want to maintain social distancing and avoid large crowds while traveling during the COVID-19 pandemic. Plaintiffs' aircraft operations are also quieter than large airlines.

38.    Plaintiffs are, however, prohibited from allowing their customers to enter SIDA areas of HPN because non-SIDA and SIDA customers cannot commingle under federal

regulations. A SIDA location is differentiated and cordoned off from non-SIDA locations at HPN—but both types of security procedures are TSA-approved and meet federal regulations. As a result, Plaintiffs' customers are federally prohibited from entering the Terminal at HPN because HPN does not have a non-SIDA area in the Terminal. The only option for Plaintiffs is therefore to maintain their operations at an FBO.

39.     Until recently, Plaintiffs have been permitted to operate at an FBO at HPN. An FBO is an aeronautical service provider located at an airport that, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators. Use of FBOs' non-Terminal facilities is currently the only way Plaintiffs' flights are able to enplane and deplane customers at HPN at a non-SIDA location.

40.     Moreover, even if Plaintiffs could require their customers to pass through a SIDA-compliant security checkpoint at HPN in the main terminal, they would be unable to do so under federal law because several of the airports that Plaintiffs serve with routes that link to HPN either do not have a TSA-checkpoint or Plaintiffs operate from those airports at non-SIDA locations that lack TSA facilities. If Plaintiffs were forced to conduct all flight operations from a sterile area of the Terminal, passengers who did not undergo TSA screening at their departure airport would not be able to deplane into the Terminal at HPN. This, in turn, would effectively evict Plaintiffs from HPN because Plaintiffs, consistent with federal regulations, do not have passengers undergo such screening at any of the many other airports that Plaintiffs serve. Even if only departing flights were required to be conducted from a sterile area, such a requirement would fundamentally alter and interfere with Plaintiffs' federally authorized procedures.

41.     Plaintiffs currently offer routes between HPN and FBOs in Van Nuys, Oakland, Fort Lauderdale, Palm Beach, and Miami, and do not utilize TSA-checkpoints at these airports.

While Plaintiffs' customers would not be subject to clear through TSA SIDA checkpoints at these airports (and in some cases such SIDA checkpoints may not even exist), if they were forced to undergo TSA screening at HPN, they would not be able to fly between HPN and any of those airports. This is because TSA requires passengers who clear through SIDA checkpoints to do so at both their origin and destination airport. If customers cannot avoid traditional TSA SIDA checkpoints when flying with Plaintiffs, then they will no longer choose to fly with Plaintiffs and Plaintiffs are thus unable to continue existing services.

42.     Plaintiffs' flight offerings have the added benefit of minimizing airport impact by aggregating passengers into smaller and/or quieter aircraft as an alternative to passengers each chartering their own aircraft, which would create further noise and environmental impact and/or airport congestion. For example, instead of ten passengers each chartering their own aircraft individually to the same destination, Plaintiffs' flight offerings aggregate those ten passengers in one aircraft, thus minimizing the impact by comparison. Further, Defendants have maintained that the TUP and Policy No. 1 would not apply to certain other operators operating out of FBOs, including a Part 91 operator, and thus they would not be subjected to the TUA's restrictions.

43.     Moreover, Plaintiffs offer other valuable services to their customers when they operate from an FBO that cannot be offered at the Terminal. These services include valet parking and shuttle services, concierge services, specialized health and safety protocols, private lounge access, and speedier check-in, boarding and baggage handling processes. As a further example, Blade also administers its industry-leading COVID-19 health and safety protocol, including on-site COVID-19 testing by registered nurses, temperature and blood oxygen level testing and proof of vaccination enforcement, from Million Air's FBO. Blade would not be able to offer these services or enforce these protocols at the Terminal, and many of Blade's customers

and the increasing popularity of Blade's services out of HPN are attributable to these services and protocols.

44.     Hence, any effort by the County to eliminate Plaintiffs from operating from the FBOs at HPN, without authorizing a non-SIDA area, effectively eliminates those routes and services.

45.     In fact, until recently, Defendants have not enforced the TUP against any of the Part 135 operators Blade and XO Global have worked with since 2015, nor have Defendants required Blade or XO Global to move their flights from their respective FBOs to the Terminal. Moreover, Defendants never required Blade or XO Global to sign the TUA, nor are Plaintiffs aware of any instances where HPN applied the TUP to Part 380 operators selling more than 9 seats until recently.

**HPN Is A Not A Private Commercial Space, But A Federally Funded Public Use Airport Subject To Federal Law And Regulations**

46.     HPN is a "public use" airport that is funded, in part, by grants obtained under one or more federal programs, including the Airport Improvement Program.  The receipt of federal grant money obligates the airport sponsor, i.e., the County, to comply with Grant Assurances.

47.     The FAA has made clear that these Grant Assurances require "Federally obligated airport sponsors . . . to operate airports for the use and benefit of aeronautical users and to make those airports available to all types, kinds, and classes of aeronautical activities on fair and reasonable terms, and without unjust discrimination."[3]  In other words, Defendants have a duty to provide Plaintiffs with reasonable access at HPN.

48.     In order to comply with their obligation to provide Plaintiffs with "reasonable

---

[3] https://www.faa.gov/airports/airport_compliance/media/airportSponsor
AndUserRightsBrochure.pdf

access," Defendants must provide Plaintiffs access to the Airport on reasonable and non-discriminatory terms.  At bottom, Defendants must ensure that Plaintiffs have reasonable and non-discriminatory access to the public use Airport in a way that is consistent with Plaintiffs' federally authorized business plan.

49.     Pertinent here, the Grant Assurances, as set forth in a federal statute (49 U.S.C. § 47107), require the County to provide access to all aviation users in a reasonable and non-discriminatory manner.  At a minimum, this means that the County cannot arbitrarily seek to exclude an airport user (e.g., an air carrier) from accessing the Airport.

**The County Is Improperly Enforcing Policy No. 1 And The TUP Against Plaintiffs**

50.     County officials have publicly recognized during public hearings, including in November 2021, that their local government power cannot simply regulate Plaintiffs' flights that depart from and arrive at HPN.  Yet, Defendants' adoption of Policy No. 1 and enforcement of the TUP require certain Part 135 and 380 operators (such as Plaintiffs) to move their departing and arriving flights from an FBO to the Terminal.  Defendants' attempt to expand their local government control to regulate Plaintiffs' flights encroaches upon federally preempted issues and violates federal law.

51.     In 2004, the County passed Westchester County Municipal Code § 712.462, which codified the TUP.  The TUP sets forth the County's policy concerning access to the Airport by airlines, establishes the Airport's terminal capacity to accommodate airlines, and adopts a mechanism for allocating capacity among airlines seeking access.  The TUP requires airlines seeking to conduct passenger services from the Terminal to enter into a TUA with the County.  The TUP governs air carriers' operations out of HPN's Terminal but does not apply to air carriers operating from FBOs.

52.     The TUP governs the use of the Terminal and the Terminal Ramp at the Airport, which is for the "exclusive use of Airlines providing Passenger Service."  Westchester Cty. Municipal Code § 712.462(1).  Specifically, the TUP applies only to Airlines offering Passenger Service under 14 C.F.R. Parts 119, 121, or 135.  The TUP defines "Passenger Service" as "any air service to or from the Airport for which seat are individually offered or sold to the public or a segment of the public."  Defendants maintain that any service that involves aircraft of more than nine seats and individual seat sales to any segment of the public must operate from the Terminal pursuant to the TUP.

53.     The TUP forces operators under Parts 119, 121, and 135 offering Passenger Services in an aircraft with more than nine seats to enter into the TUA, under which operators are to agree to abide by additional "Technical Specifications and Procedural Requirements" and prohibits operators from challenging the Technical Specifications and Procedural Requirements, or the TUP, in a court of law or administrative proceeding.  The TUP and TUA have the further effect of limiting Plaintiffs' services by causing Plaintiffs to alter flight schedules based on their allocation to the Terminal Ramp through the lottery system and the overall Terminal Capacity passenger limitation for all airlines operating at the Terminal.

54.     But as explained above, JSX, Blade, and XO Global are engaged in public charter operations under Part 380 with federal approval from the DOT.  Indeed, the County itself has repeatedly acknowledged that Plaintiffs are among a group of operators offering single-seat sales under DOT Part 380 "public charter" rules.  Notably, the County had never before applied the TUP to Part 380 operations, and indeed, the TUP itself does not reference Part 380 operators at all.  In fact, Part 380 operations at HPN have long occurred at FBOs, and public charter operations under Part 380 have existed without controversy for many decades.  Similarly, Part

380 operators have never been required to enter into a TUA or any similar agreement when operating from an FBO.  Numerous operators have operated, and continue to operate, flights at HPN with more than nine aircraft seats from FBOs, including under Part 380.  These operations have accounted for thousands of flights.

55.     Beginning in October and November 2021, the County, through AvPorts, began demanding that Plaintiffs utilize the Terminal for their Part 380 operations and enter into a TUA in order to continue operating at HPN.  The County claimed that Plaintiffs' operations violated Westchester County Municipal Code § 712.462.

56.     On November 5, 2021 and November 9, 2021, AvPorts, acting on behalf of the County, sent a letter to each Plaintiff demanding that they conduct their services out of the Terminal pursuant to a Terminal Use Agreement.  The County asserted that Plaintiffs were engaged in "Passenger Service" and were not permitted to operate from an FBO.

57.     In a December 2, 2021 letter to JSX, the County asserted that Plaintiffs' operations fell within the definition of "Passenger Service" that is otherwise regulated by the TUP because their aircraft have more than nine seats and involve sales of single seats to the public.  This is the same category that applies to the large, regularly scheduled airlines.  However, those large airlines are federally required to be subjected to full TSA security and accordingly operate from the SIDA portions of the Terminal, while Plaintiffs are not.  Thus, the County's interpretation impermissibly extends the definition of Passenger Services to Plaintiffs in a manner that destroys Plaintiffs' federally approved procedures and business models.

58.     In the same letter, Defendants further noted that the nine-seat limitation does not apply to other Part 135 air charter operations at the FBOs where a single-entity or individual charters the entire aircraft, and individual seats are not made available to the public.  Defendants

also noted that the same limitation did not apply to other operations at FBOs, including Part 91

corporate aircraft operations at FBOs, which have also been conducted for decades.

59.     Despite contending that it was not making a change to its laws, Defendants

nonetheless adopted Policy No. 1 on January 21, 2022, which directly targeted Plaintiffs'

operations and mandated that they utilize the Terminal.  As the name suggests, the policy was the

first of its kind for HPN and constitutes a new interpretation of the TUP.  The Airport Noise and

Capacity Act ("ANCA") bars local noise and access restrictions that are enacted after 1990

unless they comply with the statute's mandatory procedural requirements.  49 U.S.C. 47524(d);

*see also Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 ( 2d.

Cir. 2016).  On information and belief, Defendants have not complied with ANCA's strict

procedural requirements, and thus, the recent enactment of Policy No. 1 is unlawful.

60.     In fact, within Policy No. 1, Defendants reclassified Plaintiffs' Part 380

operations as "Single-Seat-Charter-Operations" or "SSCOs," a novel term for a decades-old

business model, implicitly acknowledging that such operations were not previously addressed by

the TUP.  Policy No. 1 credited Plaintiffs' business as innovative, while simultaneously

destroying their businesses by requiring Plaintiffs to utilize the Airport's TSA checkpoints, in

violation of federal regulations that require Plaintiffs to operate from non-SIDA areas.  Notably,

none of the FAA, DOT, TSA, TUP nor the TUA mandate use of the Airport's TSA checkpoints,

or otherwise prevent operators from utilizing separate TSA-approved screening.

61.     During this time, Plaintiffs actively sought to reach a good-faith resolution that

would address Defendants' concerns; however, Defendants summarily rejected any proposed

alternatives without any meaningful consideration or analysis.

62.     For example, in response to AvPorts' initial letter, JSX attended a meeting with

former Airport Manager, Peter Scherrer, on November 10, 2021, and spoke with him again on November 12, 2021.  In its November 15, 2021 letter, JSX stated that as a sign of goodwill, it would begin limiting all HPN flights to a maximum of nine seats for sale until the end of the year and block passenger seats from service to limit the aircraft to nine passenger seats, which in and of itself caused a significant adverse impact on JSX's revenue.  JSX agreed to maintain these restrictions for the rest of the year in order to afford time to reach a mutually acceptable resolution.  Although Defendants had many weeks to work with JSX on a potential resolution, Defendants only ignored or rejected JSX's proposals.

63.     JSX in fact proposed multiple TSA-compliant alternatives for the Airport's consideration.  These included proposals whereby passengers would check in at the Terminal, and JSX would use vacant office space on the first floor of the Terminal to hold passengers prior to boarding.  Under the first proposal, when boarding commences, passengers would be escorted through the Ross Aviation East FBO and down a non-SIDA ramp.  Under the second proposal, passengers would be escorted through an access gate just north of the Terminal and then down an Airport terminal ramp.  Unfortunately, and inexplicably, these proposals were summarily rejected by the Airport, without any meaningful consideration or analysis, even though these proposals represented common-sense solutions that would have enabled compliance with TSA security requirements.  These proposals also would have enabled the Airport to comply with its obligations under federal law.

64.     XO Global similarly objected and proposed alternatives such as completing passenger check in at the Ross Aviation East FBO and transporting the passengers to the aircraft that parked at the Terminal to be boarded planeside.

65.     Blade likewise objected to the County's position with respect to its services at an

FBO.  In a November 29, 2021 letter, Blade reminded the County that Blade's existing Part 380 service had been operating at the FBO for the last five years, that the County had approved its leasehold with Million Air, and that the County was involved in the planning, construction and leasehold improvement activities related to Blade's facilities at Million Air.

66.     However, the County refused to entertain any proposed accommodations for Plaintiffs and is accordingly denying Plaintiffs reasonable access to the Airport, a federally regulated and public space.

67.     The County's policy targets only Plaintiffs by defining them as SSCOs, and not similarly situated on-demand carriers who operate at FBOs.  Moreover, the County declined to offer any non-SIDA access to the Terminal so that Plaintiffs could reasonably access the Terminal in accordance with the TUP that the County wishes to enforce.

**The County Is Prohibited From Imposing Barriers To Access Under Federal Aviation Law**

68.     Federal law also prohibits the Airport from creating rules or policies that have the effect of unjust discrimination against a type, kind or class of aviation service and unreasonably restricting an airport user's access to the Airport.  Defendants' refusal to make any reasonable accommodation for Plaintiffs' operations restricts Plaintiffs' access to HPN in violation of federal law.

69.     Congress has preempted the field of aviation and air carrier regulation.  This means that, *inter alia*, counties and cities are not permitted to self-regulate the air transportation industry.  Any effort to do so is invalid under the Supremacy Clause of the United States Constitution and the preemption provisions of the various federal aviation statutes.

70.     Congress determined that preemption was necessary to achieve the objectives of the Airline Deregulation Act ("ADA"), which include, among other things: encouraging entry

into the air transportation market by new carriers; strengthening small air carriers to ensure a more effective and competitive airline industry; ensuring the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination; and preventing unfair, deceptive, predatory, or anticompetitive practices in air transportation. *See* 49 U.S.C. § 40101.

71.     The FAA regulates aviation safety and has done so by implementing federal regulations pertaining to every aspect of airport and aircraft operations. The DOT regulates the economic aspects of the air carrier industry. Together, the DOT and FAA have full authority to regulate air carriers.

**Preemption Under the Airline Deregulation Act ("ADA")**

72.     Congress has expressly preempted state and local governments from enacting or enforcing "a law, regulation, or other provision having the force and effect of law *related to* a price, route, or service of an air carrier . . ." 49 U.S.C. § 41713(b)(1) (emphasis added).

73.     In so doing, Congress expressly wanted to avoid a patchwork of state and local regulations from unduly burdening interstate air transportation and undermining the objectives of the ADA. As a result, all state and local laws, regulations, and other provisions having the force and effect of law that relate to carriers' prices, routes and services are preempted and invalid.

74.     Local governments are expressly prohibited from unilaterally imposing regulations in this area absent FAA approval. Local restrictions or access plans that violate federal law or federal policy are *per se* unreasonable and thus do not fit within the narrow "proprietary right" exception (discussed below).

75.     Under the ADA, 49 U.S.C. § 41713(b)(1), "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or

other provision having the force and effect of law related to a price, route, or service of an air carrier."

76.     A state or local law is "related to" a price, route or service if it has "[1] a connection with, or [2] reference to" a price, route, or service. *American Airlines v. Wolen*, 513 U.S. 219, 223 (1995); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008).  The "relating to" phrase in § 41713(b)(1) "express[es] a broad pre-emptive purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).

77.     Congress allowed for an extremely narrow exception to the otherwise wholesale preemption for local governments "carrying out [their] proprietary powers and rights" as airport sponsors.  49 U.S.C. § 41713(b)(3).  This is known as the "proprietary right exception," and it is very narrowly interpreted.

78.     Under this narrow exception, a local government's exercise of its proprietary powers must be reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed not to conflict with the ADA and its policies.

79.     The validity of any local regulation therefore depends on (1) whether the regulation "is related to a price, route, or service of an air carrier"; (2) if so, whether regulation amounts to an exercise of a State or local government's propriety powers; and (3) if it is an exercise of proprietary powers, whether such exercise is reasonable, non-arbitrary and non-discriminatory and not in conflict with the ADA, ANCA, or other federal law.  Only if all these showings are met is a local regulation exempted from preemption by 49 U.S.C. § 41713(b)(3).  In determining whether a local regulation restricting access to a public airport meets the narrow exception, the FAA has stated that such regulations must balance both local and federal interests.

80.     Here, Defendants' conduct: (1) effectively prohibits Plaintiffs from providing

certain routes (*e.g.*, routes that originate at an airport where customers enplane from a non-SIDA location, despite them being permissible under federal law) and certain services (e.g., Plaintiffs' convenient options offered to HPN travelers); (2) is a flawed attempt to exercise proprietary powers (as any other explanation would not even arguably justify them); and (3) is unreasonable, arbitrary and discriminatory (they target and single out certain safe operators, Plaintiffs, for no legitimate reason), irreparably harming Plaintiffs, Plaintiffs' employees based at HPN, *and* the traveling public who prefer Plaintiffs' services and businesses and socially distanced travel experiences.

**Preemption Under the Airport Noise and Capacity Act ("ANCA")**

81.     Congress's most authoritative expression of specific intent regarding the extent of federal preemption in the area of access at public airports is the Airport Noise and Capacity Act ("ANCA"), 49 U.S.C. § 47521, *et seq.*  ANCA was enacted after Congress determined that previous federal statutes and regulations were insufficient to ensure a uniform federal aviation policy regarding noise and airport access restrictions.  Through ANCA, Congress explicitly sought to address the "uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system[.]"  49 U.S.C. § 47521(2).  Because Congress recognized that local airport sponsors may seek to impermissibly control or regulate access to airports within their jurisdictions, Congress expressly found that access restrictions to public airports "must be carried out at the national level."  *Id.* § 47521(3)-(4).  This is express preemption in the field of access to public airports and aircraft noise.

82.     ANCA, and FAA's regulatory scheme generally, classify aircraft into four "Stages" based on noise emission levels.  Stage 1 aircraft emit the most noise, and Stage 4 aircraft emit the least, with Stage 2 and Stage 3 aircraft in between.  Plaintiffs' services utilize

Stage 3 aircraft.

83.     ANCA prohibits airport sponsors from imposing regulations that restrict a Stage 3 aircraft's ability to access a public airport unless the sponsor complies with 14 C.F.R. Part 161 ("Part 161") and the FAA grants permission.

84.     The FAA has promulgated extensive regulations, published at Part 161, which create a uniform process for airport sponsors to seek permission to introduce access restrictions at airports.  To date (more than 30 years after ANCA became federal law), no airport has successfully obtained permission from the FAA to impose an access restriction on Stage 3 aircraft via the Part 161 process or otherwise.

85.     Indeed, ANCA's requirements for enacting access restrictions for Stage 3 aircraft are remarkably stringent.  Federal courts and the FAA have both interpreted 49 U.S.C. § 47524 as a requirement that all public airports comply with Part 161 before any access restriction affecting a Stage 3 aircraft can be enforced.  *See* 14 C.F.R. §§ 161.101, 161.301(c).  Under Part 161, proprietors must obtain, *inter alia*, (i) FAA approval for the restriction or (ii) the unanimous consent of *all* aircraft operators affected by the restriction.  49 U.S.C. § 47524(c)(1).

86.     On information and belief, Defendants have neither sought nor obtained FAA approval for the access restriction imposed on Plaintiffs (whether based on the illegal Policy No. 1, the TUP, or otherwise).

87.     Alternatively, Defendants have also failed to obtain unanimous consent of all operators (as evidenced by this lawsuit).

88.     Moreover, even assuming that Defendants attempted to meet Part 161's strictures, they would have had to demonstrate to the FAA, among other things, that the access restriction imposed on Plaintiffs: (i) is reasonable, non-arbitrary and non-discriminatory; (ii) does not create

an unreasonable burden on interstate or foreign commerce; (iii) is consistent with maintaining the safe and efficient use of navigable airspace; (iv) does not conflict with a law or regulation of the United States; (v) has received adequate opportunity for public comment; and (vi) does not create an unreasonable burden on the national aviation system.  49 U.S.C. § 47524(c)(2).

89.     Each of the showings required to gain FAA approval are absent from the Defendants' decision to unilaterally impose an access restriction and to otherwise act to effectively remove Plaintiffs from the Airport.

90.     On information and belief, Defendants have not initiated, much less successfully completed, the Part 161 process.  The Defendants cannot circumvent ANCA's requirements or the FAA's processes to impose access restrictions on Stage 3 aircraft.  FAA procedures are mandatory and comprehensive, and local attempts to regulate access that are not enacted in compliance with Part 161 are federally preempted.[4]

91.     Defendants' conduct is further unreasonable because it interferes with Congress's stated goals in enacting ANCA, in particular preventing localities from creating a patchwork of regulations limiting airport access.

92.     In sum, Defendants violated ANCA (and its implementing regulations) by imposing Policy No. 1, preventing FBOs from working with Plaintiffs, and refusing to consider non-SIDA portions of the Terminal, all of which preclude Plaintiffs from operating at HPN.

93.      Furthermore, Defendants' unlawful and unconstitutional conduct was and is intentional.  Defendants were and are fully aware that any access restriction imposed by Policy No. 1 or TUP is subject to ANCA's processes and thus subject to preemption.

**Plaintiffs Will Be Irreparably Harmed If The County Is Not Enjoined From Enforcing Policy**

---

[4] Given that Policy No. 1 is a new policy enacted in 2022, it is not subject to being grandfathered in.

**No. 1**

94.     The County's Policy No. 1 prohibits Plaintiffs from operating as they always have at FBOs at HPN.  Yet the County has refused Plaintiffs' proposals to operate from alternative non-SIDA locations or create a non-SIDA location at the Terminal.  Accordingly, Defendants' actions foreclose Plaintiffs' access to the Airport on reasonable and non-discriminatory terms, as required by federal law.

95.     Enforcement of the County's new Policy No. 1 will irreparably harm Plaintiffs by entirely halting Plaintiffs' services at HPN, including routes offered to underserved cities, safe and efficient services to the traveling public, and employment for over employees in the area surrounding HPN, and causing other impact on the local economy.

96.     Plaintiffs will also suffer a significant loss of revenue and customer goodwill if they are forced to stop operations at HPN.

97.     For example, in the next twelve months, XO is expected to operate more than 1,000 flights to and from HPN with expected revenue in tens of millions annually.

98.     Similarly, JSX stands to lose significant resources it spent investing in the HPN market at an estimated value of over $2 million and significant investments already made to operate out of HPN if Policy No. 1 is to be enforced.

99.     Additionally, as mentioned above, the popularity of Blade's services out of HPN continues to grow and Blade is expected to operate approximately 165 Part 380 flights between HPN and OPF or PBI during the November 2021 through April 2022 season alone.  Blade stands to lose the significant investments it has made towards its operations at HPN and Million Air.  Moreover, Blade's increasing customer based would be forced to cancel flights that have already been booked, which will in turn damage Blade's reputation and goodwill.  If Policy No. 1 is

enforced, Blade's inability to operate out of FBOs at HPN could result in losses in the millions for the remainder of the November 2021 through April 2022 season (and in the tens of millions for the November 2022 through April 2023 season, which does not take into account any potential expanded schedules or additional routes), as well as Blade's inability to honor contractual commitments to its Part 135 operating partners.  Additionally, Blade partners with Part 135 operators and local catering, shuttle, and car service businesses, and employs eleven individuals for its operations at HPN, all of whom would be significantly impacted if Blade could no longer operate from HPN.

100.     Plaintiffs estimate that the local economic impact of their combined flight operations is well over $50 million annually.

### FIRST CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

**Defendants' Conduct Is Preempted by Federal Law and Violates the Supremacy Clause of the U.S. Constitution – ANCA (28 U.S.C. § 1331 and 49 U.S.C. §§ 47521-47534) (Against all Defendants)**

101.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

102.     The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const., art. VI.

103.     Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

104.     There is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.  AvPorts is a private company that provides airport facilities management, operations, airline services,

administration, accounting, and noise abatement on behalf of the Airport. As an agent for the County, AvPorts has sent notices to Plaintiffs on the County's behalf, seeking to exclude their operations at FBOs and improperly enforce Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP against Plaintiffs. AvPorts, with the County Defendants' approval, has promulgated Policy No. 1. As a result, AvPort's conduct is related to its agreement to adopt directives from the County Defendants aimed at unreasonably excluding Plaintiffs from HPN, including their adoption of Policy No. 1 and Defendants' enforcement of the TUP, is contrary to and interferes with federal law, including but not limited to ANCA.

105.    Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is unreasonable, arbitrary, discriminatory, and violates federal law.

106.    Defendants' conduct, including their adoption of Policy No. 1 and reliance on the TUP, constituted and constitutes an access restriction for Plaintiffs' Stage 3 aircraft.

107.    Defendants did not comply with Part 161.

108.    All air carriers present at HPN did not unanimously consent to Policy No. 1 or the TUP.

109.    The above-described conduct is not an action which falls within the narrow proprietary right exception because, among other reasons, Defendants purposefully acted in violation of federal law by intentionally discriminating against Plaintiffs.

110.    The above-described conduct is unreasonable, arbitrary, and discriminatory.

111.    Such conduct is *per se* unreasonable and unlawful as Defendants took this action in violation of federal law. As such, it is preempted by federal law and violates the Supremacy Clause of the U.S. Constitution.

112.    The above-described conduct violates ANCA, and thus HPN's Policy No. 1,

Section 712.462 of the Westchester County Municipal Code, and the TUP must be amended or eliminated as a result of this ANCA violation.

113.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise excluding Plaintiffs from operating at HPN as of January 21, 2022.

114.    Plaintiffs also seek declaratory relief that makes clear that Defendants cannot prohibit Plaintiffs' operations through local law, regulation, or other provision having the force of law.

115.    Plaintiffs specifically seek an injunction preventing Defendants from enforcing the Policy No. 1, Section 712.462 of the Westchester County Municipal Code, or the TUP, and a declaration that these regulations are invalid under the ANCA.

### SECOND CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

**Defendants' Conduct Is Preempted by Federal Law and Violates the Supremacy Clause of the U.S. Constitution – ADA (28 U.S.C. § 1331 and 49 U.S.C. §§ 41713 *et seq.*) (Against all Defendants)**

116.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

117.    The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." f U.S. Const., art. VI.

118.    Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

119.    As alleged above, there is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.

120.    Defendants' conduct aimed at unreasonably excluding Plaintiffs from HPN, including adoption of Policy No. 1 and Defendants' enforcement of the TUP is contrary to and interferes with federal law, including but not limited to the ADA.

121.    Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

122.    Defendants' conduct, including the adoption of Policy No. 1 and enforcement of the TUP constitutes a regulation affecting the "rates, routes, and services" of Plaintiffs.

123.    Defendants' above-described conduct prevents Plaintiffs from flying certain routes (*i.e.*, it forecloses Plaintiffs from operating flights to HPN from non-SIDA airport locations).

124.    Defendants' above-described conduct also prevents HPN from offering aeronautical services (e.g., it prohibits any customer services at HPN).

125.    Defendants' above-described conduct is not an action which falls within the narrow proprietary right exception, as the adoption of Policy No. 1 was unreasonable, arbitrary, and discriminatory.

126.    Plaintiffs' flights have operated safely at HPN for years.

127.    Plaintiffs' flights at HPN are serviced by quieter aircraft than most large airline flights at HPN.

128.    Plaintiffs were singled out by Defendants.

129.    Defendants' decision to target Plaintiffs is arbitrary and unconstitutional.

130.    Defendants' above-described conduct is *per se* unreasonable and unlawful as Defendants took this action in violation of federal law.  As such, it is preempted by federal law and the Supremacy Clause of the U.S. Constitution.

131.    Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, Plaintiffs irreparably by causing a substantial loss of business, damaging Plaintiffs' business reputation and goodwill, and putting Plaintiffs at a significant competitive disadvantage to other carriers operating at HPN.

132.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise excluding Plaintiffs from operating at HPN in violation of the ADA as of January 21, 2022.

133.    Plaintiffs also seek declaratory relief that makes clear that Defendants cannot prohibit Plaintiffs' operations through local law, regulation, or other provision having the force of law.

134.    Plaintiffs specifically seek an injunction preventing Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, or the TUP, and a declaration that such regulations invalid under the ADA.

### THIRD CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

**Deprivation of Equal Protection –
U.S. Const. Amend. XIV and 42 U.S.C. § 1983
(Against all Defendants)**

135.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

136.    The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the

equal protection of the laws." U.S. Const. amend. XIV, § 1.

137.    Defendant Ms. Gasparri is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.

138.    Defendant County is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights. The County has mandated and officially adopted a policy, ordinance, regulation and/or decision that violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

139.    As alleged above, there is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.

140.    Defendants' adoption of Policy No. 1 and reliance on the TUP is for the sole purpose of singling out Plaintiffs for discriminatory treatment in violation of the Equal Protection Clause. Defendants do not prohibit the operations of other similarly situated carriers.

141.    Defendants targeted Plaintiffs and treated Plaintiffs differently from other operators operating out of FBOs at HPN. Plaintiffs' operations involve similar (if not identical) aircraft to those who are permitted to continue operating at FBOs. These aircraft also apply a TSA-approved security procedure, have a similar noise profile, fly similar routes, and in many cases carry a similar number of passengers.

142.    Defendants have no legitimate justification or rational basis for instituting Policy No. 1 or relying on the TUP other than to discriminate against Plaintiffs and prohibit them from operating at HPN.

143.    Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

144.    Defendants intentionally treated Plaintiffs differently than any other air carriers or operators at the Airport.

145.    Defendants' above-described conduct is not rationally related to any legitimate state interest.  Rather, Defendants acted irrationally and arbitrarily with the sole intent of discriminating against Plaintiffs and preventing them from operating at HPN.

146.    Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, Plaintiffs irreparably by causing a substantial loss of business, damaging Plaintiff's business reputation and goodwill, and putting Plaintiffs at a significant competitive disadvantage to other carriers operating at HPN.

147.    Plaintiffs were irreparably harmed by Defendants' unconstitutional and discriminatory conduct because their constitutional rights have been infringed.

148.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek a declaratory judgment declaring that Defendants' Policy No. 1 is unconstitutional, and that Defendants are not permitted to prohibit Plaintiffs from operating at HPN.

149.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise banning Plaintiffs from operating at the Airport as of January 21, 2022.

150.    Plaintiffs also seek attorneys' fees as permitted by 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment:

1. Declaring that the Defendants must provide an accommodation to Plaintiffs that grants them access to the Airport on reasonable and nondiscriminatory terms in a manner that does not negatively impact Plaintiffs' rates, routes, or services;

2. Enjoining Defendants and any party in privity of contract with Defendants from imposing or enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, the TUP, or otherwise imposing or enforcing any law, regulation, policy, or other provision having the force and effect of law which restricts Plaintiffs' access to HPN, or affects Plaintiffs' ability to offer federally authorized rates, routes, and services at HPN;

3. Enjoining Defendants and any party in privity of contract with Defendants from ceasing doing business with Plaintiffs as a result of Defendants' actions or conduct;

4. Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

5. Damages, including nominal damages, for the completed and on-going violations of law and tortious interference claims;

6. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

7. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury of all issues triable by jury.

Dated:   March 7, 2022                    TROUTMAN PEPPER HAMILTON
                                          SANDERS LLP


                                    By: */s/ John N. Thomas*
                                          John N. Thomas (JT7317)
                                          Jenna C. Hutchinson (FILL IN)
                                          TROUTMAN PEPPER HAMILTON SANDERS
                                          LLP

                                          875 Third Avenue
                                          New York, NY 10022
                                          Telephone: 212-704-6000
                                          Facsimile: 212-704-6288
                                          Jack.thomas@troutman.com
                                          Jenna.hutchison@troutman.com

                                          Steven D. Allison (PHV Forthcoming)
                                          Samrah R. Mahmoud (PHV Forthcoming)
                                          Sheila Z. Chen (PHV Forthcoming)

                                          *Attorneys for Plaintijfs*
                                          *Delux Public Charter, LLC a/b/a JSX Air*
                                          *and JetSuiteX, Inc.; XO Global, LLC; Blade*
                                          *Urban Air Mobility, Inc.*

124179796

A-59

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR; JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC.<br><br>               Plaintiffs,<br><br>v.<br><br>COUNTY OF WESTCHESTER, NEW YORK, a charter county; APRIL GASPARRI, in her official capacity as AIRPORT MANAGER; and AVPORTS, LLC.<br><br>               Defendants. | CASE NO. 7:22-cv-01930<br><br>**DECLARATION OF DAVID DRABINSKY IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

I, David Drabinsky, state and declare as follows:

1.     I am the Vice President of Strategy and Corporate Development for Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("Delux") and Plaintiff JetSuiteX, Inc. ("JetSuiteX") (collectively, "JSX"). This declaration is made in support of Plaintiffs' Application for Temporary Restraining Order, and the supporting documents filed therewith. I have personal knowledge, or knowledge based upon my review of documents, of the facts set forth in this declaration and, if called upon to testify as a witness, I could and would testify competently thereto.

