# 24-1895-cv

## United States Court of Appeals

*for the*

## Second Circuit

DELUX PUBLIC CHARTER, LLC, DBA JSX Air, DBA JetSuiteX, Inc.,
XO GLOBAL, LLC, BLADE URBAN AIR MOBILITY, INC.,

*Plaintiffs-Counter-Defendants-Appellants,*

− v. −

COUNTY OF WESTCHESTER, NEW YORK, a charter county,

*Defendant-Counter-Claimant-Appellee,*

APRIL GASPARRI, in her official capacity as Airport Manager,
AVPORTS, LLC,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 2 of 2 (Pages A-281 to A-563)

JONATHAN F. COHN
SHANNON GRAMMEL
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Washington, DC 20001
(512) 693-8350

JONATHAN B. NELSON
DORF NELSON & ZAUDERER LLP
The International Corporate Center
555 Theodore Fremd Avenue
Rye, New York 10580
(914) 381-7600

*Attorneys for Plaintiffs-Counter-Defendants-Appellants*

*(For Continuation of Appearances See Inside Cover)*

KYLE D. HAWKINS
LEHOTSKY KELLER COHN LLP
408 West 11th Street, 5th Floor
Austin, Texas 78701
(512) 436-3052

i

## TABLE OF CONTENTS

|  | Page |
|---|---|
| District Court Docket Entries | A-1 |
| Complaint, filed March 7, 2022 | A-22 |
| Declaration of David Drabinsky, for Plaintiffs, in Support of Application for Temporary Restraining Order, filed March 9, 2022 | A-59 |
| Exhibit B to Drabinsky Declaration – Letter to David Drabinsky, dated November 5, 2021 | A-69 |
| Exhibit C to Drabinsky Declaration - Letter to Peter Scherrer, dated November 15, 2021 | A-72 |
| Declaration of Karoline Lozier, for Plaintiffs, in Support of Application for Temporary Restraining Order, filed March 9, 2022 | A-87 |
| Exhibit I to Lozier Declaration - Letter to Melissa Tomkiel, dated November 9, 2021 | A-95 |
| Declaration of Ted Botimer, for Plaintiffs, in Support of Application for Temporary Restraining Order, filed March 9, 2022 | A-98 |
| Exhibit L to Botimer Declaration - Letter to Anastasija Snicarenko, Esq., dated November 5, 2021 | A-105 |

ii

**Page**

Exhibit 1 to Letter to the Honorable Philip M.
    Halpern, filed March 9, 2022:
    Complaint in The County of Westchester v.
    Blade Urban Air Mobility, Inc., Westchester
    County Supreme Court.....................................  A-108

Stipulation and Order, filed March 16, 2022 .......  A-140

Stipulation re: Dismissal of AvPorts, LLC and
    Ms. April Gasparri and Order, filed
    March 17, 2022......................................  A-144

Stipulation and Order re: State Court Action,
    filed June 9, 2022 ................................  A-147

Answer, Demand for Jury Trial, Affirmative
    Defenses, and Counterclaims, filed
    June 19, 2022 ........................................  A-150

Joint Local Rule 56.1 Statement, filed
    May 5, 2023 ..........................................  A-281

Exhibits to the Declaration of Sean T. Carey, in
    Support of Motion for Summary Judgment,
    filed November 30, 2023
    (Incorporated here for reference only):

    Exhibit B  -
    Local Law No. 12-2004 .....................................  A-309

    Exhibit C -
    Local Law No. 17-2005 .....................................  A-335

    Exhibit E -
    Resolution No. 58-1985 ....................................  A-360

    Exhibit I -
    FAA Letter.............................................................  A-374

iii

**Page**

[EXCERPT] Exhibit AC -
Deposition Transcript of Melissa Tomkiel....... A-385

[EXCERPT] Exhibit AD -
Deposition Transcript of Peter Scherrer .......... A-406

[EXCERPT] Exhibit AE -
Deposition Transcript of Tom Rumbarger ...... A-414

[EXCERPT] Exhibit AF -
Deposition Transcript of Jennifer Lozada ....... A-427

[EXCERPT] Exhibit AG -
Deposition Transcript of April Gasparri.......... A-445

[EXCERPT] Exhibit AH -
Deposition Transcript of David Drabinsky .... A-453

[EXCERPT] Exhibit AI -
Deposition Transcript of Joan McDonald........ A-461

Declaration of Mark Duebner, for Plaintiffs, in
    Opposition to Defendant's Motion for
    Summary Judgment, filed
    November 30, 2023 ............................................ A-475

Declaration of David Drabinsky, for Plaintiffs,
    in Opposition to Defendant's Motion for
    Summary Judgment, filed
    November 30, 2023 ............................................ A-478

Declaration of Rajat Khurana, for Plaintiffs, in
    Opposition to Defendant's Motion for
    Summary Judgment, filed
    November 30, 2023 ............................................ A-482

iv

**Page**

Memorandum of Law, for Plaintiffs, in
Opposition to Defendant's Motion for
Summary Judgment, filed
November 30, 2023 ............................................. A-487

Plaintiffs' Motion for a Stay or, in the
Alternative, an Injunction Pending Appeal,
filed July 19, 2024 ................................................ A-517

Declaration of Ken Edmondson, for Plaintiffs,
in Support of Motion for a Stay or, in the
Alternative, an Injunction Pending Appeal,
filed July 19, 2024 ................................................ A-521

Exhibit H to Edmondson Declaration -
E-mail to John Nonna, dated July 18, 2024...... A-533

Exhibit I to Edmondson Declaration -
E-mail to Jon Cohn, dated July 19, 2024 .......... A-536

Exhibit J to Edmondson Declaration -
Letter to David Drabinsky, dated
July 19, 2024 ......................................................... A-539

Declaration of Rajat Khurana, for Plaintiffs, in
Support of Motion for a Stay or, in the
Alternative, an Injunction Pending Appeal,
filed July 19, 2024 ................................................ A-546

Exhibit M to Khurana Declaration -
Letter to Anastasija Snicarenko, Esq., dated
July 19, 2024 ......................................................... A-555

Notice of Appeal, dated July 12, 2024 .................. A-562

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC.,<br><br>                                        Plaintiffs,<br><br>                    -against -<br>COUNTY OF WESTCHESTER,<br><br>                                        Defendant. | **JOINT LOCAL**<br>**RULE 56.1 STATEMENT**<br><br>22-cv-01930 (PMH) |

## I.    FACTS APPLICABLE TO ALL CLAIMS FOR RELIEF

1.    The sole commercial terminal (the "Terminal") at the Westchester County Airport ("HPN") is operated pursuant to the County's local use restrictions, codified in the Laws of Westchester County ("LWC") as "Terminal Use Procedures" ("TUP"). (LWC § 712.462.)

**Resp. 1:** Disputed. The Terminal is operated pursuant to federal law and only where specifically allowed, certain local use restrictions. (49 USC § 47524; USC § 41713(b).)

2.    Since 2005, the TUP has explicitly required that "any air service to or from [HPN] for which seats are individually offered or sold to the public or a segment of the public" on "aircraft designed for more than (9) passenger seats, including but not limited to any carrier or other operator certified . . . under Parts 119, 121 or 135 of the Federal Aviation Regulations, Title 14, Code of Federal Regulations" must operate out of the Terminal. (LWC § 712.462(1), (2)(a), (j); Carey Decl., Ex. C [hereinafter, "Local Law No. 17-2005"] at C899–901[1].)

**Resp. 2:** Statement of law. Undisputed, but also states "shall apply to all use of the passenger terminal and the terminal ramp at [HPN] by Airlines providing Passenger Service, as the term is defined herein." LWC § 712.462(1).

3.    Plaintiffs Blade Urban Air Mobility, Inc. ("Blade"), XO Global, LLC ("XO"), and JetsuiteX, Inc. ("JSX") (collectively, "Plaintiffs") sell seats to the public on aircraft designed for

---

[1] *N.b.*, the County's bates prefix of "COW-" has been shortened to "C."

more than (9) passenger seats at HPN and <u>do</u> <u>not</u> operate out of the Terminal. (Dkt. No. 1 [hereinafter, "Compl."] ¶¶ 5, 15; Lozada Tr. 83:4–88:7; 94:19–23; Tomkiel Tr. 62:19–66:14; 88:13–15; Drabinsky Tr. 65:2–13, 71:23–72:1, 159:8–12.)

**Resp. 3:** Undisputed.

4.    Instead, Plaintiffs provide air service out of one of HPN's privately run Fixed-Base Operators ("FBOs"), pursuant to agreements with those FBOs. The County is not a party to those agreements. (Compl. ¶¶ 5, 26, 29, 38; Gasparri Tr. 60:4–8, 60:19–61:24.)

**Resp. 4**: Undisputed.

5.    There is no allegation that during the ten years following the 2005 Amendment's enactment, "any air service to or from [HPN] for which seats are individually offered or sold to the public or a segment of the public" on "aircraft designed for more than (9) passenger seats" occurred outside of the Terminal— *i.e.*, at one of HPN's three FBOs.

**Resp. 5:** Disputed. (Scherrer Ex. 7 (Sept. 2015 email); Scherrer Tr. 102:9-107:21.)

6.    There is no allegation that between 2015 and November 2018, the County was aware that Blade or Jetsmarter was selling seats to the public on aircraft with more than 9 passenger seats for flights operating out of the FBOs, in violation of the TUP.

**Resp. 6:** Disputed. (Scherrer Exs. 7, 11; Scherrer Tr. 102:9-107:21, 139:8-142:15.)

7.    In November 2018 and January 2019, the County received reports that Jetsmarter, Inc. ("Jetsmarter")—a non-party to the instant litigation that is "related to" XO—was operating in violation of the TUP. (Carey Decl., Ex. N (Email of Nov. 6, 2018) at C1158, Ex. O (Email of Jan. 23, 2019); *see also* Compl. ¶ 29 (identifying Jetsmarter).)

**Resp. 7**: Disputed. November 2018 was not the first discussion. (*See* Resp. Nos. 5-6).

8.    Avports' employees investigated these allegations by attempting to purchase tickets

on Jetsmarter flights. They were unable to. (Scherrer Tr. 134:2–14; Rumbarger Tr. 185:8–12.)

**Resp. 8:** Disputed. (C1422 (noting can pay fee to book); Rumbarger Tr. 183:21-184:24.)

9.      The County concluded, as a result of Avports' investigations, that tickets for the Jetsmarter flights in question were only being sold to membership groups—not to the general public. (Scherrer Tr. 132:6–136:5; Carey Decl., Ex. P (Email of Dec. 20, 2018) at BLD-13121, Ex. Q (Email of Mar. 10, 2018) at BLD-12546; *see also* XO Letter of Oct. 7, 2022 at C1331; *cf.* LWC § 712.462; 14 C.F.R. § 212.5 (setting forth the procedures for affinity charters).)

**Resp. 9:** Disputed. Cited evidence does not show JetSmarter flights were sold only to members. (*See* XO_8227; Lozada Tr. 149:3-151:3; Tomkiel Tr. 38:5-9, 63:23-66:1.)

10.      In March 2020, the world was beset by the COVID-19 pandemic. (*See* 9 N.Y.C.R.R. § 8.202.4 (declaring a state of emergency).)

**Resp. 10**: Undisputed.

11.      As a result of the pandemic, XO's and Blade's public sale of air service to and from HPN on aircraft designed for more than 9 passenger seats "spiked." (Tomkiel Tr. 75:16–21; Lozada Tr. 80:21–81:10.)

**Resp. 11:** Partially disputed. Pandemic caused increase in private aviation in general; cited testimony does not discuss 9 seats. (Tomkiel Tr. 75:19-21; Lozada Tr. 80:21-81:1.)

12.      Plaintiffs' broad public advertisement of their HPN operations caught local community leaders' attention. (*See* Carey Decl., Ex. R (Email of Mar. 25, 2021) at C1252; Ex. S (Email of Apr. 28, 2021) at C6083; Scherrer Tr. 277:18–23.)

**Resp. 12:** Partially disputed, as 2021 was not the first time local leaders raised Plaintiffs' HPN operations. (Scherrer Ex. 8 at 3 & Ex. 11 at 9, 29; Scherrer Tr. 108:3-110:9, 139:8-142:15.)

13.      In late March/early April of 2021, those local community leaders began voicing

3

concerns about Plaintiffs to the County administration. (McDonald Tr. 5:16–6:9).)

**Resp. 13:** Partially disputed. In 2017 (and ongoing), community organizations notified the County JetSmarter, XO, and others were operating from FBOs. (*See* Resp. 12.)

14.    In Fall 2021, the County again investigated whether any operators—including Plaintiffs—were operating at HPN in violation of the TUP. (McDonald Tr. 77:14–20; Carey Decl., Ex. T (Email of Sept. 24, 2021) at C1265, Ex. S (Email of Sept. 24, 2021) at C1267.)

**Resp. 14**: Undisputed.

15.    After the issuance of Policy No. 1, Plaintiffs continued to offer air service at HPN to the general public on aircraft designed for more than nine (9) passenger seats out of HPN's FBOs, and not the Terminal. (*See* Drabinsky Decl. ¶ 40; Dkt. No. 17 (Lozier Decl.) ¶ 30; Dkt. No. 18 (Botimer Decl.) ¶ 24.)

**Resp. 15**: Undisputed.

16.    Six weeks after Policy No. 1's issuance, Plaintiffs commenced the instant action. (Compl. at 1.)  A so-ordered stipulation has allowed Plaintiffs to continue their operations, in violation of the TUP, pending resolution of this action. (Dkt. No. 45 (Stipulation) at 3.)

**Resp. 16**: Disputed in part. Plaintiffs are not violating the TUPs, which are preempted.

17.    On March 8, 2022, Avports General Manager April Gasparri notified FAA's Eastern Region's District Office Manager Evelyn Martinez that the County "filed a legal claim against [Plaintiffs] for conducting Single Seat public sales and operations on aircraft with greater than nine seats and while operating out of FBOs." (Carey Decl., Ex. W (Email of Mar. 8, 2022) at C2432; Gasparri Tr. 252:11–255:12.)

**Resp. 17**: Undisputed.

18.    There is no evidence in the record that FAA has had any issue with the County's

TUP, the 2005 Amendment, Policy No. 1, or the County's instant attempt to enforce its local use restrictions. (*Cf.* Carey Decl., Ex. X (Letter from FAA to John Wayne Airport) at C6908–09.)

**Resp. 18:** Disputed. Defendant cites no evidence the FAA was provided with the current TUP, the 2005 Amendment, or Policy No. 1. (Gasparri Tr. 80:10-14; *see also* Cnty's Fact 63.)

## II.    FACTS RELEVANT TO SPECIFIC CLAIMS FOR RELIEF

### A.    Airport Noise and Capacity Act ("ANCA") Claim

#### i.    *HPN's Pre-ANCA Use Restrictions*

19.    HPN's first formal, local use restrictions came as a result of a court order in *Midway Airlines, Inc. v. County of Westchester*, No. 84-CV-2229 (EW) (S.D.N.Y.), entered on April 19, 1984 (the "*Midway* Order"). (Carey Decl., Ex. A [hereinafter, "Briefing Materials"] at C5775; Carey Decl., Ex. D [hereinafter, "Resolution No. 95-1984"] at C787–93.) This order directed the County to "promulgate rational and nondiscriminatory rules governing the allocation of ground facilities and flight slots" within 50 days. (*Midway Airlines, Inc. v. County of Westchester*, 584 F. Supp. 436, 441–42 (S.D.N.Y. 1984).

**Resp. 19:** Undisputed *Midway* Order was entered on that date with cited language; but the Order directed the County to adopt rules only for Part 121 carriers and neither the County's 1984 restrictions nor the Order addressed Part 135/Part 380 carriers. (*Midway*, 584 F. Supp. at 441–42.)

20.    On June 7, 1984, the County promulgated its first formal set of local use restrictions. (*See* Resolution No. 95-1984.)

**Resp. 20:** Undisputed.

21.    From that date forward, HPN has had local use restrictions in effect continuously. (Briefing Materials at C5803; Resolution No. 95-1984 at C787–88; *see also* LWC § 712.462.)

**Resp. 21:** Disputed that restrictions same since 1984 or are enforceable. (*See* Res. Nos. 58-

1985, 59-1985; L.L. 21-2005 at C5565; §712.462).

22.     On March 4, 1985, the County "implemented the access limits, allocation terms, and technical specifications . . . set forth in the Stipulation." (Briefing Materials at C5778; *see also* Carey Decl., Ex. E (Resolution No. 58-1985) at C811, Ex. F (Resolution No. 59-1985) at C823–28.)

**Resp. 22:** Disputed the limits, allocations, and specifications in *Midway* Stipulation apply beyond Part 121 carriers. (*Midway*, 584 F. Supp. at 441–42; C812.)

23.     On April 5, 1988, "the County and the carriers entered into the . . . Terminal Capacity Agreement . . . , the purpose of which was to continue the terms set forth in [the] Stipulation and to continue to apply those same constraints to the new Terminal." (Briefing Materials at C5784.)

**Resp. 23**: Undisputed Materials state quote, but Materials were drafted in 2004 and contain multiple hearsay. Disputed that referenced carriers were Part 135s/Part 380s. (C812; Resp. 22.)

   ii.     *Passage of the Airport Noise and Capacity Act of 1990 ("ANCA")*

24.     On November 5, 1990, Congress enacted the Airport Noise and Capacity Act of 1990 ("ANCA"). (Pub. L. No. 101-508 §§ 9301–09, 104 Stat. 1388, 378–84.)

**Resp. 24**: Undisputed.

25.     Following ANCA's passage, new local airport-use restrictions became subject to strict "notice, review, and approval requirements" established by the FAA. (49 U.S.C. § 47524.)

**Resp. 25**: Undisputed but is statement of law, not fact.

26.     Local airport-use restrictions that predate ANCA, however, are explicitly excluded from the "notice, review, and approval requirements" (*i.e.*, "grandfathered"). (49 U.S.C. § 47524(b), (c)(1), (d); 14 C.F.R. § 161.3(a), (b).)

**Resp. 26**: Disputed, statement of law. ANCA excludes only certain restrictions before November 5, 1990. 42 U.S.C. § 47524(d)(2).

27.    Furthermore, amendments to grandfathered local airport-use restrictions are themselves grandfathered, provided that such amendments do not reduce aircraft operations, limit aircraft operations, or affect aircraft safety. (49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.3(b).)

**Resp. 27**: Undisputed but is statement of law, not fact.

    *iii.    Codification of the TUP*

28.    In mid-2003, the County carried out an in-depth review of HPN's existing use restrictions. (Briefing Materials at C5887; *see also* Carey Decl., Ex B. [hereinafter, "Local Law No. 12-2004"] at C851.)

**Resp. 28**: Disputed in part. Unsupported the County "carried out an in-depth review . . . ."

29.    This review was prompted by, *inter alia*, the impending expiration of the reaffirmed 1996 Terminal Capacity Agreement between the County and various air carriers, which was scheduled to expire on December 31, 2004. (Briefing Materials at C5785, C5829, C5833, C5887.)

**Resp. 29**: Undisputed Materials stated this as to 1994 Terminal Agreement.

30.    As a result of its review, the County resolved "to codify and clarify [the] existing legal restrictions – which appear[ed] in a complex and confusing series of Board of Legislators actions, policy statements and regulations – into a single set of use restrictions." (*Id.* at C5805 (emphasis omitted); *see also id.* at C5829, C5887.)

**Resp. 30:** Undisputed County stated this was what it believed it was doing.

31.    The process of codification and clarification included, among other things, soliciting input from the various air carriers operating out of HPN. (*Id.* at C5829, C5887–97.)

**Resp. 31:** Disputed in part. County did not get input from Part 135s/Part 380s. (C5895-97)

32.     On or about February 27, 2004, the process resulted in a draft law that, if adopted by the Westchester County Board of Legislators (the "BOL"), would codify "the Procedures applicable to all Airlines providing passenger service at [HPN]." (*Id.* at C5839–56.)

**Resp. 32:**  Undisputed document states quote. Full quote provides: "This Section shall apply to all use of the Passenger Terminal ("Terminal") and the Terminal Ramp at Westchester County Airport ("Airport") by Airlines providing scheduled passenger service. The Terminal Ramp shall be for the exclusive use of Airlines providing scheduled passenger service. This section does not apply to any activities by Airport users not providing passenger service or not using the Terminal Ramp." (C5839–56.)

33.     Pursuant to ANCA's grandfather clause, the draft law—which restated, clarified, and in some instances narrowed HPN's pre-ANCA use restrictions—was exempt from ANCA's "notice, review, and approval requirements." (*Id.* at C5832.)

**Resp. 33:** Disputed the law only "restated, clarified and . . . narrowed" pre-ANCA restrictions; the rest is a legal conclusion. The County cites its 2004 FAA briefing, which does not support Fact 33. The County stated the law stemmed from *Midway* and carrier agreements (which were with Part 121 airlines) and that it codified only three existing restrictions: (1) a 240 passengers per half-hour limit at the Terminal; (2) the four-gate limit; and (3) a takeoff weight limit. These were never before applied to Part 135/Part 380 carriers. (*See* C824; C5769-70; C5773-74.)

34.     Nevertheless, the County elected to submit the draft law to the FAA's Office of the Chief Counsel for review and approval. (*See* Local Law No. 12-2004 at C851; *see generally* Briefing Materials; Carey Decl., Ex. I [hereinafter, "FAA Letter"] at C9471.)

**Resp. 34:** Disputed in part. Undisputed County submitted draft law to FAA. But letter does not state County sought approval for law or that FAA provided blanket approval. (*See* C9471.)

35.    On June 9, 2004, the FAA wrote to the County, finding that the proposed local law "[is] exempt from the Airport Noise and Capacity Act of 1990 (ANCA) since the action[] relate[s] to airport noise or access restrictions that were in effect on November 5, 1990 and would not 'reduce or limit aircraft operations or affect aircraft safety.'" (FAA Letter at C9472 (quoting 49 U.S.C. § 47524(d)(4)).)

**Resp. 35:** Disputed. FAA did not state local law was exempt but that "the proposed County actions are exempt from . . . []ANCA[] since the actions . . . were [pre-ANCA] and would not 'reduce or limit aircraft operations or affect aircraft safety.'" (*See* C9472 (emphasis added).) These actions were "(1) codify and clarify existing legal restrictions; (2) extend and renew the existing Airport terminal use agreement with air carriers who use the commercial passenger terminal by entering into a new terminal use agreement; and (3) codify and modify existing technical specifications and procedures for allocation of Airport capacity. According to the County, all changes will make the limitations less restrictive than those in effect today." (*See* C9471-72.)

36.    In so finding, the FAA explicitly found that the draft law, if enacted, would be "'grandfathered' under ANCA and is therefore not subject to its requirements." (*Id.* at C9478 (citing 49 U.S.C. §§ 47524(b), 47524(c)(1), and 14 C.F.R. § 161.3(a)).)

**Resp. 36:** Disputed. The FAA remarked on only 3 specific restrictions. (*See* Resp. 35.)

37.    The FAA also observed that the draft law constituted a permissible amendment of a grandfathered local use regulation—as both contemplated by and permissible under ANCA. (*Id.* at C9478 (citing 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.7(b)(4)).)

**Resp. 37:** Disputed. The FAA concluded only that County's proposal to codify, revise, or modify its three use restrictions were a pre-ANCA amendment. (*See* C9478; Resp. 35.)

38.    On September 14, 2004, the County codified HPN's local use restrictions at LWC

§ 712.462 (the "TUP"). (Local Law No. 12-2004 at C849, C859–73.)

**Resp. 38**: Undisputed.

39.    As set forth in its accompanying committee report, the TUP's "principal purpose . . . [was] to ensure that the procedures and regulations governing commercial use of [HPN] are well-defined and consistently applied to all commercial users." (*Id.* at C851.)

**Resp. 39**: Disputed. Report states TUP's purpose was "to codify all [] critical use restrictions . . . to ensure that the procedures and regulations governing use of the Airport terminal are well-defined and consistently applied to all commercial users." (*See* C851 (emphasis added).)

    *iv.*    *2005 Amendment of the TUP*

40.    As originally codified, the TUP required all "Airlines providing scheduled passenger service" to use HPN's Terminal. (Local Law No. 12-2004 at C859.)

**Resp. 40**: Disputed. TUP applied only "to all use of the Passenger Terminal ("Terminal") and the Terminal Ramp at the Westchester County Airport ("Airport") by Airlines providing scheduled passenger service. . . . This Section does not apply to any activities by Airport users not providing passenger service or not using the Terminal building or Terminal Ramp." (C859.)

41.    This requirement thus imposed on all Airlines: (i) an aircraft capacity limit, (ii) a passenger capacity limit, and (iii) a lottery system for use of the Terminal's four gates during 30-minute increments. (*Id.* at C852–53, C859–73; Briefing Materials at C5816–17, C5821–28; FAA Letter at C9472.)

**Resp. 41**: Disputed in part. The original TUP defined "Airline" as "any person providing scheduled passenger air service, including but not limited to, any air carrier or other operator certificated to provide scheduled passenger service under Parts 119, 121 or 135 . . . ." (C859.) It did not mention or apply to Part 380 carriers or those not providing scheduled passenger service

and did not apply to those not using the Terminal/Terminal ramp. (*Id.* at C859-873.)

42.    At the same time, the TUP retained HPN's historic practice of permitting small aircraft to operate outside the Terminal—*i.e.*, out of HPN's three FBOs. (*See* Briefing Materials at C5780; Local Law No. 12-2004 at C854.)

**Resp. 42:**  Disputed, unsupported by cited evidence. Many non-"small aircraft" have operated outside the Terminal. (*See e.g.,* Tomkiel Tr. 146:1–149:11; Lozada Tr. 118:12–130:12, 136:16–139:11; Drabinsky Tr. 100:19–102:19.)

43.    The 2004 law did not define the phrase "scheduled passenger service." (Local Law No. 12-2004 at C859–73.)

**Resp. 43**:  Undisputed.

44.    To maintain the "careful balance between competing interests at the Airport" that the TUP sought to achieve, the County amended the TUP on November 15, 2005 (the "2005 Amendment"). (Local Law No. 17-2005 at C893–94, C896, C899–914.)

**Resp. 44:**  Undisputed Report contains quoted language, but disputed it says that was the reason for the amendment as the quote is out of context.

45.    As relevant to the matter at bar, the 2005 Amendment included three key aspects. (*Id.* at C899–914.)

**Resp. 45:**  Disputed. The law does not state there were only three "key aspects."

46.    First, it defined the term "Passenger Service" to include "any air service to or from [HPN] for which seats are individually offered or sold to the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity." (*Id.* at C899.)

**Resp. 46:**  Disputed. "Passenger Services" is "any air service to or from the Airport for

11

which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity." (L.L. 17-2005 at C901 (emphasis added).) "Airport" is the "passenger terminal and the terminal ramp at the Westchester County Airport." (*Id*. at C899.)

47.    Second, it modified the term "Airline" by (i) replacing the phrase "scheduled passenger air service" with the defined term "Passenger Service"; and (ii) harmonizing it with applicable federal regulations by limiting it to "aircraft designed for more than (9) passenger seats." (*Id.*; *see e.g.*, 14 C.F.R. § 135.411(a)(1), (a)(2); 43 Fed. Reg. 46,783, 46,811 (Oct. 10, 1978); *see also* 43 Fed. Reg. 46,742, 46,752 (Oct. 10, 1978).)

**Resp. 47:**  Disputed. Cited authorities do not support the change to "Airline" was to "harmoniz[e] it with applicable federal regulations." Cited regulations have nothing to do with operating at the HPN Terminal and mostly deal with aircraft maintenance and alterations. 2005 Amendment materially changed "Airline" definition and materially added "Passenger Service."

48.    Third, it modified the "Applicability" section by replacing the phrase "scheduled passenger air service" with the term "Passenger Service." (Local Law No. 17-2005 at C899.)

**Resp. 48**:  Disputed. Original TUP "[did] not apply to any activities by Airport users not providing passenger service or not using the Terminal building or Terminal Ramp." (C874, § 1.) 2005 Amendment and new "Passenger Service" expands TUP's scope beyond Terminal. (C899.)

49.    Together, these three amendments resolved any unintended ambiguity by clarifying that the TUP "include[s] all commercial passenger operations, including those that provide infrequent or special purpose services, such as those now authorized under Part 380 of the FAA's regulations." (*Id.* at C894.)

**Resp. 49**:  Disputed. Cited evidence does not state there was any ambiguity in the original

TUP. Nor does the evidence suggest the modifications were mere clarifications or "resolved any unintended ambiguity." (C899; Latimer Tr. 170:25-172:14 (unknown why statute was amended)).

50. Like the original 2004 law, the 2005 TUP amendment was subject to the County's public notice and hearing requirements, and was codified in the official Code of Westchester County. (*Id.* at C892; *see also* N.Y. Mun. Home Rule §§ 10(1)(i), 20, 33(1), (4)(d).)

**Resp. 50**: Undisputed but immaterial.

51. To date, no federal agency, including the FAA, has ever indicated that the TUP violates any federal law or regulation.

**Resp. 51**: Disputed, unsupported by evidence. Witnesses unaware if 2005 TUP or Policy No. 1 were sent to FAA. (McDonald Tr. 45:14-46:25, 149:24-150:11; Gasparri Tr. 78:19-80:14.)

      *v.*    *Policy No. 1*

52. On January 21, 2022, the County published Policy No. 1. (Carey Decl., Ex. J [hereinafter, "Policy No. 1"] at C966.)

**Resp. 52:** Undisputed.

53. Policy No. 1 is not a legislative enactment. (*See* Policy No. 1 at C966–67.)

**Resp. 53**: Undisputed but immaterial.

54. Policy No. 1 did not add or modify any local use restriction. (*See id.*; LWC § 712.462(1), (2)(a), (j).)

**Resp. 54**: Disputed. Policy No. 1 added for the first time "Single-Seat-Charter-Operators" defined as "DOT Part 380 'public charter' operators, offering single-seat sales to the general public, or any segment thereof, on aircraft with more than nine (9) seats." *(See* C966.) Part 380 carriers were never before mentioned in the relevant laws. (C874; LWC § 712.462; Gasparri Tr. 76:13-77:10; Rumbarger Tr. 57:23-58:3; Scherrer Tr. 80:5-11.)

55.     Rather, Policy No. 1 is a clarification that the TUP's requirement that "any air service to or from [HPN] for which seats are individually offered or sold to the public or a segment of the public," on "aircraft designed for more than (9) passenger seats," must operate out of the Terminal, applies to all air carriers, irrespective of the regulatory part under which they operate— including Part 380 public charter operators. (Policy No. 1 at C966 & n.1.)

**Resp. 55**: Disputed in part. Undisputed quoted language is in Policy No. 1. But Policy No. 1 is not a mere clarification and does not state TUP's requirements. (*See* C966; Resp. 49, 54.)

56.     Policy No. 1 also offered potential solutions for those public charter operators displeased by the County's enforcement of the TUP. (*Id.* at C967.)

**Resp. 56**:    Disputed. County's proposals all required Plaintiffs to process passengers through the Terminal and Terminal TSA, a protocol different than their TSA-approved program. (C967; Rumbarger Tr. 102:14-103:25, 110:15-25; Drabinsky Tr. 218:20-219:8; JSX-157.) It also subjected them to the Terminal slot lottery. (*Id.*) These unlawful "alternatives" would interfere with Plaintiffs' routes, prices, services, and access. (*See* Counterst. of Facts ("COF") 13-17.)

57.     Specifically, it permitted public charter operators' incoming flights to arrive at HPN via FBOs, rather than at the Terminal. (*Id.*)

**Resp. 57**:    Undisputed the County offered to allow Plaintiffs to arrive at HPN via FBOs but required they enplane at Terminal. (Rumbarger Tr. 102:14-103:25.) This was not a solution as Plaintiffs would not be able to continue their service.  (*See* Resp. 56 and COF 13-17.)

58.     And while Policy No. 1 made clear that public charter operations on aircraft with more than 9 passenger seats had to <u>depart</u> from the Terminal, it proposed that the passengers on such flights could be segregated from regular commercial passengers in a designated, non-SIDA area of the Terminal prior to departure. (*Id.*)

**Resp. 58**: Undisputed County proposed to segregate Plaintiffs' passengers *after* they went through Terminal TSA. (Rumbarger Tr. 102:14-103:25.) Disputed this proposal was legally valid as Plaintiffs could not use their authorized TSA 12-5 security plan, would be subject to the Terminal lottery, and their services would be destroyed. (*See* Resps. 56-57; COF 13-17.)

59.     This proposal was presented to Robert Duffy, the United States Department of Homeland Security's Federal Security Director for HPN, who informed the County and Avports that it would comply with all applicable TSA regulations. (Gasparri Tr. 196:20–207:21.)

**Resp. 59:** Disputed, and Duffy's statements are inadmissible hearsay. Gasparri did not testify Duffy stated the above. Instead, about her call she stated: "I remember it being fairly quickly, because this Policy Number 1 that they read, they didn't have any objections or edits or comments." (Gasparri Tr. 210:19 – 211:4.) Neither Duffy nor TSA opined whether Plaintiffs had to proceed through the Terminal or if TUPs violated ADA or ANCA. (Gasparri Tr. 211:7–212:22.) Duffy said Plaintiffs complied with current TSA regulations. (Rumbarger Tr. 300:11-301:4.)

60.     Plaintiffs rejected the County's proposed accommodation as "incompatible" with their preferred business models, which avoid commercial airline terminals entirely. (Drabinsky Tr. 176:7–178:10, 202:21–24; Tomkiel Tr. 88:13–15, 103:23–114:24; Lozada Tr. 113:5–116:11.)

**Resp. 60:** Undisputed Plaintiffs rejected County's purported "accommodation" as against federal law. Disputed operating from an FBO is simply Plaintiffs' preferred business model.

**B.     Airline Deregulation Act ("ADA") Claim**

61.     In 1994, the FAA reviewed the reaffirmed Terminal Capacity Agreement—*i.e.*, one of the various documents undergirding the TUPs (*see* § II(A)(i), (ii), *supra*)—and consented to the agreement "with the understanding that [it] allows access to the airport on fair and reasonable terms, without unjust discrimination and provides access on reasonable terms to new entrants."

(Briefing Materials at C5819 (internal quotation marks and citation omitted).)

**Resp. 61**: Disputed, unsupported by cited evidence. Statement is immaterial as it predates the TUPs/Policy No. 1. Grant Assurance compliance is distinct from the ADA. *See* 49 U.S.C. § 41713. FAA "consent[ed] to [the] extension of the 1985 Stipulation since it has been voluntarily entered into by the County and the airlines since it merely extends a previously negotiated settlement." (C5819.) "Airlines" are Part 121 operators, not Part 135s/Part 380s. (C5790-92.)

62.    In its letter of June 9, 2004, the FAA affirmatively found that the proposed TUP would not violate the County's obligation under the federal grant assurances "to provide access by air carriers on reasonable and not unjustly discriminatory terms." (FAA Letter at C9479).

**Resp. 62**: Disputed and immaterial. *See* Resp. 61 (ADA compliance distinct). The FAA found "nothing in the proposed actions by the County—codifying and clarifying existing legal restrictions, extending and renewing the existing Airport terminal use agreements with the air carriers, and codifying and modifying existing technical specification and procedures for allocation of terminal space and gates—that is inconsistent at this time with its grant assurances." (*See* C9479.) These existing restrictions did not apply to Part 380 operators.

63.    The County did not submit the 2005 TUP amendment to the FAA for review, because it was not required to do so. (49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.3(b).)

**Resp. 63**: Undisputed County did not submit the 2005 Amendment to FAA. Remainder is a legal conclusion and is disputed. *See* Resp. Nos. 40-51.

64.    Neither the 2004 TUP nor the 2005 amendment purports to regulate any air carriers' prices, routes or services.

**Resp. 64**: Undisputed the TUPs do not explicitly state they regulate "rates, routes or services," but disputed whether they in fact do so. *See* Plfs' Facts 5, 13-18.

**C.    Equal Protection Claim**

65.    None of the Plaintiffs is a member of a protected class. (*See* Compl. ¶¶ 135–50; *see generally* Compl. (omitting reference to any protected class).)

**Resp. 65**: Undisputed.

66.    In their Complaint, the entities to whom Plaintiffs compare themselves (*i.e.*, the entities who Plaintiffs allege are similarly situated to themselves and who Plaintiffs allege are being treated differently for no rational basis) at HPN (hereinafter, the "Comparators") are "[the] other operators operating out of FBOs at HPN." (Compl. ¶ 141.)

**Resp. 66**: Undisputed.

67.    During their 30(b)(6) depositions, Plaintiffs identified their Comparators as including (i) Part 135 operators operating "scheduled service," including Cape Air, Tradewind, Wheels Up, and Hard Rock Air; (ii) Part 135 operators "running a political campaign or . . . flying a sports team"; (iii) corporate jets owned by companies like Pepsi, Discovery, and IBM; (iv) "community groups," such as the Albany Club, the Bakers Bay Club, the Discovery Land Club, the Nexus Club, the Yellowstone Club; (v) individuals who come together and decide to charter a plane together; (vi) operators operating pursuant to 14 C.F.R. Part 91 ("Part 91"); and (vii) operators with fractional ownership interests, such as FlexJet, NetJets, and Sentient. (Tomkiel Tr. 146:1–12, 146:18–148:7, 148:11–15, 148:20–24; 169:8–22; Lozada Tr. 118:12–130:12, 136:16–139:11; Drabinsky Tr. 100:19–102:19.)

**Resp. 67**: Undisputed.

68.    With respect to the first subgroup:  The Part 135 operators operating "scheduled service" to which Blade compares itself either operate aircraft with nine seats or fewer (*i.e.*, Cape Air, Tradewind, and Wheels Up) or complied with the TUP by moving their air service to the

Terminal (*i.e.*, Hard Rock). (Tomkiel Tr. 159:9–16; Lozada Tr. 128:11–14, 130:4–8; Scherrer Tr. 228:13–15; Drabinsky Tr. 101:10–11 (mentioning "Hard Rock"); Carey Decl., Ex. K (Email of Feb. 14, 2022) at C2170 (confirming Hard Rock moved its air services to the Terminal).)

**Resp. 68:** Disputed, immaterial. The nine-seat limitation is discriminatory and without rational basis. Tradewind is a Part 135 operating a Pilatus PC-12, which is designed for ten passengers, from an FBO. (C8056; C8071; Tomkiel Tr. 154:23-156:23). Bakers and Yellowstone operate under Part 135 from an FBO and sell more than 9 seats to the public. (Tomkiel Tr. 148:10-153:3, 159:17-160:3). Hard Rock stopped operating at HPN. (Rumbarger Tr. 219:11-220:21).

69.    With respect to the second subgroup:  Plaintiffs have not identified any political campaigns, sports teams, or other common-purpose groups chartering aircraft that are selling seats to the public for HPN flights on aircraft with more than 9 passenger seats. (*See* Tomkiel Tr. 150:7–16.)

**Resp. 69:** Disputed. (Drabinsky Tr. 100:19-101:19; Tomkiel Tr. 59:3-23, 146:1-169:15; Lozada Tr. 120:9-130:20) (identifying Yellowstone, Bakers, Discovery, Albany, and Nexus.)

70.    With respect to the third subgroup:  Plaintiffs have not identified any air carriers selling seats to the public for HPN flights on corporate jets with more than 9 passenger seats.

**Resp. 70:** Disputed in part. Corporate jets can operate from the FBOs and fly more than nine passengers. (Rumbarger Tr. 22:4-23:8, 90:24-91:10). The remainder is undisputed.

71.    With respect to the fourth subgroup:  Plaintiffs have not identified any "community groups"—including the community groups Yellowstone Mountain Club, Nexus Club, Albany Club, and Bakers Bay Club—selling seats to the general public for HPN flights on aircraft with more than 9 passenger seats. (Tomkiel Tr. 150:23–151:24, 152:17–19; Lozada Tr. 123:20–124:17; Drabinsky Tr. 101:12–16; *see also* 14 C.F.R. § 212.5 (setting forth the procedures for "affinity

(pro rata) charter[s]," which includes that "[n]o solicitation, sales or participation may take place beyond the <u>bona fide members</u> of an eligible chartering organization" (emphasis added)).

**Resp. 71:** Disputed. Yellowstone, Baker's Bay, Discovery, Albany, and Nexus operate from FBOs selling seats to a "segment of the public" on aircraft designed for more than nine seats. (Tomkiel Tr. 148:10-153:7, 159:17-160:3; Lozada Tr. 123:10-22; Drabinsky Tr. 101:12–16).

72.    <u>With respect to the fifth subgroup:</u> The "individuals who come together and decide to charter a plane together" do not, according to the definitions set forth in federal regulations, sell seats to the public. (Tomkiel Tr. 153:17–154:14; Lozada Tr. 121:19–122:3, 123:5–9; *see also* 14 C.F.R. § 1.1.)

**Resp. 72:** Disputed, statement of law. Neither witness cited testified to the above. "Commercial operator" under § 1.1 is irrelevant and does not define "selling seats to the public." Wheels Up also offers shared seat models and there are other flight aggregating websites where the public can buy seats on aircraft designed for nine or more. (Lozada Tr. 120:4-121:1.)

73.    <u>With respect to the sixth subgroup:</u>  Plaintiffs have not identified any Part 91 operators that sell seats to the public for HPN flights on aircraft with more than 9 passenger seats. (*See* 14 C.F.R. §§ 91.147 91.501(b); Tomkiel Tr. 146:10–11, 149:17–21 ("They can't sell seats, but they can use the plane for whatever they want.").)

**Resp. 73:** Undisputed.

74.    <u>With respect to the seventh subgroup:</u> Plaintiffs have not identified any operators with fractional ownership interests—including Flex Jet, NetJets, and Sentient—selling seats to the public for HPN flights on aircraft with more than 9 passenger seats. (Lozada Tr. 124:18-126:7, 136:16–139:12; *see also* 14 C.F.R. Subpart K ("Fractional Ownership Operations").)

**Resp. 74:** Disputed. The public can book seats on Flex Jet, NetJets, and Wheels Up so long

as they pay the applicable fees. These entities offer shared seat flights on aircraft designed for more than 9 passenger seats.  (Lozada Tr. 120:4-121:1, 146:1-147:6; Mahmoud Decl. Ex. C.)

75.    Aside from those entities included in the aforementioned subgroups, Plaintiffs have not identified any other Comparators. (*See generally* Compl.)

**Resp. 75**: Undisputed.

76.    None of the identified Comparators are *prima facie* identical to Plaintiffs. (*See* Tomkiel Tr. 146:1–12, 146:18–148:7, 148:11–15, 148:20–24; 169:8–22; Lozada Tr. 118:12–130:12, 136:16–139:11; Drabinsky Tr. 100:19–102:19.)

**Resp. 76:** Disputed, also statement of law. (Tomkiel Tr. 146:1-149:11, 150:16-152:23, 154:23-155:24; Lozada Tr. 120:9-127:18; Lozier Decl. ¶¶ 18-19; Drabinsky Tr. 100:19-101:19).

77.    As Plaintiffs themselves assert, they offer a unique and innovative service at HPN. (*See* Compl. ¶¶ 15; Tomkiel Tr. 115:5–7; Dkt. No. 16 [hereinafter, "Drabinsky Decl."] ¶¶ 6, 15; Carey Decl., Ex. L (JSX Letter of Nov. 15, 2021) at C8053, Ex. M. (hereinafter, "XO Letter of Oct. 7, 2022") at C1331; *see also* Policy No. 1 at C966.)

**Resp. 77:** Disputed. Plaintiffs state they offer an alternative to large commercial airlines. (Compl. ¶¶ 15, 35; Drabinsky Decl. ¶¶ 6, 15; Lozier Decl. ¶ 17; Botimer Decl. ¶ 11.).

78.    Pursuant to a process known as "code sharing," JetBlue—a well-known Part 121 commercial operator—sells seats on JSX's HPN flights. (Drabinsky Tr. 56:13–57:10, 57:17–20, 58:2–20; *see also* 14 C.F.R. § 257.3 (defining "code-sharing arrangements").)

**Resp. 78**: Undisputed, but immaterial. JetBlue's website states such flights are sold by JSX per Delux's Part 135/JetSuiteX's Part 380 certifications. (Drabinsky Tr. 60:8-19, *Id.*, Ex. 33.)

79.    Such flights provide "frequent flier" miles for JetBlue's customers. (Drabinsky Tr. 55:19–56:6.)

**Resp. 79:** Undisputed, but immaterial. Wheels Up, which County allows to operate from an FBO, partners with Delta and customers earn Delta miles. (Mahmoud Decl. Ex. D)

80.    These flights operate out of one of HPN's FBOs, while JetBlue's regular flights operate out of the Terminal. (Compl. ¶ 32; Drabinsky Tr. 53:4–22, 57:5–9, 78:15–21, 89:15–20.)

**Resp. 80:** Undisputed JSX's flights operate out of the Atlantic Aviation FBO.

81.    The County codified the TUP to formalize "a careful balance between competing interests at the Airport." (Local Law No. 12-2004 at C853.)

**Resp. 81:** Undisputed TUPs state this. In context, TUPs also state they provide for "the continuing maintenance and operation of the <u>terminal complex</u> . . . ." (C893 (emphasis added).)

82.    In passing the 2005 Amendment, the County confirmed that the TUP "was clearly intended to include all commercial passenger operations, including those that provide infrequent or special purpose services" at the Terminal, with a carve out for "very small passenger aircraft – those with (9) seats or less – [which could] continue to use the general aviation facilities at the Airport, as they always have done." (Local Law 17-2005 at C895.)

**Resp. 82:** Undisputed Amendment states this. But County cites no evidence of subjective rationale, nor did witnesses know. (Gasparri Tr. 77:11-79:3; Rumbarger Tr. 56:15-22.)

83.    The FAA's regulatory scheme recognizes both a distinction between commercial and noncommercial operators <u>and</u> a regulatory break point at nine-to-ten passenger seats. (*See, e.g.*, 14 C.F.R. §§ 91.147, 91.501(b), 135.411(a)(1), (a)(2); 139.1(a)(1); *see also* 43 Fed. Reg. 46,742, 46,756.)

**Resp. 83:** Disputed, statement of law, and immaterial. The nine-seat limitation is discriminatory and without rational basis; County witnesses could not provide rationale. (Gasparri Tr. 75:20-76:12; McDonald Tr. 101:13-103:23, 163:21-165:7; Latimer Tr. 155:18-157:19).

## III.    FACTS RELEVANT TO SPECIFIC DEFENSES

### A.    Plaintiffs' Equitable Defenses of Waiver, Estoppel, and Laches

84.    Plaintiffs have not alleged that the County defrauded them. (*See generally* Compl.)

**Resp. 84:** Undisputed but immaterial legal conclusion.

### B.    Plaintiffs' Failure to Exhaust Their Administrative Remedies

85.    Plaintiffs have not filed a complaint with the FAA against the County as airport sponsor. (*See* 14 C.F.R. Part 16.)

**Resp. 85:** Undisputed but immaterial as Plaintiffs have no obligation to do so.

## PLAINTIFFS' COUNTERSTATEMENT OF FACTS ("COF")

### I.    Facts Applicable to All Claims For Relief

1. Part 135 and Part 380 carriers have existed for decades, as the County's agents are aware. (*See* 14 C.F.R. § 135; 14 C.F.R. § 380.; *see also* Scherrer Tr. 259:6-9; Gasparri Tr. 169:12-16.)

**COF Resp. 1:**  Undisputed, but immaterial.

2. Plaintiffs provide a convenient and safe alternative to large commercial airlines under 14 C.F.R. §§ 135, 380. (Drabinsky Decl. ¶ 15-16; Lozier Decl. ¶ 17; Botimer Decl. ¶ 11, 14.)

**COF Resp. 2:**  Undisputed, but immaterial and redundant. (*See* Resp. 77.)

3. Customers processed through Plaintiffs' TSA-approved 12-5 Program cannot mix with those processed at Terminal TSA. (Drabinsky Decl. ¶ 16; Lozier Decl. ¶ 17; Botimer Decl. ¶ 14.)

**COF Resp. 3:**  Partially disputed; customers on Plaintiffs' arriving flights could utilize the Terminal. (*See* ¶¶ 56–57).  Also, redundant. (*See* Resp. 56 & 58.)

4. The County did not know the purpose of (1) the nine seat/sales to public limitation; or (2) the TUP enforcement other than it is County law. (McDonald Tr. 163:21-164:2,118:13-25.)

**COF Resp. 4:**  Disputed. (*See* ¶ 82 (citing Local Law 17-2005 at C895.)

5. Passenger allocations at the Terminal are limited. Only 240 passengers can enplane or

deplane every half-hour from 5:30 a.m-12:00 a.m. From 12:00-6:30 a.m. there is also a strongly encouraged curfew. (Gasparri Tr. 263:7-266:8, 274:19-275:24; Rumbarger Tr. 35:12-16, 36:5-15.)

**COF Resp. 5:**  Undisputed, but immaterial.

## II.  Airport Noise and Capacity Act ("ANCA") Claim

6. The 2004 TUPs applied only to use of the HPN Terminal and Terminal ramp, at which Plaintiffs have never operated. (C874;Drabinsky Decl. ¶ 23; Lozier Decl. ¶ 10; Botimer Decl. ¶ 7.)

**COF Resp. 6:**  Partially disputed; the TUPs apply to all of HPN and direct which HPN-based activities must occur at the Terminal. (*See* LWC § 712.462.)

7. Plaintiffs do not offer scheduled passenger services under federal regulations. (14 C.F.R. § 110.2 (Part 380 "on demand"); C1393-94; C1397; Scherrer Tr. 51:24-53:10, 233:3-234:24.)

**COF Resp. 7:**  Undisputed, but immaterial.  Plaintiffs offer "Passenger Service" as that term is defined in the TUPs. (*See* LWC § 712.462.)

8. Part 380 indirect carriers like Plaintiffs were first referenced in Policy No. 1's definition of "Single Seat Charter Operators," a term the County created.  This term is not used in federal regulations or the industry. (C874-888; and LWC § 712.462Gasparri Tr. 76:13-77:10;171:24-172:13; Rumbarger Tr. 57:23-58:3;84:5-85:23; Chaifetz Tr. 49:13-19; Scherrer Tr. 80:5-11.)

**COF Resp. 8:**  Partially disputed; the TUPs explicitly apply to "Airlines providing Passenger Service," a term that encompasses Plaintiffs. (*See* LWC § 712.462(1).)

9. Plaintiff Delux does not sell seats to the public. (Drabinsky Decl. ¶ 4.)

**COF Resp. 9:**  Undisputed, but immaterial; JSX—Delux's parent company—sells seats to the public. (*See* ¶ 3; Complt. ¶ 16.)

10. The County tracked data for Part 121 commercial carriers, but not Part 135 or Part 380 carriers prior to late 2020. (Rumbarger Tr. 24:17-25:13, 27:2-10; Gasparri Tr. 169:12-16.)

**COF Resp. 10:**  Undisputed, but immaterial.

23

11. The 2005 Amendment and Policy No. 1 restrict Plaintiffs' access to FBOs and HPN. (Drabinsky Decl., ¶¶ 34-35; Lozier Decl. ¶ 27; Botimer Decl. ¶ 20; Rumbarger Tr. 119:22-120:6.)

**COF Resp. 11:** A legal conclusion and disputed. (*See* ¶¶ 49, 57.)

**III.    Airline Deregulation Act ("ADA") Claim**

12. Policy No. 1/County's TUP reading affect Plaintiffs' pricing, routes, and/or services.

**COF Resp. 12:**  A legal conclusion and disputed. (*See* ¶ 64.)

13. If required to operate at the Terminal, even only for enplaning, Plaintiffs would be unable to provide their federally authorized service at HPN. (Drabinsky Decl. ¶ 24, 35, 36; Lozier Decl. ¶¶ 11, 13-14, 28-29; Botimer Decl. ¶¶ 11, 12, 14, 23; Lozada Tr. 95:11-96:7.)  Nor could they continue to offer other valuable services, such as valet and shuttle, concierge, special catering, private lounges, specialized health and safety protocols, and faster check-in and boarding. (Drabinsky Decl. ¶¶ 36; Lozier Decl. ¶¶ 28-29; Botimer Decl. ¶ 12; Tomkiel Tr. 160:6-161:22.) Plaintiffs would also be forced to use SIDA TSA, a different protocol than their TSA 12-5. (Gasparri Tr. 160:3-166:12; Drabinsky Decl. ¶ 34; Lozier Decl. ¶¶ 28-29; Botimer Decl. ¶ 22.)

**COF Resp. 13:** Disputed. (*See* ¶ 60.)

14. Plaintiffs also serve the immunocompromised, elderly, and disabled who want less touchpoints, people flying with non-service pets, and those desiring easier boarding, which they could not offer at the Terminal. (Drabinsky Tr. 187:12-188:24; Drabinsky Decl. ¶ 6; Botimer Decl. ¶ 6;Lozier Decl. ¶ 6.) JSX also has an autism certification it would lose. (Drabinsky Tr. 195:7-19.)

**COF Resp. 14:**  Undisputed, but immaterial.

15. At the Terminal, Plaintiffs will be newly subject to the lottery system and will be unable to fly their current routes either for lack of available gates or remaining passenger allocations. Plaintiffs would be left with slots (if any) that passengers don't want. (Tomkiel Tr. 171:17-172:11; Drabinsky Tr. 216:17-218:4; McDonald Tr. 173:25-175:2; Rumbarger Ex. 2; Rumbarger Tr.

51:15-52:15; Gasparri Tr. 267:21-268:8, 274:2-18, 283:9-22; Mahmoud Decl. Ex. A.)

**COF Resp. 15:** Disputed. (*See* McDonald Tr. 174:6–175:2; Rumbarger Tr. 35:6–40:4.)

16. The FAA did not evaluate any version of the TUP's for ADA compliance.  (C9479.)

**COF Resp. 16:** Undisputed, but immaterial.

17. The County does not understand Plaintiffs' services and did not determine how Policy No. 1 would affect their services. (Rumbarger Tr. 126:15-127:25, 128:20-24; Gasparri Tr. 95:23-96:15, 193:15-22; McDonald Tr. 154:5-18; Latimer Tr. 94:3-95:7, 114:14-115:10, 138:7-139:8.)

**COF Resp. 17:** Immaterial and unsupported by the cited evidence.

**IV.    Equal Protection Claim (Facts may also relate to ADA claim)**

18. Corporate charters, Part 91 carriers, sports teams, other common-purpose groups chartering aircraft from HPN's FBOs under Part 135 have no limitation on the number of flights or passengers. (Rumbarger Tr. 92:3-95:4; Tomkiel Tr. 147:17-150:3.)

**COF Resp. 18:**  Disputed; the TUP applies to HPN air service irrespective of the part under which an Airline operates. (*See* LWC § 712.462.)

19. AvPorts was inconsistent on whether carriers with memberships fell under the TUPs. (*See* Scherrer Tr. 116:14-117:16, 133:10-25, 241:13-25; Rumbarger Tr. 86:20-88:13; C8149.)

**COF Resp. 19:** Disputed and unsupported by the cited evidence.

20. The County considered Yellowstone, and similar clubs, to be a Part 135 operator not subject to the TUP even though they sell seats to segments of the public on aircraft designed for more than 9 seats. (C1404; Scherrer Tr. 241:13-25; Rumbarger Tr. 89:18-90:23.)

**COF Resp. 20:** Disputed. (*See* ¶ 71; 14 C.F.R. § 212.5.)  Redundant. (*See* Resp. 71.)

21. The County has provided no rational reason Plaintiffs must go to the Terminal but other Part 135s can stay at FBOs. (McDonald Tr. 118:13-25,163:21-164:2; Gasparri Tr. 75:20-76:12.)

**COF Resp. 21:** Disputed. (*See* ¶¶ 42–44 (citing, *inter alia*, C893–94, C896, C899–914.)

25

22. Requiring Plaintiffs to operate from the Terminal increases passenger traffic in the Terminal. (Drabinsky Decl. ¶ 33; Rumbarger Tr. 140:24-141:8, 141:23-142:14.)

**COF Resp. 22:** Undisputed, but immaterial; directing passenger traffic within a municipal airport is a quintessential proprietary right of the municipality. (*See* 49 U.S.C. § 41713(b)(3).)

23. Policy No. 1 will increase flights. Customers will charter entire aircraft or aggregate on one with less than 9 seats. (Drabinsky Decl. ¶ 9; Lozier Decl. ¶¶ 15-16; Scherrer Tr. 265:22-266:3.)

**COF Resp. 23:** Immaterial, inadmissible, and speculative. Plaintiffs' (non-expert) 30(b)(6) witnesses merely opined on this matter at their depositions.

## V.    Plaintiffs' Equitable Defenses of Waiver, Estoppel, and Laches

24. In 2015, JetSmarter and Blade filed public prospectuses disclosing they intended to fly at HPN aircraft designed for more than 9. (*See e.g.,* C9364, C9369; C978; C985; *see also* Mahmoud Decl. Ex. B; Rumbarger Tr. 192:24-193:25, 195:19-196:18; Lozier Tr. 26:24-27:7.)

**COF Resp. 24:** Undisputed, but immaterial.

25. Blade and XO widely advertised their services at HPN since 2015. (BLD_10335-10337; BLD_3-8; BLD_35-45; BLD_79-81; BLD_60-78; BLD_54-59; Rumbarger Ex. 27.)

**COF Resp. 25:** Undisputed, but immaterial.

26. In April 2018, County/Avports discussed a policy from citizens that stated "JetSmarter . . .bills itself as the 'Uber for private jets,' to promote its operation at HPN." (C1128, C1139.)

**COF Resp. 26:** Undisputed, but immaterial.

27. AvPorts was notified Blade was investing to create a dedicated customer lounge at Million Air. (Lozier Decl. ¶ 22; C1242; C1244; Scherrer 197:16-199:8.).)

**COF Resp. 27:** Undisputed, but immaterial.

28. The former and current Airport Manager's office overlooks the tarmac from which he/she could see Plaintiffs' planes taking off and landing. (Gasparri Tr. 96:11-97:19.)

**COF Resp. 28:** Undisputed, but immaterial.

29. Even if Plaintiffs employed memberships they would be subject to enforcement of the TUPs. (Rumbarger Tr. 88:7-13; Gasparri Tr. 128:7-129:15; C8419-8154.)

**COF Resp. 29:** Undisputed, immaterial, and speculative.

30. Dave Montiverdi, HPN Operations Supervisor, invited JSX to operate out of the FBOs stating the TUPs would not apply. (Drabinsky Tr. 113:19-129:24, JSX204-JSX205.)

**COF Resp. 30:** Undisputed but immaterial, as Montiverdi had no authority to invite JSX to operate out of the FBOs and his understanding of the TUPs' applicability is not controlling. (Gasparri Tr. 102:24–13, 108:22–109:4, 112:17–18, 113:21–25.)

31. Policy No. 1 was issued after advocacy against HPN expansion. (C8530; Scherrer Ex. 8 at 3.) These activists rallied against former County Exec. Astorino, who sought to privatize and expand HPN, and for County Exec. Latimer who promised to curb expansion. (McDonald Tr. 167:22-170:6; Latimer Tr: 22:5-28:7; Scherrer Tr. 108:3-110:9, 123:10-125:12.)

**COF Resp. 31:** Disputed, cited authority does not support the proposition, and Policy No. 1 offered potential solutions for those public charter operators displeased by the County's enforcement of the TUP. (*See* ¶ 56.)

32. Plaintiffs invested significant time and money at HPN and would lose millions if Policy No. 1 is now enforced. (Botimer Decl. ¶ 24; Drabinsky Decl. ¶¶ 40-43; Lozier Decl. ¶¶ 30.)

**COF Resp. 32:** Disputed; whether Plaintiffs would "lose millions if Policy No. 1 is now enforced" is both immaterial and inadmissible as speculative.

A-308

Dated: May 5, 2023

**TROUTMAN PEPPER HAMILTON**
**SANDERS LLP**
*Attorneys for Plaintiffs*

By ___/s Steven D. Allison_____
    Steven D. Allison
    Samrah R. Mahmoud
    5 Park Plaza, Suite 1400
    Irvine, CA 92614

**JOHN M. NONNA**
Westchester County Attorney
*Attorney for County*

By _____
    Sean T. Carey
    David H. Chen
    148 Martine Avenue, Suite 600
    White Plains, NY 10601

# Exhibit B
# Local Law No. 12-2004

TUESDAY SEPTEMBER 14, 2004                           3575

COMMITTEES ON TRANSPORTATION AND LEGISLATION:
*Terminal Use Procedures:* LOCAL LAW INTRO 15-2004: Local
Law codifying the County Terminal Use Procedures applicable to all
airlines providing service at the County Airport.

Messrs. Mosiello and Rogowsky presented the following report and
Local Law and moved that the report be received, filed and approved
and the Local Law adopted, which motion was carried by the
following vote:

AYE: Legislators:  Young, Oros, Abinanti, Alvarado, Astorino,
Bronz, Kaplowitz, LaMotte, Latimer, Maisano, Mosiello, Pinto,
Rogowsky, Spreckman, Stewart-Cousins, Wishnie, Chair – 17.

NAY: None.

COW-00000849

TUESDAY SEPTEMBER 14, 2004

-II-314

HONORABLE BOARD OF LEGISLATORS
THE COUNTY OF WESTCHESTER

Your Committee is in receipt of a communication from the County Executive, urging the adoption of the annexed Local Law which would, if approved by this Honorable Board, amend the Laws of Westchester County by adding a new section to Article IV of Chapter 712, entitled: "Aviation: Inside County Airport," in order to reaffirm and codify the long-standing use restrictions at the Westchester County Airport ("Airport") which have been in effect for almost twenty years. Those restrictions limit the use of the commercial passenger terminal, and were first adopted by this Honorable Board on June 6, 1984 by Resolution 95-1984. As you know, the restrictions have been modified and extended by several subsequent Resolutions of this Honorable Board, and have, therefore, been in continuous effect since 1984. The restrictions were also set forth in a series of three agreements by and between the County and the airlines. The first such agreement took the form of a court ordered stipulation issued in 1985 in settlement of the *Midway Airlines et al v. County of Westchester* litigation ("Stipulation"). The restrictions were then renewed in formal agreements, extending the terms of the Stipulation, which were executed in 1988 and 1994 ("Terminal Capacity Agreement"). The current Terminal Capacity Agreement expires on December 31, 2004.

TUESDAY SEPTEMBER 14, 2004                    3577

Your Committee is further informed that, over the course of the last year, the administration undertook a broad-based review of the existing restrictions and agreements and also began a series of communications with both federal regulators and the commercial airlines in anticipation of the expiration of the existing Terminal Capacity Agreement. This effort was undertaken because, in the absence of a renegotiated agreement with the airlines, the existing and any future restrictions at the Airport could be subject to legal challenge after December 31, 2004. Your Committee is informed that such a legal challenge could endanger not only the Terminal Capacity Agreement with the commercial airlines, but also the underlying County policies on Airport capacity and growth. The annexed Local Law is the result of intensive negotiations with the airlines and detailed consultations with the Federal Aviation Administration ("FAA").

Your Committee is informed that the principal purpose for enactment of the proposed Local Law is to codify all of the critical use restrictions, as further described below, in the Laws of Westchester County in order to ensure that the procedures and regulations governing commercial use of the Airport terminal are well-defined and consistently applied to all commercial users. Further, your Committee recognizes that the approval of the restrictions in the form of a Local Law will achieve permanence and thereby avoid the need to renew the restrictions, by Agreement, every ten years as has been necessary in the past.

COW-00000851

TUESDAY SEPTEMBER 14, 2004

Your Committee is informed that there are four key elements of the Airport use restrictions in the Local Law:

1. An aircraft capacity limit. The Local Law would codify the existing limit on commercial flights which prohibits scheduling more than four aircraft per half hour for enplaning or deplaning passengers.

2. A passenger capacity limit. The Local Law would codify the existing limit of 240 scheduled passengers per half hour in the Airport terminal. Airlines are not allowed to schedule more than that number of passengers on a quarterly average basis.

3. A lottery system. The Local Law would codify existing practice whereby the Airport's limited terminal and terminal ramp capacity is allocated among the airlines through a lottery system. Since 1985, the County has employed this lottery system for allocation of both passenger and ramp space on a quarterly basis which allows each airline to select the ramp slot and number of passengers it desires to serve at the Airport. The lottery system employs a use-it-or-lose-it system whereby unused quarterly slot allocations become available for selection by any airline. The lottery system is the mechanism by which the County ensures that the airlines do not serve more than an average of 240 passengers per half hour and do not schedule more than four aircraft per half hour to use the terminal ramp

3

COW-00000852

4. <u>County control of the ramp</u>. The Local Law would codify the existing arrangement under which the County controls the arrival and departure of commercial passenger aircraft. While at most airports the individual airline's employees or contractors control the arrival and departure of aircraft, the County has long maintained control over these functions. County control helps ensure compliance with the slot allocation system. Ramp services include directing and servicing arriving and departing aircraft, baggage handling, aircraft cleaning, towing and deicing.

Your Committee concurs with the County Executive that these four restrictions provide important protections for the people of Westchester County, and represent a careful balance between competing interests at the Airport. Moreover, the County has consistently worked to balance the needs of Airport users against the need to protect the fragile ecosystem in which the Airport is located, as well as to preserve the quality of life for the residents who live and work in the vicinity of the Airport. Further, as most recently affirmed by this Honorable Board in Resolution 245-2003, the County has had a long-standing policy against expansion of the Airport and/or increases in capacity of the Airport's runways, taxiways, ramps, gates, hangars, terminal, motor vehicle parking areas, or access roads, excepting measures necessary for the security of the Airport facility. Thus, the restrictions set forth in the annexed Local Law would preserve this policy against expansion while balancing the need to allow carefully controlled commercial airline traffic at the Airport.

4

COW-00000853

TUESDAY SEPTEMBER 14, 2004

Your Committee is informed that the provisions of the proposed Local Law also contain detailed procedures for the operation of the lottery system; the consequences for airlines who fail to use (or overuse) their allocations; the transfer of allocations among airlines; and the informal resolution of disputes among airlines or with the County over use of allocations. These provisions also contain minor changes from the existing procedures for clarity, simplicity, and improved enforcement, but retain the essential elements of the existing arrangements.

Your Committee is further informed that FAA consent is essential for ensuring the legal validity of this Local Law under federal law. Since 1990, the federal Airport Noise and Capacity Act has made it illegal for any airport in the nation to adopt new restrictions like those in effect at the Airport without formal approval from the FAA. Moreover, the FAA has made it clear to the aviation community that it will be virtually impossible to secure federal approval for any more stringent restrictions. Federal law, however, does provide for a grandfather provision which allows airport proprietors like the County to modify previously existing restrictions if the modifications are no more stringent than the restrictions that were in effect in 1990. Your Committee is informed that the administration has had several consultations with FAA officials and have been advised that the codification of those restrictions in this Local Law would not be subject to the Airport Noise Act and would be valid under federal law. Your Committee is further informed that a formal opinion from the agency will be provided under separate cover within the next several weeks.

5

COW-00000854

TUESDAY SEPTEMBER 14, 2004                              3581

Your Committee is informed that, in order to secure FAA consent, it was necessary to demonstrate to the FAA that the provisions of the Local Law are no more restrictive than the restrictions that have been in effect at the Airport since 1990. In fact, had the County attempted to adopt *new* or more stringent restrictions, not only would the effort have been denied, but the County could have lost all the restrictions that are currently in place.

Your Committee is informed that consultations with the airlines achieved a different yet equally important purpose. While the County does not need the agreement of the airlines in order to enact the Local Law, their consent to the substantive provisions of the Local Law was important because those provisions are also incorporated in a new Terminal Use Agreement that all carriers will be required to sign. The new Terminal Use Agreement addresses and consolidates a number of administrative, financial and business terms pertinent to the airlines' operations at the Airport and sets forth the fees that the airlines must pay for County services, which terms were previously set forth in several documents including the existing Terminal Capacity Agreement and the Operating Permit.

Your Committee is informed that the consultations with the airlines has resulted in an agreement that will preserve all of the key protections against Airport growth that have been so important to the County. Moreover, the airlines' consent to the terms of the agreement has also helped in our effort to secure FAA's support of the process employed by the County.

6

COW-00000855

TUESDAY SEPTEMBER 14, 2004

358

The Westchester County Department of Planning has advised that enactment of the annexed Local Law is a Type II action pursuant to the State Environmental Quality Review Act (SEQRA) pursuant to Sections 6 NYCRR 617.5(c)(20) and (27) thereof, and that no further environmental review of this proposed Local Law is required. Your Committee concurs in this determination.

Your Committee also concurs with the County Executive's statement that the Westchester County Airport is one of only a handful of Airports in the whole nation that has meaningful use restrictions, and enactment of this Local Law will preserve those restrictions for generations to come. Without this Local Law, your Committee believes the County's limitations on growth at the Airport would be in serious jeopardy.

Therefore, in order to preserve and codify the restrictions on commercial airlines at the Airport, your Committee recommends the adoption of the annexed Local Law in order to codify long-standing use restrictions at the Westchester County Airport.

Dated: September 13, 2004
White Plains, New York



TRANSPORTATION

COMMITTEE ON

LEGISLATION

**A-318**

TUESDAY SEPTEMBER 14, 2004                                    3583



Memorandum
**Department of Planning**

To:     Lawrence Salley
        Commissioner of Transportation

From:   Gerard E. Mulligan
        Commissioner of Planning

Date:   May 11, 2004

Re:     **SEQR DOCUMENTATION FOR LOCAL LAW GOVERNING AVIATION AT THE
        WESTCHESTER COUNTY AIRPORT**

In response to your request, Planning Department staff has reviewed the above referenced action in
accordance with the State Environmental Quality Review Act and its implementing regulations, 6NYCRR
Part 617 (SEQR).

As described in the attached SEQR Status Sheet, the proposed local law has been classified as a Type II
action. As such, no further environmental review is required.

Please contact me if you need any additional information regarding this classification.


GEM/CNM
Att.


cc:   Susan Gerry, Associate County Attorney
      David Kvinge, Director of Environmental Planning

COW-00000857

A-319

TUESDAY SEPTEMBER 14, 2004                           1584

### SEQR STATUS SHEET

PROJECT:          Local Law: "Aviation: Inside County Airport"

DEPARTMENT:    Transportation

Description

The Westchester County Airport is located in the Town of North Castle, the Town/Village of Harrison and Village of Rye Brook. Originally constructed by the federal government as an air defense satellite base in the early 1940s, it was turned over to the County in 1943 and currently serves both commercial and general aviation.

For a number of reasons, including the airport's proximity to a drinking water supply and residential neighborhoods, restrictions on commercial use at the airport have been applied since 1984 through a variety of measures, including a County resolution, a court-ordered stipulation and a series of "Terminal Capacity Agreements." The Terminal Capacity Agreement currently in effect will expire on December 31, 2004.

A local law is proposed that will amend the Laws of Westchester County by adding a new section to Article IV of Chapter 712, entitled "Aviation: Inside County Airport." The law will codify the use restrictions already in effect, as well as the procedures and regulations that govern commercial use of the Airport terminal. The law will embody four key elements: (1) an aircraft capacity limit; (2) a passenger capacity limit; (3) a lottery system to allocate passenger and ramp space; and (4) County control of the ramp. The law will include detailed procedures for the operation of the lottery system, the transfer of allocations among airlines, and the informal resolution of disputes regarding the use of allocations. While the proposed law contains some modifications to the existing procedures, they represent minor changes intended to clarify, simplify, or improve enforcement.

Adoption of the proposed local law by the Westchester County Board of Legislators will ensure that commercial use at the Westchester County Airport is regulated in a well-defined, equitable and consistent manner and that it continues to be regulated for the protection of the environment and preservation of the quality of life of the residents who live and work in the vicinity of the airport.

SEQR Status

Type II. The proposed local law is classified as a Type II action, pursuant to section 617.5(c)(20), "routine or continuing agency administration and management, not including new programs or major reordering of priorities that may affect the environment," and 617.5(c)(27), "adoption of regulations, policies, procedures and local legislative decisions in connection with any action on this list."

WCDP
5/04

COW-00000858

TUESDAY SEPTEMBER 14, 2004                                    1585

LOCAL LAW NO. *15* -2004

> A LOCAL LAW to amend Chapter 712 of the Laws of Westchester County to add a new Section 712.462, in order to codify the Westchester County Terminal Use Procedures applicable to all Airlines providing passenger service at the Westchester County Airport

**BE IT ENACTED** by the County Board of Legislators of the County of Westchester as follows:

**Section 1.** Chapter 712 of the Laws of Westchester County is hereby amended to add a new Section 712.462 which shall read as follows:

**Section 712.462        Westchester County Airport Terminal Use Procedures**

**1. Applicability.** This Section shall apply to all use of the Passenger Terminal ("Terminal") and the Terminal Ramp at the Westchester County Airport ("Airport") by Airlines providing scheduled passenger service. The Terminal Ramp shall be for the exclusive use of Airlines providing scheduled passenger service. This Section does not apply to any activities by Airport users not providing passenger service or not using the Terminal building or Terminal Ramp.

**2. Definitions.** The following terms as used in this Section shall have the following meanings:

a. "Airline" shall mean any person providing scheduled passenger air service, including but not limited to, any air carrier or other operator certificated to provide scheduled passenger service under Parts 119, 121 or 135 of the Federal Aviation Regulations, Title 14, Code of Federal Regulations. For purposes of this Section, "person" shall mean any individual, firm, company, association, society, corporation, partnership, co-partnership, joint-stock company, trust, estate, governmental entity or any other legal entity or legal representatives, agents or assigns thereof. The masculine gender shall include the feminine, and the singular shall include the plural, where indicated by context.

b. "Commissioner" shall mean the Commissioner of Transportation of Westchester County or his or her designee, which designee may include the Airport Manager of the Westchester County Airport.

COW-00000859

TUESDAY SEPTEMBER 14, 2004

3586

c.  "Ground Handling Services" shall include, at a minimum, ramp services, aircraft arrival and departure marshalling, aircraft parking and push-back, external engine starting, gate access coordination, aircraft deicing/anti-icing, Americans with Disability Act compliance on the Terminal Ramp, and any other services needed in the ordinary course by Airlines using the Terminal Ramp.

d.  An "Incumbent Passenger Allocation" shall mean a Passenger Allocation that was in use by a Qualified Airline on November 30, 2004, pursuant to the provisions of Westchester County Board of Legislators Resolutions 59-1985 and 266-1985, and the 1994 Terminal Capacity Affirmation and Extension Agreement.

e.  An "Incumbent Ramp Allocation" shall mean a Ramp Allocation that was in use by a Qualified Airline on November 30, 2004, pursuant to the provisions of Westchester County Board of Legislators Resolutions 59-1985 and 266-1985, and the 1994 Terminal Capacity Affirmation and Extension Agreement.

f.  "Passenger" shall mean any person enplaned or deplaned at the Terminal. Federal employees who are actually on official duty and Airline employees shall not be deemed to be Passengers.

g.  "Passenger Allocation" shall mean the authorization to schedule the enplanement or deplanement of one passenger onto or from an aircraft that has a Ramp Allocation.

h.  A "Qualified Airline" shall mean any Airline that: (1) holds a valid operating certificate from the Federal Aviation Administration for the type of service it provides or seeks to provide at the Airport; (2) has, or has immediate and demonstrable access to, sufficient aircraft and operating personnel to provide the service it provides or seeks to provide; (3) has a valid Terminal Use Agreement with the County in effect; (4) furnishes proof of requisite insurance pursuant to the terms of the then-current Terminal Use Agreement; (5) has designated a representative for purposes of this Section; and (6) is current on its financial obligations with the County.

i.  "Ramp Allocation" shall mean the authorization to schedule an Airline aircraft operation on the Terminal Ramp during a designated half hour each day.  An operation shall consist of an arrival and/or a departure.

j.  "Technical Specifications and Procedural Requirements," shall mean any applicable and lawful technical, engineering, and mechanical specifications for the Airport, including but not limited to the Terminal Ramp, that are issued from time to time by the Commissioner, based upon Federal Aviation Administration guidelines and regulations, and upon the safety, efficiency and

2

COW-00000860

TUESDAY SEPTEMBER 14, 2004                                    3587

physical limitations of the Airport, including the Terminal and Terminal Ramp. The Technical Specifications and Procedural Requirements shall at least address maximum aircraft length, maximum wingspan, and maximum weight for aircraft using the Terminal Ramp.

k.  "Terminal Ramp" shall refer to that portion of the apron at the Airport that is immediately adjacent to the Terminal building and which is available for scheduled Airline operations.

l.  "Terminal Use Agreement" shall mean that agreement that Airlines must execute with the County in order to satisfy in part the requirements of Subsection 2(h) above.

**3.  Terminal Ramp Use and Capacity.**

a.  Terminal Ramp Capacity. A maximum of four aircraft may be scheduled to use the Terminal Ramp at any time. It is the responsibility of each Airline to schedule arrivals and departures of its aircraft so as to avoid the need to wait elsewhere on the Airport for access to the Terminal Ramp. Allocation of the Terminal Ramp capacity shall be governed by Subsection 5 below.

b.  Use of Terminal Ramp. An Airline must hold a Ramp Allocation for each aircraft operation scheduled to use the Terminal Ramp. The Commissioner may deny access to the Terminal Ramp to any aircraft without a current Ramp Allocation. Subject to availability and subject to other Ramp Allocations, the County will endeavor to accommodate any aircraft arriving outside of the half-hour slot of its Ramp Allocation for such arrival or departure if caused by weather, airspace delays, mechanical difficulties, or other factors.

c.  Parking on the Terminal Ramp. Subject to the use of the Terminal Ramp by Qualified Airlines that have valid Ramp Allocations, and subject to the efficient management of limited space on the Terminal Ramp and security considerations, the County will attempt to accommodate Qualified Airlines (1) who wish to park aircraft overnight on the Terminal Ramp after the last scheduled Ramp Allocation for the day or (2) when a Qualified Airline has nonsequential arrival and departure Ramp Allocations for the same aircraft. Any actions by the County allowing use of the Terminal Ramp for such parking pursuant to this provision shall not entitle an Airline to any changes in its Ramp Allocations. An Airline is not entitled to occupy a parking position during any half hour for which it has no Ramp Allocation and must vacate the Terminal Ramp when directed by Airport staff.

d.  Technical Specifications. All Airlines shall comply with the Technical Specifications and Procedural Requirements as issued by the Commissioner from time to time.

3

TUESDAY SEPTEMBER 14, 2004

**e.** Ground Handling Services.  Ground Handling Services for all Airline operations shall be provided by the County or its contractors. An Airline must be a Qualified Airline to receive Ground Handling Services.

**4. Passenger Capacity of the Terminal.**  In the interest of passenger safety, security, public health and comfort, the Terminal was designed for a capacity of 240 passengers per half hour, without consideration of whether such passengers are enplaning or deplaning.  Allocation of this capacity shall be governed by the provisions of Subsection 5.

**5. Allocation of Terminal Ramp and Terminal Capacity.**  In order reasonably and equitably to allocate the available Terminal building and Terminal Ramp capacity, to ensure competition, and to promote orderly and efficient Airport operations, the County shall allocate available Terminal Ramp and Terminal building capacity by means of a lottery as set forth in this Subsection.

**a.** Incumbent Allocations:  A Qualified Airline that has Incumbent Ramp Allocations or Incumbent Passenger Allocations may continue to operate pursuant to such Allocations under this Section after November 30, 2004, so long as (1) this Section is in effect, and (2) the Airline complies with applicable County ordinances, laws, rules and regulations governing the Airport, including this Section.  After December 31, 2004, Incumbent Ramp Allocations and Incumbent Passenger Allocations shall be treated identically to later-acquired Ramp Allocations and Passenger Allocations for purposes of compliance with this Section, including the provisions of Subsections (5)(d)-(m).

**b.** Future Quarterly Allocations:

i.  By the last business day of December 2004, the Commissioner shall publish a report ("Terminal Capacity Allocation Report") identifying all Incumbent Ramp Allocations and Incumbent Passenger Allocation as of November 30, 2004. The Terminal Capacity Allocation Report shall list (1) the time slots for, and names of, Qualified Airlines using each Incumbent Ramp Allocation and Incumbent Passenger Allocation, and (2) available Ramp Allocations and Passenger Allocations, on a half-hourly basis.

ii.  By the last business day of every third month after November 30, 2004, the Commissioner shall make a preliminary determination of the then-available Terminal and Terminal Ramp capacity by subtracting all Ramp and Passenger Allocations from total Passenger and Ramp capacity and shall make a report of such available capacity ("Quarterly

4

COW-00000862

A-324

TUESDAY SEPTEMBER 14, 2004                          1589

Available Capacity Report") available in a convenient form for
Qualified Airlines and all other interested persons.

iii. The allocation of available capacity shall be by means of a
Quarterly Lottery. The Quarterly Lottery may be conducted
through representatives of the County and Qualified Airlines or
may be conducted electronically, as the Commissioner shall
determine from time to time.

iv. No later than December 15, 2004, and by the 15th day of
each third month thereafter, any Qualified Airline seeking an
Allocation of any available capacity by means of the Quarterly
Lottery shall submit a request to the Commissioner in the
manner specified by the Commissioner. The request shall, at a
minimum, identify the Airline's designated representative for
the forthcoming Quarterly Lottery and the aircraft with which
the Qualified Airline proposes to provide service for any Ramp
Allocation.

v. On January 4, 2005, and on the first Tuesday of each third
month thereafter, the County shall conduct the Quarterly
Lottery to allocate capacity for the half hourly periods for
which there is available capacity. The Commissioner may
designate alternative dates for the Quarterly Lottery upon 14-
days notice to the designated representative of each Qualified
Airline.

vi. At the commencement of the Quarterly Lottery, the
Commissioner will provide a report of then-available
Passenger and Ramp Allocations. All Qualified Airlines who
submitted a request pursuant to Subsection (5)(b)(iv) shall be
randomly assigned numbers to establish their order of selection
in the first round of the Quarterly Lottery. Each Qualified
Airline, in its order of selection, may draw Ramp Allocations
and Passenger Allocations for up to a total of four (4)
operations to take place in four half-hourly periods, up to the
available Passenger and Ramp capacity identified in
Subsections 3 and 4, whichever may first be reached. An
operation shall be either an arrival or a departure. Draws may
include increases in Passenger Allocations (so long as the total
of Passenger Allocations for all Qualified Airlines during the
half-hour period does not exceed 240 passengers) for
operations for which the Qualified Airline has a Ramp
Allocation.

5

COW-00000863

TUESDAY SEPTEMBER 14, 2004                                    3590

      vii. At the conclusion of the first round of the Quarterly Lottery, should any Passenger or Ramp capacity remain, the process shall be repeated, with the same order of selection, for such number of additional rounds as may be necessary until no Qualified Airline that submitted a request pursuant to Subsection (5)(b)(iv) seeks Allocations.

c.  Other Matters. Routes, rates, selection of aircraft and other matters not addressed by this Section, other County law or regulation, the Airport's Technical Specifications and Procedural Requirements, or Terminal Use Agreement shall be determined by the Qualified Airline or the Federal Aviation Administration pursuant to federal law.

d.  Compliance with Applicable Requirements. All Airlines operating at the Airport shall at all times be in compliance with all applicable and lawful Airport rules and regulations, County ordinances and laws, including all Airport Technical Specifications and Procedural Requirements that may be issued from time-to-time. Any Airline violating or causing the violation of such rules, regulations, ordinances, laws, agreements or technical specifications shall cure such violation within fifteen (15) days of being so notified by the County. Failure to so cure shall result in the cancellation by the Commissioner of the Ramp Allocations and Passenger Allocations connected with such violations.

e.  Calculation of Allocation Usage for Purposes of Determining Compliance. For purposes of determining whether an Airline is exceeding its Passenger Allocations for any half-hour period under Subsection (5)(h), the County shall employ a calendar month average. For the purposes of determining whether an Airline should have its Passenger Allocations adjusted for under-use pursuant to Subsection (5)(g), the County shall employ a three-calendar-month average based on the data reported pursuant to Subsection (5)(f). In calculating such averages, the denominator shall be the number of aircraft operations actually flown during the period pursuant to a particular Ramp Allocation and the numerator shall be the number of passengers actually enplaned and deplaned on all such operations. For purposes of using averages: (1) any average that is not a whole number shall be rounded down to the next lowest whole number if the fraction greater than the next lowest whole number is lower than five tenths; and (2) any average that is not a whole number shall be rounded up to the next highest whole number if the fraction greater than the next lowest whole number is equal to or greater than five tenths. In calculating such averages, the County shall not include, either in the numerator or the denominator, data concerning operations during the following holiday periods:

      i.  Christmas/New Year from December 20 through January 5.

6

COW-00000864

ii. The Presidents' Day holiday from three (3) days before Presidents' Day through three (3) days following Presidents' Day.

iii. Easter from five (5) days prior to Easter through the fifth day following Easter.

iv. Memorial Day from three (3) days before Memorial Day through three (3) days after Memorial Day.

v. July 4, from July 1 through July 7.

vi. Labor Day, from three (3) days prior to Labor Day through three (3) days after Labor Day.

vii. Thanksgiving from five (5) days prior to Thanksgiving through five (5) days after Thanksgiving.

f. Reporting.

i. Airlines operating at the Airport shall certify actual passenger loads, on a per flight, per day, enplaned, deplaned, basis to the County twice monthly in the form designated by the Commissioner by no later than five business days from (1) the 15th of each month and (2) the last day of each month.

ii. Each Airline shall designate at the time of any application under Subsection (5)(b)(iv), Quarterly Lottery draw under Subsection (5)(b)(vii), or transfer under Subsection (5)(k), the type of aircraft to be used for each Ramp Allocation time slot. Such designation shall be in the form established for this purpose by the Commissioner. Further, any Airline seeking to change the type of aircraft using a Ramp Allocation shall provide notice to the County, in the form designated by the Commissioner, at least seven days prior to such change. Any designation or change in aircraft type shall comply with the Technical Specifications and Procedural Requirements.

iii. The County may, at any time, audit passenger ticket lifts and/or other appropriate passenger statistics of any Airline to determine actual passenger enplanements or deplanements.

iv. Failure to comply with any of the reporting or audit requirements contained in this Subsection (5)(f) within five days of an Airline's receipt of notice of noncompliance by the Commissioner shall result in immediate termination of the

7

COW-00000865

TUESDAY SEPTEMBER 14, 2004

1592

Ramp Allocation(s) and Passenger Allocations of the Airline. Further, any intentional misstatement of information required in this Section, as determined by the Commissioner, shall result in the immediate termination of the Ramp Allocation(s) or Passenger Allocations of the Airline.

g. Failure to Use Allocations. If for any three-calendar-month period, an Airline's actual average passenger load for any half-hour for which it has Passenger Allocations should be less than 85 percent of the total of its Passenger Allocations, then the Commissioner shall reduce its Passenger Allocation for the subsequent quarter to 115 percent of such reported three calendar-month-average passenger loads for that half-hour period. The review and reduction made pursuant to this Subsection shall be made for successive, and not for overlapping, three-month periods. The County shall waive the application of this Subsection for any period in which the Commissioner has determined that total passenger enplanements at the Airport have been significantly adversely affected by war, national emergency or extraordinary terrorist threat, labor action, or force majeure.

h. Exceedance of Passenger Allocations. If for any calendar month, an Airline's average passenger load during any half-hour period should exceed its Passenger Allocations for that period, then such Airline's Passenger Allocations shall be adjusted to such average load figure or such portion thereof as the available capacity of the Terminal shall accommodate ("Adjusted Passenger Allocations"). If two or more Qualified Airlines' average passenger loads for a calendar month in a particular half-hour time period exceed their Passenger Allocations and there is insufficient Passenger Capacity to accommodate all of these exceedances, the Commissioner shall assign Adjusted Passenger Allocations proportionally to the Qualified Airlines' shares of Passenger Allocations for that half-hour period. If there is insufficient available Terminal capacity to accommodate all of the exceedances of Passenger Allocations by an Airline, then the Commissioner shall issue a written Notice of Violation to such Airline, and the Airline shall, within fifteen (15) days from such notice, reduce its average passenger load to the Adjusted Passenger Allocations level. For the purposes of determining compliance with such mandated reduction, the average passenger load will be calculated for the period from 15 days prior to the Notice of Violation to 15 days after the Notice of Violation ("Compliance Test Period"). In lieu of such mandated reduction, a Qualified Airline may obtain sufficient Passenger Allocations from another Airline pursuant to Subsection 5(k) to accommodate its average usage during the Compliance Test Period. Should any Airline fail to reduce its average passenger load during the Compliance Test Period then:

i. On the sixteenth day following the Notice of Violation, such Airline's Passenger Allocations for the applicable half-hour period shall be reduced by the amount by which that the

8

COW-00000866

TUESDAY SEPTEMBER 14, 2004                                3593

Airline's average loads exceeded the Airline's Passenger Allocations as set forth in the Notice of Violation. The Airline shall thereupon be required to comply immediately with such reduced Passenger Allocations.

ii. The Airline shall lose the privilege of participating in the next subsequent Quarterly Lottery for either Passenger Allocations or Ramp Allocations.

iii. Should such Airline's average passenger load during the calendar month following the reduction in its Passenger Allocation under Section 5(h)(i) not comply with such reduced Passenger Allocation, then the Commissioner may terminate, upon twenty days' written notice, such Airline's Ramp Allocation and Passenger Allocations for the subject half-hour period.

i.   Use of Ramp Allocations.

i.   Any Airline obtaining a Ramp Allocation must initiate service within 60 days from the date it obtains such Allocation and must provide such service on at least a five-day-per-week basis, with aircraft capable of using the Passenger Allocations corresponding to the particular Ramp Allocation. Should any Airline fail to initiate service within such 60-day period, such Airline shall, on the 61st day, lose such Ramp Allocation and Passenger Allocations. Such Airline shall also lose the privilege of participating in the next Quarterly Lottery. Notwithstanding the foregoing, any Airline may, within ten days of any Quarterly Lottery, surrender to the County without penalty any Passenger Allocations or Ramp Allocation or portions thereof obtained in such Quarterly Lottery. Any surrendered Allocations will become available capacity in the next Quarterly Lottery.

ii.  Any Airline with a Ramp Allocation must schedule use of such Allocation on at least a five-day-per-week basis, with aircraft capable of using the Passenger Allocations corresponding to the particular Ramp Allocation, or transfer the Allocation to another Airline or Airlines (pursuant to Subsection k) which together would provide service that schedules use of such Passenger Allocations, on at least a five-day-per-week basis.

(a)   Failure to schedule use of a Ramp Allocation on at least a five-day-per-week basis shall result in a notice of

17



TUESDAY SEPTEMBER 14, 2004                                    3594

violation from the Commissioner. If the Airline fails to schedule use of its Ramp Allocation on at least a five-day-per-week basis within 15 days of the notice of violation from the Commissioner, the Commissioner shall immediately cancel such Airline's Ramp Allocation and associated Passenger Allocations. If an Airline fails to schedule use of its Ramp Allocation on at least a five-day-per-week basis for a second time within a one-year period, the Commissioner shall immediately cancel the Airline's Ramp Allocation and associated Passenger Allocations upon one-day notice. The County shall waive the application of this Subsection for any period in which the Commissioner has determined that total operations at the Airport have been significantly adversely affected by war, national emergency or extraordinary terrorist threat, labor action, or force majeure.

(b)    The Commissioner may also terminate an Airline's Ramp Allocation and associated Passenger Allocations if he or she determines that an Airline's actual use of its Ramp Allocation is inconsistent with its published schedules for use of the Ramp Allocation, indicating an intent to hold a Ramp Allocation without making use of it on a five-day-per-week basis.

iii. Before initiating new or changed service, a Qualified Airline must have approval from the Commissioner regarding scheduled arrival and departure times pursuant to Subsection (5)(j).

j. Scheduled Departure and Arrival Times. The Commissioner shall approve changes in and new scheduled arrival or departure times. Any changes not disapproved within 10 days of receipt of notice of such changes shall be deemed approved. Approval or disapproval of any changes shall be based on the following criteria:

i. All arrival and departure times must be scheduled within the half hour for which the Qualified Airline holds a Ramp Allocation;

ii. The Qualified Airline must have adequate Passenger Allocations;

iii. The scheduled arrival and departure times must allow for the aircraft's passengers to be enplaned and/or deplaned within

10

COW-00000868

Case 7:22-cv-01930-PMH Document 112-2 Filed 11/30/23 Page 22 of 26

TUESDAY SEPTEMBER 14, 2004

3595

524

the half hour for which the Qualified Airline holds a Ramp Allocation and Passenger Allocations;

iv. Adequate ramp time outside of the half-hour period for which the Qualified Airline holds a Ramp Allocation is available, if necessary, to accommodate the proposed operation;

v. Scheduled times shall not interfere with efficient handling of other operations within the same half-hour period or in an adjacent period;

vi. Scheduled operations shall minimize the need for any arrival or departure holds on other Airport aprons;

vii. Operations shall maintain a reasonable balance of arrival and departure passengers in the Terminal;

viii. In no event shall the Commissioner's approval or disapproval of scheduled departure or arrival times deny a Qualified Airline the authority to use its Ramp Allocation and/or Passenger Allocation or affect Airline rates or routes,

k. Transfer of Allocations; Notice.

i. Qualified Airlines may, upon two (2) weeks prior written notice to the County, transfer:

(a) Ramp or Passenger Allocations to another Qualified Airline provided that the transferor has operated flight(s) under such Allocations, employing aircraft capable of using the entire Allocations, for 30 days on at least a five-day-per-week basis, or

(b) Ramp Allocations and Passenger Allocations from one time period into another time period as long as no such transferred Allocations would result in use of the Terminal or Terminal Ramp in excess of capacity for any half-hour time period.

ii. The Commissioner may, in his sole discretion, waive either the notice period or the transferor's required use of the Allocation under this Section for short-term transfers but in no event shall waive the notice requirement.

11

COW-00000869

TUESDAY SEPTEMBER 14, 2004                                          3596

iii. Notice to the County shall be in such electronic and/or other form designated by the Commissioner. Any notice of a transfer shall set forth (a) the names of the transferor and transferee; (b) the duration or any other conditions on the transfer, or whether the transfer is unconditional; and (c) whether the transfer is for all, or a portion (and if so, what portion) of the Allocation.

iv. The County's review of notices pursuant to this Subsection shall be limited to a determination that the proposed transaction (a) involves Qualified Airlines and (b) will not result in exceedance of the capacity limits set forth Subsections 3(a) or 4 of this Section.

l.   New Entrants.  An Airline not currently providing service at the Airport can become a Qualified Airline and obtain Allocations through the Quarterly Lottery and/or transactions with other Airlines pursuant to Subsection (5)(k) if it demonstrates compliance with the criteria set forth in Subsection (2)(h).

m. Disputes Regarding Allocations.  To the extent that any Qualified Airline disputes the identity of the designated holder of Ramp Allocations and/or Passenger Allocations, such Qualified Airline shall seek to resolve its dispute informally among the affected Airlines.  If such efforts should fail, any Qualified Airline may petition the Commissioner for resolution of the dispute. After providing all Qualified Airlines with notice of the dispute, an opportunity to provide supporting information, and an opportunity for a meeting with all affected Airlines, the Commissioner shall make one of three findings:  (1) find that the Allocation is properly identified by the County in the reports required in Subsections (5)(b)(i), (5)(b)(ii) and/or (5)(b)(vi); (2) that another Qualified Airline is properly the holder of the relevant Allocation; or (3) that no Qualified Airline has a clear right to the allocation and that the Allocation is forfeited and available for reallocation pursuant to the provisions of Subsection (5).  All determinations of the Commissioner shall be final.

**6.  Hearings; Enforcement of This Section.**

a.  Request for Hearing and Reconsideration.  Any Airline that disputes a decision by the Commissioner to terminate its Ramp Allocation(s) and/or Passenger Allocations is entitled to seek a hearing and reconsideration of the Commissioner's decision by submitting to the Commissioner a formal request within 10 days of such decision.  Upon receipt of such request, the effectiveness of the Commissioner's decision to terminate an allocation shall be suspended until he or she renders a decision under Subsection (6)(c).

COW-00000870

TUESDAY SEPTEMBER 14, 2004                    3597

b.  Process for Hearing.

    i.  Upon request for a hearing and reconsideration, the Commissioner shall cause to be held a hearing before a hearing officer selected by the County on the termination at issue.

    ii.  A formal hearing shall be on due and adequate notice to the party concerned and shall be set down for a day certain no less than 15 days and no more than 30 days from the Airline's request for hearing and reconsideration.

    iii. A notice of hearing shall set forth:

        (a)    The time and place of the hearing;

        (b)    The basis or bases for the Commissioner's decision to terminate Ramp Allocations and/or Passenger Allocations;

        (c)    The right to present evidence;

        (d)    The right to examine and cross-examine witnesses;

        (e)    The right to be represented by counsel; and

        (f)    That failure to appear shall constitute a default by the respondent, that the hearing may proceed in the respondent's absence and a determination made based upon evidence submitted by the Westchester County Department of Transportation.

    iv. The hearing officer may grant adjournments upon request of any party to the proceeding, provided that an adjournment shall not be for an indefinite period of time, but shall be set down for a day certain.

        (a)    If an adjournment is requested in advance of the hearing date, such request shall be presented to the hearing officer in writing, and shall specify the reason for such request.

        (b)    In considering an application for adjournment of a hearing, the hearing officer shall consider whether the purpose of the hearing will be affected or defeated by the granting of such adjournment.

13

COW-00000871

TUESDAY SEPTEMBER 14, 2004                                    3598

v. To aid in the administration of this Section, the Commissioner or any hearing officer designated by him or her in a particular proceeding, may issue subpoenas in the Commissioner's name requiring the attendance and giving of testimony by witnesses and the production of books, papers and other evidence for any hearing or proceeding conducted under this Section. Service of such subpoena(s), enforcement of obedience thereto, and punishment for disobedience thereof, shall be had as and in the manner provided by the Civil Practice Law and Rules relating to the enforcement of any subpoena. It shall be the responsibility of the party requesting the issuance of a subpoena to effect service thereof.

vi. On the return day of the hearing, the hearing officer shall note the appearances of the persons attending the hearing. Witnesses shall be sworn and testimony shall be recorded either by a certain stenographer or by use of an electronic recording device.

vii. Testimony shall be transcribed upon the request of any interested party. The party requesting the transcript shall pay the costs and expenses in connection therewith.

viii. The hearing officer shall not be bound by the strict rules of evidence in the conduct of a hearing, but the determination shall be founded upon sufficient legal evidence to sustain it.

ix. After the conclusion of a formal hearing, the hearing officer shall prepare and issue findings of fact, conclusions and recommendation(s) to the Commissioner.

c.   Decision by Commissioner

i.   Upon the conclusion of a formal hearing and after receipt of the hearing officer's report and recommendation(s), the Commissioner shall make a decision based on such findings, determinations and recommendations as he or she deems proper, and shall execute an order carrying such decision into effect.

ii. The Commissioner may direct a rehearing or require the taking of additional evidence and may rescind or affirm, in whole or in part, a prior determination after such hearing.

iii. The Commissioner shall cause to be served upon the Airline, copies of findings of fact, conclusions and

14

COW-00000872

TUESDAY SEPTEMBER 14, 2004                    3599

recommendations and orders made as a result of a formal hearing.

d. Service by County.   Service of findings of fact, conclusions and recommendations, and orders, shall be made by hand or by overnight delivery to the designated representative of the Airline.

e.  Hearing Cost.  The cost of the hearing process (including but not limited to the fees for the hearing officer, transcription and other clerical costs, and the cost of providing witnesses but excluding any salaries of County employees) shall be borne equally by all Airlines who are parties to the hearing.

f.  Injunctions.  The County may maintain actions in any court of competent jurisdiction to restrain by injunction any attempted use of the Terminal or Terminal Ramp by any Airline without current, valid Ramp Allocations or Passenger Allocations.

**Section 2.**  This Local Law shall take effect sixty (60) days from its enactment.

G:/appeals/do/airport/legislation/locallaw01.doc

15

COW-00000873

# Exhibit C
# Local Law No. 17-2005

TUESDAY NOVEMBER 15, 2005          4634

COMMITTEES ON LEGISLATION, TRANSPORTATION AND
THE ENVIRONMENT: *County Airport Terminal Use Procedures:*
LOCAL LAW INTRO 21-2005: Local Law clarifying the scope of
application of the County Terminal Use Procedures.

Mr. Rogowsky presented the following report and Local Law and
moved that the report be received, filed and approved and the Local
Law adopted, which motion was carried by the following vote:

AYE: Legislators: Young, Oros, Abinanti, Alvarado, Bronz,
Burrows, Kaplowitz, LaMotte, Maisano, Myers, Pinto, Rogowsky,
Spreckman, Wishnie, Chair – 15.

NAY: None.

TUESDAY NOVEMBER 15, 2005          4635

3B

HONORABLE BOARD OF LEGISLATORS
THE COUNTY OF WESTCHESTER

Your Committee is in receipt of a communication from the County Executive,
urging the adoption of the annexed Local Law which would, if approved by this
Honorable Board, amend Section 712.462 of the Laws of Westchester County, entitled:
*Westchester County Airport Terminal Use Procedures* ("Airport Procedures") in order to
clarify that the Airport Procedures apply to all aviation passenger services which operate
out of the Westchester County Airport ("the Airport") pursuant to which seats are
individually offered or sold to the public, regardless of the frequency of such offers or
sales.

As this Honorable Board knows, the Airport Procedures provide important
protections for the people of Westchester County and represent a careful balance between
competing interests at the Airport. They also provide an efficient mechanism to support
the County's investment in passenger facilities, the continuing maintenance and operation
of the terminal complex, and the implementation of passenger and aircraft security and
safety measures.

COW-00000893

TUESDAY NOVEMBER 15, 2005                    4636

As this Honorable Board also knows, the Airport Procedures have been in continuous effect since 1984, both through the operation of several Resolutions approved by this Honorable Board and pursuant to the specific provisions of the agreements which the County required each commercial airline operating out of the Airport to execute. In 2004, upon the recommendation of the County Executive, this Honorable Board codified the Airport Procedures by enacting Local Law No. 12-2004, making their application permanent.

The 2004 codification closely followed the language that had been in use in various forms since 1984. However, your Committee is informed that, as is common with such codifications, there are several unintended ambiguities in the Airport Procedures which your Committee believes it would be prudent to clarify in order to ensure that the practical application of the Airport Procedures is consistent with the legislative intent which prompted their enactment.

For example, the scope of the Airport Procedures was clearly intended to include all commercial passenger operations, including those that provide infrequent or special purpose services, such as those now authorized under Part 380 of the FAA's regulations. However, your Committee is informed that while those operations are required to use the County's baggage handling and aircraft ramp services, which services are provided only

2

COW-00000894

TUESDAY NOVEMBER 15, 2005        4637

at the terminal ramp, there is no explicit language in the Airport Procedures requiring same. Therefore, the proposed technical amendments, as set forth in the annexed Local Law, would clarify the applicability of the Airport Procedures to these operations. The proposed technical amendments would also clarify that very small passenger aircraft – those with (9) seats or less – can continue to use the general aviation facilities at the Airport, as they always have done.

Your Committee is informed that in addition to establishing a new definition for 'Passenger Service,'[1] the proposed amendments would also clarify the terms under which those providers of infrequent passenger service may use the Airport terminal ramp. Specifically, they would be able to do so by participating in the lottery process themselves, utilizing available ramp and capacity allocations, or by negotiating with airlines to use their allocations on a temporary basis. In either case, the operator will be required to expressly agree to comply with all terms governing use of the allocation, including the Airport Procedures.

In sum, the proposed amendment to the provisions of Section 712.462 of the Laws of Westchester County will clarify long-standing practice under which the County requires that all commercial passenger service providers, including those that offer their services on an infrequent basis, use the main Airport terminal and terminal ramp and be

---

[1] Passenger Service is defined to mean "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity."

3

COW-00000895

TUESDAY NOVEMBER 15, 2005          4638

subject, among other things, to the four primary limitations set forth in the Airport

Procedures. [2]

The Westchester County Department of Planning has advised that enactment of

the annexed Local Law is a Type II action pursuant to the State Environmental Quality

Review Act ("SEQRA") and its implementing regulations, pursuant to 6 NYCRR

617.5(c)(20), "routine or continuing agency administration and management, not

including new programs or major reordering of priorities that may affect the

environment," and 6 NYCRR 617.5(c)(27), "adoption of regulations, policies, procedures

and local legislative decisions in connection with any action on this list." As such, no

further environmental review is required. Your Committee concurs in this determination.

Your Committee also concurs with the County Executive's statement, urging the

enactment of the annexed Local Law in order to clarify the scope of the Airport

---

[2] The four primary Airport Procedures applicable to passenger service out of Westchester County Airport remain unchanged from those which have been in effect for more than 20 years, as follows:

1. Aircraft capacity limit. A limit on commercial flights which prohibits scheduling more than four aircraft per half hour for enplaning or deplaning passengers.

2. Passenger capacity limit. A limit of 240 scheduled passengers per half hour in the Airport terminal, whether enplaning or deplaning, calculated on a quarterly average basis.

3. Lottery system. Allocation of the Airport's limited terminal and terminal ramp capacity among the airlines through a lottery system, applicable to both passenger and ramp space, on a quarterly basis, allowing each airline to select the ramp slot and number of passengers it desires to serve at the Airport.

4. Ramp Control. Exclusive operating control of the terminal ramp by the County in order to insure compliance with the procedures.

4

COW-00000896

TUESDAY NOVEMBER 15, 2005        4639

Procedures which are so critical to the management of the competing interests at the

Westchester County Airport.

Dated: October 7 , 2005
White Plains, New York

COMMITTEE ON *Legislation*
(SFG)

*Committee on Transportation*

*(w/o pigula )*

OCT. 11, 2005

Ursula G. LaMotte

COMMITTEE ON THE ENVIRONMENT

5

Case 7:22-cv-01909-PMH   Document 112-3   Filed 11/30/23   Page 8 of 25



TUESDAY NOVEMBER 15, 2005                                    4640

Westchester
gov.com
                                                        Memorandum
                                                Department of Planning

To:      Charlene M. Indelicato
         County Attorney

From:    Jerry Mulligan      JM
         Commissioner

Date:    September 2, 2005

Subject: SEQR DOCUMENTATION FOR LOCAL LAW TO AMEND WESTCHESTER
         COUNTY AIRPORT TERMINAL USE PROCEDURES (SECTION 712.462)

In response to a request from your department, Planning Department staff has reviewed
the above referenced action in accordance with the State Environmental Quality Review
Act and its implementing regulations, 6NYCRR Part 617 (SEQR).

The action involves a local law that would amend section 712.462 of the Laws of
Westchester County, which governs use of the terminal at the Westchester County Airport.
The amendment would clarify procedures for those providing infrequent passenger service
or special purpose services at the County Airport.

Since the proposed amendment merely clarifies the applicability of the existing airport
terminal use procedures to these operations, the proposed local law has been classified as a
Type II action, pursuant to sections 617.5(c)(20), "routine or continuing agency
administration and management, not including new programs or major reordering of
priorities that may affect the environment," and 617.5(c)(27), "adoption of regulations,
policies, procedures and local legislative decisions in connection with any action on this
list." As such, no further environmental review is required.

Please contact me if you need any additional information regarding this classification.

JEM/cnm

cc:   Lawrence Salley, Commissioner of Transportation
      Harry Stanton, Deputy Commissioner, DOT
      Susan Gerry, Associate County Attorney
      David Kvinge, Director of Environmental Planning

COW-00000898

TUESDAY NOVEMBER 15, 2005          4641

## LOCAL LAW NO. 21 -2005

A LOCAL LAW to amend Section 712.462
of the Laws of Westchester County in order
to clarify the scope of application of the
Westchester County Terminal Use
Procedures which are outlined therein.

**BE IT ENACTED** by the County Board of Legislators of the County of
Westchester, as follows:

**Section 1.** Section 712.462 of the Laws of Westchester County is hereby
amended as follows:

**Section 712.462          Westchester County Airport Terminal Use Procedures**

1. **Applicability.** This Section shall apply to all use of the passenger terminal
("terminal") and the terminal ramp at the Westchester County Airport ("Airport") by
Airlines providing [scheduled passenger service] Passenger Service, as that term is
defined herein. The terminal ramp shall be for the exclusive use of Airlines providing
[scheduled passenger service] Passenger Service. This Section does not apply to any
activities by Airport users not providing [passenger service or not using the terminal
building or terminal ramp] Passenger Service. All Passenger Service provided at the
Airport shall be provided at the Terminal.

2. **Definitions.** The following terms as used in this Section shall have the following
meanings:

a. "Airline" shall mean any person providing [scheduled passenger air
service] Passenger Service in aircraft designed for more than (9) passenger
seats, including but not limited to, any air carrier or other operator certificated
to provide [scheduled passenger service] Passenger Service under Parts 119,
121 or 135 of the Federal Aviation Regulations, Title 14, Code of Federal
Regulations. For purposes of this Section, "person" shall mean any
individual, firm, company, association, society, corporation, partnership, co-
partnership, joint-stock company, trust, estate, governmental entity or any
other legal entity or legal representatives, agents or assigns thereof. The
masculine gender shall include the feminine, and the singular shall include the
plural, where indicated by context.

b. "Commissioner" shall mean the Commissioner of Transportation of
Westchester County or his or her designee, which designee may include the
Airport Manager of the Westchester County Airport.

COW-00000899

TUESDAY NOVEMBER 15, 2005      4642

c.  "Ground Handling Services" shall include, at a minimum, ramp services, aircraft arrival and departure marshalling, aircraft parking and push-back, external engine starting, gate access coordination, aircraft deicing/anti-icing, Americans with Disability Act compliance on the Terminal Ramp, and any other services needed in the ordinary course by Airlines using the Terminal Ramp.

d.  An "Incumbent Passenger Allocation" shall mean a Passenger Allocation that was in use by a Qualified Airline on November 30, 2004, pursuant to the provisions of Westchester County Board of Legislators Resolutions 59-1985 and 266-1985, and the 1994 Terminal Capacity Affirmation and Extension Agreement.

e.  An "Incumbent Ramp Allocation" shall mean a Ramp Allocation that was in use by a Qualified Airline on November 30, 2004, pursuant to the provisions of Westchester County Board of Legislators Resolutions 59-1985 and 266-1985, and the 1994 Terminal Capacity Affirmation and Extension Agreement.

f.  "Limited Qualified Airline" shall mean any Airline that: (1) holds a valid operating certificate from the Federal Aviation Administration for the type of service it provides or seeks to provide at the Airport; (2) has, or has immediate and demonstrable, access to the aircraft and operating personnel to provide the service it provides or seeks to provide; (3) has a valid Limited Terminal Use Agreement with the County in effect; (4)  furnishes proof of requisite insurance pursuant to the terms of the then-current Limited Terminal Use Agreement; (5) has designated a representative for purposes of this Section; (6) is current on its financial obligations with the County; and (7) has conducted no more than four (4) operations constituting Passenger Service at the Airport within the previous 90 days.

g.  "Limited Terminal Use Agreement" shall mean that agreement that Airlines must execute with the County in order to satisfy in part the requirements of Subsection 2(f) above.

[f]h.  "Passenger" shall mean any person enplaned or deplaned at the Terminal.  Federal employees who are actually on official duty and Airline employees shall not be deemed to be Passengers.

[g]i.  "Passenger Allocation" shall mean the authorization to schedule the enplanement or deplanement of one passenger onto or from an aircraft that has a Ramp Allocation.

2

COW-00000900

TUESDAY NOVEMBER 15, 2005        4643

j.  "Passenger Service" shall mean any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity.

[h]k. A "Qualified Airline" shall mean any Airline that: (1) holds a valid operating certificate from the Federal Aviation Administration for the type of service it provides or seeks to provide at the Airport; (2) has, or has immediate and demonstrable access to, sufficient aircraft and operating personnel to provide the service it provides or seeks to provide; (3) has a valid Terminal Use Agreement with the County in effect; (4)  furnishes proof of requisite insurance pursuant to the terms of the then-current Terminal Use Agreement; (5) has designated a representative for purposes of this Section; and (6) is current on its financial obligations with the County.

[i]l. "Ramp Allocation" shall mean the authorization to schedule an Airline aircraft operation on the Terminal Ramp during a designated half hour each day, or for a single designated half hour in the case of a Limited Qualified Airline operating pursuant to Subsection 7 hereof.  An operation shall consist of an arrival [and/]or a departure.

[j]m. "Technical Specifications and Procedural Requirements" shall mean any applicable and lawful technical, engineering, and mechanical specifications for the Airport, including but not limited to the Terminal Ramp, that are issued from time to time by the Commissioner, based upon Federal Aviation Administration guidelines and regulations, and upon the safety, efficiency and physical limitations of the Airport, including the Terminal and Terminal Ramp.  The Technical Specifications and Procedural Requirements shall at least address maximum aircraft length, maximum wingspan, and maximum weight for aircraft using the Terminal Ramp.

[k]n. "Terminal Ramp" shall refer to that portion of the apron at the Airport that is immediately adjacent to the Terminal building and which is available for scheduled Airline operations.

[l]o. "Terminal Use Agreement" shall mean that agreement that Airlines must execute with the County in order to satisfy in part the requirements of Subsection 2([h]j) above.

3.  **Terminal Ramp Use and Capacity.**

a.  Terminal Ramp Capacity.  A maximum of four aircraft may be scheduled to use the Terminal Ramp at any time.  It is the responsibility of each Airline to schedule arrivals and departures of its aircraft so as to avoid the need to

3

TUESDAY NOVEMBER 15, 2005      4644

wait elsewhere on the Airport for access to the Terminal Ramp. Allocation of the Terminal Ramp capacity shall be governed by Subsection 5 below.

b.   Use of Terminal Ramp.  An Airline must hold a Ramp Allocation for each aircraft operation scheduled to use the Terminal Ramp.  The Commissioner may deny access to the Terminal Ramp to any aircraft without a current Ramp Allocation.  Subject to availability and subject to other Ramp Allocations, the County will endeavor to accommodate any aircraft arriving outside of the half-hour slot of its Ramp Allocation for such arrival or departure if caused by weather, airspace delays, mechanical difficulties, or other factors.

c.   Parking on the Terminal Ramp.  Subject to the use of the Terminal Ramp by Qualified Airlines that have valid Ramp Allocations, and subject to the efficient management of limited space on the Terminal Ramp and security considerations, the County will attempt to accommodate Qualified Airlines (1) who wish to park aircraft overnight on the Terminal Ramp after the last scheduled Ramp Allocation for the day or (2) when a Qualified Airline has nonsequential arrival and departure Ramp Allocations for the same aircraft. Any actions by the County allowing use of the Terminal Ramp for such parking pursuant to this provision shall not entitle an Airline to any changes in its Ramp Allocations.  An Airline is not entitled to occupy a parking position during any half hour for which it has no Ramp Allocation and must vacate the Terminal Ramp when directed by Airport staff.

d.   Technical Specifications.  All Airlines shall comply with the Technical Specifications and Procedural Requirements as issued by the Commissioner from time to time.

e.   Ground Handling Services.  Ground Handling Services for all Airline operations shall be provided by the County or its contractors.  An Airline must be a Qualified Airline or Limited Qualified Airline to receive Ground Handling Services.

**4.  Passenger Capacity of the Terminal**.  In the interest of passenger safety, security, public health, and comfort, the Terminal was designed for a capacity of 240 passengers per half hour, without consideration of whether such passengers are enplaning or deplaning.  Allocation of this capacity shall be governed by the provisions of Subsection 5.

**5.  Allocation of Terminal Ramp and Terminal Capacity**.  In order reasonably and equitably to allocate the available Terminal building and Terminal Ramp capacity, to ensure competition, and to promote orderly and efficient Airport operations, the County shall allocate available Terminal Ramp and Terminal building capacity by means of a lottery as set forth in this Subsection.

4

a. Incumbent Allocations: A Qualified Airline that has Incumbent Ramp Allocations or Incumbent Passenger Allocations may continue to operate pursuant to such Allocations under this Section after November 30, 2004, so long as (1) this Section is in effect; and (2) the Airline complies with applicable County ordinances, laws, rules and regulations governing the Airport, including this Section. After December 31, 2004, Incumbent Ramp Allocations and Incumbent Passenger Allocations shall be treated identically to later-acquired Ramp Allocations and Passenger Allocations for purposes of compliance with this Section, including the provisions of Subsections (5)(d)-(m).

b. Future Quarterly Allocations:

i. By the last business day of December 2004, the Commissioner shall publish a report ("Terminal Capacity Allocation Report") identifying all Incumbent Ramp Allocations and Incumbent Passenger Allocations as of November 30, 2004. The Terminal Capacity Allocation Report shall list (1) the time slots for, and names of, Qualified Airlines using each Incumbent Ramp Allocation and Incumbent Passenger Allocation; and (2) available Ramp Allocations and Passenger Allocations, on a half-hourly basis.

ii. By the last business day of every third month after November 30, 2004, the Commissioner shall make a preliminary determination of the then-available Terminal and Terminal Ramp capacity by subtracting all Ramp and Passenger Allocations from total Passenger and Ramp capacity and shall make a report of such available capacity ("Quarterly Available Capacity Report") available in a convenient form for Qualified Airlines and all other interested persons.

iii. The allocation of available capacity shall be by means of a Quarterly Lottery. The Quarterly Lottery may be conducted through representatives of the County and Qualified Airlines or may be conducted electronically, as the Commissioner shall determine from time to time.

iv. No later than December 15, 2004, and by the 15th day of each third month thereafter, any Qualified Airline seeking an Allocation of any available capacity by means of the Quarterly Lottery shall submit a request to the Commissioner in the manner specified by the Commissioner. The request shall, at a minimum, identify the Airline's designated representative for the forthcoming Quarterly Lottery and the aircraft with which

5

COW-00000903

the Qualified Airline proposes to provide service for any Ramp Allocation.

v. On January 4, 2005, and on the first Tuesday of each third month thereafter, the County shall conduct the Quarterly Lottery to allocate capacity for the half hourly periods for which there is available capacity. The Commissioner may designate alternative dates for the Quarterly Lottery upon 14-days notice to the designated representative of each Qualified Airline.

vi. At the commencement of the Quarterly Lottery, the Commissioner will provide a report of then-available Passenger and Ramp Allocations. All Qualified Airlines who submitted a request pursuant to Subsection (5)(b)(iv) shall be randomly assigned numbers to establish their order of selection in the first round of the Quarterly Lottery. Each Qualified Airline, in its order of selection, may draw Ramp Allocations and Passenger Allocations for up to a total of four (4) operations to take place in four half-hourly periods, up to the available Passenger and Ramp capacity identified in Subsections 3 and 4, whichever may first be reached. An operation shall be either an arrival or a departure. Draws may include increases in Passenger Allocations (so long as the total of Passenger Allocations for all Qualified Airlines during the half-hour period does not exceed 240 passengers) for operations for which the Qualified Airline has a Ramp Allocation.

vii. At the conclusion of the first round of the Quarterly Lottery, should any Passenger or Ramp capacity remain, the process shall be repeated, with the same order of selection, for such number of additional rounds as may be necessary until no Qualified Airline that submitted a request pursuant to Subsection (5)(b)(iv) seeks Allocations.

c. Other Matters. Routes, rates, selection of aircraft and other matters not addressed by this Section, other County law or regulation, the Airport's Technical Specifications and Procedural Requirements, or Terminal Use Agreement shall be determined by the Qualified Airline or the Federal Aviation Administration pursuant to federal law.

d. Compliance with Applicable Requirements. All Airlines operating at the Airport shall at all times be in compliance with all applicable and lawful Airport rules and regulations, County ordinances and laws, including all Airport Technical Specifications and Procedural Requirements that may be

6

COW-00000904

TUESDAY NOVEMBER 15, 2005      4647

issued from time-to-time. Any Airline violating or causing the violation of such rules, regulations, ordinances, laws, agreements or technical specifications shall cure such violation within fifteen (15) days of being so notified by the County. Failure to so cure shall result in the cancellation by the Commissioner of the Ramp Allocations and Passenger Allocations connected with such violations.

e. Calculation of Allocation Usage for Purposes of Determining Compliance. For purposes of determining whether an Airline is exceeding its Passenger Allocations for any half-hour period under Subsection (5)(h), the County shall employ a calendar month average. For the purposes of determining whether an Airline should have its Passenger Allocations adjusted for under-use pursuant to Subsection (5)(g), the County shall employ a three-calendar-month average based on the data reported pursuant to Subsection (5)(f). In calculating such averages, the denominator shall be the number of aircraft operations actually flown during the period pursuant to a particular Ramp Allocation and the numerator shall be the number of passengers actually enplaned and deplaned on all such operations. For purposes of using averages: (1) any average that is not a whole number shall be rounded down to the next lowest whole number if the fraction greater than the next lowest whole number is lower than five tenths; and (2) any average that is not a whole number shall be rounded up to the next highest whole number if the fraction greater than the next lowest whole number is equal to or greater than five tenths. In calculating such averages, the County shall not include, either in the numerator or the denominator, data concerning operations during the following holiday periods:

> i. Christmas/New Year from December 20 through January 5.

> ii. The Presidents' Day holiday from three (3) days before Presidents' Day through three (3) days following Presidents' Day.

> iii. Easter from five (5) days prior to Easter through the fifth day following Easter.

> iv. Memorial Day from three (3) days before Memorial Day through three (3) days after Memorial Day.

> v. July 4, from July 1 through July 7.

> vi. Labor Day, from three (3) days prior to Labor Day through three (3) days after Labor Day.

> vii. Thanksgiving from five (5) days prior to Thanksgiving through five (5) days after Thanksgiving.

7

COW-00000905

TUESDAY NOVEMBER 15, 2005        4648

f.  Reporting.

i.  Airlines operating at the Airport shall certify actual passenger loads, on a per flight, per day, enplaned, deplaned, basis to the County twice monthly in the form designated by the Commissioner by no later than five business days from (1) the 15th of each month and (2) the last day of each month.

ii.  Each Airline shall designate at the time of any application under Subsection (5)(b)(iv), Quarterly Lottery draw under Subsection (5)(b)(vii), or transfer under Subsection (5)(k), the type of aircraft to be used for each Ramp Allocation time slot. Such designation shall be in the form established for this purpose by the Commissioner.  Further, any Airline seeking to change the type of aircraft using a Ramp Allocation shall provide notice to the County, in the form designated by the Commissioner, at least seven days prior to such change.  Any designation or change in aircraft type shall comply with the Technical Specifications and Procedural Requirements.

iii.  The County may, at any time, audit passenger ticket lifts and/or other appropriate passenger statistics of any Airline to determine actual passenger enplanements or deplanements.

iv.  Failure to comply with any of the reporting or audit requirements contained in this Subsection (5)(f) within five days of an Airline's receipt of notice of noncompliance by the Commissioner shall result in immediate termination of the Ramp Allocation(s) and Passenger Allocations of the Airline. Further, any intentional misstatement of information required in this Section, as determined by the Commissioner, shall result in the immediate termination of the Ramp Allocation(s) or Passenger Allocations of the Airline.

g.  Failure to Use Allocations.  If for any three-calendar-month period, an Airline's actual average passenger load for any half-hour for which it has Passenger Allocations should be less than 85 percent of the total of its Passenger Allocations, then the Commissioner shall reduce its Passenger Allocation for the subsequent quarter to 115 percent of such reported three calendar-month-average passenger loads for that half-hour period.  The review and reduction made pursuant to this Subsection shall be made for successive, and not for overlapping, three-month periods. The County shall waive the application of this Subsection for any period in which the Commissioner has determined that total passenger enplanements at the Airport have been

8

COW-00000906

TUESDAY NOVEMBER 15, 2005          4649

significantly adversely affected by war, national emergency or extraordinary terrorist threat, labor action, or force majeure.

h.  Exceedance of Passenger Allocations.  If for any calendar month, an Airline's average passenger load during any half-hour period should exceed its Passenger Allocations for that period, then such Airline's Passenger Allocations shall be adjusted to such average load figure or such portion thereof as the available capacity of the Terminal shall accommodate ("Adjusted Passenger Allocations").  If two or more Qualified Airlines' average passenger loads for a calendar month in a particular half-hour time period exceed their Passenger Allocations and there is insufficient Passenger Capacity to accommodate all of these exceedances, the Commissioner shall assign Adjusted Passenger Allocations proportionally to the Qualified Airlines' shares of Passenger Allocations for that half-hour period.  If there is insufficient available Terminal capacity to accommodate all of the exceedances of Passenger Allocations by an Airline, then the Commissioner shall issue a written Notice of Violation to such Airline, and the Airline shall, within fifteen (15) days from such notice, reduce its average passenger load to the Adjusted Passenger Allocations level.  For the purposes of determining compliance with such mandated reduction, the average passenger load will be calculated for the period from 15 days prior to the Notice of Violation to 15 days after the Notice of Violation ("Compliance Test Period").  In lieu of such mandated reduction, a Qualified Airline may obtain sufficient Passenger Allocations from another Airline pursuant to Subsection 5(k) to accommodate its average usage during the Compliance Test Period.  Should any Airline fail to reduce its average passenger load during the Compliance Test Period then:

i.  On the sixteenth day following the Notice of Violation, such Airline's Passenger Allocations for the applicable half-hour period shall be reduced by the amount by which that the Airline's average loads exceeded the Airline's Passenger Allocations as set forth in the Notice of Violation.  The Airline shall thereupon be required to comply immediately with such reduced Passenger Allocations.

ii.  The Airline shall lose the privilege of participating in the next subsequent Quarterly Lottery for either Passenger Allocations or Ramp Allocations.

iii. Should such Airline's average passenger load during the calendar month following the reduction in its Passenger Allocation under Section 5(h)(i) not comply with such reduced Passenger Allocation, then the Commissioner may terminate, upon twenty days' written notice, such Airline's Ramp Allocation and Passenger Allocations for the subject half-hour period.

9

COW-00000907

A-352

TUESDAY NOVEMBER 15, 2005        4650

i.  Use of Ramp Allocations.

    i.  Any Airline obtaining a Ramp Allocation must initiate service within 60 days from the date it obtains such Allocation and must provide such service on at least a five-day-per-week basis, with aircraft capable of using the Passenger Allocations corresponding to the particular Ramp Allocation.  Should any Airline fail to initiate service within such 60-day period, such Airline shall, on the 61st day, lose such Ramp Allocation and Passenger Allocations.  Such Airline shall also lose the privilege of participating in the next Quarterly Lottery. Notwithstanding the foregoing, any Airline may, within ten days of any Quarterly Lottery, surrender to the County without penalty any Passenger Allocations or Ramp Allocation or portions thereof obtained in such Quarterly Lottery.  Any surrendered Allocations will become available capacity in the next Quarterly Lottery.

    ii.  Any Airline with a Ramp Allocation must schedule use of such Allocation on at least a five-day-per-week basis, with aircraft capable of using the Passenger Allocations corresponding to the particular Ramp Allocation, or transfer the Allocation to another Airline or Airlines (pursuant to Subsection k) which together would provide service that schedules use of such Passenger Allocations, on at least a five-day-per-week basis.

    (a)    Failure to schedule use of a Ramp Allocation on at least a five-day-per-week basis shall result in a notice of violation from the Commissioner.  If the Airline fails to schedule use of its Ramp Allocation on at least a five-day-per-week basis within 15 days of the notice of violation from the Commissioner, the Commissioner shall immediately cancel such Airline's Ramp Allocation and associated Passenger Allocations.  If an Airline fails to schedule use of its Ramp Allocation on at least a five-day-per-week basis for a second time within a one-year period, the Commissioner shall immediately cancel the Airline's Ramp Allocation and associated Passenger Allocations upon one-day notice.  The County shall waive the application of this Subsection for any period in which the Commissioner has determined that total operations at the Airport have been significantly adversely affected by war, national emergency or extraordinary terrorist threat, labor action, or force majeure.

10

A-353

TUESDAY NOVEMBER 15, 2005        4651

    (b)    The Commissioner may also terminate an Airline's Ramp Allocation and associated Passenger Allocations if he or she determines that an Airline's actual use of its Ramp Allocation is inconsistent with its published schedules for use of the Ramp Allocation, indicating an intent to hold a Ramp Allocation without making use of it on a five-day-per-week basis.

iii. Before initiating new or changed service, a Qualified Airline must have approval from the Commissioner regarding scheduled arrival and departure times pursuant to Subsection (5)(j).

j.   Scheduled Departure and Arrival Times.  The Commissioner shall approve changes in and new scheduled arrival or departure times.  Any changes not disapproved within 10 days of receipt of notice of such changes shall be deemed approved.  Approval or disapproval of any changes shall be based on the following criteria:

i.  All arrival and departure times must be scheduled within the half hour for which the Qualified Airline holds a Ramp Allocation;

ii. The Qualified Airline must have adequate Passenger Allocations;

iii. The scheduled arrival and departure times must allow for the aircraft's passengers to be enplaned and/or deplaned within the half hour for which the Qualified Airline holds a Ramp Allocation and Passenger Allocations;

iv. Adequate ramp time outside of the half-hour period for which the Qualified Airline holds a Ramp Allocation is available, if necessary, to accommodate the proposed operation;

v.  Scheduled times shall not interfere with efficient handling of other operations within the same half-hour period or in an adjacent period;

vi. Scheduled operations shall minimize the need for any arrival or departure holds on other Airport aprons;

vii. Operations shall maintain a reasonable balance of arrival and departure passengers in the Terminal;

11

COW-00000909

viii. In no event shall the Commissioner's approval or disapproval of scheduled departure or arrival times deny a Qualified Airline the authority to use its Ramp Allocation and/or Passenger Allocation or affect Airline rates or routes.

k. Transfer of Allocations; Notice.

i. Qualified Airlines may, upon two (2) weeks prior written notice to the County, transfer:

(a) Ramp or Passenger Allocations to another Qualified Airline provided that the transferor has operated flight(s) under such Allocations, employing aircraft capable of using the entire Allocations, for 30 days on at least a five-day-per-week basis, or

(b) Ramp Allocations and Passenger Allocations from one time period into another time period as long as no such transferred Allocations would result in use of the Terminal or Terminal Ramp in excess of capacity for any half-hour time period.

ii. The Commissioner may, in his sole discretion, waive either the notice period or the transferor's required use of the Allocation under this Section for short-term transfers but in no event shall waive the notice requirement.

iii. Notice to the County shall be in such electronic and/or other form designated by the Commissioner. Any notice of a transfer shall set forth (a) the names of the transferor and transferee; (b) the duration or any other conditions on the transfer, or whether the transfer is unconditional; and (c) whether the transfer is for all, or a portion (and if so, what portion) of the Allocation.

iv. The County's review of notices pursuant to this Subsection shall be limited to a determination that the proposed transaction (a) involves Qualified Airlines and (b) will not result in exceedance of the capacity limits set forth Subsections 3(a) or 4 of this Section.

l. New Entrants. An Airline not currently providing service at the Airport can become a Qualified Airline and obtain Allocations through the Quarterly Lottery and/or transactions with other Airlines pursuant to Subsection (5)(k) if it demonstrates compliance with the criteria set forth in Subsection (2)(h).

TUESDAY NOVEMBER 15, 2005          4653

m. Disputes Regarding Allocations.  To the extent that any Qualified Airline disputes the identity of the designated holder of Ramp Allocations and/or Passenger Allocations, such Qualified Airline shall seek to resolve its dispute informally among the affected Airlines.  If such efforts should fail, any Qualified Airline may petition the Commissioner for resolution of the dispute.  After providing all Qualified Airlines with notice of the dispute, an opportunity to provide supporting information, and an opportunity for a meeting with all affected Airlines, the Commissioner shall make one of three findings:  (1) find that the Allocation is properly identified by the County in the reports required in Subsections (5)(b)(i), (5)(b)(ii) and/or (5)(b)(vi); (2) that another Qualified Airline is properly the holder of the relevant Allocation; or (3) that no Qualified Airline has a clear right to the allocation and that the Allocation is forfeited and available for reallocation pursuant to the provisions of Subsection (5).  All determinations of the Commissioner shall be final.

6.  **Hearings; Enforcement of This Section.**

a.  Request for Hearing and Reconsideration.  Any Airline that disputes a decision by the Commissioner to terminate its Ramp Allocation(s) and/or Passenger Allocations is entitled to seek a hearing and reconsideration of the Commissioner's decision by submitting to the Commissioner a formal request within 10 days of such decision.   Upon receipt of such request, the effectiveness of the Commissioner's decision to terminate an allocation shall be suspended until he or she renders a decision under Subsection (6)(c).

b.  Process for Hearing.

i.  Upon request for a hearing and reconsideration, the Commissioner shall cause to be held a hearing before a hearing officer selected by the County on the termination at issue.

ii.  A formal hearing shall be on due and adequate notice to the party concerned and shall be set down for a day certain no less than 15 days and no more than 30 days from the Airline's request for hearing and reconsideration.

iii. A notice of hearing shall set forth:

(a)      The time and place of the hearing;

(b)      The basis or bases for the Commissioner's decision to terminate Ramp Allocations and/or Passenger Allocations;

(c)      The right to present evidence;

13

COW-00000911

TUESDAY NOVEMBER 15, 2005                                              4654

(d)    The right to examine and cross-examine witnesses;

(e)    The right to be represented by counsel; and

(f)    That failure to appear shall constitute a default by the respondent, that the hearing may proceed in the respondent's absence and a determination made based upon evidence submitted by the Westchester County Department of Transportation.

iv. The hearing officer may grant adjournments upon request of any party to the proceeding, provided that an adjournment shall not be for an indefinite period of time, but shall be set down for a day certain.

(a)    If an adjournment is requested in advance of the hearing date, such request shall be presented to the hearing officer in writing, and shall specify the reason for such request.

(b)    In considering an application for adjournment of a hearing, the hearing officer shall consider whether the purpose of the hearing will be affected or defeated by the granting of such adjournment.

v. To aid in the administration of this Section, the Commissioner or any hearing officer designated by him or her in a particular proceeding, may issue subpoenas in the Commissioner's name requiring the attendance and giving of testimony by witnesses and the production of books, papers and other evidence for any hearing or proceeding conducted under this Section. Service of such subpoena(s), enforcement of obedience thereto, and punishment for disobedience thereof, shall be had as and in the manner provided by the Civil Practice Law and Rules relating to the enforcement of any subpoena. It shall be the responsibility of the party requesting the issuance of a subpoena to effect service thereof.

vi. On the return day of the hearing, the hearing officer shall note the appearances of the persons attending the hearing. Witnesses shall be sworn and testimony shall be recorded either by a certain stenographer or by use of an electronic recording device.

14

COW-00000912

TUESDAY NOVEMBER 15, 2005          4655

vii. Testimony shall be transcribed upon the request of any interested party. The party requesting the transcript shall pay the costs and expenses in connection therewith.

viii. The hearing officer shall not be bound by the strict rules of evidence in the conduct of a hearing, but the determination shall be founded upon sufficient legal evidence to sustain it.

ix. After the conclusion of a formal hearing, the hearing officer shall prepare and issue findings of fact, conclusions and recommendation(s) to the Commissioner.

c.   Decision by Commissioner

i.   Upon the conclusion of a formal hearing and after receipt of the hearing officer's report and recommendation(s), the Commissioner shall make a decision based on such findings, determinations and recommendations as he or she deems proper, and shall execute an order carrying such decision into effect.

ii.  The Commissioner may direct a rehearing or require the taking of additional evidence and may rescind or affirm, in whole or in part, a prior determination after such hearing.

iii. The Commissioner shall cause to be served upon the Airline, copies of findings of fact, conclusions and recommendations and orders made as a result of a formal hearing.

d.   Service by County.   Service of findings of fact, conclusions and recommendations, and orders, shall be made by hand or by overnight delivery to the designated representative of the Airline.

e.   Hearing Cost.   The cost of the hearing process (including but not limited to the fees for the hearing officer, transcription and other clerical costs, and the cost of providing witnesses but excluding any salaries of County employees) shall be borne equally by all Airlines who are parties to the hearing.

f.   Injunctions. The County may maintain actions in any court of competent jurisdiction to restrain by injunction any attempted use of the Terminal or Terminal Ramp by any Airline without current, valid Ramp Allocations or Passenger Allocations or any attempted Passenger Service in violation of this Section.

15

COW-00000913

TUESDAY NOVEMBER 15, 2005                4656



7. **Limited Qualified Airlines.**

a. **Applicability.** A Limited Qualified Airline may use the Terminal for an operation subject to the requirements of this Subsection.

b. **Operations.** The Commissioner shall approve each operation by a Limited Qualified Airline so long as he has determined that there is adequate Terminal and Terminal Ramp space available for such operation and either of the following conditions exists:

   i.   The Limited Qualified Airline has executed an agreement with a Qualified Airline for the use of the Qualified Airline's Ramp Allocation and the operation would not result in the use of the Terminal in excess of the limits set forth in Subsection 4 of this Section; or

   ii.  The Limited Qualified Airline provides the County with at least seven days' notice that it intends to conduct a simple operation for which there is an available Ramp Allocation.

Limited Qualified Airlines shall comply with the applicable provisions of Subsections 3, 4, and 5(d) of this Section. Each approval by the Commissioner under this Subsection 7 shall constitute a one-time Ramp Allocation for purposes of Subsections 3(b) and 3(c) of this Section.

c. **Reporting.** An Airline shall provide the Commissioner with a report, on a form provided by the Commissioner, regarding any Passenger Service operation authorized pursuant to Subsection 7(b). The County may, at any time, audit passenger ticket lifts and/or other appropriate passenger documents of any Airline to determine actual passenger enplanements or deplanements.

d. **Effect of Noncompliance.** The Commissioner may terminate any Airline's authority to use the Terminal and to receive Ground Handling services for 90 days upon a finding that the Airline has failed to comply with the requirements of this Subsection 7.

e. **Hearings.** Any Airline that disputes a decision by the Commissioner pursuant to Subsection 7(d) is entitled to seek a hearing and reconsideration of the Commissioner's decision. Such hearing and reconsideration shall substantially follow the process outlined in Subsection 6.

f. **Effect on Qualified Airline Reporting.** Use of Ramp Allocations by a Limited Qualified Airline pursuant to this Subsection shall not affect the calculations under Subsections 5(a) or 5(b).

**Section 2.** This Local Law shall take effect sixty (60) days from its enactment.

16

TUESDAY NOVEMBER 15, 2005          4657

# FISCAL IMPACT STATEMENT

SUBJECT: <u>Airport TUR Amendments</u>   ☒ NO FISCAL IMPACT PROJECTED

## OPERATING BUDGET IMPACT
(To be completed by operating department and reviewed by Budget Department)

A) ☐ GENERAL FUND     ☒ AIRPORT     ☐ SPECIAL REVENUE FUND (Districts)

B) EXPENSES AND REVENUES

**Total Current Year Cost**   $ <u>0</u>

**Total Current Year Revenue**  $ <u>0</u>

**Source of Funds** (check one):   ☐ Current Appropriations
☐ Transfer of Existing Appropriations   ☐ Additional Appropriations   ☐ Other (explain)

**Identify Accounts:** _____

_____

**Potential Related Operating Budget Expenses:**     Annual Amount  $ <u>0</u>

Describe: _____

_____

_____

_____

**Potential Related Revenues:**   Annual Amount  $ <u>0</u>

Describe: _____

_____

_____

**Anticipated Savings to County and/or Impact on Department Operations:**

Current Year:   <u>0</u>

_____

_____

Next Four years: <u>0</u>

_____

_____

_____

Prepared by: <u>Heny J. Stanton</u>                    Reviewed By: _____

Title:    <u>Deputy Commissioner</u>                        Budget Director

Department: <u>Transportation</u>

If you need more space, please attach additional sheets.

COW-00000915

# Exhibit E
# Resolution No. 58-1985

186                           MONDAY, MARCH 4, 1985

RESOLUTION 57 - 1985

RESOLVED, by the County Board of Legislators of the County of Westchester, that Local Records Disposition Request List No. 235-G-5 and Records Retention and Disposition Schedule No. 25-CPO-1 issued pursuant to Section 65-b of the Public Officers Law and Part 185, Title 8 of the Official Compilation of Codes, Rules and Regulations of the State of New York and containing legal minimum retention periods for records, is hereby adopted for use by the Westchester County Planning Commissioner; and is further

RESOLVED, that the Westchester County Board of Legislators hereby authorizes the disposition of records by the Department of Planning in accordance with the legal minimum retention periods set forth in Local Records Disposition Request List No. 235-G-5 Item Numbers 48, 26, 127, 59, 153, 128; and be it further

RESOLVED, that the Westchester County Board of Legislators hereby authorizes the disposition of records by the Department of Planning in Accordance with the legal minimum retention periods as set forth in Records Retention and Disposition Schedule No. 25-CPO-1; and be it further

RESOLVED, that the Clerk of the Westchester County Board of Legislators shall furnish a certified copy of this Resolution to County Commissioner of Planning for transmittal to the New York State Comissioner of Education.

RESOLUTION 58 - 1985: COMMITTEE ON BUDGET & APPROPRIATIONS: LEGISLATION REGARDING THE SETTLEMENT OF THE "MIDWAY CASE": AUTHORIZING STIPULATIONS, SETTLEMENT AND DISMISSAL.

Mr. Spano presented the following resolution and moved its adoption, which was declared adopted by the following vote:

AYE - Legislators: Hand, Galef, Albanese, Carey, Davis, DeMarco, Feiner, Mazzard, Hochberg, Keane, Pierro, Spano, Tenore, Chairman - 14.

NAY - None.
(Mr. O'Leary was not present when the vote was taken.)

RESOLUTION NO. 58 - 1985

WHEREAS, in December, 1983, the County Board of Legislators undertook the establishment of a Statement of Policy concerning the future operation, use and development of the Westchester County Airport, which Statement was to have included a determination of the Airport Terminal's capacity to handle airline traffic and which Statement was also to have established an Airline Access Policy, and

WHEREAS, pending the research, preparation and passage of the aforesaid Policy Statement and the determination of the Airport's ability to accomodate airlines, the County temporarily withheld the final processing of then pending applications by airlines seeking access to the Airport, and

WHEREAS, Midway Airlines, Inc. brought a legal proceeding against the County in the United States District Court for the Southern District of New York seeking to force the County to grant it immediate access to the Airport, and

WHEREAS, on April 19, 1984 Midway's Motion for preliminary injunctive relief against the County was denied by the Honorable Edward Weinfeld, U.S.D.J., S.D.N.Y. in a decision in which the County was granted an opportunity to determine the terminal's capacity and to develop and promulgate a mechanism for the allocation of the Airport's terminal and related ramp capacity to airlines seeking to serve the Airport, and

COW-00000809

ANNUAL SESSION                                                         167

WHEREAS, on June 4, 1984, the County Board of Legislators passed Resolution 93/1984 in which it determined the capacity of the resources at the Airport available for the handling of airlines and in which it promulgated an Access Plan for airlines seeking to serve the Airport, and

WHEREAS, subsequent to the passage of said Resolution, the United States, Midway Airlines, the Regional Airline Association and the thirty four other airline parties to the aforesaid lawsuit announced their intention to challenge the County's assertion of its rights as Airport proprietor, to challenge the County's right to establish an airline access mechanism and to challenge the particular access mechanism promulgated by the County, and

WHEREAS, the County made it clear and emphatic that it intended to establish its rights as Airport proprietor, including its right to establish a mechanism to allocate access to airlines, and that it would, if necessary, avail itself of all available judicial options and opportunities to vindicate and establish those rights, and

WHEREAS, the County also made it clear, including in Resolution 93/1984, that it sought input from those affected to insure that the County's ultimate Airline Access Plan not only recognized all County rights but also, to the extent possible, dealt with the legitimate operational needs and concerns of the industry, and

WHEREAS, the parties to the aforesaid lawsuit thereafter sought an opportunity to suspend pre-trial proceedings and to confer with the County concerning a possible settlement of the lawsuit, which discussions led to a period of intensive negotiations between and among the parties, and

WHEREAS, as a result of those negotiations a proposed Stipulation of Partial Settlement and Dismissal has been prepared which would:

A. Recognize the role of Westchester County Airport as primarily serving general aviation and corporate aviation, now and for the foreseeable future, and of having only a limited commercial service function.

B. Recognize the fact that the Airport is limited in its ability to accomodate airline traffic and establish a finite number on that limit in terms of passengers per half hour and in terms of ramp positions available for airlines.

C. Recognize the fact that the County, as owner of the Airport, has the right to control the development and enhancement of the Airport by determining what facilities, if any, should be constructed or upgraded.

D. Recognize the fact that the County, as Airport proprietor, has the right to establish an airline access plan.

E. Modify the Airline Access Plan originally promulgated by the County Board, so as to alleviate certain items which caused operational and other difficulties for the plaintiff parties, but which modifications in no way adversely affect any County interest or compromise any County right. Essentially the modifications involve the grandfathering of incumbents, switching from an auction to a Lottery and the revision of related technical provisions.

F. Result in the Dismissal of the aforesaid lawsuit entitled Midway Airlines, Inc., et. al. -v- The County of Westchester et. al., and

WHEREAS, the County Board of Legislators has been advised by Special Counsel to the County Attorney that the proposed Stipulation of Partial Settlement and Dismissal, and a forthcoming Stipulation of Partial Dismissal provide the County all that might be expected to be achieved by way of a trial of the lawsuit, and, in significant respects, more than might be achieved by such a trial even in the event

COW-00000810

188                    MONDAY, MARCH 4, 1985

the County were fully successful in Court, and that the Stipulations would accomplish this result without the risks and costs attendant to such a trial, NOW THEREFORE BE IT

RESOLVED, that the County Attorney and Special Counsel to the County Attorney are hereby authorized to:

1. Enter into the annexed Stipulation of Partial Settlement and Dismissal and to enter into a separate Stipulation of Partial Dismissal, without prejudice, with those parties not signatory in the annexed Stipulation of Partial Settlement and Dismissal, it being agreed that all parties to the suit shall enter into one or the other of the two said Stipulations before either shall be deemed effective or submitted to the Court.

2. Make such technical, non-substantive, changes and corrections to the proposed Stipulations as may be required.

3. Take all such steps and execute all such documents in the United States District Court for the Southern District of New York as may be necessary or appropriate to carry out the purposes and intent of this Resolution.

Dated: February 28, 1985
White Plains, New York

                              Leonard N. Spano
                              Edward J. Brady
                              Sandra R. Galef
                              John E. Hand
                              Diane A. Keane
                              Ernest D. Davis

            COMMITTEE ON BUDGET AND APPROPRIATIONS

              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK

              MIDWAY AIRLINES, INC.

                                        Plaintiff,

UNITED STATES OF AMERICA, ELIZABETH HANFORD DOLE, Secretary of Transportation, DONALD D. ENGEN, Administrator of the Federal Aviation Administration, NEW YORK AIRLINES, INC. (d/b/a NEW YORK AIR), REGIONAL AIRLINE ASSOCIATION ANA LIMITED (d/b/a BROCKWAY AIR), ATLANTIC AIR INC (d/b/a BUSINESS EXPRESS), CLINTON AERO CORP. (d/b/a BROCKWAY AIR), COLGAN AIRWAYS CORPORATION, COMMAND AIRWAYS, INC., EMPIRE AIRLINES, INC., MALL AIRWAYS INC., PRECISION AIRLINES, INC., RANSOME AIRLINES, INC., AIR ONE, INC., ALASKA AIRLINES, INC., ALOHA AIRLINES, INC., BEST AIRLINES, INC., BRANIFF, INC., CAPITAL AIR, INC., CONTINENTAL AIRLINES, INC., DELTA AIR LINES, INC., EASTERN AIR LINES, INC., EVERGREEN INTERNATIONAL AIRLINES, INC., FEDERAL EXPRESS CORPOATION, FRONTIER AIRLINES, INC., HAWAIIAN AIRLINES, INC., JET AMERICA AIRLINES, INC., MUSE AIR CORPORATION, OZARK AIR LINES, INC., TRANS WORLD AIRLINES, INC., USAIR INC., UNITED PARCEL SERVICE, INC., WESTERN AIR LINES, INC., WIEN AIR ALASKA, INC. and SOUTHWEST AIRLINES CO.,

                                        Plaintiffs-Intervenors

COW-00000811

ANNUAL SESSION 189

-against-

COUNTY OF WESTCHESTER, NEW YORK, ANDREW P. O'ROURKE, County
Executive, and WESTCHESTER COUNTY BOARD OF LEGISLATORS,

Defendants,

NATIONAL BUSINESS AIRCRAFT ASSOCIATION,

Defendant-Intervenor.

84 Civ. 2229 (EW)

STIPULATION AND ORDER OF PARTIAL SETTLEMENT AND DISMISSAL

WHEREAS, on April 19, 1984, the Honorable Edward Weinfeld, U.S.D.J.,
S.D.N.Y., issued an order denying plaintiff Midway's application for preliminary
injunctive relief but directing that the County promulgate a plan for the allocation
of access to Westchester County Airport (hereinafter "Airport" or "H.P.N.") to
and among airlines conducting operations pursuant to Part 121 of the Federal Avi-
ation Regulations; and,

WHEREAS, on June 6, 1984, in response to the aforesaid Order, the County Board
of Legislators issued Resolution #65/1984, which resolution established an alloca-
tion mechanism to be applied to all airlines seeking to conduct operations at the
said airport; and,

WHEREAS, the Parties who have signed this stipulation have discussed the is-
sues pending before the Court with a view towards achieving an accommodation
and settlement of the action; and

WHEREAS, the parties are entering into this settlement agreement for the sole
purpose of settling the litigation entitled Midway Airlines, et al. v. County of West-
chester, et al.; and

WHEREAS, the United States of America, Elizabeth Hanford Dole, Secretary
of Transportation, and Donald D. Engen, Administrator of the Federal Aviation Ad-
ministration (collectively the "Federal Plaintiff-Intervenors") are charged with
the duty of administering and enforcing the laws of the United States, as they may
be enacted, adopted and amended from time to time; and

WHEREAS, the parties acknowledge the duties of the Federal Plaintiff-
Intervenors and agree that nothing herein is intended or shall be construed to limit
the authority or ability of the United States of America or of any of its officers or
agencies to administer and enforce the laws of the United States, as they may be
enacted, adopted or amended from time to time, or to enact or adopt or amend any
law otherwise within their authority; and

WHEREAS, in entering into the following stipulation the parties have particu-
larly considered those operational and other factors applicable to Westchester County
Airport, which factors may or may not be applicable to any other airport, and agree
that this stipulation is site specific to Westchester County Airport and shall not be
deemed as having any applicability to any other airport or aviation allocation cir-
cumstance; and,

WHEREAS, with respect to the allocation mechanism set forth herein the Par-
ties signatory hereto acknowledge that while other mechanisms might also be suit-

190                    MONDAY, MARCH 4, 1985

able for H.P.N. or elsewhere, the mechanism set forth has been agreed upon on the basis of discussion and negotiation; accordingly, therefore, it is hereby,

STIPULATED AND AGREED, by and among the parties signatory hereto, as follows:

1. The County and the United States agree that the Westchester County Airport, (hereinafter "Airport" or "H.P.N.") is a public use airport serving general aviation and commercial service aviation needs within a service area comprised primarily of Westchester County and nearby adjoining areas. They further agree that the Airport's principal function at present and in the foreseeable future is one of accommodating general aviation with an emphasis on business use; by comparison its commercial service function is relatively modest.

2. The County and United States agree that the nature and extent of facilities at the Airport are reasonably consistent with its current use. They further agree that determinations concerning new or enhanced facilities, if any, will be made by the County on the basis of the Airport's aforestated role, with due consideration for the concerns and the needs of those who might be affected, and in accordance with an airport layout plan.

3. The capacity of the existing terminal at H.P.N. has been reviewed by the County and the United States, to determine its ability to handle the processing of airlines passengers. It is agreed that the normal operating capacity of the existing terminal will be 240 passengers per half hour, assuming an almost even division between arriving (deplaning) and departing (enplaning) passengers and assuming an almost uniform flow of passengers throughout the period.

4. The County has developed the mechanisms herein to allocate the Airport's terminal capacity among scheduled airlines presently serving H.P.N. and those scheduled airlines expressing a desire to provide such service according to the following criteria:

A. It should provide some recognition for incumbents and for the time, effort and expense that many incumbent airlines have expended in establishing markets and serving the public at H.P.N.

B. It should be definitive, predictable and of sufficient duration so as to permit rational planning by prospective users and the County alike.

C. It should provide a reasonable opportunity for prospective new entrants and for incumbents seeking additional capacity, consistent with the limits of both the terminal's capacity and Airport's technical specifications necessary to comply with Federal Aviation Regulations and the Airport's physical limitations. (A copy of the County's current Technical Specifications for the Airport is appended hereto.)

D. It should provide for a periodic review to insure that airlines do not overutilize their allocations and to re-allocate unused capacity to scheduled airlines having a need for it.

5. In order to reasonably and equitably allocate the Airport's terminal and ramp capacity, consistent with the above criteria, it is agreed that the County will amend Resolution 95/1984 in conformity with the following provisions.

A. Any airline which conducted scheduled operations at the Airport during the months of November and/or December, 1984, and which did so pursuant to an Operating Agreement with the County or an extension thereof, shall be defined as an Incumbent Airline for the purposes of this Stipulation.

COW-00000813

ANNUAL SESSION                                                      161

B. An Incumbent Airline may, for the term set forth in Paragraph 5L below and subject to the conditions set forth below, continue to operate the schedule of flights it operated during the months of November and/or December, 1984. For these purposes the schedule of flights shall only refer to flight times and frequencies and shall not refer to city pairs.

C. Each Incumbent Airline shall be assigned an Incumbent Allocation for each such flight, which allocation shall be equal to the average number of passengers actually enplaned and deplaned, on a per flight basis, for the period July 1, 1984 through December 31, 1984, for the days each such flight was actually flown. If any flight was operated for only a portion of such period, the allocation shall be such average passenger load for the period of service or thirty percent of the passenger capacity of the aircraft regularly scheduled to be utilized on such flight, whichever is greater.

D. In addition to the provisions of Par. 5B and 5C, Atlantic Air shall be granted a seasonable Incumbent Allocation with respect to its seasonal service during the period of May through October, based on its average actual passenger load, enplaned and deplaned, for that period during 1984. Midway Airlines shall be granted Incumbency with respect to its revised, six operations per day, schedule in effect on February 15, 1985.

E. After establishing Incumbent Airline Allocations the County shall establish a list of available terminal and ramp capacities, on a half-hourly basis, by subtracting the Incumbent Allocations and ramp use for each half hour from the total capacity set forth in Paragraph 3 above and the ramp capacity set forth in the annexed Technical Specifications. The County shall disseminate such list on February 28, 1985. By the last business day of every third month thereafter the County shall determine then available terminal and ramp capacity by subtracting all Incumbent and all other Allocations from total capacity and shall make such determinations available to interested airlines. By no later than March 15, 1985 and the 15th day of each third month thereafter, any scheduled airline seeking an allocation of such available capacity shall submit a request to the County on forms provided or approved by the County. On March 29, 1985 and on the last business day of each third month thereafter, the County shall allocate available capacity as follows:

i. In all half hour periods in which sufficient terminal and ramp capacity is available to meet the requests of all qualified airlines, such requested capacity shall be allocated directly to such airlines. A qualified airline shall be any scheduled airline which shall, at the time the application is made, hold a valid operating certificate and scheduled operation specifications from the Federal Aviation Administration and a fitness determination from the United States Department of Transportation for the type of service to be provided and who shall also have, or have immediate and demonstrable access to, sufficient aircraft and operating personnel to provide the requested service and who shall furnish a certification of financial responsibility and requisite insurance.

ii. For all other time periods, the allocation shall be by means of the Lottery mechanism set forth in Paragraph 7 below.

F. Routing, selection of aircraft and the like shall be the determination of the airline. All airlines operating at H.P.N. shall at all times be in compliance with all applicable and lawful airport rules and regulations including the Technical Specifications referenced above, with the applicable Operating Agreements and with this Stipulation. No such rule, regulation or Technical Specification will be amended to decrease the capacity of the Airport. Any airline violating or causing the violation of such rules, regulations or said Technical Specifications shall cure such violation

COW-00000814

192                    MONDAY, MARCH 4, 1985

within fifteen (15) days of being so notified by the County. Failure to so cure shall result in the cancellation of the appropriate flight or flights upon fifteen (15) days' written notice by the County. An airline obtaining an Allocation, by whatever means, should, in so far as practicable, utilize the allocation in such a manner that there shall be a relatively even distribution of passengers enplaned and deplaned and a relatively uniform flow of passengers through each half-hourly period.

G.  In the event that during any three month period an airline has not actually utilized 85% of its total allocation on any flight, based on its average loads for the period, then its allocation for the next three month period shall be reduced to 115% of such average loads. The review made pursuant to this paragraph shall be made for successive, and not for overlapping, three month periods.

H.  If at any time an airline's calender month average load on any flight(s) should exceed its Allocation(s), but if at such time there exists allocable capacity in such half hour time period(s), whether by means of the application of Paragraph 5G hereof to another airline, or otherwise, the such airline's allocation shall be adjusted to such average load figure or such portion thereof as the allocable capacity may allow. If, at any time an airline's calendar month average load on any flight(s) should exceed such airline's Allocation(s) for such flight(s), and if at such time there is no additional capacity during such time period which may be allocated to such airline for such purpose, then the County shall issue a written notice of violation to such airline, and the airline shall, within fifteen days from the receipt of such notice, reduce its usage to comply with its Allocation(s) or, if possible, obtain sufficient Allocations to cover its actual average usage. Should any airline fail to comply with the allocation limits within such fifteen day period then:

i.  On the sixteenth day following the receipt of the above set forth notice, such airline's then current Allocation(s) with respect to such flight(s) shall be REDUCED by an amount equal to the amount that the airline's average load for the thirty days preceding such notice exceeded the airline's Allocation(s) for such flight(s). The airline shall thereupon be required to comply with the new reduced Allocation; and

ii.  The Airline shall also lose the privilege of participating, either directly or by assignment, in the next periodic allocation of access privileges.

iii.  Should such airline not achieve compliance with its new, reduced Allocation within the next calendar month after such revised Allocation is established, on the basis of calendar month average load figures, then, in such event, the County may terminate such airline's privilege to thereafter conduct such flight(s) by providing such airline with twenty days' written notice of such termination.

I.  For purposes of determining whether an airline is over utilizing its Allocation(s) under Paragraph 5H the County shall employ a calendar month average. For the purposes of determining whether an Airline should have its allocation adjusted pursuant to Paragraph 5G the County shall employ a three-month average. In calculating such averages the denominator shall be the number of such operations actually flown during that calendar month period and the numerator shall be the number of passengers enplaned and deplaned on all such operations during that period. In calculating such averages, the County shall not include, either in the numerator or the denominator, data concerning flights flown during the following holiday periods:

i.  Christmas/New Years from December 20 through January 5.

ANNUAL SESSION                                                     193

ii. The President's Birthday holiday from three (3) days before Washington's Birthday through three (3) days following Washington's Birthday.

iii. Easter from five (5) days prior to Easter through the fifth day following Easter.

iv. Memorial Day from three (3) days before Memorial Day through three (3) days after Memorial Day.

v. July 4, from July 1 through July 7.

vi. Labor Day, from three (3) days prior to Labor Day through (3) days after Labor Day.

vii. Thanksgiving from five (5) days prior to Thanksgiving through five (5) days after Thanksgiving.

J. Airlines operating at H.P.N. shall certify actual passenger loads, on a per flight, per day, enplaned, deplaned, basis to the County weekly by the following Thursday for the preceeding calendar week, Monday through Sunday.

K. All airlines obtaining allocations at H.P.N. must initiate service within 60 days from the date of such award and must provide such service on at least a five day per week basis, with aircraft capable of utilizing the entire Allocation, or must arrange with another airline or airlines to provide a combined service utilizing such Allocation, on at least a five day per week basis. Should any airline fail to initiate service within such sixty (60) day period, such airline shall, on the sixty-first day, lose such Allocation and such airline shall also lose the privilege of participating, either directly or by assignment, in the next periodic allocation of access privileges. Notwithstanding the foregoing, any airline may, within ten (10) days of any periodic allocation, surrender any Allocation(s) or portions thereof obtained in such periodic allocation to the County without any penalty.

L. Incumbent Scheduled Airlines may, subject to the terms and conditions hereof and of the applicable Operating Permits, continue to operate the flights and seasonal flights described in Paragraphs 5A, B and D hereof until April 30, 1988 and their Operating Agreements shall be amended in conformity with this Stipulation. Additional airlines securing access pursuant to this allocation mechanism shall be granted operating privileges, pursuant to the County's standard form Operating Agreement and the provisions hereof, until April 30, 1988. On or before December 31, 1987 the parties hereto, and non-party airlines then conducting operatings at H.P.N., shall attempt to agree, as set forth next below, on the basis of the experience by then acquired in allocating resources to airlines at H.P.N. and consistent with the criteria set forth in Paragraph 4 hereof, on any changes to the procedures and mechanisms to be implemented on and after May 1, 1988. For the purpose of this paragraph, it shall be deemed that an agreement has been reached if the County, the United States and a majority of the remaining parties to this stipulation and other airlines then conducting operations at H.P.N. shall be in accord, but in no other event. In the event the foregoing are not able to achieve such agreement by December 31, 1987 then the allocation mechanisms set forth herein shall be renewed for a two-year period commencing May 1, 1988. The parties and the scheduled airlines than operating at the Airport may then, by an agreement as defined above, modify this Stipulation on or before December 31, 1989, such modifications, if any, shall become effective on May 1, 1990. In the event no such agreement as defined above is reached on or before 1989 the Stipulation and Order shall terminate on April 30, 1990. Should this Stipulation and Order be so terminated, the County shall then be free to implement such allocation mechanism and such procedures as it may then deem appropriate

COW-00000816

194                          MONDAY, MARCH 4, 1985

and the other parties hereto shall have the right to interpose such opposition or make such legal challenge to such mechanisms and procedures, if any, as they or any of them may deem necessary and proper, the dismissal of the action herein with prejudice notwithstanding. During any renewal period the County shall continue to make reviews and readjustments consistent with Paragraphs 5G, H, I, J, & K and Paragraph 6 hereof unless this Stipulation be otherwise modified.

6. The Airline parties and the County agree that, subsequent to the date of the first allocation set forth in Paragraph 5E, and in addition to the Incumbent Airline Allocations and the Allocations established pursuant to Paragraphs 5E (i) & (ii), airlines may, upon two (2) weeks prior written notice to the County, exchange Allocations with other airlines provided such transferor airline(s) has operated flight(s) under such allocation(s), employing aircraft capable of utilizing the entire allocation(s), for thirty (30) days on at least a 5-day per week basis. Additionally, subsequent to the date of such first allocation, airlines may move their Allocations from one time period into another time period. Notwithstanding the foregoing, no such exchanged or moved allocations shall be allowed which would result in allocations and ramp use in excess of capacity for any half-hour time period.

7. The Lottery mechanism to be utilized, in the event required pursuant to Paragraph 5E ii, shall be as follows:

A. The County shall, by no later than seven days prior to each periodic allocation, publish a list of those half hourly time periods in which a Lottery must be employed pursuant to the requirements of Paragraph 5.E.ii hereof, together with a list of the qualified applicant airlines eligible to participate in the lottery for such half hourly allocations.

B. On the date fixed for each such periodic allocation the County shall conduct the Lottery for the subject half hourly periods.

C. At the commencement of the Lottery all qualified airlines, by their designated representatives there present, shall draw numbers to establish their order of selection in the first round of the Lottery. Upon such establishment each scheduled airline, in its order of selection, may, consistent with its application and up to the available terminal and/or ramp capacity, whichever may first be reached, draw an Allocation for up to a total of four operations to take place in up to four half-hourly periods. Notwithstanding the sentence next above, in the first round of the first Lottery to be conducted pursuant to this Stipulation, Midway Airlines shall only draw an allocation for up to two operations based on its order of selection, but may draw all allocation for up to two additional operations after all other airlines have drawn allocations in such first round of the first Lottery. An operation shall be either an arrival or a departure. At the conclusion of the first round of the Lottery, should any terminal and/or ramp capacity remain in any half hourly periods the process shall be repeated, with the same order of selection, for such number of additional rounds as may be required. To enable the County to determine the effect of any Allocation, whether by means of the Lottery or otherwise, on ramp capacity, each airline submitting an application shall designate, on the aforesaid forms to be provided or approved by the County, the type and number of aircraft to be utilized in each half hourly time period for the allocation being sought.

8. It is agreed that the provisions of this Stipulation shall be modified from time to time as may become necessary to comply with applicable federal law.

9. In consideration of the commitments of the County contained herein, the other parties signing this Stipulation shall discontinue, with prejudice the captioned actions on the date this Stipulation is implemented by the County by amending Resolution 95/1984 as provided in Paragraph 5 hereof, each party to bear its own costs and expenses.

COW-00000817

ANNUAL SESSION                                                                 195

10.  To aid the County in the implementation of this Stipulation, the parties agree
to establish a Task Force which shall meet with a representative of the County, on
a monthly basis, or as needed, to provide advisory input concerning procedures and
practices relating to the aforesaid airline access and allocation mechanism.

11.  This Stipulation shall be enforceable by an action for specific performance
in the United States District Court for the Southern District of New York. Further,
any party may, for good cause shown and upon a demonstration of changed under-
lying circumstances, apply to this Court for such modification of, or relief from,
this Stipulation as the Court may deem just and proper.

Dated: February   , 1985
       New York, New York

                          Ginsburg, Feldman and Bress
                          1700 Pennsylvania Avenue, N.W.
                          Washington, DC 20006
                          202-637-9000

                          By: _____
                                    Of Counsel

                          Attorneys for:
                          MIDWAY AIRLINES, INC.

                          Rudolph W. Guiliani
                          United States District Attorney, Southern District of
                              New York
                          One Saint Andrews Plaza
                          New York, NY 10007
                          202-791-1959

                          By: _____
                                    Of Counsel

                          Attorney for:
                          THE UNITED STATES, ELIZABETH HANFORD
                          DOLE, Secretary of Transportation, DONALD D.
                          ENGEN, Administrator of The Federal Aviation
                          Administration.

                          Hughes Hubbard & Reed
                          1201 Pennsylvania Avenue, N.W.
                          Washington, DC 20004
                          202-526-6200

                          By: _____
                                    Of Counsel

                          Attorneys for:
                          NEW YORK AIRLINES, INC. (d/b/a NEW YORK
                          AIR)

196                    MONDAY, MARCH 4, 1965

Crowell & Moring
1100 Connecticut Avenue, N.W.
Washington, DC 20036
202-452-5871

By: _____
        Of Counsel

Attorneys for:
REGIONAL AIRLINE ASSOCIATION, ANA
LIMITED (d/b/a BROCKWAY AIR), ATLANTIC
AIR INC (d/b/a BUSINESS EXPRESS), CLINTON
AERO CORP. (d/b/a BROCKWAY AIR), COLGAN
AIRWAYS CORPORATION, COMMAND AIRWAYS.
INC., EMPIRE AIRLINES, INC., MALL AIRWAYS
INC., PRECISION AIRLINES, INC., RANSOME
AIRLINES, INC.

Joseph, Powell, McDermott & Reiner, P.C.
Suite 400
1300 Nineteenth Street, N.W.
Washington, DC 20036
202-331-1955

By: _____
        Of Counsel

Attorneys for:
NATIONAL BUSINESS AIRCRAFT ASSOCIATION

Wilner and Scheiner
1200 New Hampshire Avenue
Suite 300
Washington, DC 20036
202-861-7800

By:
        Of Counsel

Attorneys for:

SOUTHWEST AIRLINES CO.

Henry J. Logan
Westchester County Attorney
County Office Building
148 Martine Avenue
White Plains, NY 10601
914-285-2690

COW-00000819

ANNUAL SESSION                                                      197

By:  Samuel S. Yasgur
Hall, Dickler, Lawler, Kent & Friedman
1 North Broadway
White Plains, NY 10601
914-428-3232

_____
              Of Counsel

Attorney for:

COUNTY OF WESTCHESTER, NEW YORK
Andrew P. O'Rourke, County Executive
WESTCHESTER COUNTY BOARD OF
    LEGISLATORS

SO ORDERED:

_____
      EDWARD WEINFELD
   United States District Judge
   Southern District, New York

TECHNICAL SPECIFICATIONS FOR AIRLINES AT H.P.N.:

I. Aircraft Parking Apron Limits.

    A.  Aircraft, with a wingspan of greater than 75 feet, must be able to maneuver
into and out of the designated parking areas within a maximum 112 feet wide di-
ameter circle.

    B.  Aircraft, with a wingspan of less than or equal to 75 feet, must be able to
maneuver into and out of the designated parking areas within a maximum 108 feet
wide diameter circle.

    C.  No more than two aircraft, with wingspans greater than 75 feet operating
within the above parameters, may be scheduled to occupy the ramp simultaneously.

    D.  A maximum of four aircraft may be scheduled to use the ramp at any given
time provided that no more than two airplanes have a wingspan of greater than
75 feet. However, operators must note that H.P.N. does not have any suitable space
to stack aircraft that may be waiting to get to the ramp without interrupting air-
port operations. Thus, arrivals and departures of aircraft must be scheduled so as
to avoid having aircraft stacked up waiting for access to ramp.

    E.  Due to Tower closure during hours of 2300 through 0600 and the need of oper-
ational surveillance, ramp position No. 3 (for aircraft with a wingspan in excess
of 75 feet) and ramp positions Nos. 1 and 4 (for aircraft with a wingspan under 75
feet) are not available during nighttime for R.O.N.

    F.  Subject to the use of the ramp by others who have Terminal Access Privileges
during such time periods and subject to the ramp's overall constraints, the airport
will attempt to accommodate airlines seeking to park on the ramp for limited periods,
for an R.O.N, or when scheduled arrival and departure of a particular aircraft may
be separated by another Terminal Access Period.

    G.  Whether the terminal ramp can properly accommodate scheduled opera-
tions by rotary wing aircraft has not yet been determined.

COW-00000820

198                        MONDAY, MARCH 4, 1985

II. Crash Fire Rescue Limits.

Airlines must observe the airport's Crash Fire Rescue (CFR) capability and responsibility. The airport's CFR capability is Index B as provided in Federal Air Regulations (FAR) Part 139. Thus, among other factors, aircraft length may not exceed 126 feet.

III. Runway/Taxiway Limits.

Aircraft may not exceed 120,000 lbs. maximum gross takeoff weight with dual main landing gear.

RESOLUTION 59 - 1985: COMMITTEE ON BUDGET & APPROPRIATIONS: LEGISLATION REGARDING THE SETTLEMENT OF THE "MIDWAY CASE": (A) REPEALING RESOLUTION 95 - 1984 AND (B) AUTHORIZING A REPLACEMENT MECHANISM FOR THE ALLOCATION OF THE AIRPORT'S LIMITED RESOURCES.

Mr. Spano presented the following resolution and moved its adoption, which was declared adopted by the following vote:

AYE - Legislators: Hand, Galef, Albanese, Carey, Davis, DeMarco, Feiner, Hazzard, Hochberg, Keane, Pierro, Spano, Tenore, Chairman - 14.

NAY - None.
(Mr. O'Leary was not present when the vote was taken.)

RESOLUTION NO. 59 - 1985

WHEREAS, on June 6, 1984, the County Board of Legislators adopted Resolution 95/1984 in response to a decision of the Honorable Edward Weinfeld, United States District Judge, Southern District of New York, which decision was issued on April 19, 1984 in a case entitled Midway Airlines, Inc. et. al. -v- The County of Westchester et. al., and

WHEREAS, said Resolution 95/1984 set forth the County's Policy with respect to the future use and operation of the Westchester County Airport, set forth the County's Policy concerning access to the Airport by airlines, established the Airport Terminal's capacity to accommodate airlines and adopted a mechanism for allocating said capacity among airlines seeking access, and

WHEREAS, the United States and the airline parties to the said lawsuit expressed their intention to challenge the County's assertion of rights as Airport proprietor, to challenge the ability of the County to establish a mechanism for allocating airline access and to challenge the particular mechanism adopted by the County, and

WHEREAS, the County made manifest to the parties its intention to obtain a judicial determination of its right as Airport proprietor to control and regulate the Airport, including the regulation of access to the Airport by airlines, but

WHEREAS, the County also expressed its intention to seek input from the parties to determine whether adjustments could be made to the County's access plan that would accommodate the reasonable operational concerns of the Plaintiffs while providing full recognition of the rights of the County with regard to the future use, development and operation of the Airport including the right of the County to adopt an allocation mechanism for airlines seeking to utilize the Airport's limited resources, and

COW-00000821

A-374

# Exhibit I

FAA Letter



**U.S. Department
of Transportation
Federal Aviation
Administration**

JUN  9 2004

800 Independence Ave., S.W.
Washington, D.C. 20591

Peter J. Kirsch, Esq.
Kaplan, Kirsch & Rockwell LLP
1675 Broadway, Suite 2300
Denver, CO 80202

RE:     Proposed Codification and Modification of Terminal Capacity Restrictions at
         Westchester County Airport

Dear Mr. Kirsch:

This is in response to an April 20, 2004 request from Westchester County (County) for the views of
the Office of the Chief Counsel, Federal Aviation Administration (FAA) concerning the County's
proposal to take several actions with regard to its use restrictions and limitations in effect at
Westchester County Airport (Airport).  We understand that you represent the County in this matter.
The County's restrictions include limitations on passenger throughput of the Airport terminal,
limitations on the number of gates available for scheduled commercial passenger operations, a
lottery mechanism to allocate terminal capacity and to ensure competition among commercial air
carriers, and technical specifications based upon such factors as runway weight limitations[1] and
aircraft fuselage length.

You have advised that recently it has become clear to the County that its existing Airport use
restrictions (set forth in various resolutions, policies, and agreements) were difficult to understand,
especially for Airport users.  As a result, you reported that in connection with negotiations with the
air carriers for renewal of the County's 1994 Terminal Capacity Agreement – which is set to expire
at the end of 2004 – the County believes it would be prudent to collect and codify existing legal
requirements so that all use restrictions would be more easily accessible.[2]  Specifically, the County
proposes to take the following actions: (1) codify and clarify existing legal restrictions; (2) extend
and renew the existing Airport terminal use agreement with air carriers who use the commercial
passenger terminal by entering into a new terminal use agreement; and (3) codify and modify

---

[1] In a notice published on July 1, 2003, *Weight-Based Restrictions at Airports: Proposed Policy* (68 Fed.
Reg. 39176), the FAA affirmed its policy that reasonable weight-based access restrictions at airports can be
used to protect airport pavement.  Use of weight-based restrictions for other purposes, such as noise
mitigation, would not be consistent with the airport operator's obligation to provide reasonable, not unjustly
discriminatory access to the airport.

[2] As the County notes, not all operational constraints are appropriate for codification since some of the
existing constraints are contractual or technical in nature because they affect only the business relationship
between the County and the air carriers.

COW-00009471

A-376

2

existing technical specifications and procedures for allocation of Airport capacity. According to the County, all changes will make the limitations less restrictive that those in effect today.

In this letter, we conclude that the proposed County actions are exempt from the Airport Noise and Capacity Act of 1990 (ANCA) since the actions relate to airport noise or access restrictions that were in effect on November 5, 1990 and would not "reduce or limit aircraft operations or affect aircraft safety." 49 U.S.C. § 47524(d)(4). We also advise that the FAA will not act to prevent adoption and approval of the proposed County actions under any transfer or grant agreements, and that the adoption and approval itself will not adversely affect future County grant applications under the Airport and Airway Improvement Act of 1982, as amended (AAIA), or applications to impose or collect passenger facility charges under 49 U.S.C. § 40117.

The County's March 16, 2004 submission, *Terminal Capacity Restrictions: Briefing Materials for FAA Staff*, assisted the FAA in reviewing and analyzing the County's proposed actions. The various timelines and tables of historic sources for the County's restrictions were especially helpful. The materials describe the history of the County's restrictions; the 1984 *Midway* litigation; the subsequent 1985 *Midway* stipulation; and air carrier agreement over the years with the County's terminal capacity limit, lottery system, and various technical limitations.

The material provided by the County indicates that there are currently three restrictions in effect at the Airport:

- The use of the Airport terminal is limited to 240 passengers per half-hour;
- Commercial air carriers are limited to four operations per half-hour to correspond to the four gate positions in the terminal. Two of these positions have historically been designated for aircraft with fuselages no longer than 85 feet and two for aircraft with fuselages up to 126 feet in length[3]; and
- Aircraft may not exceed 120,000 pounds maximum gross takeoff weight with dual landing gear. The County currently provides prior permission for operations up to 135,000 pounds maximum gross takeoff weight.

Passenger terminal space and terminal ramp space has been allocated through a lottery system since 1985.

The County proposes to codify, clarify, and/or modify its existing use restrictions through the adoption of three documents: (1) a new Terminal Use Agreement (TUA), which would be required to be executed by any carrier desiring to have terminal use privileges; (2) a new set of Terminal Use Procedures (TUP) which will be codified as a new Section 712.462 of the Laws of Westchester County; and (3) Technical Specifications and Procedural Requirements (TSPR) which would primarily codify existing regulations on Airport use and be promulgated by Airport management.

Through numerous consultations with air carriers and other interested stakeholders, the County

---

[3] In order to comply with airport design criteria and avoid obstructions, the County has historically limited aircraft length. The apron adjacent to the terminal is significantly constrained by the Airport fence and by obstructions outside the fence, by the proximity of the terminal and fence to active taxiways, by the need to allow space for ground handling equipment movements and by Object Free Area and similar constraints.

A-377

3

agreed to make the following changes to its existing use restrictions. As the County points out, these changes, if implemented, would have the effect of relaxing, rather than limiting, certain existing use restrictions at the Airport:

- Upon completion of pending engineering analysis, the County expects that it will be able to revise the Airport's technical specifications to accommodate commercial aircraft with longer overall fuselage length than currently allowed. The length limitations would/could be revised from the current 85 feet (for the two shorter terminal apron positions) to 107 feet, and from 126 feet (for the two longer terminal apron positions) to 130 feet. This would/could accommodate, among other aircraft, the Boeing 737-800 which exceeds current technical specifications.
- At the request of the air carriers, the County has prepared an updated analysis of its runway pavement capacity of 120,000 pounds, dual wheel. At this time, the County expects to be able to accommodate aircraft weighing up to 180,000 pounds certificated maximum gross takeoff weight on a prior-permission basis based upon forecast operations through at least 2010. The County proposes to issue a blanket prior permission to air carriers who execute the TUA to provide service consistent with their slot allocations.

At the request of the air carriers, the County has also agreed to make several changes which govern the air carriers' use of the terminal. These changes are not restrictions but instead reflect an adjustment of the business relationship between the County and the carriers. The TUA contains commitments by the County to:

- Construct jet bridges for regional jets if so requested;
- Implement a system of allocation of limited terminal building space for proprietary electronic ticket kiosks;
- Refurbish ticket and gate counter areas; and
- Utilize its best efforts to construct secure overnight parking for commercial aircraft.

The County advises that none of these changes would reduce or limit aircraft operations from the airport's current levels or affect aircraft safety.

The issues for FAA review include whether the County's proposed codification, clarifications, and modifications are in compliance with ANCA, and whether they are consistent with the County's contractual grant assurance obligations under the AAIA.

Application of the Airport Noise and Capacity Act of 1990

Under Federal law, sponsors of federally-funded airports like the County must comply with the national program for review of airport noise and access restrictions under ANCA before implementing restrictions on operations by Stage 2 and/or Stage 3 aircraft. ANCA applies to airports imposing restrictions on Stage 2 aircraft operations proposed after October 1, 1990, and to airports imposing restrictions on Stage 3 aircraft operations that became effective after October 1, 1990. 14 C.F.R. § 161.3(a). Airport noise or access restrictions proposed (Stage 2) or enacted (Stage 3) prior to these deadlines are "grandfathered" under ANCA and are therefore not subject to its requirements. 49 U.S.C. §§ 47524(b), 47524(c)(1); 14 C.F.R. § 161.3(a). In addition, certain

COW-00009473

4

restrictions are exempt from ANCA, including "a subsequent amendment[4] to an airport noise or access agreement or restriction in effect on November 5, 1990, that does not reduce or limit aircraft operations or affect aircraft safety." 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.7(b)(4).

Since Westchester County has had three restrictions in effect since 1985, the restrictions are grandfathered under ANCA. 49 U.S.C. §§ 47524(b), 47524(e)(1); 14 C.F.R. § 161.3(a). The legislative history shows that County Resolution 59-1985, which adopted the use restrictions contained in the 1985 Stipulation, has been in continuous effect since 1985. Another Resolution which adopted a new "Statement of Airport Policy" (which incorporates the terminal capacity limitation established in the Stipulation) has also been in effect since 1985. In addition, to the extent that the proposed County actions amend the two Resolutions, the actions would constitute "a subsequent amendment to an airport noise or access agreement or restriction in effect on November 5, 1990, that does not reduce or limit aircraft operations or affect aircraft safety" and are therefore exempt from ANCA and Part 161. 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.7(b)(4).

In order for the County's existing use restrictions to be grandfathered under ANCA, there must have been an airport noise or access restriction proposed (Stage 2) or enacted (Stage 3) on or before October 1, 1990. The materials submitted by the County indicate that existing use restrictions were in effect at the Airport on or before October 1, 1990. The fact that the current terminal use agreements with the air carriers expire on December 31, 2004, does not affect the grandfathered status of the underlying use restrictions under ANCA.

According to the County, the first expression of its policies concerning use of the terminal occurred in 1980 when a consultant completed a Master Plan Study Phase II Report which determined, among other things, that the practical hourly capacity of the Airport was between 60 and 125 aircraft operations per hour, depending upon weather conditions, and that the Airport was currently operating at a level equal to its practical annual capacity. At the end of 1983, seven Part 121 air carriers and ten commuter air carriers expressed an interest in initiating new service at the Airport. Accordingly, in January 1984, the County hired a consultant to develop a comprehensive airport access plan and began to defer decisions on pending applications for commercial access until completion of the study and promulgation of rules.

The County's February 1984 deferral of Midway Airlines' application for access became the subject of litigation in March 1984 when Midway sued the County seeking injunctive relief to allow immediate access to the Airport.[5] While the Federal court denied Midway's motion for injunctive relief, it ordered the County to conclude its study within 30 days and "promulgate rational and nondiscriminatory rules governing the allocation of ground facilities ..." within 20 days thereafter. *Midway*, 584 F. Supp. at 441.

---

[4] Although the plain language of §47524(d)(4) states "a" subsequent amendment (and thus could be read to authorize only one amendment per airport), we interpret "a" to mean "any." *See Black's Law Dictionary* 1 (6th ed. 1999), "[t]he word "a" has varying meanings and uses. "A" means "one" or "any ...."

[5] *Midway Airlines, Inc. v. County of Westchester*, 584 F. Supp. 436 (S.D.N.Y. 1984).

COW-00009474

5

The court's order resulted in the County's first formal limitation on the use of the Airport. On June 6, 1984, the County Board of Legislators approved Resolution 95-1984[6] which adopted numerous findings (*e.g.*, that the existing terminal facility was utilized far beyond reasonable and safe levels during the peak hours of usage, and that terminal's reasonable passenger capacity was about 80 passengers per quarter-hour) and promulgated an auction mechanism to allocate available space to the air carriers. The Resolution specified that both the capacity and the allocation provisions were adopted on an interim basis, pending adoption of a final airport policy statement. Resolution 95-1984 was forwarded to the Federal district court judge on June 7, 1984.

In October 1984, 22 intervenor air carriers in the *Midway* litigation filed a complaint alleging the interim rules (*i.e.*, Resolution 95-1984) violated Federal law. In February 1985, the County, the FAA, the National Business Aviation Association, and 13 air carriers entered into a *Stipulation and Order of Partial Settlement and Dismissal*. The parties agreed that the Airport's principal function "at present and in the foreseeable future" was one of "accommodating general aviation with an emphasis on business use; by comparison its commercial service function is relatively modest." Settlement Agreement at 4. The Stipulation set forth the following restrictions on the use of the Airport:

- Passenger throughput was to be limited to 240 passengers per half-hour;
- Passenger capacity was to be allocated through a slot-lottery mechanism;
- Apron space for air carriers was to be limited to four ramp positions, two of which were to be designed for aircraft with a wingspan under 75 feet, and the other two for aircraft with a wingspan in excess of 75 feet;
- Aircraft length was to be limited to 126 feet in order to comply with the Airport's Crash Fire Rescue (CFR) Index B capability;
- Aircraft weight was to be limited to 120,000 pounds maximum gross takeoff weight for aircraft with dual wheel landing gear;[7] and
- The County committed not to adopt any rule, regulation, or technical specification to decrease the capacity of the Airport.

The Stipulation contained a complex expiration clause which created two deadlines for changing the stipulated terms. An agreement to make changes was deemed to be reached if the County, the United States and a majority of the remaining parties to the Stipulation and other airlines then conducting operations at the Airport were in accord. The record indicates that the parties to the Stipulation invoked the second deadline:

> In the event the [parties] are not able to achieve such agreement by December 31, 1987, then the allocating mechanisms set forth herein shall be renewed for a two-year period

---

[6] According to the County, its use restrictions were initially promulgated through resolution (as opposed to regulation or ordinance) due to the short timeframes in the court order. The County has advised us that it is not known why subsequent articulations of the restrictions were not accomplished through regulation or ordinance.

[7] The County's weight-based restriction is included in County Resolution 59-1985 (appended as one of the technical specifications) and at some point in time (the County advises the date of codification is uncertain) was codified into § 712.411 of the Laws of Westchester County. It exists today in the Resolution, the ordinance, and in technical specifications attached to the air carrier terminal use agreements.

COW-00009475

6

commencing May 1, 1988. The parties and the scheduled airlines then operating at the Airport may then, by an agreement as defined above, modify this Stipulation on or before December 31, 1989, such modifications, if any, shall become effective on May 1, 1990.

Stipulation and Order of Partial Settlement and Dismissal, Midway Airlines, Inc. v. FAA, 14.

In the event that no agreement on extension of the terms could be reached by the parties, the Stipulation and Order would have terminated on April 30, 1990. Because the parties agreed to modify the Stipulation on or before December 31, 1989 (accomplished through a terminal capacity agreement which the carriers then serving the Airport each signed), consistent with the Stipulation's expiration clause, the modified terms became effective on or before May 1, 1990. Thus, the Stipulation's termination clause was not invoked. Had the County not been able to reach an agreement with the air carriers as to the extension of the terms of the Stipulation, the Stipulation provided that "the County shall then be free to implement such allocation mechanism and such procedures as it may then deem appropriate and other parties hereto shall have the right to interpose such opposition or make such legal challenge to such mechanisms and procedures ...." Stipulation at 14. Thus, it would appear that the County had court-approved authority and consent of the parties to enact use restrictions at the Airport beyond and independent of the Stipulation.

The County authorized and implemented the Stipulation through the adoption of two Resolutions: (1) Resolution 58-1985, which approved the Stipulation and settlement and authorized the County Attorney to execute all necessary documents in the United States District Court; and (2) Resolution 59-1985, which repealed Resolution 95-1984 and implemented the access limits, allocation terms, and technical specifications as set forth in the Stipulation. Thus, among other things, Resolution 59-1985 states that the "normal operating capacity of the existing terminal at the Airport will be 240 passengers per half hour" and establishes an allocation mechanism for the Airport's terminal capacity among scheduled air carriers. Unlike the Stipulation, Resolution 59-1985 contains no termination provision. The Resolution states that

In the event that ... there be no agreement to modify this Resolution ... then ... the County shall be free to either continue the allocation mechanisms then in effect or to adopt such new Statement of Airport Policy and such new airline allocation mechanism(s) as the County Board of Legislators may then deem appropriate.

Resolution 59-1985, paragraph 5(L) (February 28, 1985).

According to the materials provided to us by the County, the Board of Legislators has not repealed Resolution 59-1985 or otherwise modified the terms and conditions set forth therein. On its face, the February 28, 1985 Resolution does not contemplate termination of its provisions and has been continually enforced since its adoption and treated as the legislative authority for the current use restrictions at the Airport.

On October 8, 1985, the County Board of Legislators approved by Resolution 266-1985 a "Statement of Airport Policy" that declared a new policy for the use of the Airport (which compliments Resolution 59-1985), and was also intended as a "guide for the day to day management of the airport" and to provide information to the public, Airport users, and Airport neighbors about the role of the Airport in the community. This Resolution, which remains in effect today, provides for, among other things:

COW-00009476

7

- Terminal capacity shall not be increased beyond the level established in the Stipulation and authorized by the Board Resolution 58-1985;
- The Airport's capacity, measured in terms of its capability to accept annual numbers of aircraft operations, shall not be increased;
- Preparation of a revised Master Plan and a revised Airport Layout Plan (ALP) within six months;
- The ALP is to provide for improved passenger terminal facilities.
- The ALP is to contain no provision or contingency for any parallel runways.

A master plan update developed the concept of a new terminal building to be designed to accommodate 240 passengers each half-hour, the capacity of the existing terminal. Subsequent environmental approvals for the master plan and new terminal building assumed the continuing existence of the 240 passenger per half-hour limit throughout the forecast periods.

In 1988, in contemplation of the County's plans to build the new terminal, the County and the air carriers entered into the 1988 Terminal Capacity Agreement (1988 TCA) to continue the terms set forth in the *Midway* Stipulation and to memorialize use provisions for the new terminal. Consistent with the Stipulation and Resolution 59-1985, the 1988 TCA limited the capacity of the proposed terminal to 240 passengers per half-hour but modified the passenger restriction to allow the calculation to be based on total passengers, without regard to whether the passengers were enplaning or deplaning. The parties agreed that the enforcement of the capacity limits would be as set forth in the Stipulation whether or not that Stipulation be extended, except that the terminal capacity limitation shall expire January 1, 1995 and shall thereafter be reassessed in light of experience and conditions current at the time. The parties agreed to several amendments to the Airport's technical specifications relating to ramp size and runway weight limitation (*i.e.*, an 18-month trial period to allow Boeing 737-300 aircraft with a maximum gross takeoff weight of up to 135,000 pounds to operate at the Airport). According to County Resolution 43-1989, the FAA reviewed and approved the 1988 TCA (although no FAA documentation is available to support this). The 1988 TCA remained in effect through 1994, when the County and the air carriers reaffirmed the terms and provisions related to the conduct of operations and committed to extend the capacity limits and regulations for an additional ten years.

Facing the expiration of the 1988 TCA and a new terminal building, the County and the air carriers entered into a new terminal capacity agreement in 1994 (1994 TCA) which reaffirmed the terms and provisions related to the conduct of Airport operations as described in the Stipulation and 1988 TCA, including the measurement of actual terminal usage and the enforcement of the capacity limits. The parties to the 1994 TCA also agreed that the capacity of the new terminal was still limited to 240 passengers per half-hour and agreed to continue the substance of the Stipulation and 1988 TCA through December 31, 2004. Like the 1988 TCA, the 1994 TCA provided that, upon expiration of the agreement, the parties could agree to continue existing terms, adopt newly agreed-to terms, or take appropriate actions to protect their respective interests. The 1994 TCA did not modify any of the substantive restrictions contained in the 1988 TCA. The FAA's New York Airports District Office reviewed the 1994 TCA and consented

> to the extension of the 1985 Stipulation since it has been voluntarily entered into by the County and the airlines and since it merely extends a previously negotiated settlement. The

COW-00009477

8

FAA consents with the understanding that the agreement allows access to the airport on fair and reasonable terms, without unjust discrimination and provides access on reasonable terms to new entrants.

Letter from Philip Brito, Manager, New York Airport District Office, FAA, to Joseph J. Petrocelli, Acting Commissioner, Westchester County (September 28, 1994).

To summarize:

- The Airport's current use restrictions derive from the 1985 Federal District Court Stipulation and Order, the essential terms of which were set forth in the County's February 28, 1985 Resolution 59-1985, and reflected in part in the County's October 8, 1985 Resolution 266-1985.
  - o The Resolutions resulted from the Stipulation and Order to which the FAA and numerous air carriers were parties.
  - o The Resolutions were adopted prior to 1990 when ANCA was enacted and have been continuously in effect since their adoption. They remain in effect today and do not contain expiration dates.
- The FAA was a party to the 1985 Stipulation, appears to have consented to the 1988 TCA, and expressly consented to the 1994 TCA.
- Since 1985, air carriers serving the Airport have consented to the use restrictions. At times, the County has modified the restrictions to accommodate air carrier needs. In exchange for carrier consent, the County has agreed since 1985 not to decrease the capacity of the Airport.[8]

Based upon the above, we can conclude that Westchester County has had an access restriction in effect on or before October 1, 1990, and as a result, the County's restriction is "grandfathered" under ANCA and is therefore not subject to its requirements. 49 U.S.C. §§ 47524(b), 47524(c)(1); 14 C.F.R. § 161.3(a). Further, the County's current proposed actions to codify, revise, or modify its three use restrictions constitute "a subsequent amendment"[9] to an airport noise or access agreement or restriction in effect on November 5, 1990, that does not reduce or limit aircraft operations or affect aircraft safety." 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.7(b)(4). If the County's actions are not found to "reduce or limit aircraft operations or affect aircraft safety," then the County is exempt from the requirements of ANCA and Part 161. As noted above, we find that the County is so exempt.

As noted above, the current restrictions at the Airport are as follows:

- The use of the Airport terminal is limited to 240 passengers per half-hour;

---

[8] If the County decides in the future to take an action that reduces or limits aircraft operations or affects aircraft safety, it would have to comply with ANCA and Part 161.

[9] Although the plain language of §47524(d)(4) states "a" subsequent amendment (and thus could be read to authorize only one amendment per airport), we interpret "a" to mean "any." See Black's Law Dictionary 1 (6th ed. 1999), "[t]he word "a" has varying meanings and uses. "A" means "one" or "any ...."

COW-00009478

A-383

9

- Commercial air carriers are limited to four operations per half-hour to correspond to the four gate positions in the terminal. Two of these positions have historically been designated for aircraft with fuselages no longer than 85 feet and two for aircraft with fuselages up to 126 feet in length; and
- Aircraft may not exceed 120,000 pounds maximum gross takeoff weight with dual landing gear. The County currently provides prior permission for operations up to 135,000 pounds maximum gross takeoff weight.

Under the proposed TUP, TUA, and TSPR, the Airport terminal's limitation of 240 passengers per half-hour remains unchanged. While four gate positions remain, as noted, the County has already agreed to revise the length of aircraft fuselages permitted from the current 85 feet (for the two shorter terminal apron positions) to 107 feet, and from 126 feet (for the two longer terminal apron positions) to 130 feet. The County has also revised its maximum gross takeoff weight limitation from 135,000 to 180,000 pounds. The latter two changes will accommodate new types of aircraft at the Airport. Nothing in the County's proposed TUP, TUA, and TSPR reduces or limits aircraft operations or affects aircraft safety within the meaning of ANCA and Part 161.

As you know, airport access restrictions are also subject to other applicable Federal law in addition to ANCA, including the Airport Improvement Program ("AIP") grant assurances prescribed by 49 U.S.C. §47101, *et seq.* Compliance with the provisions of ANCA does not ensure compliance with other Federal law.

Application of Westchester County's Grant Assurance Requirements

The County has accepted grants under the Airport Improvement Program (AIP), 49 U.S.C. § 47101 *et seq.*, and is obligated by the assurances in its contractual grant agreements with the FAA. Obligations under the grant assurances include the obligation to provide access by air carriers on reasonable and not unjustly discriminatory terms. We find nothing in the proposed actions by the County – codifying and clarifying existing legal restrictions, extending and renewing the existing Airport terminal use agreements with the air carriers, and codifying and modifying existing technical specifications and procedures for allocation of terminal space and gates – that is inconsistent at this time with its grant assurances.

We also note that the aircraft length, wingspan, and takeoff weight limitations in the TSPR appear to be based on physical limitations of airfield and terminal facilities. There are references in the historical record to the fuselage length limitation being based on the airport rescue and fire fighting (ARFF) index under 14 C.F.R. §139.315. We would not consider the current ARFF[10] index of the Airport to represent a reasonable basis for a permanent restriction on access to the Airport. However, the County did not cite the ARFF index in any of the current materials submitted to the FAA for review, and the technical requirements are adequately supported by the physical facility limitations of the Airport pavement and terminal area.

For almost 20 years, the County has employed an allocation system to ensure that limited terminal and apron capacity is made available to all carriers. We note that air carriers have three times voluntarily entered into terminal use agreements with the County for commercial access. At this

---

[10] Airport rescue and firefighting (ARFF) equipment used to be denoted as "crash, fire, and rescue" (CFR).

COW-00009479

10

time, no air carrier to our knowledge is raising issues of noncompliance with the proposed TUA or other proposed County actions relating to the Airport. The County appears to have addressed most if not all of the air carriers' concerns regarding access to the Airport (e.g., accommodating new types of air carrier aircraft).

As noted above, the FAA will not act to prevent adoption and approval of the proposed County actions under any transfer or grant agreements, and that the adoption and approval itself will not adversely affect future County grant applications under the AAIA, or applications to impose or collect passenger facility charges under 49 U.S.C. §40117.

We considered the history and circumstances of the use restrictions in effect at Westchester County Airport, and that the County faced litigation in 1984 from numerous air carriers (led by Midway Airlines) seeking access to the Airport, resulting in the 1985 Stipulation. With the *Midway* litigation acting as a catalyst, the County has worked successfully over the years with the air carriers in providing reasonable access to both incumbent and new entrant carriers to the constrained Airport passenger facilities. We note that in the recent process of developing the TUP, TUA, and TSPR, the County has convened five formal consultation meetings with incumbent air carriers to solicit input about the effectiveness of the current use restrictions, possible modifications to the use restrictions, modifications to administrative arrangements, and review of technical specifications at the Airport. The County also made attempts to reach out to all potentially interested (but non-incumbent) air carriers and potentially affected carriers by providing these carriers with notice of all consultation meetings.

Finally, the opinions expressed above are not intended, and should not be construed, to apply to any other airport. The FAA looks forward to continue working with the County to ensure that its new period of operation under the TUA fully complies with Federal law.

I appreciate the time and effort that representatives of Westchester County have spent in meeting with representatives of the FAA and responding to our inquiries.

Sincerely,

James W. Whitlow
Deputy Chief Counsel
Office of the Chief Counsel

COW-00009480

County Exhibit
**AC**
Tomkiel Transcript

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.: 7:22-cv-01930(PMH)
-------------------------------------------x

DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and
JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE
URBAN AIR MOBILITY, INC.,

                         Plaintiffs,

          - against -

COUNTY OF WESTCHESTER, NEW YORK, a charter
county; APRIL GASPARRI, in her official
capacity as AIRPORT MANAGER; and
AVPORTS, LLC,

                         Defendants.

-------------------------------------------x
                         January 19, 2023
                         9:49 a.m.


DEPOSITION of MELISSA TOMKIEL, a witness on

behalf of BLADE URBAN AIR MOBILITY, INC.,

a Plaintiff herein, taken pursuant to

Notice, and held at the offices of Dorf &

Nelson, LLP, 555 Theodore Fremd Avenue,

Rye, New York, before April Pearl, a Court

Reporter and Notary Public of the State of

New York.



2

```
1
     A P P E A R A N C E S :
2
           TROUTMAN PEPPER HAMILTON SANDERS,
3
           LLP
                Attorneys for the Plaintiffs
4                5 Park Plaza
                Suite 1400
5                Irvine, California 92614-2545
           BY:  STEVEN D. ALLISON, ESQ.
6

7
           DORF & NELSON, LLP
8                Co-Attorneys for the Plaintiffs
                555 Theodore Fremd Avenue
9                Suite A300
                Rye, New York 10580
10               - NOT PRESENT -

11

12         OFFICE OF THE WESTCHESTER COUNTY
           ATTORNEY
13               Attorneys for the Defendants
                148 Martine Avenue
14               Suite 600
                White Plains, New York 10601
15         BY:  DAVID H. CHEN, ESQ.,
                Deputy County Attorney
16               SEAN T. CAREY, ESQ.,
                Sr. Assistant County Attorney
17

18
     ALSO PRESENT (via telephone):
19         SAM STONE
           RAYMOND MOSS
20         JENNA CAFFERY

21

22

23

24
```



A-387

**MELISSA TOMKIEL**                                    **3**

1          IT IS HEREBY STIPULATED AND AGREED

2    by and between the attorneys for the

3    respective parties herein, that filing and

4    sealing be and the same are hereby waived.

5

6          IT IS FURTHER STIPULATED AND AGREED

7    that  all objections, except as to the form

8    of the  question, shall be reserved to the

9    time of the  trial.

10

11          IT IS FURTHER STIPULATED AND AGREED

12    that  the within deposition may be signed

13    and sworn to before any officer authorized

14    to administer an oath, with the same force

15    and effect as if signed and sworn to before

16    the Court.

17

18

19

20

21

22

23

24



800.DAL.8779
dalcoreporting.com

MELISSA TOMKIEL                                    4

```
 1        MELISSA TOMKIEL,
 2                  having been first duly sworn by
 3                  the Notary Public (April
 4                  Pearl), and stating her
 5                  professional address as 55
 6                  Hudson Yards, New York, New
 7                  York 10001, was examined and
 8                  testified as follows:
 9
10
11   EXAMINATION
12   BY MR. CHEN:
13        Q.   Good morning, Ms. Tomkiel.
14        A.   Good morning.
15        Q.   My name is Dave Chen.  I'm an
16   attorney from the Westchester County
17   Attorney's Office representing the
18   defendant in this case.  My colleague is
19   Sean Carey.  We will be asking you some
20   questions this morning.
21             Real quick, have you ever been
22   deposed before?
23        A.   Yes.
24        Q.   Okay.  So I'll give you the
```



MELISSA TOMKIEL                                    59

1    long.   A year or two.
2            Q.    There is a reference on -- in
3    this document to something called the
4    Albany Club?
5            A.    Yeah.
6            Q.    What is that?
7            A.    The Albany Club is a -- like, a
8    residential development that, like, the
9    homeowners are members.  It's in Nassau,
10   Bahamas.  It's similar to, like, the
11   Discovery Land Company, like, Yellowstone
12   Club.
13           Q.    I see.  Okay.  There is also a
14   reference to something called the Nexus
15   Club?
16           A.    Yes.
17           Q.    And what is that?
18           A.    That is another kind of
19   membership club, like, lifestyle membership
20   club.  From what I recall, there is, like,
21   common ownership between the Albany Club
22   and the Nexus Club, but I'm not exactly
23   sure.
24           Q.    What did membership in either



A-390

MELISSA TOMKIEL                                146

1          Q.   Are you aware of any other,

2    I'll just call them, entities that are

3    operating at HPN that are not subject to

4    the same restrictions as Blade?

5          A.   Yes.

6          Q.   Who?

7          A.   Well, any partner, anyone, you

8    know, any owned aircraft that is operating

9    under Part 91, all of the other 135s.

10   Netjets, Flexjet, they are, like, 91F or

11   something.  I can't remember the

12   regulation.  Some version of 91.

13         Q.   So let's break that down.  So

14   first of all --

15              MR. ALLISON:  Well, let her

16         finish with her answer.

17         A.   Yeah, I can keep going.

18              And then I think the most

19   glaring example would be with the other

20   135s or with 135s that are operating

21   scheduled service at very high volumes year

22   round that are not being mandated by the

23   County to use the terminal.

24         Q.   And who are those 135s?



A-391

MELISSA TOMKIEL                                147

```
1          A.    Cape Air and Tradewind.
2          Q.    Okay.  We will come back to
3   those.  But first, can you explain, what is
4   Part 91?
5          A.    Private owner.  So like, we
6   were talking about those tiers before.
7   This is, like, your billionaire who owns
8   his own jet.  No one else uses it, or her
9   own jet, doesn't charter it out.  It's just
10  used for the owners' flying purposes.
11         Q.    And some are -- there are jets
12  like that housed at HPN?
13         A.    Many.
14         Q.    Some at Million Air; right?
15         A.    Yeah, at all the FBOs.
16         Q.    Okay.
17         A.    And you've got your corporates,
18  your Pepsi, your Discovery, your IBM that
19  have their, you know, corporate jets based
20  at Westchester that can use -- that are
21  free to use the general aviation FBOs,
22  whether or not they are -- they are always
23  putting -- they are aggregating people,
24  putting them on seats.
```



MELISSA TOMKIEL                    148

1              Another thing would be, like, a
2    135 charter that's running a political
3    campaign or, you know, flying a sports team
4    in, you know, all individuals, not one
5    group, meaning it's not, like, one person
6    chartering.  It's, like, aggregating people
7    onto a plane that can use the GA FBOs.
8         Q.   When you say "aggregating," is
9    that a term of art?
10        A.   Well, it's, like,
11   self-aggregation.  And then there is also
12   the people, the groups who, you know,
13   decide to split -- you know, do a shared
14   charter, right.  Like, two families come
15   together and decide to charter a big plane.
16        Q.   So similar to what Blade used
17   to do but is no longer doing?
18        A.   Right.  That's just happening
19   outside of Blade, but there are other --
20   there are chat groups.  You know, there are
21   community groups.  There are things like
22   Albany Club and Nexus Club that we talked
23   about.  Yellowstone Club is another
24   example.  You know, they ran a Part 380



MELISSA TOMKIEL                                    149

1   program out of HPN for years, I think they

2   still do, to Bozeman and to Baker's Bay in

3   Marsh Harbor, where they sell by the seat

4   on the same planes that we use to their

5   residents group.  And they can use the GA

6   FBOs.

7          Q.   Let me stick a pin in the 380s

8   because I just want to put the other ones

9   to bed first.

10              So you mentioned the Part 91s,

11  the privately owned jets.

12         A.   Uh-huh.

13         Q.   They're not conducting

14  passenger service though; right?

15              MR. ALLISON:  Object to the

16         form.

17         A.   Well, it's not commercial.

18  They can't sell seats, but they can use the

19  plane for whatever they want.  I know one

20  who uses it to fly around his son's Little

21  League team around the country.

22         Q.   Okay.  So is that what you mean

23  by "aggregate"?

24         A.   Yeah.  Like, there is so many



A-394

MELISSA TOMKIEL                              150

1  ways to aggregate people.  Like I said,

2  like, road shows, sports teams, political

3  campaigns.

4        Q.   Right.

5        A.   They are all sharing the jet.

6        Q.   Okay.  Understood.  And so

7  let's -- just to play it out, the example

8  of the sports team, right, if the New York

9  Knicks charter a jet, right, they are

10  chartering the entire thing, and then all

11  of the players and coaches get a seat on

12  it.

13        A.   Right.

14        Q.   Okay.  But those seats aren't

15  being individually sold; right?

16        A.    In that specific example, no,

17  but you take the example that I gave you

18  of, you know, Baker's Bay or Yellowstone

19  Club, and I'm sure there are others.  Those

20  are the ones that come to mind.

21        Q.   Yeah.  Let's break those down.

22             So what is Baker's Bay?

23        A.    It's a -- it is a, for lack of

24  a better word, neighborhood in the Bahamas



MELISSA TOMKIEL                          151

1    where if you buy property in that

2    neighborhood, you become a member, and so

3    you get a lot of privileges.  You get the

4    common golf course.  You get the pool.  You

5    know, all of those things.  Albany Club

6    that was in that earlier document is an

7    example of that.  Yellowstone Club is an

8    example of that.  There are many, many,

9    many of them, and they aggregate their

10   residents on planes to fly there.

11        Q.    So they --

12        A.    Sometimes --

13        Q.    To take it step by step, they

14   charter a flight?

15        A.    Yes.

16        Q.    Okay.

17        A.    And then they sell the seats to

18   the members.

19        Q.    Directly to the members of that

20   organization, be it Baker's Bay?

21        A.    Yeah, but the members could buy

22   them for themselves, their friends, their

23   guests.  Like, you don't have to be a

24   member to fly on it, to my knowledge.



MELISSA TOMKIEL                              152

1           Q.    Got it.

2           A.    This is just to my knowledge.

3           Q.    Understood.  And the reason

4   those are not considered commercial flights

5   is because?

6           A.    They run under Part 135.

7           Q.    And the sales are -- the

8   individual seat sales are not directly to

9   individuals?

10          A.    No, they are, through Part 380.

11  I think they do it through Part 380.

12          Q.    Okay.  So there is a 380 called

13  Baker's Bay?

14          A.    No, that is the destination.  I

15  don't know.

16          Q.    Oh, I'm sorry.  Okay.

17          A.    I don't know whose program it

18  is or whatever.  I just know that is where

19  they are flying people.

20          Q.    Got it.  Okay.  But there are

21  380 groups, which is the same thing as

22  Blade; right?

23          A.    Yeah.

24          Q.    That charter an entire flight,



MELISSA TOMKIEL                                153

1   and as you say, aggregate the seats and

2   sell them to individuals?

3          A.    (Nodding head.)

4          Q.    Okay.  Do you know any of those

5   by name?

6          A.    I just gave you two examples of

7   customers.  I don't know.

8          Q.    So you said Cape Air and

9   Tradewind?

10         A.    Oh, no, that's different.

11         Q.    That's different.  Sorry.   So

12  set Cape Air and Tradewind aside.

13              Any examples of what I just

14  said?

15         A.    The groups that go -- I just

16  gave you two destinations of where they go

17  to, but there are little sites that do this

18  all the time for things, like, to the Super

19  Bowl or, you know, I mean you name it,

20  like.

21         Q.    Got it.

22         A.    There are tons of different

23  actors that do that.

24         Q.    Okay.



A-398

MELISSA TOMKIEL                              154

```
1          A.    And there are message boards.
2     There's -- you know, people self-aggregate
3     to share aircrafts.  Because as we know,
4     it's very expensive.  And, like, a lot of
5     people from this area go to Florida in the
6     winter; so they come up with ways to share
7     the jets, through apps or otherwise.  We
8     are just the most branded and well-known.
9          Q.    So in those situations you are
10    talking about, you know, say, 15 people
11    will come together, pool their money and
12    Charter a flight?
13         A.    Yes.
14         Q.    Okay.  Got it.  Okay.
15               Now, going back now to the two
16    examples or two of the examples you gave,
17    Cape Air, Tradewind, and I think Netjets,
18    was that another one?
19         A.    That's not in that category.
20    That's a little different.
21         Q.    Sorry.  Okay.  Forget that
22    then.
23               Cape Air and Tradewind, explain
24    to me what they are.
```



MELISSA TOMKIEL                                    155

1        A.   They are essentially mini

2   airlines.   Like, they run scheduled service

3   out of the FBOs, you know, at pretty high

4   volumes.   They sell tickets directly to the

5   public.

6             I mean, Cape Air is -- both of

7   them actually code share with airlines.

8   Meaning, like, you can buy a ticket from --

9   I'm just giving you by means of example.

10  Like, you can buy a ticket, like, on

11  United -- well, that is not a good

12  example -- on Jetblue to HPN, and then you

13  can, like, code share and get a fare

14  from -- on Cape Air on the same ticket from

15  HPN to Boston.   They don't do it at HPN

16  because they don't operate out of the

17  commercial terminals, but that is just an

18  example.   Like, they run a lot.   They have

19  a very, very dense schedule.

20       Q.   So who, if you know, does it

21  out of HPN specifically?

22       A.   Cape Air and Tradewind.   Cape

23  Air does it out of Signature East, and

24  Tradewind does it out of Million Air.

800.DAL.8779
dalcoreporting.com

DALCO

MELISSA TOMKIEL                    156

1          Q.    And are those 380 indirect air
2    carriers?
3          A.    No.
4          Q.    They are 135s?
5          A.    Yes.
6          Q.    Both of those?
7          A.    Yes.
8          Q.    Okay.  Similar to TriState or
9    Contour?
10         A.    Yes.
11         Q.    Okay.  So if I'm -- if I want
12   to fly from White Plains to somewhere that
13   Cape Air flies, I can go online?
14         A.    Uh-huh.
15         Q.    They have a website,
16   presumably, and book a flight through them?
17         A.    Yes.
18         Q.    Then show up at HPN, go to the
19   Signature FBO and fly out of there?
20         A.    Yeah.
21         Q.    Okay.  Same thing with
22   Tradewind and the Million Air FBO?
23         A.    Yes.
24         Q.    Does Tradewind have its own



A-401

MELISSA TOMKIEL                                157

1    lounge at Million Air's FBO?

2         A.   No.  They have offices, but I

3    don't believe they have a passenger lounge.

4         Q.   Okay.  Are there any other

5    differences between Blade and Tradewind?

6         A.   Well, there is a lot of

7    differences, but that is just an example

8    of --

9         Q.   What are some of the other

10   differences, in terms of operations?

11        A.   Well, you know, they are the

12   air carrier.

13        Q.   Right.

14        A.   They are limited to -- you

15   know, they own and operate.  They have

16   their select routes.

17        Q.   Which are different, generally,

18   from yours?

19        A.   Yeah.

20        Q.   Okay.  So they are not -- would

21   you consider them a competitor of Blade, if

22   they don't fly to the same places?

23        A.   Well, they were a direct

24   competitor for Nantucket, and then we



A-402

**MELISSA TOMKIEL**                              158

1   stopped doing the scheduled service.

2          Q.   Okay.

3          A.   They do a lot of -- they have

4   jets.  They charter a lot to Florida.  So

5   we compete with them in that way.

6          Q.   So help me understand.  So if

7   they are a Part 135, how come they don't

8   need to partner with a 380 the way TriState

9   partners with you guys?

10         A.   Because they own and operate

11  the equipment.  They have the 135 commuter

12  license.

13         Q.   Okay.

14         A.   So they can sell direct to the

15  public.

16         Q.   Okay.

17         A.   We need 380 because we're not a

18  direct air carrier.  They are a direct air

19  carrier.

20         Q.   Got it.  Thank you.

21              Do you know, did Blade or

22  anyone from Blade bring this, these names

23  we've been talking about, to the attention

24  of anyone at the County, prior to just now?



MELISSA TOMKIEL                    159

```
 1          A.   I'm not sure.
 2               MR. ALLISON:  I was going to
 3          say, I instruct you not to answer if
 4          it was from counsel that you found
 5          that out, but if you know.
 6               THE WITNESS:  I'm just not
 7          sure.
 8               MR. ALLISON:  Okay.
 9          Q.   Do you know if Tradewind
10     operates aircraft with more than nine
11     passenger seats?
12          A.   They generally don't.
13          Q.   What about Cape Air?
14          A.   Same.
15          Q.   They generally do not?
16          A.   Right.
17          Q.   Do you know of any Part 135s
18     operating out of FBOs that sell individual
19     seats that generally do operate aircraft
20     with more than nine seats?
21          A.   Well, the examples that I gave
22     you of the jet aggregations would be nine
23     or more or, you know, ten or more.
24          Q.   The Baker's Bay and
```



A-404

MELISSA TOMKIEL                                    160

1    Yellowstone?

2         A.    (Nodding head.)

3         Q.    Okay.  All right.

4              MR. CHEN:  Give me a second,

5         but I'm very close to being done.

6         Q.    Is it Blade's position that

7    enforcement of the TUPs affects Blade's

8    rates, routes or services?

9              MR. ALLISON:  Object to the

10        form.

11        A.    Yes.

12        Q.    In what way?

13        A.    Well, it would completely

14   destroy the service that we're offering by

15   requiring the passengers to go through the

16   commercial terminal and then arrive at a

17   different terminal and not be able to enjoy

18   the lounge that we invested in or the, you

19   know, ease of connecting from ground

20   transportation.

21              It would likely require changes

22   in our schedule, having to, you know,

23   become part of the route or the slot

24   allocation system.  And we just -- you



A-405

181

```
1              C E R T I F I C A T I O N

2   STATE OF NEW YORK          )

3                              ss:

4   COUNTY OF WESTCHESTER      )

5              I, APRIL PEARL, Court Reporter

6   and Notary Public within and for the County

7   of Westchester, State of New York, do

8   hereby certify:

9              That I reported the proceedings

10  that are hereinbefore set forth, and that

11  such transcript is a true and accurate

12  record of said proceedings.

13              AND, I further certify that I

14  am not related to any of the parties to

15  this action by blood or marriage, and that

16  I am in no way interested in the outcome of

17  this matter.

18

19

20

21          April Pearl

22  _____

23              APRIL PEARL

24              Court Reporter
```



A-406

County Exhibit

**AD**

Scherrer Transcript

```
 1
 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     -------------------------------------------X
       DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR
 4     and JETSUITEX, INC.; XO GLOBAL, LLC; and
       BLADE URBAN AIR MOBILITY, INC.,
 5
                                    PLAINTIFFS,
 6
              -against-      Case No.:
 7                           7:22-cv-01930-PMH
 8     COUNTY OF WESTCHESTER, NEW YORK, a
       Charter County,
 9
                                    DEFENDANT.
10     -------------------------------------------X
11                   DATE:  January 31, 2023
12                   TIME:  9:33 A.M.
13
14
15          DEPOSITION of the Defendant,
16     COUNTY OF WESTCHESTER, by a witness, PETER
17     SCHERRER, taken by the Plaintiffs, pursuant
18     to a Notice and to the Federal Rules of
19     Civil Procedure, held at the offices of
20     John M. Nonna, Esq., Westchester County
21     Attorney, 148 Martine Avenue, White Plains,
22     New York 10601, before Lisa Moran, a Notary
23     Public of the State of New York.
24
25
```

A-407

Page 2

```
 1
 2      A P P E A R A N C E S:
 3
 4
        TROUTMAN PEPPER HAMILTON SANDERS, LLP
 5         Attorneys for the Plaintiffs
           5 Park Plaza, Suite 1400
 6         Irvine, California 92614
           BY:  SAMRAH MAHMOUD, ESQ.
 7              JENNA C. HUTCHINSON, ESQ.
 8
 9      DORF & NELSON, LLP
           Attorneys for the Plaintiffs
10         555 Theodore Fremd Avenue
           Rye, New York 10580
11         (NOT PRESENT)
12
13
14      JOHN M. NONNA, ESQ.
           Westchester County Attorney
15         Attorney for the Defendant
           148 Martine Avenue
16         White Plains, New York 10601
           BY:  DAVID H. CHEN, ESQ.
17              SEAN CAREY, ESQ.
18
19      ALSO PRESENT:
           Raymond Moss, Esq., via video conference
20         Jenna Caffery, Esq., via video conference
21
22
                   *         *         *
23
24
25
```

A-408

Page 3

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24            *      *      *      *

25

A-409

Page 4

1                    PETER SCHERRER

2      P E T E R     S C H E R R E R, called as a

3      witness, having been first duly sworn by a

4      Notary Public of the State of New York, was

5      examined and testified as follows:

6      EXAMINATION BY

7      MS. MAHMOUD:

8           Q.     Please state your name for the

9      record.

10          A.     Peter Scherrer.

11          Q.     What is your address?

12          A.     2234 Mark Road, Yorktown

13     Heights, New York 10598.

14          Q.     Good morning, Mr. Scherrer, is

15     it pronounced Scherrer?

16          A.     Close enough.

17          Q.     Got it.

18                 My name is Samrah Mahmoud.  I

19     represent the Plaintiffs in this action.  I

20     will be asking you some questions today.

21                 Have you ever been deposed

22     before?

23          A.     Yes.

24          Q.     How many times?

25          A.     I don't recall.

A-410

Page 264

1                    PETER SCHERRER

2    charter a flight, and instead of having

3    nine different people charter nine

4    different flights, they go on the same

5    charter flight, would that reduce the

6    congestion and the noise?

7              MR. CHEN:   Objection.

8         A.    It all depends.  It's not an

9    easy answer, it all depends.

10         Q.    In the scenario I just gave you

11   where nine separate people are chartering a

12   flight out of HPN and flying cross country

13   versus nine people chartering one flight,

14   would that reduce traffic and noise?

15         A.    It all depends.

16         Q.    What does it depend on in that

17   scenario?

18         A.    Well, if you can charter an

19   airplane by yourself to LAX, why would you

20   want to jump on a plane with nine other

21   people?

22         Q.    Sure, but my question was not

23   would you want to, my question was, if you

24   have nine different people chartering nine

25   separate flights versus chartering one

Page 265

PETER SCHERRER

1

2    flight together, would that reduce

3    congestion and noise?

4        A.    If they decided they wanted to

5    do that?

6        Q.    Yes.

7        A.    You are asking a question and I

8    can't answer.

9        Q.    Well, so, yes, I am asking if

10   they decide to charter one flight together,

11   nine people on one flight versus chartering

12   their own separate flight, would that

13   reduce noise and congestion?

14       A.    All depends on what kind of

15   flight they're going to take.  Depends on

16   what kind of airplane.  I mean, if they're

17   going to charter -- it could be a tiny

18   little airplane, it could be a large

19   airplane, it's subjective.  You are asking

20   me something that's subjective, I don't

21   know.

22       Q.    Let's focus on the congestion

23   point, so maybe your answer is noise, but

24   if there's nine different flights going out

25   of an FBO versus one flight, nine would be

```
                                        Page 266
 1                    PETER SCHERRER
 2     more congestion; correct?
 3          A.      Correct.
 4          Q.      Did you do anything with this
 5     letter other than pass it on --
 6          A.      That's it.
 7          Q.      -- to the County?
 8          A.      That's all I did, pass it on.
 9          Q.      You can put that document to
10     the side.
11                  (Whereupon, the aforementioned
12             document was marked as Scherrer
13             Exhibit 36 for identification as of
14             this date by the Reporter.)
15          Q.      I'm handing you what has been
16     marked Scherrer 36, Bates No. 1422 at the
17     bottom, and do you recognize this document?
18          A.      I don't recognize it.
19          Q.      But that is your e-mail on the
20     e-mail from Mr. Soule?
21          A.      Yes.
22          Q.      It would have been your
23     practice likely to have read this then?
24          A.      I know I was on vacation.
25          Q.      Would you have read it after
```

Page 312

```
 1                 PETER SCHERRER
 2              C E R T I F I C A T E
 3
 4   STATE OF NEW YORK      )
                            :  SS.:
 5   COUNTY OF WESTCHESTER  )
 6
 7        I, LISA MORAN, a Notary Public for
 8   and within the State of New York, do hereby
 9   certify:
10        That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or by marriage and that I
17   am in no way interested in the outcome of
18   this matter.
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 3rd day of February, 2023.
21
22
23   _____
            LISA MORAN
24
25
```

**County Exhibit**
**AE**
**Rumbarger Transcript**

```
 1
 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     ------------------------------------------X
       DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR
 4     and JETSUITEX, INC.; XO GLOBAL, LLC; and
       BLADE URBAN AIR MOBILITY, INC.,
 5
                              PLAINTIFFS,
 6
             -against-     Case No.:
 7                         7:22-cv-01930-PMH
 8     COUNTY OF WESTCHESTER, NEW YORK, a
       Charter County,
 9
                              DEFENDANT.
10     ------------------------------------------X
11              DATE:  February 1, 2023
12              TIME:  9:43 A.M.
13
14
15           DEPOSITION of the Defendant,
16     COUNTY OF WESTCHESTER, by a witness, TOM
17     RUMBARGER, taken by the Plaintiffs,
18     pursuant to a Notice and to the Federal
19     Rules of Civil Procedure, held at the
20     offices of John M. Nonna, Esq., Westchester
21     County Attorney, 148 Martine Avenue, White
22     Plains, New York 10601, before Lisa Moran,
23     a Notary Public of the State of New York.
24
25
```

A-415

Page 2

```
 1
 2    A P P E A R A N C E S :
 3
 4
      TROUTMAN PEPPER HAMILTON SANDERS, LLP
 5       Attorneys for the Plaintiffs
         5 Park Plaza, Suite 1400
 6       Irvine, California 92614
         BY:  SAMRAH MAHMOUD, ESQ.
 7            JENNA C. HUTCHINSON, ESQ.
 8
 9    DORF & NELSON, LLP
         Attorneys for the Plaintiffs
10       555 Theodore Fremd Avenue
         Rye, New York 10580
11       (NOT PRESENT)
12
13
14    JOHN M. NONNA, ESQ.
         Westchester County Attorney
15       Attorney for the Defendant
         148 Martine Avenue
16       White Plains, New York 10601
         BY:  DAVID H. CHEN, ESQ.
17            PHOENIX MARINO, ESQ.
18
19    ALSO PRESENT:
         Joe Raguso, Videographer
20       Raymond Moss, Esq., via video conference
         Jenna Caffery, Esq., via video conference
21
22
23            *         *         *
24
25
```

Page 3

1

2   F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10  may be signed and sworn to by the witness

11  before anyone authorized to administer an

12  oath, with the same effect as if signed

13  before a Judge of the Court; that an

14  unsigned copy of the deposition may be used

15  with the same force and effect as if signed

16  by the witness, 30 days after service of

17  the original & 1 copy of same upon counsel

18  for the witness.

19

20     IT IS FURTHER STIPULATED AND AGREED that

21  all objections except as to form, are

22  reserved to the time of trial.

23

24            *     *     *     *

25

A-417

Page 6

1                    TOM RUMBARGER

2     T O M      R U M B A R G E R, called as a

3     witness, having been first duly sworn by a

4     Notary Public of the State of New York, was

5     examined and testified as follows:

6     EXAMINATION BY

7     MS. MAHMOUD:

8          Q.     Good morning, Mr. Rumbarger.

9     My name is Samrah Mahmoud, and I am

10    representing the Plaintiffs in this action,

11    and I am here today to ask you some

12    questions.

13              Can you please state your full

14    name for the record?

15         A.     It's Thomas Rumbarger.

16         Q.     It's pronounced Rumbarger not

17    Rumbarger?

18         A.     Yes.

19         Q.     Okay.  And could you also tell

20    us your address?

21         A.     11 Minehaha Boulevard in

22    Oakland, New Jersey.

23         Q.     And have you ever been deposed

24    before.

25         A.     Yes, I have.

Page 135

                    TOM RUMBARGER

1

2    airline where there is 30 first class

3    business seats or 30 first class seats

4    available?

5         A.    Are you referring aircraft out

6    of our facility or nationwide?

7         Q.    Out of your facility.

8         A.    No.

9         Q.    And you talked earlier about

10   the slot system, and you said it was a

11   random drawing, and what did you mean by

12   that?

13        A.    At each lottery, when we go

14   into the room, the choice for the airlines

15   is chosen at random.  Basically, all their

16   names are put into a glass bowl, and

17   they're randomly selected out, and that

18   will be the, uhm, the pecking order for the

19   airlines to choose, uhm, available slots

20   and allocations.

21             And that applies for both

22   incumbents and new entrants, they are all

23   put into the same.

24        Q.    Okay.  So, it goes in order of

25   when your name is picked?

A-419

Page 136

TOM RUMBARGER

1
2    A.    That's correct.
3    Q.    But the incumbents get to keep
4  their already provisioned slot?
5    A.    They are able to keep their
6  provisioned slots, yes, but they are not
7  given a priority for choosing an additional
8  allocation.
9    Q.    What are the operational hours
10 in the main terminal?
11   A.    24/7 facility.
12   Q.    Okay.   There are slots
13 throughout the entire day?
14   A.    That is correct.
15   Q.    Okay, so there are slots
16 allocated at 12:30 a.m.?
17   A.    Yes, there are.
18   Q.    Okay.   And are there ever -- we
19 mentioned that there's only four gates;
20 correct?
21   A.    That's correct.
22   Q.    Okay.   So what happens if there
23 is a delay or problem at one of the gates
24 during the half an hour slot?
25   A.    Okay.   We have four gates with

A-420

Page 137

1                    TOM RUMBARGER
2    jet bridges, and we have two hard stand
3    ramp positions.
4         Q.     Okay.
5         A.     So, if you have an aircraft
6    that has mechanical, we can use one of the
7    other positions.
8         Q.     What do you mean one of the
9    other positions?
10        A.     Again, you have two hard stand
11   positions, and you have four positions with
12   jet bridges attached, so one of the
13   aircraft can come into the hard stand or if
14   it's a long mechanical, that can be towed
15   to the hard stand and free up the jet
16   bridge.
17        Q.     Do you ever have occasions
18   where because of delays or malfunctions,
19   one of the bridges or slots is not able to
20   be used completely?
21        A.     I can't say that I've
22   experienced a time period where four gates
23   could not be used.
24        Q.     One of the four is what I am
25   asking?

A-421

Page 138

1                    TOM RUMBARGER
2        A.    No, all four, we offered four.
3        Q.    Okay.
4        A.    Whether it be jet bridges or
5   hard stands or a combination thereof.
6        Q.    Okay.  So, at all times that
7   you're aware of the four gates have
8   operated?
9        A.    Yes, mm-hmm.
10       Q.    Okay.  And in terms of the
11  available slots after the last lottery, is
12  there a time, half an hour slot, you can
13  think of where three of the gates are open?
14       A.    After the last lottery, can I
15  think of a time period when three or more?
16       Q.    Yes, so, in other words, there
17  is a slot where only one airline has used
18  up slots and there is three gates
19  available?
20       A.    Yes.
21       Q.    Okay.  And what time period
22  would that have been for?
23       A.    5:30 in the morning.
24       Q.    Okay.  Any other times?
25       A.    I would say anything between

A-422

Page 139

                         TOM RUMBARGER
1
2    midnight and 5 a.m. is wide open.
3         Q.    And, so, three gates are more
4    are open?
5         A.    Three or more are open, yes,
6    and there may be others, I have to look at
7    the lottery sheet to determine that.
8         Q.    But the rest of the time
9    throughout the day?
10        A.    Correct, throughout the rest of
11   the day, there may be other slots where
12   there are three gates open.  I'd have to
13   see the actual lottery sheet.
14        Q.    But largely, as we looked at
15   with at least the chart from April, a lot
16   of the midday slots have zero available,
17   right, meaning there are no slots
18   available?
19        A.    During the April time period,
20   yes, again, there were changes to the last
21   lottery, without having that in front of
22   me, I couldn't tell you which they are.
23        Q.    Okay.
24             MS. MAHMOUD:  Can we go off the
25        record for a second?  Dave, do you

A-423

Page 140

                    TOM RUMBARGER

1

2       agree?

3              MR. CHEN:  Yes.

4              THE VIDEOGRAPHER:  Off the

5       record, the time is 1:06 p.m.

6              (Whereupon, an off-the-record

7       discussion was held.)

8              THE VIDEOGRAPHER:  We're back

9       on the record.  The time is 1:07 p.m.

10      Q.    And can you tell me a little

11  bit more about Olympus, how often do they

12  operate, if you know?

13      A.    Olympus operates twice a week.

14      Q.    Okay.  Are they seasonal or do

15  they operate year round?

16      A.    Right now, I am not sure.  We

17  know that they have selected slots which go

18  through the next lottery period, to the

19  summer.

20      Q.    Okay.  And so it is your

21  understanding that they are year round or

22  seasonal?

23      A.    Unknown.

24      Q.    Okay.  Would you agree that

25  adding more passengers from the Part 380,

Page 141

1                    TOM RUMBARGER
2    Part 135 operations to the main terminal
3    that that would add more congestion to the
4    main terminal?
5              MR. CHEN:  Objection.
6         A.    It would add more passengers to
7    the terminal, as to whether it would be
8    more congested or not, I couldn't tell you.
9         Q.    So, if there is more passengers
10   being processed through TSA security, that
11   would necessarily mean longer lines;
12   correct?
13             MR. CHEN:  Objection.
14        A.    No, it would not.
15        Q.    Why not?
16        A.    Depends on what time of day.
17   If you have a security line that has
18   virtually no one in it, then if a new
19   carrier would come in and choose that time
20   slot, it would not necessarily mean that
21   there would be more people piling up in the
22   que.
23        Q.    So, if they are operating
24   during a time period that is in demand,
25   like, the mid morning, afternoon --

A-425

Page 142

TOM RUMBARGER

1

2        A.      Mm-hmm.

3        Q.      -- and adding 60 or so

4    passengers processing through the TSA, that

5    would add to the line, right?

6        A.      It would add to the line, yes.

7    Again, depends on how many flights and how

8    many passengers were being processed during

9    that half-hour time period.

10       Q.      Sure.  I am talking about the

11   most busy time.

12       A.      The most busy time, assuming

13   there were additional allocation available,

14   then, yes.

15       Q.      Okay.  All right.  I would like

16   to mark the next Exhibit, it's 110.

17               (Whereupon, the aforementioned

18         document was marked as Rumbarger

19         Exhibit 4 for identification as of

20         this date by the Reporter.)

21               (Whereupon, an off-the-record

22         discussion was held.)

23       Q.      I am handing you what has been

24   marked Rumbarger 4, Bates No. COW 1110 at

25   the bottom.

Page 314

1                    TOM RUMBARGER

2            C E R T I F I C A T E

3

4    STATE OF NEW YORK        )

                              :   SS.:

5    COUNTY OF WESTCHESTER    )

6

7        I, LISA MORAN, a Notary Public for

8    and within the State of New York, do hereby

9    certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 3rd day of February 2023.

21

22

23   _____

            LISA MORAN

24

25

County Exhibit
**AF**
Lozada Transcript

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.: 7:22-cv-01930(PMH)
------------------------------------------x

DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and
JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE
URBAN AIR MOBILITY, INC.,

                              Plaintiffs,

          - against -

COUNTY OF WESTCHESTER, NEW YORK, a charter
county; APRIL GASPARRI, in her official
capacity as AIRPORT MANAGER; and
AVPORTS, LLC,

                              Defendants.

------------------------------------------x
                              February 7, 2023
                              9:31 a.m.


DEPOSITION of JENNIFER LOZADA, a witness on

behalf of the Plaintiff, XO GLOBAL, LLC,

herein, taken pursuant to Notice, and held

at the Offices of Westchester County

Attorney, 148 Martine Avenue, White Plains,

New York, before April Pearl, a Court

Reporter and Notary Public of the State of

New York.



2

```
 1   A P P E A R A N C E S :

 2          TROUTMAN PEPPER HAMILTON SANDERS,
            LLP
 3              Attorneys for the Plaintiffs
                5 Park Plaza
 4              Suite 1400
                Irvine, California 92614-2545
 5          BY:  STEVEN D. ALLISON, ESQ.
                 and
 6              SAMRAH R. MAHMOUD, ESQ.
                (via telephone)
 7


 8
            OFFICE OF THE WESTCHESTER COUNTY
 9          ATTORNEY
                Attorneys for the Defendants
10              148 Martine Avenue
                Suite 600
11              White Plains, New York 10601
            BY:  DAVID H. CHEN, ESQ.
12              Deputy County Attorney
                SEAN T. CAREY, ESQ.
13              Sr. Assistant County Attorney

14

15   ALSO PRESENT
            ANASTASIJA SNICARENKO
16          RAYMOND MOSS (via telephone)
            JENNA CAFFERY (via telephone)
17

18

19

20

21

22

23

24
```



800.DAL.8779
dalcoreporting.com
DALCO

JENNIFER LOZADA                                    3

1          IT IS HEREBY STIPULATED AND AGREED

2     by and between the attorneys for the

3     respective parties herein, that filing and

4     sealing be and the same are hereby waived.

5

6          IT IS FURTHER STIPULATED AND AGREED

7     that  all objections, except as to the form

8     of the  question, shall be reserved to the

9     time of the  trial.

10

11         IT IS FURTHER STIPULATED AND AGREED

12    that  the within deposition may be signed

13    and sworn to before any officer authorized

14    to administer an oath, with the same force

15    and effect as if signed and sworn to before

16    the Court.

17

18

19

20

21

22

23

24



A-430

**4**                    **JENNIFER LOZADA**

```
 1       JENNIFER LOZADA,

 2                 having been first duly sworn by

 3                 the Notary Public (April

 4                 Pearl), and stating her

 5                 professional address as 1901

 6                 West Cypress Creek Road, Fort

 7                 Lauderdale, Florida 33309,

 8                 was examined and testified as

 9                 follows:

10

11

12   EXAMINATION

13   BY MR. CHEN:

14        Q.    Good morning.

15        A.    Good morning.

16        Q.    Like I said, my name is Dave

17   Chen.  I represent the County of

18   Westchester, the defendant, in this action,

19   and this is the 30(b)(6) deposition of XO

20   pursuant to the notice that we served on

21   12/15/2022.

22                 Ms. Lozada, have you been

23   deposed before?

24        A.    No.
```



120                        JENNIFER LOZADA

1   passengers; right?

2         A.    Less than nine, more than nine,

3   but yes.

4         Q.    Okay.  So there is a subset of

5   Part 135 operators that certainly operate

6   aircraft configured to carry nine or more

7   passengers; right?

8         A.    Yes.

9         Q.    Okay.  Now, of that subset, do

10  you know how those various operators sell

11  individual seats on their flights?

12        A.    They sell -- they can either

13  sell individual seats through somebody like

14  XO, somebody like -- you know, any

15  affiliates of ours.  WheelsUp offers

16  sharing seat models.  Private clubs offer

17  sharing seat models.  I mean, people are

18  sharing seats in What's App groups.

19  There's flight aggregate websites that

20  private fliers have created to share

21  planes, to share seats.

22            So essentially, they don't need

23  XO, right, to share flights.  There's a

24  bunch of other dashboards.  We just help



JENNIFER LOZADA                           121

1   make it easier and more efficient.

2        Q.   All right.  Let's break those

3   down.

4             You mentioned flight

5   aggregating websites?

6        A.   Uh-huh.

7        Q.   What are those?

8        A.   So somebody can say, hey, I'm

9   flying to -- from White Plains to Aspen

10  next week.  Anybody want to split the cost

11  of the plane with me, and they'll put up a

12  price of how much they want to split the

13  cost of, if they've gotten a quote or

14  something like that.  So they'll,

15  essentially, split the aircraft that way.

16       Q.   So how is that different from

17  the crowdsourcing option that XO offers

18  that we discussed before?

19       A.   So they are not booking

20  directly in booking transactions and/or

21  filing the flights, right.  So they are

22  privately saying, anybody want to share my

23  flight with me.  I'm taking four seats, you

24  can take four seats.

800.DAL.8779
dalcoreporting.com



DALCO

A-433

122                    JENNIFER LOZADA

1          Q.    I see.

2          A.    So there's no public

3    transactions being done.

4          Q.    Are these flight aggravating

5    websites a relatively new development?

6          A.    They've been around.  They've

7    always been around.  You either had them in

8    Facebook groups or What's App group or

9    GroupMe, right.  There's a bunch of

10   different -- these little groups that share

11   their flights.

12         Q.    Okay.

13         A.    The formalized websites have

14   probably been around a few -- a couple of

15   years.

16         Q.    Do you know any off the top of

17   your head?

18         A.    Fly Katana is one of them.

19              MR. ALLISON:  You might want to

20        spell that for her.

21              THE WITNESS:  F-L-Y

22        K-A-T-A-N-A.

23              MR. ALLISON:  Thank you.

24              THE WITNESS:  Yep.



A-434

JENNIFER LOZADA                                123

```
 1         Q.   Any others, off the top of your
 2   head?
 3         A.   I don't have any others off of
 4   the top of my head.
 5         Q.   And there's no Part 380 entity
 6   involved in those transactions; right?
 7         A.   No.
 8         Q.   It's completely private?
 9         A.   Yep.
10         Q.   Okay.  All right.  I think you
11   also mentioned private clubs?
12         A.   Uh-huh.
13         Q.   What are those?
14         A.   So destination clubs, right,
15   whether Yellowstone Club, your Baker's Bay,
16   any of the Discovery Land properties, they
17   all have access to sharing flights and
18   selling them, but they also do so privately
19   where they can sell -- you know, split the
20   aircraft amongst members, right.  Think of
21   it as a country club in the sky that's
22   sharing a plane to go to the country club.
23         Q.   Okay.  Are they like the flight
24   aggregating websites, in that there is no
```



124                     **JENNIFER LOZADA**

1    Part 380 entity involved?

2            A.    No Part 380 entity involved in

3    those.

4            Q.    So the members of that club can

5    just get together and partner with a Part

6    135 operator to get an aircraft?

7            A.    The club -- usually it's an

8    aviation group inside of those clubs that

9    helps facilitate it, and they work with the

10   members to get fliers on board.

11           Q.    Okay.  Do you happen to know,

12   like, how one joins these clubs?

13           A.    You have to buy big expensive

14   properties usually in their location.

15           Q.    Locations like Yellowstone?

16           A.    Like Yellowstone, yeah, or

17   Baker's Bay down in the Bahama Islands.

18           Q.    Got it.  I think you mentioned

19   an entity or process called WheelsUp?

20           A.    WheelsUp is another charterer

21   plus air -- I think they are an air

22   carrier, too.  I think they have aircraft

23   that they own and operate, but they also

24   have the ability to share flights for their



A-436

**JENNIFER LOZADA** 125

1  clients or have their clients share flights

2  through a Part 380 process, and they'll do

3  it on different sized aircraft as well.

4      Q.   So they are a broker?

5      A.   They have a brokerage as part

6  of, like, their business model, and they

7  also have aircraft.  I don't know the

8  working of their organization, but they do

9  have aircraft.

10     Q.   And do they operate under Part

11 380, if you know?

12     A.   135, and they have flights that

13 are shared that would then be filed most

14 likely through 380.

15     Q.   Okay.  And they operate out of

16 HPN?

17     A.   Yep.

18     Q.   Do you happen to know where

19 they fly to?

20     A.   I do not, no.

21     Q.   Or the kind of aircraft they

22 operate?

23     A.   They have a pretty large fleet.

24 So amongst the list that I already said,



126                    **JENNIFER LOZADA**

1   they have probably three or five of those

2   in there.  So King Airs, Citation 10s.

3   They have some larger aircraft that they've

4   acquired through acquisitions.

5          Q.   Okay.

6          A.   So a mix of plus and minus nine

7   seats.

8          Q.   And I meant to ask this at the

9   beginning.

10              Other than the fact that you

11  are co-plaintiffs in this lawsuit, there is

12  no relationship between XO and Blade or

13  JSX; right?

14              MR. ALLISON:  Object to the

15         form.

16         A.   No, we don't have any

17  partnership or agreements with each other

18  right now.

19         Q.   Would you consider them your

20  competitors?

21         A.   Yeah.

22         Q.   Okay.  As far as you know, they

23  are doing the same kind of things at HPN

24  that XO is, in terms of how they are



A-438

**JENNIFER LOZADA**                                     127

 1    operating and selling seats, et cetera?

 2          A.   Yes, I would assume it's

 3    similar.

 4          Q.   All right.  So let's set aside,

 5    if we could, those private clubs and those

 6    flight aggregating websites and any other

 7    operation that is private, and then let's

 8    also set aside, obviously, the plaintiffs.

 9               Who else, to your knowledge, is

10    operating in the same fashion at HPN, as

11    far as selling individual seats publicly on

12    these Part 380 flights?

13               MR. ALLISON:  Object to the

14          form.

15          A.   There is Trade Wind, Cape Air,

16    Tailwind.  Those are the few off the top of

17    my head that I know operate more of a

18    schedule.

19          Q.   Okay.  Let's take those one by

20    one.  So what's Trade Wind?

21          A.   They are an air carrier, also a

22    sales organization, I'm assuming.  But they

23    operate short hops daily between different

24    northeast market from White Plains.



A-439

128                    **JENNIFER LOZADA**

1          Q.   Do they fly out to Martha's
2   Vineyard and the islands there?
3          A.   Yeah.  Same with -- yeah,
4   Tailwind does a similar, and Cape Air does
5   similar routes.
6          Q.   Do you know what types of
7   aircraft they operate?
8          A.   I believe, they are mostly on
9   props, but I don't know exactly which each
10   of them operate.
11          Q.   Do the props tend to be smaller
12   than the jets?
13          A.   Yeah, anywhere between six and
14   eight seats.
15          Q.   And then you mentioned
16   Tailwind?
17          A.   Tailwind is another operator.
18          Q.   So who are they?
19          A.   They do intercity, right.  So
20   they have props.  They have seaplanes.
21   They can go from, like, the Hudson River,
22   I think, to, like -- they can also land on
23   a runway.  So they do scheduled flights
24   between different seaports and airports.



JENNIFER LOZADA                                    129

1        Q.    Oh, these are, like, float
2   planes?
3        A.    Yeah.
4        Q.    Or seaplanes?
5        A.    Yeah.
6        Q.    Okay.
7        A.    I think they are, like, -- I
8   forget what they are called -- amphibian
9   planes.  They can do air and sea.
10       Q.    But you know for a fact they
11  operate out of HPN currently?
12       A.    Not for a fact if it's
13  scheduled, but I've definitely seen HPN on
14  their website.
15       Q.    Okay.
16       A.    Yeah.
17       Q.    So it might not be regularly
18  scheduled, but it's the kind of thing where
19  you can charter a whole aircraft through
20  them?
21            MR. ALLISON:  Object to the
22       form.
23       A.    Or they schedule the flight,
24  right.  So if you are landing with XO,



A-441

130                    **JENNIFER LOZADA**

1  Blade or JSX, right, you can hop on one of

2  their planes and head out to the Hamptons

3  or into the City.

4          Q.   Got it.  Okay.  Do you have any

5  idea how many passenger seats these

6  amphibious planes are configured to hold?

7          A.   I don't know exactly.  Probably

8  six, six or eight.

9          Q.   Okay.  So you said Trade Wind

10 Cape Air, Tailwind.  Any other others that

11 you know of operating out of HPN?

12         A.   Not off the top of my head.

13         Q.   Who, if anyone, would know at

14 XO, if there are others?

15         A.   Most of the company if they are

16 at a computer.

17         Q.   Okay.

18         A.   Yeah.

19         Q.   Is that because you can go

20 online and see?

21         A.   Yep.

22         Q.   Okay.  Got it.

23              MR. CHEN:  Can we go off the

24         record.



800.DAL.8779
dalcoreporting.com

146                     JENNIFER LOZADA

1           Q.   Okay.  So if you can just

2    direct your attention to the second page,

3    5246, there's a couple of different bullet

4    points, and the first one reads, "Offer a

5    premium experience starting at check-in,

6    similar to luxury offerings on first class

7    with airlines, seats on Blade or JSX or

8    charter on Jet Linx and FlexJet."

9           A.   Uh-huh.

10          Q.   Are you familiar with Jet Linx?

11          A.   Yes.

12          Q.   Who or what is that?

13          A.   They are another charter

14   company.  They are a Part 135 air carrier.

15   They also have a sales arm where they sell

16   membership type packages.  I don't know if

17   it's necessarily fractionals, but they sell

18   membership packages.

19          Q.   Okay.  And FlexJet?

20          A.   Same.  So they are a partner

21   with Sentient.  So they offer membership on

22   aircraft.

23          Q.   Do you know if either of those

24   entities operate out of HPN?



A-443

**JENNIFER LOZADA**                                147

1          A.    Yes, they both do.

2          Q.    Do you know since when?

3          A.    FlexJet, probably at least 15

4    plus years.  Jet Linx, as long as they have

5    been around.  I'm not sure if that's 10 --

6    probably 10, 10, 15 years.

7          Q.    And you also see, there is a

8    reference to Blade and JSX; right?

9          A.    Uh-huh.

10         Q.    And they obviously both operate

11   out of HPN as well; right?

12         A.    Yes.

13         Q.    Would you consider them XO's

14   primary competitors at HPN?

15         A.    Yes.

16         Q.    All right.  And then if you see

17   the third bullet down, it says, "Offer a

18   more accommodating waiting area to pax when

19   handling delays and IROPS on both shared

20   and charter flights."

21         A.    Yes.

22         Q.    What are "IROPS"?

23         MR. ALLISON:  Object to the

24         form.



264

```
 1              C E R T I F I C A T I O N

 2

 3    STATE OF NEW YORK          )

 4                               ss:

 5    COUNTY OF WESTCHESTER      )

 6

 7              I, APRIL PEARL, Court Reporter

 8    and Notary Public within and for the County

 9    of Westchester, State of New York, do

10    hereby certify:

11              That I reported the proceedings

12    that are hereinbefore set forth, and that

13    such transcript is a true and accurate

14    record of said proceedings.

15              AND, I further certify that I

16    am not related to any of the parties to

17    this action by blood or marriage, and that

18    I am in no way interested in the outcome of

19    this matter.

20

21              April Pearl

22    _____

23              APRIL PEARL

24              Court Reporter
```



800.DAL.8779
dalcoreporting.com

DALCO

County Exhibit

AG

Gasparri Transcript

1
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    -------------------------------------X
     Delux Public Charter, LLC d/b/a JSX AIR and
4    JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE
     URBAN AIR MOBILITY, INC.,
5
                              PLAINTIFFS,
6
7         -against-        Case No.:
                           7:22-cv-01930-PMH
8
9    COUNTY OF WESTCHESTER, NEW YORK, a charter
     County; APRIL GASPARRI, in her official
10   capacity as AIRPORT MANAGER; and AVPORTS,
     LLC,
11
                              DEFENDANTS.
12   -------------------------------------X
13
14              DATE: February 8, 2023
15                 TIME: 9:38 A.M
16
17
18        VIDEOTAPED DEPOSITION of the
19   Defendant, APRIL GASPARRI, taken by the
20   respective parties, pursuant to a Court
21   Order and to the Federal Rules of Civil
22   Procedure, held at the offices of Dorf &
23   Nelson, 555 Theodore Fremd Avenue, Rye, New
24   York 10580, before Helen DeLucci, a Notary
25   Public of the State of New York.

```
                                              Page 2

 1
 2     A  P  P  E  A  R  A  N  C  E  S:
 3
 4     TROUTMAN PEPPER HAMILTON SANDER LLP
          Attorneys for the Plaintiffs
 5        Delux Public Charter, LLC d/b/a JSX AIR
          and JETSUITEX, INC.; XO GLOBAL, LLC; and
 6        BLADE URBAN AIR MOBILITY, INC.
          5 Park Plaza, Suite 1400
 7        Irvine, California 92614
          BY: STEVEN D. ALLISON, ESQ.
 8
 9     DORF & NELSON
          Co-Counsel form the Plaintiffs
10        The International Corporate Center
             55 Theodore Fremd Avenue
11        Rye, New York 10580
          (NOT PRESENT)
12
13     OFFICE OF THE WESTCHESTER COUNTY ATTORNEY
       MIRIAM E. ROCAH, ESQ.
14        Attorneys for the Defendants
          COUNTY OF WESTCHESTER, NEW YORK, a
15        charter County; APRIL GASPARRI, in her
          official capacity as AIRPORT MANAGER; and
16        AVPORTS, LLC
          148 Martine Avenue
17        White Plains, New York 10601
          BY: DAVID H. CHEN, ESQ.
18
19
20     ALSO PRESENT:
          ADAM VENTURINI, Legal Videographer
21        JENNA CAFFERY, In-house counsel to XO
          RAYMOND MOSS, Outside General Counsel for
22        JSX and Delux
23
                   *         *         *
24
25
```

Page 3

1

2        F E D E R A L   S T I P U L A T I O N S

3

4

5        IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20       IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24            *      *      *      *

25

```
                                    Page 4

 1                  A. GASPARRI

 2            THE VIDEOGRAPHER: Good morning.

 3      We are going on the record at

 4      9:42 a.m. on February 8th, 2023.

 5            This is media unit 1 in the

 6      video recorded deposition of April

 7      Gasparri in the matter of Delux

 8      Public Charter, et al, v. County of

 9      Westchester, et al.  It is filed in

10      the United States District Court for

11      the Southern District of New York,

12      Case Number 7:22-cv-01930-PMH.

13            My name is Adam Venturini,

14      representing Veritext, and I'm the

15      videographer.  The court reporter

16      today is Helen DeLucci, also from the

17      firm Veritext.

18            I'm not authorized to

19      administer an oath.  I'm not related

20      to any party in this action, nor am

21      financially interested in the

22      outcome.  Counsel and all present

23      will be noted on the stenographic

24      record.

25            Will the court reporter please
```

A-449

Page 5

```
1                    A. GASPARRI
2          swear in the witness and counsel may
3          proceed.
4    A P R I L  L.  G A S P A R R I, called as a
5    witness, having been first duly sworn by a
6    Notary Public of the State of New York, was
7    examined and testified as follows:
8    EXAMINATION BY
9    MR. ALLISON:
10         Q.    Good morning, Ms. Gasparri.
11   And I'm saying that correctly, right, your
12   last name?
13         A.    You are.
14         Q.    Okay, good.   Can you please
15   state your full name for the record?
16         A.    April Lynn Gasparri.
17         Q.    And what is your current
18   address?
19         A.    218 Grant Terrace in
20   Mamaroneck, New York, zip code 10543.
21         Q.    Thank you.   And have you been
22   deposed before, had your deposition taken
23   before?
24         A.    I have.
25         Q.    Okay.   On how many occasions?
```

Page 75

1                    A. GASPARRI

2        but if you understand the question,

3        you can answer.

4        A.      Negative.

5        Q.      And does Tailwind operate out

6    of HPN?  Are you familiar with that

7    company?

8        A.      I'm not familiar with that

9    company.

10       Q.      Fair enough.  Now, if you can

11   stick on the same document here, if you go

12   back to the first page please, there is --

13   under the definition of airline, there is a

14   reference to nine seats there, and it says

15   "Airline shall mean any person providing

16   passenger service in aircraft designed for

17   more than nine passenger seats," and then

18   it says "including but not limited to," and

19   gives the various categories.

20            Do you know what the purpose of

21   the nine-seat limitation is in the TUPs?

22       A.      I do not know the purpose.

23       Q.      Have you ever inquired of

24   anybody at the County, other than counsel,

25   about what the reason was or the rationale

A-451

Page 76

```
1                    A. GASPARRI

2    was for the nine-seat limitation?

3         A.    That's attorney/client

4    privilege.

5                 MR. CHEN:  He said other than

6            with counsel.

7                 MR. ALLISON:  I was trying to

8            keep lawyers out.

9                 MR. CHEN:  So it's a yes or no

10           question.  Have you -- you can repeat

11           it --

12        A.    No, I do not.  No, have not.

13        Q.    When you reviewed the TUPs,

14   this document, Exhibit 2, did you see any

15   reference to Part 380, public charters

16   anywhere in the document?

17        A.    May I take a moment to review

18   it?

19        Q.    You sure can.  And with any

20   document that I give you, you can take the

21   time to review it.  I should have said that

22   in the beginning.

23                 I see you're reading the last

24   couple of pages.  It actually stops at the

25   second to last page because it's through
```

Page 350

1                    A. GASPARRI

2              C E R T I F I C A T E

3

STATE OF NEW YORK        )

4                        :  SS.:

COUNTY OF PUTNAM         )

5

6         I, HELEN DELUCCI, a Notary Public for

7    and within the State of New York, do hereby

8    certify:

9         That the witness whose examination is

10   hereinbefore set forth was duly sworn and

11   that such examination is a true record of

12   the testimony given by that witness.

13        I further certify that I am not

14   related to any of the parties to this

15   action by blood or by marriage and that I

16   am in no way interested in the outcome of

17   this matter.

18        IN WITNESS WHEREOF, I have hereunto

19   set my hand this 10th day of February, 2023.

20

21

22   _____

          HELEN DELUCCI

23

24

25

A-453

**County Exhibit
AH
Drabinsky Transcript**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.: 7:22-cv-01930(PMH)
- - - - - - - - - - - - - - - - - - - -X
DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and
JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE
URBAN AIR MOBILITY, INC.,

                         Plaintiffs,

         -against-

COUNTY OF WESTCHESTER, NEW YORK, a charter
County; APRIL GASPARRI, in her official
Capacity as AIRPORT MANAGER; and
AVPORTS, LLC,

                         Defendants.
- - - - - - - - - - - - - - - - - - - -X
                         February 15, 2023
                         8:06 a.m.


DEPOSITION of DAVID DRABINSKY, a witness on behalf

of DELUX PUBLIC CHARTER, LLC D/B/a JSX AIR And

JETSUITEX, INC., a Plaintiff herein, taken pursuant

to Notice, and held at the offices of Troutman

Pepper Hamilton Sanders, LLP, 875 3rd Avenue, New

York, New York, before Ceita Lazar, a Court

Reporter and Notary Public of the State of New

York.



2

```
 1   A P P E A R A N C E S :

 2

 3       TROUTMAN PEPPER HAMILTON SANDERS, LLP
             Attorneys for Plaintiffs
 4           5 Park Plaza
             Suite 1400
 5           Irvine, California 92614-2545
         BY:  SAMRAH R. MAHMOUD, ESQ.

 6

 7       OFFICE OF THE WESTCHESTER COUNTY ATTORNEY
             Attorneys for Defendant
 8           COUNTY OF WESTCHESTER, NEW YORK
             148 Martine Avenue, Suite 600
 9           White Plains, New York 10601
         BY:  DAVID H. CHEN, ESQ.
10           Deputy County Attorney
             PHOENIX MARINO, ESQ.
11           Assistant County Attorney Litigation
             Bureau

12

13

14       ALSO PRESENT:

15           RAYMOND MOSS
             JENNA CAFFREY, via telephone
16           PAUL NOTO, via telephone

17

18

19

20

21

22

23

24
```



A-455

**DAVID DRABINSKY**                                    **3**

1              IT IS HEREBY STIPULATED AND AGREED

2    by and between the attorneys for the respective

3    parties herein, that filing and sealing be and the

4    same are hereby waived.

5

6

7              IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to the form of the

9    question, shall be reserved to the time of the

10   trial.

11

12

13             IT IS FURTHER STIPULATED AND AGREED

14   that the within deposition may be signed and sworn

15   to before any officer authorized to administer an

16   oath, with the same force and effect as if signed

17   and sworn to before the Court.

18

19

20

21

22

23

24

800.DAL.8779
dalcoreporting.com



DAVID DRABINSKY                                    4

1  DAVID DRABINSKY,

2  having first been duly sworn by the Notary Public

3  (Ceita Lazar), and stating his address as 2728 Ceder

4  Spring Road, Apartment 523, Dallas, Texas 75201, was

5  examined and testified as follows:

6

7  EXAMINATION

8  BY MR. CHEN:

9      Q.   Good morning, Mr. Drabinsky.  My name is

10 Dave Chen.  I represent the county of Westchester in

11 this matter, and I'll be asking you some questions

12 today in regards to our federal litigation.

13          First question is, have you been deposed

14 before?

15     A.   I have not.

16     Q.   Okay.  Congratulations on your first

17 deposition.  So I'll go through a couple of ground

18 rules.

19          You know there's a court reporter,

20 obviously, who's taking down everything we say, so

21 for that reason, all of our -- everything has to be

22 verbal.  So I just ask that your responses be, you

23 know, the yes/no variety versus, like, nodding or

24 shaking your head.  It's hard to transcribe, like,



A-457

**DAVID DRABINSKY**                                    100

1   dispute with Westchester County?

2        A.   I don't know.

3        Q.   Do you know if specifically JSX has filed

4   any complaints with the FAA regarding any dispute

5   with Westchester County?

6        A.   I don't know.

7        Q.   Do you know if JSX has informed the FAA of

8   its dispute with Westchester County?

9        A.   I don't know.

10       Q.   Same question but broadening it to any

11   other federal agency like the DOT?

12       A.   I don't know.

13       Q.   And if you recall earlier, we looked at

14   the TUPs, the county's Terminal Use Procedures.

15            Do you have any reason to believe that the

16   FAA or any other federal agency has disapproved of

17   the TUPs in any way?

18       A.   I don't know.

19       Q.   Okay.  Other than the three plaintiffs in

20   this litigation, so JSX, XO, and Blade, setting

21   those aside, do you know of any other public charter

22   companies that operate out of the FBOs at HPN as

23   opposed to out of the terminal?

24       A.   Yes, there are other operators.



A-458

DAVID DRABINSKY                    101

```
1        Q.   And of those other ones, do you know if
2   any of them operate aircraft with more than nine
3   passenger seats?
4        A.   Yes.
5        Q.   And of those, do you know of any that sell
6   individual seats on their flights to the public?
7             MS. MAHMOUD:  Object to form.
8        A.   Yes.
9        Q.   And who are they?
10       A.   I believe there's one called Hard Rock
11  Air, I believe Wheels Up.  That's some examples.
12       Q.   Any others?
13       A.   There's flights operated.  I don't know
14  the name of the entity, but it's for the Yellowstone
15  Club and also for Baker's Bay, which is in the
16  Bahamas.
17       Q.   Any others?
18       A.   That's all that come to the top of my mind
19  right now.
20       Q.   What is Wheels Up?
21            MS. MAHMOUD:  Object to form.
22       A.   Can you repeat the question?
23       Q.   What or who is Wheels Up?  I'm just not
24  familiar with that entity.
```



DAVID DRABINSKY                    102

1        A.   It's a group that owns and operates

2   aircraft under Part 135.  They're publicly traded.

3        Q.   Do you know if they also operate under

4   Part 380?

5        A.   I believe so.

6        Q.   And do you know -- do you know where they

7   fly to out of HPN?

8        A.   I don't.

9        Q.   Okay.  Do you know how long they've

10  operated out of HPN?

11       A.   Since the company was founded.

12       Q.   Do you have any idea when that was?

13       A.   In the last five to ten years.

14       Q.   And do you know which -- excuse me.  Do

15  you know which FBO they operate out of?

16       A.   I do not.

17       Q.   Do you know how they sell seats for their

18  flights?

19       A.   I do not.

20            MR. CHEN:  Okay.  If anyone needs a break,

21       this is sort of a natural time to take, one but

22       if no one needs one, I'll keep going.

23

24            (A recess was taken.)



A-460

227

```
 1           C E R T I F I C A T I O N

 2

 3    STATE OF NEW YORK         )

 4                              )   ss.

 5    COUNTY OF KINGS           )

 6    I, CEITA LAZAR, Court Reporter

 7    and Notary Public within and for the County of

 8    Kings, State of New York, do hereby certify:

 9    That I reported the proceedings that are

10    hereinbefore set forth, and that such transcript is

11    a true and accurate record of said proceedings.

12    AND, I further certify that I am not related to any

13    of the parties to this action by blood or marriage,

14    and that I am in no way interested in the outcome of

15    this matter.

16

17    IN WITNESS WHEREOF, I have hereunto set my hand.

18

19

20

21

22

23           CEITA LAZAR

24           Court Reporter
```



County Exhibit
**AI**
**McDonald Transcript**

```
 1
 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     -----------------------------------X
       DELUX PUBLIC CHARTER, LLC d/b/a
 4     JSX AIR and JETSUITEX, INC., XO
       GLOBAL, LLC; and BLADE URBAN AIR
 5     MOBILITY, INC.,
                                     Case No.
 6             PLAINTIFFS,     7:22-CV-01930(pmh)
 7         -against-
 8     COUNTY OF WESTCHESTER, NEW YORK,
       a charter county; APRIL GASPARRI,
 9     in her official capacity as
       AIRPORT MANAGER, and AVPORTS, LLC,
10
               DEFENDANTS.
11     -----------------------------------X
               555 Theodore Fremd Avenue
12             Rye, New York   10580
               February 17, 2023
13             9:30 a.m.
14
15         DEPOSITION of JOAN McDONALD on behalf of the
16     Defendant, County of Westchester, in the
17     above-captioned matter, held at the above time
18     and place, before Howard Breshin, a Notary Public
19     of the State of New York.
20
21
22
23
24
25
```

A-462

```
                                                    Page 2

 1
 2    A P P E A R A N C E S :
 3
      DORF & NELSON, LLP
 4        Attorneys for Plaintiffs
          555 Theodore Fremd Avenue
 5        Rye, New York  10580
      BY: JONATHAN NELSON, ESQ.
 6        RACHEL LUST, ESQ.
          914 381-7600
 7
      TROUTMAN, PEPPER, HAMILTON, SANDERS, LLP
 8        Attorneys for Plaintiffs
          5 Park Plaza, Suite 1400
 9        Irvine, California  92614-2545
          (Not Present)
10
      OFFICE OF THE WESTCHESTER COUNTY ATTORNEY
11        Attorney for Defendants
          148 Martine Avenue - Suite 600
12        White Plains, New York  10601
      BY: SEAN CAREY, ESQ.
13        PHOENIX MARINO, ESQ.
          914 995-3132
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 3

 1                    STIPULATIONS

 2              IT IS HEREBY STIPULATED AND AGREED

 3         by and between the attorneys for the

 4         respective parties hereto, that this

 5         examination may be sworn to before any

 6         Notary Public.

 7              IT IS FURTHER STIPULATED AND

 8         AGREED that the sealing and filing of

 9         the said examination shall be waived.

10              IT IS FURTHER STIPULATED AND

11         AGREED that all objections to questions

12         except as to form shall be reserved for

13         trial.

14

15

16

17

18

19

20

21

22

23

24

25
```

A-464

```
                                        Page 4
 1                     JOAN McDONALD
 2    J O A N    M c D O N A L D,  a witness called on
 3    behalf of the Plaintiffs, having been first duly
 4    sworn, was examined and testified as follows:
 5                     THE COURT REPORTER:  Can I have
 6            your name and business address for the
 7            record?
 8                 THE WITNESS:  Joan McDonald, 148
 9            Martine Avenue, White Plains, New York
10            10601.
11    EXAMINATION BY
12    MR. NELSON:
13         Q.    Good morning, Ms. McDonald.  My name
14    is Jonathan Nelson and we have introduced one
15    another.  I don't know if you have ever been
16    deposed before.
17         A.    I have.
18         Q.    You have.  I am going to keep my
19    introduction a little bit briefer because you
20    probably know most of it.  I am going to be
21    asking you a series of questions.  Every once in
22    a while, I am not as articulate as I hope I am
23    and so if you don't understand what I am asking
24    or if you want me to clarify, please, just tell
25    me and I will do my best to do so.
```

A-465

Page 100

1                         JOAN McDONALD
2     the crux, that is what we are here for.  But for
3     anything that was said to you by your counsel or
4     by Mr. Nonna, if you could tell me how this
5     arose?
6          A.    We were attempting -- yes, I will tell
7     you what happened.  The matter was brought to the
8     attention of the county, that the charterers were
9     operating nine seats and greater.  We determined
10    that they were in violation of the terminal use
11    regulations.  We informed Blade of that and then
12    we attempted and recommended various ways to work
13    with the charterers so that they could conform to
14    the TUR.
15         Q.    Okay.  You say we a lot, so when you
16    say we are you just speaking about the county?
17         A.    Yes, we the county in general.
18         Q.    How was the county informed of the
19    issue that you just recited?
20         A.    I don't remember that exactly.
21         Q.    What were the ways you said you tried
22    to work with Blade?  What were the ways that you
23    tried to work with Blade?
24         A.    We recommended that we would make --
25    we informed them because of the nine seats and

A-466

Page 101

JOAN McDONALD

1

2     selling to the general public, that they had to

3     conform to the terminal use regulations.  We

4     proposed -- and we met with them and we would

5     have segregated out a portion of the commercial

6     terminal on the second floor for passengers on

7     these chartered flights to go through their own

8     security, and so that was one option we put on

9     the table for departures.  We also put on the

10    table that they could come back through the FBOs.

11        Q.    Was there also an option that they

12    just operate less seats per plane?

13        A.    Oh, yes, yes, they could always do

14    under nine.

15        Q.    Wouldn't that just increase the number

16    of flights, though?

17        A.    Not necessarily.  I don't know if that

18    would or would not, but the law states that if

19    you are nine seats or more, you have to conform

20    to the terminal use regulations.

21        Q.    I understand, but I'm just trying --

22    was there a concern -- is there a concern in the

23    community about the number of flights that fly in

24    and out of Westchester County Airport that you

25    are aware of?

A-467

Page 102

                          JOAN McDONALD

1

2       A.      Yes.

3       Q.      And if there is a plane that holds

4    let's say 30 seats, would that be -- with regard

5    to those concerns, would that be better than two

6    planes holding 15 seats?

7              MR. CAREY:  I am just going to

8              note the objection for the record as to

9              form.  You can answer.

10      A.      Well, first of all, if they are more

11   than nine seats, they would have to go adhere to

12   the terminal use regulations and they would be

13   subject to the lottery, so they would fall within

14   those requirements that are in county law

15   regarding the terminal use regulations, which I

16   don't know the number off the top of my head, but

17   has a number of flights and passengers per half

18   hour.  So that they would still have to adhere to

19   those terminal use regulations if they are more

20   than nine seats.

21      Q.      I think it is actually the number of

22   passengers that go through the terminal in a

23   period of time.

24      A.      Two separate things.

25      Q.      And so what I am asking is with regard

Page 103

1                    JOAN McDONALD

2   to the concerns, the community concerns that we

3   just spoke about with regard to the number of

4   flights going in and out of Westchester County

5   Airport, with regard to those particular

6   concerns, would it be more beneficial to have one

7   30-person flight or two 15-person flights?

8        A.    That is a personal_-- that's a

9   subjective decision and my job is to make sure

10  that we adhere to the terminal use regulations

11  and the number of flights that are restricted by

12  them.

13       Q.    Understood.  What I am saying is,

14  though, based on your being here on the part of

15  the county and the county is concerned about

16  community concerns I would imagine, right?

17       A.    Yes.

18       Q.    One of those community concerns we

19  just spoke about is the number of flights going

20  in and out of Westchester County Airport; is that

21  right?

22       A.    Yes.

23       Q.    Based upon the county's concern about

24  those concerns, from the county's perspective,

25  would it be better to have one 30-person flight

A-469

Page 104

1                      JOAN McDONALD

2    or two 15-person flights?

3                    MR. CAREY:   I am going to put an

4            objection to form on the record.

5        A.    Well, again the total number of

6    flights at the commercial terminal are dictated

7    by the terminal use restrictions, so that's what

8    we would do.

9        Q.    Okay.  Let me turn to, I think we can

10   get this streamlined a bit.  We can turn to 18.

11   Do you recognize what 18 is, Plaintiff's 18?  It

12   is Bates stamp number 9794.

13       A.    I do.

14       Q.    What is it?

15       A.    It is the lottery for April 5th, so

16   the quarterly lottery for April 5th, 2022 at the

17   commercial terminal.

18       Q.    So if we are looking at each column,

19   the heading of the column is the time period,

20   right?  So the first one is 5:30 a.m. to 5:59

21   a.m.

22       A.    That is correct.

23       Q.    So let's just jump over to the column

24   that says 7:30 a.m. to 7:59 a.m.

25       A.    Yes.

Page 105

                    JOAN McDONALD

1

2      Q.     And at the bottom there is number 13.

3   Do you see that?

4      A.     I do.

5      Q.     And that's the number of passengers --

6   passenger availability in the terminal that would

7   still be available during that time slot?

8      A.     That is correct.

9      Q.     So what I am asking is, based upon --

10  specifically about this column --

11     A.     That time period.

12     Q.     That time period, if -- with regard to

13  the concerns that we said before, the community

14  concerns about the number of flights flying in

15  and flying out, if there was an additional flight

16  that needed to be had in order to accommodate the

17  same amount of passengers, would that be

18  beneficial or would that be not beneficial with

19  regard to those community concerns?

20     A.     I don't really know how to answer that

21  question.

22     Q.     And why is that?

23     A.     Because I think again that is a

24  subjective opinion and my job is to make sure

25  that we adhere to the TUR that says at that time

A-471

Page 106

JOAN McDONALD

1

2    slot there could be a flight with 13 passengers.

3        Q.    Right.  I am not_-- respectfully, I am

4    not asking about your opinion.  I respect your

5    opinion but I am not asking about your opinion.

6    I am asking about the county's position with

7    regard to those complaints or those concerns

8    about the number of flights going in and out.

9    That's what I am asking about.  So would the

10   county's position be that it would be beneficial

11   to have an additional flight to accommodate the

12   exact same amount of passengers in this time

13   slot?

14            MR. CAREY:  I am just going to

15            note for the record that this question

16            has been asked and answered a couple of

17            ways.  I am not going to direct you not

18            to answer, but if we are going to tread

19            the same ground...

20       A.    The county has not opined on that one

21   way or another.

22       Q.    So while we are here, let's just look

23   at the second column just for a moment from 6:00

24   to 6:29 a.m.

25       A.    Yes.

Page 173

JOAN McDONALD

1

2      Q.      And for those people who want to wait

3   in the terminal to take off, I guess -- you know,

4   for instance, JSX has some immunocompromised

5   passengers who take JSX specifically for that

6   reason.  That wouldn't be -- that wouldn't cater,

7   I guess, to that ailment, right?  I mean they

8   would still have to -- withdrawn.

9           Clients would have to wait in the main

10   terminal to take off under this sort of

11   alternative plan, right?

12      A.      In the main terminal, but we had put

13   on the table setting up a separate area on the

14   second floor of the terminal for them.

15      Q.      But customers with immune compromised

16   or immunity compromised systems or disabilities

17   would still need to, even in that other part,

18   still need to go through the terminal, right?

19      A.      Yes.

20      Q.      And that would sort of defeat the

21   purpose for which many of them went to JSX in the

22   first place?

23      A.      I don't know because that issue was

24   never raised.

25      Q.      And I guess with regard to the lottery

Page 174

                        JOAN McDONALD

1

2    system, if the plaintiffs went into the lottery

3    system, I think we saw there is some slots where

4    there is just no availability?

5         A.    Yes.

6         Q.    And then there are other slots where

7    there are airlines which are already in it and

8    the airlines who already had the slots wouldn't

9    lose the slots, right?

10        A.    If you -- I don't know the answer to

11   that and, you know, that's why the lottery is

12   once a quarter.

13        Q.    I guess there would be instances where

14   the plaintiffs would not be able to maintain the

15   same routes that they are conducting now if they

16   were to enter into this lottery system where

17   there is some with restricted time periods and

18   other time periods where airlines already have

19   the majority of the people allowance?

20        A.    Right.  If they were in, let's say,

21   you know, the lottery that is coming up, the

22   April lottery, there would be the slots that

23   would be available for them to participate in but

24   then those could change in the next quarter, so

25   it depends.  It is a point in time as far as what

Page 178

1                    CERTIFICATION

2

3     STATE OF NEW YORK      )

4                            )   ss:

5     COUNTY OF WESTCHESTER )

6

7              I, HOWARD BRESHIN, a Court Reporter

8     and Notary Public within and for the State of New

9     York, do hereby certify:

10             That I reported the proceedings that

11    are hereinbefore set forth, and that such

12    transcript is a true and accurate record of said

13    proceedings.

14             I further certify that I am not

15    related to any of the parties to this action by

16    blood or marriage, and that I am in no way

17    interested in the outcome of this matter.

18             IN WITNESS WHEREOF, I have hereunto

19    set my hand.

20

21    _____

22             HOWARD BRESHIN,

23             COURT REPORTER

24

25

A-475

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DELUX PUBLIC CHARTER, LLC
d/b/a JSX AIR and JETSUITEX, INC.;

XO GLOBAL, LLC; and

BLADE URBAN AIR MOBILITY, INC.,

Plaintiffs,

-against -

COUNTY OF WESTCHESTER,

Defendant.

**DECLARATION OF MARK DUEBNER IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT.**

Civil Action No.
22-cv-01930 (PMH)

Mark Duebner declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

1. I am the VP for Corporate Real Estate and Airport Affairs at JSX ("JSX"), one of the Plaintiffs in the above-captioned case. I have personal knowledge, or knowledge based upon my review of documents, of the facts set forth in this declaration and, if called upon to testify as a witness, I could and would testify competently thereto.

2. I am authorized to submit this Declaration on behalf of JSX.

3. I submit this Declaration in support of Plaintiffs' opposition to Defendant's Motion for Summary Judgment.

4. As an Aviation Executive, I have served in the Aviation industry for more than 12 years, in both the government and private sector as such, I have a deep understanding of the Federal Aviation Administration ("FAA"), Part 380, Part 135 Operations and Airport development.

5. Under Title 49 Air Commerce and Safety, in order to provide air transportation an air carrier must obtain the required authorizations from the FAA for Operations Specifications and the Department of Transportation ("DOT") in the form of an Air Carrier Certificate.

A-476

6.      JSX, Inc. is a public charter operator authorized under 14 C.F.R. Part 380 to arrange and sell seats on public charter flights, which are non-scheduled operations under FAA regulations. JSX, Inc.'s public charter flights are flown by Delux.

7.      Delux Public Charter, LLC ("Delux") holds (i) an air carrier certificate issued by the Federal Aviation Administration ("FAA") which authorizes on-demand operations under 14 C.F.R. Part 135, and (ii) Commuter Air Carrier Authorization issued by the U.S. Department of Transportation ("DOT").

8.      Aircraft operators that utilize Westchester County Airport ("HPN") terminal (the "Terminal") are required to have an TSA approved Aircraft Operator Standard Security Program ("AOSSP"). The AOSSP sets forth the standard security measures to which such carriers must adhere.

9.      According to the TSA, the AOSSP applies to all air service operating into or out of a TSA controlled sterile area.

10.     The Terminal is a "sterile" area which requires all individuals to be either badged by the airport for this area, or they must go through TSA screening.

11.     The current TSA approve security program for Part 380 Operators like JSX, is called the Twelve-Five Standard Security Program (TFSSP). TFSSP outlines the security requirements for Part 135 certificated carriers and is acceptable for non-sterile areas.

12.     In fact, JSX does not operate from any sterile location in its network.

13.     With the proposed Terminal requirement, JSX would be unable to deplane any in-bound passengers at HPN because they would not have departed from a sterile area of another airport.

14.     Simply put, JSX would not be able to continue operations if forced to operate from the Terminal due to the fact that no in-bound passenger could enter the Terminal per Federal regulations.

15.    It is not possible to operate air service where passengers could not return to the location they departed from. JSX would no longer be able to operate service at HPN and would lose all revenue from the operation of these flights, as well as the amount of investment we have made in real estate, aircraft, and personnel.

16.    In addition to the above, forcing JSX to operate from the Terminal (if it could) will have damaging and detrimental effects on JSX's routes, services, and pricing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 26 day of October 2023 in *Dallas, Texas*.

Mark Duebner

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DELUX PUBLIC CHARTER, LLC
    d/b/a JSX AIR and JETSUITEX, INC.;
XO GLOBAL, LLC; and
BLADE URBAN AIR MOBILITY, INC.,

                                    Plaintiffs,

            -against -

COUNTY OF WESTCHESTER,

                                    Defendant.

**DECLARATION OF DAVID DRABINSKY IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT.**

Civil Action No.
22-cv-01930 (PMH)

David Drabinsky declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

1. I am the Vice President of Strategy and Corporate Development at Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc. (collectively, "JSX"), one of the Plaintiffs in the above-captioned case. I have personal knowledge, or knowledge based upon my review of documents, of the facts set forth in this declaration and, if called upon to testify as a witness, I could and would testify competently thereto.

2. I am authorized to submit this Declaration on behalf of JSX.

3. I submit this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment.

4. Delux Public Charter, LLC ("Delux") holds (i) an air carrier certificate issued by the Federal Aviation Administration ("FAA") which authorizes on-demand operations under 14 C.F.R. Part 135, and (ii) Commuter Air Carrier Authorization issued by the U.S. Department of Transportation ("DOT").

5. JetSuiteX, Inc. is a public charter operator authorized under 14 C.F.R. Part 380 to arrange and sell seats on public charter flights, which are non-scheduled operations under FAA regulations. JetSuiteX, Inc.'s public charter flights are flown by Delux.

1

6.     There are several reasons why JSX's move from Westchester County Airport's ("HPN") Fixed Based Operators ("FBOs") to the HPN's terminal (the "Terminal") restrict JSX's aircraft operations, ranging from security limitations to the devastating effects on JSX's prices, routes, and services.

7.     The Transportation Security Administration ("TSA") approved security program for Part 135 air carriers such as Delux that operate from FBO locations is the Twelve-Five Standard Security Program ("TFSSP"). The TFSSP sets forth the security requirements to which such carriers must adhere.

8.     JSX's TSA-approved TFSSP does not authorize JSX to operate at a terminal where all passengers must clear TSA-staffed security screening checkpoints to access the terminal's sterile area.

9.     Specifically, the TSA and Federal law requires aircrafts operating from the Terminal to utilize a different security plan than what JSX currently holds.

10.    To utilize the Terminal, aircraft operators are required to adopt and adhere to a TSA approved Aircraft Operator Standard Security Program ("AOSSP"), to operate out of a sterile area at an airport.

11.    JSX currently operates from HPN's FBOs under JSX's TSA-approved TFSSP.

12.    Even if JSX could operate from the Terminal, many services that are offered through its business model is predicated on operating at FBOs, would no longer be permitted.

13.    When departing from the Terminal, passengers must go through a TSA security checkpoint, also known as a Security Identification Display Area (SIDA), to enter the sterile area of an airport.

14. Once passengers pass through a SIDA, they are considered "sterile" while remaining in the sterile airport area.

15. However, the FBOs where JSX operates from are not sterile, as their customers do not go through a SIDA checkpoint.

16. Passengers who go through a non-sterile checkpoint, like JSX's customers, cannot deplane at a sterile terminal due to insufficient screening at their departure airport. As a result, JSX would be unable to fly any of their current routes from non-sterile FBOs to HPN.

17. As examples, JSX would not be able to operate its routes from Miami/Opa-Locka ("OPF"), Nashville International ("BNA") and Dallas Love Field ("DAL") to HPN, as its passengers would not be authorized by TSA to enter the terminal at HPN.

18. JSX has future bookings for the BNA-HPN route from October 2023 to March 31, 2025. It has sold approximately 4,698 seats, generating revenue of roughly $1,610,360.00.

19. Furthermore, JSX currently has future bookings for the DAL-HPN route from October 2023 to March 31, 2025. It has sold approximately 2,220 seats, generating revenue of roughly $1,419,396.00.

20. For all the above routes, JSX flights depart from non-sterile FBOs.

21. If JSX were mandated to operate at the Terminal, that requirement would deal a devasting blow to JSX's revenue and essentially eliminate its operations to HPN, resulting in an immediate financial loss of roughly $3,029,756.00.

22. JSX's business model allows it to charge the prices it does because of the benefits of flying into and out of non-sterile locations such as the FBOs.

23. Enplaning and deplaning in two separate locations at the HPN would not logistically feasible as would cause JSX to offer different services.

24. In addition to the above, HPN's FBOs provide an airport experience unlike the Terminal, due to the ability to arrive 20 minutes prior to departure, convenience, access to lounges, and reduced crowds that FBOs provide.

25. This would also impact the ease of boarding for those passengers who have disabilities, travel with small children, or travel with oversized pets.

26. This litigation will have far-reaching economic implications in underserved regional airports that lack sterile locations.

27. The Terminal requirement will undoubtedly result in further isolation of these underserved communities.

28. In sum, the Plaintiffs' airport operations would be substantially reduced and its routes and services adversely impacted should the Terminal requirement be allowed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 30th day of October 2023 in Dallas, Texas.

David Drabinsky

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DELUX PUBLIC CHARTER, LLC
d/b/a JSX AIR and JETSUITEX, INC.;

XO GLOBAL, LLC; and

BLADE URBAN AIR MOBILITY, INC.,

Plaintiffs,

-against -

COUNTY OF WESTCHESTER,

Defendant.

**DECLARATION OF RAJAT KHURANA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT.**

Civil Action No.
22-cv-01930 (PMH)

Rajat Khurana declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

1. I am the Chief Commercial Officer of XO Global, LLC ("XO"), one of the Plaintiffs in the above-captioned case. I have personal knowledge, or knowledge based upon my review of documents, of the facts set forth in this declaration and, if called upon to testify as a witness, I could and would testify competently thereto.

2. I am authorized to submit this Declaration on behalf of XO.

3. I submit this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment.

4. XO is a public charter operator authorized under 14 C.F.R. Part 380 to arrange and sell seats on public charter flights, which are non-scheduled operations under FAA regulations. XO's public charter flights are flown by variety of Part 135 Air Carriers.

5. XO's Part 135 Air Carriers holds (i) an air carrier certificate issued by the Federal Aviation Administration ("FAA") which authorizes on-demand operations under 14 C.F.R. Part 135, and (ii) Commuter Air Carrier Authorization issued by the U.S. Department of Transportation ("DOT").

6. XO provides a luxury jet experience to its passengers.

1

6. XO provides a luxury jet experience to its passengers.

7. The Transportation Security Administration ("TSA") is responsible for creating and assigning security programs for the Aviation community based on their FAA classification.

8. The TSA has specifically approved the Twelve-Five Standard Security Program ("TFSSP") for the Air Carriers. The TSSP outlines and sets the security requirements to which such carriers must adhere.

9. The TFSSP does not authorize the Air Carriers to operate at a terminal where all passengers must clear TSA-staffed security screening checkpoints to access the terminal's sterile area.

10. This is important to highlight because, depending on the exact location within an airport, there are different levels of security for difference types of air carriers.

11. As such, HPN's terminal (the "Terminal") has been designated as sterile area and is required to establish a Security Identification Display Area ("SIDA").

12. The TSA approved security program for the Terminal differs from the approved program for the FBO, which is a non-sterile location.

13. Unlike the FBOs, the Terminal requires all passengers to pass through a TSA security checkpoint in order to enter the sterile Terminal.

14. If XO was required to operate out of the Terminal, it would disrupt XO's market as it would be restricted from departing a non-sterile FBO and deplaning in the Terminal.

15. Specifically, XO would not be able to operate its route from Fort Lauderdale International Airport ("FLL") to HPN, as well as Palm Beach International Airport (PBI) to HPN because passengers would be departing from non-sterile locations (generally FBOs) and, as such, would be unable to enter the Terminal.

16.    Over the last twenty-one (21) months, XO has generated approximately $13 million in revenue from the FLL to HPN route, while providing services to approximately six thousand customers. Flights from HPN to FLL also generated $13 million and flew approximately six thousand customers. The collective impact is $26 million and twelve thousand customers. This is XO's most lucrative route.

17.    Over the last twenty-one months, XO has also generated approximately $10 million in revenue from the PBI to HPN, servicing approximately five thousand customers. Flights from HPN to PBI generated $9.9 million and flew approximately five thousand customers. The collective impact is $19.9 million and ten thousand customers. This is XO's second most lucrative route.

18.    In addition to the devasting effect that moving into the Terminal would have on routes, it would also adversely impact the services XO provides to its customers.

19.    XO's boarding procedures are unique from those at the Terminal as passengers may arrive at the FBO about thirty (30) minutes prior to departure and they are greeted by on the ground service representatives who accept their luggage for a K-9 screening.

20.    For Plaintiffs' customers, a significant aspect of the experience is the ability to wait comfortably at the FBO before boarding the plane rather than in a very crowded terminal. This experience is preferred by many elderly citizens that are a large percentage of flyers for XO.

21.    The luggage is then loaded onto the aircraft. While the passengers wait in the FBO they are offered snacks, drinks, comfortable seating, and office space if needed.

22.    Boarding starts about fifteen (15) minutes prior to departure. Pilots cross-check IDs with their manifest, and aircraft doors are typically closed 10 minutes prior to departure.

3

23.    XO and the Air Carriers have the unique ability to utilize its discretion to delay departure time of the flight to accommodate late arrival of the passengers or depart earlier in the event all passengers are onboard earlier, which is an invaluable part of the customer service experience that XO provides and it will not be able to do so if the flights are forced into the Terminal.

24.    Upon arrival, the line service at the FBO removes the luggage from the aircraft and passes it out to each passenger immediately either planeside or at the FBO lobby.

25.    If XO is forced to use the Terminal and is still able to sell any tickets, our passengers would need to arrive to the airport much earlier, wait in line to check in, and have some sort of a boarding pass. Our passengers would then be required to wait in a second line for TSA security checks and make their journey toward their designated gate. It would be impossible to provide the same level of amenities, service and experience at the gate and at the Terminal that our passengers are accustomed to at the FBO.

26.    Another luxury service XO provides their passengers is catered meals on both inbound and outbound flights, regardless of time in the air and distance unlike commercial carriers operating out of HPN that only provide snacks.

27.    Catered meals are supplied by gourmet restaurants and are stored at the FBO until take off.

28.    Breakfast meals have luxury items that include, but is not limited to, Smoked Salmon Bagel Sandwich and Farm Egg Frittata.[1]

29.    Lunch meals have luxury items that includes, but is not limited to, Seared Faroe Island Salmon, Grilled Shrimp Cobb Salad and Fregola Pasta & Cannelini Beans.[2]

---

[1] https://flyxo.com/data/catering/ny_breakfast_menu_2023.pdf
[2] https://flyxo.com/data/catering/ny_lunch_menu_2023.pdf

30. XO's services allow for passengers to choose their in-flight meal 72 hours prior to boarding, to ensure the best experience possible.

31. This service would be eliminated if XO was forced to move operations into the Terminal as it is undisputed that HPN Terminal does not allow catering on outbound flights.

32. The impact of forcing XO to operate from the HPN's Terminals would undeniably result in a significant reduction of their most lucrative routes and would force XO to eliminate its most profitable routes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 27 day of October 2023 in Boca Raton, FL.

_____
Rajat Khurana

A-487

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**Dorf Nelson & Zauderer LLP**
**555 Theodore Fremd Ave**
**Rye, New York 10580**
**(914) 381-7600**
**Attorneys for Plaintiff**
**Jonathan B. Nelson (JN 8705)**
**Paul J. Noto (PN 8388)**

-----------------------------------------------------------------

DELUX PUBLIC CHARTER, LLC
d/b/a JSX AIR and JETSUITEX, INC.;
XO GLOBAL, LLC; and
BLADE URBAN AIR MOBILITY, INC.,

                      Plaintiffs,

     -against -

COUNTY OF WESTCHESTER,

                      Defendant.

-----------------------------------------------------------------

Civil Action No.
22-cv-01930 (PMH)

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DNZ

Dorf Nelson & Zauderer LLP
The International Corporate Center
555 Theodore Fremd Avenue
Rye, New York 10580
Phone: 914.381.7600
Fax: 914.381.7608

**TABLE OF CONTENTS**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. ii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.      ANCA Preemption Claim. . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . .3

            A.  ANCA and the 2004 Terminal Use Procedures. . . . . . . . . . . . . . . . . . . . . .3

            B.  The 2005 Amendment is Preempted by ANCA. . . . . . . . . . .. . . . . . . . .. ..5

    II.     The Airline Deregulation Act Preempts the 2005 Amendment . . . . . . . . . . . . . . .9

            A.  The Airline Deregulation Act's
                Proprietor Exception Does Not Apply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .9

            B.  The 2005 Amendment Has a Clear Effect
                on Plaintiff's Businesses and is Preempted Under the ADA. . . . . . . . . . . .  12

                    i.   Routes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

                   ii.   Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

                  iii.   Prices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

    III.    Enforcement of the 2005 Amendment is Barred
            by the Doctrine of Laches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    IV.    The 2005 Amendment Violates the Equal Protection Clause
             of the Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . .25

## TABLE OF AUTHORITIES

CASES                                                                          PAGE

*Abdu-Brisson v. Delta Air Lines,*
   128 F.3d 77 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Air Transport Ass'n of America, Inc. v. Cuomo,*
   520 F.3d 218 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .18

*Allens Creek/Corbetts Glen Pres. Grp., Inc. v. West,*
   2 F. App'x 162 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Arapahoe County Public Airport Authority v. F.A.A.,*
   242 F.3d 1213 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Barnahrt v. Sigmon Coal Co., Inc.*
   534 U.S. 438 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Bravman v. Baxter Healthcare Corp.,*
   842 F. Supp. 747 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 9

*Cayuga Indian Nation of N.Y. v. Pataki,*
   413 F.3d 266 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Conopco, Inc. v. Campbell Soup Co.,*
   95 F.3d 187 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Friends of East Hampton Airport, Inc. v. Town of East Hampton,*
   841 F. 3d 133 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n,*
   634 F.3d 206 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Harlen Associates v. Incorporated Village of Mineola,*
   273 F.3d 494 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..24

*Hekmat v. U.S. Transportation Security Administration,*
   247 F.Supp.3d 427 (S.D.N.Y. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Midway Airlines, Inc. v. Westchester County, N.Y.,*
   584 F. Supp. 436 (S.D.N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .. 10, 11

*Morales v. Trans World Airlines, Inc.,*
   504 U.S. 374 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*National Helicopter Corp. of America v. City of New York*,
    137 F.3d 81 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Northwest Inc. v. Ginsberg*
    572 U.S. 273 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . 13

*Puerto Rico v. Franklin California Tax-Free Tr.,*
    579 U.S. 115 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Rowe v. New Hampshire Motor Transport Ass'n*,
    552 U.S. 364 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Warren v. Stop & Shop Supermarket, LLC*,
    592 F.Supp.3d 268 (S.D.N.Y. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*U.S. v. Dauray*,
    215 F.3d 257 (2d. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Zuckerman v. Metropolitan Museum of Art*,
    928 F.3d 186 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

**STATUTES**

U.S. Const. amend XIV, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

14 C.F.R. § 110.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

14 C.F.R. § 161.7(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . 7

14 C.F.R. Part 119. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

14 C.F.R. Part 121. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 4

14 C.F.R. Part 135. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

14 C.F.R. Part 380. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . 1

49 C.F.R. 1544.101(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

49 U.S.C. § 41713(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

49 U.S.C. § 47524(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 8

49 U.S.C. § 47524(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

49 U.S.C. § 47524(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 7, 8

49 U.S.C. § 47524(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 7

## PRELIMINARY STATEMENT

Plaintiffs DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR, JETSUITEX, INC., XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC. (collectively, "Plaintiffs'"), by their attorneys Dorf Nelson & Zauderer LLP, submit this memorandum of law in opposition to Defendant's Motion for Summary Judgment, for judgment in Plaintiffs' favor pursuant to FRCP 56(f) and for such other and further relief as this Court deems just and proper. Accordingly, for the reasons further articulated below, this Court should deny Defendant's Motion for Summary Judgment in its entirety and grant judgment in favor of Plaintiffs.

## STATEMENT OF FACTS[1]

Plaintiffs provide public charter flights under 14 C.F.R. Part 380 ("Part 380"), which are on-demand, non-scheduled air carriers. Plaintiffs have continuously provided safe, economical, and federally authorized air transportation services to the public at Westchester County Airport ("HPN").[2] Plaintiffs are federally authorized direct and/or indirect air carriers that comply with all applicable federal laws and regulations.[3]

Like 14 C.F.R. Part 121 ("Part 121") passenger airlines such as JetBlue or Delta, Plaintiffs, as Part 380 public charter operators, are authorized by the U.S. Department of Transportation ("DOT") to sell tickets to the public.[4] In this regard, Plaintiffs partner with 14 C.F.R. Part 135 ("Part 135") operators (which are direct air carriers certificated by the Federal Aviation Administration ("FAA")), and Plaintiffs' flights enplane and deplane at Fixed Base Operator

---

[1] In addition, Plaintiffs rely on the facts set forth in their accompanying Rule 56.1 Statement, ECF Doc. No. 93.
[2] *See* Exhibit ("Exh") 1, Plaintiffs' Counter Statement of Facts ("COF") ⁋ 2, attached to Declaration of Jonathan B. Nelson, submitted herewith.
[3] Exh 1, COF ⁋ 13.
[4] Exh 1, ⁋ 3.

1

spaces ("FBOs") at HPN.[5]  This is a common form of federally approved operations and a business model that has been in existence for decades.

Despite years of open and uneventful operations at HPN, in 2021 Defendant Westchester County ("Defendant" or the "County") attempted to improperly regulate Plaintiffs' operations by forcing Plaintiffs to discontinue operating out of the FBOs and enter the lottery for gate access at the main terminal (the "Terminal").[6] Historically at HPN, the use of the Terminal and the lottery has been exclusively for Part 121 passenger airlines, such as Delta or JetBlue.

Now, Defendant seeks to force Plaintiffs to enplane and deplane through the Terminal building, which includes clearing passengers through Transportation Security Administration ("TSA") screening checkpoints.[7] Such regulation would end Plaintiffs' current operations at HPN, as Plaintiffs' customers cannot deplane at the Terminal.[8] The Terminal lottery which is, by definition a game of chance, has limited spots available.[9] The safety and convenience offered at the FBOs would be discontinued and Plaintiffs' ability to service underserved routes and airports from HPN would end.

Importantly and contrary to Defendant's assertion, Plaintiffs do not seek to "invalidate" the Terminal Use Procedures ("TUP").  Indeed, Plaintiffs seek no relief with regard to the 2004 TUP. Instead, Plaintiffs seek a ruling that, as Part 380 operators, they are exempt from the provisions of the TUP as amended in 2005 and that the 2005 Amendment, as applied to Part 380 and Part 135 operators, is preempted by Federal law.  This is consistent with existing Federal regulations and case law.

_____

[5] Exh 2, ¶ 7.
[6] Exh 3.
[7] Id.
[8] Exh 4, ¶ 16.
[9] Exh 1, COF ¶15.

2

Defendant fails to acknowledge the very important distinction between Part 380 operators which are considered on demand, non-scheduled operations and Part 121 operators which operate under a different set of rules and regulations. Defendant attempts to regulate Plaintiffs' operations is preempted by the Airline Deregulation Act of 1978 ("ADA") and the Airport Noise and Capacity Act of 1990 ("ANCA").

## ARGUMENT

I.   ANCA Preemption Claim

*A. ANCA and the 2004 Terminal Use Procedures*

ANCA preempts noise or access restrictions on Stage 3 aircraft that were not in effect on or before October 1, 1990, unless agreed to by all aircraft operators or approved by the Department of Transportation. *See* 49 U.S.C.A. § 47524(c)(1). The County, in their passage of the 2005 Amendment to the Terminal Use Procedures ("TUP"), materially altered the 2004 TUP and violated ANCA.

The 2004 TUP codified the three allowable restrictions that resulted from the *Midway* litigation[10], which are (i) the Terminal is limited to 240 passenger per half hours, (ii) commercial air carriers are limited to 4 operations per half hours, and (iii) aircraft weight maximums.[11] These restrictions, which are memorialized throughout the 2004 TUP, are "grandfathered" under ANCA, as they were effective prior to the passage of ANCA in 1990.

By its terms, the 2004 TUP was applicable only to "all use of the Passenger Terminal and the Terminal Ramp at the Westchester County Airport ("Airport" or "HPN") by Airlines providing

---

[10] The litigation entitled *Midway Airlines v. County of Westchester*, No. 84 Civ. 2229 is commonly referred to as the "Midway Litigation" in which the DOT and FAA were Plaintiffs-Intervenors. The 2004 TUP was the codification of the settlement resulting from the Midway Litigation.

[11] So as to not overburden the Court, Plaintiffs have refrained from submitting duplicative exhibits and, instead, will cite to Defendant's exhibits ("Def. Exh") when possible. Def. Exh I, Page 3.

scheduled passenger service."[12] It did not apply "to any activities by Airport user not providing passenger service or not using the Terminal Ramp."[13]

Further, "Airline" was defined in the 2004 TUP as "any person providing scheduled passenger air service, including but not limited to, any air carrier or other operator certificated to provide scheduled passenger service under Parts 119, 121 or 135 of the Federal Aviation Regulations."[14]

The following are important to note at this point:

a.  The 2004 TUP was applicable to Airlines (as defined above) providing "scheduled air service"; however, Plaintiffs are statutorily on demand, non-scheduled operators[15];

b.  The 2004 TUP was applicable to all use of the Passenger Terminal; however, Plaintiffs do not use, and have never used, the Passenger Terminal;

c.  The 2004 TUP did not apply to Airport users not using the Terminal Ramp and Plaintiffs do not use the Terminal Ramp;

d.  The 2004 TUP never referred to non-scheduled Part 380 operators.

It is therefore abundantly clear that the 2004 TUP did not and does not apply to Plaintiffs. At a bare minimum, there certainly is a triable issue of fact whether the 2004 TUP apply to Plaintiffs.

---

[12] Def. Exh B, p. 12
[13] Id.
[14] Def. Exh B, p. 12.
[15] Pursuant to the § 110.2 of the Federal Aviation Regulations, "Scheduled Operation means any common carriage passenger-carrying operation for compensation or hire conducted by an air carrier or commercial operator for which the certificate holder or its representative offers in advance the departure location, departure time, and arrival location. **It does not include any passenger-carrying operation that is conducted as a public charter operation under part 380 of this chapter.**" 14 CFR § 110.2 (emphasis added). Plaintiff Delux Public Charter holds an air carrier certificate issued by the FAA authorizing on-demand operations under 14 C.F.R. Part 135, pursuant to which it operates passenger-carrying flights conducted as Part 380 public charters. Plaintiffs JetSuiteX, XO Global, and Blade are all Part 380 public charter operators.  None of the Plaintiffs engages in scheduled operations under the Federal Aviation Regulations.

4

B. *The 2005 Amendment is Preempted by ANCA*

In the 2005 Amendment, the County eviscerated the above carve-outs which made the 2004 TUP inapplicable to the Plaintiffs and it did so without FAA approval in violation of ANCA. Specifically, the County first altered the "Applicability" section, by removing the term "scheduled passenger service" and replaced it with a new defined term of "Passenger Service."[16] Passenger Service under the 2005 Amendment was defined as "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity."[17]

In this regard, the 2004 TUP applied to "scheduled passenger service," yet the Plaintiffs do not engage in scheduled operations under FAA regulations.  In contrast, the 2005 Amendment applied to "Passenger Service" which includes any service to or from the Airport for which seats are offered or sold to the public.  While the 2004 TUP, on its face, is inapplicable to Plaintiffs; the 2005 Amendment might be interpreted to apply to Plaintiffs.

It is important to highlight the significance of the difference between an airline being scheduled and non-scheduled pursuant to the Federal Aviation Regulations. As the Plaintiffs are non-scheduled operators under § 14 C.F.R. § 110.2, the 2004 TUP would not be applicable to them, as it only applied to those Airlines providing scheduled passenger service.

In response, the County contends that the 2005 Amendment merely resolved unintended ambiguity by clarifying that the TUP includes "all commercial passenger operations, including

---

[16] Def. Exh C, p. 9.
[17] Def. Exh C, p. 11.

5

those that provide infrequent or special purpose services, such as those now authorized under Part 380 of the FAA's regulations."[18] However, neither the text of the 2004 TUP nor the 2005 Amendment ever included reference to the non-scheduled Part 380 operators.[19]

Moreover, the County has not provided any evidence that the 2004 TUP was ambiguous or that the definitions created any confusion or problems.  In fact, the opposite is true.  Part 380 operations at HPN have long occurred at FBOs.  Numerous operators have for decades operated HPN flights using aircraft with more than 9 aircraft seats from FBOs, including Part 380 public charter flights.[20] As a result, it was more than reasonable for Plaintiffs – and other similar operators – to conclude that the TUPs, whether the 2004 or 2005 version, never applied to them.

Now, under the 2005 Amendment, if an operator is providing passenger service to or from the Airport, the passenger Terminal and/or ramp must be utilized, despite the operator's air carrier classification.[21] This is more than a mere "clarification" as the County claims, because the County has materially altered the 2004 TUP, and did so without obtaining FAA approval. The County is forced to contort itself into a pretzel and argue that the 2005 Amendment was a mere clarification to the 2004 TUP for a simple reason: ANCA's grandfathering only applies to "subsequent amendments to an airport noise or access agreement or restriction in effect on November 5, 1990, that *does not reduce or limit aircraft operations* or affect aircraft safety." *See* 49 U.S.C. § 47524(d)(4) (emphasis added).

However, as set forth above in detail, the 2005 Amendment in no way *clarified* the 2004 TUP but, instead, materially altered and eviscerated the carveouts created by the 2004 TUP all to

---

[18] Exh 1, ¶ 49.
[19] Def. Exh AG, 76:13-18, 77:6-10, Def. Exh AD, 80:5-11.
[20] Exh 1, COF ¶ 1.
[21] Def. Exh C.

6

(evidently) limit Plaintiffs' and similar carriers' access to HPN.  Indeed, the 2004 TUP did not even apply to Plaintiffs.  Now, not only would the 2005 Amendment arguably apply to Plaintiffs, it would effectively shut down their entire business operations (see Section II below).

By way of an analogy:  the 2004 TUP placed a 55 mile per hour speed limit on operators with a car license and truck license.  The 2004 TUP was amended by the 2005 Amendment which took the 55 mile per hour speed limit and applied it to those operators with a motorcycle license as well.  The 2005 Amendment is clearly more restrictive, as it applied the speed limit to a new classification of licenses that was not before restricted. This is exactly what happened here, when the County enacted the 2005 Amendment – it took restrictions and placed them on carriers that were not before subject to the them.

Moreover, the County does not even argue that the 2005 Amendment is an access or noise restriction. Instead, the County conveniently relies on the argument that the 2005 TUP is "grandfathered" under ANCA, while ignoring the statutory requirement that a subsequent amendment cannot reduce or limit aircraft operations or affect aircraft safety.[22] Furthermore, the 2005 Amendment is clearly preempted, as the County overlooks the language in the statute that noise and access restrictions are preempted under ANCA if not in effect before October 1, 1990, *unless* agreed upon by all aircraft operators or approved by the Department of Transportation.[23] As demonstrated herein, the 2005 Amendment is clearly more restrictive than the 2004 TUP, as it now requires all passenger service to operate out of the Terminal subject to a limited lottery, thereby reducing Plaintiffs' aircraft operations. Accordingly, the 2005 Amendment would not qualify for any "grandfather" protection under ANCA.

---

[22] 49 U.S.C.A. § 47524(d)(4): 14 C.F.R. § 161.7 (b) (4); See also Def. Exh I.
[23] 49 U.S.C.A. § 47524(c)(1).

7

A-499

Pursuant to ANCA's passage, new local airport use restrictions are subject to strict notice, review, and approval requirements which were established by the FAA. *See* 49 U.S.C. § 47524(a). The Second Circuit has held that Sections 47524(b) and (c) mandate procedures for the enactment of local noise and access restrictions for *any* public airport operator. *See Friends of East Hampton Airport, Inc. v. Town of East Hampton*, 841 F. 3d 133,152 (2d Cir. 2016) (explaining that "local laws not enacted in compliance with [ANCA] are federally preempted"). As the 2005 TUP Amendment was not enacted in compliance with ANCA, it is federally preempted.

Further, the County conceded that the 2005 Amendment was not submitted to the FAA for review.[24] Without the FAA's review and approval of the 2005 Amendment's expanded restrictions, the 2005 Amendment is ineligible for "grandfathering" under ANCA, as it was not effective prior to the passage of ANCA. In other words, the 2005 Amendment is subject to ANCA's procedural requirements – requirements with which the County concedes it did not comply with prior to its adoption.

Therefore, due to the County's concession that the 2005 Amendment was never submitted to the FAA, the TUP as Amended in 2005 is not "grandfathered" under ANCA, as its expanded restrictions were not effective before November 5, 1990 and were not agreed to by all aircraft operators and not approved by the FAA. 49 U.S.C. Section 47523(c); *See Friends of East Hampton Airport, Inc.* 841 F. 3d at 152 (compliance with Part 161 procedures mandatory).

---

[24] Exh 1 ⁋ 63.

II.     The Airline Deregulation Act Preempts the 2005 Amendment

A.  *The Airline Deregulation Act's Proprietor Exception Does Not Apply.*

The preemption provision of the ADA provides "a State, political subdivision of a State, or political authority of 2 or more states may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier…" 49 U.S.C. § 41713(b)(1). The party claiming preemption has the burden of proof to establish that Congress has spoken clearly and made its intention to preempt unmistakable. *Bravman v. Baxter Healthcare Corp.*, 842 F. Supp. 747, 753 (S.D.N.Y. 1994).

The Second Circuit has held that the proprietor exception permits a political subdivision of a state to promulgate "reasonable, nonarbitrary and non-discriminatory" regulations of "noise and other environmental concerns at the local level" and that "the proprietor exception, allowing reasonable regulations to fix noise levels at and around an airport at an acceptable amount, gives no authority to local officials to assign or restrict routes." *National Helicopter Corp. of America v. City of New York*, 137 F.3d 81, 89 (2d Cir. 1987). Specifically, the Second Circuit has stated that a local interest does not allow the exercise of a proprietary authority to produce a patchwork of uncoordinated and inconsistent airport restrictions. *Friends of the East Hampton Airport, Inc.* 841 F. 3d at 154. In *Friends of the East Hampton Airport, Inc.*, the Second Circuit held that because the laws at issue were not enacted according to the procedures mandated in ANCA, the town could not claim the protection of the proprietor exception from federal preemption. *Id.* at 155.

The County, by arguing that the 2005 Amendment fits within the "Proprietor Exception" to the ADA, implicitly concedes the indisputable proposition that the 2005 Amendment affects prices, routes, and services.

9

The County argues that because the FAA's confirmation of the 2004 TUP was in line with grant assurances, the 2005 Amendment must be compliant as well. However, the FAA specifically stated that "[c]ompliance with the provisions of ANCA does not ensure compliance with other Federal law."[25] It is important to highlight that the FAA's confirmation was under ANCA and the grant assurances[26], not all federal law, as shown above. Further, as demonstrated herein, the 2005 Amendment significantly altered the scope of the 2004 TUP. The 2005 Amendment, which the County failed to submit to the FAA for review[27], imposed broader restrictions on a new class of operators. Consequently, the County's assertion that the 2005 Amendment must be compliant with the grant assurances because the 2004 TUP is compliant, is baseless.

Although it is clear that under the law, that the 2005 Amendment does not fall within the Proprietor Exception, the County argues that the *Midway* Litigation, which references the exception, demonstrates that the 2004 TUP were "explicitly premised" on the exception.  The County is incorrect. *See Midway Airlines, Inc. v. Westchester County, N.Y.*, 584 F. Supp. 436, 440 (S.D.N.Y. 1984). Indeed, the particular decision relied on by the County related only to a preliminary injunction, in which the Court stated that pursuant to the County's proprietary powers, "the County may study the status quo arrangement and develop rational and nondiscriminatory rules for allocating scarce space and landing and takeoff slots, consistent with local environmental and safety needs." *Id.* at 440.

The Court in *Midway* was clear, that the study was to be conducted consistent with local environmental and safety needs; however, it did not grant the County unfettered authority to bypass the ADA preemption provision in the future nor did it make any decisions about or authorize the

---

[25] Def. Exh I, p. 10.
[26] Def. Exh I, p. 3.
[27] Exh 1 ¶ 63.

10

County to pass any legislation. *Midway,* 584 F. Supp at 440.  This bears repeating – it was the study, not a stipulation, years into the future, that the Court spoke to.  It is not possible that the Judge in *Midway* could have prognosticated that granting the County permission to conduct a study of the status quo would, almost twenty years later, lead to a stipulation which, in turn, would lead to the enactment of 2004 TUP, and all of that he would have predicted would be based on the Proprietor Exception.

Furthermore, the *Midway* litigation, and the resulting stipulation, only applied to Part 121 operators.  No where in the litigation or subsequent stipulation was there any reference to any operators other than Part 121 operators.   The stipulation permitted the County to enact a few very specific regulations that addressed the number of gates, passengers going through those gates and the weight of the aircraft.  None of those regulations would have applied to Part 135/Part 380 operations, which use smaller planes, carry fewer passengers, and do not utilize the Terminal. Thus, the County's reliance on *Midway* as the predicate for a proprietor exception is misplaced.

But for this passing reference to the Proprietary Exception at the preliminary injunction stage of the *Midway* litigation, there is absolutely nothing in the record supporting the County's position. Indeed, but for the fact that the 2004 TUP was the result of a negotiated stipulation, even the 2004 TUP is outside the proprietary exception and seems to violate the ADA; however, as the 2004 TUP is not directed to Plaintiffs, we will leave that argument to someone else.

Here, the County has failed to provide any evidence that the material alteration of the 2004 TUP was to resolve any noise and/or other environmental concerns. In this regard, the County has not pointed to any evidence, be it legislative history, deposition testimony, or documents to demonstrate that the 2005 Amendment was a restriction to address noise and/or environmental concerns. Rather, the 2005 Amendment was a way to force all traffic to the main Terminal,

11

regardless of the certificate status of the operator, to restrict volume and access, which is exactly what is preempted by ANCA as discussed above. Notwithstanding the County's false narrative, it is evident that the 2005 Amendment was not enacted to resolve any noise and/or other environmental concerns, but to place new restrictions on Part 380 operators, although they were in operation prior to the passage of the 2004 TUP.

Indeed, if the 2005 Amendment (or the 2004 TUP for that matter) were truly enacted to resolve noise and/or other environmental concerns, the County would be required to provide the "reasonable, nonarbitrary and non-discriminatory" justification for such regulations.[28] The County, as the party asserting the justification, has the burden of proof to demonstrate that the 2005 Amendment is reasonable and nonarbitrary to prove it falls within the Proprietor Exception. *Arapahoe County Public Airport Authority v. F.A.A.*, 242 F.3d 1213, 1223. (10th Cir. 2001).

At the very least, one would expect a noise or environmental study. Nothing of this kind has been produced by the County. The fact that the record is devoid of any such evidence belies the County's position and clearly demonstrates that the legislation was not a result of a noise or environmental concern. The County has not met its burden.

Therefore, as the 2005 Amendment is not a regulation concerning noise or other environmental concerns, but a regulation put in place to restrict an entire new classification of operators, and it clearly does not fall within the Proprietary Exception of the ADA.

B. *The 2005 Amendment Has a Clear Effect on Plaintiffs' Businesses and is Preempted Under the ADA.*

Where a statute includes an express preemption clause, such as the ADA, the court does not invoke any presumption against preemption but instead focuses on the plain wording of the

---

[28] In addition, the County would be required to comply with ANCA, which as shown above they did not.

clause, which necessarily contains the best evidence of Congress' preemptive intent. *Warren v. Stop & Shop Supermarket, LLC*, 592 F.Supp.3d 268, 282 (S.D.N.Y. 2022) *citing Puerto Rico v. Franklin California Tax-Free Tr.,* 579 U.S. 115, 125 (2016) (internal quotations omitted). The U.S. Supreme Court has held that the preemption provision of the ADA was put in place to prevent a "patchwork of state service-determining laws, rules, and regulations" which would be inconsistent with Congress' "legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 373 (2008).

In enacting the ADA, Congress's overarching goal was to assure that "transportation rates, routes, and services reflected maximum reliance on competitive market forces..." *Rowe*, 552 U.S. at 371, see *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992); *Northwest Inc. v. Ginsberg*, 572 U.S. 273, 288 (2014). The ADA's emphasis on reliance on the free and open market has encouraged competition among carriers, from budget airlines such as Spirit and Frontier, to public charter operators such as the Plaintiffs.

Following the enactment of the ADA, the Supreme Court has issued key rulings interpreting the intent behind Congress's use of the phrase "related to a price, route or service of an air carrier…" in the preemption provision. *See* 49 U.S.C.A. § 41713(b). In *Morales, supra,* the Supreme Court interpreted the preemption provision of the ADA broadly, holding that "state enforcement actions having a connection with or reference to airline 'rates, routes, or services' are preempted." 504 U.S. at 384.

The County argues that the relation between the TUP and Plaintiffs' services is not substantial enough, or too remote, to trigger preemption, citing *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206 (2d Cir. 2011) and *Abdu-*

13

*Brisson v. Delta Air Lines*, 128 F.3d 77 (2d Cir. 1997). Contrary to the County's position, as demonstrated below, the 2005 Amendment has a direct effect on Plaintiffs' rates, routes, and services and is preempted under the ADA

      i.     Routes[29]

If the Plaintiffs are required to operate out of the Terminal at HPN, the Part 135 Air Carriers that Plaintiffs contracts with to perform Public Charter flights ("Air Carriers"), would need to obtain an Aircraft Operator Standard Security Program ("AOSSP") to the TSA. The AOSSP is required for a scheduled passenger or public charter operation with an aircraft (1) having a passenger seating configuration of 61 or more seats; or (2) having a passenger seating configuration of 60 or fewer seats when passengers and enplaned from or deplaned into a sterile area. *See* 49 CFR 1544.101(a). The AOSSP is required for all scheduled passenger service and public charter operations operating into or out of a TSA controlled sterile area."[30]

A TSA-controlled "sterile area" refers to portions of an airport defined in the airport security program that provides passengers access to boarding aircraft and to which the access generally is controlled by the TSA, an aircraft operator, or a foreign air carrier.[31] Any individual entering a "sterile area" must be screened by TSA, as the TSA screening procedures are intended to prevent prohibited items and threats from entering the sterile area of the airport.[32] The TSA screening is what allows passengers to leave a sterile area of one airport to enter into another airport's sterile area upon arrival.[33] The Terminal is a sterile area.[34]

---

[29] Plaintiffs are submitting declarations relating to the effect the 2005 Amendment has on Plaintiffs' routes, services, and prices, due to the County's apparent reluctance to question Plaintiffs during depositions on these subjects.
[30] 49 CFR 1544.101(a).
[31] Id.
[32] Exh 4, ⁋ 13.
[33] Exh 2, ⁋ 10.
[34] Id.

14

The FBOs where Plaintiffs operate from are not sterile, as their customers do not go through a TSA checkpoint.[35] Passengers who go through a non-sterile checkpoint, like Plaintiffs' customers, cannot deplane at a sterile terminal due to insufficient screening at their departure airport. As a result, Plaintiffs would be unable to fly any of their current routes from non-sterile FBOs to HPN.[36] To the extent the County, in their reply, offers to allow the Plaintiffs to deplane at the FBOs, this offer of compromise fails for two reasons. First, there is no mention of FBOs in the text of 2004 TUP or the 2005 Amendment.[37] Second, if the County is to offer this as a proposed settlement, any evidence of settlement or attempt at settlement are not admissible. *See* Federal Rule of Evidence 408.

The 2005 Amendment would have a major impact on Plaintiff XO, as this would eliminate its routes from Fort Lauderdale International Airport ("FLL") and Palm Beach International Airport ("PBI"), as XO customers would be unable to deplane at HPN.[38] This is due to XO passengers going through non-sterile checkpoints prior to boarding at both FLL and PBI.[39] Over the last twenty-one months, XO has generated over $23 million dollars in revenue from these routes; $13 million was generated from FLL to HPN and $10 million from PBI to HPN. These routes have become their most lucrative, as approximately 11,000 people have flown on XO from FLL and PBI to HPN.[40] This route would be eliminated, as XO's passengers would not be able to deplane at HPN.[41]

---

[35] Exh 2, ¶ 12.
[36] Exh 2, ¶ 13.
[37] A Court's "starting point in statutory interpretation is the statute's plain meaning…" *U.S. v. Dauray*, 215 F.3d 257, 260 (2d. Cir. 2000); "Courts must presume that a legislature says in a statute what it means and means in a statute what is says there." *Barnhart v. Sigmon Coal Co., Inc.* 534 U.S. 438, 461-2 (2002).
[38] Exh 5, ¶ 15.
[39] Id.
[40] Exh 5, ¶ 15.
[41] Id. at ¶17

15

Further, Plaintiff Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc. (collectively, "JSX") would also have to cease operating key routes if it were forced to relocate to the Terminal at HPN. JSX would not be able to operate its route from Miami/Opa-Locka Airport ("OPF") to HPN, as its passengers would not be able to deplane as they are arriving from a non-sterile security checkpoint.[42] Further, JSX would have to eliminate its route from Nashville and Dallas to HPN, as the passengers go through non-sterile checkpoints in those airports.[43] Since the introduction of these routes, there have been 4,698 bookings from Nashville to HPN totaling $1,610,360 and 2,220 bookings from Dallas to HPN totaling $1,419,396.[44]

Moreover, if Plaintiffs are required to operate out of the Terminal, they would need to enter the lottery system at HPN. The lottery system was put in place as a result of HPN's restriction of only 240 passengers per-half hour from the Terminal.[45] An airline may choose to operate during available time slots, but cannot exceed the 240 passengers per-half hour.[46] For new entrants, such as Plaintiffs, they would sign a Terminal Use Agreement, enter the lottery, and choose an open allocation that is available.[47]

As there are only 240 passengers allowed per-half hour from the Terminal, the allocated slots are broken down in half hour increments.[48] As incumbents, airlines like Delta and JetBlue have priority in choosing their slots and are permitted to hold on to their incumbent spots.[49] New entrants, such as the Plaintiffs, are left with the remaining slots,[50] which, to the extent they exist,

---

[42] Exh 4, ¶ 17.
[43] Id. at ¶ 18.
[44] Id. at ¶ 19.
[45] Def. Exh. AE. 35:8-16
[46] Def. Exh. AE, 36:1-4.
[47] Id. at 39:14-18.
[48] Def. Exh. AE, 35:15-16.
[49] Def. Exh. AG, 264:3-11.
[50] Def. Exh. AE, 39:19-22.

usually occur early in the morning or late in the evening. Indeed, this was confirmed by Defendants' witnesses including Joan McDonald, Director of Operations for Westchester County, who confirmed that "there would be instances where the plaintiffs would not be able to maintain the same routes that they are conducting now if they were to enter into this lottery system…"[51]

Melissa Tomkiel, President and General Counsel of Blade, testified that Blade chooses "very specific times that we believe will have the highest demand. And if we're not able to get those times, then we're not going to sell our seats."[52] If subject to the lottery system, Plaintiffs will be unable to fly their current routes either for lack of available gates or remaining passenger allocations and be left with the remaining slots that passengers do not want.[53] Additionally, Tom Rumbarger testified that he notified another air carrier to hold onto the slots they already had, as they might not get the same slots at the next lottery due to new operators being added to the lottery.[54] This further demonstrates how competitive the lottery is and how important the time slots are to the incumbent airlines.

It is evident that not only will Plaintiffs not be able to deplane their passengers at the Terminal if they lose their access use the FBOs at HPN, but they also stand to lose millions of dollars in business, as well as thousands of customers with whom Plaintiffs have spent years building relationships with. Therefore, the 2005 Amendment is preempted under the ADA as it has a clear negative effect on Plaintiffs' routes.

    ii.    Services

---

[51] Def. Exh. AI, 174:13-25.
[52] Def. Exh. AC, 172:6-11.
[53] Def. Exh. AC, 171:17-172:11; Def. Exh. AH, 216:17-218:4; Defendant AI, 173:25-175:2; Def. Exh. AE, 51:15-52:15; Def. Exh AG, 267:21-268:8, 274:2-18, 283:9-22.
[54] Def. Exh. AE, 51:12-53:21.

Several decisions by courts in the Second Circuit give insight into what is and is not considered a "service" under the ADA. In *Air Transport Ass'n of America, Inc. v. Cuomo*, the Second Circuit held that "[o]nboard amenities, regardless of whether they are luxuries or necessities, still relate to airline service and fall within the *express terms* of the preemption provision." 520 F.3d 218, 224 (2d Cir. 2008).[55] The U.S. District Court for the Southern District of New York expanded in *Air Transport Ass'n*, noting that a majority of circuits had interpreted service as referring to the provision or anticipated provision of labor from the airline to its passengers and encompasses matters such as boarding procedures, baggage handling, and food and drink—matters incidental to and distinct from the actual transportation of passengers. *Hekmat v. U.S. Transportation Security Administration*, 247 F.Supp.3d 427, 432 (S.D.N.Y. 2017) citing *Cuomo*, 520 F.3d at 223.

The operations of each Plaintiff are similar, as they each offer customers the chance to travel on semi-private jet flights to various destinations across the United States from HPN. Despite their shared premise, the unique services provided by each Plaintiff will be impacted differently if they were required to operate out of the Terminal. Again, although the County has offered to let Plaintiffs deplane from the FBOs (contrary to the text of the 2005 Amendment), this would still have a direct impact on their operations. Enplaning and deplaning in two separate locations at the Airport is not logistically feasible. This would cause Plaintiffs to offer different services, as Plaintiffs are limited to what they can offer from the Terminal, as demonstrated below.[56]

---

[55] The County, in their memorandum of law, acknowledges that the ADA's definition of services "includes both on- and off-fight procedures" as was held in *Air Transport Ass'n*.
[56] Exh 4, ¶ 23.

For example, Plaintiff XO currently provides catered meals to its passengers on both inbound and outbound flights, allowing its passengers to choose their in-flight meal prior to boarding.[57] Depending on the time of day, passengers can choose from a variety of breakfast and lunch options. The catered meals are supplied by gourmet restaurants.[58] The meals are then stored at the FBOs prior to takeoff.[59] This service would be eliminated if XO was required to fly out of the Terminal, as HPN does not allow catering on outbound flights.[60]

Moreover, the entire FBOs experience of waiting in a lounge would be eliminated. Customers can now be dropped off right in front of the FBOs, proceed through a fast and efficient security screening process, and relax in the lounge area. Here, customers are offered snacks, drinks, comfortable seatings, and access office space if needed.[61] For Plaintiffs' customers, a significant aspect the experience is the ability to wait comfortably at the FBOs before boarding the plane.[62]

Additionally, JSX is the first air carrier certified as Autism-Aware by Autism Double-Checked, which allows them to cater to the specific needs of those traveling with autism.[63] If forced to operate from the Terminal, this would cause JSX to lose its autism certification as passengers would have to go through a different process as the one JSX currently offers.[64] This would also impact the ease of boarding for those passengers who have disabilities, travel with small children, or travel with oversized pets. [65] These are all services that the Plaintiffs offer that would be eliminated if they were to operate out of the Terminal.

---

[57] Exh 5, ⁋ 26.
[58] Id. at ⁋ 27.
[59] Id. at. ⁋ 27.
[60] Id. at. ⁋ 31.
[61] Id. at ⁋ 21.
[62] Id. at ⁋ 20.
[63] https://www.jsx.com/equality
[64] Def. Exh. AH, 187:17-188:24
[65] Id., 193:8-15; See also Exh 4.

If forced to embark and exit through the Terminal, Plaintiffs would not be able to offer these services.[66] Therefore, as the services Plaintiffs provide to their customers would be eliminated if they were to fly from the Terminal, the 2005 Amendment is preempted under the ADA as they have a direct effect on Plaintiffs' services.

iii.    Prices

The Plaintiffs' business models allow for them to charge the prices they do because of the convenience of flying in and out of the FBOs.[67]  If Plaintiffs are to operate out of the Terminal, it would eliminate the unique aspects of their business and essentially impose a rate ceiling on their services as they would not be able to charge for the services they currently offer.[68]  For example, passengers would now have to arrive at the Terminal up to two hours before to ensure they are able to make their flight.[69]  Further, passengers would be required to engage in the cumbersome practice of standing in lengthy lines before the TSA checkpoint and waiting outside the overcrowded Terminal gate prior to boarding. The entire luxury experience is obliterated, resulting in Plaintiffs being required to lower their prices, as the cost would no longer align with the diminished quality of service, which will in turn make provision of the flight not feasible.

In sum, it is evident that the 2005 Amendment would have a devastating effect of the Plaintiffs' business. The 2005 Amendment would have a drastic impact on Plaintiffs' businesses, essentially dismantling their operations. Therefore, the Court should find that the 2005 Amendment is federally preempted under the ADA, as it impacts Plaintiffs' prices, routes, and services.

---

[66] Exh 5, ¶ 25.
[67] Exh 4, ¶ 22.
[68] Id. at ¶ 22.
[69] Westchester County Airport https://airport.westchestergov.com/airlines/airline-information

20

Thus, the County's overreaching attempt to apply the 2005 Amendment to Plaintiffs' operations is in direct conflict with the letter and spirit of the ADA and its strong reliance on allowing the competition found in the free market to further efficiency, innovation, and competition.

III.   Enforcement of the 2005 Amendment is Barred by the Doctrine of Laches

The equitable defense of laches bars an equitable claim where a [party] has unreasonably and inexcusably delayed, resulting in prejudice to the [alleging party]." *Allens Creek/Corbetts Glen Pres. Grp., Inc. v. West*, 2 F. App'x 162, 164 (2d Cir. 2001). A mere lapse of time, without a showing of prejudice, will not sustain a defense of laches. *Zuckerman v. Metropolitan Museum of Art*, 928 F.3d 186, 193 (2d Cir. 2019). Prejudice ensues when the alleging party has changed his position in a way that would not have occurred if the other party delayed. *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996). The Second Circuit has held that the defense of laches can be pursued against the government, where the government seeks to enforce a right akin to a private one. *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 278 (2d Cir. 2005).

In this case, Plaintiffs have expended millions of dollars in the development of their businesses over the past few years, all under the watchful eye of the County.[70]   The Plaintiffs' actions and investments in furthering their businesses were undertaken with the understanding that there were no legal impediments and that their operations at the Airport were in line with the Airport's regulations.[71] Plaintiffs have been operating openly at HPN. Plaintiff XO's sister company, JetSmarter, and Plaintiff Blade began operating at HPN since as early as 2015 without incident.[72]   The sudden emergence of the County's claim that they can no longer operate from the

---

[70] Def Exh. AC, 160:13-161:4.
[71] Exh 3.
[72] Exh 1, COF ¶ 24

FBOs and must operate from the Terminal, directly impacts the Plaintiffs' position.[73] The Plaintiffs' future operations at HPN are seriously jeopardized due to the delayed legal action by the County.[74]

On November 8, 2018, the issue was first raised regarding single seat charter operations ("SSCOs"), when an email was submitted to add an item to the agenda for the Westchester County Airport Advisory Board regarding the applicability of the TUP to SSCOs like JetSmarter, now XO.[75] At this point, nothing was done by the County to address the issue or to communicate with the Plaintiffs. Then on March 1, 2019, Peter Schlactus, Chair of the Airport Advisory Counsel, outlined his concerns to Susan Spear, Westchester County Executive George Latimer's Assistant, regarding JetSmarter's alleged noncompliance with the TUP.[76] Again, at this point, nothing was done by the County to stop Plaintiffs from continuing their operations at the FBOs.[77]

Further, multiple employees of the County testified at their depositions that they were aware of Plaintiffs' operations before any Plaintiff was notified it was operating in purported violation of the TUP. Specifically, Tom Rumbarger, Property Manager at Westchester County Airport[78], testified that he became aware of Blade's operations in which it paired with operators that flew charters in around 2020.[79] Nicholas Hartman, Chairman of the Airport Advisory Board, testified that he became aware of Plaintiffs' operations about three or four years ago, as early as

---

[73] Def Exh. AC,162:20-163:9.
[74] Exh 4, ¶ 28
[75] Exh 6.
[76] Exh 7.
[77] Exh 3.
[78] Def. Exh. AE, 13:13-15
[79] Id. at 72:5-12

22

2019.[80]   Indeed, it stretches credulity to believe that the County did not know about Plaintiffs' operations when the Airport Manager's office looks right out over the runway.

Here, the Plaintiffs have invested substantial resources, in both time and money, into developing their businesses that operate out of the Airport. This development occurred over a span over eight years, during which the County was aware. The sudden demand to relocate operations from the FBOs to the Terminal, after years of unrestricted activity, has disrupted their established operations and jeopardized their investments. It was only in November 2021 that AvPorts, the managing company of the Airport, communicated with Plaintiffs, notifying them that aircraft departures could no longer take place at the FBOs and must be moved into the Terminal.[81] This was the first time after years of operation and hundreds of flights for some of the Plaintiffs, that they were notified their operations were in violation of the TUPs.

Therefore, it is evident that the Plaintiffs have valid grounds to invoke the defense of laches against the County, based on the unexplained and prejudicial delay in enforcing the alleged violations of the TUP.

IV.   The 2005 Amendment Violates the Equal Protection Clause of the Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment "provides that no state shall deny to any person within its jurisdiction the equal protection of the law."[82]   The Second Circuit has held that it is a general rule that whether items are similarly situated, for the purposes of an equal protection claim, is a factual issue that should be submitted to the jury, unless it is clear that no reasonable jury could find the similarly situated prong met. *Harlen Associates v. Incorporated*

---

[80] Exh 8, 24:14-25:4.
[81] Exh 3.
[82] U.S. Const. amend XIV, § 1.

23

*Village of Mineola*, 273 F.3d 494 (2d Cir. 2001). The County's attempted enforcement of the 2005 Amendment against Plaintiffs, but not any other Part 380 or Part 135 operator, singles out Plaintiffs and demonstrates the discriminatory treatment Plaintiffs are receiving in violation of the Equal Protection Clause.

The County has targeted the Plaintiffs and treated them differently from other carriers operating out of FBOs at HPN, such as Bakers Bay, NetJets, and Wheels Up.[83] Plaintiff's operations involve similar if not identical aircraft to those who are permitted to continue operations at FBOs. These aircraft have a similar noise profile, fly similar routes, and in many cases carry a similar number of passengers.[84] There are factual disputes as to Plaintiff's Equal Protection Claim. Plaintiffs have set forth many disputed facts regarding others similarly situated to Plaintiffs but are allowed to operate from FBOs or private hangars[85] while the County attempts to force Plaintiffs into the lottery and Terminal.[86]

Further, the County has never articulated a rationale for the nine-seat limitation or the distinction between private and public other than to use these arbitrary standards to negatively impact Plaintiffs' ability to operate out of HPN.  The County has failed to provide any rational reason why the Plaintiffs must enter the lottery and operate out of the Terminal while other similarly situated carriers can operate from FBOs and private hangars.[87]

---

[83] Def. Exh. AH, 101-102
[84] Def. Exh. AC, 146:7-160:3
[85] Def. Exh. AC, 148:10-153:7, 159:17-160:3; Def. Exh. AF, 123:10-22; Def Exh. AH, 101:12–16
[86] Exh 1, ¶ 68-72, 76-77,83; COF ¶ 4, 18-23,29
[87] Def. Exh. AI, 118:13-25,163:21-164:2; Def. Exh. AG, 75:20-76:12

A-516

Therefore, the disparate treatment becomes glaringly apparent as the County is singling out the Plaintiffs' operations despite the presence of similarly situated operators operating from the FBOs at HPN.

## **CONCLUSION**

For the reasons set forth herein, Plaintiffs respectfully request that this Court deny Defendant's Motion for Summary Judgment in its entirety; enter judgment in favor of Plaintiffs; along with any such other and further relief as this Court may deem just and proper.

Dated:      Rye, New York
            October 31, 2023

                              Dorf Nelson & Zauderer LLP

            By:

                              Jonathan B. Nelson, Esq.
                              Paul J. Noto, Esq.
                              Christina L. Grimes, Esq.
                              *Attorneys for Plaintiffs*
                              555 Theodore Fremd Ave.
                              Rye, New York 10580
                              (914) 381-7600

To:    Sean T. Carey, Esq.
       Associate County Attorney, of Counsel
       *Attorney for Defendant*
       Michaelian Office Building
       148 Martine Avenue, Room 600
       White Plains, New York 10601
       (914) 995-2243
       stca@westchestercountyny.gov

25

A-517

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC., | ) ) ) ) |
| *Plaintiffs,* | ) ) ) |
| v. | )    Civil Action No. 22-cv-01930 (PMH) |
| COUNTY OF WESTCHESTER, | ) ) ) |
| *Defendant.* | ) ) |
| _____ | ) |

## <u>PLAINTIFFS' MOTION FOR A STAY,<br>OR IN THE ALTERNATIVE AN INJUNCTION PENDING APPEAL</u>

PLEASE TAKE NOTICE that upon the Memorandum of Law in Support of Plaintiffs' Motion for a Stay, or in the Alternative an Injunction Pending Appeal, dated July 19, 2024; the Declaration of Ken Edmondson, dated July 19, 2024; the declaration of Rajat Khurana, dated July 19, 2024; all exhibits attached to the aforementioned declarations; and all the papers and proceedings had or to be had herein, including all papers previously filed in this action, Plaintiffs Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc.; XO Global, LLC; and Blade Urban Air Mobility, Inc. (collectively "Plaintiffs") will and hereby do move, before the Honorable Philip M. Halpern, of the United States Court for the Southern District of New York, on a date and at a time and in a manner to be designated by the Court, for (1) a stay of the effectiveness of the Court's order pending resolution of the appellate process, (2) in the alternative, an order enjoining Defendant the County of Westchester (the "County") from enforcing Westchester County Municipal Code § 712.462 against Plaintiffs pending resolution of the appellate process, and (3) a temporary administrative stay.

Plaintiffs seek such relief on the bases that they will suffer irreparable harm if their appeal is ultimately successful, as they will be forced to cease their operations out of the Westchester County Airport (the "Airport") in the interim. There is at least a substantial possibility that the Second Circuit will disagree with this Court on the difficult and novel federal issues presented on appeal. And both the public interest and balance of the equities favor a stay or injunction. Countless non-party passengers will be harmed otherwise, as their planned travel will be disrupted by Plaintiffs' cancellation of flights once they are no longer able to operate out of the Airport. And the County—which has never enforced Westchester County Municipal Code § 712.462 against Plaintiffs and still does not seek to do so until October 31, 2024—stands to suffer no harm. Any stay or injunction would presumably be brief, as Plaintiffs intend to seek expedited briefing in the Second Circuit.

Plaintiffs have made great efforts to resolve informally the matters raised in this request. Through their counsel, the parties have met and conferred via email, letter, and telephone regarding various solutions. Unfortunately to date, the parties have been unable to achieve a resolution. The County has demanded that—by Monday, July 29—Plaintiffs commit to complying with Westchester County Municipal Code § 712.462 by October 31, 2024. Plaintiffs thus respectfully seek the assistance of this Court especially considering the irreparable harm that both Plaintiffs and the public will suffer without the requested stay or injunction.

A-519

Dated: July 19, 2024         Respectfully submitted.

_/s/ Jonathan B. Nelson_
Jonathan B. Nelson, Esq.
Paul J. Noto, Esq.
Christina L. Grimes, Esq.
Dorf Nelson & Zauderer LLP
555 Theodore Fremd Ave.
Rye, New York 10580
(914) 381-7600

_Attorneys for Plaintiffs_

3

A-520

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing to all counsel of record by filing same with the Court via CM/ECF on July 19, 2024, which will provide notice to all counsel.

*/s/ Jonathan B. Nelson*
Jonathan B. Nelson, Esq.

A-521

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC., | ) ) ) ) |
| *Plaintiffs*, | ) ) ) |
| v. | ) )  Civil Action No. 22-cv-01930 (PMH) |
| COUNTY OF WESTCHESTER, | ) ) ) |
| *Defendant*. | ) ) ) |

**DECLARATION OF KEN EDMONDSON IN SUPPORT OF PLAINTIFFS' MOTION**

I, Ken Edmondson, state and declare as follows:

1.     I am the Vice President of Airport Affairs & Aviation Security for Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("Delux") and Plaintiff JetSuiteX, Inc. ("JetSuiteX") (collectively, "JSX"). This declaration is made in support of Plaintiffs' Motion for Clarification, or in the Alternative a Stay, or in the Alternative an Injunction Pending Appeal. I have personal knowledge, or knowledge based upon my review of documents, of the facts set forth in this declaration and, if called upon to testify as a witness, I could and would testify competently thereto.

2.     Along with the other Plaintiffs in this action, JSX has filed this action to prevent the enforcement of the 2005 Amendment to the Terminal Use Procedures ("TUPs") adopted by the Westchester County Airport. That amendment would prohibit Plaintiffs, including JSX, from servicing Westchester County Airport ("HPN" or the "Airport").

1

### JSX's Operations

3.      Delux is a Federal Aviation Administration ("FAA") certificated on-demand air carrier that operates commercial flights pursuant to 14 C.F.R. § 135 ("Part 135") and holds a Commuter Air Carrier Authorization issued by the United States Department of Transportation ("DOT"). Delux has flown over one million people between numerous airports since it was certified over eight years ago.

4.      JetSuiteX is an indirect air carrier that has authority from the DOT under 14 C.F.R. § 380 ("Part 380"). JetSuiteX is a Part 380 operator authorized by the DOT to conduct public charter operations on an on-demand air carrier operated under Part 135. Under this federally authorized arrangement, JetSuiteX sells tickets (including individual seats) to the traveling public, JetSuiteX charters an entire Delux flight, and then Delux operates the flight using the time, location, and destination designated by JetSuiteX.

5.      JSX's operations are authorized by and fully compliant with federal law. Delux operates compliant with all Part 135 regulations, and JetSuiteX operates compliant with all Part 380 regulations.

6.      Thousands of JSX customers rely on JSX's unique crowd-free service to travel safely. In addition to business and leisure travel, JSX customers' use of JSX's flights often also involve critical purposes including safely traveling to provide front line health care; safely traveling to fight forest fires; and safely traveling to receive health care.

7.      JSX services a massive and underserved need for quick, efficient, safe, affordable, and pleasant air transportation to markets in a manner that is faster and safer than driving.

2

8.    JSX focuses on short-haul air travel, service for which has shrunk dramatically over a 20-year period as airport terminals have become overcrowded, overpriced, and fortified shopping malls designed more to capture consumers than to get them on their way.

9.    JSX is a public charter jet service, founded on the notion that consumers should not have to spend two to three hours at a crowded airport in order to board short-haul regional flights. JSX is designed to provide a fast, crowd-free airport experience.

10.    JSX has spent years developing its business based on its faster, equally secure, and more convenient federally approved non-Security Identification Display Areas ("non-SIDA") security protocol. The overwhelmingly positive consumer response and huge consumer demand for our services has enabled JSX to grow significantly each year of its existence.

11.    JSX's operations are structured differently from those of major scheduled airlines and provide a different type of service than the large scheduled airlines that also operate out of HPN.

12.    For example, JSX's flights follow a TSA-approved "Twelve-Five" Standard Security Plan, which is a regulatory protocol that permits its customers to undergo a different TSA-security procedure than the TSA security checkpoint plan utilized in main passenger terminals ("Terminal"). JSX maintains a rigorous TSA-approved and monitored security plan (which provides an equivalent TSA-approved level of security to the standard TSA plan utilized in the Terminal), but customers flying with JSX are not processed through the Terminal's TSA checkpoints. Instead, the "Twelve-Five" Security Plan is uniquely available for Part 135 air carriers and allows JSX's flights to enplane and deplane passengers at a non-SIDA location. The result is a fast, crowd-free airport experience that is not only compliant with, but in many ways exceeds, applicable federal safety regulations.

3

13. JSX's service operates pursuant to a federal TSA program that requires its customers to undergo different (not lesser) security processes. JSX's operations are regularly audited by the TSA nationwide, and JSX routinely passes those audits with no adverse findings. Several TSA auditors have said that JSX is the most competently and professionally run organization they audit.

14. By contrast, customers of large airlines who board from terminal buildings are required to pass through a TSA security checkpoint in order to enter the Terminal (which is exclusively a Security Identification Display Area ("SIDA") location) at HPN. A SIDA location requires everyone who is permitted access to pass through a TSA-security checkpoint. The TSA security checkpoints—and the crowds, frustration, and delays associated with them—are ubiquitous for the average airport user.

15. JSX does not operate from any SIDA location in its network.

16. JSX's federally authorized procedures allow JSX to provide an innovative, convenient, and safe alternative to large commercial airline services by (a) providing access to small airports and underserved cities not regularly serviced by the large airlines, and (b) providing customers with unique and convenient flying services the large airlines cannot offer customers—a TSA-approved and compliant security process that is faster and more convenient than the TSA process that is required for other airlines.

17. Further, at the core of JSX's business is that customers can forego standard TSA security checkpoints in favor of a non-SIDA (but TSA approved) protocol. Consistent with federal law, JSX's customers can arrive 20 minutes before a flight, pass through JSX's TSA-approved security procedures, and avoid long lines and large crowds.

18. JSX's TSA-approved security protocol also allows JSX to provide access to additional or underserved airports and smaller cities not regularly serviced by the large airlines, or in

underserved airports that do not generate sufficient traffic to justify the resources required of a TSA checkpoint in the main passenger terminal.

19.    JSX is uniquely positioned to service these airports because of its Twelve-Five Security program. Roughly 90% of U.S. public use airports, and half of the airports served by Plaintiffs, do not have terminals or airlines at all, making Plaintiffs' services the only ones available to those without access to private jets of their own. JSX is uniquely qualified to serve 4,500 public use airports that are not served by any major carriers and that do not have an airline terminal at all.

20.    JSX's services have been especially valuable to customers looking to avoid crowded terminals and long security lines where social distancing is not always possible. JSX provides a level of safety, convenience, and social distancing that is not otherwise available to big airline customers.

21.    JSX's operations are quieter than their commercial competitors. JSX's services also minimize the impact of charter planes by aggregating passengers into smaller or quieter aircraft when passengers may instead charter their own aircraft which would create further impact or airport congestion.

22.    JSX enjoys the highest customer satisfaction of any air carrier in the United States. It was named "Best Regional Airline" in North America by APEX, the Airline Passenger Experience Association, and has earned "5-star Regional Airline" designation for 5 consecutive years— the only carrier of its type to do so. JSX was previously also named by Fast Company as one of the world's "Most Innovative Companies for 2020," ranked within the top 5 in the travel category. In addition, JSX routinely achieves a New Promoter Score ("NPS") in the mid 70s and 80s. An NPS is a reflection of how likely a customer is to recommend a product or service to a friend or colleague.

23.     In July 2024, JSX was voted the "No. 1 Domestic Airline" by the readers of *Travel + Leisure* magazine and earned this distinction by a margin of nearly 20 points over the runner-up on a 100-point scale.[1]

24.     The air transportation industry (like the auto, steel, or utility business) has high capital costs, which serve as a barrier to entry for newer firms like JSX. In short, sustaining a successful business in the air transportation industry takes significant time, money, and capital to build the business and customer base before the airline becomes and can stay profitable. In addition, due to the issues of safety and reliability, it also takes a great deal of money, time, and staff to build a reputation and to keep the goodwill of a loyal customer base.

### JSX's Operations at HPN

25.     JSX's first flight into HPN was in 2020. JSX currently operates out of the Atlantic Aviation FBO at the Airport.

26.     Before JSX launched its flight from the Airport to Miami International Airport ("MIA") in 2021, JSX engaged in meetings with Airport officials, including Airport Manager Peter Scherrer. JSX advised Mr. Scherrer that JSX intended to begin charter operations specific to HPN. JSX explained JSX flights were operated pursuant to Part 380.

27.     JSX has been operating out of HPN through an FBO, similar to other Part 135 and Part 380 operators. An FBO is an aeronautical service provider located at an airport that, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators. Many other Part 135 and Part 380 operators utilize FBOs at HPN for access to a non-SIDA

---

[1] *See* Stephanie Waldek, *This Semi-private Carrier Was Voted Best U.S. Airline by T+L Readers— and One-way Fares Start at $249*, Travel + Leisure (July 9, 2024), https://perma.cc/8UTA-5SRP.

location. Aside from the implementation of the 2005 Amendment at issue in this litigation, JSX is fully compliant with all applicable federal, state, and local legal obligations.

28.    FBOs are the only way JSX is able to enplane and deplane customers at HPN at a non-SIDA location in light of the County's continuous refusal to provide JSX with a means for using its terminal for arriving or departing customers that complies with federal regulations. Although JSX does not need to operate from an FBO, their operations must take place from a non-SIDA portion of any Airport with access to the airfield. The Terminal is currently configured without any non-SIDA boarding areas. A non-SIDA boarding area is essential for JSX's operations because JSX's TSA protocol requires that their customers board from a non-SIDA location, and under federal regulations, SIDA and non-SIDA passengers must be segregated until boarding. Again, JSX is unable to utilize SIDA locations to deplane (as an example) because its customers have not passed through TSA checkpoints at the departure airport and, in some routes, are coming from airports that do not even have SIDA locations. Thus, HPN's Terminal as currently configured is not viable for JSX's operations because of the lack of segregated non-SIDA boarding.

29.    The County has historically permitted charter flight operations to operate from FBOs rather than the Terminal. In fact, Part 380 operations at HPN have long occurred at FBOs, and public charter operations under Part 380 go back many decades. Numerous operators have operated, and continue to operate, HPN flights from FBOs, including under Part 380.

30.    HPN is an important airport for JSX. From the fall of 2024, JSX will fly an average of 28 flights per week into the Airport (from 4 other airports) and 28 flights per week out of the Airport (to 4 other airports). So far in 2024, JSX has flown 14,946 passengers either into or out of HPN.

## The County Seeks to Force JSX to Use the Terminal

31.    On November 5, 2021, JSX received notice from the County's operator, AvPorts, and Mr. Scherrer informing JSX that the County would no longer permit JSX's operations to take place at an FBO. The County asserted that JSX was subject to the Airport's TUPs and required to conduct all of its services from the Terminal rather than at an FBO. The County further stated that JSX was required to operate from the Terminal even if its services were non-scheduled in nature and rejected JSX's proposal to only sell tickets to members of a private club. The County informed JSX that it had to discontinue its operations and arrange to move its operations to the Terminal pursuant to a Terminal Use Agreement ("TUA"). A true and correct copy of the November 5, 2021, letter is attached hereto as **Exhibit A**.

32.    On November 15, 2021, JSX responded to Mr. Scherrer's November 5 letter, offering to limit flights, under certain conditions, to nine passengers for the remainder of 2021 until a resolution could be reached. JSX reiterated that Part 380 operations have occurred at FBOs at HPN for several years and were never before subject to the TUP. A true and correct copy of the November 15, 2021, letter is attached hereto as **Exhibit B**.

33.    Because Mr. Scherrer's letter had suggested that flights with fewer than nine seats would not need to operate from the Terminal, JSX in the meantime made a good faith attempt to limit the size of its flights to nine seats per flight at HPN. This cost approximately $85,000 a week. Although Defendants had many opportunities to work with JSX on a potential resolution, Defendants rejected JSX's efforts to reach a good faith resolution.

34.    Despite JSX's desire to cooperate with the County and good faith attempts at resolution, the County refused to change its position. On December 2, 2021, Mr. Scherrer sent another letter to JSX, addressed to JSX's CEO, Mr. Alex Wilcox, insisting that JSX move its operations

to the Terminal. A true and correct copy of the December 2, 2021, letter is attached hereto as **Exhibit C**.

35.    On January 7, 2022, JSX received another letter from April Gasparri, the new Airport Manager, again insisting on JSX's agreement to use the Terminal and be subjected to the ramp allocation and passenger limitation restrictions. A true and correct copy of the January 7, 2022, letter is attached hereto as **Exhibit D**.

36.    But starting in 2022, Defendants became largely unresponsive to any of JSX's attempts to communicate and reach a potential alternative for reasonable access.

37.    On February 7, 2022, Airport Manager Ms. Gasparri sent another letter to JSX about JSX's alleged failure to operate out of the Terminal as required. A true and correct copy of the February 7, 2022, letter with attachment is attached hereto as **Exhibit E**.

38.    On February 15, 2022, Mr. Wilcox responded to Ms. Gasparri's February 7 letter, reiterating the hardship that would be caused by JSX's operation out of the Terminal and outlining the alternative proposed by JSX that the County failed to consider. This letter also references a correspondence that JSX sent on December 23, 2021, where JSX proposed two alternative reasonable accommodations for the Airport's consideration. Both proposals would involve checking in passengers at the Terminal and the use of vacant office space on the first floor of the Terminal to hold passengers prior to boarding. Under the first proposal, when boarding commences, passengers would be escorted through the Ross Aviation East FBO and down a non-SIDA ramp. Under the second proposal, passengers would be escorted through an access gate just north of the Terminal and then down an Airport terminal ramp. Inexplicably, these proposals were rejected by the Airport, without any meaningful consideration or analysis. A true and correct copy of the February 15, 2022, letter is attached hereto as **Exhibit F**.

39. JSX and the other Plaintiffs initiated this lawsuit on March 7, 2022.

40. On July 1, 2024, the district court dismissed all claims by all parties. On July 12, 2024, JSX and the other Plaintiffs appealed the district court's order and judgment to the Second Circuit.

41. On July 15, 2024, JSX received another letter from April Gasparri informing JSX that, unless it agreed within seven days to come into compliance with the 2005 Amendment by September 30, 2024, it could face an end to its operations at HPN and/or legal action. A true and correct copy of the July 15, 2024, letter is attached hereto as **Exhibit G**.

42. On July 18, 2024, counsel for JSX reached out to counsel for the County asking if the County would agree to a limited stay in this case or to an accommodation that would allow JSX to operate out of a non-SIDA area in the terminal. A true and correct copy of the July 18, 2024, e-mail is attached hereto as **Exhibit H**.

43. On July 19, 2024, counsel for the County responded, indicating that the County would agree to neither a stay nor an accommodation. A true and correct copy of the July 19, 2024, e-mail is attached hereto as **Exhibit I**.

44. On July 19, 2024, JSX received another letter from April Gasparri informing JSX that the County was revising its demand. The County now demands that, unless JSX agrees by July 29, 2024, to come into compliance with the 2005 Amendment by October 31, 2024, it could face an end to its operations at HPN and/or legal action. A true and correct copy of the July 19, 2024, letter is attached hereto as **Exhibit J**.

### Use of the Terminal Would Cause JSX Irreparable Harm

45. Operation out of the Terminal poses a number of substantial legal and logistical challenges to JSX. At the Terminal, JSX is not permitted to route passengers through the standard

TSA checkpoint and, despite its own TSA-approved screening procedures, the County refuses to provide an accommodation that would enable JSX to follow its approved screening procedures at the Terminal. This would eliminate a key feature of JSX's business model and one of the primary reasons that passengers choose to fly with JSX.

46.    Passengers who go through a non-SIDA checkpoint, like JSX's, cannot deplane at a sterile terminal due to insufficient screening at their departure airport. As a result, JSX would be unable to fly any of their current routes from non-sterile FBOs to HPN.

47.    As examples, JSX would not be able to operate its routes from Miami/Opa-Locka Airport, Boca Raton Airport, Naples Airport, and West Palm Beach Airport to HPN, as its passengers would not be authorized by TSA to enter the terminal at HPN. These are popular routes.

48.    Routing passengers through the standard TSA screening and into SIDA checkpoints also eliminates JSX's ability to offer routes to underserved airports without TSA facilities because passengers who arrive at HPN's Terminal from these locations are not permitted to deplane at HPN because they were not screened through TSA at their airport of origin.

49.    If forced to comply with the 2005 Amendment, JSX would no longer be able to operate service at HPN.

50.    Defendants' enforcement of the 2005 Amendment, without any alternatives for reasonable access despite JSX's proposals, will impact and eliminate JSX's flight offerings at HPN.

51.    Moreover, JSX would be forced to cancel hundreds of flights that have already been booked, which would in turn damage JSX's reputation and goodwill. JSX has already booked flights through March 31, 2025. JSX would need to cancel over 700 tickets for flights after October 31 if it were forced to go to the Terminal. This includes flights on the days surrounding the

11

Thanksgiving and winter holidays. Such cancelations would damage JSX's reputation with its customer base and risk driving them to JSX's competitors.

52.    Enforcement of the 2005 Amendment will also cause JSX to lose significant investments they have already made to operate from HPN, such as agreements with FBOs, commercial arrangements with other vendors, and improvements made to their facilities. JSX has also spent years and millions of dollars developing its market share, goodwill and customer base.

53.    By seeking to limit its aircraft to nine seats from mid-November through the end of 2021 in an effort to reach a compromise with HPN, JSX already experienced a significant impact on its revenue and profitability. This led to losses of approximately $600,000.

54.    Enforcement of the 2005 Amendment will irreparably harm JSX by entirely halting JSX's services at HPN, including routes to be offered to underserved cities, safe and efficient services to the traveling public, and employment for employees in the area surrounding HPN. JSX will suffer a significant loss of revenue and customer goodwill if it is forced to stop operations at HPN.

55.    Further, as the County's July 15 and July 19 letters make clear, Plaintiffs also face a serious risk of unwarranted litigation from the County.

56.    The County, meanwhile, would suffer no harm from any delay in enforcement of the 2005 Amendment against JSX. The City has not enforced the TUPs against JSX for four years, and JSX continues to operate without complaint about its operations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 19th day of July 2024 in Dallas, Texas.

Ken Edmondson

12

A-533

# EXHIBIT H

**Friday, July 19, 2024 at 14:50:48 Eastern Daylight Time**

**Subject:** JSX/XO
**Date:** Thursday, July 18, 2024 at 3:54:45 PM Eastern Daylight Time
**From:** Jon Cohn
**To:** JNonna@westchestercountyny.gov
**CC:** Jonathan Nelson, pnoto@dorflaw.com, Kyle Hawkins, Shannon Grammel

John:

Thank you for your time on Tuesday. I found our conversation productive, and I look forward to continuing our dialogue.

Our clients are reviewing the letter from Ms. Gasparri and plan to respond soon. In the meantime, I wanted to touch base on a few items we discussed.

First, we talked about a potential extension of the grace period, and you said you needed to speak with your client. Please let us know if the County is amenable to extending the period to the next lottery and when that might be. An extension would be helpful (1) to give the Second Circuit more time to rule and (2) to consider potential revisions to the TUAs, which you mentioned are currently being negotiated. In addition, JSX currently has flights booked through March 2025. In our view, it would be a disservice to the people of Westchester—and anyone else flying into or out of the airport—to cancel published and purchased flights, especially around the holidays.

Second, I promised to provide you with a proposed expedited briefing schedule. If the grace period ends on September 30, we would propose:

- Opening appellant brief due August 15.
- Appellee brief due September 12.
- Reply brief due September 23.

Of course, if the grace period is extended, we can relax these deadlines a bit. Also. in our experience, the Second Circuit may expedite the schedule even more than what the parties proposed.

Third, we raised the issue of a limited stay in the event the Second Circuit needs more time to rule after we fully brief the case. We would prefer not to squeeze the Court on timing.  You indicated you would raise that issue with your client. Please let me know if the County is amenable to such a stay.

Fourth, we discussed whether it would be possible for our clients to use a segregated area of the terminal that is separate from the TSA checkpoints and a hold room with a separate controlled access door to the ramp where they would remain under the control and supervision of our client's duly authorized and airport-badged representatives. Our clients operate under the security protocol known as TFSSP, as required under federal law and TSA regulations for their kind of operation. Thus, their passengers are not permitted to use a TSA checkpoint or enter a SIDA location on arrival or departure. Only users - airlines - who are subject to an AOSSP security protocol like the one governing Part 121 airlines flying into the terminal at HPN are authorized to use TSA checkpoints and pay the associated screening fees. TSA does not permit other users through their checkpoints.

Please let us know if the County is willing to postpone or waive the Tuesday deadline in Ms. Gasparri's letter to consider these federal law issues. We have drafted a stay motion, which we can file tomorrow, but would prefer to reach a non-litigation solution if

A-535

possible. We appreciate your attention to this matter. Feel free to reach out if you would like to discuss further.
All the best,
Jon


**Jonathan F. Cohn** | Lehotsky Keller Cohn | 202.538.1214

# EXHIBIT I

**Friday, July 19, 2024 at 14:45:30 Eastern Daylight Time**

**Subject:** RE: Response to your July 18, e-,mail
**Date:** Friday, July 19, 2024 at 11:50:14 AM Eastern Daylight Time
**From:** Nonna, John
**To:** Jon Cohn
**CC:** Jonathan Nelson, pnoto@dorflaw.com, Kyle Hawkins, Shannon Grammel, Carey, Sean, Mountain, Francesca, Adin, Justin, Macleod, Shawna

Jon and team,
Below is the County's response to your e-mail:
John
<u>First</u>, we talked about a potential extension of the grace period, and you said you needed to speak with your client. Please let us know if the County is amenable to extending the period to the next lottery and when that might be. An extension would be helpful (1) to give the Second Circuit more time to rule and (2) to consider potential revisions to the TUAs, which you mentioned are currently being negotiated. In addition, JSX currently has flights booked through March 2025. In our view, it would be a disservice to the people of Westchester—and anyone else flying into or out of the airport—to cancel published and purchased flights, especially around the holidays.
<span style="color:red">The County is not amendable to extending the grace period beyond October 31, 2024. (see my comment to "Fourth," below). JSX made the decision to schedule flights knowing the summary judgment motion was under submission for many months. It was already able to operate for almost two years in violation of the County law. With the existing grace period, there is sufficient time for JSX to inform its customers and to allow them to make alternative arrangements past October 31, 2024.</span>
<u>Second</u>, I promised to provide you with a proposed expedited briefing schedule. If the grace period ends on September 30, we would propose:
- Opening appellant brief due August 15.
- Appellee brief due September 1<span style="color:red">9</span>.
- Reply brief due September <span style="color:red">30</span>.
<span style="color:red">We propose moving our brief and the reply brief by one week.</span>
Of course, if the grace period is extended, we can relax these deadlines a bit. Also. in our experience, the Second Circuit may expedite the schedule even more than what the parties proposed.
<u>Third</u>, we raised the issue of a limited stay in the event the Second Circuit needs more time to rule after we fully brief the case. We would prefer not to squeeze the Court on timing.  You indicated you would raise that issue with your client. Please let me know if the County is amenable to such a stay.
<span style="color:red">The County is not amenable to a limited stay.</span>
<u>Fourth</u>, we discussed whether it would be possible for our clients to use a segregated area of the terminal that is separate from the TSA checkpoints and a hold room with a separate controlled access door to the ramp where they would remain under the control and supervision of our client's duly authorized and airport-badged representatives. Our clients operate under the security protocol known as TFSSP, as required under federal law and TSA regulations for their kind of operation. Thus, their passengers are not permitted to use a TSA checkpoint or enter a SIDA location on arrival or departure. Only

users - airlines - who are subject to an AOSSP security protocol like the one governing Part 121 airlines flying into the terminal at HPN are authorized to use TSA checkpoints and pay the associated screening fees. TSA does not permit other users through their checkpoints.

The County will not agree that your clients can use a segregated area of the terminal. Please let us know if the County is willing to postpone or waive the Tuesday deadline in Ms. Gasparri's letter to consider these federal law issues. We have drafted a stay motion, which we can file tomorrow, but would prefer to reach a non-litigation solution if possible. We appreciate your attention to this matter. Feel free to reach out if you would like to discuss further.

We will be sending a correction to Ms. Gasparri's letter shortly. The next lottery is October 15th. The County will therefore extend the grace period to October 31st and the time to respond to the corrected letter to July 29.

John M. Nonna
Westchester County Attorney

148 Martine Avenue, 6th Fl.
White Plains, NY  10601
(914) 995-2690
JNonna@westchestercountyny.gov

A-539

# EXHIBIT J

A-540





**George Latimer**
County Executive

Department of Public Works and Transportation
 Hugh J. Greechan, Jr., P.E., Commissioner
 April L. Gasparri, Director of Aviation

July 19, 2024

**VIA REGULAR MAIL, CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED, AND EMAIL**

David Drabinsky
Vice President of Strategy and Corporate Development
Delux Public Charter LLC
1341 West Mockingbird Lane
Dallas, TX 75247
david.drabinsky@jsx.com

>     **Re:     Correction and Modification to the County's Letter of July 15, 2024**

Dear Mr. Drabinsky:

On July 15, 2024, Westchester County sent Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc. ("JSX") a letter regarding compliance with Westchester County's Terminal Use Procedures (the "First JSX Letter"). For your reference, a copy of the First JSX Letter is appended hereto as "Exhibit A." The County is writing to correct an error in the First JSX Letter.

The County has recently learned that the next Lottery is actually scheduled for Tuesday, October 15, 2024. To account for this error, the County hereby modifies the terms set forth in the First JSX Letter as follows:

(i)     **Affirmative Acknowledgement**: On or before <u>Monday, July 29, 2024</u>, JSX must notify the County in writing (i) that it intends to come into full compliance with the TUPs by <u>Thursday, October 31, 2024</u>; and (ii) the method by which it intends to achieve compliance (*e.g.*, by operating aircraft with nine seats or fewer, by moving non-compliant operations to HPN's terminal, by ceasing sales to the public or a segment thereof).

(ii)     **Grace Period**: In exchange for such acknowledgment, the County will permit JSX to operate all of its *currently scheduled* flights, which are scheduled to depart on or before <u>Thursday, October 31, 2024</u> ("Currently Scheduled Flights") from HPN's fixed-based operators ("FBOs"). Note that Currently Scheduled Flights includes only those flights that are scheduled as of the date of this letter. Note further that Currently Scheduled Flights also includes only those flights that are scheduled *for JSX*; JSX cannot increase its allotment by acquiring additional, previously scheduled flights. For all Currently Scheduled Flights, JSX may continue to sell

Michaelian Office Building
148 Martine Avenue, Room 518
White Plains, New York 10601     Telephone:  (914) 995-2547     Fax:  (914) 995-4479



**A-541**

any unsold seats to the public. All operations and sales for flights after Thursday, October 31, 2024, must fully comply with the TUPs.

Finally, please note that any term or condition contained in the First JSX Letter that is not expressly modified by the foregoing remains in effect.

Very truly yours,

By: *April L. Gasparri*

April L. Gasparri
Director of Aviation
Westchester County Airport (HPN)
axgc@westchestercountyny.gov
O: (914) 995-4887

CC:    Joan McDonald, Director of Operations (*via Email*)
       Hugh J. Greechan, Jr., P.E., Commissioner,
        Westchester County Department of Public Works & Transportation (*via Email*)
       John Nonna, Esq., Westchester County Attorney (*via Email*)
       Francisco Tejada, Airport Manager, Avports/Westchester County Airport (*via Email*)

2

# Exhibit A
# First JSX Letter

A-543



**George Latimer**
**County Executive**

Department of Public Works and Transportation
Hugh J. Greechan, Jr., P.E., Commissioner
April L. Gasparri, Director of Aviation

July 15, 2024

**VIA REGULAR MAIL, CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED, AND EMAIL**

David Drabinsky
Vice President of Strategy and Corporate Development
Delux Public Charter LLC
1341 West Mockingbird Lane
Dallas, TX 75247
david.drabinsky@jsx.com



Re:    **Compliance with Westchester County's Terminal Use Procedures**

Dear Mr. Drabinsky:

On July 1, 2024, the court in *Delux Public Charter, LLC d/b/a JSX Air, et al. v. County of Westchester, New York*, No. 22-cv-1930 (PMH) (S.D.N.Y.) (the "Action") issued a valid court order finding that Westchester County's terminal use procedures, codified at Section 712.462 of the Laws of Westchester (the "TUPs"), are not preempted by federal law. Now—in accordance with the parties' so-ordered stipulation of March 16, 2022—the County of Westchester (the "County") hereby directs that Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc. ("JSX") come into compliance with the TUPs.

**Becoming Compliant**

Given both the lead-up time inherent in scheduling flights and the operational complexities of admitting new entrants to the quarterly lottery (the "Lottery") for ramp allocations at the Westchester County Airport ("HPN"), the County affirmatively recognizes that JSX will likely need time to come into full compliance with the TUPs. The County will grant that time subject to the following terms and conditions:

- <u>Affirmative Acknowledgement</u>:  Within seven days of its receipt of this letter, JSX must notify the County in writing (i) that it intends to come into full compliance with the TUPs by September 30, 2024; and (ii) the method by which it intends to achieve compliance (*e.g.*, by operating aircraft with nine seats or fewer, by moving non-compliant operations to HPN's terminal, by ceasing sales to the public or a segment thereof).

- <u>Grace Period</u>:  In exchange for such acknowledgment, the County will permit JSX to operate all of its *currently scheduled* flights, which are scheduled to depart on or before

Michaelian Office Building
148 Martine Avenue, Room 518
White Plains, New York 10601    Telephone: (914) 995-2547    Fax: (914) 995-4479



**A-544**

Monday, September 30, 2024 ("Currently Scheduled Flights") from HPN's fixed-based operators ("FBOs"). Note that Currently Scheduled Flights includes only those flights that are scheduled as of the date of this letter. Note further that Currently Scheduled Flights also includes only those flights that are scheduled *for JSX*; JSX cannot increase its allotment by acquiring additional, previously scheduled flights. For all Currently Scheduled Flights, JSX may continue to sell any unsold seats to the public. All operations and sales for flights after Monday, September 30, 2024, must fully comply with the TUPs.

- The Lottery: The participation of any new entrant in the Lottery necessarily implicates certain administrative prerequisites—including but not limited to execution of a terminal use agreement or limited terminal use agreement; proof of appropriate insurance; and in-person attendance at the Lottery itself (*see, e.g.*, LWC § 712.462 [2] [g], [o], [5] [b] [iii]). In the event that JSX intends to participate in the next Lottery—currently scheduled to occur at 240 Airport Road (passenger terminal, 2nd floor, administrative conference room) on September 17, 2024, at 10:00am—I ask that a representative reach out to me as soon as possible to begin the process of satisfying the prerequisites. While failure to do so will not affect the aforementioned Grace Period, it could jeopardize JSX's ability to participate meaningfully in the next scheduled Lottery.

**Failure to Comply**

Note, finally, that in the event JSX fails to comply with the above-outlined terms and conditions, the County expressly reserves its rights to enforce the TUPs to the fullest extent authorized by law. Pursuant to the Laws of Westchester County, those rights include, among other options:

- Denial of Airport Use (*see* LWC § 712.421 [25] ["The Manager shall have the authority to deny the use of the airport to any owner or operator violating any airport . . . regulation . . . ."]);

- Injunction (*see* LWC § 712.462 [6] [f] ["The County may maintain actions in any court of competent jurisdiction to restrain by injunction . . . any attempted Passenger Service in violation of [the TUPs]."]); and

- Reimbursement of All Attorney's Fees Expended to Date (*see* LWC § 712.651 [2] ["[A]ny person who violates any provisions contained in Article IV [of Chapter 712 of the Laws of Westchester County] must reimburse the Westchester County Airport for any **and all** expenses and costs incurred by the Westchester County Airport to address such violation."] [emphasis added]).

Very truly yours,

By: *April L. Gasparri*
April L. Gasparri
Director of Aviation
Westchester County Airport (HPN)

2

axgc@westchestercountyny.gov
O: (914) 995-4887

CC:    Joan McDonald, Director of Operations (*via Email*)
       Hugh J. Greechan, Jr., P.E., Commissioner,
        Westchester County Department of Public Works & Transportation (*via Email*)
       John Nonna, Esq., Westchester County Attorney (*via Email*)
       Francisco Tejada, Airport Manager, Avports/Westchester County Airport (*via Email*)

A-546

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> COUNTY OF WESTCHESTER, <br><br> *Defendant.* | Civil Action No. 22-cv-01930 (PMH) |

### DECLARATION OF RAJAT KHURANA IN SUPPORT OF PLAINTIFFS' MOTION

I, Rajat Khurana, state and declare as follows:

1.      I am the Chief Marketplace Officer for Plaintiff XO Global, LLC ("XO Global"). This declaration is made in support of Plaintiffs' Motion for Clarification, or in the Alternative a Stay, or in the Alternative an Injunction Pending Appeal. I have personal knowledge, or knowledge based upon my review of the corporate record, of the facts set forth herein and, if called upon to testify as a witness, I could and would testify competently thereto.

2.      Along with the other Plaintiffs in this action, XO Global has filed this action to prevent the enforcement of the 2005 Amendment to the Terminal Use Procedures ("TUPs") adopted by the Westchester County Airport. That amendment would prohibit Plaintiffs, including XO Global, from servicing Westchester County Airport ("HPN" or the "Airport").

### XO Global's Operations

3.      XO Global is an indirect air carrier that that furnishes air transportation pursuant to authority granted by the Department of Transportation ("DOT") under 14 C.F.R. Part 380 ("Part

1

380"). As relevant here, XO Global partners with various 14 C.F.R. Part 135 ("Part 135") Air Carriers, such as Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), to sell individual seats to the public for flights pursuant to its authority from DOT under Part 380.

4.      XO Global's operations are fully compliant with Part 380 regulations and federal law.

5.      XO Global provides on-demand charter, priority access to private jet fleet, and other programs to meet private aviation needs, as well as products for flyers who have demanding schedules and minimal flexibility around how and when they fly.

6.      XO Global provides a level of safety, convenience, and a socially distanced flying experience that is not otherwise available to big airline customers. XO Global's services are safe, federally authorized, and quieter than large airlines.

7.      XO Global, and its related company, JetSmarter, Inc., have been operating out of various fixed based operators ("FBOs") at HPN since 2015. A FBO is an aeronautical service provider located at an airport that, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators. XO currently operates out of the Million Air and Atlantic Aviation East FBOs at HPN.

8.      XO Global has offered flights between HPN and Los Angeles, Oakland, Aspen and various locations in South Florida. In the last 18 months, XO Global organized more than 1,500 flights and transported more than 17,000 passengers to and from HPN. On average, per week, XO operates 10 flights carrying approximately 110 customers into HPN and 10 flights carrying approximately 110 customers out of HPN.

9.      XO Global's flights have an impeccable safety record and not a single operator XO Global has worked with had any safety incidents at HPN.

10.    XO Global's operations are structured differently than the large scheduled airlines that also operate out of HPN.

11.    XO Global flights follow a TSA-approved "Twelve-Five" Security Plan, which is a regulatory protocol that permits its customers to bypass TSA security checkpoints in the main passenger terminal ("Terminal"). The "Twelve-Five" Security Plan is uniquely available for Part 135 operators (and thus Part 380 operators like XO Global that partner with Part 135 operators). XO Global's flights maintain a rigorous TSA-approved and monitored security plan, which is superior to and in many ways exceeds the standard TSA plan utilized in an airport's main terminal. For instance, XO Global contracts with private K-9 security providers to use K-9s to search customer luggage. Customers can pass through security screening and board their flight 30 minutes before departure, and avoid the long lines and crowds associated with the Terminal's TSA protocols. The result is a fast, crowd-free airport experience that is still compliant with federal safety regulations. Additionally, by partnering with Part 135 operators that have a Twelve-Five security protocol, XO Global is able to offer routes to smaller markets from non-Security Identification Display Area ("non-SIDA") locations at FBOs.

12.    In addition to its streamlined security screening, XO Global offers other valuable services to their customers when they operate from a FBO that cannot be offered at the Terminal. These services include valet and shuttle services, concierge services, and speedier check-in and boarding.

13.    XO's customers are extremely satisfied with XO's services. In Q2 of this year, XO was able to achieve a 4.75 rating with over 100 customers providing feedback. XO also has very high retention rates, which XO believes is the best proxy of customer satisfaction. Of XO's top fliers (420 people), 86% flew with XO in both 2023 and 2024. The majority of the remaining 14%

has not yet flown in 2024 but plans to utilize the service later this year. The majority of XO's flyers have been retained year over year, a rare accomplishment for any company or product.

14.    XO Global's flights are quiet and lessen the impact of charter planes on the surrounding community. XO Global's shared flights address the inefficiencies of the private aircraft industry by flying ten or more passengers and increasing the efficiency of seating capacity. XO Global's services minimize the impact of charter planes by aggregating passengers into smaller or quieter aircraft when passengers may instead individually charter their own aircraft which would create further impact or airport congestion. For example, instead of ten passengers chartering their own aircraft individually to the same destination, XO Global's flight offerings aggregate those ten passengers in one aircraft, thus minimizing the impact by comparison.

15.    Given that XO Global's customers are processed through this separate (not lesser) TSA-approved screening protocol, customers flying with XO Global are not processed through the Terminal's TSA checkpoints. Instead, XO Global's federally authorized certification status and Twelve-Five Security Plan require it to enplane and deplane passengers at non-SIDA security checkpoints. A Security Identification Display Area ("SIDA") location is differentiated and cordoned off from non-SIDA locations at HPN—but both types of security procedures are TSA-approved and meet federal regulations. The Terminal at HPN is currently a SIDA-only space, and under federal regulations, XO Global's customers are not permitted to enter SIDA checkpoints or mingle with passengers that have been screened through SIDA. The only option for XO Global is to maintain operations at the FBOs. As a result, XO Global is unable to operate from the Terminal unless HPN establishes a non-SIDA location.

16.    XO does not operate from any SIDA location in its network.

17. Because XO Global could not offer its services at the Terminal, XO Global's and JetSmarter's, its related company, flights have been operating from the FBOs since 2015. Many other Part 135 and Part 380 operators use FBOs at HPN for access to a non-SIDA location. This is a common form of federally licensed and approved operations and business model in the air transportation industry that has been in existence without controversy for decades.

18. In fact, Part 380 operations at HPN have long occurred at FBOs, and public charter operations under Part 380 go back many decades. As a Part 380 operator, until recently, XO Global has not been subject to the TUP at HPN, nor has the Airport prior to the end of last year asked XO Global to sign the Terminal Use Agreement ("TUA").

**The County Seeks to Force XO Global to Use the Terminal**

19. On November 5, 2021, the County of Westchester ("County"), through the County's operator, AvPorts, and Airport Manager, Peter Scherrer, contacted XO Global. The County asserted XO Global was subject to the Airport's TUP and required to conduct all of its services from the Terminal rather than at a FBO. The County further stated that XO Global was required to operate from the Terminal even if its customers were members of a private club. The County informed XO Global that it had to discontinue its operations and arrange to move its operations to the Terminal. A true and correct copy of the November 5, 2021, letter is attached hereto as **Exhibit K**.

20. Over the course of two months, XO engaged in discussions with the County's representatives to find an amicable resolution.

21. In response to Defendant's demands and, in an effort to reach a good faith compromise, XO proposed completing passenger check in at the Ross Aviation East FBO and transporting the passengers to the aircraft that parked at the terminal to be boarded planeside. This proposal

was ultimately denied without explanation. The County has refused any proposals to allow XO Global to operate from an alternative non-SIDA location.

22.     XO Global and the other Plaintiffs initiated this lawsuit on March 7, 2022.

23.     On July 1, 2024, the district court dismissed all claims by all parties. On July 12, 2024, XO Global and the other Plaintiffs appealed the district court's order and judgment to the Second Circuit.

24.     On July 15, 2024, XO Global received another letter from April Gasparri informing XO that, unless it agreed within seven days to come into compliance with the 2005 Amendment by September 30, 2024, it could face an end to its operations at HPN and/or legal action. A true and correct copy of the July 15, 2024, letter is attached hereto as **Exhibit L**.

25.     On July 19, 2024, XO Global received another letter from April Gasparri informing XO that the County was revising its demand. The County now demands that, unless XO agrees by July 29, 2024, to come into compliance with the 2005 Amendment by October 31, 2024, it could face an end to its operations at HPN and/or legal action. A true and correct copy of the July 19, 2024, letter is attached hereto as **Exhibit M**.

### Use of the Terminal Would Cause XO Global Irreparable Harm

26.     The Terminal poses many legal and logistical challenges to XO Global's operations. At the Terminal, XO Global will be forced to route customers through the Terminal's TSA screening protocol, despite having a legal right to utilize TSA-approved screening procedures designated for Part 135 carriers, because the Terminal does not provide for non-SIDA TSA screening procedures.

27.     Operation out of the Terminal rather than a FBO would eliminate a key feature of XO Global's business and one of the primary reasons that customers choose to fly with XO Global.

28.     Routing passengers through the standard TSA screening and into SIDA checkpoints eliminates XO Global's ability to offer routes connecting other airports without TSA facilities or airports where the flight enplanes at a non-SIDA location. Customers who arrive at HPN's Terminal from these locations are not permitted to deplane at HPN because they were not screened through TSA at the airport of origin. Such a requirement would prevent XO from offering routes into HPN.

29.     For example, XO would not be able to operate its routes from Fort Lauderdale International Airport ("FLL") and Palm Beach International Airport ("PBI") into HPN because passengers would be departing from non-SIDA locations (generally FBOs) and, as such, would be unable to enter the Terminal.

30.     Over the last 18 months, XO flew approximately 8,500 customers between HPN and each of FLL and PBI. The collective impact of these flights would be 17,000 thousand customers. These are XO's most lucrative routes

31.     XO Global has spent time and money in building its operations at HPN and contributing to the local economy. XO Global and JetSmarter have been building the market and the shared charter routes from HPN since 2015.

32.     If the 2005 Amendment is enforced, XO Global stands to lose the significant investments it has made toward its operations at HPN and to develop its reputation and customer base.

33.     Because of the drastic impact the 2005 Amendment will have on XO Global, XO Global will be forced to eliminate routes, cease operations, and lay off employees. In essence, XO will not be able to operate at HPN.

34.    If it cannot continue organizing flights to and from HPN, XO is likely to lose a significant number of its customers who have been utilizing XO's and JetSmarter's shuttle flights to and from HPN for years.

35.    If XO Global is forced to move to the Terminal, it would also no longer be able to offer valet, concierge services, and speedier check-in and boarding to its customers.

36.    A significant aspect of the XO experience is the ability to wait comfortably at the FBO before boarding the plane rather than in a very crowded terminal. This experience is preferred by many elderly people who are a large percentage of flyers for XO.

37.    While the passengers wait in the FBO, they are offered snacks, drinks, comfortable seating, and office space if needed. Boarding starts about 15 minutes prior to departure. Pilots cross-check IDs with their manifest, and aircraft doors are typically closed 10 minutes prior to departure.

38.    XO has the unique ability to delay departure time of a flight to accommodate the late arrival of passengers or depart earlier in the event all passengers are on board earlier. This is an invaluable part of the customer service experience that XO provides now but will not be able to if forced to operate out of the Terminal.

39.    Upon arrival, the line service at the FBO removes the luggage from the aircraft and passes it out to each passenger immediately either planeside or at the FBO lobby.

40.    If XO is forced to use the Terminal and is still able to sell any tickets, our passengers would need to arrive at the airport much earlier, wait in line to check in, and have some sort of boarding pass. Our passengers would then be required to wait in a second line for TSA security screening and then make their journey toward their designated gate. It would be impossible to

provide the same level of amenities, convenience, and experience at the Terminal that our passengers are accustomed to at the FBO.

41.    XO would also have to cancel contracts with its security and shuttle-service partners.

42.    Further, XO Global faces unwarranted litigation from the County, as I understand that the County has threatened litigation to enforce the 2005 Amendment.

43.    The County, meanwhile, would suffer no harm from any delay in enforcement of the 2005 Amendment against XO. The City has not enforced the TUPs against XO or its sister company JetSmarter for nine years, and XO continues to operate without complaint about its operations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 19th day of July 2024 in Boca Raton, Florida.

Rajat Khurana

# EXHIBIT M

A-556



# Westchester County

**George Latimer**
County Executive

Department of Public Works and Transportation
Hugh J. Greechan, Jr., P.E., Commissioner
April L. Gasparri, Director of Aviation

July 19, 2024

**VIA REGULAR MAIL, CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED, AND EMAIL**

Anastasija Snicarenko, Esq.
General Counsel
XO Global LLC
1901 W. Cypress Creek Rd., Suite 6B
Fort Lauderdale, FL 33309
asnicarenko@flyxo.com

> **Re:     Correction and Modification to the County's Letter of July 15, 2024**

Dear Ms. Snicarenko:

On July 15, 2024, Westchester County sent XO Global LLC ("XO") a letter regarding compliance with Westchester County's Terminal Use Procedures (the "First XO Letter"). For your reference, a copy of the First XO Letter is appended hereto as "Exhibit A." The County is writing to correct an error in the First XO Letter.

The County has recently learned that the next Lottery is actually scheduled for Tuesday, October 15, 2024. To account for this error, the County hereby modifies the terms set forth in the First XO Letter as follows:

(i)     **Affirmative Acknowledgement**: On or before <u>Monday, July 29, 2024</u>, XO must notify the County in writing (i) that it intends to come into full compliance with the TUPs by <u>Thursday, October 31, 2024</u>; and (ii) the method by which it intends to achieve compliance (*e.g.*, by operating aircraft with nine seats or fewer, by moving non-compliant operations to HPN's terminal, by ceasing sales to the public or a segment thereof).

(ii)     **Grace Period**: In exchange for such acknowledgment, the County will permit XO to operate all of its *currently scheduled* flights, which are scheduled to depart on or before <u>Thursday, October 31, 2024</u> ("Currently Scheduled Flights") from HPN's fixed-based operators ("FBOs"). Note that Currently Scheduled Flights includes only those flights that are scheduled as of the date of this letter. Note further that Currently Scheduled Flights also includes only those flights that are scheduled *for XO*; XO cannot increase its allotment by acquiring additional, previously scheduled flights. For all Currently Scheduled Flights, XO may continue to sell any unsold

Michaelian Office Building
148 Martine Avenue, Room 518
White Plains, New York 10601     Telephone:  (914) 995-2547     Fax:  (914) 995-4479



**A-557**

seats to the public. All operations and sales for flights after <u>Thursday, October 31, 2024</u>, must fully comply with the TUPs.

Finally, please note that any term or condition contained in the First XO Letter that is not expressly modified by the foregoing remains in effect.

Very truly yours,

By: *April L. Gasparri*

April L. Gasparri
Director of Aviation
Westchester County Airport (HPN)
axgc@westchestercountyny.gov
O: (914) 995-4887

CC:   Joan McDonald, Director of Operations (*via Email*)
        Hugh J. Greechan, Jr., P.E., Commissioner,
         Westchester County Department of Public Works & Transportation (*via Email*)
        John Nonna, Esq., Westchester County Attorney (*via Email*)
        Francisco Tejada, Airport Manager, Avports/Westchester County Airport (*via Email*)

2

# Exhibit A
# First XO Letter

**A-559**

## Westchester County

**George Latimer**
**County Executive**

Department of Public Works and Transportation
 Hugh J. Greechan, Jr., P.E., Commissioner
 April L. Gasparri, Director of Aviation

July 15, 2024

**VIA REGULAR MAIL, CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED, AND EMAIL**

Anastasija Snicarenko, Esq.
General Counsel
XO Global LLC
1901 W. Cypress Creek Rd., Suite 6B
Fort Lauderdale, FL 33309
asnicarenko@flyxo.com

    **Re:   Compliance with Westchester County's Terminal Use Procedures**

Dear Ms. Snicarenko:

On July 1, 2024, the court in *Delux Public Charter, LLC d/b/a JSX Air, et al. v. County of Westchester, New York*, No. 22-cv-1930 (PMH) (S.D.N.Y.) (the "Action") issued a valid court order finding that Westchester County's terminal use procedures, codified at Section 712.462 of the Laws of Westchester (the "TUPs"), are not preempted by federal law. Now—in accordance with the parties' so-ordered stipulation of March 16, 2022—the County of Westchester (the "County") hereby directs that XO Global, LLC ("XO") come into compliance with the TUPs.

**Becoming Compliant**

Given both the lead-up time inherent in scheduling flights and the operational complexities of admitting new entrants to the quarterly lottery (the "Lottery") for ramp allocations at the Westchester County Airport ("HPN"), the County affirmatively recognizes that XO will likely need time to come into full compliance with the TUPs. The County will grant that time subject to the following terms and conditions:

-   Affirmative Acknowledgement: Within seven days of its receipt of this letter, XO must notify the County in writing (i) that it intends to come into full compliance with the TUPs by September 30, 2024; and (ii) the method by which it intends to achieve compliance (*e.g.*, by operating aircraft with nine seats or fewer, by moving non-compliant operations to HPN's terminal, by ceasing sales to the public or a segment thereof).

-   Grace Period: In exchange for such acknowledgment, the County will permit XO to operate all of its *currently scheduled* flights, which are scheduled to depart on or before Monday, September 30, 2024 ("Currently Scheduled Flights") from HPN's fixed-based

Michaelian Office Building
148 Martine Avenue, Room 518
White Plains, New York 10601    Telephone: (914) 995-2547   Fax: (914) 995-4479



operators ("FBOs"). Note that Currently Scheduled Flights includes only those flights that are scheduled as of the date of this letter. Note further that Currently Scheduled Flights also includes only those flights that are scheduled *for XO*; XO cannot increase its allotment by acquiring additional, previously scheduled flights. For all Currently Scheduled Flights, XO may continue to sell any unsold seats to the public. All operations and sales for flights after Monday, September 30, 2024 must fully comply with the TUPs.

- The Lottery: The participation of any new entrant in the Lottery necessarily implicates certain administrative prerequisites—including but not limited to execution of a terminal use agreement or limited terminal use agreement; proof of appropriate insurance; and in-person attendance at the Lottery itself (*see, e.g.*, LWC § 712.462 [2] [g], [o], [5] [b] [iii]). In the event that XO intends to participate in the next Lottery—currently scheduled to occur at 240 Airport Road (passenger terminal, 2nd floor, administrative conference room) on September 17, 2024, at 10:00am—I ask that a representative reach out to me as soon as possible to begin the process of satisfying the prerequisites. While failure to do so will not affect the aforementioned Grace Period, it could jeopardize XO's ability to participate meaningfully in the next scheduled Lottery.

## Failure to Comply

Note, finally, that in the event XO fails to comply with the above-outlined terms and conditions, the County expressly reserves its rights to enforce the TUPs to the fullest extent authorized by law. Pursuant to the Laws of Westchester County, those rights include, among other options:

- Denial of Airport Use (*see* LWC § 712.421 [25] ["The Manager shall have the authority to deny the use of the airport to any owner or operator violating any airport . . . regulation . . . ."]);

- Injunction (*see* LWC § 712.462 [6] [f] ["The County may maintain actions in any court of competent jurisdiction to restrain by injunction . . . any attempted Passenger Service in violation of [the TUPs]."]); and

- Reimbursement of **All** Attorney's Fees Expended to Date (*see* LWC § 712.651 [2] ["[A]ny person who violates any provisions contained in Article IV [of Chapter 712 of the Laws of Westchester County] must reimburse the Westchester County Airport for any **and all** expenses and costs incurred by the Westchester County Airport to address such violation."] [emphasis added]).

Very truly yours,

By: *April L. Gasparri*

April L. Gasparri
Director of Aviation
Westchester County Airport (HPN)

2

axgc@westchestercountyny.gov
O: (914) 995-4887

CC:    Joan McDonald, Director of Operations (*via Email*)
       Hugh J. Greechan, Jr., P.E., Commissioner,
        Westchester County Department of Public Works & Transportation (*via Email*)
       John Nonna, Esq., Westchester County Attorney (*via Email*)
       Francisco Tejada, Airport Manager, Avports/Westchester County Airport (*via Email*)

3

A-562

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC., | ) ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) Civil Action No. 22-cv-01930 (PMH) |
| COUNTY OF WESTCHESTER, | ) ) |
| *Defendant.* | ) ) ) |

## NOTICE OF APPEAL

Please take notice that, pursuant to Federal Rules of Appellate Procedure 3 and 4(a)(1)(A), Plaintiffs Delux Public Charter, LLC d/b/a JSX Air; JetSuiteX, Inc.; XO Global, LLC; and Blade Urban Air Mobility, Inc. appeal to the United States Court of Appeals for the Second Circuit from each and every part of this Court's final judgment, entered on July 2, 2024 (ECF 121), and each and every part of this Court's opinion and order, entered on July 1, 2024 (ECF 120).


Dated: July 12, 2024                    Respectfully submitted.

                                        */s/ Jonathan B. Nelson*
                                        Jonathan B. Nelson, Esq.
                                        Paul J. Noto, Esq.
                                        Christina L. Grimes, Esq.
                                        Dorf Nelson & Zauderer LLP
                                        555 Theodore Fremd Ave.
                                        Rye, New York 10580
                                        (914) 381-7600
                                        *Attorneys for Plaintiffs*

A-563

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing to all counsel of record by filing same with the Court via CM/ECF on July 12, 2024, which will provide notice to all counsel.

*/s/ Jonathan B. Nelson*
Jonathan B. Nelson