2.     Along with the other Plaintiffs in this action, JSX has filed this action to prevent the enforcement of Westchester County Airport Operational Policy No. 1 ("Policy No. 1"), Section 712.462 of the Terminal Use Procedures ("TUP"), and other related government actions enforcing the same policy imposed by the Airport sponsor Westchester County ("County") that would prohibit Plaintiffs, including JSX, from servicing Westchester County Airport ("HPN" or "Airport").

3.     Delux is a Federal Aviation Administration ("FAA") Certificated on demand air carrier that operates commercial flights pursuant to 14 C.F.R. § 135 ("Part 135") and holds a Commuter Air Carrier Authorization issued by the United States Department of Transportation

("DOT"). Delux has flown over one million people among numerous airports since it was certified over six years ago.

4.    JetSuiteX is an indirect air carrier that has authority from the DOT under 14 C.F.R § 380 ("Part 380"). JetSuiteX is a Part 380 operator authorized by the DOT to conduct public charter operations on an on-demand air carrier operated under Part 135. Under this federally authorized arrangement, JetSuiteX sells tickets (including individual seats) to the traveling public, JetSuiteX charters an entire Delux flight, and then Delux operates the flight using the time, location, and destination designated by JetSuiteX. For example, Delux's departure times, departure locations, and arrival locations are specifically negotiated with its sole customer, JetSuiteX, Inc.

5.    JSX's operations are provided for and fully compliant with federal law. Delux operates compliant with all Part 135 regulations, and JetSuiteX operates compliant with all Part 380 regulations.

6.    Thousands of JSX customers rely on JSX's unique crowd-free service to travel safely, particularly during the pandemic. In addition to business and leisure travel, JSX customers' use of JSX's flights often also involve critical purposes including safely traveling to provide front line health care in critically hit areas; safely traveling to fight forest fires; and safely traveling to receive health care.

7.    JSX services a massive and underserved need for quick, efficient, safe, affordable, and pleasant air transportation to markets in a manner that is faster and safer than driving.

8.    JSX focuses on short-haul air travel, service for which has shrunk dramatically over a 20-year period as airport terminals become more crowded, overpriced, and fortified shopping malls designed more to capture consumers than to get them on their way.

9.    JSX is a "hop-on" jet service, founded on the notion that consumers should not have to spend two to three hours at a crowded airport in order to board a 45-minute flight. JSX is designed to provide a fast, crowd-free airport experience.

10.    JSX has spent years developing its business based on its faster, safer, and more

-2-

convenient federally approved non-Security Identification Display Areas ("non-SIDA") security protocol. The overwhelmingly positive consumer response and huge consumer demand for our services has enabled JSX to grow significantly each year of its existence.

11.    Unlike traditional major scheduled airlines, JSX's operations are structured differently and provide a different type of service than the large scheduled airlines that also operate out of HPN.

12.    For example, JSX's flights follow a TSA-approved "Twelve-Five" Security Plan, which is a regulatory protocol that permits its customers to undergo a different TSA-security procedure than the TSA security checkpoint plan utilized in the main passenger terminal ("Terminal"). JSX maintains a rigorous TSA-approved and monitored security plan (which is superior to and in many ways exceeds the standard TSA plan utilized in the Terminal), but customers flying with JSX are not processed through the Terminal's TSA checkpoints. Instead, the "Twelve-Five" Security Plan is uniquely available for Part 135 air carriers and allows JSX's flights to enplane and deplane passengers at a non-SIDA location. The result is a fast, crowd-free airport experience that is still compliant, and in many cases exceeds, with federal safety regulations.

13.    JSX's service operates pursuant to a federal TSA program that requires its customers to undergo different (not lesser) security processes. In fact, JSX achieved additional authority from the TSA to screen all passengers with certain weapons and explosives detection technology not in use by other air carriers. JSX's operations are regularly audited by the TSA nationwide, and JSX routinely passes those audits with no adverse findings. Several TSA auditors have said that JSX is the most competently and professionally run organization they audit.

14.    By contrast, customers of large airlines who board from terminal buildings are required to pass through a TSA security checkpoint in order to enter the Terminal (which is exclusively a Security Identification Display Area ("SIDA") location) at HPN. A SIDA location requires everyone who is permitted access to pass through a TSA-security checkpoint. The TSA security checkpoints—and the crowds, frustration, and delays associated with them—are

124179639

ubiquitous for the average airport user.

15.     JSX's federally authorized procedures allows JSX to provide an innovative, convenient, and safe alternative to large commercial airline services by (a) providing access to small airports and underserved cities not regularly serviced by the large airlines, and (b) providing customers with unique and convenient flying services the large airlines cannot offer customers—a TSA-approved and compliant security process that is faster and more convenient than the TSA process that is required for airlines.

16.     Further, at the core of JSX's business is that customers can forego standard TSA security checkpoints in favor of a non-SIDA (but TSA approved) protocol.  Consistent with federal law, JSX's customers can arrive 20 minutes before a flight, pass through JSX's TSA-approved security procedures, and avoid long lines and large crowds.

17.     JSX's TSA-approved security protocol also allows JSX to provide access to additional or underserved airports and smaller cities not regularly serviced by the large airlines, or in underserved airports that do not generate sufficient traffic to justify the resources required of a TSA checkpoint in the main passenger terminal.  JSX is uniquely positioned to service these airports because of its Twelve-Five Security program.

18.     Particularly in the era of COVID-19, JSX's services have been especially valuable to customers looking to avoid crowded terminals and long security lines where social distancing is not always possible.  JSX provides a level of safety, convenience, and a socially distanced flying experience that is not otherwise available to big airline customers.

19.     JSX's operations are also quieter than their commercial competitors.  JSX's services also minimize the impact of charter planes by aggregating passengers into smaller or quieter aircraft when passengers may instead charter their own aircraft which would create further impact or airport congestion.

20.     JSX enjoys the highest customer satisfaction of any air carrier in the United States, was named #1 air carrier in North America by APEX, the Airline Passenger Experience Association, and was named the only Five-Star Regional Air Carrier in the World by APEX for

-4-

124179639

the last four consecutive years. JSX was previously also named by Fast Company as one of the world's "Most Innovative Companies for 2020," ranked within the top 5 in the travel category. In addition, JSX routinely achieves a New Promoter Score ("NPS") in the mid 80s and 90s. An NPS is a reflection of how likely a customer is to recommend a product or service to a friend or colleague.

21.     JSX first flight into HPN was in 2020. Before JSX launched HPN-MIA in 2021, JSX engaged in meetings with Airport officials, including Airport Manager Peter Scherrer. I advised Mr. Scherrer that JSX intended to begin charter operations specific to HPN. I explained JSX flights were operated pursuant to Part 380.

22.     In following up on our meeting, I provided Mr. Scherrer with documentation, including a copy of the approved Part 380 Charter Prospectus. A true and correct copy of my October 26 email to Mr. Scherrer is attached hereto as Exhibit A, with attachments omitted for brevity.

23.     JSX has been operating out of HPN through a FBO, similar to other Part 135 and Part 380 operators. An FBO is an aeronautical service provider located at an airport who, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators. Many other Part 135 and Part 380 operators utilize FBOs at HPN for access to a non-SIDA location. Aside from the implementation of the Terminal Use Procedures ("TUP") and Operational Policy No. 1 ("Policy No. 1") at issue in this litigation, JSX is fully compliant with all applicable federal, state, and local legal obligations.

24.     FBOs are the only way JSX is able to enplane and deplane customers at HPN at a non-SIDA location. Although JSX does not need to operate from an FBO, their operations must take place from a non-SIDA portion of any Airport with access to the airfield. The Terminal is currently configured without any non-SIDA boarding areas. A non-SIDA boarding area is essential for JSX's operations because JSX's TSA protocol requires that their customers board from a non-SIDA location, and under federal regulations, SIDA and non-SIDA passengers must be segregated until boarding. Again, JSX is unable to utilize SIDA locations to deplane (as an

124179639

example) because its customers have not passed through TSA checkpoints at the departure airport and, in some routes, are coming from airports that do not even have SIDA locations. Thus, HPN's Terminal as currently configured is not viable for JSX's operations because of the lack of segregated non-SIDA boarding.

25.    The County has historically permitted charter flight operations to operate from FBOs rather than the Terminal. In fact, Part 380 operations at HPN have long occurred at FBOs, and public charter operations under Part 380 go back many decades. Numerous operators have operated, and continue to operate, HPN flights with aircraft with more than nine seats from FBOs, including under Part 380.

26.    On November 5, 2021, I received notice from the County's operator, AvPorts, and Mr. Scherrer informing me that the County would not permit JSX's operations to take place at an FBO. The County asserted that JSX was subject to the Airport's TUP and required to conduct all of its services from the Terminal rather than at a FBO because JSX sells individual seat tickets to the public on aircraft with more than nine seats. The County further stated that JSX was required to operate from the Terminal even if its services were non-scheduled in nature and rejected JSX's proposal to only sell tickets to members of a private club. The County informed JSX that it had to discontinue its operations and arrange to move its operations to the Terminal pursuant to a Terminal Use Agreement ("TUA"). A true and correct copy of the November 5, 2021 letter is attached hereto as Exhibit B.

27.    On November 15, 2021, JSX responded to Mr. Scherrer's November 5 letter, offering to limit flights, under certain conditions, to nine passengers for the remainder of 2021 until a resolution could be reached. JSX reiterated that Part 380 operations with more than nine seats have occurred at FBOs at HPN for several years and were never before subject to the TUP. A true and correct copy of the November 15, 2021 letter is attached hereto as Exhibit C.

28.    JSX's good faith attempt to limit its flights to nine seats per flight at HPN in the meanwhile cost JSX approximately $85,000 a week. Although Defendants had many weeks to work with JSX on a potential resolution, Defendants rejected JSX's efforts to reach a good faith

resolution.

29.      Despite JSX's desire to cooperate with the County and good faith attempts at resolution, the County refused to change its position.  On December 2, 2021, Mr. Scherrer sent another letter to JSX, addressed to JSX's CEO, Mr. Alex Wilcox, insisting that JSX move its operations to the Terminal.  A true and correct copy of the December 2, 2021 letter is attached hereto as Exhibit D.

30.      On January 7, 2022, I received another letter from April Gasparri, the new Airport Manager, again insisting on JSX's agreement to be bound by the terms of the TUA, which would require JSX to use the Terminal and be subjected to the ramp allocation and passenger limitation restrictions.  A true and correct copy of the January 7, 2022 letter is attached hereto as Exhibit E.

31.      But starting in 2022, Defendants became largely unresponsive to any of JSX's attempts to communicate and reach a potential alternative for reasonable access.

32.      The County adopted Policy No. 1 on January 21, 2022, defining JSX's services as "Single Seat Charter Operations" or "SSCO," and mandating that JSX's services be moved from the FBO to the Terminal pursuant to a TUA.  Unlike the Section 712.462, Policy No. 1 expressly attempts to apply the TUP and the TUA to certain Part 380 operators.  A true and correct copy of Policy No. 1 was provided as an attachment to Exhibit F.

33.      Policy No. 1 further impermissibly limits Plaintiffs' access to HPN because it requires Plaintiffs to route their passengers through the Terminal for departing flights and mandates the use of the Terminal's TSA screening procedures.

34.      The Terminal poses a number of legal and logistical challenges to JSX's operations. At the Terminal, JSX will be forced to route customers through the standard TSA checkpoint, despite its own TSA-approved screening procedures, because the Terminal does not provide for non-SIDA checkpoints.  This would also eliminate a key feature of JSX's business model and one of the primary reasons that customers choose to fly with JSX.

35.      Routing passengers through the standard TSA screening and into SIDA checkpoints also eliminates JSX's ability to offer routes to underserved airports without TSA facilities because

customers who arrive at HPN's Terminal from these locations are not permitted to deplane at HPN because they were not screened through TSA at the airport of origin.

36.     In addition to its streamlined security screening, JSX offers other valuable services to their customers when their flights are offered from a FBO that cannot be offered at the Terminal. These services include valet and shuttle services, concierge services, and speedier check-in and boarding.

37.     However, Defendants' enforcement of Section 712.462 and the TUP and Defendants' adoption of Policy No. 1, without any alternatives for reasonable access despite JSX's proposals, will impact and eliminate JSX's flight offerings at HPN.

38.     On February 7, 2022, Airport Manager Ms. Gasparri sent another letter to JSX about JSX's alleged non-compliance to Policy No. 1 and attached a copy of Policy No. 1.  A true and correct copy of the February 7, 2022 letter with attachment is attached hereto as Exhibit F.

39.     On February 15, 2022, Mr. Wilcox responded to Ms. Gasparri's February 7 letter, reiterating the hardship that would be caused by the enforcement of Policy No. 1 and outlining the alternative proposed by JSX that the County failed to consider.  This letter also references a correspondence that JSX sent on December 23, 2021 where JSX proposed two alternative reasonable accommodations for the Airport's consideration.  Both proposals would involve checking in passengers at the Terminal and the use of vacant office space on the first floor of the Terminal to hold passengers prior to boarding.  Under the first proposal, when boarding commences, passengers would be escorted through the Ross Aviation East FBO and down a non-SIDA ramp.  Under the second proposal, passengers would be escorted through an access gate just north of the Terminal and then down an Airport terminal ramp.  Inexplicably, these proposals were rejected by the Airport, without any meaningful consideration or analysis.  A true and correct copy of the December 23, 2022 e-mail is attached hereto as Exhibit G.

40.     JSX will suffer irreparable harm if it is required to abide by Policy No. 1 and enter into a TUA.  JSX stands to lose the significant investment it has made toward its operations at HPN, as well as expected revenues of approximately $6,000,000 for the remainder of 2022.

124179639

Moreover, JSX's increasing customer base would be forced to cancel flights that have already been booked, which will in turn damage JSX's reputation and goodwill. JSX would need to cancel 630 tickets worth $500K in revenue if it were forced to go to the main terminal. For example, JSX has spent significant resources investing in the HPN market with an estimated value of $2,000,000 and has already paid over $500,000 in fees and expenses. Policy No. 1 will also cause JSX to lose significant investments they have already made to operate from HPN, such as agreements with FBOs, commercial arrangements with other vendors, and improvements made to their facilities.

41.    By seeking to limit its aircraft to nine seats from mid-November through the end of 2021 JSX has already seen a significant impact on its revenue and profitability, which has led to losses of approximately $600,000. The loss of these flights not only damages JSX financially, but harms JSX's goodwill and reputation in an incalculable amount.

42.    Enforcement of the new Policy No. 1 will irreparably harm JSX by entirely halting JSX's services at HPN, including routes to be offered to underserved cities, safe and efficient services to the traveling public, and employment for at least five employees in the area surrounding HPN. JSX will suffer a significant loss of revenue and customer good will if they are forced to stop operations at HPN. JSX estimates that the local economic impact of its flight operations is $40,000,000 million annually.

43.    The air transportation industry (like the auto, steel, or utility business) has high capital costs, which serve as a barrier to entry for newer firms like JSX. In short, sustaining a successful business in the air transportation industry takes significant time, money, and capital to build the business and customer base before the airline becomes and can stay profitable. In addition, due to the issues of safety and reliability, it also takes a great deal of money, time, and staff to build a reputation ad to keep the goodwill of a loyal customer base.

44.    Further, Plaintiffs face a serious risk of unwarranted litigation from the County.

///

///

///

124179639

A-68

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 8th day of March 2022 in Dallas, TX.

David Drabinsky

124179639

# EXHIBIT B

**AVP⚲RTS**

Westchester County Airport
240 Airport Road
Suite 202
White Plains, NY 10604

914.995.4856
www.avports.com

VIA EMAIL &
CERTIFIED MAIL

November 5, 2021

David Drabinsky
Vice President of Strategy and Corporate Development
JSX
1341 West Mockingbird Lane
Dallas, TX 75247
david.drabinsky@jsx.com

Dear Mr. Drabinsky:

This letter responds to your email of October 26th.  Please note that it has come to my attention that JSX is proposing to operate passenger service and selling seats for purchase from a Fixed Base Operator ("FBO") at the Westchester County Airport ("HPN") namely Signature Flight Support, as opposed to the Terminal.

As required by the Westchester County Code and following review with the relevant County officials and the County's outside aviation counsel, this service *must* be conducted at the Terminal and cannot be conducted at a FBO.  Section 712.462(j) of the Westchester County Code, embodying the Westchester County Airport Terminal Use Procedures (the "TUP"), states that "Passenger Service" must be conducted at the Terminal. The TUP define "Passenger Service" as "any air service to or from the Airport for which seats are individually offered or sold to the public *or a segment of the public*, *regardless* of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity." WEST. CTY. CODE § 712.462(2)(j) (emphasis added).

**In short, any service that involves aircraft of more than nine seats and individual seat sales to any segment of the public must operate from the Terminal pursuant to a Terminal Use Agreement.**

David Drabinsky                    2                    November 5, 2021

You emphasize JSX's assertion that these flights are non-scheduled in nature, but that factor, while potentially relevant at other airports, is neither determinative nor relevant under the Westchester County TUP.

Your email also states that the seat purchases for this proposed service by JSX will only be available to members of a private club. However, a private club in which otherwise unrelated persons purchase individual seats is a segment of the public, particularly when operated as Public Charter flights, no matter how restrictive the club's membership might be. Moreover, the word "regardless" as set forth in the TUP and quoted above clearly evinces an intent by the County Legislature to apply that phrase broadly. This is consistent with the County's grant assurance obligations to the FAA given that this same standard has been applied in the past to commuter airlines providing service at HPN.

Because the new flight service that JSX is proposing must be considered "Passenger Service" under the duly enacted Westchester County Code, it can only be provided at the HPN Terminal, and may not be operated to and from an FBO. Please note that we are in the process of notifying all of the FBOs as to these requirements to ensure that they are applied uniformly and consistently.

This service may be conducted from the Terminal based upon entering into a Terminal Use Agreement (a "TUA") provided that the service meets all the requirements of the County Code. If a TUA can be entered into during the 2021 calendar year, then the operator can participate in the January 2022 ramp allocation procedure. If you wish to operate prior to that time, we can also potentially help to obtain interim ramp allocations from either other Terminal operators, or possibly through a special lottery, so as to allow the commencement of service.

JSX must discontinue these non-compliant services immediately and arrange to move its operations to the Terminal pursuant to a TUA as set forth above. You may contact me with any questions at (914) 995-4887.

Sincerely,

*oft for* Peter Scherrer
Peter Scherrer
Airport Manager

cc (via e-mail):  Joan McDonald - Director of Operations
                  Hugh J. Greechan, Jr., P. E. - Commissioner of Public Works & Transportation
                  John Nonna - County Attorney

# EXHIBIT C



Peter Scherrer
Airport Manager
Westchester County Airport (HPN)
240 Airport Road, Suite 202
White Plains, NY  10604

Via Email to pfs5@westchestergov.com

Dear Mr. Scherrer,

Many thanks for your letter dated November 5th and for meeting with me on November 10 and our phone call on November 12. I appreciate your time and description of the County's unique and beautiful airport.

Following our discussion, as a sign of our goodwill (and reserving all rights), I directed the JSX team, with immediate effect, to limit all of our HPN flights to a maximum of nine seats for sale.  JSX will remove passenger seats from service to also physically limit the aircraft itself to nine passenger seats for our flights to and from HPN. JSX will maintain these restrictions through the earlier of (i) the end of 2021 or (ii) a mutually acceptable resolution of this matter.  In the meantime, this will enable JSX to meet its federal obligations under 14 C.F.R. Part 380 to operate the flights we are required to perform, beginning with services as planned this week at the FBO of our choice without any further issue.  This will also enable HPN to comply with federal law (as explained below) while affording the County time to work with JSX to find a mutually agreeable long-term solution.

As we discussed, JSX is aware that Part 380 operations at HPN have long occurred at FBOs.  The Nov 5th letter's assertion that "this same standard has been applied in the past to commuter airlines providing service at HPN" is not based in fact.  Numerous operators, including competitors of JSX, have for decades operated, and continue to operate, HPN flights with more than 9 aircraft seats from FBOs, including under Part 380.  These operations have accounted for thousands of flights, and are continuing. Attached to this this letter please find numerous specific examples of operators who have sold, and continue to sell, seats on aircraft with more than 9 passengers, that operate out of the FBOs, and have done so for many decades. The airport management and the county cannot credibly claim ignorance of these operations. These flights have been publicly marketed, publicly filed with and published by the USDOT and prominently covered in major media and aviation trade journals alike. And they continue to be sold and to operate to this day. Thus the County clearly does not now and has never previously considered Part 380 operations to constitute "Passenger Service" under the Westchester County Airport Terminal Use Procedures ("TUP"), which they are clearly not.  This is likely why Part 380 is not listed in the TUP definition of "Airline" or "Passenger Service" at subsections 712.462.2(a) and (j) respectively, let alone referenced anywhere else in the TUP.  JSX's operations are operated under Part 380 by Delux Public Charter, LLC on behalf of a single charterer JetSuiteX.  If HPN were to deem such a charter operation to be that of an "Airline" providing "Passenger Service," then every air carrier operation using aircraft with more than 9 seats at HPN would also be subject to the TUP and the requirement to operate at the terminal – even if those flights were operated on behalf of a single charterer.  This would be an absurd and completely irrational conclusion.

A local authority cannot establish a new restriction that would disregard or override federal law and regulations, nor can a local authority change its interpretation of its existing procedures in a manner that unjustly discriminates against a single carrier, JSX. Such unjust discrimination is prohibited by

Page 2  Nov 15, 2021 JSX to HPN

Airport Sponsor Grant Assurance 22 (under the federal Airport Improvement Program). HPN, as a recipient of federal funding under that program, must comply with Grant Assurance 22. In addition, such a local restriction on Stage 3 aircraft is not permitted under the Airport Noise and Capacity Act ("ANCA") (which applies to both access and noise restrictions). The County in its letter may in fact be imposing a **new** restriction with its new interpretation of its own law – one that did not exist before, or after, ANCA was enacted and thus one that the County cannot now adopt unilaterally.

This new move by the County to restrict JSX's Part 380 operations at FBOs at HPN seems to reflect a misunderstanding that could be easily rectified by simply treating JSX as it has always treated every other Part 380 operation at the airport. We are not aware of a single time in the history of HPN that the County required that a Part 380 flight use the terminal to operate. As noted above, Part 380 operations are **not** listed in the TUP definitions of "Airline" or "Passenger Service." The TUP does, however, specifically provide that operations that are not Passenger Services are not subject to the TUP, including its requirement to operate at the terminal. This makes sense. It is how the County has always treated Part 380 operations.

We trust that our self-imposed limit on our operations for a period of time will afford the County time to review its position on this matter. We remain available at your convenience to discuss this matter with the objective of expediting a mutually acceptable resolution. To be clear, however, JSX will suffer irreparable harm if the HPN and County prevent JSX from obtaining non-discriminatory access to FBO service at the airport. Such an outcome would have a severely adverse impact on JSX's business, negatively affecting its goodwill and business relationships, including its rate structure. As the FAA has previously recognized in relation to JSX's business model, such action by an airport authority to attempt to prevent JSX from serving an airport via an FBO also would impermissibly affect JSX's operations at other airports, including because JSX passengers who did not clear TSA security at their departing airport would not be able to enter the TSA-sterile area upon arrival.

JSX operates the nation's highest rated air carrier service, in some of the very quietest aircraft in the market, with the kind of unique business model that the Airline Deregulation Act was designed to encourage. We are also at the forefront of making our aircraft noise profile even more quiet and reducing our carbon footprint even further by placing some of the industry's first ever orders for Electric, Hybrid and Hydrogen powered aircraft and we look forward to the day we will bring those innovations to HPN as well. We believe that HPN and the community and passengers its serves will benefit greatly from JSX service.

Best regards,

Alex Wilcox
CEO

Page 3  Nov 15, 2021 JSX to HPN

## XO Shuttle

XO is currently selling and operating flights with 16 individual seats with up to 3 departures per day out of an FBO at HPN.



Page 4  Nov 15, 2021 JSX to HPN

## Blade

Blade is currently selling and operating flights with 16 individual seats with multiple departures per week.



Page 5  Nov 15, 2021 JSX to HPN

## Tradewind

Tradewind operates the Pilatus PC-12, which is designed for 10 passengers.



Page 6  Nov 15, 2021 JSX to HPN

## Hard Rock Air

Hard Rock Air's flights are sold by the seat and operated by Ultimate Air Shuttle on 30 seat Dornier 328s.



## Examples of Previous Public Charter Flights from Various Operators (Source US DOT)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 14-167 | TCS & Starquest Expeditions | Thomson Airways Ltd | SFB | LIM-PC-PPT etc | 1/22/2016 | 2/13/2016 | Around the World | 1 | B757 w/80 1st class seats |
| 14-168 | TCS & Starquest Expeditions | Thomson Airways Ltd | SFB | LIM-PC-PPT etc | 3/21/2016 | 4/12/2016 | Around the World | 1 | B757 w/80 1st class seats |
| 14-169 | Sevilla Travel Agency | TEM Enterprises dba Xtra Airways | PLU | SJU | 5/22/2015 | 8/3/2015 | | 25 | Boeing 737 400 w/162 seats |
| 14-171 | Gulfstream Air Charter | Falcon Air Express | MIA-TPA | HAV-SCU-SNU | 11/18/2014 | 1/31/2015 | | 75 | MD-83 w/149 sts |

17 2/23/2016

CHARTER REPORT -2014 PROSPECTUSES

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 14-171 | Marina District Development Co. LLC dba Borgata Hotel Casino & Spa | Ultimate JETCHARTERS dba Ultimate Air Shuttle (Commuter) | [illegible] | ACY | 3/13/2014 | 9/1/2014 | | [illegible] | Dornier 328-300 Jets w/30 seats |
| 14-172 | [illegible] Service | IBC Airways (Air Taxi) | MIA | HAV | 11/13/2014 | 3/31/2015 | | 2 | SAAB Turbo Pro w/30 seats |
| 14-173 | ABC Charters | Caribbean Sun Airlines dba World Atlantic Airlines | MIA | HAV-SCU-SNU-etc | 12/10/2015 | 1/7/2015 | | 7 | MD-83 w/156 pagr seats 15d contracted |
| 14-174 | Island Travel & Tours Ltd dba Cuba Air | Swift Air LLC | MIA-[illegible] | HAV-FPO | 11/15/2014 | 11/14/2015 | Cancelled all flights between CCS and MAR 4/14/15 thru 11/13/15/Can. all flts to Miami 6/23/15 thru 11/10/15 | 158 | B737-400 w/150 seats |
| 14-175 | Windsor Air LLC | Professional Flight Transport, Inc dba Windsor Jet Management | [illegible]-OPF | CCS | 12/1/2014 | 12/10/2014 | Cancelled Flights effective 12/1/14 | 0 | Gulfstream GIV w/17 seats |
| 14-176 | Resort Air Services | Ultimate JETCHARTERS dba Ultimate Air Shuttle (Commuter) | DAL | Lajitas TX-HOU-MAF etc | 11/21/2014 | 7/5/2015 | Changed carrier to [illegible] Aviation (air taxi) | 145 | Dornier 328 Jet w/30 seats |
| 14-177 | Backpacker Tours | Southwest Airlines | BTR | CJT-HON | 2/14/2015 | 2/21/2015 | | 1 | Boeing 673 w/143 seats |

CHARTER REPORT - 2019 PROSPECTUSES

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 19-030 | Charter Alliance Group LLC | Key Lime Air Corp. dba Denver Air (Commuter) | APA | GIT | 7/1/2019 | 6/1/2019 | | 1464 | SA227-DC w/19 sts Embraer E-AB-120 w/[illegible] sts Dornier |
| 19-031 | JetSmarter Inc | Critical Care Medflight, Inc (air taxi) | KPDK | KBED | 4/26/2019 | 4/26/2019 | | 1 | Hawker 400XP w/7 Guests |
| 19-032 | Public Charters, Inc dba North Country Sky | Ultimate JETCHARTERS, LLC dba Ultimate Air Shuttle (commuter) | MBL | MDW | 10/11/2019 | 10/21/2019 | | [illegible] | SAAB 340 w/30 Y sts |
| 19-033 | TCS & Starquest Expeditions | TAG Aviation (UK) Limited | KOA-PPT-SYD-etc | PPT-SYD-LGK-etc | 3/15/2020 | 4/4/2001 | CANCELLED | 1 | B757 w/52 sts |
| 19-034 | Wheels Up Partners, LLC | Corporate Flight Management LLC dba Contour Flight Management | KHPN-KAGS | KAGS-KHPN | 4/11/2019 | 4/15/2019 | | 2 | Canadair Regional Jet w/16 sts |
| 19-035 | Ultimate Jetcharters, LLC dba Ultimate Nat Shuttle Public Charters Inc. dba Regional Sky (co-charterer) | Ultimate Jetcharters, LLC dba Ultimate Air Shuttle | LUK | CLT | 6/20/2019 | 8/19/2020 | | [illegible] | Dornier 328 Jet w/30 sts Embraer 135 Jet w/30 sts |
| 19-036 | Cubazul Travel Services, Inc. dba Cubazul Air Charter | Swift Air, LLC | MIA | HAV-RSW-HOG-etc | 5/10/2019 | 3/28/2020 | | 621 | B737-400 w/150 sts |
| 19-037 | JetSmarter Inc | Executive Air Services, LLC (air taxi) | KOPF | KIAD | 5/7/2019 | 5/7/2019 | | 1 | Learjet 45 w/7 guests |
| 19-038 | Ultimate Jetcharters, LLC dba Ultimate Jet Shuttle | Ultimate Jetcharters, LLC dba Ultimate Jet Shuttle | PIT-HEF-CNX-etc | HEF-CNX-EMU-etc | 5/18/2019 | 9/14/2019 | | 88 | Dornier 328 Jet w/30 sts Embraer 135 Jet w/30 sts |
| 19-039 | Ultimate Jetcharters, LLC dba Ultimate Jet Shuttle | East Coast Flight Services, Inc (air taxi) | MMU-CNX-HEF-etc | CNX-HEF-PIT-etc | 5/19/2019 | 9/15/2019 | | 86 | BAE Jetstream 31/32 w/19 sts |



Page 8 Nov 15, 2021 JSX to HPN

CHARTER REPORT - 2019 PROSPECTUSES

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 19-050 | Total Sports Travel, Inc | MN Airlines, LLC dba Sun Country Airlines | CHO | MSP | 4/5/2019 | 4/9/2019 | Final Four Game | 3 | Boeing 737-800 w/180 sts |
| 19-051 | Sports & Entertainment Travel, LLC | MN Airlines, LLC dba Sun Country Airlines | LBB | MSP | 4/5/2019 | 4/9/2019 | Final Four Game | 1 | 737 w/ 180 sts |
| 19-052 | Sports & Entertainment Travel, LLC | Miami Air International | LBB | MSP | 4/5/2019 | 4/9/2019 | Final Four Game | 1 | 737-800 w/168 sts |
| 19-053 | The Greensboro Area Chamber of Commerce/Air Planning co-charterer | Miami Air International | GSO | SDF | 5/15/2019 | 5/18/2019 | | 1 | 737-800 w/168 sts |
| 19-054 | AirChicago Connect, INC | [illegible] Aviation, INC (air taxi) | KPWK | KHPN | 6/3/2019 | 3/18/2020 | | 1 | Falcon DA-2000 w/10 sts |
| 19-055 | BLADE Urban Air Mobility, Inc | Altus Aviation LLC (air taxi) | AC-HPN-TEB-etc | HPN-TEB-BOS-etc | 4/20/2019 | 4/19/2020 | | 2,800 | Pilatus PC-12 w/8 psgrs |
| 19-056 | Delta Vacations, LLC dba Delta Private Jets Shuttle | Delta Private Jets, Inc. (air taxi) | CLE | LUK | 4/26/2019 | 4/26/2020 | | 1 | Cessna Citation CJ2 w/6 sts |
| 19-057 | TCS & Starquest Expeditions | TAG Aviation (UK) Limited | SEA-ITM-BLC-etc | ITM-BLC-SEZ-etc | 6/4/2019 | 6/25/2019 | CANCELLED | 8 | B757 w/52 sts |
| 19-058 | [illegible] Inc | Tradewind Aviation (commuter) | HPN | PWM | 6/20/2019 | 6/20/2019 | | 1 | Citation CJ3 w/7 guests |
| 19-059 | Student City .com dba GradCity.com | Swift Air | MSY | NAS | 5/20/2019 | 5/25/2019 | | 2 | B737-400 w/150 sts |

Type here to search

72°F Mostly clear

10

12/15/2017

CHARTER REPORT 2017 PROSPECTUSES

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 17-100 | National Travel Systems | Southwest Airlines | BOS-SDF | SDF-BOS | [illegible] | 6/24/2017 | | 4 | Boeing 737 w/143 sts |
| 17-101 | Beau Rivage Resorts | MN Airlines dba Sun Country Airlines | GPT-MH-OKC-etc | MH-OKC-GPT-etc | 6/9/2017 | 12/31/2017 | | 830 | 737-700 w/150 sts |
| 17-102 | Apple Vacations | Aerovias Nacionales SA De CV dba Viva Aerobus | DTW | CUN | 1/1/2018 | 4/7/2018 | | 18 | A320 w/180 sts |
| 17-103 | Apple Vacations | Vacation Express USA, Inc. (PC-17-074) Swift Air | CVG-CMH-IND | DCA | [illegible] | [illegible] | Sub-Charter Program | 49 | B737-300 w/90 sts B737-400 w/50 sts |
| 17-104 | Apple Vacations | Vacation Express USA, Inc. (PC-17-073) Aerovias [illegible] S.A. de C.V. dba Viva Aerobus | CMH | CUN | 2/18/2017 | 12/9/2018 | Sub-Charter Program | 44 | A320 w/90 sts |
| 17-105 | Swift AirTravel | Swift Air | OGD | LAX-OAK-MCO-etc | [illegible] | [illegible] | PROGRAM CANCELLED | 71 | B737-300 w/143 sts |
| 17-106 | [illegible] Inc | Tailwind Air (air taxi) | Bayport | ACK | 7/6/2017 | [illegible] | | 1 | Cessna Caravan Amphibian w/[illegible] |
| 17-107 | [illegible] Inc | Zetta Jet USA (air taxi) | VNY-HPN | [illegible] | [illegible] | [illegible] | | 8 | Gulfstream G-IV-SP w/13 sts |
| 17-108 | Sports & Entertainment Travel | Southwest Airlines | BTR | OMA | 6/25/2017 | 6/29/2017 | | 1 | 737 w/143 sts |
| 17-109 | [illegible] | Swift Air | SJU | PUJ-CUN | 5/24/2018 | [illegible] | | 88 | 734-400 w/150 sts |

11

12/15/2017

CHARTER REPORT 2017 PROSPECTUSES

Type here to search

72°F Mostly clear



Page 9  Nov 15, 2021 JSX to HPN



Page 10  Nov 15, 2021 JSX to HPN

Coverage of Part 380 HPN FBO Flights Competitor in NY Post

Examples below retrieved Nov 15 2021, publish date Nov 10 2021. See

https://nypost.com/dispatch/why-bladeone-is-the-best-way-to-fly-from-nyc-to-miami/

Page 11  Nov 15, 2021 JSX to HPN

11/15/21, 9:13 PM                                        Why BLADEone is the best way to fly from NYC to Miami

   



  

    

# Why BLADEone is the best way to fly between NYC and Miami or Palm Beach

November 10, 2021 | 12:01am



Provided by BLADE

 NEW YORK POST 

https://nypost.com/dispatch/why-bladeone-is-the-best-way-to-fly-from-nyc-to-miami/                                                    1/6

Page 12  Nov 15, 2021 JSX to HPN

11/15/21, 9:13 PM                    Why BLADEone is the best way to fly from NYC to Miami

Throughout the last year, stress from the pandemic has been a catalyst behind travelers experiencing mounting passenger disturbances and misbehavior due to limited service and departure times, and standoffs regarding mask requirements. With fewer travel options, fliers have had to cram into fewer available flights. This harsh reality means your next commercial flight has the risk of health concerns, delays, oversold inventory, passenger volatility and other headaches.

Commercial airlines are not the only aviation companies seeing a decrease in flight availability. Private jets are also in extremely limited supply due to owners using their own aircraft that would otherwise be available to charter, resulting in sky-high pricing.



BLADEone Tv Ad

Here's where BLADEone comes in. No longer are you limited to the choice between a jam-packed commercial metal tube and astronomical jet charter prices. With BLADEone, you can fly between New York and South Florida with simple by-the-seat booking from November to April. Flights are now available between New York and Miami and, starting on November 22 for the first time, BLADEone will also be flying between New York and Palm Beach.

  NEW YORK POST  LOG IN

Page 13  Nov 15, 2021 JSX to HPN

11/15/21, 9:13 PM                 Why BLADEone is the best way to fly from NYC to Miami

    

enhanced aviation jet service starting at $2,850 (one-way) — all at your fingertips through the BLADE app.

BLADEone exclusively uses Bombardier CRJ 200s, commercial-size jets that normally accommodate 65 passengers but have now been retrofitted to accommodate only 16 passengers, eight on each side of the fuselage. That means every seat is both an aisle and a window seat, eliminating the need to switch seats or race to select your seat during commercial check-in.



Provided by BLADE

When passengers fly BLADEone, they receive the renowned BLADE SKYfx services, with one SKYfx for approximately every four passengers. Additionally, fliers are met with meticulously selected in-flight dining and caviar from Michelin-starred favorites and a harmonious, fast and friction-free travel experience to their ultimate destination, consisting of BLADE's helicopter transfers and seamless SUV ground links to their hotel or home upon arrival. With BLADE, your destination is closer than you think, especially when you depart from Manhattan's BLADE Lounge West on a 10-minute helicopter flight to the side of your jet. This service is included in the BLADEone ticket price, so no more expensive Ubers en

 NEW YORK POST                                    LOG IN

https://nypost.com/dispatch/why-bladeone-is-the-best-way-to-fly-from-nyc-to-miami/                           3/6

Page 14  Nov 15, 2021 JSX to HPN

11/15/21, 9:13 PM                                Why BLADEone is the best way to fly from NYC to Miami

     



Provided by BLADE

With BLADEone, you can fly between New York and South Florida and know that you're doing everything to stay safe — for yourself, your family and your friends. BLADE remains the only aviation company requiring all passengers to provide proof of vaccination to fly. Simply put, that is how you "Fly Without Compromise."

Visit BLADE.com to learn more about how to enjoy all the perks of being a BLADEone frequent flyer. The purchase of a BLADEone 10 Pack or BLADEone 20 Pack not only yields significant savings but applies to flights between New York and Miami or Palm Beach interchangeably, and is valid for two years.

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR; JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC. | CASE NO. 7:22-cv-01930 |
| Plaintiffs, | **DECLARATION OF KAROLINE LOZIER IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| COUNTY OF WESTCHESTER, NEW YORK, a charter county; APRIL GASPARRI, in her official capacity as AIRPORT MANAGER; and AVPORTS, LLC | |
| Defendants. | |

I, Karoline Lozier, state and declare as follows:

1.     I am the Manager of Fixed Wing Operations for Plaintiff Blade Urban Air Mobility, Inc. ("Blade"). This declaration is made in support of Plaintiffs' Application for Temporary Restraining Order, and the supporting documents filed therewith. I have personal knowledge, or knowledge based upon my review of the corporate records, of the facts set forth herein and, if called upon to testify as a witness, I could and would testify competently thereto.

2.     Along with the other Plaintiffs in this action, Blade has filed this action to prevent the enforcement of Westchester County Airport Operational Policy No. 1 ("Policy No. 1"), Section 712.462 of the Westchester County Municipal Code/the Terminal Use Procedures ("TUP"), and other related government actions enforcing the same policy imposed by Defendants that would prohibit Plaintiffs, including Blade, from servicing Westchester County Airport ("HPN" or "Airport").

3.     Blade is an air charter broker and an indirect air carrier that furnishes air transportation pursuant to authority granted by the Department of Transportation ("DOT") pursuant to 14 C.F.R. Part 380 ("Part 380"). As relevant here, Blade partners with a 14 C.F.R. Part 135 ("Part 135") Air Carrier, Corporate Flight Management, Inc. d/b/a Contour Aviation

("Contour"), to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

4.      Blade's operations are fully compliant with Part 380 regulations and federal law.

5.      Blade is a technology-powered, global air mobility platform committed to reducing travel friction by enabling cost-effective air transportation alternatives to some of the most congested ground routes in the U.S. and abroad.  Blade arranges on-demand charter and scheduled flights across a diverse accessible fleet of helicopters, jets, turboprops, and seaplanes.

6.      Blade provides a level of safety, convenience, and a socially distanced flying experience that is not otherwise provided by large airlines in any class of service.  Blade's services are safe, federally authorized, and especially well-suited for individuals who want to maintain social distancing and avoid large crowds while traveling during the COVID-19 pandemic.  Blade's aircraft operations are also serviced by quieter aircraft than most large airline flights at HPN.

7.      Blade operates in New York City, Long Island and the Hamptons, the County of Westchester (the "County"), Los Angeles, Boston, Nantucket, Miami, Palm Beach, Vancouver and British Columbia, and many other locations.  Since 2015, Blade has offered service between HPN and Miami-Opa Locka Executive Airport ("OPF"), and due to increasing popularity, Blade introduced service between HPN and Palm Beach International Airport ("PBI") in 2021.

8.      Blade's flights have an impeccable safety record, and Blade has not experienced any passenger or employee safety incidents or accidents at HPN.

9.      Blade's operations are structured differently than the large scheduled airlines that also operate out of HPN.

10.     Under security protocols authorized by the TSA for flights from fixed base operators ("FBOs"), customers can arrive at HPN minutes before their departure, and avoid the long lines and crowds at the Terminal.  The result is a fast, crowd-free airport experience that is still compliant with federal safety regulations.

11.     Due to its operations out of FBOs and by-the-seat offerings, Blade is able to offer service to underserved airports and smaller cities that are not served by larger airlines, such as the

-2-

124380850

Airport. In some instances, these airports and cities do not generate sufficient traffic to justify the resources required of a TSA checkpoint. Blade is well positioned to service these types of airports because of its operations out of FBOs and by-the-seat offerings.

12.    Blade employees at HPN are also required to complete a security clearance and undergo a badging process conducted by HPN, and a formal safety training with White Plains Aviation Partners LLC d/b/a Million Air ("Million Air"), the FBO at HPN that Blade primarily operates out of.

13.    Blade offers other valuable services to its customers when operating flights from FBOs at HPN that cannot be offered at the Terminal, including valet parking and shuttle services, concierge services, specialized health and safety protocols, private lounge access, and speedier check-in, boarding and baggage handling processes.

14.    In the COVID-19 era, Blade has seen an uptick in demand as more and more customers desire safe and socially-distanced travel alternatives and to avoid crowded airport terminals, long security lines, and packed flights. Blade administers its industry-leading COVID-19 health and safety protocols from FBOs at HPN, including on-site COVID-19 testing by registered nurses, temperature and blood oxygen level testing and proof of vaccination enforcement. Blade would not be able to offer these services or enforce these protocols at the Terminal, and many of Blade's customers and the increasing popularity of Blade's services out of HPN are attributable to these services and protocols.

15.    Blade's by-the-seat flights have the added benefit of minimizing airport impact by aggregating passengers into smaller and/or quieter aircraft as an alternative to passengers each chartering their own aircraft, which would create further noise and environmental impact and/or airport congestion. For example, instead of ten passengers each chartering their own aircraft to the same destination, Blade's flight offerings aggregate those ten passengers in one aircraft, thus minimizing the impact by comparison.

16.    If Blade were prohibited from providing its by-the-seat services from FBOs at HPN and required to provide them from the Terminal, many of our customers would instead choose to

124380850

charter entire aircraft (both from the Airport or from other airports outside of the County), instead of purchasing any by-the-seat services offered from the Terminal, in order to continue to enjoy safe, convenient and speedier check-in, boarding and baggage handling processes, enhanced social distancing and health and safety protocols and the many other services that operators are only able to provide from an FBO. In fact, many of Blade's regular customers at HPN charter entire aircraft when Blade's by-the-seat offerings are sold out or do not fit their travel schedules, rather than purchase first-class commercial airline tickets from the Terminal or other airports.

17.     Given that Blade's customers are processed through security protocols authorized by the TSA for flights from FBOs, customers flying with Blade are not processed through the Terminal's TSA checkpoints.  Instead, Blade's passengers enplane and deplane aircraft at non-Security Identification Display Area ("non-SIDA") security checkpoints at the FBOs at HPN. The Terminal is currently a Security Identification Display Area ("SIDA") location and is differentiated and cordoned off from non-SIDA locations at HPN. However, both SIDA and non-SIDA security procedures are TSA-approved and meet federal regulations.  The Terminal at HPN is currently a SIDA-only space, and under federal regulations, Blade's customers are not permitted to enter SIDA checkpoints or interact with passengers that have been screened through a SIDA. The only option for Blade is to maintain its operations from the FBOs at HPN.

18.     Blade's flights have been operating from FBOs at HPN since 2015.  Many other Part 135 and Part 380 operators utilize FBOs at HPN for access to a non-SIDA location

19.     In fact, Part 380 operations have long occurred from FBOs at HPN, and public charter operations under Part 380 go back many decades.  Numerous operators have operated, and continue to operate, flights to or from FBOs at HPN with more than nine passenger seats, including under Part 380.

20.     Aside from the implementation of the TUP and Operational Policy No. 1 at issue in this litigation, Blade is fully compliant with all applicable federal, state, and local legal obligations.  As a Part 380 operator, until recently, Blade has not been subject to the TUP at HPN, nor has the Airport prior to the end of last year asked Blade to sign a Terminal Use Agreement

-4-

("TUA").

21.    Blade's flights are currently offered out of Million Air's FBO at HPN.  An FBO is an aeronautical service provider located at an airport that, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators.

22.    Blade has invested over $200,000 in improvements at Million Air's FBO and pays approximately $60,000 per year to rent a dedicated lounge at Million Air's FBO to service its passengers.  Blade and/or its Part 135 operating partners also pay the Airport various fees associated with the operation of Blade flights, including landing, facility, parking, RON, shuttle, charter, hanger, after hours and valet parking fees.

23.    On November 9, 2021, the County through AvPorts, a private company that provides airport facilities management, operations, airport services, administration, accounting and noise abatement on behalf of HPN, and Airport Manager, Peter Scherrer sent a letter to Blade. The County asserted that Blade's by-the-seat offerings were subject to the Airport's TUP and Blade was required to conduct such services from the Terminal rather than from an FBO because Blade sells individual seat tickets to the public on aircraft with more than nine seats.  The County further stated that Blade was required to operate from the Terminal even if its customers were members of a private club.  The County informed Blade that in order to operate from the Terminal, it must enter into a TUA.  A true and correct copy of the November 9, 2021 letter is attached hereto as Exhibit I.

24.    I understand that the County through AvPorts also sent notices to FBOs requesting that the FBOs also enforce Section 712.462 and the TUP.

25.    On November 29, 2021, Blade, through a letter from its counsel, responded to the County's November 9, 2021 letter.  Blade reminded the County that Blade's existing service had been operating at the FBO for the last five years, that the County had approved its leasehold with the FBO, and that the County was involved in the planning, construction, and leasehold improvement activities related to Blade's facilities at Million Air.  A true and correct copy of the November 29, 2021 letter is attached hereto as Exhibit J.

124380850

26.     On December 13, 2021, the County, through a letter from its counsel, responded to Blade's November 29, 2021 letter, again insisting that Blade move its operations to the Terminal and enter into a TUA. A true and correct copy of the December 13, 2021 letter is attached hereto as Exhibit K.

27.     The County's demands that Blade move its operations to the Terminal and comply with the TUP and Policy No. 1 are inconsistent with Blade's federally authorized operations. Under Policy No. 1, the County classified Blade's flights as "Single-Seat-Charter-Operations." If Blade is subject to the TUP and required to abide by Policy No. 1, it will be prohibited from continuing its long-standing operations at FBOs at HPN and forced to move to the Terminal, which poses a number of legal and logistical challenges to Blade's operations.

28.     Blade will be forced to route customers through the TSA screening protocols used for SIDA at the Terminal, despite the security protocols currently authorized by the TSA for operations at the FBOs, because the Terminal does not have a non-SIDA location. This would eliminate Blade's ability to offer routes to underserved airports without SIDA checkpoints, because customers who arrive at the Terminal from these non-SIDA locations are not permitted to deplane at HPN because they were not screened at SIDA checkpoints at their originating airports.

29.     Moreover, if Blade is forced to move its operations to the Terminal, it would no longer be able to provide valet parking and shuttle services, concierge services, specialized health and safety protocols, private lounge access, catering, and speedier check-in, boarding and baggage handling processes to its customers—which are key features of Blade's service offerings and often the primary reason that customers choose to fly with Blade.

30.     Blade will suffer irreparable harm if it is required to abide by Policy No. 1 and enter into a TUA. Because of the drastic impact Policy No. 1 will have on Blade's business, if Policy No. 1 is implemented, Blade will be forced to eliminate routes, cease operations, and lay off employees. Further, Blade stands to lose the significant investments it has made toward its operations at HPN and Million Air's FBO. The popularity of Blade's services out of HPN continues to grow, and Blade is expected to operate approximately 165 by-the-seat flights between

HPN and OPF or PBI during the November 2021 through April 2022 season alone. Blade's increasing customer base would be forced to cancel flights that have already been booked, which will in turn damage Blade's reputation and goodwill. Blade's inability to operate out of the FBOs at HPN could result in losses in the millions for the remainder of the November 2021 through April 2022 season (and in the tens of millions for the November 2022 through April 2023 season, which does not take into account any potential expanded schedules or additional routes), as well as Blade's inability to honor contractual commitments to its Part 135 operating partners. Additionally, Blade partners with local catering, shuttle and car service businesses, indirectly supports numerous local jobs, and employs eleven individuals for its operations at HPN, all of whom would be significantly impacted if Blade could no longer operate from FBOs at HPN.

31.    Further, Blade faces unwarranted litigation from the County, as I understand that the County has authorized litigation to enforce Policy No. 1.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

124380850

///

///

///

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 8th day of March 2022 in *New York*, *NY* .

Karoline Lozier

124380850

A-95

# EXHIBIT I

**AVP⊙RTS**

⚲ Westchester County Airport
    240 Airport Road
    Suite 202
    White Plains, NY  10604

☎ 914.995.4856
✉ www.avports.com

VIA CERTIFIED MAIL

November 9, 2021

Melissa Tomkiel
President
Blade Urban Air Mobility, Inc.
31 Hudson Yards, 11th Floor
New York, NY  10001

Dear Ms. Tomkiel:

It has come to our attention that Blade, together with a third-party operator, is providing passenger service out of the Westchester County Airport (HPN) utilizing aircraft in excess of nine seats.

As required by the Westchester County Code and following review with the relevant County officials and the County's outside aviation counsel, such service *must* be conducted at the Terminal and cannot be conducted at a FBO.  Section 712.462(j) of the Westchester County Code, which sets forth the Westchester County Airport Terminal Use Procedures ("TUP"), states that "Passenger Service" must be conducted at the Terminal.  "Passenger Service" is defined as "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity."  WEST. CTY. CODE § 712.462(2)(j).

**In short, any service that involves aircraft of more than nine seats and individual seat sales to any segment of the public must operate from the Terminal pursuant to a Terminal Use Agreement.**

To the extent Blade's services are only offered to members of a private club, please note that a private club in which otherwise unrelated persons purchase individual seats is a segment of the public for purposes of the above-cited law, particularly when operated as Public Charter flights, no matter how restrictive the club's membership might be.  Moreover, the word

A-97

Ms. Melissa Tomkiel                           2                    November 9, 2021

"regardless" as set forth in the TUP and quoted above clearly evinces an intent by the County Legislature to apply that phrase broadly. This is consistent with the County's grant assurance obligations given that this same standard has been applied in the past to commuter airlines providing service at HPN.

Because Blade's flight service out of HPN must be considered "Passenger Service" under the duly enacted Westchester County Code, it can only be provided at the HPN Terminal, and may not be operated to and from a FBO.  Please note that we are in the process of notifying all of the FBOs as to these requirements to ensure that they are applied uniformly and consistently.

This service may be conducted from the Terminal based upon entering into a Terminal Use Agreement (a "TUA") provided that the service meets all the requirements of the County Code.  If a TUA can be entered into during the 2021 calendar year, then the operator can participate in the January 2022 ramp allocation procedure.  If you wish to operate prior to that time, we can also potentially help to obtain interim ramp allocations from either other Terminal operators, or possibly through a special lottery, so as to allow the commencement of service.

You may contact me with any questions at (914) 995-4887.

Sincerely,

Peter Scherrer
Airport Manager

cc (via e-mail):  Joan McDonald, Director of Operations
                 Hugh J. Greechan, Jr., P. E., Commissioner of Public Works & Transportation
                 John Nonna, County Attorney

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR; JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC. | CASE NO. 7:22-cv-01930 |
|               Plaintiffs, | **DECLARATION OF TED BOTIMER IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| COUNTY OF WESTCHESTER, NEW YORK, a charter county; APRIL GASPARRI, in her official capacity as AIRPORT MANAGER; and AVPORTS, LLC | |
|               Defendants. | |

I, Ted Botimer, state and declare as follows:

1.      I am the Senior Vice President, Revenue Management and Strategy for Plaintiff XO Global, LLC ("XO Global"). This declaration is made in support of Plaintiffs' Application for Temporary Restraining Order, and the supporting documents filed therewith. I have personal knowledge, or knowledge based upon my review of the corporate record, of the facts set forth herein and, if called upon to testify as a witness, I could and would testify competently thereto.

2.      Along with the other Plaintiffs in this action, XO Global has filed this action to prevent the enforcement of Westchester County Airport Operational Policy No. 1 ("Policy No. 1"), Section 712.462 of the Westchester County Municipal Code/the Terminal Use Procedures ("TUP"), and other related government actions enforcing the same policy imposed by Defendants that would prohibit Plaintiffs, including XO Global, from servicing Westchester County Airport ("HPN" or "Airport").

3.      XO Global is an indirect air carrier that that furnishes air transportation pursuant to authority granted by the Department of Transportation ("DOT") under 14 C.F.R. Part 380 ("Part

A-99

380"). As relevant here, XO Global partners with various 14 C.F.R. Part 135 ("Part 135") Air Carriers, such as Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), to sell individual seats to the public for flights pursuant to its authority from DOT under Part 380.

4. XO Global's operations are fully compliant with Part 380 regulations and federal law.

5. XO Global provides on-demand charter, priority access to private jet fleet, and other programs to meet private aviation needs, as well as products for flyers who have demanding schedules and minimal flexibility around how and when they fly.

6. XO Global provides a level of safety, convenience, and a socially distanced flying experience that is not otherwise available to big airline customers. XO Global's services are safe, federally authorized, and especially well-suited for individuals who travel during the pandemic. XO Global's operations are also quieter than large airlines.

7. XO Global, and its related company, JetSmarter, Inc., has been operating out of various fixed based operators ("FBO") at HPN since 2015. A FBO is an aeronautical service provider located at an airport that, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators.

8. XO Global has offered flights between HPN and Van Nuys, Oakland, and various locations in South Florida. In the last twelve months, XO Global organized more than one thousand flights and transported more than 12,000 passengers to and from HPN.

9. XO Global's flights have an impeccable safety record and not a single operator XO Global worked with had any safety incidents at HPN.

10. XO Global's operations are structured differently than the large scheduled airlines that also operate out of HPN.

124179638

11.     XO Global flights follow a TSA-approved "Twelve-Five" Security Plan, which is a regulatory protocol that permits its customers to bypass TSA security checkpoints in the main passenger terminal ("Terminal").  The "Twelve-Five" Security Plan is uniquely available for Part 135 operators (and thus Part 380 operators like XO Global that partner with Part 135 operators). XO Global's flights maintain a rigorous TSA-approved and monitored security plan, which is superior to and in many ways exceeds the standard TSA plan utilized in an airport's main terminal. For instance, XO Global contracts with private K-9 security providers to utilize K-9s to search customer luggage.  Customers can pass through security screening and board their flight thirty minutes before departure, and avoid the long lines and crowds associated with the Terminal's TSA protocols.  The result is a fast, crowd-free airport experience that is still compliant with federal safety regulations.  Additionally, by partnering with Part 135 operators that have a Twelve-Five security protocol, XO Global has the ability to offer routes to smaller markets from non-SIDA locations at FBOs.

12.     In addition to its streamlined security screening, XO Global offers other valuable services to their customers when they operate from a FBO that cannot be offered at the Terminal. These services include valet and shuttle services, concierge services, and speedier check-in and boarding.

13.     XO Global's flights are quiet and lessen the impact of charter planes on the surrounding community.  XO Global's shared flights address the inefficiencies of the private aircraft industry by flying ten or more passengers and increasing the efficiency of seating capacity. XO Global's services minimize the impact of charter planes by aggregating passengers into smaller or quieter aircraft when passengers may instead individually charter their own aircraft which would create further impact or airport congestion.  For example, instead of ten passengers chartering their

124179638

own aircraft individually to the same destination, XO Global's flight offerings aggregate those ten passengers in one aircraft, thus minimizing the impact by comparison.

14.    Given that XO Global's customers are processed through this separate (not lesser) TSA-approved screening protocol, customers flying with XO Global are not processed through the Terminal's TSA checkpoints.  Instead, XO Global's federally authorized certification status and the Twelve-Five Security Plan that is available to the carriers that perform the flights and its business model require it to enplane and deplane passengers at non-Security Identification Display Area ("non-SIDA") security checkpoints.  A Security Identification Display Area ("SIDA") location is differentiated and cordoned off from non-SIDA locations at HPN—but both types of security procedures are TSA-approved and meet federal regulations.  The Terminal at HPN is currently a SIDA-only space, and under federal regulations, XO Global's customers are not permitted to enter SIDA checkpoints or mingle with passengers that have been screened through SIDA.  The only option for XO Global is to maintain operations at the FBOs.  As a result, XO Global is unable to operate from the Terminal unless HPN establishes a non-SIDA location.

15.    Due to the lack of non-SIDA accommodations at HPN, XO Global's and JetSmarter's, its related company, flights have been operating from the FBOs since 2015.  Many other Part 135 and Part 380 operators utilize FBOs at HPN for access to a non-SIDA location.  This is a common form of federally licensed and approved operations and business model in the air transportation industry that has been in existence without controversy for decades.

16.    In fact, Part 380 operations at HPN have long occurred at FBOs, and public charter operations under Part 380 go back many decades.  As a Part 380 operator, until recently, XO Global has not been subject to the TUP at HPN, nor has the Airport prior to the end of last year asked XO Global to sign the Terminal Use Agreement ("TUA").

124179638

17.      On November 5, 2021, the County of Westchester ("County"), through the County's operator AvPorts, and Airport Manager, Peter Scherrer contacted XO Global.   The County asserted XO Global was subject to the Airport's TUP and required to conduct all of its services from the Terminal rather than at a FBO because XO Global sells individual seat tickets to the public on aircraft with more than nine seats.  The County further stated XO Global was required to operate from the Terminal even if its customers were members of a private club.  The County informed XO Global that it had to discontinue its operations and arrange to move its operations to the Terminal pursuant to a TUA.  A true and correct copy of the November 5, 2021 letter is attached hereto as Exhibit L.

18.      Over the course of two months, XO has engaged in discussions with the County's representatives to find an amicable resolution.

19.      In response to Defendants' demands and, in an effort to reach a good faith compromise, XO proposed completing passenger check in at the Ross Aviation East FBO and transporting the passengers to the aircraft that parked at the terminal to be boarded planeside.  This proposal was ultimately denied without explanation.  The County has refused any proposals to allow XO Global to operate from an alternative non-SIDA location.

20.      The Terminal poses a number of legal and logistical challenges to XO Global's operations.  At the Terminal, XO Global will be forced to route customers through the Terminal's TSA screening protocol, despite having a legal right to utilize TSA-approved screening procedures designated for Part 135 carriers, because the Terminal does not provide for non-SIDA TSA screening procedures.

21.      Routing passengers through the standard TSA screening and into SIDA checkpoints eliminates XO Global's ability to offer routes connecting other airports without TSA facilities or

124179638

airports where the flight enplanes at a non-SIDA location because customers who arrive at HPN's Terminal from these locations are not permitted to deplane at HPN because they were not screened through TSA at the airport of origin. Such a requirement would alter and interfere with XO Global's federally authorized procedures.

22.    This would also eliminate a key feature of XO Global's business and one of the primary reasons that customers choose to fly with XO Global.

23.    If XO Global is forced to move to the Terminal, it would also no longer be able to offer valet, concierge services, and speedier check-in and boarding to its customers.

24.    XO Global will suffer irreparable harm if it is required to abide by Policy No. 1 and enter into a TUA. XO Global spent time and money in building its operations at HPN and contributing to the local economy. XO Global's related company, JetSmarter and XO have been building the market and the shared charter routes from HPN since 2015. If Policy No. 1 is enforced, XO Global stands to lose the significant investments it has made toward its operations at HPN. As of March 8, 2022, XO has sold 530 seats for 150 flights that are scheduled through April 30, 2022 alone for a total revenue of over $1 million that will be lost. XO Global's customer base would be forced to cancel flights that have already been booked and will be unable to book future flights, which will in turn damage XO Global's reputation and goodwill.

25.    Because of the drastic impact Policy No. 1 will have on XO Global, XO Global will be forced to eliminate routes, cease operations, and lay off employees.

26.    XO Global estimates that it would lose approximately tens of millions in revenue annually if it cannot continue organizing flights to and from HPN. In addition, XO is likely to lose a significant number of its customers who have been utilizing XO's and JetSmarter's shuttle flights to and from HPN for years.

27.    Further, XO Global faces unwarranted litigation from the County as I understand that the County has authorized litigation to enforce Policy No. 1.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 8th day of March 2022 in *Cooper City, Florida*.

*Ted BA*

Ted Botimer

124179638

# EXHIBIT L



 Westchester County Airport
240 Airport Road
Suite 202
White Plains, NY 10604

914.995.4856
www.avports.com

VIA E-MAIL &
CERTIFIED MAIL

November 5, 2021

Anastasija Snicarenko, Esq.
General Counsel, XO Global, LLC
1901 W. Cypress Creek Road, Suite 6B
Fort Lauderdale, FL 33309
ASnicarenko@FlyXO.com

Dear Ms. Snicarenko:

Thank you for your October 7th letter on behalf of XO and JetSmarter Inc., regarding a proposed new flight service out of the Westchester County Airport (HPN).

As required by the Westchester County Code and following review with the relevant County officials and the County's outside aviation counsel, this service *must* be conducted at the Terminal and cannot be conducted at a FBO. Section 712.462(j) of the Westchester County Code, embodying the Westchester County Airport Terminal Use Procedures (the "TUP"), states that "Passenger Service" must be conducted at the Terminal. The TUP define "Passenger Service" as "any air service to or from the Airport for which seats are individually offered or sold to the public *or a segment of the public*, *regardless* of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity." WEST. CTY. CODE § 712.462(2)(j) (emphasis added).

**In short, any service that involves aircraft of more than nine seats and individual seat sales to any segment of the public must operate from the Terminal pursuant to a Terminal Use Agreement.**

We understand your contention that the seat purchases for this proposed service will only be available to members of a private club. However, a private club in which otherwise unrelated persons purchase individual seats is a segment of the public, particularly when operated as Public Charter flights, no matter how restrictive the club's membership might be. Moreover, the word "regardless" as set forth in the TUP and quoted above clearly evinces an intent by the County Legislature to apply that phrase broadly. This is consistent with the County's grant

Anastasija Snicarenko, Esq.                    2                    November 5, 2021

assurance obligations given that this same standard has been applied in the past to commuter airlines providing service at HPN.

Because the new flight service that XO and JetSmarter propose must be considered "Passenger Service" under the duly enacted Westchester County Code, it can only be provided at the HPN Terminal, and may not be operated to and from a FBO. Please note that we are in the process of notifying all of the FBOs as to these requirements to ensure that they are applied uniformly and consistently.

This service may be conducted from the Terminal based upon entering into a Terminal Use Agreement (a "TUA") provided that the service meets all the requirements of the County Code. If a TUA can be entered into during the 2021 calendar year, then the operator can participate in the January 2022 ramp allocation procedure. If you wish to operate prior to that time, we can also potentially help to obtain interim ramp allocations from either other Terminal operators, or possibly through a special lottery, so as to allow the commencement of service.

Finally, and most urgently, it has recently come to our attention that XO is currently offering for sale individual seats on aircraft configured with more than nine seats on flights operated from one or more FBO at HPN. As an example we note a flight from HPN to Palm Beach offered in a 16-seat aircraft departing on November 12th and not operating from the Terminal. The pricing for this flight offered on the XO website allows any member of the public to book a seat and pay a $395 "non-member fee." Similar flights are offered from HPN to Los Angeles, Oakland and London. These flights are in clear violation of the TUP / County Ordinance and undercut your assertions that these services are prospective in nature and offered exclusively to members of a private club. XO must discontinue these non-compliant services immediately and arrange to move its operations to the Terminal pursuant to a TUA as set forth above.

You may contact me with any questions at (914) 995-4887.

Sincerely,

Peter Scherrer,
Airport Manager

cc (via e-mail):  Joan McDonald - Director of Operations
                  Hugh J. Greechan, Jr., P. E. - Commissioner of Public Works & Transportation
                  John Nonna - County Attorney

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM
NYSCEF DOC. NO. 2

INDEX NO. 57179/2022
RECEIVED NYSCEF: 03/07/2022

SUPREME COURT, STATE OF NEW YORK
WESTCHESTER COUNTY

|  |  |
|---|---|
| THE COUNTY OF WESTCHESTER,<br><br>       Plaintiff,<br><br>  -against -<br><br>BLADE URBAN AIR MOBILITY, INC.;<br><br>JETSUITEX, INC.;<br><br>XO GLOBAL LLC;<br><br>CORPORATE FLIGHT MANAGEMENT, d/b/a<br>CONTOUR AVIATION; and<br><br>DELUX PUBLIC CHARTER, LLC,<br><br>       Defendants. | **COMPLAINT** |

   Plaintiff, the County of Westchester ("Westchester" or "the County"), by and through its

statutory counsel, JOHN M. NONNA, Westchester County Attorney, as and for its Verified

Complaint, alleges as follows:

## INTRODUCTION

   1.  This is an action seeking a declaratory judgment that the defendants are required

to comply with County law.

   2.  This action also seeks injunctive relief in the form of a court order prohibiting the

defendants from further violations of County law.

   3.  Westchester is authorized to pass local laws pursuant to Article IX of the New

York State Constitution and Section 1 of New York's Municipal Home Rule Law.

   4.  Part V of the Laws of Westchester County[1] sets forth "General Ordinances

Relating to County Property and Facilities."  Chapter 712 therein sets forth "Use of County-

---

[1] *Available at* https://library.municode.com/ny/westchester_county/codes/code_of_ordinances.

1

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM    INDEX NO. 57179/2022
NYSCEF DOC. NO. 2                                       RECEIVED NYSCEF: 03/07/2022

Owned Properties;" Article IV therein sets forth ordinances regarding "Aviation: Inside County Airport;" and Section 712.462 therein sets forth the "Westchester County Airport Terminal Use Procedures" (hereafter the "TUPs").  All of these laws were duly enacted by the Westchester County Board of Legislators.

5.    Subsection 1 of the TUPs states, in relevant part, that the TUPs "shall apply to all use of the passenger terminal" by "Airlines" providing "Passenger Service," and that "[a]ll Passenger Service provided at the Airport shall be provided at the Terminal."

6.    Subsection 2 of the TUPs states, in relevant part, that Airlines must have "a valid Terminal Use Agreement with the County in effect."  Subsection 2 also sets forth the following definitions:

"Airline" is defined as "any person providing Passenger Service in aircraft designed for more than (9) passenger seats, including but not limited to, any air carrier or other operator certificated to provide Passenger Service under Parts 119, 121 or 135 of the Federal Aviation Regulations, Title 14, Code of Federal Regulations."

"Person" is defined as "any individual, firm, company, association, society, corporation, partnership, co-partnership, joint-stock company, trust, estate, governmental entity or any other legal entity or legal representatives, agents or assigns thereof."

"Passenger Service" is defined as "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity."

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM          INDEX NO. 57179/2022
NYSCEF DOC. NO. 2                                              RECEIVED NYSCEF: 03/07/2022

"Ramp Allocation" is defined as "the authorization to schedule an Airline aircraft operation on the Terminal Ramp during a designated half hour each day.... An operation shall consist of an arrival or a departure."

"Terminal Ramp" is defined as "that portion of the apron at the Airport that is immediately adjacent to the Terminal building and which is available for scheduled Airline operations."

7.      Subsection 3 of the TUPs states, in relevant part, that "[a]n Airline must hold a Ramp Allocation for each aircraft operation scheduled to use the Terminal Ramp."

8.      The TUPS have been in effect since 2004. That same year, the TUPs were reviewed by the Federal Aviation Administration (FAA), whose Office of the Chief Counsel represented to the County that the TUPs comply with federal aviation law.

## JURISDICTION AND VENUE

9.      Pursuant to Laws of Westchester County ("LWC") § 712.462(6)(f), "[t]he County may maintain actions in any court of competent jurisdiction to restrain by injunction … any attempted Passenger Service in violation of this Section."

10.     The Supreme Court, State of New York has personal jurisdiction over the defendants pursuant to CPLR § 302(a) because the defendants have all transacted business within the State of New York.

11.     Venue is proper in Westchester County pursuant to CPLR § 503(a) because Westchester is the plaintiff , and because Westchester is "the county in which a substantial part of the events or omissions giving rise to the claim occurred."

3

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM          INDEX NO. 57179/2022
NYSCEF DOC. NO. 2                                            RECEIVED NYSCEF: 03/07/2022

Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 4 of 32

## PARTIES

12.     Plaintiff, the County of Westchester, is a municipal corporation located in, and existing by virtue of, the State of New York and its laws.

13.     Defendant Blade Urban Mobility, Inc. ("Blade") is an air charter broker that operates as indirect air carrier in accordance with 14 CFR Part 380.  Blade is incorporated in Delaware, with a primary place of business in New York, NY.

14.     Defendant JetSuiteX Inc. ("JSX") is an air charter broker that operates as indirect air carrier in accordance with 14 CFR Part 380.  JSX is incorporated in Delaware, with a primary place of business in Dallas, TX.

15.     Defendant XO Global LLC ("XO") is an air charter broker that operates as indirect air carrier in accordance with 14 CFR Part 380.  XO is incorporated in Delaware, with a primary place of business in Fort Lauderdale, FL.

16.     Defendant Corporate Flight Management, d/b/a Contour Aviation ("Contour") is a Part 135 charter operator.  Contour is incorporated in Tennessee, with a primary place of business in Smyrna, TN.

17.     Defendant Delux Public Charter LLC ("Delux") is a Part 135 charter operator. Delux is incorporated in Delaware, with a primary place of business in Dallas, TX.

18.     Contour and Delux each hold an Air Carrier or Operating Certificate issued by the Federal Aviation Administration ("FAA") pursuant to Title 14 of the Code of Federal Regulations Part 135 (14 CFR Part 135).  Part 135 operations are referred to as "air taxi" or "air charter" operations.  Certificated air carriers are also referred to in applicable U.S. transportation regulations as "direct air carriers."[2]

_____

[2] *See* 14 CFR Part 380.2.

Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 5 of 32

19.     Blade, JSX, and XO (in contrast to Contour and Delux) are not air carriers and

hold no operating certificate permitting commercial transportation by air.  Rather, on information

and belief, Blade, JSX and XO are engaged indirectly in air transportation operations, in that

they arrange, market and sell flights, but utilize the services of a direct air carrier such as

Contour or Delux for the actual flights.  Blade, JSX, and XO are therefore referred to as "indirect

air carriers"[3] or Part 380 Public Charters.

20.     Part 380 of 14 CFR contains a set of Department of Transportation ("DOT")

economic and consumer protection regulations (distinct from FAA safety regulations) with

which U.S. indirect air carriers must comply.  It requires such operators to file a prospectus with

the DOT and to furnish adequate security / financial guarantees to protect the funds of

passengers in the event that flights are cancelled.

## FACTUAL ALLEGATIONS

### Background

21.     The Westchester County Airport (the "Airport") is located approximately five

miles northeast of White Plains, New York.  It has been a public-use airport since 1945, and

offers a mixture of commercial, business and private aviation services.

22.     Westchester owns the Airport, which is managed and operated on behalf of

Westchester by AFCO Avports LLC ("Avports").

23.     Aircraft traffic to and from the Airport (FAA code "HPN") includes flights by

well-known commercial operators such as American Airlines, Delta, and jetBlue.  Pursuant to

the TUPs, each of these commercial operators has a Terminal Use Agreement ("TUA") with

---

[3] *Id.*

5

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM    INDEX NO. 57179/2022
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 03/07/2022

Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 6 of 32

Westchester, which governs their use of the Airport's passenger terminal.  Each commercial

operator also has a Ramp Allocation from Westchester.

24.    Some aircraft traffic to and from the Airport consists of non-public, chartered

flights, often chartered by business entities or professional sports teams.  Because such "whole-

aircraft" charter flights do not involve the sale of individual seats, they are not considered

"Passenger Service," and they are not required by the TUPs to use a Ramp Allocation at the

Airport terminal.  Instead, such flights operate out of other Airport facilities run by various Fixed

Based Operators ("FBOs").

### The Business Model in Dispute

25.    In late 2019, a new business model began to emerge, catering in part to

passengers who wish to avoid flying with the general public out of the Airport terminal on a

typical commercial flight.

26.    Under this model, air charter brokers will charter flights, operating out of various

Airport FBOs, and then sell tickets for individual seats on those flights to the general public,

typically via publicly-accessible websites.  So long as those flights are on aircraft with nine seats

or fewer, the TUPs do not apply because the definition of "Airline" is not met.

27.    In 2021, however, Blade, JSX, and XO began selling individual tickets, to the

general public, on chartered aircraft with more than nine seats.

28.    For example, per a DOT "Statement of Charter Operator and Direct Air Carrier"

filed by Blade and Contour on 4/21/21 (attached hereto as Exhibit 'A'), the aircraft Blade and

Contour are using is a 2002 Bombardier CRJ-200, with sixteen seats.

6

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM          INDEX NO. 57179/2022
NYSCEF DOC. NO. 2                                            RECEIVED NYSCEF: 03/07/2022

Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 7 of 32

29.     Per a similar DOT "Statement of Charter Operator and Direct Air Carrier" filed by JSX and Delux on 10/7/21 (attached hereto as Exhibit 'B'), the aircraft JSX and Delux are using is an Embraer EMB-135/145, with thirty seats.

30.     Upon information and belief, XO has also sold individual tickets, and continues to sell individual tickets, to "the public or a segment of the public," on chartered aircraft with more than nine seats operated by Contour, from an FBO at the Airport.

31.     Blade, JSX and XO do not directly operate these flights; the flights are operated by either Delux (for JSX) or Contour (for Blade and XO). Regardless, per the TUPs, the definition of "Passenger Service" applies "regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity." LWC § 712.462(2).

### Communications with the Defendants

32.     In mid-2021, the County and Avports determined that flights such as those described above violate the TUPs, to the extent they involve individual-seat sales, are offered to "the public or a segment of the public," and are flown on aircraft containing more than nine (9) seats from an FBO as opposed to from the Airport terminal by an operator with a Terminal Use Agreement and Ramp Allocation.

33.     Nevertheless, in an effort to avoid litigation, the County and Avports have, beginning in the Fall of 2021 and continuing through February 2022, engaged in communications with the defendants (and other air charter brokers and operators), including letters, telephone calls, and video conferences.

34.     In the course of these communications, Westchester has made clear that its intent is to bring all air charter brokers and operators into compliance with County law, not just the

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM          INDEX NO. 57179/2022
NYSCEF DOC. NO. 2                                             RECEIVED NYSCEF: 03/07/2022

Case 7.22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 8 of 32

defendants. The defendants named in the instant action are simply those air charter brokers and operators who have refused to comply with County law.

35.    Westchester has also made clear that Avports would work with any and all operators to arrange for the necessary TUAs and Ramp Allocations.

36.    Notwithstanding this spirit of cooperation, Westchester has also repeatedly and consistently asserted its rights. For example, on November 3, 2021, Westchester informed XO that because a flight service XO had proposed is "Passenger Service" under the TUPS, "it could, by law, only be provided at the HPN Terminal" as opposed to an FBO.

37.    On November 5, 2021, the County wrote to JSX, noting that "JSX's passenger service at the Westchester County Airport is being operated out of a Fixed Base Operation, namely Signature Flight Support, as opposed to the Terminal," and stating that JSX must "immediately conform its operations at the Westchester County Airport with local law."

38.    On November 9, 2021, the County wrote to Blade, stating that "any service that involves aircraft of more than nine seats and individual seat sales to any segment of the public must operate from the Terminal pursuant to a Terminal Use Agreement." That same day, the County sent similar letters to a number of FBOs at the Airport, including Signature Flight Support, Ross Aviation, and White Plains Aviation Partners, LLC.

39.    On November 22, 2021, Westchester wrote to XO stating, in part, that XO "must immediately cease and desist the practice of selling more than nine (9) seats on any aircraft flight operated from an FBO at HPN, as this practice violates County law."

40.    On December 1, 2021, Westchester informed JSX that the County and Avports are "currently in the process of identifying any and all operations of this nature and notifying them of the requirement to operate at the Terminal[.]"

8

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM    INDEX NO. 57179/2022
NYSCEF DOC. NO. 2                                       RECEIVED NYSCEF: 03/07/2022

Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 9 of 32

41.     On December 17, 2021, Westchester wrote to XO, noting that "XO and another operator, Contour Aviation, are continuing to offer flights from an FBO at HPN (for example to Florida) that do not comply with this requirement," *i.e.*, to operate public flights with more than nine seats from the Terminal, and stating that "[t]hese current operations must be brought into immediate compliance."

42.     On January 7, 2022, Westchester wrote to JSX noting, *inter alia*, that "[w]hile the County remains willing to provide flexibility for your arriving flights to deplane passengers at a FBO, all other activities must be in compliance with the TUP, which requires, *inter alia,* the staging of aircraft at the Terminal ramp."

43.     On January 21, 2022, Avports published, on behalf of Westchester, a "Public Charter Operational Policy," attached hereto as Exhibit 'C.' This publicly-available policy states, in relevant part:

> Single Seat Charter Operations (SSCO) represent an innovative, recent and distinct type of operation at HPN. In order to determine how to accommodate this new business model at the Airport in compliance with County law, the County has engaged over the last several months in detailed consultations with the SSCOs that have expressed an interest in serving HPN. The County intends to treat all of the SSCO operations in the same fashion, and has developed this policy accordingly.
> …
> SSCOs refer to DOT Part 380 "public charter" operators, offering single-seat sales to the general public, or any segment thereof, on aircraft with more than nine (9) seats.
> …
> For aircraft operations designed for more than nine (9) seats, the Operating Plan shall include passengers and their baggage originating and using the Airport's passenger terminal, at a minimum, for departure. Optional to the Operating Plan is utilizing the passenger terminal for arriving flights.

44.     On February 7, 2022, Westchester sent letters to Contour and Delux. These letters stated, in relevant part, that the County had informed the air charter brokers:

> that these services are in violation of the TUP and must cease. It has been our understanding that they have been sharing this information with you, as the actual

9

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM
NYSCEF DOC. NO. 2
INDEX NO. 57179/2022
RECEIVED NYSCEF: 03/07/2022

Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 10 of 32

AOC operator of the flights in question. However, we are now sending this letter to you directly as the air carrier (along with all other similarly-situated air carriers operating non-compliant SSCO services at HPN) so as to be certain that you are fully aware that these operations are not in compliance. You are hereby so informed, and directed to immediately cease these non-conforming operations and come into immediate compliance. The attached [Public Charter Operational Policy] sets forth the acceptable means of compliance.

45.     To date, neither Delux nor Contour has directly responded to these letters.

46.     However, on February 15, 2022, JSX responded on behalf of Delux and refused to comply with the TUPs or the Public Charter Operational Policy.

47.     For the avoidance of doubt, there are two separate and equally-acceptable ways in which the defendants may come into compliance with County law.  First, the air charter brokers (Blade, JSX, and XO) can permanently cease their practice of selling tickets for individual seats on flights with more than nine seats to "the public or a segment of the public."  Second, the operators (Contour and Delux) can enter into TUAs, obtain Ramp Allocations, and operate the flights in question from the Airport terminal.

## COUNT ONE
### (For Declaratory Relief)

48.      Westchester repeats each and every allegation set forth above as if fully set forth herein.

49.     Pursuant to CPLR § 3001, this Court "may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed."

50.     A "justiciable controversy" exists between Westchester and the defendants as to whether the TUPs, as codified in County law, apply to the defendants with respect to the aforementioned actions at the Airport.

10

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM

NYSCEF DOC. NO. 2

INDEX NO. 57179/2022

RECEIVED NYSCEF: 03/07/2022

51.     The defendants have taken the position that the TUPs conflict with federal aviation law.  They do not.  The primary means by which operators of U.S. public-use airports ("airport sponsors") such as Westchester are regulated is through certain "Grant Assurances" entered into between the sponsor and the FAA in connection with receiving Federal assistance for such airport. Grant Assurance 22, "Economic Nondiscrimination," requires the sponsor to make the airport available as an airport for public use on reasonable terms and without "unjust discrimination."[4]  This requirement does not require an airport sponsor to accommodate all operators at its FBOs simply because that is their business preference. The essence of Grant Assurance 22 is that the sponsor must not "unjustly" discriminate, but sponsors may and do treat differently distinct categories of users, to wit: the new category of "Single Seat Charter Operations" (*see* Ex.C) vs. the whole-aircraft, Part 135 On-Demand charter operations that have long been served at Airport FBOs.

52.     As set forth in its recently-published policy (*see* Ex. C), all of the former are accommodated at the Airport; the defendants have been treated no differently than any other Single Seat Charter Operator.  The point of dispute is simply whether they will comply with the County's law requiring that such operations must be conducted at the Terminal.

53.     Notably, if the defendants were permitted to conduct this type of operation at the FBOs, despite County law to the contrary, Westchester could in fact be accused of unjustly discriminating against other airlines that offer single-seat sales to a "segment of the public" on aircraft with more than nine seats, such as United, Delta, and jetBlue, all of whom operate from the Airport terminal pursuant to a TUA.

---

[4] *See* https://www.faa.gov/airports/aip/grant_assurances/media/airport-sponsor-assurances-aip-2020.pdf.

11

A-119

INDEX NO. 57179/2022
Case 7:22-cv-01930-PMH   Document 21-1   Filed 03/09/22   Page 12 of 32
RECEIVED NYSCEF: 03/07/2022

54.     The County's TUPs do not conflict with 49 U.S.C. § 41713(b)(1), either.  This federal statute prohibits any State (or a "political subdivision" of a State, such as a county) from enacting or enforcing a law or regulation "related to a price, route, or service of an air carrier." The TUPs do not regulate prices, routes or services of an air carrier; they are simply the long-standing mechanism by which the County "carr[ies] out its proprietary powers and rights," as permitted under 49 U.S.C. § 41713(b)(3), such as its power to regulate traffic at the Airport terminal.

55.     Nor do the TUPs conflict with the Airport Noise and Capacity Act of 1990 ("ANCA"), which limits the ability of airport sponsors to impose new noise or access restrictions.  As noted, the County is not imposing any new access restriction; it is merely requiring Single Seat Charter Operations (including, but not limited, to the defendants at bar) to operate from the Airport terminal, just as every other air carrier selling individual seats on aircraft with more than nine seats to a "segment of the general public" has been required to do since 2004.

56.     The defendants have also taken the position that the County's TUPs are out of step with local laws at other airports around the United States.  The TUPs are, in fact, relatively unique in that they predate the applicable FAA regulations.  The FAA has opined, however, that the TUPs are effectively "grandfathered," and may still be applied by the County so long as they are applied in a non-discriminatory manner.  In publishing and disseminating the Westchester County Airport Public Charter Operational Policy (Ex. C), Avports has demonstrated that the TUPs are in fact being applied to all air charter brokers and operators equally.

57.     The aforementioned disputes are purely disputes of law, which this Court may adjudicate.

12

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM          INDEX NO. 57179/2022
NYSCEF DOC. NO. 2                                              RECEIVED NYSCEF: 03/07/2022

Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 13 of 32

58.     Accordingly, Westchester is entitled to an order declaring that the TUPs, as codified in County law, apply to all of the defendants with respect to the aforementioned actions at the Airport.

## COUNT TWO
### (For Permanent Injunction)

59.     Westchester repeats each and every allegation as set forth above as if fully set forth herein.

60.     As set forth above, the defendants have acted in violation of Westchester's rights with respect to the TUPs, which are duly enacted local laws.

61.     Indeed, each of the defendants has continued to act, and in fact is currently acting, in violation of Westchester's rights with respect to the TUPs.

62.     Notably, the defendants continue to do so despite receiving numerous communications from the County and its counsel explaining how their actions violate local law.

63.     Given these repeated and ongoing violations, and the suggestion by the defendants that the local laws in question simply do not apply to them, a declaratory judgment alone would likely be rendered ineffectual.

64.     Accordingly, Westchester is entitled to an order permanently enjoining the defendants from violating the TUPs.

*[Remainder of Page Intentionally Left Blank]*

13

A-121

Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 14 of 32

**WHEREFORE**, Westchester requests a judgment in its favor, as follows:

A.    Declaring that the TUPs, as codified in County law, apply to the defendants with

respect to their activities at the Airport;

B.    Permanently enjoining the defendants from further violations of the TUPs; and

C.    For such other relief that the Court may deem just and proper.


DATED:    White Plains, New York              **JOHN M. NONNA**
          March 7, 2022                        Westchester County Attorney
                                               *Attorney for County of Westchester*

                                               By: _____
                                                   Sean T. Carey
                                                   Sr. Assistant County Attorney, of Counsel
                                                   Michaelian Office Building
                                                   148 Martine Avenue, Room 600
                                                   White Plains, New York 10601
                                                   T: (914) 995-2243
                                                   F: (914) 995-3132
                                                   stca@westchestergov.com

TO:    **BLADE URBAN AIR MOBILITY, INC.**
       499 East 34th Street
       New York, NY 10016

       **JETSUITEX, INC.**
       1341 W. Mockingbird Lane, Suite 600e
       Dallas, TX 75247

       **XO GLOBAL LLC**
       500 E Broward Blvd Ste 1900
       Fort Lauderdale, FL, 33394-3040

       **CORPORATE FLIGHT MANAGEMENT, INC.**
        **d/b/a CONTOUR AVIATION**
       276 Doug Warpoole Road
       Smyrna, Tennessee 37167

       **DELUX PUBLIC CHARTER, LLC**
       1341 W. Mockingbird Lane, Suite 600e
       Dallas, TX 75247

14

A-122

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM          INDEX NO. 57179/2022
NYSCEF DOC. NO. 3                                             RECEIVED NYSCEF: 03/07/2022

# Complaint
# Exhibit A
Blade & Contour DOT Applications

A-123

OMB No. 2106-0005
Expires 01/31/2020

**PAPERWORK REDUCTION Act Statement**

A federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that Control Number for this information collection is 2106-0005. Public reporting for this collection of information is estimated to be approximately 30 minutes per response, including the time for reviewing instructions, completing and reviewing the collection of information. All responses to this collection of information are voluntary. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, U.S. Department of Transportation, Office of International Aviation, X-46, 1200 New Jersey Avenue SE, Suite W-86-445, Washington, DC 20590.

| For DOT Use Only –PC No. 21-051 | Waiver No. 21-008 |
|---|---|

**U.S. Department of Transportation**
Office of the Secretary of Transportation

**STATEMENT OF CHARTER OPERATOR AND DIRECT AIR CARRIER**
**FLIGHT SCHEDULE NUMBER** Blade-Contour-2022-01

**INSTRUCTIONS:** Date of filing for purposes of DOT regulations is the date properly completed forms are received by DOT.

1a. Name (and DBA, if applicable) and Mailing Address of Charter Operator

BLADE Urban Air Mobility, Inc. (DBA Blade)
31 Hudson Yards, 11th Floor
New York, NY 10001
Attn: Sean Grennan

Accepted 5/17/2021
R. Flemmings
PC-21-051

1b. Telephone Number ( )  844-359-2523

Fax Number  ( )

2a. Name (and DBA, if applicable) and Mailing Address of Direct Air Carrier:

Corporate Flight Management, Inc.
800 Blue Angel Way
Smyrna, TN 37167
Attn: Matt Chalfetz

(commuter)

2b. Telephone Number ( )  615-534-4600

Fax Number  ( )  616-984-2100

3. Proposed date and routing of each flight: (use additional pages, if necessary)

see attached schedule.

4. Type of aircraft and number of seats engaged:

2002 Bombardier CRJ-200
(16 seats engaged)

5. Charter price of each flight:*

$  N/A

6. Tour itinerary (if any) including hotels (names and length of stay at each), and other accommodations and services:

N/A

**\*If confidentiality is desired, please state charter price in separate correspondence.**

OST Form 4532

OST 4530, 32-35 Form Disk

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM    INDEX NO. 57179/2022
NYSCEF DOC. NO. 5    Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 17 of 32
RECEIVED NYSCEF: 03/07/2022

We, __Blade Urban Air Mobility, Inc.__
(Charter Operator)

and __Corporate Flight Management, Inc.__
(Direct Air Carrier)

certify that we have entered into a charter contract on __4/21/21__ that covers the
(Date)

flight schedule described above. The contract complies with all applicable DOT regulations.

7. A copy of the flight schedule has been sent to (complete applicable blanks and write "N.A." in those not applicable):

__ACSTAR Insurance Company__
(Charter Operator's Securer)

__Central Bank & Trust__
(Charter Operator's Depository Bank)

__N/A__
(Direct Carrier's Securer)

__N/A__
(Direct Carrier's Depository Bank)

8. Applicant is a U.S. Public Charter Operator as defined in Section 380.2 of the Department's regulations:

_____    __Melissa Tomkiel__    __4/21/21__
(Signature of Officer)    (Name in print)    (Title)

9.    **CHARTER OPERATOR**    **DIRECT AIR CARRIER**

BY: _____    BY: _____
(Signature)    (Signature)

__Melissa Tomkiel__    __Matt Chalfetz__
(Name in print)    (Name in print)

__President__    __CEO__
(Title)    (Title)

__844-359-2523__    /    __516-946-0482__    /
(Phone Number)    (Fax Number)    (Phone Number)    (Fax Number)

__31 Hudson Yards, 11th Floor__    __808 Blue Angel Way__
(Street, Box Number)    (Street, Box Number)

__New York, NY 10001__    __Smyrna, TN 37167__
(City, State, Zip Code)    (City, State, Zip Code)

__4/21/21__    __5/12/21__
(Date)**    (Date)**

**This document is not acceptable if not dated.

**A-125**

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM

INDEX NO. 57179/2022

NYSCEF DOC. NO. 9

RECEIVED NYSCEF: 03/07/2022

Case 7:22-cv-01930-PMH   Document 21-1   Filed 03/09/22   Page 18 of 32

| Blade-Contour-2022-01 | | |
|---|---|---|

| 5/26/21-5/25/22 | Except Holidays Below | |
|---|---|---|
| **SUNDAYS** | OPF | HPN |
| | HPN | OPF |
| | OPF | HPN |
| | HPN | PBI |
| | PBI | HPN |
| | | |
| **MONDAYS** | PBI | HPN |
| | HPN | PBI |
| | PBI | OPF |
| | OPF | HPN |
| | | |
| **THURSDAYS** | HPN | PBI |
| | PBI | HPN |
| | HPN | OPF |
| | | |
| **FRIDAYS** | HPN | OPF |
| | OPF | HPN |
| | HPN | OPF |
| | OPF | PBI |
| | PBI | HPN |
| | HPN | PBI |

| 11/23/21-11/29/21 | Thanksgiving Schedule | |
|---|---|---|
| | | |
| Tuesday (11/23) | HPN | PBI |
| | PBI | HPN |
| | HPN | OPF |
| | | |
| Wednesday (11/24) | OPF | HPN |
| | HPN | OPF |
| | | |
| Sunday (11/28) | OPF | HPN |
| | HPN | OPF |
| | OPF | HPN |
| | | |
| Monday (11/29) | HPN | PBI |
| | PBI | HPN |

| 12/16/21-12/20/21 | Christmas Schedule | |
|---|---|---|
| | | |
| Thursday (12/16) | HPN | PBI |
| | PBI | HPN |

A-126

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM
NYSCEF DOC. NO. 9
INDEX NO. 57179/2022
RECEIVED NYSCEF: 03/07/2022

| Friday (12/17) | HPN | OPF |
| | OPF | HPN |
| | HPN | OPF |
| | | |
| Sunday (12/19) | OPF | HPN |
| | HPN | PBI |
| | | |
| Monday (12/20) | PBI | HPN |
| | HPN | OPF |
| | OPF | HPN |

| 12/26/21-1/2/22 | **New Years Schedule** | |
| | | |
| Sunday (12/26) | HPN | PBI |
| | PBI | HPN |
| | HPN | OPF |
| | | |
| Monday (12/27) | OPF | HPN |
| | HPN | OPF |
| | | |
| Saturday (1/1) | OPF | HPN |
| | HPN | PBI |
| | | |
| Monday (1/2) | PBI | HPN |
| | HPN | OPF |
| | OPF | HPN |

| 1/13/22-1/18/22 | **Martin Luther Schedule** | |
| | | |
| Thursday (1/13) | HPN | PBI |
| | PBI | HPN |
| | | |
| Friday (1/14) | HPN | OPF |
| | OPF | HPN |
| | HPN | OPF |
| | | |
| Monday (1/17) | OPF | HPN |
| | HPN | OPF |
| | OPF | HPN |
| | | |
| Tuesday (1/18) | HPN | PBI |
| | PBI | HPN |

| 2/10/22-2/14/22 | **Valentine's Schedule** | |

A-127

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM
NYSCEF DOC. NO. 9
INDEX NO. 57179/2022
RECEIVED NYSCEF: 03/07/2022

Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 20 of 32

| | | |
|---|---|---|
| | | |
| Thursday (2/10) | HPN | PBI |
| | PBI | HPN |
| | | |
| Friday (2/11) | HPN | OPF |
| | OPF | HPN |
| | HPN | OPF |
| | | |
| Sunday (2/13) | OPF | HPN |
| | HPN | PBI |
| | | |
| Monday (2/14) | PBI | HPN |
| | HPN | OPF |
| | OPF | HPN |

| | | |
|---|---|---|
| 2/17/22-2/22/22 | **President's Schedule** | |
| | | |
| Thursday (2/17) | HPN | PBI |
| | PBI | HPN |
| | | |
| Friday (2/18) | HPN | OPF |
| | OPF | HPN |
| | HPN | OPF |
| | | |
| Monday (2/21) | OPF | HPN |
| | HPN | OPF |
| | OPF | HPN |
| | | |
| Tuesday (2/22) | HPN | PBI |
| | PBI | HPN |

A-128

OMB No. 2106-0005
Expires 01/31/2020

**PAPERWORK REDUCTION Act Statement**

A federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that Control Number for this information collection is 2106-0005. Public reporting for this collection of information is estimated to be approximately 30 minutes per response, including the time for reviewing instructions, completing and reviewing the collection of information. All responses to this collection of information are voluntary. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, U.S. Department of Transportation, Office of International Aviation, X-46, 1200 New Jersey Avenue SE, Suite W-86-445, Washington, DC 20590.

# STATEMENT OF CHARTER OPERATOR OR
# DIRECT AIR CARRIER, AND SECURER



U.S. Department of
Transportation
Office of the Secretary
of Transportation

**INSTRUCTIONS:** Date of filing for purposes of DOT regulations is the date properly completed forms are received by DOT.

We ___Blade Urban Air Mobility, Inc.___
(Charter Operator or Director Air Carrier)

and ___ACSTAR Insurance Company___
(Securer)

certify that we have entered into a security agreement number ___F22780___, in the
(Security Agreement Number)

amount of $___200,000___ on ___5/12/21___. This agreement covers proposed flight schedule
(Amount)          (Date)

number ___Blade-Contour-2022-01___, a copy of which has been received by ___ACSTAR Insurance Company___.
(Securer)

This agreement complies with (§380.34) (§380.34a) of DOT's Regulations (14 CFR §380.34 or §380.34a).

This agreement is a (Check one):
- [✓] Surety Bond
- [ ] Surety Trust Agreement
- [ ] Letter of Credit (for participants of flight schedule number _____)

Check one of the following:
- [ ] This agreement is in an unlimited amount.
- [✓] There are no outstanding claims against this agreement.
- [ ] There are outstanding claims against this agreement in the amount of $_____. We have executed a rider to the agreement

on _____, increasing the coverage by this amount.*
(Date)

*In place of this sentence, the following statement may be used: "_____ will separately pay any claims for
(Securer)

which it may be liable without impairing the security agreement or reducing the amount of coverage."

| CHARTER OPERATOR or DIRECT AIR CARRIER | SECURER |
|---|---|
| BY: _____ (Signature)* | BY: _____ (Signature) |
| Melissa Tomkiel (Name in print) | Henry W. Nozko Jr. (Name in print) |
| President (Title) | President (Title) |
| 844-359-2523 / (Phone Number) (Fax Number) | 860-415-8400 / 860-404-5394 (Phone Number) (Fax Number) |
| 31 Hudson Yards, 11th Floor (Street, Box Number) | 30 South Road (Street, Box Number) |
| New York, NY 10001 (City, State, Zip Code) | Farmington, CT 06032 (City, State, Zip Code) |
| 5/12/21 (Date)** | 5/13/21 (Date)** |

**This document is not acceptable if not dated.

OST Form 4533                                                          OST 4533, 32-35 Form Disk

A-129

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM INDEX NO. 57179/2022
NYSCEF DOC. NO. 5                                                    RECEIVED NYSCEF: 03/07/2022

Case 7.22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 22 of 32

OMB No. 2106-0005
Expires 01/31/2020

**Paperwork Reduction Act Statement**

A federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2106-0005. Public reporting for this collection of information is estimated to be approximately 30 minutes per response, including the time for reviewing instructions, completing and reviewing the collection of information. All responses to this collection of information are voluntary. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, U.S. Department of Transportation, Office of International Aviation, X-46, 1200 New Jersey Avenue SE, Suite W-86-445, Washington, DC 20590.

## STATEMENT OF CHARTER OPERATOR, DIRECT AIR CARRIER AND DEPOSITORY BANK



U.S. Department of
Transportation
Office of the Secretary
of Transportation

**INSTRUCTIONS:** Date of filing for purposes of DOT regulations is the date properly completed forms are received by DOT.

We ___Blade Urban Air Mobility, Inc.___ , ___Corporate Flight Management, Inc.___
(Charter Operator)*                                    (Direct Air Carrier)

and ___Central Bank & Trust___ , certify that we have entered into a depository agreement on
(Depository Bank)

___4/21/21___ . This agreement covers proposed flight schedule number ___Blade-Contour-2022-01___ a copy of which has been
(Date)                                                  (Flight Schedule Number)

received by ___Central Bank & Trust___ . This agreement complies with (§380.34) (§380.34a) of DOT's
(Depository Bank)

Regulations (14 CFR §380.34 or §380.34a). The depository bank is insured by the Federal Deposit Insurance Corporation.

As signatories to this agreement, we fully understand, and will completely fulfill our respective obligations outlined in the agreement and the above-stated DOT regulations.

**CHARTER OPERATOR**

BY: _____
(Signature)*

___Melissa Tomkiel___
(Name in print)

___President___
(Title)

___844-359-2523___ / _____
(Phone Number)       (Fax Number)

___31 Hudson Yards, 11th Avenue___
(Street, Box Number)

___New York, NY 10001___
(City, State, Zip Code)

___4/21/21___
(Date)**

**DIRECT AIR CARRIER**

BY: _____
(Signature)*

___Matt Chaifetz___
(Name in print)

___CEO___
(Title)

___516-946-0482___ / _____
(Phone Number)       (Fax Number)

___808 Blue Angel Way___
(Street, Box Number)

___Smyrna, TN 37167___
(City, State, Zip Code)

___5/12/21___
(Date)**

**DEPOSITORY BANK**

BY: _____
(Signature)*

Greg Guidici
(Name in print)

Vice President
(Title)

720.647.5185 / _____
(Phone Number)       (Fax Number)

4582 S Ulster St, Suite 150
(Street, Box Number)

Denver, CO 80237
(City, State, Zip Code)

May 13, 2021
(Date)**

**This document is not acceptable if not dated.                    *Write "N.A." if there is no charter operator

OST Form 4534                                                    OST 4530, 32-35 Form Disk

A-130

Case 7:22-cv-01930-PMH    Document 21-1    Filed 03/09/22    Page 23 of 32

## CERTIFICATION OF THE PUBLIC CHARTER OPERATOR,
## DIRECT AIR CARRIER, AND ESCROW BANK

Blade Urban Air Mobility, Inc.    Corporate Flight Management, Inc. and    Central Bank & Trust    certify that we will comply with all the
(Public Charter Operator)    (Direct Air Carrier)    (Escrow Bank)

regulatory requirements in 14 CFR Part 380. In particular, we certify that the following statements are true

and accurate. If your Public Charter program is secured by an escrow account pursuant to 14 CFR 380.34(b),

you should begin at item number 1. Go directly to item number 4 if your Public Charter program is covered by

a security agreement pursuant to 14 CFR 380.34(a)).

1) **The Public Charter Operator and Direct Air Carrier** certify that the contract between the charter operator
and the direct air carrier covers the full price of the air transportation, including the cost of aircraft, crew,
maintenance, insurance, fuel, ground handling, landing fees, passenger fees and taxes, and all other costs
associated with the direct air transportation.
Yes____(Go directly to item number 3)    No x___(You must complete item number 2)
N/A____(e.g., for Direct Sales Programs conducted under 14 CFR 212.7)

2) **The Public Charter Operator** certifies that all passenger funds in the charter program will be deposited in
the Public Charter Operator's escrow bank (less travel agent and credit card fees under 14 CFR 380.34
(b)) and that it will provide sufficient instructions to the escrow bank in order for the bank to comply with
the requirements of 14 CFR 380.34(b); the Escrow Bank certifies that it will maintain a full and accurate
accounting of disbursements to all vendors, fuel or ground handling providers, and other expense
categories, e.g., taxes, in accordance with 14 CFR 380.34(b).

Yes x____(Go directly to item number 3)    No_____(Stop – this filing will not be accepted)

3) **The Public Charter Operator** certifies that no debit cards will be accepted from passengers for air
transportation payments unless the Public Charter Operator receives an assurance from the merchant
bank(s) that the credit card/debit card processors will provide the same chargeback protections to those
passengers using debit cards that are provided to credit card users.

Yes x____(Go directly to item number 5)    No_____(Stop – this filing will not be accepted)

4) **The Public Charter Operator** certifies that the security instrument maintained for the **charter program**
**pursuant to 14 CFR 380.34(a) is unlimited** or at least **equal** to the full cost of the air **transportation.**[1] The
full cost of the air transportation includes the cost of aircraft, crew, maintenance, insurance, fuel, ground
handling, landing fees, passenger fees and taxes, and all other costs associated with the air transportation.

Yes____(Go directly to item number 5)    No_____(Stop – this filing will not be accepted)

---

[1]    For programs being conducted pursuant to a waiver from the full bonding requirement, check "yes" and include
waiver number.

A-131

5) <u>The Public Charter Operator</u> certifies that it will maintain access to the reservation records as required by existing rules and share this information with the direct air carrier in case of a disruption in the charter program in order to assist the direct air carrier in complying with its regulatory obligations under 14 CFR 212.3(f). <u>The Direct Air Carrier</u> certifies that it will request from the Public Charter Operator all the information necessary to return passengers that it transported on the outbound flight and has a regulatory responsibility to return to their point or origin in the event of a disruption of the Public Charter program.

Yes  x   (Go directly to item number 6)          No_____(Please Explain below[2]then go directly to
                                                                                              item number 6)

6) <u>The Public Charter Operator</u> certifies that it does not sell vouchers to passengers for travel at unspecified dates in the future.  Purely gratuitous or complimentary vouchers distributed for passenger goodwill are not covered by this certification.

Yes x _____          No_____(Stop – this filing will not be accepted)

**[CHARTERER]**

By: _____

[name and title—if applicable]

Melissa Tomkiel, President

Date: ___4/21/21___

**[CARRIER]**

By: _____

[name title—if applicable]

Date: __5/12/21__

**[BANK]**

By: _____

[name and title—if applicable]

Greg Guidici - Vice President

Date: __May 13, 2021__

---

[2]       This obligation does not apply to direct air carriers that are not subject to section 212.3(f).

A-132

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM INDEX NO. 57179/2022
NYSCEF DOC. NO. 4 RECEIVED NYSCEF: 03/07/2022

# Complaint
# Exhibit B
# JSX & Delux DOT Applications

A-133

AMEND

OMB No. 2106-0005
Expires 01/31/2020

**PAPERWORK REDUCTION Act Statement**

A federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that Control Number for this information collection is 2106-0005. Public reporting for this collection of information is estimated to be approximately 30 minutes per response, including the time for reviewing instructions, completing and reviewing the collection of information. All responses to this collection of information are voluntary. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, U.S. Department of Transportation, Office of International Aviation, X-46, 1200 New Jersey Avenue SE, Suite W-86-445, Washington, DC 20590.

**For DOT Use Only –PC No.** 21-001 _____ **Waiver No.** _____

**U.S. Department of Transportation**
Office of the Secretary of Transportation

**STATEMENT OF CHARTER OPERATOR AND DIRECT AIR CARRIER**
**FLIGHT SCHEDULE NUMBER** _____

**INSTRUCTIONS:** Date of filing for purposes of DOT regulations is the date properly completed forms are received by DOT.

1a. Name (and DBA, if applicable) and Mailing Address of Charter Operator
**JetSuiteX, Inc.**
**1341 W Mockingbird Lane, Suite 600E**
**Dallas, TX 75247**

Accepted 10/7/2021
R. Flemmings

1b. Telephone Number ( ) 800-435-9579 _____
Fax Number ( ) _____

2a. Name (and DBA, if applicable) and Mailing Address of Direct Air Carrier:
**Delux Public Charter, LLC**
**550 N 5th St. #101**
**Rapid City, SD 57701**

2b. Telephone Number ( ) 605-718-3501 _____
Fax Number ( ) _____

3. Proposed date and routing of each flight: (use additional pages, if necessary)
**See Attachment A**

4. Type of aircraft and number of seats engaged:
**Embraer EMB-135/145**
**30 Seats**

5. Charter price of each flight:*
$ Confidential _____

6. Tour itinerary (if any) including hotels (names and length of stay at each), and other accommodations and services:
**None**

***If confidentiality is desired, please state charter price in separate correspondence.**

OST Form 4532                OST 4530, 32-35 Form Disk

A-134

We, JetSuiteX, Inc.
_____
(Charter Operator)

and Delux Public Charter, LLC
_____
(Direct Air Carrier)

certify that we have entered into a charter contract on 10/7/2021 _____ that covers the
(Date)

flight schedule described above. The contract complies with all applicable DOT regulations.

7. A copy of the flight schedule has been sent to (complete applicable blanks and write "N.A." in those not applicable):

First Foundation Bank
_____
(Charter Operator's Securer)

First Foundation Bank
_____
(Charter Operator's Depository Bank)

N/A
_____
(Direct Carrier's Securer)

N/A
_____
(Direct Carrier's Depository Bank)

8. Applicant is a U.S. Public Charter Operator as defined in Section 380.2 of the Department's regulations:

_____        Alex Wilcox                CEO
(Signature of Officer)           (Name in print)              (Title)

9.

CHARTER OPERATOR                          DIRECT AIR CARRIER

BY: _____         BY: _____
(Signature)                                 (Signature)

Alex Wilcox                              Randy Mckinney
(Name in print)                           (Name in print)

CEO                                     COO
(Title)                                  (Title)

469-791-7272    461-791-7929        605-718-3501   461-791-7929
(Phone Number)  (Fax Number)         (Phone Number)  (Fax Number)

1341 W Mockingbird Ln #600E         550 N 5th St, suite 101
(Street, Box Number)                     (Street, Box Number)

Dallas, TX 75247                        Rapid City, SD 57701
(City, State, Zip Code)                   (City, State, Zip Code)

10/7/2021                               10/7/2021
(Date)**                                 (Date)**

**This document is not acceptable if not dated.

A-135

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM
INDEX NO. 57179/2022
NYSCEF DOC. NO. 4     Case 7:22-cv-01930-PMH     Document 21-1     Filed 03/09/22     Page 28 of 32
RECEIVED NYSCEF: 03/07/2022

**Attachment A**
**Proposed Flight Schedule**

| | |
|---|---|
| **Direct Air Carrier** | Delux Public Charter, LLC d/b/a JSX Air |
| **Charter Operator** | JetSuiteX, Inc. |
| **Aircraft** | Embraer EMB 135/145 |
| **Capacity** | 30 seats |
| **Total Flights** | 3,600 |

| Route | Start Date | End Date | Flights |
|---|---|---|---|
| HPN-MIA | 11/15/2021 | 3/31/2022 | 300 |
| MIA-HPN | 11/15/2021 | 3/31/2022 | 300 |
| HPN-OPF | 11/15/2021 | 3/31/2022 | 300 |
| OPF-HPN | 11/15/2021 | 3/31/2022 | 300 |
| FRG-MIA | 11/15/2021 | 3/31/2022 | 300 |
| MIA-FRG | 11/15/2021 | 3/31/2022 | 300 |
| FRG-OPF | 11/15/2021 | 3/31/2022 | 300 |
| OPF-FRG | 11/15/2021 | 3/31/2022 | 300 |
| DAL-MIA | 11/15/2021 | 3/31/2022 | 300 |
| MIA-DAL | 11/15/2021 | 3/31/2022 | 300 |
| DAL-OPF | 11/15/2021 | 3/31/2022 | 300 |
| OPF-DAL | 11/15/2021 | 3/31/2022 | 300 |

A-136

| | |
|---|---|
| **From:** | David Drabinsky |
| **To:** | Flemmings, Reather (OST) |
| **Cc:** | Kruger, Brett (OST); Langhorst, Alie (OST) |
| **Subject:** | Additional Flights to PC21-001 |
| **Date:** | Thursday, October 7, 2021 2:51:10 PM |
| **Attachments:** | PC21-☐☐☐☐☐☐☐☐☐☐☐.pdf |

**CAUTION:** This email originated from outside of the Department of Transportation (DOT). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Hi Reather - Please see additional flights to add to PC21-001. Please let me know if you have any questions.

Thanks,

--
**David Drabinsky**
Vice President of Strategy and Corporate Development
o 469-791-7270 | m 818-624-3124



To fly: www.jsx.com | 800-iFLYJSX

*JSX is proud to be certified by Autism Double-Checked*

LEGAL DISCLAIMER
The information transmitted is intended solely for the individual or entity to whom it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender and delete the material from any computer.

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM          INDEX NO. 57179/2022
NYSCEF DOC. NO. 5     Case 7:22-cv-01930-PMH   Document 21-1   Filed 03/09/22   Page 30 of 32   RECEIVED NYSCEF: 03/07/2022

# Complaint
# Exhibit C
Westchester County Airport
Public Charter Operational Policy # 1

A-138

# AVP◎RTS

**Subject: Westchester County Airport Public Charter Operational Policy #1**
**From:**   Westchester County Airport (HPN) Manager
**Date:**   Issued on January 21, 2022

Thank you for interest in conducting air operations at Westchester County Airport (HPN). We review all proposals, giving consideration and approval commensurate with the County laws within **Section 712.462. Westchester County Airport Terminal Use Procedures** [L.L. No. 2-2004; § 1; amended by L.L. No. 7-2005].

Single Seat Charter Operations (SSCO)[1] represent an innovative, recent and distinct type of operation at HPN. In order to determine how to accommodate this new business model at the Airport in compliance with County law, the County has engaged over the last several months in detailed consultations with the SSCOs that have expressed an interest in serving HPN. The County intends to treat all of the SSCO operations in the same fashion, and has developed this policy accordingly.

"Qualified airlines"[2] and cargo companies conducting Passenger Service must be conducted at the Passenger Terminal pursuant to a Terminal Use Agreement. The following list provides minimum information necessary to satisfy a compliant proposal:

1. Charter company name and direct air carrier name.
2. Equipment type and number of seats.
   If a company currently operates at a Fixed Base Operator (FBO) for equipment with nine (9) or fewer seats, and additionally seeks to perform service utilizing equipment with greater than nine (9) seats, then County approval is required prior to the operation of equipment with greater than nine (9) seats.
3. Operating Plan for both below-wing and above-wing services.
4. Security plan with written TSA approval for both passenger and baggage security screening.
5. Terminal Use Agreement terms that support an executable Agreement with the County.
6. Ground handling for third-party services with valid written agreement(s) of each service, including, but not limited to, aircraft maintenance, de-icing, fueling, catering, and lavatory.
7. FBO agreements for such services performed at respective FBO(s).

During the new entrant or new business coordination process with the County, the Airport will plan for appropriate wayfinding on airport property landside roadways and on the terminal frontage, consistent with other "qualified airlines."

---

[1] Single-Seat-Charter-Operators (SSCOs) to refer to DOT Part 380 "public charter" operators, offering single-seat sales to the general public, or any segment thereof, on aircraft with more than nine (9) seats.
[2] Section 712.462. Westchester County Airport Terminal Use Procedures, Para 2k, a "Qualified Airline" shall mean any Airline that: (1) holds a valid operating certificate from the Federal Aviation Administration for the type of service it provides or seeks to provide at the Airport; (2) has, or has immediate and demonstrable access to, sufficient aircraft and operating personnel to provide the service it provides or seeks to provide; (3) has a valid Terminal Use Agreement with the County in effect; (4) furnishes proof of requisite insurance pursuant to the terms of the then-current Terminal Use Agreement; (5) has designated a representative for purposes of this Section; and (6) is current on its financial obligations with the County.

A-139

FILED: WESTCHESTER COUNTY CLERK 03/07/2022 12:55 PM          INDEX NO. 57179/2022
NYSCEF DOC. NO. 9          RECEIVED NYSCEF: 03/07/2022

Case 7:22-cv-01930-PMH          Document 21-1          Filed 03/09/22          Page 32 of 32

For items #3 and #4 listed above, we offer further clarification herein:

The overall safety, security and health of the operation is of paramount importance and guides approval of any Operating Plan.

For aircraft operations designed for more than nine (9) seats, the Operating Plan shall include passengers and their baggage originating and using the Airport's passenger terminal, at a minimum, for departure. Optional to the Operating Plan is utilizing the passenger terminal for arriving flights.

The Airport supports a plan that optimizes the passenger processing time and, subsequently, overall experience. While all passengers shall be screened at the TSA passenger screening checkpoint, there are approaches for these charter passengers to expedite to the front of the TSA queue, joining the checkpoint directly at the TSA's Ticket Document Checker (TDC) post. We offer the following example scenario.

➢ Charter passengers check-in at the terminal's check-in area →
➢ Checked luggage / bags will be introduced into the terminal's baggage screening system →
➢ Passengers walk to a private area within the terminal, likely on the mezzanine level →
➢ Passengers are potentially offered food & beverage in this private area, per Operator's agreement with third parties →
➢ Once the flight's passengers are ready to move (in a group) to TSA screening, they seamlessly utilize an elevator, which transports them directly to the entry point at the TSA's TDC post. This entry point is rarely used and is restricted to approved carriers, such as jetBlue's *Even More Speed* passengers →
➢ The Airport's ground handling team loads passengers' luggage / bags onto the designated aircraft →
➢ Passengers board the aircraft, remaining indoors and in a swift manner →
➢ Aircraft is parked at a contact gate →
➢ Aircraft pushes back and departs per Carrier and FAA coordination.

This example scenario retains security compliance, excellent customer experience (indoors, no multi-modal transportation, no waiting among crowds), and an overall safe operation.

We look forward to working together to accommodate service for our region's customer demand.

Please refer questions and comments to HPN Properties Manager, Tom Rumbarger, at tar6@westchestergov.com or 914-995-4885.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC., <br><br> Plaintiffs, <br><br> – vs – <br><br> COUNTY OF WESTCHESTER, NEW YORK, a charter company; APRIL GASPARRI, in her official capacity as AIRPORT MANAGER; and AVPORTS, LLC, <br><br> Defendants. | **STIPULATION AND ~~[PROPOSED]~~ ORDER** <br><br> **22-cv-1930 (PMH)** |

**WHEREAS,** on March 7, 2022, Plaintiffs Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc.; XO Global, LLC; and Blade Urban Air Mobility, Inc. (collectively, "Plaintiffs") commenced the instant action (Dkt. No. 1); and

**WHEREAS,** Defendant, the County of Westchester ("Westchester") has represented that Defendants April Gasparri and Avports, LLC (Avports) are, for purposes of this lawsuit, agents of Westchester (the "Westchester Agents"), and act entirely on Westchester's behalf, as set forth in the Airport Management Agreement circulated to all parties by Avports' counsel on Friday, March 11, 2022;

**WHEREAS,** on March 7, 2022, Plaintiffs filed a Complaint in this Action for Declaratory and Injunctive Relief and Demand for Jury Trial alleging that Westchester's and the Westchester Agents' application of Westchester County Airport Operational Policy No. 1 and section 712.462 of the Laws of Westchester County as to the Plaintiffs at Westchester County Airport ("HPN") is preempted by federal law and violates Plaintiffs' constitutional rights;

**WHEREAS,** Westchester denies that Operational Policy No. 1 or section 712.462 are preempted by federal law or that their instant application violates Plaintiffs' constitutional rights;

**WHEREAS,** on March 9, 2022, Plaintiff filed a proposed Order to Show Cause seeking a

1

124631918

A-141

temporary restraining order and preliminary injunction to enjoin Westchester from (1) enforcing Westchester County Airport Operational Policy No. 1 ("Policy No. 1"), as promulgated on January 21, 2022, against Plaintiffs and any Part 135 or other operator (collectively, "Air Carriers") utilized by Plaintiffs to organize flights arriving to or departing from HPN; (2) enforcing section 712.462 (the "TUP") as applied to the Plaintiffs and their Air Carriers at HPN; (3) preventing or interfering with Plaintiffs' continuing operations out of the Fixed Base Operators ("FBO") at HPN; and (4) indirectly violating any of the orders contained therein (Dkt. No. 14);

**WHEREAS,** Westchester and/or the Westchester Agents have previously sent cease and desist letters and/or other communications to Plaintiffs;

**WHEREAS,** by letters dated March 9th and 10th, 2022 (ECF Nos. 21, 29), Westchester represented that it would not seek to enforce its Policy No. 1 against Plaintiffs without a valid court order, specifically representing that "other than its initiation of the state court action, Westchester has not interfered with [Plaintiffs'] flights and will not do so without a valid court order"; and

**WHEREAS,** at a telephone conference with the Court on March 11, 2022, the Westchester County Attorney personally reaffirmed that Westchester would not seek to enforce Policy No. 1 without a valid court order against Plaintiffs or their Air Carriers, so that they can continue their operations at their respective FBOs;

**WHEREAS,** at this same telephone conference, Plaintiffs' counsel expressed concern that the FBOs at the Westchester County Airport, all of whom have leases with Westchester, would, pursuant to cease-and-desist letters sent by Westchester prior to this litigation, interfere with Plaintiffs' flight operations;

2

**WHEREAS**, the Court directed the parties to meet and confer and file a Stipulation "concerning the promises set forth in the County's letters (Doc. 21, Doc. 29) with respect to plaintiffs' operations at the Westchester County Airport and impact on certain non-parties," and

**WHEREAS**, the Court then denied Plaintiffs' request for a TRO (Dkt. No. 34);

In light of the foregoing, Plaintiffs and Westchester, by and through their counsel of record, hereby stipulate as follows:

**IT IS HEREBY STIPULATED AND AGREED,** by and between Plaintiffs and Westchester, through their respective counsel of record, that neither Westchester nor any of its agents will seek to or take any action to enforce Policy No. 1 and/or section 712.462 of the Laws of Westchester County (the "TUP") against Plaintiffs and their Air Carriers without a valid court order; and

**IT IS FURTHER STIPULATED AND AGREED,** that Westchester will not demand, request or otherwise encourage any of the FBOs—specifically, White Plains Aviation Partners, LLC, d/b/a Million Air White Plains ("Million Air"); HPN NY Holdings, LLC d/b/a Ross Aviation ("Ross Aviation"); and Signature Flight Support Corporation, Inc. ("Signature")—at the Westchester County Airport, to seek to enforce the TUP and/or Policy No. 1 against Plaintiffs without a valid court order; and

**IT IS FURTHER STIPULATED AND AGREED,** that Westchester will provide a copy of this stipulation to the FBOs once it is so-ordered by the Court; and

**IT IS FURTHER STIPULATED AND AGREED,** that Westchester will inform the Westchester Agents of this Stipulation and will ensure the Westchester Agents' compliance with this Stipulation.

3

124631918

A-143

DATED: White Plains, New York
          March 15, 2022

David H. Chen, Esq.
**OFFICE OF THE WESTCHESTER**
**COUNTY ATTORNEY**
148 Martine Avenue, Suite 600
White Plains, NY 10601
dhca@westchestergov.com
(914) 995-3616
*Counsel for Defendant Westchester County*

DATED: White Plains, New York
          March 15, 2022

John Nelson Thomas, Esq.
TROUTMAN PEPPER HAMILTON SANDERS
LLP
875 Third Ave, 15th Fl
New York, NY 10022
jack.thomas@troutman.com
(212) 704-6102
*Counsel for Plaintiffs*

SO ORDERED: _____

Philip M. Halpern, United States District Judge

Dated: White Plains, New York
          March 16, 2022

4

124631918

**A-144**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC., | |
| Plaintiffs, | **STIPULATION RE DISMISSAL OF AVPORTS LLC AND MS. APRIL GASPARRI AND [PROPOSED] ORDER** |
| - vs - | |
| COUNTY OF WESTCHESTER, NEW YORK, a charter company; APRIL GASPARRI, in her official capacity as AIRPORT MANAGER; and AVPORTS LLC, | **22-cv-1930 (PMH)** |
| Defendants. | |

**WHEREAS,** on March 7, 2022, Plaintiffs Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc.; XO Global, LLC; and Blade Urban Air Mobility, Inc. (collectively, "Plaintiffs") commenced the instant action (Dkt. No. 1);

**WHEREAS,** Plaintiffs' Complaint in this action seeks Declaratory and Injunctive Relief and Demand for Jury Trial and alleges that the County of Westchester's ("Westchester") application of Westchester County Airport Operational Policy No. 1 and section 712.462 of the Laws of Westchester County as to the Plaintiffs at Westchester County Airport ("HPN") is preempted by federal law and violates Plaintiffs' constitutional rights;

**WHEREAS,** Plaintiffs initially named as Defendants in this action Avports LLC ("Avports"), HPN's management company, and April Gasparri, in her official capacity as Airport Manager, as Ms. Gasparri signed Policy No. 1 as well as cease and desist letters sent to Plaintiffs on Avports letterhead;

**WHEREAS,** all Defendants have represented that, for purposes of this lawsuit, Ms. Gasparri and Avports are mere agents of Westchester and act entirely on Westchester's behalf, as

1

set forth in the Airport Management Agreement circulated to all parties by Avports' counsel on Friday, March 11, 2022;

**WHEREAS,** Ms. Gasparri and Avports requested that Plaintiffs dismiss them from this action based on these representations.

In light of the foregoing, Plaintiffs, on one hand, and Ms. Gasparri and Avports, on the other, by and through their counsel of record, hereby stipulate as follows:

**IT IS HEREBY STIPULATED AND AGREED,** that Plaintiffs will dismiss without prejudice Ms. Gasparri and Avports, pursuant to their representations and Westchester's representations that Ms. Gasparri and Avports are mere agents of Westchester acting on its behalf;

**IT IS FURTHER STIPULATED AND AGREED,** that Ms. Gasparri and Avports agree to abide by and be bound by any Court order entered against Westchester;

**IT IS FURTHER STIPULATED AND AGREED,** that Ms. Gasparri and Avports will not seek to avoid written discovery or depositions solely on the grounds that they are third parties to this action; and

**IT IS FURTHER STIPULATED AND AGREED,** that the statute of limitations as to causes of action in this action against Ms. Gasparri and Avports will be tolled as of March 7, 2022 through the termination of this action.

DATED: Potomac, Maryland
       March 16 , 2022

Brian E. Foont, Esq.
THE FOONT LAW FIRM, LLC
11727 Gainsborough Road
Potomac, MD 20854
foont@foontlaw.com
(202) 236-4851
*Counsel for Defendants Avports LLC and April Gasparri, in her official capacity as Airport Manager*

2

I24748434v2

DATED:  Sarasota, Florida
    March 16, 2022

_____
John Nelson Thomas, Esq.
TROUTMAN PEPPER HAMILTON SANDERS
LLP
875 Third Ave, 15th Fl
New York, NY 10022
jack.thomas@troutman.com
(212) 704-6102
*Counsel for Plaintiffs*

The Clerk of Court is respectfully directed to
terminate April Gasparri and AvPorts, LLC as
defendants in this action.

SO ORDERED.

_____
Philip M. Halpern
United States District Judge

Dated:  White Plains, New York
    March 16, 2022

124748434v2

A-147

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC., | |
| Plaintiffs, | **STIPULATION AND [PROPOSED] ORDER RE STATE COURT ACTION** |
| - vs – | |
| COUNTY OF WESTCHESTER, NEW YORK, a charter company, | **22-cv-1930 (PMH)** |
| Defendants. | |

**WHEREAS,** Plaintiffs Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc.; XO Global, LLC; and Blade Urban Air Mobility, Inc. (collectively, "Plaintiffs") commenced the instant action (Dkt. No. 1) on March 7, 2022, seeking declaratory and injunctive relief alleging that the County of Westchester's (the "County") application of Westchester County Airport Operational Policy No. 1 and section 712.462 of the Laws of Westchester County as codified in the Westchester Country Airport Terminal Use Procedures ("TUP") is preempted by federal law and violates Plaintiffs' constitutional rights as applied to Plaintiffs;

**WHEREAS,** the County commenced an action in the Supreme Court of the State of New York, County of Westchester on March 7, 2022, (Index No. 57179/2022) seeking declaratory and injunctive relief alleging that Plaintiffs have violated Section 712.462 as set forth in the TUPs and that the TUPs are not preempted ("State Court Action");

**WHEREAS,** in light of this Court's May 24, 2022 ruling denying the County's request for abstention, ECF No. 57, the Parties have discussed the appropriate forum for litigation and as a result the County has agreed to dismiss the State Court Action without prejudice;

**WHEREAS,** in exchange for this dismissal, Plaintiffs have agreed to waive any right to attorneys' fees and costs in the State Court Action with each party to bear its own fees and costs

1

126974592v1

in the State Court Action;

**WHEREAS,** Plaintiffs have further agreed to dismiss without prejudice their request for attorneys' fees and costs in this action on their Third Cause of Action for Deprivation of Equal Protection – U.S. Const. Amend. XIV and 42 U.S.C. § 1983; and

**WHEREAS,** Plaintiff have further agreed that Defendant may have a week extension of time to answer the Complaint in this Action.

In light of the foregoing, Plaintiffs and the County, by and through their counsel of record, hereby stipulate as follows:

**IT IS HEREBY STIPULATED AND AGREED,** that the County will dismiss without prejudice the State Court Action; and

**IT IS FURTHER STIPULATED AND AGREED,** that Plaintiffs will waive any right to attorneys' fees and costs in the State Court Action and that each party will bear its own fees and costs in the State Court Action;

**IT IS FURTHER STIPULATED AND AGREED,** that Plaintiffs will dismiss without prejudice any right to attorneys' fees and costs in this action on their Third Cause of Action for Deprivation of Equal Protection – U.S. Const. Amend. XIV and 42 U.S.C. § 1983; and

**IT IS FURTHER STIPULATED AND AGREED,** that Defendants may have a one week extension of time to answer the Complaint in this Action, to June 20, 2022.

DATED: White Plains, New York
June 8, 2022

David H. Chen, Esq.
OFFICE OF THE WESTCHESTER
COUNTY ATTORNEY

2

126974592v1

148 Martine Avenue, Suite 600
White Plains, NY 10601
dhca@westchestergov.com
(914) 995-3616
*Counsel for Defendant Westchester County*

DATED:  White Plains, New York
           June  8  , 2022

Steven D. Allison, Esq.
TROUTMAN PEPPER HAMILTON SANDERS LLP
5 Park Plaza. Suite 1400
Irvine, California
steven.allison@troutman.com
(949) 622-2703
*Counsel for Plaintiffs*

SO ORDERED: _____

Philip M. Halpern, U.S.D.J.

Dated:   White Plains, New York
           June 9, 2022

3

126974592v1

A-150

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC., <br><br>                  Plaintiffs, <br><br>           - vs - <br><br> COUNTY OF WESTCHESTER, NEW YORK, a charter company, <br><br>                  Defendant. | **ANSWER,** <br> **DEMAND FOR JURY TRIAL,** <br> **AFFIRMATIVE DEFENSES,** <br> **AND COUNTERCLAIMS** <br><br> Civil Action No. <br> 22-cv-01930-PMH |

Defendant County of Westchester (s/h/a "County of Westchester, New York, a charter company") (alternatively, the "County" or "County Defendant"), by its attorney John M. Nonna, Westchester County Attorney, by Sean T. Carey, Senior Assistant County Attorney, of counsel, as and for its answer ("Answer") to the Complaint ("Complaint") of plaintiffs Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc. ("Delux"); XO Global, LLC ("XO"); and Blade Urban Air Mobility, Inc. ("Blade") (collectively, "Plaintiffs") alleges as follows:

**PRELIMINARY STATEMENT**

Paragraph 1

1.     This paragraph is multi-sentence; for the sake of clarity—and on all other multi-sentence paragraphs herein—the County restates each sentence separately and answers sentence-by-sentence the allegations therein:

Paragraph 1, Sentence 1

> Plaintiffs have continuously provided safe, economical, and federally authorized air transportation services to the public at Westchester County Airport ("HPN" or "Airport").

1.1     Admits that Plaintiffs have provided safe air transportation services to the public while operating out of the Westchester County Airport (the "Airport"); denies

knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 1, Sentence 2

> Plaintiffs are federally authorized direct and/or indirect air carriers that comply with all applicable federal laws and regulations.

     1.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully questions of law to the Court.

Paragraph 1, Sentence 3

>     Plaintiffs offer a convenient alternative to the large, well-funded air carriers (colloquially referred to as airlines) by (a) providing access to small airports and underserved cities/markets not regularly serviced by the large airlines, and (b) providing customers with convenient flying services the large airlines cannot offer customers, including—a Transportation Security Administration ("TSA")-approved and compliant security screening process that is faster and more convenient than the typical TSA process that is required for the large airlines.

     1.3    Makes no answer regarding Plaintiffs' allegations that their security screening processes are "Transportation Security Administration ("TSA")-approved and compliant," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully questions of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 2

> 2.      Defendants, the County of Westchester and Airport Manager, April Gasparri, in her official capacity (collectively "County Defendants"), along with AvPorts, LLC ("AvPorts")—a private company that provides airport facilities management, operations, airline services, administration, accounting, and noise abatement on behalf of HPN—are unlawfully preventing Plaintiffs from operating at the Airport.

    2.      Denies the allegations; notes that former defendant April Gasparri, sued in her official capacity as Airport Manager ("Gasparri") and former defendant Avports, LLC ("Avports") (collectively, the "Former Defendants") have been dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.[1]

Paragraph 3

    3.      This paragraph is multi-sentence:

Paragraph 3, Sentence 1

> Westchester County officials have publicly admitted and recognized that their local government power cannot simply regulate Plaintiffs' *flights* that depart and arrive at HPN.

    3.1     Denies knowledge or information of the specific alleged admissions, recognitions, and officials to which Plaintiffs here refer; deny the implicit allegation that the County is without authority to regulate Plaintiffs' flights in any regard; makes no response to the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully such questions of law to the Court.

---

[1] To avoid making this note one hundred times, this Answer interprets all future references to "Defendants" as stating "County Defendant."

Paragraph 3, Sentence 2

> Notably, unlike the airlines operating out of the main passenger terminal ("Terminal") at HPN, as 14 C.F.R. Part 380 ("Part 380") operators authorized to sell tickets to the public by the U.S. Department of Transportation ("DOT"), partnering with 14 C.F.R. Part 135 ("Part 135") operators, direct air carriers certified by the Federal Aviation Administration ("FAA"), Plaintiffs' flights enplane and deplane at Fixed Base Operator spaces ("FBOs") at HPN.

3.2 Denies that Delux is a 14 C.F.R. Part 380 ("Part 380") operator; denies that XO or Blade is a 14 C.F.R. Part 135 ("Part 135") charter operator or a direct air carrier certified by the Federal Aviation Administration ("FAA"); denies that Plaintiffs are authorized to sell tickets to the public without limitation; admits the remaining allegations.

Paragraph 3, Sentence 3

> This is a common form of federally licensed and approved operations and business model in the air transportation industry that has been in existence without controversy for decades.

3.3 Admits that the general practice of Part 380 operators partnering with Part 135 operators is "a common form of federally licensed and approved operations and business model in the air transportation industry that has been in existence without controversy for decades"; denies that Part 380 operators operating out of FBOs at the Westchester County Airport ("HPN") have engaged in the practice of offering individual-seat sales on aircraft containing more than nine (9) seats to the public or a segment of the public (the "Practice") for decades; denies that the Practice is federally licensed or approved.

4

Paragraph 3, Sentence 3

> Yet, Defendants attempt to accomplish their goal of regulating what they cannot regulate – for instance the number of Plaintiffs' flights departing from or arriving at HPN FBOs – by adopting and enforcing policies that require certain Part 380 operators (including Plaintiffs) to move their departing and arriving flights from an FBO to the Terminal.

    3.4    Denies the allegations.

Paragraph 3, Sentence 4

> Even if Plaintiffs could continue their operations in the Terminal, Plaintiffs would be subject to further regulations that would unlawfully restrict and eliminate Plaintiffs' flights at HPN.

    3.5    Denies the allegations.

Paragraph 4

    4.    This paragraph is multi-sentence:

Paragraph 4, Sentence 1

> Specifically, Defendants' attempt to expand their local government control over federally regulated and preempted issues led to Defendants' recent adoption of the Westchester County Airport Operational Policy No. 1 ("Policy No. 1"), which effectively prohibits Plaintiffs from operating at HPN compliant with their federally regulated and issued licenses and authorities.

4.1     Admits that on January 21, 2022, Avports issued HPN Public Charter Operational Policy #1 ("Policy No. 1"); denies the remaining allegations.

Paragraph 4, Sentence 2

> At the end of 2021, Defendants began enforcing the Westchester County Municipal Code § 712.462, a local ordinance codifying the County's Terminal Use Procedures ("TUP"), under a novel and erroneous interpretation to require Plaintiffs to operate out of the Terminal and enter into a Terminal Use Agreement ("TUA").

4.2     Denies the allegations.

Paragraph 4, Sentence 3

> The TUA, in turn, imposed further restrictions, including subjecting users to a lottery system to determine allocation and flight capacity and requiring users to alter flight schedules to adhere to Terminal ramp allocations and passenger limitation restrictions.

4.3     Denies that the Terminal Use Agreements ("TUAs") impose restrictions; denies knowledge or information sufficient to form a belief as to the allegation that TUAs require users to alter flight schedules; admits the remaining allegations.

Paragraph 4, Sentence 4

> Although Part 380 operations at HPN have long occurred at FBOs, Defendants recently adopted Policy No. 1 in January 2022 to specifically require certain Part 380 operators to move their flights to the Terminal.

4.4     Denies that the Practice has long occurred at HPN FBOs; denies that the definition of "Part 380 operations" can include the Practice simply because Part 380 operators are now engaging or attempting to engage in the Practice; denies that Policy No. 1 was "adopted"; denies that Policy No. 1 represented a change in the relevant law or applicable applications; denies that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refers respectfully the Court to Policy No. 1 as the best evidence of its content and import; denies that Policy No. 1 or section 712.462 of the Laws of Westchester County (the "TUP") targets or singles out Part 380 operators; admits that "Part 380 operations," not including the Practice, "have long occurred at [HPN] FBOs."

Paragraph 5

5.     This paragraph is multi-sentence:

Paragraph 5, Sentence 1

> But the TUP has historically and for good reason been applied only to large airlines, and not to the Plaintiffs which operate under Part 380.

5.1     Denies the allegations.

Paragraph 5, Sentence 2

> Plaintiffs, because of their federally regulated and authorized procedures, must operate from a non-Security Identification Display Area ("non-SIDA").

7

5.2     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully such questions of law to the Court; to the degree that a response is required, denies the allegations.

Paragraph 5, Sentence 3

> Unlike many other airports that are configured to segregate TSA-screened from non-screened passengers such that non-screened passengers can still access non-SIDA boarding, and arrival and baggage claim areas, HPN does not currently offer a non-SIDA area in the Terminal.

5.3     Admits that HPN does not currently offer a non-Security Identification Display Area ("non-SIDA") area at its main passenger terminal (the "Terminal"); denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 5, Sentence 4

> Accordingly, Plaintiffs have each historically operated out of FBOs to enplane and deplane passengers outside of the Terminal.

5.4     Admits that Plaintiffs have historically operated out of HPN FBOs; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 6

6.     This paragraph is multi-sentence:

Paragraph 6, Sentence 1

> In fact, Plaintiffs' customers cannot, under federal regulations, enter the Terminal Boarding Area in its current configuration.

6.1     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully such questions of law to the Court; to the degree that a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 2

> This is because the Terminal is currently a SIDA-only space, and Plaintiffs' passengers who are screened through a different, but nonetheless TSA-approved screening process, cannot enter SIDA areas.

6.2     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully such questions of law to the Court; to the degree that a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 3

> Stated differently, Plaintiffs operate a federally approved style of flying that does not require customers to pass through the standard TSA checkpoints found at most large airports.

6.3     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully such questions of law to the

Court; to the degree that a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 4

> Indeed, at the core of Plaintiffs' business models is that customers can forego crowded terminals, long lines and TSA security checkpoints in favor of a non-SIDA TSA-approved security protocol.

      6.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 5

> Entirely consistent with federal law, Plaintiffs' customers can arrive 20 minutes before a flight, pass through Plaintiffs' TSA-compliant and approved security procedures at the FBO, and avoid long lines and large crowds.

      6.5    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 6

> Plaintiffs' TSA-approved security protocol also allows Plaintiffs to provide access to additional or smaller airports and underserved cities not regularly serviced by the large airlines, or in underserved airports that do not generate sufficient traffic to justify the resources required of establishing a SIDA TSA checkpoint.

6.6     Makes no answer regarding the allegation that Plaintiffs' security protocol is "TSA-approved," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully such a question of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 7

> Plaintiffs are able to offer their federally approved services to such locations only through a non-SIDA location.

6.7     Notes that the allegation that non-SIDA services cannot be offered through a SIDA location is tautological; makes no answer regarding the allegation that Plaintiff's services are federally approved, which is a legal conclusion; save to demand strict proof thereof and to refer respectfully such a question of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 7

7.     This paragraph is multi-sentence:

Paragraph 7, Sentence 1

> Defendants know all of this.

7.1     Denies the allegation.

Paragraph 7, Sentence 2

> However, Defendants have issued various notices in recent months to Plaintiffs demanding that they utilize the Terminal for their operations and notifying them that they are not in compliance with Policy No. 1 if they continue to operate out of their respective FBOs.

7.2    Admits that County Defendant issued various notices to Plaintiffs demanding that they comply with the TUP; denies the remaining allegations.

Paragraph 7, Sentence 3

> They have further refused to provide any reasonable accommodations to Plaintiffs, such as to establish a non-SIDA area in the Terminal, so that Plaintiffs can continue their operations.

7.3    Denies the allegations.

Paragraph 8

> 8.    As a result, Defendants' Policy No. 1 effectively precludes Plaintiffs from operating at HPN and deprives Plaintiffs of reasonable and non-discriminatory access to the Airport in violation of federal law.

8.    Denies the allegations.

Paragraph 9

9.    This paragraph is multi-sentence:

Paragraph 9, Sentence 1

> Because of Defendants' conduct, Plaintiffs do not have a solution for reasonable access to HPN, a federally funded and regulated, public use Airport.

9.1    Admits that HPN is a "federally funded and regulated, public use Airport"; deny the remaining allegations.

Paragraph 9, Sentence 2

> Defendants' unlawful conduct prevents Plaintiffs from offering diverse and underserved routes and services that are fully authorized by federal law.

9.2    Denies the allegations.

Paragraph 9, Sentence 3

> Defendants' conduct was performed with the specific intent of discriminating against Plaintiffs.

9.3    Denies the allegations.

Paragraph 10

10.    This paragraph is multi-sentence:

Paragraph 10, Sentence 1

> Defendants' conduct is unlawful for at least two reasons: (1) it is preempted by federal law; and (2) it violates Plaintiffs' right to equal protection under the law.

10.1    Makes no answer to the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 10, Sentence 2

> For both reasons, Plaintiffs seek declaratory and permanent injunctive relief to ensure that they will be able to provide air transportation services at the Airport.

10.2    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

## JURISDICTION

Paragraph 11

> 11.    This Court has original jurisdiction over the subject matter of this action pursuant to (1) 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States: (2) because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution; and (3) this Court's inherent jurisdiction to grant equitable relief for violations of the United States Constitution and the laws of the United States.

11.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 12

12.    This paragraph is multi-sentence:

14

Paragraph 12, Sentence 1

> This Court has personal jurisdiction over Defendants because they are domiciled in, reside in, or are a county located in New York and because their denial of Plaintiffs' rights under the United States Constitution and the laws of the United States occurred within New York.

12.1    Admits that County Defendant is domiciled in Westchester County, New York; denies that County Defendant denied any of Plaintiffs' rights; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 12, Sentence 2

> The injuries caused by each Defendant thus occurred in New York.

12.2    Admits that the conduct about which Plaintiffs complain occurred in New York; denies the remaining allegations.

Paragraph 13

> 13.    This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

13.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 14

> 14.     This Court also has authority to enter injunctive relief for Defendants' violation of federal law and the United States Constitution pursuant to 28 U.S.C. § 1331 under *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002), *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d. Cir. 2016), *certiorari denied by* 137 S. Ct. 2295 (2017) and equity jurisdiction authorized by *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny.

14.     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

## PARTIES

Paragraph 15

15.     This paragraph is multi-sentence:

Paragraph 15, Sentence 1

> Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("Delux") is a Delaware limited liability company with its administrative offices located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas.

15.1     Admits the allegations.

Paragraph 15, Sentence 2

> Delux is a FAA-certificated, on-demand air carrier that operates commercial flights pursuant to Part 135 and holds a Commuter Air Carrier Authorization issued by the DOT.

15.2    Denies knowledge or information sufficient to form a belief as to whether Delux holds a Commuter Air Carrier Authorization issued by the DOT; admits the remaining allegations.

Paragraph 15, Sentence 3

> Delux's operations are safe, legal, quieter than traditional airlines at HPN, and offer the traveling public a unique alternative to those traditional airlines.

15.3    Admits that Delux's operations at HPN are safe; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 15, Sentence 4

> Indeed, due to Delux's ability to facilitate a fast, terminal-free, and socially distanced boarding and travel experience, customers are able to travel with confidence even during the pandemic.

15.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 15, Sentence 5

> Delux has an impeccable safety record.

15.5    Denies knowledge or information sufficient to form a belief as to the truth of the allegation.

Paragraph 15, Sentence 6

> Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, Delux is fully compliant with all applicable federal, state, and local laws.

15.6    Denies that the implementation of the TUP or the issuance of Policy No. 1 was illegal; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required regarding the remaining allegations, denies knowledge or information sufficient to form a belief as to their truth.

Paragraph 15, Sentence 7

> Though Delux's operations are fully compliant with federal law, they are structured differently than the large scheduled airlines that operate out of HPN.

15.7    Admits that Delux's operations at HPN are "structured differently than the large scheduled airlines that operate out of HPN"; denies knowledge or information sufficient to form a belief as to the truth of the allegation that Delux's non-HPN operations are "structured differently than the large scheduled airlines that operate out of HPN"; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 15, Sentence 8

> Delux's departure times, departure locations, and arrival locations are specifically negotiated with its sole customer, JetSuiteX, Inc.

15.8    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 16

16.    This paragraph is multi-sentence:

Paragraph 16, Sentence 1

Plaintiff JetSuiteX, Inc. ("JetSuiteX") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas.

16.1    Admits the allegations.

Paragraph 16, Sentence 2

JetSuiteX is the parent corporation of Delux.

16.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegation.

Paragraph 16, Sentence 3

JetSuiteX is an indirect air carrier that sells tickets for Delux flights pursuant to authority granted by DOT.

16.3    Admits the allegations.

Paragraph 16, Sentence 4

> Under this federally authorized arrangement, JetSuiteX sells tickets to the traveling public, JetSuiteX charters an entire Delux flight, and then Delux operates the flight using the time, location, and destination designated by JetSuiteX.

16.4    Makes no answer regarding the allegation that the arrangement between Delux and JetSuite X is "federally authorized," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 16, Sentence 5

> Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, JetSuiteX is fully compliant with all applicable federal, state, and local legal obligations.

16.5    Denies that the implementation of the TUP or the issuance of Policy No. 1 is illegal; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 16, Sentence 6

> Collectively, JetSuiteX and Delux will be referred to as "JSX" unless otherwise noted.

16.6   Admits the allegation.

Paragraph 17

17.   This paragraph is multi-sentence:

Paragraph 17, Sentence 1

> Plaintiff XO Global, LLC ("XO Global") is a limited liability company registered under the laws of Delaware with its principal place of business located at 1901 West Cypress Creek Road, Suite 6B in Fort Lauderdale, Florida.

17.1   Admits the allegations.

Paragraph 17, Sentence 2

> XO Global's parent company is XO Holding Inc., whose parent company is Vista Global Holding Limited.

17.2   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 17, Sentence 3

> XO Global is an indirect air carrier that offers on-demand charter, priority access to a private jet fleet, and other programs to meet private aviation needs, as well as products for flyers who have demanding schedules and minimal flexibility around how and when they fly.

17.3   Admits that XO is an indirect air carrier; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 17, Sentence 4

> XO Global partners with various Part 135 Air Carriers, such as Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

17.4    Admits that XO partners with Contour; admits that XO sells individual seats to the public for flights; makes no representation regarding the allegation that XO operates "pursuant to its authority from the DOT under Part 380," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 18

18.    This paragraph is multi-sentence:

Paragraph 18, Sentence 1

> XO Global's flights have an impeccable safety record, as not a single operator XO Global has worked with has had any safety incidents at HPN.

18.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 18, Sentence 2

> Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, XO Global is also fully compliant with all applicable federal, state, and local laws.

18.2    Denies that the implementation of the TUP or the issuance of Policy No. 1 was illegal; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 19

19.    This paragraph is multi-sentence:

Paragraph 19, Sentence 1

> Plaintiff Blade Urban Air Mobility, Inc. ("Blade") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 499 East 34th Street, New York, New York.

19.1    Admits the allegations.

Paragraph 19, Sentence 2

> Blade is a wholly-owned subsidiary of Blade Air Mobility, Inc., a publicly traded company.

19.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 19, Sentence 3

> Blade is a technology-powered, global air mobility platform committed to reducing travel friction by enabling cost-effective air transportation alternatives to some of the most congested ground routes in the U.S. and abroad.

19.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 19, Sentence 4

> Blade arranges on-demand charter and scheduled flights across a diverse accessible fleet of helicopters, jets, turboprops, and seaplanes.

19.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 19, Sentence 5

> Blade is an indirect air carrier that furnishes air transportation pursuant to authority granted by DOT.

19.5    Admits that Blade is an indirect air carrier; makes no answer regarding the remaining allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 19, Sentence 6

> Blade's flights have an impeccable safety record, and Blade has not experienced any passenger or employee safety incidents at HPN.

19.6    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 19, Sentence 7

> Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, Blade is fully compliant with all applicable federal, state, and local legal obligations.

19.7    Denies that the implementation of the TUP or the issuance of Policy No. 1 was illegal; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 19, Sentence 8

> Blade partners with Part 135 operators, such as Contour, to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

19.8    Admits that Blade partners with Contour; admits that Blade sells individual seats to the public for flights; makes no representation regarding the allegation that XO operates "pursuant to its authority from the DOT under Part 380," which is a legal

conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 20

20.    This paragraph is multi-sentence:

Paragraph 20, Sentence 1

> Consistent with HPN's badging process, Blade employees are also required to complete a security clearance and undergo a badging process conducted by HPN consistent with procedures in the Terminal.

20.1    Admit that four Blade employees opted for the Criminal Records History Check ("CHRC") option for one of the two security background checks that are pre-requisites for the Airport's ID application/badging process; deny knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 20, Sentence 2

> Blade's employees at HPN are further required to complete a formal safety training with the FBO that it operates out of at HPN, White Plains Aviation Partners LLC d/b/a Million Air ("Million Air").

20.2    Deny the implicit allegation that the County requires a safety-training course for Blade's employees; deny knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 21

21.    This paragraph is multi-sentence:

Paragraph 21, Sentence 1

> Defendant County of Westchester, New York ("County"), is a municipal corporation located in the Southern District of New York, with capacity to sue and be sued.

21.1    Admits the allegations.

Paragraph 21, Sentence 2

> The County is the owner of the Airport.

21.2    Admits the allegations.

Paragraph 21, Sentence 3

> The Airport, a division of the County, is a commercial and general aviation airport located at 240 Airport Road, White Plains, New York, within the Southern District of New York.

21.3    Denies that the Airport is a division of County Defendant; admits the remaining allegations.

Paragraph 21, Sentence 4

> The Airport is the only commercial service airport in the County and the primary provider of general aviation services and facilities in the County.

21.4    Admits the allegations.

Paragraph 21, Sentence 5

> The acceptance and receipt of federal grant money obligates the airport sponsor, *i.e.*, the County, to comply with statutorily enumerated obligations, known as "Grant Assurances."

21.5    Admits the allegations.

Paragraph 21, Sentence 6

> Here, the County receives federal grant money to operate and finance investment at the Airport and, as a result, is obligated by the Grant Assurances and federal statutes to operate in a reasonable, non-discriminatory, and financially self-sustaining manner.

21.6    Admits the allegations.

Paragraph 22

22.    This paragraph is multi-sentence:

Paragraph 22, Sentence 1

> The County operates and maintains the Airport as a governmental function for the primary purpose of providing air transportation to the public.

22.1    Admits that County Defendant operates and maintains the Airport; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 22, Sentence 2

> The County's Airport operations are managed by nine current members and two ex-officio members who make up the Westchester County Airport Advisory Board ("Board").

22.2    Denies the allegations.

Paragraph 22, Sentence 3

> The Board, and each of its individual members, are representatives, agents, and employees of the County and the scope of their duties includes, among other things, adopting Policy No. 1.

22.3    Denies the allegations.

Paragraph 22, Sentence 4

> The County is a person within the meaning of 42 U.S.C. § 1983.

22.4    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 23

23.    This paragraph is multi-sentence:

Paragraph 23, Sentence 1

> Defendant April Gasparri ("Ms. Gasparri" or "Airport Manager"), is named in her official capacity as the Airport Manager of HPN.

23.1    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 23, Sentence 2

> At all times relevant to this complaint, Ms. Gasparri (or alternatively her predecessor(s)) was and is an agent and employee of the County, responsible for developing airport policies and administering all activities associated with the operation of a medium hub commercial airport.

23.2    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 23, Sentence 3

> Ms. Gasparri reports to the County and is responsible for carrying out policies, procedures, and duties regarding the Airport authorized by the Board.

23.3    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 23, Sentence 4

> Ms. Gasparri is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this Complaint.

23.4   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 23, Sentence 5

> Ms. Gasparri's official residence is at HPN, which is located in Westchester County, New York, within the Southern District of New York.

23.5   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 24

24.   This paragraph is multi-sentence:

Paragraph 24, Sentence 1

> Defendant AvPorts, LLC, on information and belief, is a Virginia limited liability company with its headquarters at 45025 Aviation Drive, Suite 100, Dulles, VA 20166.

24.1   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 24, Sentence 2

> AvPorts is a private company that provides airport facilities management, operations, airline services, administration, accounting, and noise abatement on behalf of the Airport.

24.2    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 24, Sentence 3

> On information and belief, AvPorts is responsible for the promulgation and enforcement of certain policies regarding the Airport, including the policies at issue here.

24.3    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 24, Sentence 4

> As an agent for the County, overseeing the management and operation of the Airport, AvPorts is engaged in state action and thus also liable for the violations at issue.

24.4    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

## ALLEGATIONS

**Plaintiffs' Operations At HPN Are Federally Authorized, Safe, And Quiet**

Paragraph 25

25.     This paragraph is multi-sentence:

Paragraph 25, Sentence 1

> Plaintiffs' operations are fully compliant with federal law, but they are structured differently than the large scheduled airlines that operate at HPN.

25.1    Admits that Plaintiffs' operations at HPN are "structured differently than the large scheduled airlines that operate out of HPN"; denies knowledge or information sufficient to form a belief as to the truth of the allegation that Delux's non-HPN operations are "structured differently than the large scheduled airlines that operate out of HPN"; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 25, Sentence 2

> Plaintiffs offer a type of service that federal regulations classify as "on-demand" services. *See* 14 C.F.R. Part 110.2 (defining "on demand" operations).

25.2    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 25, Sentence 3

> Under applicable regulations and their respective TSA-approved security plans, Plaintiffs' flights can operate from non-SIDA portions of HPN, such as an FBO (discussed *infra*) and have not experienced any passenger safety incidents since the beginning of their operations at HPN.

25.3     Denies knowledge or information sufficient to form a belief as to the truth of the allegation that none of the Plaintiff have experienced "any passenger safety incidents since the beginning of their operations at HPN"; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 25, Sentence 4

> Consistent with federal regulations, Plaintiffs do not need to operate from an FBO, but their operations must take place from a non-SIDA portion of the Airport with access to the airfield.

25.4     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, deny the allegation that Plaintiffs' operations with respect to departures must take place from a non-SIDA portion of the Airport.

Paragraph 26

26.     This paragraph is multi-sentence:

Paragraph 26, Sentence 1

> Blade's flights have been operating from FBOs at HPN since 2015, and Blade's flights are currently offered out of Million Air's FBO.

26.1    Admits the allegations.

Paragraph 26, Sentence 2

> Blade is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

26.2    Denies that Blade is authorized to sell tickets to the public without limitation; makes no representation regarding the remaining allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 27

27.    This paragraph is multi-sentence:

Paragraph 27, Sentence 1

> Blade is a technology-powered, global air mobility platform committed to reducing travel friction by enabling cost-effective air transportation alternatives to some of the most congested ground routes in the U.S. and abroad.

27.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 27, Sentence 2

> Since 2015, Blade has offered service between HPN and Miami-Opa Locka Executive Airport ("OPF"), and due to increasing popularity, Blade introduced service between HPN and Palm Beach International Airport ("PBI") in 2021.

27.2   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 27, Sentence 3

> Blade has never had any passenger or employee safety incidents or accidents at HPN.

27.3   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 28

28.   This paragraph is multi-sentence:

Paragraph 28, Sentence 1

> Blade's operations at HPN directly employ more than 11 individuals who live in or near the County.

28.1   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 28, Sentence 2

> Blade's operations at HPN also indirectly support numerous other local jobs, including its Part 135 operating partners and local catering, shuttle, and car service businesses.

  28.2 Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 28, Sentence 3

> In addition to significant marketing investments regarding its services at HPN, Blade has invested over $200,000 in improvements at Million Air and pays approximately $60,000 per year to rent a dedicated lounge at Million Air to service its passengers.

  28.3 Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 28, Sentence 4

> Blade and/or its Part 135 operating partners also pay the Airport various fees associated with the operation of Blade flights, including landing, facility, parking, RON, shuttle, charter, hanger, after hours and valet parking fees.

  28.4 Denies the allegations.

Paragraph 28, Sentence 5

> Blade expects to fly approximately 165 Part 380 flights between HPN and OPF or PBI during the November 2021 through April 2022 season.

28.5    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 29

29.    This paragraph is multi-sentence:

Paragraph 29, Sentence 1

> XO Global, and its related company, JetSmarter, Inc., has been offering flights out of various FBOs at HPN since 2015.

29.1    Admits the allegations.

Paragraph 29, Sentence 2

> In the last twelve months, XO Global organized more than one thousand flights and transported more than 12,000 passengers to and from HPN.

29.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 29, Sentence 3

> XO Global is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

29.3    Denies that XO is authorized to sell tickets to the public without limitation; makes no representation regarding the remaining allegation, which is a legal conclusion,

save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 29, Sentence 4

Since it began operations at HPN, XO Global has been partnering with various Part 135 operators and operating from various FBOs.

29.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 30

30.    This paragraph is multi-sentence:

Paragraph 30, Sentence 1

XO Global has offered flights from HPN to Van Nuys, Oakland, and various locations in South Florida.

30.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 30, Sentence 2

XO Global's flights have an impeccable safety record as not a single operator XO Global worked with had any safety incidents at HPN.

30.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

A-189

Paragraph 31

> 31.    XO has likewise spent time and money in building its operations at HPN and contributing to the local economy.

31.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 32

32.    This paragraph is multi-sentence:

Paragraph 32, Sentence 1

> JSX began operating 30-seat aircraft from an FBO at HPN in June of 2020 with flights to Pinehurst, NC.

32.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 32, Sentence 2

> In November 2021, it began HPN's only service to Miami International Airport (MIA) with 5 flights a week, from an FBO.[1]

32.2    Admits the allegations.

Paragraph 32, Sentence 3

> [1] From November 15 to December 31, 2021, JSX reduced its operations from 30 passengers to 9 passengers per flight under a reservation of rights in response to demands from HPN until a more permanent solution could be reached.

32.3    Admits the allegations.

Paragraph 32, Sentence 4

> Delux is an FAA-certificated air carrier that is authorized by federal law to fly customers for compensation or hire under the FAA's operating rules contained in Part 135.

32.4    Admits that Delux is an FAA-certified air carrier; makes no answer regarding the remaining allegations, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 32, Sentence 5

> Delux holds a commuter air carrier authorization issued by the DOT, and JetSuiteX is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

32.5    Admits that Delux holds a DOT-issued commuter air carrier authorization; makes no answer regarding the remaining allegations, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 32, Sentence 6

> Since it began operations at HPN, JSX has been operating from an FBO.

32.6    Admits the allegations.

Paragraph 33

33.    This paragraph is multi-sentence:

Paragraph 33, Sentence 1

> JSX currently offers flights from HPN to Miami.

33.1    Admits the allegations.

Paragraph 33, Sentence 2

> In addition to the route currently offered, JSX also intended to offer many more routes in 2022.

33.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 33, Sentence 3

> JSX has never had a safety incident or accident at HPN or elsewhere in its over five-year operating history.

33.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 33, Sentence 4

> JSX enjoys a perfect safety record, the highest customer satisfaction of any air carrier in the United States, was named #1 air carrier in North America by APEX (the Airline Passenger Experience Association), and it is the only Five-Star Rated Regional Air Carrier in the World named by APEX for the last four consecutive years.

33.4   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 34

34.   This paragraph is multi-sentence:

Paragraph 34, Sentence 1

> Additionally, JSX's operations at HPN directly employ 5 individuals who live in or near the County.

34.1   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 34, Sentence 2

> Numerous additional jobs are supported indirectly.

34.2   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 34, Sentence 3

> JSX spent significant resources investing in the HPN market, estimating at least $2 million, and JSX has paid significant amounts in fees.

     34.3   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 35

     35.   This paragraph is multi-sentence:

Paragraph 35, Sentence 1

> Unlike traditional airlines, Plaintiffs' flights follow a TSA-approved "Twelve-Five" Security Plan,[2] which is a regulatory protocol that permits its passengers to bypass TSA security checkpoints in the Terminal.

     35.1   Denies knowledge or information sufficient to form a belief as to the allegation traditional airlines do not follow a TSA-approved "Twelve-Five" Security Plan; denies knowledge or information sufficient to form a belief as to the allegation that Plaintiffs' flights follow a TSA-approved "Twelve-Five" Security Plan; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 35, Sentence 2

[2] The "Twelve-Five" Security Plan refers to a category of TSA-approved security plan applicable to the operation of certain aircraft with a maximum certificated takeoff weight of 12,500 pounds or more. *See* 49 C.F.R. § 1550.7.

35.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 35, Sentence 3

> Plaintiffs maintain a rigorous TSA-approved and monitored security plan, but passengers flying with Plaintiffs are not processed through the main terminal's TSA checkpoints.

35.3    Admits that Plaintiffs' passengers are not processed through the Terminal's TSA checkpoints; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 35, Sentence 4

> Instead, the "Twelve-Five" Security Plan is uniquely available for Part 135 operators and allows Plaintiffs' flights to enplane and deplane passengers at non-SIDA locations, and as a result, Plaintiffs' customers do not have to enter the terminal of an airport to do so.

35.4    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 35, Sentence 5

> Under the "Twelve-Five" federally authorized regulatory protocol, Plaintiffs' passengers are able to bypass large crowds, long lines, typical time spent waiting for an airplane to board and depart.

35.5    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 35, Sentence 6

> The result is a faster, safer, and crowd-free airport experience that is fully compliant with federal safety regulations.

35.6    Denies knowledge or information sufficient to form a belief as to truth of the allegations.

Paragraph 36

36.    This paragraph is multi-sentence:

Paragraph 36, Sentence 1

> By contrast, customers of large airlines who board from terminal buildings are required to pass through a TSA security checkpoint in order to enter the Terminal (which is exclusively a SIDA location) at HPN.

36.1    Admits that the Terminal is a SIDA location; admits that Terminal passengers pass through a TSA security checkpoint before entering the Terminal; denies knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 36, Sentence 2

> The TSA security checkpoints—and the crowds, frustration, and delays associated with them—are ubiquitous for the average airport user, and in HPN they are particularly crowded and congested and provide no opportunity for social distancing protocols or a quick experience from car to airplane.

36.2   Denies that the TSA security checkpoints at HPN are particularly crowded and congested; denies that the TSA security checkpoints at HPN provide no opportunity for social distancing protocols; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 37

37.   This paragraph is multi-sentence:

Paragraph 37, Sentence 1

> Plaintiffs provide a level of safety, convenience, and a socially distanced flying experience that is not otherwise available to customers of large traditional airline customers in any class of service.

37.1   Denies that Plaintiffs provide a level of safety that is not otherwise available to customers of large traditional airline customers in any class of service; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 37, Sentence 2

> Plaintiffs' services are safe, federally authorized, and especially well-suited for individuals who want to maintain social distancing and avoid large crowds while traveling during the COVID-19 pandemic.

37.2    Admits that Plaintiffs' services at HPN are safe; makes no representation regarding the allegation that Plaintiffs' services are federally authorized, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 37, Sentence 3

> Plaintiffs' aircraft operations are also quieter than large airlines.

37.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 38

38.    This paragraph is multi-sentence:

Paragraph 38, Sentence 1

> Plaintiffs are, however, prohibited from allowing their customers to enter SIDA areas of HPN because non-SIDA and SIDA customers cannot commingle under federal regulations.

38.1    Denies that Plaintiffs are prohibited form allowing their customers to enter SIDA areas of HPN; makes no representation regarding the remaining allegations, which

are legal conclusions, save to demand strict proof thereof and refer respectfully all questions of law to the Court.

Paragraph 38, Sentence 2

> A SIDA location is differentiated and cordoned off from non-SIDA locations at HPN—but both types of security procedures are TSA-approved and meet federal regulations.

38.2   Admits that, at HPN, SIDA locations are differentiated and cordoned off from non-SIDA locations; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 38, Sentence 3

> As a result, Plaintiffs' customers are federally prohibited from entering the Terminal at HPN because HPN does not have a non-SIDA area in the Terminal.

38.3   Denies that Plaintiffs' customers are prohibited from entering the Terminal; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and refer respectfully all questions of law to the Court.

Paragraph 38, Sentence 4

> The only option for Plaintiffs is therefore to maintain their operations at an FBO.

38.4   Denies the allegations.

Paragraph 39

39.    This paragraph is multi-sentence:

Paragraph 39, Sentence 1

> Until recently, Plaintiffs have been permitted to operate at an FBO at HPN.

39.1    Admits that Plaintiff have been permitted to operate at HPN FBOs; denies that Plaintiffs are no longer permitted to do so.

Paragraph 39, Sentence 2

> An FBO is an aeronautical service provider located at an airport that, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators.

39.2    Admits the allegations.

Paragraph 39, Sentence 3

> Use of FBOs' non-Terminal facilities is currently the only way Plaintiffs' flights are able to enplane and deplane customers at HPN at a non-SIDA location.

39.3    Denies the allegations.

Paragraph 40

40.    This paragraph is multi-sentence:

Paragraph 40, Sentence 1

> Moreover, even if Plaintiffs could require their customers to pass through a SIDA-compliant security checkpoint at HPN in the main terminal, they would be unable to do so under federal law because several of the airports that Plaintiffs serve with routes that link to HPN either do not have a TSA-checkpoint or Plaintiffs operate from those airports at non-SIDA locations that lack TSA facilities.

    40.1   Denies the allegations.

Paragraph 40, Sentence 2

> If Plaintiffs were forced to conduct all flight operations from a sterile area of the Terminal, passengers who did not undergo TSA screening at their departure airport would not be able to deplane into the Terminal at HPN.

    40.2   Denies that County Defendant is forcing Plaintiffs to perform their flight operations from a sterile area; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 40, Sentence 3

> This, in turn, would effectively evict Plaintiffs from HPN because Plaintiffs, consistent with federal regulations, do not have passengers undergo such screening at any of the many other airports that Plaintiffs serve.

    40.3   Denies that compliance with the TUP would "effectively evict Plaintiffs from HPN"; makes no answer regarding the remaining allegations, which are legal

conclusions, save to demand strict proof thereof and to refer all questions of law to the Court.

Paragraph 40, Sentence 4

> Even if only departing flights were required to be conducted from a sterile area, such a requirement would fundamentally alter and interfere with Plaintiffs' federally authorized procedures.

40.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 41

41.    This paragraph is multi-sentence:

Paragraph 41, Sentence 1

> Plaintiffs currently offer routes between HPN and FBOs in Van Nuys, Oakland, Fort Lauderdale, Palm Beach, and Miami, and do not utilize TSA-checkpoints at these airports.

41.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 41, Sentence 2

> While Plaintiffs' customers would not be subject to clear through TSA SIDA checkpoints at these airports (and in some cases such SIDA checkpoints may not even exist), if they were forced to undergo TSA screening at HPN, they would not be able to fly between HPN and any of those airports.

41.2   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 41, Sentence 3

> This is because TSA requires passengers who clear through SIDA checkpoints to do so at both their origin and destination airport.

41.3   Makes no answer to these allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 41, Sentence 4

> If customers cannot avoid traditional TSA SIDA checkpoints when flying with Plaintiffs, then they will no longer choose to fly with Plaintiffs and Plaintiffs are thus unable to continue existing services.

41.4   Denies knowledge or information sufficient to form a belief as to truth of the allegations.

Paragraph 42

42.   This paragraph is multi-sentence:

Paragraph 42, Sentence 1

> Plaintiffs' flight offerings have the added benefit of minimizing airport impact by aggregating passengers into smaller and/or quieter aircraft as an alternative to passengers each chartering their own aircraft, which would create further noise and environmental impact and/or airport congestion.

42.1   Denies the allegations.

Paragraph 42, Sentence 2

> For example, instead of ten passengers each chartering their own aircraft individually to the same destination, Plaintiffs' flight offerings aggregate those ten passengers in one aircraft, thus minimizing the impact by comparison.

    42.2    Denies the allegations.

Paragraph 42, Sentence 3

> Further, Defendants have maintained that the TUP and Policy No. 1 would not apply to certain other operators operating out of FBOs, including a Part 91 operator, and thus they would not be subjected to the TUA's restrictions.

    42.3    Denies the allegations.

Paragraph 43

    43.    This paragraph is multi-sentence:

Paragraph 43, Sentence 1

> Moreover, Plaintiffs offer other valuable services to their customers when they operate from an FBO that cannot be offered at the Terminal.

    43.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 43, Sentence 2

> These services include valet parking and shuttle services, concierge services, specialized health and safety protocols, private lounge access, and speedier check-in, boarding and baggage handling processes.

43.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 43, Sentence 3

> As a further example, Blade also administers its industry-leading COVID-19 health and safety protocol, including on-site COVID-19 testing by registered nurses, temperature and blood oxygen level testing and proof of vaccination enforcement, from Million Air's FBO.

43.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 43, Sentence 4

> Blade would not be able to offer these services or enforce these protocols at the Terminal, and many of Blade's customers and the increasing popularity of Blade's services out of HPN are attributable to these services and protocols.

43.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 44

> 44.     Hence, any effort by the County to eliminate Plaintiffs from operating from the FBOs at HPN, without authorizing a non-SIDA area, effectively eliminates those routes and services.

44.     Denies the allegations.

Paragraph 45

45.     This paragraph is multi-sentence:

Paragraph 45, Sentence 1

> In fact, until recently, Defendants have not enforced the TUP against any of the Part 135 operators Blade and XO Global have worked with since 2015, nor have Defendants required Blade or XO Global to move their flights from their respective FBOs to the Terminal.

45.1     Admits that—pursuant to a stipulation and order (*see* CM/ECF Doc No 45)—County Defendant has not required Blade or XO to move any flights to the Terminal and will not do so absent a further court order; denies the remaining allegations.

Paragraph 45, Sentence 2

> Moreover, Defendants never required Blade or XO Global to sign the TUA, nor are Plaintiffs aware of any instances where HPN applied the TUP to Part 380 operators selling more than 9 seats until recently.

45.2     Denies that neither Blade nor XO is required to sign a TUA; denies knowledge or information necessary to form a belief as to the allegation regarding Plaintiffs' awareness of any such instances.

**HPN Is A Not A Private Commercial Space, But A Federally Funded Public Use Airport Subject To Federal Law And Regulations**

Paragraph 46

46.     This paragraph is multi-sentence:

Paragraph 46, Sentence 1

> HPN is a "public use" airport that is funded, in part, by grants obtained under one or more federal programs, including the Airport Improvement Program.

46.1     Admits the allegations.

Paragraph 46, Sentence 2

> The receipt of federal grant money obligates the airport sponsor, i.e., the County, to comply with Grant Assurances.

46.2     Admits the allegations.

Paragraph 47

47.     This paragraph is multi-sentence:

Paragraph 47, Sentence 1

> The FAA has made clear that these Grant Assurances require "Federally obligated airport sponsors . . . to operate airports for the use and benefit of aeronautical users and to make those airports available to all types, kinds, and classes of aeronautical activities on fair and reasonable terms, and without unjust discrimination."[3]

47.1     Refers respectfully the Court to the cited Grant Assurances as the best evidence of their content and import.

Paragraph 47, Sentence 2

> [3] https://www.faa.gov/airports/airport_compliance/media/airportSponsor
> AndUserRightsBrochure.pdf

    47.2   Refers respectfully the Court to the cited document as the best evidence of its content and import.

Paragraph 47, Sentence 3

> In other words, Defendants have a duty to provide Plaintiffs with reasonable access at HPN.

    47.3   Makes no regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 48

    48.   This paragraph is multi-sentence:

Paragraph 48, Sentence 1

> In order to comply with their obligation to provide Plaintiffs with "reasonable access," Defendants must provide Plaintiffs access to the Airport on reasonable and non-discriminatory terms.

    48.1   Makes no answer regarding the allegations, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 48, Sentence 2

> At bottom, Defendants must ensure that Plaintiffs have reasonable and non-discriminatory access to the public use Airport in a way that is consistent with Plaintiffs' federally authorized business plan.

48.2    Makes no answer regarding the allegations, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 49

49.    This paragraph is multi-sentence:

Paragraph 49, Sentence 1

> Pertinent here, the Grant Assurances, as set forth in a federal statute (49 U.S.C. § 47107), require the County to provide access to all aviation users in a reasonable and non-discriminatory manner.

49.1    Makes no regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 49, Sentence 2

> At a minimum, this means that the County cannot arbitrarily seek to exclude an airport user (e.g., an air carrier) from accessing the Airport.

49.2    Makes no regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

**The County Is Improperly Enforcing Policy No. 1 And The TUP Against Plaintiffs**

Paragraph 50

50.     This paragraph is multi-sentence:

Paragraph 50, Sentence 1

> County officials have publicly recognized during public hearings, including in November 2021, that their local government power cannot simply regulate Plaintiffs' flights that depart from and arrive at HPN.

50.1     Admits the allegations; denies the implicit allegation that County Defendant is prohibited from regulating Plaintiff's flights at HPN in any respect.

Paragraph 50, Sentence 2

> Yet, Defendants' adoption of Policy No. 1 and enforcement of the TUP require certain Part 135 and 380 operators (such as Plaintiffs) to move their departing and arriving flights from an FBO to the Terminal.

50.2     Denies the allegations.

Paragraph 50, Sentence 3

> Defendants' attempt to expand their local government control to regulate Plaintiffs' flights encroaches upon federally preempted issues and violates federal law.

50.3     Denies the allegations.

Paragraph 51

51.     This paragraph is multi-sentence:

Paragraph 51, Sentence 1

> In 2004, the County passed Westchester County Municipal Code § 712.462, which codified the TUP.

51.1   Admits the allegations.

Paragraph 51, Sentence 2

> The TUP sets forth the County's policy concerning access to the Airport by airlines, establishes the Airport's terminal capacity to accommodate airlines, and adopts a mechanism for allocating capacity among airlines seeking access.

51.2   Denies that the TUP is "policy," as opposed to a law; admits the remaining allegations.

Paragraph 51, Sentence 3

> The TUP requires airlines seeking to conduct passenger services from the Terminal to enter into a TUA with the County.

51.3   Admits that the TUP requires "Airlines" seeking to conduct "Passenger Service," as those terms are defined within the TUP (*see* LWC § 712.462(2)) from the Terminal to enter a TUA with the County; denies the remaining allegations.

Paragraph 51, Sentence 4

> The TUP governs air carriers' operations out of HPN's Terminal but does not apply to air carriers operating from FBOs.

51.4    Denies the allegations.

Paragraph 52

52.    This paragraph is multi-sentence:

Paragraph 52, Sentence 1

> The TUP governs the use of the Terminal and the Terminal Ramp at the Airport, which is for the "exclusive use of Airlines providing Passenger Service."  Westchester Cty. Municipal Code § 712.462(1).

52.1    Refers respectfully the Court to the cited law as the best evidence of its content and import; to the degree a response is required, admits the allegations.

Paragraph 52, Sentence 2

> Specifically, the TUP applies only to Airlines offering Passenger Service under 14 C.F.R. Parts 119, 121, or 135.

52.2    Admits that the TUP applies to "Airlines" seeking to conduct "Passenger Service," as those terms are defined within the TUP (*see* LWC § 712.462(2)); denies the remaining allegations.

Paragraph 52, Sentence 3

> The TUP defines "Passenger Service" as "any air service to or from the Airport for which seat are individually offered or sold to the public or a segment of the public."

52.3   Refers respectfully the Court to the cited law as the best evidence of its content and import; to the degree a response is required, denies the allegation to the degree it omits part of the legal definition.

Paragraph 52, Sentence 4

> Defendants maintain that any service that involves aircraft of more than nine seats and individual seat sales to any segment of the public must operate from the Terminal pursuant to the TUP.

52.4   Admits the allegations.

Paragraph 53

53.   This paragraph is multi-sentence:

Paragraph 53, Sentence 1

> The TUP forces operators under Parts 119, 121, and 135 offering Passenger Services in an aircraft with more than nine seats to enter into the TUA, under which operators are to agree to abide by additional "Technical Specifications and Procedural Requirements" and prohibits operators from challenging the Technical Specifications and Procedural Requirements, or the TUP, in a court of law or administrative proceeding.

53.1   Refers respectfully the Court to the TUP as the best evidence of its content and import; to the degree that a response is required, denies the allegations, which makes no mention of the "individual-seat sales" requirement.

Paragraph 53, Sentence 2

> The TUP and TUA have the further effect of limiting Plaintiffs' services by causing Plaintiffs to alter flight schedules based on their allocation to the Terminal Ramp through the lottery system and the overall Terminal Capacity passenger limitation for all airlines operating at the Terminal.

53.2    Denies knowledge or information sufficient to for a belief as to the truth of the allegations.

Paragraph 54

54.    This paragraph is multi-sentence:

Paragraph 54, Sentence 1

> But as explained above, JSX, Blade, and XO Global are engaged in public charter operations under Part 380 with federal approval from the DOT.

54.1    Admits that an earlier section of the complaint alleges that Plaintiffs are engaged in public charter operations under Part 380; denies knowledge or information sufficient to form a belief as to whether Plaintiffs are operating with[,] or within[,] federal approval.

Paragraph 54, Sentence 2

> Indeed, the County itself has repeatedly acknowledged that Plaintiffs are among a group of operators offering single-seat sales under DOT Part 380 "public charter" rules.

54.2    Admits that "Plaintiffs are among a group of operators offering single-seat sales under DOT Part 380 'public charter' rules"; denies knowledge of the specific "repeated[] acknowledge[ments]" to which Plaintiffs here refer.

Paragraph 54, Sentence 3

> Notably, the County had never before applied the TUP to Part 380 operations, and indeed, the TUP itself does not reference Part 380 operators at all.

54.3    Denies the allegation that "the County had never before applied the TUP to Part 380 operations"; refer respectfully the Court to the TUP as the best evidence of its content and import.

Paragraph 54, Sentence 4

> In fact, Part 380 operations at HPN have long occurred at FBOs, and public charter operations under Part 380 have existed without controversy for many decades.

54.4    Denies the implicit implication that Part 380 operations are synonymous with or inherently include the Practice; admits the remaining allegations.

Paragraph 54, Sentence 5

> Similarly, Part 380 operators have never been required to enter into a TUA or any similar agreement when operating from an FBO.

54.5    Denies the allegations.

Paragraph 54, Sentence 6

> Numerous operators have operated, and continue to operate, flights at HPN with more than nine aircraft seats from FBOs, including under Part 380.

54.6    Denies the implicit obligation that the Practice is limited to operating "flights at HPN with more than nine aircraft seats," as such statement omits the additional element of selling such seats on an individual basis to the public; admits the remaining allegations.

Paragraph 54, Sentence 7

> These operations have accounted for thousands of flights.

54.7    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 55

55.    This paragraph is multi-sentence:

Paragraph 55, Sentence 1

> Beginning in October and November 2021, the County, through AvPorts, began demanding that Plaintiffs utilize the Terminal for their Part 380 operations and enter into a TUA in order to continue operating at HPN.

55.1    Admits the allegations with respect to Plaintiffs' operations that included the Practice; denies the remaining the allegations.

Paragraph 55, Sentence 2

> The County claimed that Plaintiffs' operations violated Westchester County Municipal Code § 712.462.

55.2    Admits the allegations with respect to Plaintiffs' engagement in the Practice; denies the remaining the allegations.

Paragraph 56

56.    This paragraph is multi-sentence:

Paragraph 56, Sentence 1

> On November 5, 2021 and November 9, 2021, AvPorts, acting on behalf of the County, sent a letter to each Plaintiff demanding that they conduct their services out of the Terminal pursuant to a Terminal Use Agreement.

56.1    Refers respectfully the Court to such letters as the best evidence of their content and import; to the degree a response is required, admits the allegations with respect to Plaintiffs' engagement in the Practice; denies the remaining allegations.

Paragraph 56, Sentence 2

> The County asserted that Plaintiffs were engaged in "Passenger Service" and were not permitted to operate from an FBO.

56.2    Refers respectfully the Court to such letters as the best evidence of their content and import; to the degree a response is required, admits the allegations with respect to Plaintiffs' engagement in the Practice; denies the remaining allegations.

Paragraph 57

57.     This paragraph is multi-sentence:

Paragraph 57, Sentence 1

> In a December 2, 2021 letter to JSX, the County asserted that Plaintiffs' operations fell within the definition of "Passenger Service" that is otherwise regulated by the TUP because their aircraft have more than nine seats and involve sales of single seats to the public.

57.1     Refers respectfully the Court to such letter as the best evidence of its content and import; to the degree a response is required, admits the allegations with respect to Plaintiffs' engagement in the Practice; denies the remaining allegations.

Paragraph 57, Sentence 2

> This is the same category that applies to the large, regularly scheduled airlines.

57.2     Refers respectfully the Court to the TUP as the best evidence of its content and import; to the degree a response is required, admits the allegation.

Paragraph 57, Sentence 3

> However, those large airlines are federally required to be subjected to full TSA security and accordingly operate from the SIDA portions of the Terminal, while Plaintiffs are not.

57.3     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 57, Sentence 4

> Thus, the County's interpretation impermissibly extends the definition of Passenger Services to Plaintiffs in a manner that destroys Plaintiffs' federally approved procedures and business models.

57.4    Denies that the TUP is impermissible; denies that the County's interpretation of the TUP is impermissible, improper, or an "exten[sion]" of the TUP's plain meaning; denies knowledge and information sufficient to form a belief as to the remaining allegations.

Paragraph 58

58.    This paragraph is multi-sentence:

Paragraph 58, Sentence 1

> In the same letter, Defendants further noted that the nine-seat limitation does not apply to other Part 135 air charter operations at the FBOs where a single-entity or individual charters the entire aircraft, and individual seats are not made available to the public.

58.1    Refers respectfully the Court to such letter as the best evidence of its content and import; to the degree a response is required, admits the allegations.

Paragraph 58, Sentence 2

> Defendants also noted that the same limitation did not apply to other operations at FBOs, including Part 91 corporate aircraft operations at FBOs, which have also been conducted for decades.

58.2    Admits the allegations.

A-219

Paragraph 59

59.     This paragraph is multi-sentence:

Paragraph 59, Sentence 1

> Despite contending that it was not making a change to its laws, Defendants nonetheless adopted Policy No. 1 on January 21, 2022, which directly targeted Plaintiffs' operations and mandated that they utilize the Terminal.

59.1    Admits that Policy No. 1 is not a law, did not change County law, and was rather a determination of the applicability of the TUP to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refer respectfully the Court to Policy No. 1 as the best evidence of its content and import; admits that County Defendant has contended and continues to contend same; denies the remaining allegations.

Paragraph 59, Sentence 2

> As the name suggests, the policy was the first of its kind for HPN and constitutes a new interpretation of the TUP.

59.2    Denies the allegations.

Paragraph 59, Sentence 3

> The Airport Noise and Capacity Act ("ANCA") bars local noise and access restrictions that are enacted after 1990 unless they comply with the statute's mandatory procedural requirements. 49 U.S.C. 47524(d); *see also Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d. Cir. 2016).

59.3   Makes no answer to the above allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 59, Sentence 4

> On information and belief, Defendants have not complied with ANCA's strict procedural requirements, and thus, the recent enactment of Policy No. 1 is unlawful.

59.4   Denies the allegations.

Paragraph 60

60.   This paragraph is multi-sentence:

Paragraph 60, Sentence 1

> In fact, within Policy No. 1, Defendants reclassified Plaintiffs' Part 380 operations as "Single-Seat-Charter-Operations" or "SSCOs," a novel term for a decades-old business model, implicitly acknowledging that such operations were not previously addressed by the TUP.

60.1   Denies the allegations.

Paragraph 60, Sentence 2

> Policy No. 1 credited Plaintiffs' business as innovative, while simultaneously destroying their businesses by requiring Plaintiffs to utilize the Airport's TSA checkpoints, in violation of federal regulations that require Plaintiffs to operate from non-SIDA areas.

60.2    Refers respectfully the Court to Policy No. 1 as the best evidence of its content and import; to the degree a response is required, denies the allegations.

Paragraph 60, Sentence 3

> Notably, none of the FAA, DOT, TSA, TUP nor the TUA mandate use of the Airport's TSA checkpoints, or otherwise prevent operators from utilizing separate TSA-approved screening.

60.3    Refers respectfully the Court to the TUP and existing TUAs as the best evidence of their content and import; denies knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 61

> 61.    During this time, Plaintiffs actively sought to reach a good-faith resolution that would address Defendants' concerns; however, Defendants summarily rejected any proposed alternatives without any meaningful consideration or analysis.

61.    Admits that the parties together sought to reach a good-faith resolution that would address all parties' concerns; denies the remaining allegations.

Paragraph 62

62.    This paragraph is multi-sentence:

A-222

Paragraph 62, Sentence 1

> For example, in response to AvPorts' initial letter, JSX attended a meeting with former Airport Manager, Peter Scherrer, on November 10, 2021, and spoke with him again on November 12, 2021.

62.1    Admits the allegations.

Paragraph 62, Sentence 2

> In its November 15, 2021 letter, JSX stated that as a sign of goodwill, it would begin limiting all HPN flights to a maximum of nine seats for sale until the end of the year and block passenger seats from service to limit the aircraft to nine passenger seats, which in and of itself caused a significant adverse impact on JSX's revenue.

62.2    Refers respectfully the Court to the letter as the best evidence of its content and import; denies knowledge or information sufficient to form a belief as to the truth of the allegation that JSX's actions "in and of itself caused a significant adverse impact on JSX's revenue."

Paragraph 62, Sentence 3

> JSX agreed to maintain these restrictions for the rest of the year in order to afford time to reach a mutually acceptable resolution.

62.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 62, Sentence 4

> Although Defendants had many weeks to work with JSX on a potential resolution, Defendants only ignored or rejected JSX's proposals.

62.4    Denies the allegations.

Paragraph 63

63.    This paragraph is multi-sentence:

Paragraph 63, Sentence 1

> JSX in fact proposed multiple TSA-compliant alternatives for the Airport's consideration.

63.1    Admits that JSX has proposed multiple alternatives; makes no answer regarding the remaining allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 63, Sentence 2

> These included proposals whereby passengers would check in at the Terminal, and JSX would use vacant office space on the first floor of the Terminal to hold passengers prior to boarding.

63.2    Admits the allegations.

Paragraph 63, Sentence 3

> Under the first proposal, when boarding commences, passengers would be escorted through the Ross Aviation East FBO and down a non-SIDA ramp.

63.3    Admits the allegations.

Paragraph 63, Sentence 4

> Under the second proposal, passengers would be escorted through an access gate just north of the Terminal and then down an Airport terminal ramp.

    63.4    Admits the allegations.

Paragraph 63, Sentence 5

> Unfortunately, and inexplicably, these proposals were summarily rejected by the Airport, without any meaningful consideration or analysis, even though these proposals represented common-sense solutions that would have enabled compliance with TSA security requirements.

    63.5    Makes no answer to the allegation that JSX's proposal "would have enabled compliance with TSA security requirements," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully to the Court all questions of law; denies the remaining allegations.

Paragraph 63, Sentence 6

> These proposals also would have enabled the Airport to comply with its obligations under federal law.

    63.6    Makes no answer to the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully to the Court all questions of law

Paragraph 64

> 64.    XO Global similarly objected and proposed alternatives such as completing passenger check in at the Ross Aviation East FBO and transporting the passengers to the aircraft that parked at the Terminal to be boarded planeside.

64.    Admits the allegations.

Paragraph 65

65.    This paragraph is multi-sentence:

Paragraph 65, Sentence 1

> Blade likewise objected to the County's position with respect to its services at an FBO.

65.1    Admits the allegations.

Paragraph 65, Sentence 2

> In a November 29, 2021 letter, Blade reminded the County that Blade's existing Part 380 service had been operating at the FBO for the last five years, that the County had approved its leasehold with Million Air, and that the County was involved in the planning, construction and leasehold improvement activities related to Blade's facilities at Million Air.

65.2    Refers respectfully the Court to the cited letter as the best evidence of its content and import; denies knowledge or information sufficient to form a belief as to the truth of the allegation that Blade had engaged in the Practice between November 29, 2016, and November 29, 2021.

Paragraph 66

> 66.    However, the County refused to entertain any proposed accommodations for Plaintiffs and is accordingly denying Plaintiffs reasonable access to the Airport, a federally regulated and public space.

66.    Admits that the Airport is federally regulated; makes no representation to the allegation that the Airport is a "public space," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; denies the remaining allegations, including and specifically the allegation that the County has denied or is denying Plaintiffs access to the airport and/or reasonable accommodations.

Paragraph 67

67.    This paragraph is multi-sentence:

Paragraph 67, Sentence 1

> The County's policy targets only Plaintiffs by defining them as SSCOs, and not similarly situated on-demand carriers who operate at FBOs.

67.1    Denies the allegations.

Paragraph 67, Sentence 2

> Moreover, the County declined to offer any non-SIDA access to the Terminal so that Plaintiffs could reasonably access the Terminal in accordance with the TUP that the County wishes to enforce.

67.2    Denies the allegations.

**The County Is Prohibited From Imposing Barriers To Access Under Federal Aviation Law**

Paragraph 68

68.    This paragraph is multi-sentence:

Paragraph 68, Sentence 1

> Federal law also prohibits the Airport from creating rules or policies that have the effect of unjust discrimination against a type, kind or class of aviation service and unreasonably restricting an airport user's access to the Airport.

68.1    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 68, Sentence 2

> Defendants' refusal to make any reasonable accommodation for Plaintiffs' operations restricts Plaintiffs' access to HPN in violation of federal law.

68.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations, —including and specifically the allegation that the County has denied or is denying Plaintiffs access to the airport and/or reasonable accommodations.

Paragraph 69

69.    This paragraph is multi-sentence:

Paragraph 69, Sentence 1

> Congress has preempted the field of aviation and air carrier regulation.

69.1    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the implicit allegation that Congress completely preempted the field of aviation and air carrier regulation.

Paragraph 69, Sentence 2

> This means that, *inter alia*, counties and cities are not permitted to self-regulate the air transportation industry.

69.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 69, Sentence 3

> Any effort to do so is invalid under the Supremacy Clause of the United States Constitution and the preemption provisions of the various federal aviation statutes.

69.3    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 70

> 70. Congress determined that preemption was necessary to achieve the objectives of the Airline Deregulation Act ("ADA"), which include, among other things: encouraging entry into the air transportation market by new carriers; strengthening small air carriers to ensure a more effective and competitive airline industry; ensuring the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination; and preventing unfair, deceptive, predatory, or anticompetitive practices in air transportation. *See* 49 U.S.C. § 40101.

70. Refers respectfully the Court to the ADA as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 71

71. This paragraph is multi-sentence:

Paragraph 71, Sentence 1

> The FAA regulates aviation safety and has done so by implementing federal regulations pertaining to every aspect of airport and aircraft operations.

71.1 Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies that the FAA has implemented federal regulations pertaining to "every" aspect of airport and aircraft operations.

Paragraph 71, Sentence 2

> The DOT regulates the economic aspects of the air carrier industry.

    71.2    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, admits the allegation.

Paragraph 71, Sentence 3

> Together, the DOT and FAA have full authority to regulate air carriers.

    71.3    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the implicit allegation that the DOT and the FAA together possess the exclusive authority to regulate air carriers.

**Preemption Under the Airline Deregulation Act ("ADA")**

Paragraph 72

>     72.    Congress has expressly preempted state and local governments from enacting or enforcing "a law, regulation, or other provision having the force and effect of law *related to* a price, route, or service of an air carrier . . ." 49 U.S.C. § 41713(b)(1) (emphasis added).

    72.    Refers respectfully the Court to the cited statute as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree

a response is required, denies the allegation to the degree the citation omits a material, codified limitation.

Paragraph 73

73.    This paragraph is multi-sentence:

Paragraph 73, Sentence 1

> In so doing, Congress expressly wanted to avoid a patchwork of state and local regulations from unduly burdening interstate air transportation and undermining the objectives of the ADA.

73.1    Admits the allegation.

Paragraph 73, Sentence 2

> As a result, all state and local laws, regulations, and other provisions having the force and effect of law that relate to carriers' prices, routes and services are preempted and invalid.

73.2    Denies the allegations.

Paragraph 74

74.    This paragraph is multi-sentence:

Paragraph 74, Sentence 1

> Local governments are expressly prohibited from unilaterally imposing regulations in this area absent FAA approval.

74.1    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegation.

Paragraph 74, Sentence 2

> Local restrictions or access plans that violate federal law or federal policy are *per se* unreasonable and thus do not fit within the narrow "proprietary right" exception (discussed below).

74.2    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, notes that the allegation is tautological.

Paragraph 75

> 75.    Under the ADA, 49 U.S.C. § 41713(b)(1), "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."

75.    Refers respectfully the Court to the cited statute as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 76

76.    This paragraph is multi-sentence:

Paragraph 76, Sentence 1

> A state or local law is "related to" a price, route or service if it has "[1] a connection with, or [2] reference to" a price, route, or service. *American Airlines v. Wolen*, 513 U.S. 219, 223 (1995); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008).

76.1    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 76, Sentence 2

> The "relating to" phrase in § 41713(b)(1) "express[es] a broad pre-emptive purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).

76.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 77

77.    This paragraph is multi-sentence:

Paragraph 77, Sentence 1

> Congress allowed for an extremely narrow exception to the otherwise wholesale preemption for local governments "carrying out [their] proprietary powers and rights" as airport sponsors.  49 U.S.C. § 41713(b)(3).

77.1    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 77, Sentence 2

> This is known as the "proprietary right exception," and it is very narrowly interpreted.

77.2    Admits that the cited statutory provision is known as the "proprietary right exception"; makes no answer regarding the remaining allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegation.

Paragraph 78

> 78.    Under this narrow exception, a local government's exercise of its proprietary powers must be reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed not to conflict with the ADA and its policies.

78.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 79

79.    This paragraph is multi-sentence:

Paragraph 79, Sentence 1

> The validity of any local regulation therefore depends on (1) whether the regulation "is related to a price, route, or service of an air carrier"; (2) if so, whether regulation amounts to an exercise of a State or local government's propriety powers; and (3) if it is an exercise of proprietary powers, whether such exercise is reasonable, non-arbitrary and non-discriminatory and not in conflict with the ADA, ANCA, or other federal law.

79.1   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 79, Sentence 2

> Only if all these showings are met is a local regulation exempted from preemption by 49 U.S.C. § 41713(b)(3).

79.2   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 79, Sentence 3

> In determining whether a local regulation restricting access to a public airport meets the narrow exception, the FAA has stated that such regulations must balance both local and federal interests.

79.3   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 80

> 80.      Here, Defendants' conduct: (1) effectively prohibits Plaintiffs from providing certain routes (*e.g.,* routes that originate at an airport where customers enplane from a non-SIDA location, despite them being permissible under federal law) and certain services (e.g., Plaintiffs' convenient options offered to HPN travelers); (2) is a flawed attempt to exercise proprietary powers (as any other explanation would not even arguably justify them); and (3) is unreasonable, arbitrary and discriminatory (they target and single out certain safe operators, Plaintiffs, for no legitimate reason), irreparably harming Plaintiffs, Plaintiffs' employees based at HPN, *and* the traveling public who prefer Plaintiffs' services and businesses and socially distanced travel experiences.

80.      Denies the allegations

**Preemption Under the Airport Noise and Capacity Act ("ANCA")**

Paragraph 81

81.      This paragraph is multi-sentence:

Paragraph 81, Sentence 1

> Congress's most authoritative expression of specific intent regarding the extent of federal preemption in the area of access at public airports is the Airport Noise and Capacity Act ("ANCA"). 49 U.S.C. § 47521, *et seq.*

81.1    Refers respectfully the Court to the Airport Noise and Capacity Act ("ANCA") as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 81, Sentence 2

> ANCA was enacted after Congress determined that previous federal statutes and regulations were insufficient to ensure a uniform federal aviation policy regarding noise and airport access restrictions.

    81.2   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 81, Sentence 3

> Through ANCA. Congress explicitly sought to address the "uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system[.]" 49 U.S.C. § 47521(2).

    81.3   Refers respectfully the Court to the cited statute as the best evidence of its content and import; denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 81, Sentence 4

> Because Congress recognized that local airport sponsors may seek to impermissibly control or regulate access to airports within their jurisdictions. Congress expressly found that access restrictions to public airports "must be carried out at the national level." Id. § 47521(3)-(4).

    81.4   Refers respectfully the Court to the cited statute as the best evidence of its content and import; denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 81, Sentence 5

> This is express preemption in the field of access to public airports and aircraft noise.

81.5    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 82

82.    This paragraph is multi-sentence:

Paragraph 82, Sentence 1

> ANCA, and FAA's regulatory scheme generally, classify aircraft into four "Stages" based on noise emission levels.

82.1    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 82, Sentence 2

> Stage 1 aircraft emit the most noise, and Stage 4 aircraft emit the least, with Stage 2 and Stage 3 aircraft in between.

82.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 82, Sentence 3

> Plaintiffs' services utilize Stage 3 aircraft.

82.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 83

> 83.    ANCA prohibits airport sponsors from imposing regulations that restrict a Stage 3 aircraft's ability to access a public airport unless the sponsor complies with 14 C.F.R. Part 161 ("Part 161") and the FAA grants permission.

83.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 84

84.    This paragraph is multi-sentence:

Paragraph 84, Sentence 1

> The FAA has promulgated extensive regulations, published at Part 161. which create a uniform process for airport sponsors to seek permission to introduce access restrictions at airports.

84.1    Refers respectfully the cited regulations as the best evidence of their content and import; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 84, Sentence 2

> To date (more than 30 years after ANCA became federal law), no airport has successfully obtained permission from the FAA to impose an access restriction on Stage 3 aircraft via the Part 161 process or otherwise.

84.2   Denies knowledge and information sufficient to form a belief as to the truth of the allegations.

Paragraph 85

85.   This paragraph is multi-sentence:

Paragraph 85, Sentence 1

> Indeed, ANCA's requirements for enacting access restrictions for Stage 3 aircraft are remarkably stringent.

85.1   Refers respectfully the Court to the cited requirements as the best evidence of their content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 85, Sentence 2

> Federal courts and the FAA have both interpreted 49 U.S.C. § 47524 as a requirement that all public airports comply with Part 161 before any access restriction affecting a Stage 3 aircraft can be enforced. *See* 14 C.F.R. §§ 161.101, 161.301(c).

85.2   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the

Court; to the degree a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 85, Sentence 3

> Under Part 161, proprietors must obtain, *inter alia*, (i) FAA approval for the restriction or (ii) the unanimous consent of *all* aircraft operators affected by the restriction. 49 U.S.C. § 47524(c)(1).

85.3    Refers respectfully the Court to the cited statute and the cited regulations as the best evidence of their content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 86

> 86.    On information and belief, Defendants have neither sought nor obtained FAA approval for the access restriction imposed on Plaintiffs (whether based on the illegal Policy No. 1, the TUP, or otherwise).

86.    Denies the allegations.

Paragraph 87

> 87.    Alternatively, Defendants have also failed to obtain unanimous consent of all operators (as evidenced by this lawsuit).

87.    Denies the allegations.

Paragraph 88

> 88.    Moreover, even assuming that Defendants attempted to meet Part 161's strictures, they would have had to demonstrate to the FAA, among other things, that the access restriction imposed on Plaintiffs: (i) is reasonable, non-arbitrary and non-discriminatory; (ii) does not create an unreasonable burden on interstate or foreign commerce; (iii) is consistent with maintaining the safe and efficient use of navigable airspace; (iv) does not conflict with a law or regulation of the United States; (v) has received adequate opportunity for public comment; and (vi) does not create an unreasonable burden on the national aviation system. 49 U.S.C. § 47524(c)(2).

88.    Refers respectfully the Court to the cited statute and the cited regulations as the best evidence of their content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 89

> 89.    Each of the showings required to gain FAA approval are absent from the Defendants' decision to unilaterally impose an access restriction and to otherwise act to effectively remove Plaintiffs from the Airport.

89.    Denies the allegations.

Paragraph 90

90.    This paragraph is multi-sentence:

Paragraph 90, Sentence 1

> On information and belief, Defendants have not initiated, much less successfully completed, the Part 161 process.

90.1    Denies the allegations.

Paragraph 90, Sentence 2

> The Defendants cannot circumvent ANCA's requirements or the FAA's processes to impose access restrictions on Stage 3 aircraft.

90.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 90, Sentence 3

> FAA procedures are mandatory and comprehensive, and local attempts to regulate access that are not enacted in compliance with Part 161 are federally preempted.[4]

90.3    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 90, Sentence 4

> [4] Given that Policy No. 1 is a new policy enacted in 2022, it is not subject to being grandfathered in.

90.4    Denies the implicit allegation that Policy No. 1 worked a change in the relevant law; denies the implicit allegation that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refers respectfully the Court to Policy No. 1 as the best evidence of its content and import.

Paragraph 91

> 91.    Defendants' conduct is further unreasonable because it interferes with Congress's stated goals in enacting ANCA, in particular preventing localities from creating a patchwork of regulations limiting airport access.

91.    Denies the allegations.

Paragraph 92

> 92.    In sum, Defendants violated ANCA (and its implementing regulations) by imposing Policy No. 1, preventing FBOs from working with Plaintiffs, and refusing to consider non-SIDA portions of the Terminal, all of which preclude Plaintiffs from operating at HPN.

92.    Denies the allegations.

Paragraph 93

93.    This paragraph is multi-sentence:

Paragraph 93, Sentence 1

> Furthermore, Defendants' unlawful and unconstitutional conduct was and is intentional.

93.1    Denies that the County's conduct was either unlawful or unconstitutional; admits that the County acted with intent.

Paragraph 93, Sentence 2

> Defendants were and are fully aware that any access restriction imposed by Policy No. 1 or TUP is subject to ANCA's processes and thus subject to preemption.

93.2    Denies that Policy No. 1 is an access restriction; makes no answer to the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies that the TUP is subject to preemption.

**Plaintiffs Will Be Irreparably Harmed If The County Is Not Enjoined From Enforcing Policy**

Paragraph 94

94.    This paragraph is multi-sentence:

Paragraph 94, Sentence 1

> The County's Policy No. 1 prohibits Plaintiffs from operating as they always have at FBOs at HPN.

94.1    Denies the allegations.

Paragraph 94, Sentence 2

> Yet the County has refused Plaintiffs' proposals to operate from alternative non-SIDA locations or create a non-SIDA location at the Terminal.

94.2    Denies the implicit allegation that the County has refused to consider Plaintiffs' proposals; admits the remaining allegations.

Paragraph 94, Sentence 3

> Accordingly, Defendants' actions foreclose Plaintiffs' access to the Airport on reasonable and non-discriminatory terms, as required by federal law.

94.3    Denies the allegations.

Paragraph 95

> 95.    Enforcement of the County's new Policy No. 1 will irreparably harm Plaintiffs by entirely halting Plaintiffs' services at HPN, including routes offered to underserved cities, safe and efficient services to the traveling public, and employment for over employees in the area surrounding HPN, and causing other impact on the local economy.

95.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 96

> 96.    Plaintiffs will also suffer a significant loss of revenue and customer goodwill if they are forced to stop operations at HPN.

96.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 97

> 97.    For example, in the next twelve months, XO is expected to operate more than 1,000 flights to and from HPN with expected revenue in tens of millions annually.

97.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 98

> 98.   Similarly, JSX stands to lose significant resources it spent investing in the HPN market at an estimated value of over $2 million and significant investments already made to operate out of HPN if Policy No. 1 is to be enforced.

98.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 99

99.   This paragraph is multi-sentence:

Paragraph 99, Sentence 1

> Additionally, as mentioned above, the popularity of Blade's services out of HPN continues to grow and Blade is expected to operate approximately 165 Part 380 flights between HPN and OPF or PBI during the November 2021 through April 2022 season alone.

99.1   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 99, Sentence 2

> Blade stands to lose the significant investments it has made towards its operations at HPN and Million Air.

99.2   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 99, Sentence 3

> Moreover, Blade's increasing customer based would be forced to cancel flights that have already been booked, which will in turn damage Blade's reputation and goodwill.

    99.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 99, Sentence 4

> If Policy No. 1 is enforced, Blade's inability to operate out of FBOs at HPN could result in losses in the millions for the remainder of the November 2021 through April 2022 season (and in the tens of millions for the November 2022 through April 2023 season, which does not take into account any potential expanded schedules or additional routes), as well as Blade's inability to honor contractual commitments to its Part 135 operating partners.

    99.4    Denies the implicit allegation that Policy No. 1 worked a change in the relevant law; denies the implicit allegation that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refers respectfully the Court to Policy No. 1 as the best evidence of its content and import; denies knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 99, Sentence 5

> Additionally, Blade partners with Part 135 operators and local catering, shuttle, and car service businesses, and employs eleven individuals for its operations at HPN, all of whom would be significantly impacted if Blade could no longer operate from HPN.

99.5   Denies knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 100

> 100.   Plaintiffs estimate that the local economic impact of their combined flight operations is well over $50 million annually.

100.   Denies knowledge or information sufficient to form a belief as to the remaining allegations.

## FIRST CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

**Defendants' Conduct Is Preempted by Federal Law and Violates the Supremacy Clause of the U.S. Constitution – ANCA
(28 U.S.C. § 1331 and 49 U.S.C. §§ 47521-47534)
(Against all Defendants)**

Paragraph 101

> 101.   Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

101.   Repeats and reincorporates the allegations in the preceding responses as if more fully set forth at length herein.

Paragraph 102

> 102.    The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const., art. VI.

102.    Refers respectfully the Court to the cited clause as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 103

> 103.    Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

103.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 104

104.    This paragraph is multi-sentence:

Paragraph 104, Sentence 1

> There is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.

104.1   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 104, Sentence 2

> AvPorts is a private company that provides airport facilities management, operations, airline services, administration, accounting, and noise abatement on behalf of the Airport.

104.2   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 104, Sentence 3

> As an agent for the County, AvPorts has sent notices to Plaintiffs on the County's behalf, seeking to exclude their operations at FBOs and improperly enforce Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP against Plaintiffs.

104.3   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 104, Sentence 4

> AvPorts, with the County Defendants' approval, has promulgated Policy No. 1.

104.4   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 104, Sentence 5

> As a result, AvPort's conduct is related to its agreement to adopt directives from the County Defendants aimed at unreasonably excluding Plaintiffs from HPN, including their adoption of Policy No. 1 and Defendants' enforcement of the TUP, is contrary to and interferes with federal law, including but not limited to ANCA.

104.5   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 105

> 105.    Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is unreasonable, arbitrary, discriminatory, and violates federal law.

105.    Denies the allegations.

Paragraph 106

> 106.    Defendants' conduct, including their adoption of Policy No. 1 and reliance on the TUP, constituted and constitutes an access restriction for Plaintiffs' Stage 3 aircraft.

106.    Denies the implicit allegation that Policy No. 1 worked a change in the relevant law; denies the implicit allegation that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and

a proposed accommodation to that business model on a going-forward basis; refers respectfully the Court to Policy No. 1 as the best evidence of its content and import; denies the remaining allegations.

Paragraph 107

> 107.   Defendants did not comply with Part 161.

107.   Makes no response to the allegation, which is a legal conclusion, save to demand strict proof thereof and refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegation.

Paragraph 108

> 108.   All air carriers present at HPN did not unanimously consent to Policy No. 1 or the TUP.

108.   Admits that Plaintiffs have not consented to Policy No. 1 or the TUP; denies the remaining allegations.

Paragraph 109

> 109.   The above-described conduct is not an action which falls within the narrow proprietary right exception because, among other reasons, Defendants purposefully acted in violation of federal law by intentionally discriminating against Plaintiffs.

109.   Denies the allegations.

Paragraph 110

> 110.   The above-described conduct is unreasonable, arbitrary, and discriminatory.

110.   Denies the allegations.

Paragraph 111

111.   This paragraph is multi-sentence:

Paragraph 111, Sentence 1

> Such conduct is *per se* unreasonable and unlawful as Defendants took this action in violation of federal law.

111.1   Denies the allegations.

Paragraph 111, Sentence 2

> As such, it is preempted by federal law and violates the Supremacy Clause of the U.S. Constitution.

111.2   Denies the allegations.

Paragraph 112

> 112.   The above-described conduct violates ANCA, and thus HPN's Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP must be amended or eliminated as a result of this ANCA violation.

112.   Denies the allegations.

Paragraph 113

> 113.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise excluding Plaintiffs from operating at HPN as of January 21, 2022.

113.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 114

> 114.    Plaintiffs also seek declaratory relief that makes clear that Defendants cannot prohibit Plaintiffs' operations through local law, regulation, or other provision having the force of law.

114.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court

Paragraph 115

> 115.    Plaintiffs specifically seek an injunction preventing Defendants from enforcing the Policy No. 1, Section 712.462 of the Westchester County Municipal Code, or the TUP, and a declaration that these regulations are invalid under the ANCA.

115.   Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court

## SECOND CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

### Defendants' Conduct Is Preempted by Federal Law and Violates the Supremacy Clause of the U.S. Constitution – ADA (28 U.S.C. § 1331 and 49 U.S.C. §§ 41713 et seq.) (Against all Defendants)

Paragraph 116

> 116.   Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

116.   Repeats and reincorporates the allegations in the preceding responses as if more fully set forth at length herein

Paragraph 117

> 117.   The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." f U.S. Const., art. VI.

117.   Refers respectfully the Court to the cited clause as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 118

> 118.   Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

118.   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 119

> 119.   As alleged above, there is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.

119.   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 120

> 120.   Defendants' conduct aimed at unreasonably excluding Plaintiffs from HPN, including adoption of Policy No. 1 and Defendants' enforcement of the TUP is contrary to and interferes with federal law, including but not limited to the ADA.

120.   Denies the implicit allegation that Policy No. 1 worked a change in the relevant law; denies the implicit allegation that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refers respectfully

the Court to Policy No. 1 as the best evidence of its content and import; denies the remaining allegations.

Paragraph 121

> 121.    Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

121.    Denies the allegations.

Paragraph 122

> 122.    Defendants' conduct, including the adoption of Policy No. 1 and enforcement of the TUP constitutes a regulation affecting the "rates, routes, and services" of Plaintiffs.

122.    Denies the implicit allegation that Policy No. 1 worked a change in the relevant law; denies the implicit allegation that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refers respectfully the Court to Policy No. 1 as the best evidence of its content and import; makes no answer regarding the remaining allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 123

> 123.    Defendants' above-described conduct prevents Plaintiffs from flying certain routes (*i.e.*, it forecloses Plaintiffs from operating flights to HPN from non-SIDA airport locations).

123.    Denies the allegations.

Paragraph 124

> 124.   Defendants' above-described conduct also prevents HPN from offering aeronautical services (e.g., it prohibits any customer services at HPN).

124.   Denies the allegations.

Paragraph 125

> 125.   Defendants' above-described conduct is not an action which falls within the narrow proprietary right exception, as the adoption of Policy No. 1 was unreasonable, arbitrary, and discriminatory.

125.   Denies the allegations.

Paragraph 126

> 126.   Plaintiffs' flights have operated safely at HPN for years.

126.   Admits the allegations.

Paragraph 127

> 127.   Plaintiffs' flights at HPN are serviced by quieter aircraft than most large airline flights at HPN.

127.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 128

> 128.   Plaintiffs were singled out by Defendants.

128.   Denies the allegations.

Paragraph 129

> 129.   Defendants' decision to target Plaintiffs is arbitrary and unconstitutional.

129.   Denies the allegations.

Paragraph 130

130.   This paragraph is multi-sentence:

Paragraph 130, Sentence 1

> Defendants' above-described conduct is *per se* unreasonable and unlawful as Defendants took this action in violation of federal law.

130.1   Denies the allegations.

Paragraph 130, Sentence 2

> As such, it is preempted by federal law and the Supremacy Clause of the U.S. Constitution.

130.2   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 131

> 131.   Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, Plaintiffs irreparably by causing a substantial loss of business, damaging Plaintiffs' business reputation and goodwill, and putting Plaintiffs at a significant competitive disadvantage to other carriers operating at HPN.

131.    Denies the allegations.

Paragraph 132

> 132.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise excluding Plaintiffs from operating at HPN in violation of the ADA as of January 21, 2022.

132.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 133

> 133.    Plaintiffs also seek declaratory relief that makes clear that Defendants cannot prohibit Plaintiffs' operations through local law, regulation, or other provision having the force of law.

133.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 134

> 134.    Plaintiffs specifically seek an injunction preventing Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, or the TUP, and a declaration that such regulations invalid under the ADA.

134.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

### THIRD CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

### Deprivation of Equal Protection – U.S. Const. Amend. XIV and 42 U.S.C. § 1983 (Against all Defendants)

Paragraph 135

135.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

135.    Repeats and reincorporates the allegations in the preceding responses as if more fully set forth at length herein.

Paragraph 136

136.    The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. § 1.

136.    Refers respectfully the Court to the cited clause as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 137

137.    Defendant Ms. Gasparri is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.

137.   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 138

138.   This paragraph is multi-sentence:

Paragraph 138, Sentence 1

> Defendant County is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.

138.1   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegation that the County in any way deprived Plaintiffs of their equal protection rights.

Paragraph 138, Sentence 2

> The County has mandated and officially adopted a policy, ordinance, regulation and/or decision that violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

138.2   Denies the allegations.

Paragraph 139

> 139.   As alleged above, there is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.

139.    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 140

140.    This paragraph is multi-sentence:

Paragraph 140, Sentence 1

> Defendants' adoption of Policy No. 1 and reliance on the TUP is for the sole purpose of singling out Plaintiffs for discriminatory treatment in violation of the Equal Protection Clause.

140.1   Denies the allegations.

Paragraph 140, Sentence 2

> Defendants do not prohibit the operations of other similarly situated carriers.

140.2   Denies the allegations.

Paragraph 141

141.    This paragraph is multi-sentence:

Paragraph 141, Sentence 1

> Defendants targeted Plaintiffs and treated Plaintiffs differently from other operators operating out of FBOs at HPN.

141.1   Denies the allegations.

Paragraph 141, Sentence 2

> Plaintiffs' operations involve similar (if not identical) aircraft to those who are permitted to continue operating at FBOs.

141.2   Denies the implicit allegation that the County allows other operators to engage in the Practice insofar as other operators do not sell individual seats to the public; admits that other operators based out of FBOs use similar aircraft to Plaintiffs'.

Paragraph 141, Sentence 3

> These aircraft also apply a TSA-approved security procedure, have a similar noise profile, fly similar routes, and in many cases carry a similar number of passengers.

141.3   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 142

> 142.   Defendants have no legitimate justification or rational basis for instituting Policy No. 1 or relying on the TUP other than to discriminate against Plaintiffs and prohibit them from operating at HPN.

142.   Denies the allegations.

Paragraph 143

> 143.   Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

143.   Denies the allegations.

Paragraph 144

> 144.   Defendants intentionally treated Plaintiffs differently than any other air carriers or operators at the Airport.

144.   Denies the allegations.

Paragraph 145

145.   This paragraph is multi-sentence:

Paragraph 145, Sentence 1

> Defendants' above-described conduct is not rationally related to any legitimate state interest.

145.1   Denies the allegations.

Paragraph 145, Sentence 2

> Rather, Defendants acted irrationally and arbitrarily with the sole intent of discriminating against Plaintiffs and preventing them from operating at HPN.

145.2   Denies the allegations.

Paragraph 146

> 146.   Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, Plaintiffs irreparably by causing a substantial loss of business, damaging Plaintiff's' business reputation and goodwill, and putting Plaintiffs at a significant competitive disadvantage to other carriers operating at HPN.

146.   Denies the allegations.

Paragraph 147

> 147.    Plaintiffs were irreparably harmed by Defendants' unconstitutional and discriminatory conduct because their constitutional rights have been infringed.

147.    Denies the allegations.

Paragraph 148

> 148.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek a declaratory judgment declaring that Defendants' Policy No. 1 is unconstitutional, and that Defendants are not permitted to prohibit Plaintiffs from operating at HPN.

148.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 149

> 149.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise banning Plaintiffs from operating at the Airport as of January 21, 2022.

149.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 150

> 150.    Plaintiffs also seek attorneys' fees as permitted by 42 U.S.C. § 1988.

150.    Makes no answer regarding the allegation, which involves a demand for relief that has been dismissed from this action by stipulation. *See* CM/ECF Doc. No. 59.

## DEMAND FOR JURY TRIAL

151.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the County hereby demands a trial by jury in this action.

## AS AND FOR THE FIRST AFFIRMATIVE DEFENSE

152.    Plaintiffs have failed to state a claim upon which relief can be granted.

## AS AND FOR THE SECOND AFFIRMATIVE DEFENSE

153.    The County is entitled to qualified immunity, because at all relevant times it acted in good faith and in accordance with all laws, rules, and regulations and pursuant to statutory authority and obligations.

## AS AND FOR THE THIRD AFFIRMATIVE DEFENSE

154.    The County acted reasonably and its conduct was justified under the circumstances and did not violate Plaintiffs' constitutional or statutory rights.

## AS AND FOR THE FOURTH AFFIRMATIVE DEFENSE

155.    At all times relevant hereto, the County acted in good faith and for good cause including but not limited to, legitimate, rational, and appropriate governmental interests in accordance with all applicable statutes, laws, and regulations.

### AS AND FOR THE FIFTH AFFIRMATIVE DEFENSE

156.    Plaintiffs have failed to join Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), a necessary and indispensable party.

### AS AND FOR THE SIXTH AFFIRMATIVE DEFENSE

157.    Plaintiffs claims should be dismissed for failure to exhaust their administrative remedies under 14 C.F.R. Part 16.

### COUNTERSTATEMENT OF FACTS

<u>INTRODUCTION</u>

158.    The County hereby seeks a declaratory judgment that Plaintiffs are required to comply with County law.

159.    The County also seeks injunctive relief in the form of a court order prohibiting the Plaintiffs from further violations of County law.

160.    The County is authorized to pass local laws pursuant to Article IX of the New York State Constitution and Section 1 of New York's Municipal Home Rule Law.

161.    Part V of the Laws of Westchester County[2] sets forth "General Ordinances Relating to County Property and Facilities."   Chapter 712 therein sets forth "Use of County-Owned Properties;" Article IV therein sets forth ordinances regarding "Aviation: Inside County Airport;" and Section 712.462 therein sets forth the "Westchester County Airport Terminal Use Procedures" (hereafter the "TUPs").  All of these laws were duly enacted by the Westchester County Board of Legislators.

---

[2] *Available at* https://library.municode.com/ny/westchester_county/codes/code_of_ordinances.

162.    Subsection 1 of the TUPs states, in relevant part, that the TUPs "shall apply to all use of the passenger terminal" by "Airlines" providing "Passenger Service," and that "[a]ll Passenger Service provided at the Airport shall be provided at the Terminal."

163.    Subsection 2 of the TUPs states, in relevant part, that Airlines must have "a valid Terminal Use Agreement with the County in effect."  Subsection 2 also sets forth the following definitions:

"Airline" is defined as "any person providing Passenger Service in aircraft designed for more than (9) passenger seats, including but not limited to, any air carrier or other operator certificated to provide Passenger Service under Parts 119, 121 or 135 of the Federal Aviation Regulations, Title 14, Code of Federal Regulations."

"Person" is defined as "any individual, firm, company, association, society, corporation, partnership, co-partnership, joint-stock company, trust, estate, governmental entity or any other legal entity or legal representatives, agents or assigns thereof."

"Passenger Service" is defined as "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity."

"Ramp Allocation" is defined as "the authorization to schedule an Airline aircraft operation on the Terminal Ramp during a designated half hour each day….  An operation shall consist of an arrival or a departure."

"Terminal Ramp" is defined as "that portion of the apron at the Airport that is immediately adjacent to the Terminal building and which is available for scheduled Airline operations."

164.    Subsection 3 of the TUPs states, in relevant part, that "[a]n Airline must hold a Ramp Allocation for each aircraft operation scheduled to use the Terminal Ramp."

165.    The TUPs have been in effect since 2004.  That same year, the TUPs were reviewed by the Federal Aviation Administration (FAA), whose Office of the Chief Counsel represented to the County that the TUPs comply with federal aviation law.

166.    The TUPs have been amended twice since 2004, once in 2005 (by Local Law No. 21-2005) and once in 2010 (by Local Law No. 25-2010).

167.    Neither amendment worked a material change to the TUPs.

**FACTUAL ALLEGATIONS**

**Background**

168.    The Airport is located approximately five miles northeast of White Plains, New York.  It has been a public-use airport since 1945, and offers a mixture of commercial, business and private aviation services.

169.    The County owns the Airport, which is managed and operated on the County's behalf by Avports.

170.    Aircraft traffic to and from the Airport (FAA code "HPN") includes flights by well-known commercial operators such as American Airlines, Delta, and jetBlue.  Pursuant to the TUPs, each of these commercial operators has a Terminal Use Agreement ("TUA") with County Defendant, which governs their use of the Airport's passenger terminal.  Each commercial operator also has a Ramp Allocation from County Defendant.

171.    Some aircraft traffic to and from the Airport consists of non-public, chartered flights, often chartered by business entities or professional sports teams.  Because such "whole-aircraft" charter flights do not involve the sale of individual seats, they are not considered

"Passenger Service," and they are not required by the TUPs to use a Ramp Allocation at the Airport terminal. Instead, such flights operate out of other Airport facilities run by various Fixed Based Operators ("FBOs").

### The Business Model in Dispute

172.    In late 2019, a new business model began to emerge, catering in part to passengers who wish to avoid flying with the general public out of the Airport terminal on a typical commercial flight.

173.    Under this model, air charter brokers will charter flights, operating out of various Airport FBOs, and then sell tickets for individual seats on those flights to the general public, typically via publicly-accessible websites. So long as those flights are on aircraft with nine seats or fewer, the TUPs do not apply because the definition of "Airline" is not met.

174.    In or about 2020 or 2021, however, Blade, JSX, and XO began selling individual tickets, to the general public, on chartered aircraft with more than nine seats.

175.    For example, per a DOT "Statement of Charter Operator and Direct Air Carrier" filed by Blade and Contour on 4/21/21 (attached hereto as Exhibit 'A'), the aircraft Blade and Contour are using is a 2002 Bombardier CRJ-200, with sixteen seats.

176.    Per a similar DOT "Statement of Charter Operator and Direct Air Carrier" filed by JSX and Delux on 10/7/21 (attached hereto as Exhibit 'B'), the aircraft JSX and Delux are using is an Embraer EMB-135/145, with thirty seats.

177.    Upon information and belief, XO has also sold individual tickets, and continues to sell individual tickets, to "the public or a segment of the public," on chartered aircraft with more than nine seats operated by Contour, from an FBO at the Airport.

178.    Blade, JSX and XO do not directly operate these flights; the flights are operated by either Delux (for JSX) or Contour (for Blade and XO).  Regardless, per the TUPs, the definition of "Passenger Service" applies "regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity."  LWC § 712.462(2).

**Communications with the Defendants**

179.    In mid-2021, the County and Avports determined that flights such as those described above violate the TUPs, to the extent they involve individual-seat sales, are offered to "the public or a segment of the public," and are flown on aircraft containing more than nine (9) seats from an FBO as opposed to from the Airport terminal by an operator with a Terminal Use Agreement and Ramp Allocation.

180.    Nevertheless, in an effort to avoid litigation, the County and Avports have, beginning in the Fall of 2021 and continuing through February 2022, engaged in communications with Plaintiffs (and other air charter brokers and operators), including letters, telephone calls, and video conferences.

181.    In the course of these communications, the County has made clear that its intent is to bring all air charter brokers and operators into compliance with County law, not just Plaintiffs. Plaintiffs are simply those air charter brokers and operators who have refused to comply with County law.

182.    The County has also made clear that Avports would work with any and all operators to arrange for the necessary TUAs and Ramp Allocations.

183.    Notwithstanding this spirit of cooperation, the County has also repeatedly and consistently asserted its rights.  For example, on November 3, 2021, the County informed XO that

because a flight service XO had proposed is "Passenger Service" under the TUPS, "it could, by law, only be provided at the HPN Terminal" as opposed to an FBO.

184.    On November 5, 2021, the County wrote to JSX, noting that "JSX's passenger service at the Westchester County Airport is being operated out of a Fixed Base Operation, namely Signature Flight Support, as opposed to the Terminal," and stating that JSX must "immediately conform its operations at the Westchester County Airport with local law."

185.    On November 9, 2021, the County wrote to Blade, stating that "any service that involves aircraft of more than nine seats and individual seat sales to any segment of the public must operate from the Terminal pursuant to a Terminal Use Agreement."  That same day, the County sent similar letters to a number of FBOs at the Airport, including Signature Flight Support, Ross Aviation, and White Plains Aviation Partners, LLC.

186.    On November 22, 2021, the County wrote to XO stating, in part, that XO "must immediately cease and desist the practice of selling more than nine (9) seats on any aircraft flight operated from an FBO at HPN, as this practice violates County law."

187.    On December 1, 2021, the County informed JSX that the County and Avports are "currently in the process of identifying any and all operations of this nature and notifying them of the requirement to operate at the Terminal[.]"

188.    On December 17, 2021, the County wrote to XO, noting that "XO and another operator, Contour Aviation, are continuing to offer flights from an FBO at HPN (for example to Florida) that do not comply with this requirement," *i.e.*, to operate public flights with more than nine seats from the Terminal, and stating that "[t]hese current operations must be brought into immediate compliance."

189. On January 7, 2022, the County wrote to JSX noting, *inter alia*, that "[w]hile the County remains willing to provide flexibility for your arriving flights to deplane passengers at a FBO, all other activities must be in compliance with the TUP, which requires, *inter alia,* the staging of aircraft at the Terminal ramp."

190. On January 21, 2022, Avports published, on behalf of the County, a "Public Charter Operational Policy," attached hereto as Exhibit 'C.' This publicly-available policy states, in relevant part:

> Single Seat Charter Operations (SSCO) represent an innovative, recent and distinct type of operation at HPN. In order to determine how to accommodate this new business model at the Airport in compliance with County law, the County has engaged over the last several months in detailed consultations with the SSCOs that have expressed an interest in serving HPN. The County intends to treat all of the SSCO operations in the same fashion, and has developed this policy accordingly.
> …
> SSCOs refer to DOT Part 380 "public charter" operators, offering single-seat sales to the general public, or any segment thereof, on aircraft with more than nine (9) seats.
> …
> For aircraft operations designed for more than nine (9) seats, the Operating Plan shall include passengers and their baggage originating and using the Airport's passenger terminal, at a minimum, for departure. Optional to the Operating Plan is utilizing the passenger terminal for arriving flights.

191. As evidenced by the document itself, Public Charter Operational Policy represented both a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis.

192. On February 7, 2022, the County sent letters to Contour and Delux. These letters stated, in relevant part, that the County had informed the air charter brokers:

> that these services are in violation of the TUP and must cease. It has been our understanding that they have been sharing this information with you, as the actual AOC operator of the flights in question. However, we are now sending this letter to you directly as the air carrier (along with all other similarly-situated air carriers operating non-compliant SSCO services at HPN) so as to be certain that you are fully aware that these operations are not in compliance. You are hereby so

informed, and directed to immediately cease these non-conforming operations and come into immediate compliance. The attached [Public Charter Operational Policy] sets forth the acceptable means of compliance.

193.    To date, neither Delux nor Contour has directly responded to these letters.

194.    However, on February 15, 2022, JSX responded on behalf of Delux and refused to comply with the TUPs.

195.    For the avoidance of doubt, there are two separate and equally-acceptable ways in which Plaintiffs may come into compliance with County law.  First, the air charter brokers (Blade, JSX, and XO) can permanently cease their practice of selling tickets for individual seats on flights with more than nine seats to "the public or a segment of the public."  Second, the operators (Contour and Delux) can enter into TUAs, obtain Ramp Allocations, and operate the flights in question from the Airport terminal.

## COUNT ONE
### (For Declaratory Relief)

196.    The County repeats each and every allegation set forth above as if fully set forth herein.

197.    Pursuant to CPLR § 3001, this Court "may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed."

198.    A "justiciable controversy" exists between the County and Plaintiffs as to whether the TUPs, as codified in County law, apply to Plaintiffs with respect to the aforementioned actions at the Airport.

199.    Plaintiffs have taken the position that the TUPs conflict with federal aviation law. They do not.  The primary means by which operators of U.S. public-use airports ("airport sponsors") such as the County are regulated is through certain "Grant Assurances" entered into

between the sponsor and the FAA in connection with receiving Federal assistance for such airport. Grant Assurance 22, "Economic Nondiscrimination," requires the sponsor to make the airport available as an airport for public use on reasonable terms and without "unjust discrimination."[3] This requirement does not require an airport sponsor to accommodate all operators at its FBOs simply because that is their business preference. The essence of Grant Assurance 22 is that the sponsor must not "unjustly" discriminate, but sponsors may and do treat differently distinct categories of users, to wit: the new category of "Single Seat Charter Operations" (*see* Ex.C) vs. the whole-aircraft, Part 135 On-Demand charter operations that have long been served at Airport FBOs.

200.    As set forth in its recently-published policy (*see* Ex. C), all of the former are accommodated at the Airport; Plaintiffs have been treated no differently than any other Single Seat Charter Operator.  The point of dispute is simply whether they will comply with the County's law requiring that such operations must be conducted at the Terminal.

201.    Notably, if Plaintiffs were permitted to conduct this type of operation at the FBOs, despite County law to the contrary, the County could in fact be accused of unjustly discriminating against other airlines that offer single-seat sales to "the public or a segment of the public" on aircraft with more than nine seats, such as United, Delta, and jetBlue, all of whom operate from the Airport terminal pursuant to a TUA.

202.    The County's TUPs do not conflict with 49 U.S.C. § 41713(b)(1), either.  This federal statute prohibits any State (or a "political subdivision" of a State, such as a county) from enacting or enforcing a law or regulation "related to a price, route, or service of an air carrier."

---

[3] *See* https://www.faa.gov/airports/aip/grant_assurances/media/airport-sponsor-assurances-aip-2020.pdf.

The TUPs do not regulate prices, routes or services of an air carrier; they are simply the long-standing mechanism by which the County "carr[ies] out its proprietary powers and rights," as permitted under 49 U.S.C. § 41713(b)(3), such as its power to regulate traffic at the Airport terminal.

203.    Nor do the TUPs conflict with the Airport Noise and Capacity Act of 1990 ("ANCA"), which limits the ability of airport sponsors to impose new noise or access restrictions. As noted, the County is not imposing any new access restriction; it is merely requiring Single Seat Charter Operations (including, but not limited, to Plaintiffs) to operate from the Airport terminal, just as every other air carrier selling individual seats on aircraft with more than nine seats to a "segment of the general public" has been required to do since 2004.

204.    Plaintiffs have also taken the position that the County's TUPs are out of step with local laws at other airports around the United States.  The TUPs are, in fact, relatively unique in that they predate the applicable FAA regulations.  The FAA has opined, however, that the TUPs are effectively "grandfathered," and may still be applied by the County so long as they are applied in a non-discriminatory manner.  In publishing and disseminating the Westchester County Airport Public Charter Operational Policy (Ex. C), Avports has demonstrated that the TUPs are in fact being applied to all air charter brokers and operators equally.

205.    The aforementioned disputes are purely disputes of law, which this Court may adjudicate.

206.    Accordingly, the County is entitled to an order declaring that the TUPs, as codified in County law, apply to all of Plaintiffs with respect to the aforementioned actions at the Airport.

## COUNT TWO

### (For Permanent Injunction)

207.     The County repeats each and every allegation as set forth above as if fully set forth herein.

208.     As set forth above, Plaintiffs have acted in violation of the County's rights with respect to the TUPs, which are duly enacted local laws.

209.     Indeed, each Plaintiff has continued to act, and in fact is currently acting, in violation of the County's rights with respect to the TUPs.

210.     Notably, Plaintiffs continue to do so despite receiving numerous communications from the County and its counsel explaining how their actions violate local law.

211.     Given these repeated and ongoing violations, and the suggestion by Plaintiffs that the local laws in question simply do not apply to them, a declaratory judgment alone would likely be rendered ineffectual.

212.     Accordingly, the County is entitled to an order permanently enjoining the Plaintiffs from violating the TUPs.


*[Remainder of Page Intentionally Left Blank]*

A-280

**WHEREFORE**, the County demands judgment:

a.      Dismissing Plaintiffs' Complaint

b.      Granting the County's Counterclaims for Declaratory Relief and Permanent

Injunction; and

c.      Granting such other and further relief that the court deems just and proper.

DATED:   White Plains, New York
         June 19, 2022

**JOHN M. NONNA**
Westchester County Attorney
*Attorney for County Defendant*

By: _____
      Sean T. Carey (SC8804)
      Sr. Assistant County Attorney, of Counsel
      Michaelian Office Building
      148 Martine Avenue, Room 600
      White Plains, New York 10601
      T: (914) 995-2243
      F: (914) 995-3132
      stca@westchestergov.com

To:     All Parties (*via CM/ECF*)