# 24-1895-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

DELUX PUBLIC CHARTER, LLC, DBA JSX Air, DBA JetSuiteX, Inc.,
XO GLOBAL, LLC, BLADE URBAN AIR MOBILITY, INC.,

*Plaintiffs-Counter-Defendants-Appellants,*

– v. –

COUNTY OF WESTCHESTER, NEW YORK, a charter county,

*Defendant-Counter-Claimant-Appellee,*

APRIL GASPARRI, in her official capacity as Airport Manager,
AVPORTS, LLC,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————

### BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-COUNTER-DEFENDANTS-APPELLANTS

———————————————

JONATHAN F. COHN
SHANNON GRAMMEL
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Washington, DC 20001
(512) 693-8350

JONATHAN B. NELSON
DORF NELSON & ZAUDERER LLP
The International Corporate Center
555 Theodore Fremd Avenue
Rye, New York 10580
(914) 381-7600

*Attorneys for Plaintiffs-Counter-Defendants-Appellants*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS     (800) 4-APPEAL • (332113)

KYLE D. HAWKINS
LEHOTSKY KELLER COHN LLP
408 West 11th Street, 5th Floor
Austin, Texas 78701
(512) 436-3052

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. This case presents critical issues of nationwide importance concerning whether local governments may singlehandedly restrict the national marketplace for air travel by enforcing arbitrary local airport rules inconsistent with federal law. The district court's decision below not only allows a local government to effectively shut innovative air carriers out of the critical Westchester County Airport hub—but if left undisturbed, could upend air carrier routes nationwide and stifle innovation in the air transportation industry. That is exactly the type of harm Congress sought to avert through its comprehensive federal regulatory preemption regimes embodied in the Airline Deregulation Act and the Airport Noise and Capacity Act. Oral argument is likely to aid the Court's resolution of these weighty issues.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Plaintiffs-Appellants Delux Public Charter, LLC d/b/a JSX Air and Jet-SuiteX, Inc.; XO Global, LLC; and Blade Urban Air Mobility, Inc. states as follows:

1. JetSuiteX, Inc. is the parent corporation and owns 100% of JSX Air. JetSuiteX, Inc. does not have a parent corporation. United Airlines, Inc. owns 10% or more of JetSuiteX, Inc.

2. The parent corporation of XO Global, LLC is XO Holding Inc. No publicly held company owns 10% or more of either XO Global, LLC or XO Holding Inc.

3. Blade Urban Air Mobility, Inc. is a wholly-owned subsidiary of Blade Air Mobility, Inc. Blade Air Mobility, Inc. is a publicly held company.

*/s/ Jonathan F. Cohn*
Jonathan F. Cohn
*Counsel of Record for Plaintiffs-Counter-Defendants-Appellants*

ii

# TABLE OF CONTENTS

Page

Statement Regarding Oral Argument ..............................................i

Corporate Disclosure Statement......................................... ii

Table of Contents............................................................ iii

Table of Authorities........................................................v

Introduction.................................................................1

Jurisdictional Statement....................................................9

Issues Presented ...........................................................9

Statement of the Case ......................................................9

    I.   Regulatory Background ..........................................9

        A.  Congress claims near-total control over regulation of air transportation. ...............................................10

            1.  The Airline Deregulation Act .................................10

            2.  The Airport Noise and Capacity Act......................11

        B.  The federal regulatory scheme permits public charters to operate from FBOs.......................................13

    II.  Factual Background ..............................................20

        A.  Plaintiffs offer their customers a hassle-free public-charter experience at FBOs and other municipal or private facilities nationwide. ..........................20

        B.  The County suddenly seeks to enforce Section 712.462 to drive Plaintiffs out of the FBOs. ...............................22

    III.  Procedural Background .........................................28

Summary of the Argument .............................................33

Standard of Review ...................................................37

Argument ................................................................................ 37

I.   The County's Efforts to Enforce Section 712.462 Against
     Plaintiffs Are Preempted by the Foundational Federal Laws
     Setting National Aviation Policy. ......................................... 37

     A.   The County's enforcement efforts are preempted by the
          ADA. ........................................................................... 39

          1.   The ADA expressly preempts local regulation of air
               carrier "price[s], route[s], or service[s]." ................. 39

          2.   The County's efforts to force Plaintiffs out of the FBOs
               would restrict Plaintiffs' "route[s]" and "service[s]"
               and therefore fall within the ADA's preemptive scope ....... 42

          3.   The "extremely limited" proprietor exception does
               not apply. .................................................................. 45

     B.   The County's enforcement efforts are preempted by
          ANCA. ......................................................................... 58

          1.   ANCA prescribes strict procedural requirements for
               new airport access restrictions. ............................... 58

          2.   The 2005 Amendment restricts airport access, and the
               County did not comply with ANCA's requirements in
               adopting it. ................................................................ 59

          3.   ANCA's grandfather clause does not apply. ....................... 60

II.  The County's Enforcement Efforts Violate Plaintiffs' Equal
     Protection Rights. ............................................................... 68

Conclusion ............................................................................. 75

Certificate of Service ............................................................. 76

Certificate of Compliance ...................................................... 76

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  697 F.3d 154 (2d Cir. 2012) ..................................................*passim*

*Air Transp. Ass'n of Am. v. City & Cnty. of S.F.*,
  266 F.3d 1064 (9th Cir. 2001) ..........................................42

*Air Transp. Ass'n of Am. v. Cuomo*,
  520 F.3d 218 (2d Cir. 2008) ........................................8, 10, 41, 44

*Altria Group, Inc. v. Good*,
  555 U.S. 70 (2008) ..............................................................40

*American Airlines, Inc. v. DOT*,
  202 F.3d 788 (5th Cir. 2000) ................................46, 48, 54

*American Airlines, Inc. v. Wolens*,
  513 U.S. 219 (1995) ..........................................................41, 44

*Arapahoe Cnty. Pub. Airport Auth. v. FAA*,
  242 F.3d 1213 (10th Cir. 2001) ..........................44, 46, 48

*In re Bernard L. Madoff Inv. Sec. LLC*,
  12 F.4th 171 (2d Cir. 2021) ..............................................66

*British Airways Bd. v. Port Auth. of N.Y. & N.J.*,
  564 F.2d 1002 (2d Cir. 1977) ........................2, 33, 46, 54

*British Airways Bd. v. Port Auth. of N.Y. & N.J.*,
  558 F.2d 75 (2d Cir. 1977) ..............................38, 45, 47

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
  473 U.S. 432 (1985) ..........................................................69

*Drake v. Lab. Corp. of Am. Holdings,*
    458 F.3d 48 (2d Cir. 2006) ...............................................................37

*Fawemimo v. American Airlines, Inc.,*
    751 F. App'x 16 (2d Cir. 2018) ................................................42, 44

*Fortress Bible Church v. Feiner,*
    694 F.3d 208 (2d Cir. 2012) ...........................................36, 70, 71, 73

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
    841 F.3d 133 (2d Cir. 2016) .....................................................*passim*

*Harlen Assocs. v. Inc. Vill. of Mineola,*
    273 F.3d 494 (2d Cir. 2001) ..............................................................74

*Hu v. City of New York,*
    927 F.3d 81 (2d Cir. 2019) ................................................................70

*Lepper v. Scordino,*
    No. 22-1064, 2023 WL 4004220 (2d Cir. June 15, 2023) ...............70

*Loesel v. City of Frankenmuth,*
    692 F.3d 452 (6th Cir. 2012) ......................................................70, 74

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ..........................................................................40

*Midway Airlines, Inc. v. Westchester Cnty.,*
    584 F. Supp. 436 (S.D.N.Y. 1984) ...........................................*passim*

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ...................................................................*passim*

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown,*
    612 F.3d 97 (2d Cir. 2010) ...............................................................37

*Nat'l Helicopter Corp. of Am. v. City of New York,*
    137 F.3d 81 (2d Cir. 1998) ........................................................*passim*

*New England Legal Found. v. Mass. Port Auth.*,
883 F.2d 157 (1st Cir. 1989) ...................................................... 39

*Northwest Airlines, Inc. v. Minnesota*,
322 U.S. 292 (1944) .................................................................. 10

*Northwest, Inc. v. Ginsberg*,
572 U.S. 273 (2014) .............................................................. 40, 41

*Progressive Credit Union v. City of New York*,
889 F.3d 40 (2d Cir. 2018) ........................................................ 69

*Rowe v. N.H. Motor Transp. Ass'n*,
552 U.S. 364 (2008) .................................................................. 11

*SeaAir NY, Inc. v. City of New York*,
250 F.3d 183 (2d Cir. 2001) ...................................................... 48

*Tweed-New Haven Airport Auth. v. Tong*,
930 F.3d 65 (2d Cir. 2019) ...................................................... 1, 8

*Victory v. Pataki*,
814 F.3d 47 (2d Cir. 2016) ........................................................ 37

*W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*,
658 F. Supp. 952 (S.D.N.Y. 1986) ....................................... *passim*

*W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*,
817 F.2d 222 (2d Cir. 1987) ...................................................... 52

*Wachovia Bank, Nat. Ass'n v. VCG Special Opp. Master Fund*,
661 F.3d 164 (2d Cir. 2011) ...................................................... 37

*Weiss v. El Al Israel Airlines*,
309 F. App'x 483 (2d Cir. 2009) ................................................ 42

*Wisconsin Cent. Ltd v. United States*,
585 U.S. 274 (2018) .................................................................. 67

## Statutes & Regulations

28 U.S.C. § 1291 ...................................................................................... 9

28 U.S.C. § 1331 ...................................................................................... 9

28 U.S.C. § 1343(a) ................................................................................. 9

49 U.S.C. § 40101 ................................................................. 1, 3, 10, 34, 57

49 U.S.C. § 41713 ............................................................................ *passim*

49 U.S.C. § 47107 .................................................................................. 69

49 U.S.C. § 47521 ........................................................................ 1, 12, 58

49 U.S.C. § 47523 .................................................................................. 12

49 U.S.C. § 47524 ............................................................................ *passim*

Pub. L. No. 95-504, 92 Stat. 1705 ......................................................... 10

Pub. L. No. 101-508, 104 Stat. 1388 ...................................................... 11

Westchester Cnty. Mun. Code § 712.462 ...................................... *passim*

14 C.F.R. § 110.2 ........................................................ 7, 14, 16, 24, 65

14 C.F.R. § 119.3 (2004) ....................................................................... 67

14 C.F.R. § 119.21 ................................................................................. 16

14 C.F.R. § 161.5 ................................................................................... 59

14 C.F.R. § 161.305 ............................................................................... 13

14 C.F.R. § 380.2 ....................................................................... 14, 24, 65

14 C.F.R. § 380.34 ................................................................................. 15

49 C.F.R. § 1540.5 ................................................................................. 17

49 C.F.R. § 1544.101 ........................................................................17, 27

49 C.F.R. § 1544.105 ...............................................................................27

*Public Charter Rule*,
   43 Fed. Reg. 36,604 (Aug. 18, 1978) .............................................14

*Operating Requirements: Domestic, Flag, Supplemental, Commuter,
   and On-Demand Operations: Editorial and Other Changes*,
   62 Fed. Reg. 13,248 (Mar. 19, 1997) .............................................67

*Operations Specifications*,
   76 Fed. Reg. 7,482 (Feb. 10, 2011) ...............................................67

*Revisions to the Regulatory Definitions of "On-Demand Operation",
   "Supplemental Operation" and "Scheduled Operation,"*
   88 Fed. Reg. 59,480 (Aug. 29, 2023) .............................................16

**Other Authorities**

*Air Traffic by the Numbers*, FAA (June 20, 2024),
   https://perma.cc/LK53-QW3A;.........................................................17

*Census*, U.S. Census Bureau (Aug. 25, 2021),
   https://perma.cc/4HAB-Z72J............................................................22

Complaint, *Cnty. of Westchester v. Delux Public Charter, LLC*,
   No. 67904/2024 (N.Y. Sup. Ct.) .....................................................32

Cong. Rsch. Serv., R46920, Federal Airport Noise Regulations
   and Programs (Sept. 27, 2021), https://perma.cc/5JCR-DKVE .................13

County of Westchester, Comment Letter on Revisions to the
   Regulatory Definitions of "On-Demand Operation", "Sup-
   plemental Operation" and "Scheduled Operation" (Oct. 13,
   2023), https://perma.cc/JXP4-4Q54...............................................65

*Essential Air Service*, DOT (Sept. 21, 2023),
   https://perma.cc/E3AQ-F9X4 ...................................................................19

*FAA Ensuring Safe Public Charter Flights, Exploring Future Solutions for All Flyers*, FAA (June 17, 2024),
   https://perma.cc/RE3P-5LE2 ....................................................................16

Mem. of Law ISO Prelim. Inj., *Cnty. of Westchester v. Delux Public Charter, LLC*,
   No. 67904/2024 (N.Y. Sup. Ct.) ..............................................................32

*Record-breaking Independence Day Weekend Travel Volumes*, TSA
   (June 24, 2024), https://perma.cc/DL9Z-3SYN.......................................17

*Regional Planning*, NYC Planning, https://perma.cc/3B76-TNP5
   (last visited Sept. 2, 2024) .......................................................................22

*To Our JSX Community*, JSX, https://perma.cc/ZP83-JAJA (last
   visited Sept. 2, 2024)................................................................................19

Stephanie Waldek, *This Semi-private Carrier Was Voted Best U.S. Airline by T+L Readers—and One-way Fares Start at $249*,
   Travel + Leisure (July 9, 2024), https://perma.cc/8UTA-5SRP .................21

*Westchester County*, JSX, https://perma.cc/G96B-6NFY (last
   visited Sept. 2, 2024)................................................................................43

# INTRODUCTION

Since the first flight at Kitty Hawk more than a century ago, Congress has made it the policy of the United States to "centraliz[e] in a single authority . . . the power to frame rules for the safe and efficient use of the nation's airspace." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 74 (2d Cir. 2019) (citation omitted). The resulting preemptive framework exists to stamp out "uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system." 49 U.S.C. § 47521(2).

Instead, Congress has chosen to "plac[e] maximum reliance on competitive market forces and on actual and potential competition," *id.* § 40101(a)(6), protected by federal law against parochial interests. Such competition, Congress explained, fosters "efficiency, innovation, . . . low prices," and "variety" across the air transportation industry. *Id.* § 40101(a)(12). Courts must "carefully scrutinize all exercises of local power" over aviation "to insure that impermissible parochial considerations do not unconstitutionally burden interstate commerce or inhibit the accomplishment of [these]

legitimate national goals." *British Airways Bd. v. Port Auth. of N.Y. & N.J.* ("*British Airways II*"), 564 F.2d 1002, 1011 (2d Cir. 1977).

This case is emblematic of the anticompetitive parochialism Congress has preempted as anathema to national aviation policy. Plaintiffs-Appellants are air carriers offering what are known as public charters. This means that Plaintiffs pay to charter small jets themselves, and then sell individual seats on those jets to the public. Since Plaintiffs' aircraft carry no more than 30 passengers, Plaintiffs can avoid crowded airport terminals and operate instead from Fixed Base Operator areas ("FBOs") and other municipal or private facilities—with no Transportation Security Administration ("TSA") checkpoints, few crowds, and no hassles. (Instead of TSA checkpoints, Plaintiffs use alternative, similarly effective, federally-approved security protocols.)

Plaintiffs fill a critical and popular niche in the air transportation industry—their fares are a tiny fraction of the cost of private jet travel, and they can fly to and accept passengers from thousands of regional airports that major commercial carriers cannot. Plaintiffs achieve all this with the full

blessing of federal law and with licenses and authorities issued by the Department of Transportation ("DOT") and Federal Aviation Administration ("FAA"), which specifically define public charter rules and allow for operators like Plaintiffs to use FBOs and other municipal and private facilities. All this promotes the "innovation" and "variety" that Congress has declared critical to national air transportation policy. 49 U.S.C. § 40101(a)(12).

Since 2015, Plaintiffs have offered their popular public charters to and from FBOs at the Westchester County Airport (the "Airport"). For over six years, Defendant-Appellee Westchester County (the "County")—which controls the Airport—happily welcomed Plaintiffs' niche service.

But in 2021, the County suddenly and inexplicably sought to enforce a law that had been on the books since 2005, and that the County had never before attempted to apply against public charters. The County took the novel position that this law applied to Plaintiffs and announced that Plaintiffs could no longer use the FBOs. The County insisted that Plaintiffs would instead have to adopt a fundamentally different business model that would end their operations at the Airport: they would have to use security

3

screening protocols they are not federally authorized to use and operate in a space their passengers are not federally permitted to enter.

The law the County cited to justify this anticompetitive result is Westchester County Municipal Code § 712.462 ("Section 712.462"). It provides that airlines selling seats "individually . . . to the public or a segment of the public" on "aircraft designed for more than (9) passenger seats" must provide their service "at the Terminal." *Id.* § 712.462(1), (2)(a), (j). According to the County, Plaintiffs fall within the regulation as it was amended in 2005 and are therefore prohibited from using the FBOs. Even though federal law permits Plaintiffs to operate out of FBOs and other municipal or private facilities nationwide, Westchester County has now decided, "not ours."

Forcing Plaintiffs out of the FBOs will force them out of the Airport altogether. Plaintiffs simply cannot use the terminal, which under federal law requires TSA checkpoint screening to enter. Plaintiffs cannot board at the terminal because they are not federally approved to use TSA checkpoints. And they cannot deplane at the terminal because their incoming passengers will not have undergone TSA checkpoint screening at their points of

4

departure, many of which do not even have such screening. The County's enforcement efforts would thus have the effect of cutting the County off from the thousands of airports across the country that do not have TSA checkpoints and are not served by the major airlines.

The County's efforts to apply Section 712.462 against Plaintiffs are preempted by two federal statutory regimes. The first, the Airline Deregulation Act ("ADA"), expressly preempts any local law "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). The district court recognized that Section 712.462 is such a law. SPA-13 to 14. Yet it held that the County's enforcement efforts were not preempted because of the ADA's limited exception for airport owners "carrying out [their] proprietary powers and rights," 49 U.S.C. § 41713(b)(3)—here, the proprietary power to reduce scarcity at the terminal. That was error. The County's efforts to force Plaintiffs from the FBOs and into the terminal would only *increase* scarcity and congestion at the already-overcrowded terminal.

At bottom, the County is arbitrarily seeking to burden an innovative carrier and squeeze it out of the marketplace, cutting the County off from the

more than 4,500 airports nationwide that lack TSA checkpoints. This embodies the exact type of parochialism the ADA was enacted to eliminate, with only one difference: the County will not achieve its supposed parochial interest and instead will exacerbate the purported problem.

The County's enforcement actions are further preempted by the Airport Noise and Capacity Act ("ANCA"). Under ANCA, before enacting a new airport access restriction on aircraft like Plaintiffs', an airport owner must secure the approval of either all affected operators or the FAA. 49 U.S.C. § 47524(c)(1). There is no dispute that the County did not do so in 2005 when it added the language to Section 712.462 that it now seeks to enforce against Plaintiffs (the "2005 Amendment"). The district court nonetheless concluded that the 2005 Amendment was not preempted under ANCA's "grandfather" clause, which exempts from ANCA's requirements amendments to pre-ANCA restrictions that do not "reduce or limit aircraft operations." *Id.* § 47524(d)(4). The problem for the County is that the 2005 Amendment *does*, as a matter of law, reduce or limit aircraft operations. Before the 2005 Amendment, Section 712.462's restrictions did not apply to Plaintiffs. Before

2005, Section 712.462 did not apply to airlines unless they were "using the Terminal building or Terminal ramp." A-320. Plaintiffs indisputably do not use the terminal building or terminal ramp. But the 2005 Amendment would *require* Plaintiffs to use the terminal building and terminal ramp. A-343. Thus the 2005 Amendment changed an option into a requirement.

Also, before the 2005 Amendment, Section 712.462's restrictions applied only to "scheduled" passenger service, A-320, which federal law defines not to encompass public charters like Plaintiffs' (even though they fly on schedule), *see* 14 C.F.R. § 110.2. Again, before the 2005 Amendment, Section 712.462's restrictions did not apply to Plaintiffs. Now, however, the County interprets its regulations to apply to all "Passenger Service"—including public charters. A-343.

The ADA and ANCA thus preempt the County's actions, and this Court should reverse the contrary decision below. But there is another independent reason Plaintiffs should prevail: the County's selective enforcement of Section 712.462 against Plaintiffs, while allowing other similarly situated carriers to continue operating from FBOs, violates Plaintiffs' equal protection

7

rights. The County asserts that Plaintiffs must leave the FBOs because they sell individual seats "to the public or a segment of the public" on "aircraft designed for more than (9) passenger seats." Westchester Cnty. Mun. Code § 712.462(2)(a), (j). But the County continues to allow other operators that do the same to continue operating from FBOs. The County has articulated no rational reason for this differential treatment, and there is none.

This Court has a proud history of rejecting local efforts to intrude upon Congress's "centralize[d]" and "single authority" to "frame rules" for air transportation. *Tweed-New Haven Airport Auth.*, 930 F.3d at 74-75 (reversing district court decision failing to recognize federal preemption of aviation safety); *see Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 136 (2d Cir. 2016) (ANCA likely preempted local laws); *Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (per curiam) (ADA preempted New York's Passenger Bill of Rights). It should do so again here. Local airports may not wield local laws to advance parochial interests at the expense of the nationwide interstate market in air travel. The contrary judgment below should be reversed.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered final judgment dismissing the action on July 2, 2024. SPA-29. Plaintiffs filed a timely notice of appeal on July 12, 2024. A-562.

## ISSUES PRESENTED

**1.** Whether federal law, as codified in the Airline Deregulation Act and the Airport Noise and Capacity Act, preempts the County's efforts to enforce Westchester County Municipal Code § 712.462 against Plaintiffs.

**2.** Whether the County's efforts to enforce Westchester County Municipal Code § 712.462 against Plaintiffs violate Plaintiffs' equal protection rights under the U.S. Constitution.

## STATEMENT OF THE CASE

### I. Regulatory Background

We begin with Congress's regulatory scheme for aviation and illustrate how Congress has carefully safeguarded its central control over regulation of the air transportation industry. As part of its careful tapestry of aviation law, Congress has blessed public charters as an important middle-ground

alternative to the behemoth commercial carriers on the one hand, and ultra-expensive private jets on the other.

## A. Congress claims near-total control over regulation of air transportation.

Through a series of federal statutes dating back nearly a century, "Congress has recognized the national responsibility for regulating air commerce." *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring). This case involves two such statutes.

### 1. The Airline Deregulation Act

The first is the Airline Deregulation Act—enacted to eliminate the problem of "conflicting or overlapping regulations issued by the federal and state governments." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154, 160 (2d Cir. 2012) (citation omitted). Signed into law in 1978, *see* Pub. L. No. 95-504, 92 Stat. 1705, the ADA set out to loosen burdensome "regulation of the airline industry," *Air Transp.*, 520 F.3d at 222, to achieve "maximum reliance on competitive market forces and on actual and potential competition," 49 U.S.C. § 40101(a)(6). Such reliance was meant to "stimulat[e] 'efficiency, innovation, and low prices,' as well as 'variety' and 'quality'" in air

10

transportation services. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008) (citation omitted).

"To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). As it exists today, that provision broadly and expressly prohibits States and localities from "enact[ing] or enforc[ing] a law . . . related to [an air carrier's] price, route, or service." 49 U.S.C. § 41713(b)(1). It contains a limited carve-out for airport owners "carrying out [their] proprietary powers and rights." *Id.* § 41713(b)(3). But it otherwise operates to "confer[] on the federal government exclusive authority to regulate a carrier's routes, rates, and services." *Air Cargo*, 697 F.3d at 160.

### 2.   The Airport Noise and Capacity Act

Congress took further steps to nationalize aviation regulation in 1990 with the Airport Noise and Capacity Act. *See* Pub. L. No. 101-508, 104 Stat. 1388. ANCA aimed to stop the problem of local "uncoordinated and inconsistent restrictions" on noise that had the effect of altering the national air

travel market. 49 U.S.C. § 47521(2). It did that by charging the federal government with crafting "a national aviation noise policy." *Id.* § 47523(a).

To ensure that this national policy was not thwarted by isolated parochial interests, Congress set up a mechanism for federal approval of any new local restrictions on airport noise or access. *See id.* § 47524(a). The way such approval works differs based on the type of aircraft at issue.[1] For aircraft like Plaintiffs', no locality may enact any new airport noise or access restriction unless the restriction is either "agreed to by . . . all aircraft operators" or "submitted to and approved by" the FAA. *Id.* § 47524(c)(1). The same requirements apply to any amendments to pre-ANCA noise and access restrictions that "reduce or limit aircraft operations." *Id.* § 47524(d)(4).

Securing FAA approval of new noise and access restrictions is no small feat. Among other things, the locality must provide the FAA a detailed cost-

---

[1]    "Aircraft are classified roughly according to the amount of noise they produce," whereby "Stage 1 [are] the noisiest" and "Stage 3 . . . are relatively quieter." *Friends*, 841 F.3d at 138 (citation omitted). Plaintiffs use Stage 3 aircraft and Stage 4 aircraft (which are even quieter).

benefit analysis and demonstrate satisfaction of each of six criteria.[2] As of three years ago, the FAA had yet to approve *any* noise or access restriction under these requirements.[3]

## B. The federal regulatory scheme permits public charters to operate from FBOs.

This case involves a facet of the federal government's control over what are known as "public charters." That control is manifested through three sets of rules under Title 14 of the Code of Federal Regulations: Part 380, Part 121, and Part 135. We explain each below.

*Part 380.* The core regulations governing public charters are set out in Part 380. Adopted the same year Congress passed the ADA, Part 380 was likewise designed to "increase[] competition among and within various segments of the air transportation industry" and to "mak[e] low-cost travel

---

[2]  The restriction must (1) be "reasonable, nonarbitrary, and nondiscriminatory"; (2) "not create an undue burden on interstate or foreign commerce"; (3) "maintain[] safe and efficient use of the navigable airspace"; (4) "not conflict with any existing Federal statute or regulation"; (5)  be preceded by "adequate opportunity for public comment"; and (6) "not create an undue burden on the national aviation system." 14 C.F.R. § 161.305(e)(2).

[3]  Cong. Rsch. Serv., R46920, Federal Airport Noise Regulations and Programs (Sept. 27, 2021), https://perma.cc/5JCR-DKVE.

widely available to the consuming public." *Public Charter Rule*, 43 Fed. Reg. 36,604, 36,604-05 (Aug. 18, 1978). The government recognized that public charters provide "an important low-cost alternative form of air travel" that spurs "lower prices and innovative service offerings" across the air transportation industry. *Id.* at 36,606.

Part 380 defines a "public charter" as a "one-way or round-trip charter flight to be performed by one or more direct air carriers that is arranged and sponsored by a charter operator." 14 C.F.R. § 380.2. A "charter" is "a flight operated under the terms of a charter contract between a direct air carrier and its customer." *Id.* In the case of public charters, that contract is between the public charter operator and the direct air carrier. Charter flights—including public charters—"do[] not include scheduled air transportation." *Id.*; *see id.* § 110.2. Even when the planes fly pursuant to a schedule published by a "charter operator," the flights flown by the separate "air carrier" do not fit within the definition of "scheduled" air transportation as a matter of federal law.

Public charters work like this: A public charter operator itself charters an aircraft from a direct air carrier. The public charter operator pays for the whole charter itself, but it sells individual seats on that charter to members of the public. The public charter operator bears the financial risk of any seats not ultimately purchased. The public charter operator contracts directly with the direct air carrier to set the time, location, and destination of the flight. And the direct air carrier operates the flight according to those terms.

As set out below, Plaintiffs operate under Part 380: they charter entire aircraft from direct air carriers, then sell seats on those aircraft to the public, bearing any risk of loss from unsold seats. Notably, Part 380 also requires consumer protections absent in regular airline regulation. *See* 14 C.F.R. § 380.34.

**Parts 121 and 135.** Just as Part 380 regulates public charters, Parts 121 and 135 regulate direct air carriers, including those who sell flights to Part 380 public charter operators.

Part 121 generally applies to "scheduled operations" on larger aircraft, including those of the commercial airlines we are all familiar with. *See id.*

§§ 110.2, 119.21(a)(1)-(2). "Scheduled operation[s]" by definition "do[] not include any passenger-carrying operation that is conducted as a public charter operation under part 380." *Id.* § 110.2.[4]

Part 135, meanwhile, applies to what are called "on-demand operations." *See id.* § 119.21(a)(5). The FAA has defined "on-demand operations" to include "[p]assenger-carrying operations conducted as a public charter under part 380" on aircraft with "30 seats or fewer." *Id.* § 110.2.[5] Federal law thus expressly allows Part 380 public charters on aircraft with 30 seats or fewer to be conducted under Part 135.

---

[4]    The FAA recently announced that it would proceed with a rulemaking to amend Part 110's definitions of "scheduled," "on demand," and "supplemental" operations. *FAA Ensuring Safe Public Charter Flights, Exploring Future Solutions for All Flyers*, FAA (June 17, 2024), https://perma.cc/RE3P-5LE2; *see Revisions to the Regulatory Definitions of "On-Demand Operation", "Supplemental Operation" and "Scheduled Operation,"* 88 Fed. Reg. 59,480, 59,480 (Aug. 29, 2023) (expressing the FAA's "inten[t] to initiate a rulemaking").

[5]    Public charters on aircraft with "more than 30 seats" are subject to the requirements in Part 121. *See* 14 C.F.R. §§ 110.2, 119.21(a)(3). All of Plaintiffs' public charter operations occur on aircraft with 30 seats or fewer. A-64, 91, 102.

This is important because the TSA has subjected Part 135 operators to different security requirements than Part 121 operators. Part 121 operators must operate out of a "sterile" location that requires TSA checkpoint screening to access. 49 C.F.R. § 1544.101(a); *see id.* § 1540.5 (access to sterile areas "generally is controlled by TSA"). Part 135 operators, however, do not have to operate from sterile locations. They are federally authorized to use different (though similarly secure) security screening protocols instead of TSA checkpoints. *See id.* § 1544.101(d)-(e). This enables them to operate at all varieties of the more than 5,000 public use airports in the United States, and not just the 430 or so that have TSA checkpoints. A-525.[6]

The type of nonsterile location at issue here is known as a "Fixed Base Operator" area, or FBO. An FBO is a company that operates at an airport and offers, among other things, fueling, maintenance, and other ground-based services to aircraft operators. A-63, 91, 99. FBOs are separate from terminals,

---

[6] *See Air Traffic by the Numbers*, FAA (June 20, 2024), https://perma.cc/LK53-QW3A; *TSA Breaks Record for Most Individuals Screened on a Single Day, Readies for Record-breaking Independence Day Weekend Travel Volumes*, TSA (June 24, 2024), https://perma.cc/DL9Z-3SYN.

which major commercial airlines generally use, and they are among the only facilities available for Plaintiffs at the thousands of public use, federally funded airports that don't have terminals or TSA checkpoints.

FBOs and other municipal or private facilities allow public charter operators to offer valuable services the major airlines cannot offer in terminals. For one thing, public charters can serve smaller airports that lack terminals in underserved and unserved communities. A-481. Absent operations like Plaintiffs', air travelers in those communities would not be able to use their local airports without access to private jets.

Operating out of FBOs and other municipal or private facilities also allows public charters to offer conveniences unavailable in terminals. The most important service offered is the ability to use publicly funded airports otherwise available only to private jets. Another is to also allow one to go from a car to a plane in a matter of a few minutes. Other services can include valet parking and shuttle services; more efficient security screening; and accessibility and a better environment for people with certain types of

disabilities. A-92, 481, 484 to 485. JSX, for example, is the first air carrier certified as Autism-Aware by Autism Double-Checked.[7]

\*   \*   \*

This regulatory framework may be complex, but its underlying policy is simple: The federal government has for decades believed that smaller aircraft are the appropriate way to serve the vast majority of public use airports and that they pose different safety, security, and logistical concerns than the larger aircraft major airlines use to transport hundreds of passengers. So the federal government allows—and in many cases subsidizes[8]—operators of those smaller aircraft to use different facilities without TSA checkpoints, and with less regulatory burden. When those smaller operators use spaces like FBOs, they can transport passengers to literally thousands of regional airports that large commercial carriers cannot access. All of this advances Congress's demand for variety and innovation in air travel. Everyone benefits

---

[7] *To Our JSX Community*, JSX, https://perma.cc/ZP83-JAJA (last visited Sept. 2, 2024).

[8] *Essential Air Service*, DOT (Sept. 21, 2023), https://perma.cc/E3AQ-F9X4.

when passengers can choose among cheap fares on a jumbo jet, pricey fares on a private jet, and middle-of-the-road options (and virtually unlimited destinations) from public charters.

## II. Factual Background

### A. Plaintiffs offer their customers a hassle-free public-charter experience at FBOs and other municipal or private facilities nationwide.

Plaintiffs provide public charters that fit hand-in-glove with this federal regulatory regime. JSX Air (known also as "Delux") is a Part 135 direct air carrier, while JetSuiteX, XO, and Blade are Part 380 public charter operators. A-87, 476, 478, 482. Delux and JetSuiteX are together known as "JSX." Jet-SuiteX charters entire Delux flights and sells tickets for seats on those flights to the public. A-476, 478. Delux then operates the flights using the time, location, and destination designated by JetSuiteX. A-60. XO and Blade operate similarly with other Part 135 direct air carriers. A-87 to 88, 482.

A defining characteristic of Plaintiffs' air transportation services is the spaces from which they operate. Plaintiffs operate from FBOs and other municipal or private facilities where they are federally authorized to use

security screening that is more convenient than (but just as secure as) TSA checkpoints. A-90, 476, 479, 483. Operating out of those facilities allows Plaintiffs to serve communities that do not have airports with terminals or TSA checkpoints. *See supra* p.18. It also allows them to offer conveniences that major airlines operating out of terminals cannot. *See supra* pp.18-19.

Plaintiffs' customers value their services highly. JSX, for example, enjoys the highest customer satisfaction of any air carrier in the United States, was named "Best Regional Airline" in North America by the Airline Passenger Experience Association ("APEX"), and has earned "5-Star Regional Airline" designation from APEX for multiple consecutive years. A-62 to 63, 525. Just this summer, JSX was voted the "No. 1 Domestic Airline" by the readers of *Travel + Leisure* magazine and earned this "World's Best" distinction by a margin of 20 points over the runner-up on a 100-point scale.[9] A-526. Earlier this year, XO achieved a 4.75 rating on a 5-point scale from its customers with over 100 customers providing feedback. A-548. XO also has very high

---

[9]    Stephanie Waldek, *This Semi-private Carrier Was Voted Best U.S. Airline by T+L Readers—and One-way Fares Start at $249*, Travel + Leisure (July 9, 2024), https://perma.cc/8UTA-5SRP.

retention rates, with the majority of XO's flyers being retained year over year. A-548 to 549.

The benefits of Plaintiffs' air transportation services extend beyond just their customers. Plaintiffs' public charter aircraft are typically much quieter than the flights of their commercial competitors. A-62, 88, 99. And they help minimize the impact of private charter planes by aggregating in a single charter multiple passengers who may otherwise charter their own planes. A-62, 89, 100 to 101.

## B. The County suddenly seeks to enforce Section 712.462 to drive Plaintiffs out of the FBOs.

**1.** The Westchester County Airport is situated within and owned by Westchester County in the greater New York metropolitan area—a region of over 23 million residents.[10] Westchester County is New York's most populous county north of New York City.[11]

---

[10]  *Regional Planning*, NYC Planning, https://perma.cc/3B76-TNP5 (last visited Sept. 2, 2024).

[11]  *New York: 2020 Census*, U.S. Census Bureau (Aug. 25, 2021), https://perma.cc/4HAB-Z72J.

The Airport is a critical part of Plaintiffs' business operations. As of this fall, JSX will fly an average of at least 28 flights per week into and out of FBOs at the Airport. A-527. JSX has flown 14,946 passengers through the Airport so far this year. A-527. XO, meanwhile, arranges a weekly average of 10 flights into and out of FBOs at the Airport. A-547. In the last 18 months, XO flew more than 17,000 passengers through the Airport. A-547.

Plaintiffs have been operating out of FBOs at the Airport without incident since 2015. Blade and XO (in connection with its sister company) began operating from FBOs in 2015, and JSX has been operating out of FBOs since 2020. A-63, 88, 103.

**2.** After six years of sterling customer service, and without any previous hint of discontentment, the County suddenly informed Plaintiffs in 2021 that Westchester County Municipal Code § 712.462[12] required them to operate out of the terminal rather than the FBOs. A-64, 91, 102. Section 712.462 codifies the County's restrictions on access to and use of the terminal. In asserting

---

[12] Westchester County Municipal Code § 712.462 is available online at https://perma.cc/9D4G-QXNK.

that this regulation applies to Plaintiffs, the County pointed to language added nearly two decades ago in 2005, which the County had never before hinted encompasses Plaintiffs.

Prior to 2005, Section 712.462 was applicable only to airlines already using "the Passenger Terminal." A-320. It expressly did "not apply to any activities by Airport users not . . . using the Terminal building or the Terminal ramp." A-320. And nothing in the County's law required public charters to use the terminal. They were allowed to use FBOs.

Further, before 2005, Section 712.462 applied only to "*scheduled* passenger service." A-320 (emphasis added). And use of the terminal ramp was reserved exclusively for "scheduled passenger service." A-320. As noted above, *see supra* pp.14-16, it is well-established that public charters do not provide "scheduled" service under federal law, *see* 14 C.F.R. §§ 110.2, 380.2.

But in 2005, the County amended Section 712.462 in two pertinent ways that expanded its reach. *First*, the County imposed a new affirmative requirement—not previously present in Section 712.462—that "*[a]ll* Passenger Service provided at the Airport *shall be provided at the Terminal*." A-343

(emphasis added); *see* Westchester Cnty. Mun. Code § 712.462(1). The 2005 Amendment struck the previous language indicating that the law "does not apply to any activities by Airport users . . . not using the Terminal building or Terminal ramp." A-343.

*Second*, the County deleted its limitation to "scheduled" passenger service, such that Section 712.462 now applies to any "airlines providing . . . *Passenger Service*." A-343 (emphasis added); *see* Westchester Cnty. Mun. Code § 712.462(1). The County defined "Passenger Service" to include "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity." A-345; *see* Westchester Cnty. Mun. Code § 712.462(2)(j). And "[a]irline" is defined to include any "person providing Passenger Service in aircraft designed for more than (9) passenger seats." A-343; *see* Westchester Cnty. Mun. Code § 712.462(2)(a).

**3.** Section 712.462 imposes multiple terminal access restrictions on the airlines to which it applies. It requires such airlines to operate out of the main

terminal as opposed to any other part of the Airport—such as FBOs. *See* Westchester Cnty. Mun. Code § 712.462(1). And it requires airlines to participate in a lottery for gate and ramp allocations at the terminal. *See id.* § 712.462(5). Such allocations are necessary to abide by the County's restrictions on terminal capacity (240 passengers per half-hour) and ramp capacity (four operations per half-hour). *See id.* § 712.462(3)-(4).

Enforcement of Section 712.462 against Plaintiffs would devastate their businesses. It would effectively put an end to Plaintiffs' FBO-based services at the Airport and require them to "provide[] [their service] at the Terminal." Westchester Cnty. Mun. Code § 712.462(1). Because the terminal is a "sterile" security area, *see* A-476, 479, 483, Plaintiffs would be required by local law to use TSA checkpoints even though federal law neither requires nor even allows them to do so.

This would create insurmountable problems for Plaintiffs' operations. As noted, Plaintiffs use FBOs and other municipal and private spaces throughout their networks of operations. *See supra* pp.20. And at those spaces, Plaintiffs operate under a TSA-approved security program that does

not involve TSA checkpoints.[13] *See supra* pp.20-21. Plaintiffs are not federally authorized to use TSA checkpoints. And many airports from which Plaintiffs operate do not even have TSA checkpoints. *See supra* pp.18, 21.

Plaintiffs therefore could not board or deplane passengers from the terminal. Plaintiffs could not board passengers because they are not federally approved to use the TSA checkpoints those passengers would need to use to enter the terminal. And Plaintiffs could not deplane passengers because it would not be the case that *all* of Plaintiffs' passengers arriving at the Airport will have undergone the TSA checkpoint screening required to enter the terminal. They will instead have undergone the different security protocols Plaintiffs *are* authorized to use throughout their networks. Put simply,

---

[13]  Plaintiffs' operations from FBOs are currently governed by a TSA-approved "Twelve-Five Standard Security Program" ("TFSSP"). *See* A-90, 476, 479, 483. Plaintiffs' TFSSP does not authorize operations into and out of a sterile area. To obtain approval to operate from the sterile area, Plaintiffs would need to seek it from the TSA—and there is no guarantee the TSA would grant it. *See* 49 C.F.R. §§ 1544.101(e)(2), 1544.105(b).

enforcement of Section 712.462 against Plaintiffs would have the effect of forcing them out of the Airport altogether. A-476 to 477, 480 to 481, 483 to 486.[14]

## III. Procedural Background

**1.** Seeking to avoid these insurmountable problems, Plaintiffs tried to work with the County to find a solution that would allow them to continue their FBO-based services at the Airport consistent with federal law. A-64 to 65, 73. The County refused to negotiate or accommodate, A-64 to 65, and in March 2022 filed a state-court action seeking a declaration that Plaintiffs' operations are subject to Section 712.462, A-108 to 121.[15]

---

[14]   The County has suggested that Plaintiffs may preserve their FBO-based operations by "operating aircraft with nine seats or fewer." A-543, 559. That is not an economically sound option for Plaintiffs. In November 2021, JSX briefly limited its flights to aircraft with nine seats to accommodate the County while they worked toward a resolution. A-64. Such operations cost JSX $85,000 per week—a total of approximately $600,000 over less than two months. A-64, 67. Regardless, allowing Plaintiffs to fly out of FBOs as long as they use multiple planes (and more jet fuel) to transport their customers only underscores the irrationality of the County's position. *See infra* pp.53-54.

[15]   This state-court action was ultimately dismissed pursuant to a stipulation among the parties. *See* A-147 to 148.

Plaintiffs thereafter initiated the present lawsuit against the County.[16] A-22 to 58. Plaintiffs bring three claims alleging that (1) the County's efforts to enforce Section 712.462 against Plaintiffs are preempted by the ADA, A-52 to 54; (2) the County's efforts to enforce Section 712.462 against Plaintiffs are preempted by ANCA, A-50 to 52; and (3) the County's efforts to enforce Section 712.462 against Plaintiffs violate the Equal Protection Clause, A-54 to 56. The County later brought two counterclaims seeking declaratory and injunctive relief that would force Plaintiffs to comply with Section 712.462. A-276 to 279.

**2.** The County moved for summary judgment, and the court granted the motion in part. The court dismissed all of Plaintiffs' claims, as well as all of the County's counterclaims. SPA-28.

The court determined that "the 2005 Amendment is not preempted by the ADA." SPA-16. It properly recognized that Section 712.462 "may be

---

[16]   Plaintiffs also originally named April Gasparri (then the Airport's manager) and AvPorts, LLC (a company that helps manage the Airport) as Defendants. A-30 to 31. Those parties were later dismissed pursuant to a stipulation among the parties. A-144 to 145.

characterized as a regulation touching upon a 'price, route or service' of an air carrier and Defendant advances no significant arguments to the contrary." SPA-13 to 14. Thus, the court explained, Section 712.462 "invade[s] the preempted field, as [it] directly concern[s] aviation." SPA-14 n.7. The court nonetheless determined that Section 712.462 was not preempted, invoking "the Proprietor Exception to the [ADA's] express preemption provision." SPA-14. According to the court, the County was exercising its proprietary power to "regulate airport access so as to allocate scarce space and landing and takeoff slots." SPA-16.

The district court also concluded that "the 2005 Law is not preempted by ANCA." SPA-13. The court reasoned that the 2005 Amendment "was merely a clarification of the grandfathered 2004 Law which did not change the aircraft operations for entities to which the rules applied, and is therefore a grandfathered amendment." SPA-10.

The district court also rejected Plaintiffs' equal protection claim. SPA-16 to 23. It stated that Plaintiffs had not identified any comparators that were "sufficiently similarly situated." SPA-18 to 21. And it also concluded that

30

Plaintiffs had not "carr[ied] their 'burden to negative every conceivable basis which might support [the rationality of the legislative classification].'" SPA-22 (citation omitted).

The court entered its final judgment on July 2, 2024, SPA-29, and Plaintiffs noticed their appeal on July 12, A-562.

**3.** The following week, the County sent a series of letters to Plaintiffs directing them to, "[w]ithin seven days[,] . . . notify the County in writing" that they "intend[] to come into full compliance" with Section 712.462 by "October 31." A-540 to 544, 556 to 560. Should Plaintiffs decline to capitulate, the County threatened "denial of airport use" and legal proceedings. A-544, 560.

Plaintiffs tried once again to negotiate a workable compromise with the County pending resolution of this appeal. A-530. As noted, the County never sought to enforce Section 712.462 against Plaintiffs from 2015 to 2021. *See supra* p.23. When pushed on what the sudden emergency is now, the County had no answer. A-537 to 538. In fact, to this day, the County has never once explained—after over six years of nonenforcement—what has changed that suddenly makes enforcement a time-sensitive priority.

31

Accordingly, Plaintiffs moved in the district court for a stay or injunction pending appeal. A-517 to 519. Despite recognizing that "Defendant has not identified an injury" at all from nonenforcement of Section 712.462, and that "the public . . . has an interest in the execution of air travel as planned," the district court denied that motion on July 25. SPA-35. But in so doing, it made clear that the County would need to pursue a "plenary action" before it could enforce Section 712.462 against Plaintiffs. SPA-32 n.5.

On August 23, the County filed a new action in Westchester County Supreme Court seeking declaratory and injunctive relief that Plaintiffs are subject to and must comply with Section 712.462. *See* Complaint, *Cnty. of Westchester v. Delux Public Charter, LLC*, No. 67904/2024 (N.Y. Sup. Ct.). The County moved for a preliminary injunction by October 31, and that motion remains pending. *See* Mem. of Law ISO Prelim. Inj., *Cnty. Of Westchester*, No. 67904/2024.

## Summary of the Argument

**I.** The district court erred in holding that the County's efforts to enforce Section 712.462 against Plaintiffs are not preempted.

**A.** The County's enforcement efforts are preempted by the Airline Deregulation Act. The ADA expressly preempts any local "law . . . related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). This provision "express[es] a broad pre-emptive purpose." *Morales*, 504 U.S. at 383. And, as the district court recognized, it plainly encompasses the County's enforcement efforts here, which would require cancellation of Plaintiffs' routes and the end of their FBO-based services at the Airport.

The district court determined that the County's enforcement efforts were not preempted pursuant to the ADA's narrow proprietor exception for localities that "own[] or operate[] an airport" and are "carrying out [their] proprietary powers and rights." 49 U.S.C. § 41713(b)(3). But this exception is "extremely limited." *British Airways II*, 564 F.2d at 1010. The proprietor's actions must actually "advance the local interest" asserted, *W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 658 F. Supp. 952, 958 (S.D.N.Y. 1986), *aff'd*, 817 F.2d

33

222 (2d Cir. 1987); must be "reasonable, nonarbitrary and non-discriminatory," *Friends*, 841 F.3d at 139 (citation omitted); and must be "consistent with federal policy," *id.* (citation omitted).

The County's enforcement actions satisfy none of these requirements. *First*, the County baldly asserts a proprietary interest in "allocating scarce space." SPA-15. But the County has not identified any scarcity problem that forcing Plaintiffs' operations into the terminal would solve. To the contrary, forcing Plaintiffs into an already-overcrowded terminal would *exacerbate* scarcity and congestion problems. *Second*, the County's enforcement actions are unreasonable, arbitrary, and discriminatory. They would increase scarcity and congestion, were not enacted in compliance with ANCA, and differ from the County's more favorable treatment of similar carriers. *Third*, the County's enforcement efforts would undermine federal aviation policy by eliminating "competition," stifling "innovation," and reducing "variety" in the air transportation industry. 49 U.S.C. § 40101(a)(12). The proprietor exception does not apply.

**B.** The County's enforcement efforts are also preempted by the Airport Noise and Capacity Act. ANCA preempts new local restrictions on noise and access for aircraft like Plaintiffs' that are not either (1) "agreed to by the airport proprietor and all aircraft operators" or (2) "submitted to and approved by the [FAA]." *Id.* § 47524(c)(1). Access restrictions that do not satisfy these requirements are "federally preempted." *Friends*, 841 F.3d at 152.

There is no dispute that the County did not satisfy ANCA's requirements in adopting the 2005 Amendment. The district court nonetheless determined that the 2005 Amendment was not preempted because it "mere[ly] clarifi[ed]" the original version of Section 712.462, which was "grandfathered" under ANCA. SPA-12. Critically, however, ANCA's grandfather clause does not apply to new amendments that "reduce or limit aircraft operations." 49 U.S.C. § 47524(d).

That is exactly what the 2005 Amendment did. Whereas Section 712.462 originally did not apply to airlines not already "using the Terminal building or Terminal ramp," A-320, the 2005 Amendment added a new requirement that *all* airlines providing passenger service "shall" use "the Terminal," A-

35

343. Whereas Section 712.462 originally applied only to "*scheduled* passenger service," A-320 (emphasis added), the 2005 Amendment broadened its scope to all "Passenger Service"—scheduled or not, A-343. Put simply, the 2005 Amendment imposed more access restrictions on more air carriers. ANCA's grandfather clause does not apply.

**II.** The district court further erred in dismissing Plaintiffs' equal protection claim. The County does not subject other air carriers to the requirements at issue. Instead, it has singled out Plaintiffs for disfavored treatment, even though these other carriers are similarly situated with respect to the County's "specific concerns." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 224 (2d Cir. 2012). Each provides "air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public" on "aircraft designed for more than (9) passenger seats." Westchester Cnty. Mun. Code § 712.462(2)(a), (j). The district court also erred in determining that the County's discriminatory enforcement efforts have a rational basis, as neither of the vague bases the court gestured to—allocation of scarce terminal space and consistency with federal law—holds up under scrutiny.

36

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant summary judgment de novo. *Wachovia Bank, Nat. Ass'n v. VCG Special Opp. Master Fund*, 661 F.3d 164, 171 (2d Cir. 2011); *see Drake v. Lab. Corp. of Am. Holdings,* 458 F.3d 48, 56 (2d Cir. 2006) ("[A] determination regarding preemption is a conclusion of law, and we therefore review it de novo."). Summary judgment should be reversed where "there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation omitted).

## ARGUMENT

## I.  The County's Efforts to Enforce Section 712.462 Against Plaintiffs Are Preempted by the Foundational Federal Laws Setting National Aviation Policy.

Under the Supremacy Clause, "state and local laws that conflict with federal law are 'without effect.'" *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (citation omitted). This preemption doctrine serves multiple important aims.

37

Preemption prevents States and localities from thwarting federal policy by enacting a conflicting patchwork of idiosyncratic laws. Such a patchwork would be particularly detrimental in the area of air travel. As this Court has recognized, local variations in the law of air travel "would be confusing and burdensome to airline passengers, as well as to the airlines." *Air Cargo*, 697 F.3d at 160 (citation omitted).

Preemption also ensures that interstate commerce is not negatively impacted by such conflicting local rules. When it comes to air travel, the "likelihood of multiple, inconsistent rules would be a dagger pointed at the heart of commerce and the rule applied might come literally to depend on which way the wind was blowing." *British Airways Bd. v. Port Auth. of N.Y. & N.J.* ("*British Airways I*"), 558 F.2d 75, 83 (2d Cir. 1977).

To safeguard federal aviation policy and interstate commerce, Congress has enacted several statutes preempting state and local regulations of air travel. *See supra* pp.9-13. The County's efforts to enforce Section 712.462 against Plaintiffs are preempted by two such statutes: the ADA and ANCA.

## A. The County's enforcement efforts are preempted by the ADA.

The County's efforts to enforce its own local law to end Plaintiffs' FBO-based services at the Airport fall squarely within the ADA's preemption of local laws "related to a price, route, or service of an air carrier," 49 U.S.C. § 41713(b)(1), and are therefore expressly preempted.

### 1. The ADA expressly preempts local regulation of air carrier "price[s], route[s], or service[s]."

As explained above, *see supra* pp.10-11, Congress enacted the ADA to alleviate pervasive government regulation of airline operations and "encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services." *Air Cargo*, 697 F.3d at 160 (citation omitted).

"To ensure that the States would not undo federal deregulation with regulation of their own," the ADA contains an express preemption provision. *Morales*, 504 U.S. at 378; *see New England Legal Found. v. Mass. Port Auth.*, 883 F.2d 157, 173 (1st Cir. 1989) ("In reducing federal economic regulation of the field to allow the forces of free competition to rule the marketplace, Congress obviously did not intend to leave a vacuum to be filled by the Balkanizing

forces of state and local regulation."). That provision preempts States and localities from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).

The "purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted). And the "unusual breadth," *Altria Group, Inc. v. Good*, 555 U.S. 70, 85 (2008), of the language of the ADA's preemption provision "express[es] a broad preemptive purpose," *Morales*, 504 U.S. at 383. As a unanimous Supreme Court recently explained, "the preemption provision was included to prevent the States from undoing what the [ADA] was meant to accomplish." *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014).

Pursuant to Congress's broad preemptive purpose, the Supreme Court has read the ADA's preemption provision broadly. It prohibits any local "enforcement actions having a *connection with* or *reference to* airline 'rates, routes, or services.'" *Morales*, 504 U.S. at 384 (emphasis added) (citation omitted). Even enforcement efforts that are "consistent" with the ADA are preempted

if they are connected with or refer to airline rates, routes, or services. *Id.* at 386-88.

The Supreme Court has thrice encountered the ADA's preemption provision, and each time it determined that it barred enforcement of certain state laws. *See Northwest*, 572 U.S. at 281 ("state common-law rules fall comfortably within the language of the ADA pre-emption provision"); *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 227-28 (1995) (ADA preempts the use of an Illinois consumer protection law to challenge airline's devaluation of frequent flyer miles); *Morales*, 504 U.S. at 378 (ADA "pre-empts the States from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes").

This Court, too, has found all manner of state and local laws preempted by the ADA. *See, e.g.*, *Air Cargo*, 697 F.3d at 160 (ADA "preempt[ed] state-law antitrust suits against foreign as well as domestic air carriers"); *Air Transp.*, 520 F.3d at 220 (ADA preempted New York law requiring airlines to furnish fresh air, sanitation facilities, water, and food to passengers on long-delayed flights); *Nat'l Helicopter Corp. of Am. v. City of New York*, 137

F.3d 81, 91 (2d Cir. 1998) (ADA preempted local restriction on sightseeing flights); *see also Fawemimo v. American Airlines, Inc.*, 751 F. App'x 16, 19 (2d Cir. 2018) (ADA preempted state-law negligence claim); *Weiss v. El Al Israel Airlines*, 309 F. App'x 483, 484 (2d Cir. 2009) (ADA preempted tort claim arising from practice of "bumping" passengers from flights).

**2. The County's efforts to force Plaintiffs out of the FBOs would restrict Plaintiffs' "route[s]" and "service[s]" and therefore fall within the ADA's preemptive scope.**

The County's enforcement actions here are likewise preempted by the ADA. Plaintiffs are "air carrier[s]." 49 U.S.C. § 41713(b)(1); *see supra* p.20. Section 712.462 is no doubt a "law." 49 U.S.C. § 41713(b)(1). And as the district court recognized, the County did not seriously dispute that the "2005 Law may be characterized as a regulation touching upon a 'price, route or service' of an air carrier." SPA-13 to 14.

Nor could the County have. Section 712.462 plainly relates to airline "routes," which refers to "the point-to-point transport of passengers" along "courses of travel." *Air Transp. Ass'n of Am. v. City & Cnty. of S.F.*, 266 F.3d 1064, 1071 (9th Cir. 2001). For one thing, enforcement of the law against

Plaintiffs would change the starting and ending points of their flights—from the FBOs to the terminal. Enforcement would also effectively require Plaintiffs to cancel all of their routes into and out of the Airport because use of the terminal requires TSA checkpoint screening. Plaintiffs are not authorized to use TSA checkpoint screening and do not use it anywhere in their networks. *See supra* pp.26-27. (Indeed, many of the airports Plaintiffs serve do not even have TSA checkpoints. *See supra* pp.18, 21.) JSX, for example, would be required to cancel routes to and from Miami Opa-Locka, Naples, Boca Raton, and Palm Beach.[17] A-480. And XO would be required to cancel routes to and from Fort Lauderdale and Palm Beach. A-483.

Operation out of the terminal would also require Plaintiffs to enter the Airport's gate lottery. *See supra* pp.25-26. The slots available in the gate lottery are limited. And as the County's Director of Operations explained during a deposition, this means that "there would be instances where the

---

[17] *Discover the Best Flights from Westchester County*, JSX, https://perma.cc/G96B-6NFY (last visited Sept. 2, 2024).

plaintiffs would not be able to maintain the same routes that they are conducting now if they were to enter into this lottery system." A-473.

Section 712.462 also relates to air carrier "services." An air carrier's services include "access to flights," *Wolens*, 513 U.S. at 226, and the "business decision to offer a particular service in a particular market," *Arapahoe Cnty. Pub. Airport Auth. v. FAA*, 242 F.3d 1213, 1222 (10th Cir. 2001). They also include "matters incidental to and distinct from the actual transportation of passengers," including "boarding procedures, baggage handling, and food and drink," *Air Transp.*, 520 F.3d at 223, as well as "the size, arrangement, and spacing of aircraft seats," *Fawemimo*, 751 F. App'x at 19.[18]

Enforcement of Section 712.462 would prohibit Plaintiffs from offering their FBO-based services altogether—not only their FBO-based flights, but also the many conveniences Plaintiffs offer at the FBOs. These conveniences range from more efficient security screening to speedier boarding and

---

[18]   To the extent the County is really trying to force Plaintiffs to limit the number of seats in their aircraft, *see* A-543, 559 (suggesting that Plaintiffs may continue to operate from the FBOs if they "operat[e] aircraft with nine seats or fewer"), that too would relate to Plaintiffs' services.

44

baggage handling processes to comfortable lounges. *See supra* p.18. Such FBO-based services are at the heart of Plaintiffs' business models and make it possible for certain individuals—including immunocompromised, neuro-diverse/autistic, and otherwise differently abled individuals—to fly. *See supra* pp.18-19.

### 3. The "extremely limited" proprietor exception does not apply.

Despite recognizing that the County's enforcement efforts fall within the terms of the ADA's express preemption provision, the district court nonetheless determined that those efforts were not preempted because they also fall within "the ADA's Proprietor Exception." SPA-14 to 16. That was error.

The so-called proprietor exception permits a locality that "owns or operates an airport" to "carry[] out its proprietary powers and rights." 49 U.S.C. § 41713(b)(3). But it must do so in a "reasonable, nonarbitrary and non-discriminatory" way. *Friends*, 841 F.3d at 139 (citation omitted). And its actions must "advance[] and [be] consistent with federal policy." *British Airways I*, 558 F.2d at 84-85.

The proprietor exception is "extremely limited." *British Airways II*, 564 F.2d at 1010; *see Friends*, 841 F.3d at 139 (same); *Nat'l Helicopter*, 137 F.3d at 89 ("narrow[]"). It does not give localities "carte blanche power" whenever "they declare their regulatory action necessary . . . to satisfy aviation needs." *Arapahoe*, 242 F.3d at 1223. Rather, localities may "regulate only a narrowly defined subject matter—*aircraft noise and other environmental concerns* at the local level." *Nat'l Helicopter*, 137 F.3d at 89 (emphasis added). And such regulation must "advance the local interest" asserted. *W. Air Lines*, 658 F. Supp. at 958. In other words, it must be "targeted at alleviating an existing problem at the airport or in the surrounding neighborhood." *American Airlines, Inc. v. DOT*, 202 F.3d 788, 806 (5th Cir. 2000) (citing *Nat'l Helicopter*, 137 F.3d at 88; *W. Air Lines,* 817 F.2d at 226). Courts must "carefully scrutinize" each invocation of the proprietor exception to ensure that the actions taken thereunder are so limited. *British Airways II*, 564 F.2d at 1011.

The limited scope of the proprietor exception makes sense in light of its limited origin. At bottom, the proprietor exception focuses "on an airport operator's potential liability for—and, thus, right to mitigate—noise

damage" from the use of its airport. *Friends*, 841 F.3d at 149. Because a proprietor "controls the location of the facility, acquires the property and air easements and [can] assure compatible land use," *British Airways I*, 558 F.2d at 83, it "might be liable to other property owners for noise damage," *Friends*, 841 F.3d at 139. Courts have thus long recognized a proprietor's right "to limit [such] liability by restricting the use of [its] airport." *British Airways I*, 558 F.2d at 83. This recognition was ultimately "codified . . . in the Airline Deregulation Act" as the proprietor exception. *Friends*, 841 F.3d at 139.

Careful policing of the proprietor exception is indispensable in ensuring that it does not defeat the federal policy of preventing "a patchwork of 'uncoordinated and inconsistent' airport restrictions that impede the national transportation system." *Friends*, 841 F.3d at 154 (citation omitted). A proprietor's enforcement efforts "must be 'consistent with federal policy; other, noncomplementary exercises of local prerogative are forbidden.'" *Id.* at 139 (citation omitted). "The proprietor exception," for example, "gives no authority to local officials to assign or restrict routes." *Nat'l Helicopter*, 137 F.3d at 92.

Hewing to the proprietor exception's extremely limited scope, courts have held it to encompass "noise-related regulation of sightseeing flights," *SeaAir NY, Inc. v. City of New York*, 250 F.3d 183, 187 (2d Cir. 2001); "curfews" designed to prevent "undesirable heliport noise during sleeping hours," *Nat'l Helicopter*, 137 F.3d at 89; and "eliminat[ion]" of "weekend operations . . . to protect area residents from significant noise intrusion during the weekend when most people are trying to rest and relax at home," *id.* at 90. And courts have rejected readings of the proprietor exception that would encompass, for example, "law[s] controlling flight paths through navigable airspace," *Nat'l Helicopter*, 137 F.3d at 92; laws that "allocate traffic between two airports" as "a goal in and of itself," *American Airlines*, 202 F.3d at 807-08; and "ban[s] on scheduled passenger service" at an airport, *Arapahoe*, 242 F.3d at 1224.

The proprietor exception is inapplicable here for three independent reasons: (1) the County is not exercising any "proprietary power"; (2) the County's enforcement efforts are not "reasonable, nonarbitrary and non-discriminatory," *Friends*, 841 F.3d at 139 (citation omitted); and (3) application

48

of the proprietor exception would not be "consistent with federal policy," *id.* (citation omitted).

*First*, the County's efforts to enforce Section 712.462 against Plaintiffs do not actually serve any proprietary interests. The County purports to be exercising its proprietary authority to "allocat[e] scarce space." SPA-15. But that assertion does not pass the smell test.

The district court cited *Midway Airlines, Inc. v. Westchester County*, 584 F. Supp. 436 (S.D.N.Y. 1984), as an example of how the County has exercised this proprietary power in the past. SPA-15. But the facts and circumstances of *Midway* were fundamentally different. The problem in *Midway* was the allocation of scarce space at the Airport's terminal among an increasing number of airlines *seeking to use that terminal*. *Midway*, 584 F. Supp. at 439. As the court recounted, there was "limited terminal space available for the processing of passenger traffic and . . . limited parking area for the . . . aircraft." *Id.* (citation omitted). "[T]here is only one small terminal equipped to handle flights by Part 121 air carriers," and there were "'so many passengers . . .

currently booked on departing flights that it [was] often impossible *to even enter* the building.'" *Id.* (citation omitted).

The situation here could not be more different. Plaintiffs are not seeking to use the main terminal; they are seeking to *remain out* of it. Plaintiffs wish to continue operating—as they have been for nine years without issue, *see supra* p.23—from FBOs that are not plagued by the terminal's scarcity problems. Because they operate out of FBOs, Plaintiffs do not compete for the limited gate allocations at the terminal, do not contribute to any congestion on the terminal ramp, and do not cause their passengers to crowd the terminal's waiting area. They also use aircraft that are far quieter than those used by their competitors. *See supra* p.22.

Enforcing Section 712.462 against Plaintiffs—as the County seeks to do— would force Plaintiffs into the terminal and thereby exacerbate the scarcity issues the County in *Midway* sought to resolve. Plaintiffs would be forced to enter the gate lottery to compete with other airlines for the terminal's limited gate allocations. *Cf.* Westchester Cnty. Mun. Code § 712.462(5). Plaintiffs would need to use the terminal ramp, contributing to ramp congestion. *Cf.*

*id.* § 712.462(3), (5). And Plaintiffs' passengers would need to remain in the terminal's passenger seating area, contributing to existing lines and crowds. *Cf. id.* § 712.462(4).

The district court here was simply wrong to suggest that the County's efforts to enforce Section 712.462 are "rooted in the same consideration" that motivated the *Midway* litigation. SPA-15. It is the opposite. Enforcement of Section 712.462 against Plaintiffs would *disserve* that consideration. The County here is not "allocating scarce space and landing and takeoff slots." *Midway*, 584 F. Supp. at 440. It is making them even scarcer.

The district court's reliance on *Western Air Lines, Inc. v. Port Authority of New York and New Jersey* is similarly misplaced. *See* SPA-14 to 15. In that case, the Port Authority of New York and New Jersey adopted a "perimeter rule" setting a maximum distance for nonstop flights to LaGuardia. 658 F. Supp. at 953. The rule's purpose was "to manage congestion in a multi-airport system." *Id.* at 958. Critically, the Port Authority also controlled two other airports in that system—Newark and JFK—at which it permitted nonstop service from points beyond the LaGuardia perimeter. *Id.* at 953. The perimeter

rule thus did not have the effect of barring these flights altogether. *Id.* at 957-58.

That fact was essential to the court's determination that the perimeter rule fell within the proprietor exception and did not frustrate national aviation objectives. Because two other local airports owned by the proprietor remained open to long-haul flights, LaGuardia's perimeter rule did not "close down metropolitan area runways" to such flights. *Id.* at 958. In affirming the district court's opinion, the Second Circuit was therefore careful to expressly limit its reach to cases involving "a multi-airport proprietor." *W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 226 (2d Cir. 1987).[19]

Once again, this case is fundamentally different. The County's enforcement actions would not *manage* congestion at the terminal but *increase* it. *See supra* pp.50-51. Furthermore, the County is not "a multi-airport proprietor." *W. Air Lines*, 817 F.2d at 226. It owns only the Airport. It owns no other airports from which it is willing to let Plaintiffs operate their type of services in

---

[19]   Also notable is the fact that the perimeter rule was adopted six years before ANCA's enactment. *See W. Air Lines*, 658 F. Supp. at 953.

the Westchester area. The County's enforcement efforts here, unlike in *Western Air Lines*, would have the effect of "clos[ing] down [Westchester] area runways" to Plaintiffs' public charter operations. 658 F. Supp. at 958.

The County's enforcement efforts thus do not "advance [any] local interest" in managing scarce space at the terminal. *Id*. Nor can the County be said to be acting on any interest in congestion more broadly. The County has said that Plaintiffs may preserve their FBO-based public charter operations consistent with Section 712.462 by simply "operating aircraft with nine seats or fewer." A-543, 559. According to the County, Plaintiffs can operate the very *same* aircraft at FBOs so long as they only sell 9 of the 30 seats onboard. And they can operate *more* aircraft at FBOs so long as they only sell 9 seats on those aircraft. In concrete terms, the County will not allow Plaintiffs to fly one plane with 27 passengers from FBOs, but it will allow Plaintiffs to fly three planes with 9 passengers each from FBOs.

The County's position is irrational. Far from reducing Airport congestion, it threatens to increase congestion, while also increasing noise, fuel use, and the Airport's carbon footprint. The County has no response. When asked

in a deposition whether the nine-seat limitation would "increase the number of flights," the County's Director of Operations responded, "I don't know if that would or would not." A-466; *see also* A-425 (Q. "[A]dding 60 or so passengers processing through the TSA, that would add to the line, right? A. It would add to the line, yes."); A-411 to 412 (Q. "[I]f there's nine different flights going out of an FBO versus one flight, nine would be more congestion; correct? A. Correct."). The County doesn't know, and doesn't care.

To summarize: The County may not reallocate airlines from one area of the Airport to another as "a goal in and of itself," *American Airlines*, 202 F.3d at 808, without any "environmental concern[]" to solve, *Nat'l Helicopter*, 137 F.3d at 89. But that is precisely what the County is doing. The County has not identified any scarcity or congestion problem that forcing Plaintiffs into the terminal would help alleviate. And as such, the County may not invoke the "extremely limited" proprietor exception. *British Airways II*, 564 F.2d at 1010.

*Second*, even if the County were exercising a proprietary power, such exercise would not be "reasonable, nonarbitrary and non-discriminatory."

*Friends*, 841 F.3d at 139 (citation omitted). This requirement demands that the County's enforcement efforts be "reasonable in light of the legitimate objectives sought to be achieved." *W. Air Lines*, 658 F. Supp. at 959. And the County must avoid even "the appearance of irrational or arbitrary action." *Nat'l Helicopter*, 137 F.3d at 89.

That standard is not satisfied here for multiple reasons. As noted, forcing more airlines into the terminal will only exacerbate scarcity and congestion problems. *See supra* pp.50-51. It is thus not a "reasonable" way to solve such problems. The County's enforcement efforts are also unreasonable because, as explained below, the enactment of the 2005 Amendment was not procedurally proper under ANCA. *See infra* pp.58-68. "Local laws not enacted in compliance with ANCA procedures cannot claim to be a reasonable exercise of [proprietary] authority." *Friends*, 841 F.3d at 154. Finally, for reasons also explained below, the County's enforcement efforts are discriminatory. *See infra* pp.68-74. The County seeks to enforce Section 712.462 against Plaintiffs but not against other carriers who similarly sell individual seats to the public on aircraft with more than nine seats.

*Third*, allowing the County's enforcement efforts here would undermine federal aviation policy. The County seeks to weave precisely the sort of "patchwork of 'uncoordinated and inconsistent' airport restrictions" that Congress so carefully sought to avoid. *Friends*, 841 F.3d at 154 (citation omitted). Federal regulations specifically authorize Plaintiffs to operate outside of airport terminals using more efficient (though similarly secure and approved by TSA) security protocols. *See supra* p.17. And pursuant to these federal regulations, Plaintiffs operate from such areas using such security protocols nationwide. *See supra* pp.20-21.

The County, for whatever reason, is not satisfied with the policy the federal government has set. So it instead seeks to enforce its own more stringent restrictions, requiring Plaintiffs to operate out of the Airport's terminal where they would be required by the County, but not allowed by the TSA, to use TSA checkpoints. *See supra* pp.23-24. In Westchester County—and Westchester County only—would Plaintiffs be subject to these stringent requirements. This would prevent Plaintiffs from operating flights between the Airport and anywhere else in the nation, *see supra* pp.26-28, thereby

seriously "imped[ing] the national transportation system," *Friends*, 841 F.3d at 154.

Enforcement of Section 712.462 would also be inconsistent with other federal aviation policies. The ADA sought to promote "competition," "efficiency, innovation," and "variety." 49 U.S.C. § 40101(12). Forcing Plaintiffs into the terminal would do just the opposite. It would shutter Plaintiffs' operations at the Airport, *see supra* pp.26-28, thereby decreasing "competition" stifling "innovation," eliminating "efficien[t]" air travel alternatives, and reducing the "variety" of options available to the traveling public, 49 U.S.C. § 40101(a)(12). The end of Plaintiffs' operations at the Airport would prove particularly detrimental to those underserved communities the major airlines do not operate in. *Cf. id.* § 40101(a)(11) (expressing particular concern for "small communities and isolated areas").

For all these reasons, the ADA's narrow proprietor exception does not apply, and the County's enforcement efforts are expressly preempted by the ADA.

## B. The County's enforcement efforts are preempted by ANCA.

Even if the County's efforts to enforce Section 712.462 against Plaintiffs amounted to an exercise of proprietary power, they would still be preempted by ANCA. *See Friends*, 841 F.3d at 154 (explaining that ANCA "cabins airport operators' proprietary authority").

### 1. ANCA prescribes strict procedural requirements for new airport access restrictions.

As explained above, *see supra* pp.11-13, Congress enacted ANCA based on its determination that "noise policy must be carried out at the national level." 49 U.S.C. § 47521(3). Local responses to "community noise concerns ha[d] led to uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system." *Id*. § 47521(2).

To achieve nationalization of noise and access policy, ANCA preempts state and local efforts to adopt new noise or access restrictions. ANCA does this by "identifying procedures that airport proprietors must follow in order to impose any noise or access restrictions on air operations." *Friends*, 841 F.3d at 148. States and localities may not adopt new noise or access restrictions on aircraft like Plaintiffs' unless those restrictions are either (1) "agreed to by

the airport proprietor and all aircraft operators" or (2) "submitted to and approved by the [FAA]." 49 U.S.C. § 47524(c)(1). Any "local laws not enacted in compliance with [these requirements] . . . are federally preempted." *Friends*, 841 F.3d at 152.

> ### 2. The 2005 Amendment restricts airport access, and the County did not comply with ANCA's requirements in adopting it.

The County's adoption of the 2005 Amendment to Section 712.462 was subject to but did not comply with ANCA's procedural requirements.

In the district court's words, "there is no genuine dispute that the 2005 Law was meant to regulate airport access." SPA-15. It restricts Plaintiffs' access to FBOs, which in turn prevents Plaintiffs from conducting their FBO-based operations at the Airport. *See* 14 C.F.R. § 161.5 (defining "[n]oise or access restrictions" as "restrictions . . . affecting access or noise that affect [aircraft] operations").

Because the 2005 Amendment was a new access restriction, the County was required to comply with ANCA's procedural requirements. But it did not. There is no dispute here that the County neither secured the approval of all affected operators nor secured the approval of the FAA. A-296.

Because the 2005 Amendment was "not enacted in compliance with [ANCA's requirements]," it is "federally preempted." *Friends*, 841 F.3d at 152.

### 3. ANCA's grandfather clause does not apply.

The district court reached a contrary holding by relying on ANCA's grandfather clause. SPA-10 to 13. Pursuant to that clause, noise and access restrictions that were in effect prior to ANCA's passage on November 5, 1990, were permitted to remain in effect. 49 U.S.C. § 47524(d). But, critically, such restrictions could not be modified in any way that "reduce[s] or limit[s] aircraft operations." *Id.* If a locality wants to make a modification to a grand-fathered law that reduces or limits operations, it must satisfy the procedural requirements set forth in ANCA for new noise and access restrictions.

In 2004, the FAA determined that the original version of Section 712.462 was "exempt from the Airport Noise and Capacity Action of 1990 (ANCA)" because it "relate[s] to the airport noise or access restrictions that were in effect on November 5, 1990." A-376. The FAA explained that there were

"currently three restrictions in effect at the Airport."[20] A-376. *First*, use of the terminal was "limited to 240 passengers per half-hour." A-376. *Second*, air carriers were "limited to four operations per half-hour to correspond to the four gate positions in the terminal." A-376. *Third*, aircraft could "not exceed 120,000 pounds maximum gross takeoff weight with dual landing gear." A-376. There was no fourth restriction requiring public charter operations—or anyone else for that matter—to use the Airport's terminal.[21]

The FAA explained that the County had these "three restrictions in effect since 1985," the year the *Midway* litigation described above reached a settlement. A-378 to 379; *see supra* pp.49-51. Because the three restrictions had been in effect since the *Midway* settlement, the FAA concluded, their inclusion in the original version of Section 712.462 was "'grandfathered' under ANCA." A-378.

---

[20] The FAA also recognized that the terminal and ramp capacity limitations had "been allocated through a lottery system since 1985." A-376.

[21] The County explained the grandfathered restrictions in similar terms. It too did not identify any requirement that anyone must use the terminal. A-313 to 314.

The 2005 Amendment modified this grandfathered law. Thus, under ANCA, it may only escape ANCA's strict procedural requirements if it does not "reduce or limit aircraft operations." 49 U.S.C. § 47524(d)(4). The district court determined that the 2005 Amendment did not reduce or limit aircraft operations because it "did not change the aircraft operations to which [that law] already applied." SPA-13. Rather, it "was a mere clarification of the 2004 Law." SPA-12. That interpretation simply cannot be squared with the text of Section 712.462 and the 2005 Amendment.

The original version of Section 712.462 applied only to those airlines already "us[ing] . . . the Passenger Terminal ('Terminal') and the Terminal Ramp." A-320. It expressly did "not apply to any activities by airport users . . . not using the Terminal building or Terminal ramp." A-320. And it did not affirmatively require *anyone* to use the terminal. The original version of Section 712.462 also applied only to "scheduled passenger service." A-320. And it reserved the terminal ramp for the "exclusive use of Airlines providing scheduled passenger service." A-320.

The 2005 Amendment broadened the scope of Section 712.462 in two pertinent ways. *First*, the 2005 Amendment eliminated Section 712.462's limitation to airlines already "using the Terminal building or Terminal ramp." A-343. In its place, it added a new affirmative requirement that "[a]ll Passenger Service provided at the Airport *shall be provided at the Terminal*." A-343 (emphasis added); *see* Westchester Cnty. Mun. Code § 712.462(1).

*Second*, the 2005 Amendment eliminated Section 712.462's limitation to "scheduled" passenger service. A-343. It expanded the law to cover *all* "Passenger Service"—both scheduled and unscheduled—provided by any "Airlines." A-343; *see* Westchester Cnty. Mun. Code § 712.462(1). "Passenger Service" is defined to include "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public." A-345; *see* Westchester Cnty. Mun. Code § 712.462(2)(j). And "[a]irline" is defined to include any "person providing Passenger Service in aircraft designed for more than (9) passenger seats." A-343; *see* Westchester Cnty. Mun. Code § 712.462(2)(a).

The daylight between the original and new versions of Section 712.462 shines brightly. Airlines providing passenger service that were not already using the terminal did *not need* to do so under the original Section 712.462. But all passenger service—no matter where it is currently provided—"*shall be provided at the Terminal*" under the new Section 712.462. Westchester Cnty. Mun. Code § 712.462(1) (emphasis added). Passenger service that was not "scheduled" was *not within* the scope of the original Section 712.462. But it *is within* the scope of the new Section 712.462. Passenger service that was not "scheduled" *could not* use the terminal ramp under the original Section 712.462. But it *must* use the terminal ramp under the new Section 712.462.

Plaintiffs' own operations illustrate the expansion occasioned by the 2005 Amendment. Plaintiffs plainly would not have fallen within the scope of the original version of Section 712.462. Plaintiffs do "not us[e] the Terminal building or Terminal ramp." A-320. And Plaintiffs' public-charter services are not "scheduled," as that term is used in the industry pursuant to federal law. A-320. Federal regulations expressly exempt "public charter operation[s] under part 380" from the definition of "[s]cheduled operation." 14

64

C.F.R. § 110.2; *see also id.* § 380.2 ("Charter flight[s]" do "not include scheduled air transportation"). The County expressly acknowledged this in a recent comment to the FAA: "Part 380 operations are not deemed to be 'scheduled' operations simply because the regulations state that they are not included within the definition of scheduled."[22]

The County now asserts, however, that Plaintiffs are within the scope of the new version of Section 712.462. That is because, according to the County, Plaintiffs offer "Passenger Service" by selling "individual[]" seats on aircraft with "more than (9) passenger seats" to "the public or a segment of the public." Westchester Cnty. Mun. Code § 712.462(1)-(2); *see* A-70 to 71, 96 to 97, 106 to 107. The County thus asserts that Plaintiffs' operations "shall be provided at the Terminal." Westchester Cnty. Mun. Code § 712.462(1). All of this language was added to the law with the 2005 Amendment.

---

[22] *See* County of Westchester, Comment Letter on Revisions to the Regulatory Definitions of "On-Demand Operation", "Supplemental Operation" and "Scheduled Operation" at 12 (Oct. 13, 2023), https://perma.cc/JXP4-4Q54. That the FAA is actively exploring these issues through the regulatory process with input from the County, *see supra* n.4, makes the County's efforts to jump out in front of that process all the more improper.

The district court ignored the fact that the 2005 Amendment requires use of the terminal whereas the prior law did not. This requirement is clearly an "access restriction[]" that did not exist in the grandfathered law. 49 U.S.C. § 47524(c)(1).

In addition, the district court relied on long-outdated federal regulations. According to the court, at the time of the *Midway* settlement—which had nothing to do with public charters or the use of FBOs—federal regulations defined "[s]chedule operations" to include "operations [that are] conducted in accordance with a published schedule for passenger operations which includes dates or times (or both) that is openly advertised or otherwise made readily available to the general public." SPA-11 (quoting 50 Fed. Reg. 23,944, 23,946 (June 7, 1985)). And because Section 712.462 codified the *Midway* settlement, the district court reasoned that the County in 2004 also meant "scheduled" to be defined this way. *Id.*

That was error. Courts are supposed to construe the text of a statute in accord with its commonly understood meaning "at the time [the legislature] enacted the statute." *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 186

(2d Cir. 2021); *see Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018) ("[W]ords generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute.'" (citation omitted)). And in 2004, when the County enacted Section 712.462, federal regulations were clear that "[s]cheduled operation[s]" do "not include any passenger-carrying operation that is conducted as a public charter operation under part 380." 14 C.F.R. § 119.3 (2004)[23]; *see Operating Requirements: Domestic, Flag, Supplemental, Commuter, and On-Demand Operations: Editorial and Other Changes*, 62 Fed. Reg. 13,248, 13,253 (Mar. 19, 1997).

Furthermore, even assuming that the *Midway* settlement was designed to mirror federal law, and Section 712.462 meant to mirror the *Midway* settlement, there is no reason to believe the *Midway* settlement was designed to be insulated from—rather than consistent with—changes in federal law. *Cf.* A-369 ("It is agreed that the provisions of this Stipulation shall be modified from time to time as may become necessary to comply with applicable

---

[23]   This definition was moved to its current location in 2011. *See Operations Specifications*, 76 Fed. Reg. 7,482, 7,488 (Feb. 10, 2011).

federal law."). As was foreseeable at the time, the aviation industry has undergone significant transformation in the last 40 years. And in order to keep regulations current, the government has had to modify them. It would be curious—and inconsistent with federal aviation policy—if the *Midway* settlement were designed to tie the Airport to the mast of a 1985 aviation regulation, developments in the coming decades be damned.

*   *   *

In sum, the County's efforts to enforce Section 712.462 against Plaintiffs are preempted. Those efforts impermissibly restrict Plaintiffs' routes and services in violation of the ADA, and they also impermissibly restrict Plaintiff's access to the Airport in violation of ANCA. The district court therefore erred in dismissing Plaintiffs' preemption claims.

## II. The County's Enforcement Efforts Violate Plaintiffs' Equal Protection Rights.

The district court committed further error in dismissing Plaintiffs' equal protection claim. The Equal Protection Clause "direct[s] that all persons

similarly situated should be treated alike."[24] *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The government violates an individual's equal protection rights when it "intentionally treat[s]" that individual "differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) (citation omitted).

The district court held that Plaintiffs had not raised any genuine dispute of material fact as to whether the County had improperly discriminated against them. SPA-17 to 21. But that holding rested on two fundamental errors of law.

*First*, the district court misunderstood the nature of an equal protection "comparator." SPA-19 to 21. A comparator must be similar such that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment *on the basis of a legitimate government policy*; and (ii) the similarity in

---

[24] Public use airports like the Airport that accept FAA-administered federal funds are prohibited from denying or unreasonably restricting access to carriers like Plaintiffs. *See* 49 U.S.C. § 47107.

circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Hu v. City of New York*, 927 F.3d 81, 94 (2d Cir. 2019) (emphasis added) (citation omitted).

The Constitution does "not demand exact correlation" but rather "seek[s] relevant similarity." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012). Where, as here, a government decision is based on specific "concerns, and a claimant presents evidence that comparators were treated differently with regard to *those specific concerns* without any plausible explanation for the disparity, such a claim can succeed." *Fortress*, 694 F.3d at 224 (emphasis added); *see also Lepper v. Scordino*, No. 22-1064, 2023 WL 4004220, at *2 (2d Cir. June 15, 2023) (explaining that because "the village's scrutiny of the Leppers' treehouse began when the village building inspector received a complaint that the Leppers were building a treehouse without a permit," a "similarly situated comparator" would exist if "the village was put on notice of another village resident who had built a treehouse without a permit").

The County's purported basis for enforcing Section 712.462 against Plaintiffs—its "specific concern[]," *Fortress*, 694 F.3d at 224—was that they are "Airlines" that offer "Passenger Service," Westchester Cnty. Mun. Code § 712.462(1); *see* A-70 to 71, 96 to 97, 106 to 107. An "Airline" is "any person providing Passenger Service in aircraft designed for more than (9) passenger seats." Westchester Cnty. Mun. Code § 712.462(2)(a). And "Passenger Service" is "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public." *Id.* § 712.462(2)(j).

But as discovery made clear, several other operators who the County permits to continue operating from FBOs *also* sell individual seats to the public (or a segment thereof) on aircraft designed for more than nine seats. The Baker's Bay Club sells individual seats to its members (a segment of the public) on aircraft with more than nine seats. *See* A-392 to 396, 434, 458. The Yellowstone Club sells individual seats to its members (a segment of the public) on aircraft with more than nine seats. *See* A-392, 394, 404, 434, 458. NetJets sells individual seats to its fee-paying customers (a segment of the public)

on aircraft with more than nine seats. *See* A-390. And WheelsUp sells seats to its fee-paying customers (a segment of the public) on aircraft with more than nine seats. *See* A-431, 435 to 436, 458. The list goes on. *See* A-389 to 404, 431 to 443, 458.[25] All of these operators are similarly situated comparators.

The district court's contrary conclusion ignored factual disputes and focused on immaterial distinctions. To the extent the parties dispute the size of WheelsUp's aircraft, SPA-21; *see* A-437 (indicating that WheelsUp operates "King Airs, Citation 10s," and "some *larger aircraft* that they've acquired through acquisitions" (emphasis added)), that is a genuine dispute of material fact that precludes summary judgment. And it does not matter, as the district court suggested, that the Baker's Bay Club "is a community group" and NetJets "is a fractional ownership operation." SPA-18, 20. Each of those

---

[25] The district court erred in considering only Baker's Bay, NetJets, and WheelsUp because they were the operators listed as illustrative examples in Plaintiffs' brief. SPA-18. Plaintiffs' brief argued that Plaintiffs were "treated . . . differently from other carriers operating out of FBOs at [the Airport]" and cited evidence also identifying several other operators as comparators. A-515 nn.83-85 (citing A-390 to 404, 434, 458 to 459 (describing the operations of, among others, FlexJet, Cape Air, Tradewind, the Albany Club, the Nexus Club)).

operators sells individual seats "to the public or a segment of the public" on "aircraft designed for more than (9) passenger seats." Westchester Cnty. Mun. Code § 712.462(2)(a), (j). Each is thus similarly situated with respect to the County's "specific concerns." *Fortress*, 694 F.3d at 224.

*Second*, the district court determined that, even if Plaintiffs had identified a comparator, they have not "carr[ied] their 'burden to negative every conceivable basis which might support [the rationality of the legislative classification].'" SPA-22 to 23 (citation omitted).

But neither of the "conceivable bases" offered by the district court is in fact rational. The district court suggested that Section 712.462 is aimed at "the allocation of scarce space." SPA-22. But as explained above, forcing Plaintiffs into the terminal would *exacerbate* scarcity problems rather than solve them. *See supra* pp.50-51. The district court also suggested that "the 'nine-seat break point has been an aviation industry standard'" for decades. SPA-22 to 23. But the simple fact that the limitation exists elsewhere does not make it rational here. And in their depositions, County officials could not articulate any rational justification for using the limitation in Section 712.462.

*See* A-450 ("Q. Do you know what the purpose of the nine-seat limitation is in the TUPs? A. I do not know the purpose."); A-466 ("Q. Wouldn't [the nine-seat limitation] just increase the number of flights, though? A. Not necessarily. I don't know if that would or would not."). If the County were truly concerned with hewing to federal aviation law, it would not be seeking to use a local law to thwart federal regulations favoring the widespread and continued use of public charters.

*   *   *

In sum, the County is irrationally treating Plaintiffs differently from other operators who also sell individual seats to the public on aircraft with more than nine seats. At the very least, there are material issues of fact precluding summary judgment. *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) ("As a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury."); *Loesel*, 692 F.3d at 463 ("[D]etermining whether individuals are similarly situated is generally a factual issue for the jury." (citation omitted)). The district court therefore erred in dismissing Plaintiffs' equal protection claim.

74

## CONCLUSION

The Court should reverse the district court's judgment and render judgment for Plaintiffs.

Dated:  September 3, 2024

Respectfully submitted.

/s/ Jonathan F. Cohn
Jonathan F. Cohn
Shannon Grammel
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave., NW
Washington, DC 20001
(512) 693-8350
jon@lehotskykeller.com

Kyle D. Hawkins
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701

Jonathan Nelson
DORF NELSON & ZAUDERER LLP
555 Theodore Fremd Ave.
Rye, New York 10580

*Counsel for Plaintiffs-Counter-Defendants-Appellants*

## CERTIFICATE OF SERVICE

On September 3, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ Jonathan F. Cohn
Jonathan F. Cohn

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Local Rule 32.1(a)(4)(A) and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,823 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

/s/ Jonathan F. Cohn
Jonathan F. Cohn

# SPECIAL APPENDIX

i

**SPECIAL APPENDIX**

**TABLE OF CONTENTS**

                                                    **Page**

Opinion and Order of the Honorable Philip M.
   Halpern, Appealed from, filed July 1, 2024.....   SPA-1

Judgment Appealed from, filed July 2, 2024.......   SPA-29

Order of the Honorable Philip M. Halpern,
   filed July 25, 2024 ................................   SPA-30

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DELUX PUBLIC CHARTER, LLC d/b/a JSX
AIR, et al.,

                              Plaintiffs,

                 -against-

COUNTY OF WESTCHESTER, NEW YORK,
a charter county,

                              Defendant.

---

**OPINION AND ORDER**

22-CV-01930 (PMH)

PHILIP M. HALPERN, United States District Judge:

     Delux Public Charter, LLC d/b/a JSX Air ("Delux"), JetSuiteX, Inc. ("JetSuiteX"), XO Global, LLC ("XO Global"), and Blade Urban Air Mobility, Inc. ("Blade," and collectively, "Plaintiffs") are federally authorized direct and/or indirect air carriers, each of whom provide flight services at the Westchester County Airport ("HPN" or the "Airport"). Plaintiffs commenced this action against the County of Westchester ("Defendant" or the "County") on March 7, 2022, asserting claims of federal preemption and deprivation of equal protection. (Doc. 1, "Compl.").[1]

     The Court issued a Memorandum Opinion and Order on May 23, 2022, denying Plaintiffs' motion for a preliminary injunction and Defendant's request to abstain in favor of an action that was pending in Supreme Court of the State of New York, County of Westchester (the "State Court Action"). (Doc. 57).[2] The parties thereafter agreed that, *inter alia*, Defendant would dismiss without prejudice the State Court Action and Plaintiffs would dismiss without prejudice any right

---

[1] Plaintiffs also originally named AvPorts, LLC, a private company that provides certain services on behalf of HPN, and April Gasparri, HPN's Airport Manager as defendants. On March 16, 2022, the Court endorsed a stipulation whereby, *inter alia*, Plaintiffs dismissed without prejudice Ms. Gasparri and AvPorts, LLC from this action. (Doc. 51).

[2] This decision is available on commercial databases. *Delux Pub. Charter, LLC v. Cnty. of Westchester, New York*, No. 22-CV-01930, 2022 WL 1620300 (S.D.N.Y. May 23, 2022).

SPA-2

to attorneys' fees and costs in this action. (Doc. 59). Defendant then filed an Answer and Counterclaims against Plaintiffs on June 19, 2022. (Doc. 60, "Ans."). Plaintiffs filed an Answer to the Counterclaims on July 11, 2022 (Doc. 62) and the parties thereafter engaged in discovery pursuant to a Civil Case Discovery Plan and Scheduling Order (Doc. 64).

Before the Court is Defendant's motion for summary judgment dismissing the Complaint and granting relief on its First Counterclaim. (Doc. 111; Doc. 112, "Carey Decl."; Doc. 113, "Def. Br."). Defendant seeks no relief with respect to its Second Counterclaim. Plaintiffs opposed Defendant's motion and requested that the Court search the record and grant summary judgment in their favor pursuant to Rule 56(f). (Doc. 116, "Nelson Decl."; Doc. 117, "Pl. Opp."). Defendant's motion was briefed fully with the filing of a reply memorandum of law and supporting declaration on November 30, 2023. (Doc. 114, "Reply Decl."; Doc. 115, "Reply Br."). Plaintiffs thereafter requested that the Court schedule oral argument on the pending motion. (Doc. 118).

For the reasons set forth below, Defendant's motion for summary judgment is GRANTED IN PART.

## BACKGROUND

The Court recites the facts herein only to the extent necessary to adjudicate the extant motion for summary judgment and draws them from the pleadings, the Rule 56.1 Statement and responses thereto (Doc. 93, "56.1"), and the admissible exhibits proffered on this motion. Unless otherwise indicated, the facts cited herein are undisputed.[3]

Plaintiffs are federally authorized direct air carriers that fly customers for compensation or

---

[3] Plaintiffs' responses to Defendant's statements of fact in the Rule 56.1 Statement indicate that Plaintiffs largely dispute them. However, the Court deems admitted for purposes of this motion those material facts which are not "specifically controverted" and/or where the responses are lacking "citation to evidence which would be admissible." Local Civil Rule 56.1; *see Malarczyk v. Lovgren*, No. 22-504, 2023 WL 8073099, at *1 (2d Cir. Nov. 21, 2023).

hire under the Federal Aviation Administration's ("FAA") operating rules contained in 14 C.F.R. Part 135 ("Part 135") and/or indirect air carriers authorized by the Department of Transportation ("DOT") who partner with Part 135 direct air carriers to market commercial air carrier services under 14 C.F.R. Part 380 ("Part 380"). (Compl. ¶¶ 3, 15-17, 19). Delux is a Part 135 operator for JetSuiteX. (Carey Decl., Ex. AG, "Gasparri Tr." at 121). JetSuiteX, XO Global, and Blade are Part 380 Operators. (Compl. ¶¶ 15-17, 19; Carey Decl., Ex. AC, "Tomkiel Tr." at 23-24; Ex. AF, "Lozada Tr." at 35; Gasparri Tr. at 121). Plaintiffs provide air service out of one of HPN's privately run Fixed-Base Operators ("FBOs"), pursuant to agreements with those FBOs. (56.1 ¶ 4). The FBOs operate on the opposite side of the Airport from the Terminal that serves commercial airline passengers such as JetBlue, Delta, and United Airlines. (*See, e.g., id.* ¶ 80; Carey Decl., Ex. A).

Defendant, on September 14, 2004, passed Section 712.462 of the Laws of Westchester County (the "2004 Law"), which codified HPN's Terminal Use Procedures ("TUPs"). (56.1 ¶ 38; Carey Decl., Ex. B). The 2004 Law was the codification of a court-ordered settlement of a litigation titled *Midway Airlines v. County of Westchester*, bearing Docket No. 84-CV-02229 entered on April 19, 1984 (the "*Midway* Litigation"). (56.1 ¶ 19; Pl. Opp. at 3 n.10). The settlement order directed Defendant to "promulgate rational and nondiscriminatory rules governing the allocation of ground facilities and flight slots" within 50 days. (56.1 ¶ 19 (citing *Midway Airlines, Inc. v. County of Westchester*, 584 F. Supp. 436, 441-42 (S.D.N.Y. 1984))). On June 7, 1984, Defendant promulgated its first formal set of local use restrictions. (*Id.* ¶ 20). Thereafter, Defendant implemented access limits, allocation terms, and technical specifications, and entered into the Terminal Capacity Agreement with air carriers, "the purpose of which was to continue the terms set forth in [the] Stipulation and to continue to apply those same constraints to the new Terminal." (*Id.* ¶¶ 22-23). In mid-2003, Defendant carried out an in-depth review of HPN's existing use

restrictions and, as a result of that review, resolved to codify and clarify the existing restrictions into a single set of use restrictions. (*Id*. ¶¶ 28, 30). That process resulted in the draft 2004 Law, which was then submitted to the FAA's Office of the Chief Counsel together with maps, a chart of then-current terminal and ramp use allocations, a technical analysis of runway weight-bearing capacity, and a twenty-six-page memorandum detailing the history of HPN's use restrictions. (*Id*. ¶ 34; Carey Decl., Ex. A). The FAA thereafter found "nothing in the proposed actions by [Defendant] – codifying and clarifying existing legal restrictions, extending and renewing the existing Airport terminal use agreements with the air carriers, and codifying and modifying existing technical specifications and procedures for allocation of terminal space and gates – that is inconsistent at this time" with the "obligation to provide access by air carriers on reasonable and not unjustly discriminatory terms." (Carey Decl., Ex. I at 10). On November 15, 2004, Defendant amended the TUPs (the "2005 Law"). (56.1 ¶ 44; Carey Decl., Ex. C).

The TUPs require certain air carriers to operate from the Terminal pursuant to a Terminal Use Agreement which in turn imposes further requirements, such as the use of a lottery system to determine allocation and flight capacity, and to alter flight schedules to adhere to Terminal ramp allocations and passenger limitation restrictions. *See* Westchester, N.Y., Code of Ordinances § 712.462(1)-(5).

Plaintiffs did not and do not operate from the Terminal pursuant to a Terminal Use Agreement. (56.1 ¶¶ 3, 4, 15, 16). Instead, Blade and XO Global have been operating from FBOs at HPN since 2015 (Compl. ¶¶ 26, 29); and Plaintiffs allege that Delux began operating a 30-seat aircraft from an FBO at HPN in June 2020 (*id*. ¶ 32). On January 21, 2022, Defendant published Westchester County Airport Operational Policy No. 1 ("Policy No. 1"), requiring Plaintiffs to operate out of the Terminal, enter into a Terminal Use Agreement, and utilize HPN's

4

Transportation Security Administration ("TSA") checkpoints. (Nelson Decl., Ex. 3). Pursuant to a so-ordered stipulation entered on March 16, 2022 (Doc. 45), Defendant agreed that neither it nor any of its agents will seek to or take any action to enforce Policy No. 1 and/or the TUPs against Plaintiffs and their Air Carriers without a valid court order, thus permitting Plaintiffs to continue their operations pending resolution of this action. (56.1 ¶ 16).

Plaintiffs contend that the TUPs—specifically and only the 2005 Law—are preempted by the Airport Noise and Capacity Act of 1990 ("ANCA") and the Airline Deregulation Act of 1978 ("ADA"). Plaintiffs further maintain that Defendant's reliance on the TUPs is for the sole purpose of singling out Plaintiffs for discriminatory treatment in violation of the Equal Protection Clause of the Fourteenth Amendment, targeting Plaintiffs and treating them differently from other similarly situated carriers. (*See generally* Compl.). Plaintiffs seek declaratory and injunctive relief on each of their claims for relief.[4] Defendant's First Counterclaim seeks an order declaring that the TUPs apply to all of Plaintiffs with respect to their actions at HPN. (Ans. ¶ 206).

Pursuant to a so-ordered stipulation, Plaintiffs have withdrawn all relief sought concerning Policy No. 1 and it, and the factual allegations concerning the relief sought, have been deemed dismissed from this action. (Doc. 108). Further, Plaintiffs, in their opposition brief, state as follows: "Plaintiffs seek no relief with regard to the 2004 [Law]. Instead, Plaintiffs seek a ruling that, as Part 380 operators, they are exempt from the provisions of the TUP <u>as amended in 2005</u> and that the 2005 Amendment, as applied to Part 380 and Part 135 operators, is preempted by Federal law." (Pl. Opp. at 2 (emphasis in original)). Plaintiffs' representations on this score further

---

[4] The prayer for relief in the Complaint seeks, *inter alia*, an order declaring that Defendant "must provide an accommodation to Plaintiffs"; and damages for the "tortious interference claims" (Compl. at 36). There are no predicate claims for such relief pled in the Complaint, and a properly pled claim "is a necessary predicate to any recovery." *Melvin v. UA Loc. 13 Pension Plan*, 236 F.R.D. 139, 144 (W.D.N.Y. 2006). Accordingly, and to the extent Plaintiffs seek such relief, it is denied.

SPA-6

narrows the subject of their preemption claims for relief. Plaintiffs have abandoned any claims in this action concerning Policy No. 1 and the 2004 Law and they are, accordingly, dismissed. *See Allegrino v. Ruskin Moscou Faltischek, P.C.*, No. 19-CV-08900, 2021 WL 429121, at *5 (S.D.N.Y. Feb. 8, 2021), *aff'd*, No. 21-484-CV, 2021 WL 5500084 (2d Cir. Nov. 24, 2021) (deeming claims abandoned and dismissed based upon representations in opposition brief). To be clear, in light of the parties' express limitations, the Court need not and does not consider whether the 2004 Law passes muster under ANCA and the ADA and expresses no opinion on the subject other than to recognize that the FAA indicated that the 2004 Law was not preempted when given the opportunity to do so. (*See* Carey Decl., Ex. I).

Defendant now seeks summary judgment dismissing Plaintiffs' Complaint and granting relief on its First Counterclaim for declaratory relief.

### STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, No. 17-CV-03875, 2020 WL 917294, at *4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[5] "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248).

---

[5] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

6

"The question at summary judgment is whether a genuine dispute as to a *material* fact exists—not whether the parties have a dispute as to any fact." *Hernandez v. Comm'r of Baseball*, No. 22-343, 2023 WL 5217876, at *5 (2d Cir. Aug. 15, 2023); *McKinney v. City of Middletown*, 49 F.4th 730, 737 (2d Cir. 2022)).

The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. *Porter v. Dartmouth-Hitchcock Medical Center*, No. 92 F.4th 129, 147 (2d Cir. 2024) ("[T]he court may not make credibility determinations or weigh the evidence." (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010))). The task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cnty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Further, "while the court is required to review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Porter*, 92 F.4th at 147 (quoting *Kaytor*, 609 F.3d at 545). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*,

2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her claim, the District Court properly granted summary judgment dismissing that claim"). Simply put, the movant must separately establish that the law favors the judgment sought.

The Court may, after giving notice and a reasonable time to respond, grant judgment for a nonmoving party. Fed. R. Civ. P. 56(f). Judgment for the nonmoving party may be appropriate where the record is clear "that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court . . . if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000).[6]

---

[6] The Court, at the pre-motion conference on June 29, 2023 and at Plaintiffs' request, put the parties on notice that it would search the record and consider granting summary judgment in favor of Plaintiffs, the nonmoving party, should that be warranted by the facts and law. (Carey Decl., Ex. Y at 66-67). Plaintiffs, in their opposition, reiterated their request for judgment in their favor under Rule 56(f), though they did not

## ANALYSIS

I.  First Claim for Relief: ANCA Preemption

Plaintiffs' First Claim for Relief seeks a declaration that the 2005 Law is invalid under ANCA and an injunction preventing Defendants from enforcing the 2005 Law against them. (Compl. ¶ 115).

The Supremacy Clause of the United States Constitution invalidates state and local laws that "interfere with or are contrary to, the laws of congress." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317 (1981). As is relevant to the claim concerning ANCA preemption, Congress, in that statutory scheme, preempted state and local noise restrictions which were not enacted under the specified procedures set forth in ANCA. *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton* ("*Friends*"), 841 F.3d 133, 151 (2d Cir. 2016); 49 U.S.C. § 47521, *et seq.*

ANCA, enacted on November 5, 1990, "(1) directs the Department of Transportation (which has delegated its authority to the FAA) to establish 'a national aviation noise policy,' 49 U.S.C. § 47523(a), including 'a national program for reviewing airport noise and access restrictions on operations of Stage 2 and Stage 3 aircraft,' *id*. § 47524(a); and (2) outlines the requirements of that program." *Friends*, 841 F.3d at 138. The FAA promulgated a national aviation noise policy through 14 C.F.R. Part 161, and established the "notice, review, and approval requirements," which apply to new local airport-use restrictions. *See* 49 U.S.C. § 47524(b), (c)(1), (d); 14 C.F.R. § 161.3(a), (b). Local airport-use restrictions that pre-date ANCA's passage are explicitly excluded from the strict "notice, review, and approval" requirements and are considered "grandfathered" under ANCA. 42 U.S.C. § 47524(b), (c)(1), (d); 14 C.F.R. § 161.3(a), (b).

---

identify each claim, counterclaim or defense—or the part of each claim, counterclaim or defense—on which they believe themselves entitled to summary judgment. (Pl. Opp. at 1).

Likewise, amendments to grandfathered local airport-use restrictions are also grandfathered and therefore not preempted by ANCA, provided that such amendments do not "reduce aircraft operations, limit aircraft operations, or affect aircraft safety." 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.3(b).

Plaintiffs take issue with the 2005 Law to the extent it added a defined term that they believe so materially changed the 2004 Law that the 2005 Law cannot be a grandfathered amendment. Specifically, Plaintiffs argue that the new defined term "Passenger Service" made the TUPs applicable to Part 380 operators when the 2004 Law did not so apply to them. The effect of that change, Plaintiffs argue, reduces and/or limits their aircraft operations and this makes the amendments invalid under ANCA. Defendant takes the position that the new defined term in the 2005 Law is not preempted because it was merely a clarification of the grandfathered 2004 Law which did not change the aircraft operations for entities to which the rules applied, and is therefore a grandfathered amendment.

The first paragraph of the 2004 Law made the law applicable to "all use of the Passenger Terminal ("Terminal") and the Terminal Ramp at the Westchester County Airport ("Airport") by Airlines providing scheduled passenger service." (Carey Decl., Ex. B at 12). The term "Airline" was defined, in relevant part, as "any person providing scheduled passenger air service, including but not limited to, any air carrier or other operator certificated to provide scheduled passenger service under Parts 119, 121, or 135 of the Federal Aviation Regulations . . ." (*Id.*).

That paragraph was amended by the 2005 Law, removing the words "scheduled passenger service" and replacing them with "Passenger Service, as that term is defined herein." (Carey Decl., Ex. C at 9). The defined term, "Passenger Service," means "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless

whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or another entity.'" (*Id*. at 11). The 2005 Law further specified that "[a]ll Passenger Service provided at the Airport shall be provided at the Terminal." (*Id*. at 9).

Plaintiffs argue that the 2005 Law impermissibly expands the reach of the TUPs to Part 380 operators; and now requires them to provide their services at the Terminal instead of at the FBOs. The impact of such application would, according to Plaintiffs, effectively shut down their entire business operations. Plaintiffs argue that enforcing the 2005 Law, besides requiring them to operate out of the Terminal (as opposed to the FBOs), would subject them to a limited gate lottery (whereas at the FBOs there currently is none), and thereby reduce Plaintiffs' aircraft operations. (Pl. Opp. at 7). Plaintiffs support this contention by arguing that none of them provide "scheduled operations" as defined in section 110.2 of the Federal Aviation Regulations; and therefore, the 2004 Law which applied to "scheduled passenger service" could not have applied to them. (Pl. Opp. at 4 n.15, 5). Plaintiffs' conclusion then is that the 2005 Law was a material alteration to existing law that required FAA approval under ANCA.

It is important to recall, in connection with Plaintiffs' argument, that the 2004 Law was part of a settlement of the *Midway* Litigation. At the time of the *Midway* Litigation and resulting local use restrictions which became a part of the 2004 Law, the definition of "[s]chedule operations" in the Federal Aviation Regulations was, "operations conducted in accordance with a published schedule for passenger operations which includes dates or times (or both) that is openly advertised or otherwise made readily available to the general public." (*See* Carey Decl., Ex. AM ("An operator who attempts to hold itself out as a charter operator but who, in fact, announces regularly scheduled flights to the public would be considered a scheduled operator and would have to comply with the regulations for scheduled operations under Part 121 or Part 135, as

11

appropriate.")). A review of the definition of "Passenger Service" in the 2005 Law makes clear that the operators to which the TUPs were meant to apply were those who offered or sold flights to the general public, so as to mirror that which the Federal Aviation Regulations defined.

Plaintiffs also argue that Defendant fails to provide evidence supporting its contention that the 2005 Law was a mere clarification of the 2004 Law. The record evidence demonstrates, contrary to Plaintiffs' contention, that the 2005 Law was intended to clarify "unintended ambiguities . . . to ensure that the practical application of the [TUPs] is consistent with the legislative intent which prompted their enactment." (Carey Decl., Ex. C at 4). Defendant proffers a report of the Westchester County Board of Legislators (the "BOL"), issued in advance of passing the 2005 Law, explaining why the 2004 Law required amendment. (*Id.*). The BOL report states, in relevant, part as follows: "the scope of the [TUPs] was clearly intended to include all commercial passenger operations, including those that provide infrequent or special purpose services, such as those now authorized under Part 380 of the FAA's regulations. . . . [T]he proposed technical amendments . . . would clarify the applicability of the [TUPs] to these operations." (*Id.* at 4-5). The BOL report concludes that "[i]n sum, the proposed amendment . . . will clarify long-standing practice under which the County requires that all commercial passenger service providers, including those that offer their services on an infrequent basis, use the main Airport terminal and terminal ramp and be subject, among other things, to the four primary limitations set forth in the [TUPs]." (*Id.* at 5-6).

In other words, Defendant has in fact provided evidence supporting the factual contention that the addition of the defined term "Passenger Service" in the 2005 Law was a mere clarification of the 2004 Law. The 2005 Law did not expand the reach of the TUPs to Part 380 operators because the TUPs already applied to them, at least to the extent they offered or sold flights to the general

12

SPA-13

public as discussed *supra*.

Based on the foregoing, the 2005 Law is not preempted by ANCA. It does not reduce or limit Part 380 aircraft operations or affect aircraft safety because the 2005 Law simply did not change the aircraft operations to which the TUPs already applied. Therefore the 2005 Law is a grandfathered amendment to the 2004 Law under ANCA. Because the 2005 Law is not preempted by ANCA, there is no basis under that law on which to enjoin Defendant from enforcing the TUPs and, to the extent Plaintiffs seek such relief, it is denied as Plaintiffs have failed to sustain their burden of proof in that regard. Accordingly, Defendant is entitled to summary judgment dismissing Plaintiffs' First Claim for Relief.

II.   <u>Second Claim for Relief: ADA Preemption</u>

The Second Claim for Relief seeks a declaration that the 2005 Law is invalid under the ADA and an injunction preventing Defendants from enforcing the 2005 Law against them. (*Id.* ¶ 134).

As relevant to the claim concerning ADA preemption, Congress preempted state and local regulations "related to a price, route or service of an air carrier" when it passed § 1305(a) of the ADA. *Nat'l Helicopter Corp. of Am. v. City of New York*, 137 F.3d 81, 88 (2d Cir. 1998); 49 U.S.C. § 41713(b)(1). The 2005 Law may be characterized as a regulation touching upon a "price, route

or service" of an air carrier and Defendant advances no significant arguments to the contrary.[7]  The

ADA clarifies, however, that such preemption does not "extend to acts passed by state and local

agencies in the course of 'carrying out [their] proprietary powers and rights.'" *Nat'l Helicopter*

*Corp. of Am.*, 137 F.3d at 88 (quoting 49 U.S.C. § 41713(b)(3), the "Proprietor Exception").

Defendant thus focuses on the Proprietor Exception to the express preemption provision, arguing

that the TUPs fit squarely within the exception. The Court agrees.

The right of an airport proprietor "is narrow, vesting the proprietor 'only with the power to

promulgate reasonable, nonarbitrary and non-discriminatory regulations that establish acceptable

noise levels for the airport and its immediate environs.'" *Friends*, 841 F.3d at 139 (quoting *Brit.*

*Airways Bd. v. Port Auth. of New York*, 558 F.2d 75, 84 (2d Cir. 1977)). Plaintiffs seize upon this

language, arguing that Defendant has not established that the 2005 Law was a restriction meant to

address noise and/or environmental concerns.

Contrary to Plaintiffs' contention, however, noise and environmental regulations are not

the only areas which airport proprietors may regulate. *See W. Air Lines, Inc. v. Port Auth. of New*

*York & New Jersey*, 658 F. Supp. 952, 957 (S.D.N.Y. 1986), *aff'd*, 817 F.2d 222 (2d Cir. 1987)

("Section 1305(b)(1) does not expressly limit proprietary powers to the regulation of noise,

although presumably Congress would have so limited the section if that is what it had in mind.").

---

[7] Defendant asks the Court to "sidestep" the express preemption inquiry. (Def. Br. at 4). Indeed, the only argument Defendant makes with respect to express preemption is that the relation between the TUPs and Plaintiffs' prices, routes or services is not substantial enough to trigger preemption. (*See id.* at 7-8; Reply at 3). Defendant, in support of that argument, cites cases that concern preemption of age discrimination claims (*Abdu-Brisson v. Delta Air Lines*, 128 F.3d 77, 86 (2d Cir. 1997)); and land use regulations imposing permit requirements (*Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 212 (2d Cir. 2011)). (*Id.*). The regulatory schemes in those cases bear, at best, a tenuous relation to and are remote from the aviation field. The TUPs at issue here do invade the preempted field, as they directly concern aviation. Because the cases cited by Defendant are entirely distinguishable, the Court is not persuaded by Defendant's limited argument that the express preemption provision is inapplicable here. The issue need not be resolved however, in light of the Court's determination regarding the Proprietor Exception.

Indeed, "[a] proprietor's interest in regulating ground congestion at its airports would appear to be at the core of the proprietor's function as airport manager, perhaps even more so than the regulation of noise," *id.*, as a "legitimate need[ ] of local airport proprietors to ensure the safety of passengers while on the ground," *Midway*, 584 F. Supp. at 440. The 2004 Law was codified after a fulsome analysis, supported by maps, a chart of then-current terminal and ramp use allocations, a technical analysis of runway weight-bearing capacity, and a twenty-six-page memorandum detailing the history of HPN's use restrictions, all of which was submitted to the FAA's Office of the Chief Counsel together with the text of the draft 2004 Law. (56.1 ¶¶ 28-32, 34; Carey Decl., Ex. A). As set forth above, the 2005 Law merely clarified language in the 2004 Law. Defendant has established that the 2005 Law is rooted in the same consideration as the 2004 Law: allocating scarce space at HPN by directing carriers to leave from one part of the airport or the other. (*See* Carey Decl., Ex. B, Ex. C). There is no evidence that the reasoning behind the amendment diverged from that which precipitated the 2004 Law.

Though Plaintiffs make passing reference to the possibility that the 2004 Law is outside the Proprietor Exception, they have withdrawn any claim in this action directed to the propriety of the 2004 Law. Plaintiffs have explicitly conceded as regards the Proprietor Exception that, "as the 2004 [Law] is not directed to Plaintiffs, we will leave that argument to someone else." (Pl. Opp. at 11). Plaintiffs themselves even acknowledge the purpose of the TUPs "was a way to force all traffic to the main Terminal, regardless of the certificate status of the operator, to restrict volume and access." (*Id*. at 11-12). In other words, there is no genuine dispute that the 2005 Law was meant to regulate airport access so as to allocate scarce space and landing and takeoff slots. Such is a matter wholly within Defendant's proprietary rights and powers.

Thus, the only question Plaintiffs have left to the Court on this issue is whether the addition

of the defined term in the 2005 Law was reasonable, nonarbitrary and non-discriminatory. Plaintiffs do not identify what, if anything, is unreasonable, arbitrary, or discriminatory about the 2005 Law, merely suggesting that it is Defendant's burden to demonstrate that the amendment is reasonable and nonarbitrary. (*Id*. at 12). It appears—from what the Court can divine from this briefing—that it is Plaintiffs' position that the new defined term "Passenger Service" was only added so as to place new restrictions on Part 380 operators. (*Id*. at 11-12). Plaintiffs offer no support in the record that the defined term was added with the purpose of placing *new* restrictions on Part 380 operators, or for any other improper purpose. On its face, the TUPs apply equally to all "Airlines" selling seats to the public, regardless of the certificate status of the operator. *See* Westchester, N.Y., Code of Ordinances § 712.462(2)(a), (3). Simply put, the record demonstrates that the TUPs fit within the ADA's Proprietor Exception on reasonable, nonarbitrary, and non-discriminatory terms.

Because the Court concludes that the 2005 Law is not preempted by the ADA, there is no basis under that law either on which to enjoin Defendant from enforcing the TUPs and, to the extent Plaintiffs seek such relief, it is denied as Plaintiffs have failed to sustain their burden of proof in that regard. Accordingly, Defendant is entitled to summary judgment dismissing the Second Claim for Relief on the grounds that the 2005 Amendment is not preempted by the ADA as a result of the Proprietor Exception.

III.   Third Claim for Relief: 42 U.S.C. § 1983 (Equal Protection)

Plaintiffs bring their Third Claim for Relief under 42 U.S.C. § 1983 alleging a violation of the Equal Protection Clause of the Fourteenth Amendment and seek preliminary and permanent injunctive relief prohibiting Defendant from enforcing the 2005 Law against them, or otherwise banning Plaintiffs from operating at HPN as of January 21, 2022 (the date that Defendant published

16

Policy No. 1 (*see* 56.1 ¶ 52)). Plaintiffs proceed on a "class-of-one" theory, arguing that Defendant singled them out intentionally for discriminatory treatment without a rational basis, and seek a declaration that due to this Constitutional violation, the 2005 Law is invalid and they are entitled to an injunction preventing Defendants from enforcing the 2005 Law against them. (Compl. ¶¶ 148-149).

"Plaintiffs who allege a Fourteenth Amendment class-of-one claim must show that they have been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. The claim requires an extremely high degree of similarity between [the plaintiff] and its comparators." *Lepper v. Scordino*, No. 22-CV-01064, 2023 WL 4004220, at *2 (2d Cir. June 15, 2023). "Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010). "When a statute or regulatory regime imposes different classifications or regulatory burdens on groups of regulated participants, rational basis review contemplates 'a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it.'" *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) (quoting *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 314-15 (1993)).

Plaintiffs sell seats to the public on aircraft designed for more than nine passenger seats at HPN. (56.1 ¶ 3). Plaintiffs did not specifically identify in the Complaint any purported

comparators, alleging only that they were treated differently from other operators operating out of FBOs at HPN. (*See* Compl. ¶ 141). Discovery apparently revealed their alleged comparators are: (i) Part 135 operators operating "scheduled service," including Cape Air, Tradewind, Wheels Up, and Hard Rock Air; (ii) Part 135 operators "running a political campaign or . . . flying a sports team"; (iii) corporate jets owned by companies like Pepsi, Discovery, and IBM; (iv) "community groups," such as the Albany Club, the Bakers Bay Club, the Discovery Land Club, the Nexus Club, the Yellowstone Club; (v) individuals who come together and decide to charter a plane together; (vi) operators operating pursuant to 14 C.F.R. Part 91 ("Part 91"); and (vii) operators with fractional ownership interests, such as FlexJet, NetJets, and Sentient. (56.1 ¶ 67; *id*. ¶ 75 ("Aside from those entities included in the aforementioned subgroups, Plaintiffs have not identified any other Comparators.")). Although these "seven subgroups" have been identified as Plaintiffs' comparators (*id*.), Plaintiffs single out only Bakers Bay, NetJets, and Wheels Up in their opposition with respect to their analysis of Defendant's alleged differential treatment (Pl. Opp. at 24). The Court, accordingly, considers only the operators which Plaintiffs have addressed in their brief as adequate comparators.[8]

Defendant maintains that Bakers Bay is a community group, not an air carrier, and is not

---

[8] Defendant analyzed each "subgroup" in their moving papers that they identified in the Rule 56.1 Statement with citation to record evidence. (Def. Br. at 15-18; 56.1 ¶¶ 65-75). Plaintiffs disputed the factual statements in the Rule 56.1 Statement concerning six of the seven "subgroups" (*see* 56.1 ¶¶ 68-72, 74; *id*. ¶ 73 (admitting the fact stated by Defendant concerning the sixth "subgroup")), but did not respond in their opposition brief to the points raised by Defendant, only mentioning three alleged comparators falling into three of the "subgroups" identified (*see* Pl. Opp. at 23-25). Plaintiffs' silence in their brief indicates that they either: (1) believe the denials in the Rule 56.1 Statement were incorrect and therefore "conceded the argument by [their] failure to respond" (*Tyson v. Town of Ramapo*, 677 F. Supp. 3d 173, 183 n.7 (S.D.N.Y. 2023), *aff'd*, No. 23-1018-CV, 2024 WL 2890395 (2d Cir. June 10, 2024)); or (2) believe the denials in the Rule 56.1 Statement were enough to generate a genuine issue of material fact without any substantive argument in the brief. To the extent it is the latter, the denials in the Rule 56.1 Statement are particularly insufficient to create an issue of fact where, as here, the denial either does not actually respond to the stated fact (*see* Plaintiffs' Response to 56.1 ¶¶ 68, 70, 72) or cite to evidence that, upon review, actually supports Defendant's stated fact (*see id*. ¶¶ 69, 71, 74).

18

selling tickets to the public, so it is different from Plaintiffs. To support this contention, Defendant cites the deposition testimony of Plaintiffs' Rule 30(b)(6) witnesses Melissa Tomkiel, Jennifer Lozada, and David Drabinsky, arguing that this organization operates under 14 C.F.R. § 212.5, a section of the Code of Federal Regulations that permits "affinity (pro rata) charter[s]" that are not permitted to sell seats beyond the *bona fide* members of the organization. (Def. Br. at 17; 56.1 ¶ 71 (citing Tomkiel Tr. at 150:23-151:24, 152:17-19; Lozada Tr. at 123:20-124:17; Carey Decl., Ex. AH, "Drabinsky Tr." at 101:12-16)). Plaintiffs counter that Bakers Bay operates under Part 135 from FBOs selling seats to a "segment of the public" on aircraft designed for more than nine seats, citing the very same deposition testimony. (*See* Plaintiffs' Response to 56.1 ¶ 71 (citing Tomkiel Tr. 148:10-153:7, 159:17-160:3; Lozada Tr. 123:10-22; Drabinsky Tr. 101:12-16)). The parties, in other words, are relying upon the same evidence to reach opposing conclusions. Ordinarily, this kind of circumstance would suggest the existence of an issue of material fact precluding summary judgment. However, the Court has carefully reviewed the deposition testimony, and there is not, as Plaintiff argues, any fact disputes "regarding others similarly situated to Plaintiffs but are allowed to operate from FBOs or private hangars while the County attempts to force Plaintiffs into the lottery and Terminal." (Pl. Opp. at 24). In other words, the Court is not picking between two interpretations of the same evidence. Rather, and only, the Court has concluded that there is but one conclusion to be drawn from the evidence.

Ms. Tomkiel, in the cited portions of the deposition testimony, described Bakers Bay as a "neighborhood in the Bahamas" and that the purchase of property in that neighborhood affords membership privileges such as the ability to purchase seats on a chartered flight to that neighborhood. (Tomkiel Tr. at 150:23-151:24). She described how the model operates: a group would charter an entire flight for the residents, aggregate the seats, and sell the seats directly to its

members. (*Id.*).  She also testified that, to her knowledge, whoever operates the flights to Bakers Bay (she did not know "whose program it is or whatever," just the destination) does so under Part 135 and that is why they are not considered commercial flights. (*Id.* at 152:3-19). She testified that these "jet aggregations" to Bakers Bay would be an example of a Part 135 operating out of FBOs that sell individual seats on aircraft with more than nine seats. (*Id.* at 159:17-160:2). Ms. Lozada, in the cited portions of the deposition testimony, described Bakers Bay as "a country club in the sky that's sharing a plane to go to the country club." (Lozada Tr. at 123:14-22). She testified that there is usually an aviation group inside a club such as Bakers Bay that helps facilitate getting fliers on an aircraft. (*Id.* at 124:4-17). Mr. Drabinsky pointed to Bakers Bay as one example of a public charter company, operating out of the FBOs at HPN as opposed to the terminal, that sells individual seats on their flights to the public on aircraft with more than nine passenger seats. (Drabinsky Tr. at 100:19-101:16). The gravamen of this collective testimony is that the "aviation group" inside Bakers Bay sells tickets to its members—the testimony does not suggest that it advertises or offers to sell seats directly to the public. Based upon the cited deposition testimony, there does not exist the "extremely high degree of similarity between [Plaintiffs] and [Bakers Bay]" that would suffice for a class-of-one claim. *Lepper*, 2023 WL 4004220, at *2.

With respect to NetJets, Defendant maintains that it is a fractional ownership operation which does not sell tickets to the public, so it is different from Plaintiffs. Defendant cites Ms. Lozada's testimony to support this contention (56.1 ¶ 74 (citing Lozada Tr. at 124:18-126:7, 136:16-139:12)) as well as a section of the Code of Federal Regulations concerning Fractional Ownership Operations (*id.* (citing 14 C.F.R. Subpart K)). Plaintiffs, disputing that fact, likewise cite Ms. Lozada's deposition transcript, and state that the public can book seats on NetJets so long as they pay the applicable fees. (*See* Plaintiffs' Response to 56.1 ¶ 74 (citing Lozada Tr. at 120:4-

121:1, 146:1-147:6)).[9] Ms. Lozada, however, specifically testified that NetJets "do[es] fractional memberships" and explained that it means that a party pays a deposit and becomes a fractional owner to a specific plane. (Lozada Tr. at 136:16-137:19). She did not testify in the portions of her transcript cited by Plaintiffs that "the public can book seats on NetJets so long as they pay the applicable fees." Accordingly, the fact stated by Defendant is deemed admitted. (56.1 ¶ 74). NetJets is not a sufficiently similarly situated comparator to support a class-of-one claim.

Finally, with respect to Wheels Up, Defendant contends it is not a comparator because it is a Part 135 operator operating "scheduled service" on aircraft with nine seats or fewer, so it is not violating the TUPs. (56.1 ¶ 68). Defendant cites the deposition testimony of Peter Scherrer, the Airport Manager employed by AvPorts, responsible for HPN's day-to-day operations (Carey Decl., Ex. AD at 8:20-9:14, 14:7-10), who stated that Wheels Up was "flying King Airs" which "was only eight seats" (*id*. at 228:13-15). Plaintiffs dispute this fact in the Rule 56.1 Statement but do not offer any citation to record evidence in connection therewith. (*See* Plaintiffs' Response to 56.1 ¶ 68 (offering citation to evidence concerning Tradewind, Bakers Bay, Yellowstone, and Hard Rock, but not Wheels Up)). Accordingly, the fact stated by Defendant is deemed admitted; and Wheels Up is not a sufficiently similarly situated comparator either.[10]

---

[9] Plaintiffs also cite "Mahmoud Decl. Ex. C," but no such document exists in this record. (*See* Plaintiffs' Response to 56.1 ¶ 74).

[10] Defendant, in its reply brief, posits that "<u>Wheels Up</u> is understood by the County to be a Part 135 air carrier operating aircraft with nine seats or fewer. . . . [b]ut to the degree the County is incorrect and Wheels Up is violating the TUP—or if it does so in the future—the County has every intention of enforcing the TUP to prohibit Wheels Up and all other carriers from operating outside of the Terminal while offering single-seat sales to the general public, or any segment thereof, on aircraft with more than nine seats." (Reply at 6-7). To the extent this surplusage has created any issue of fact, Plaintiffs have not established that the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that Defendant acted on the basis of a mistake. *See, e.g., Komondy v. Gioco*, 253 F. Supp. 3d 430, 444 (D. Conn. 2017) ("Moreover, '[s]mall town governments often make decisions with less than perfect information and ordinarily without the benefit of sophisticated enforcement resources.' . . . Accordingly, 'not every wrong or ill-informed decision by a local government official is grounds for a federal constitutional cause of action.'" (citing *Gray v. Town of Easton*, 115 F. Supp. 3d 312, 317 (D. Conn. 2015))).

21

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiffs' failure to produce any evidence of an adequate comparator constitutes a failure of proof and their approach here is insufficient to create a genuine issue of material fact.

Even if Plaintiffs had provided evidence of an adequate comparator, Plaintiffs have failed to carry their "burden to negative every conceivable basis which might support [the rationality of the legislative classification]." *Progressive Credit Union*, 889 F.3d at 49. As explicitly set forth in the BOL report, "the principal purpose for enactment of the [2004 Law] is to codify all of the critical use restrictions . . . in order to ensure that the procedures and regulations governing commercial use of the Airport terminal are well-defined and consistently applied to all commercial users" so as to "preserve [Defendant's] policy against expansion while balancing the need to allow carefully controlled commercial airline traffic at [HPN]." (Carey Decl., Ex. B at 4-6). As set forth *supra*, the 2005 Law is rooted in the same consideration as the 2004 Law. That consideration is the allocation of scarce space at HPN by directing carriers to leave from one part of the airport or the other. The 2005 Law merely clarified "that the [TUPs] apply to all aviation passenger services which operate out of [HPN] pursuant to which seats are individually offered or sold to the public, regardless of the frequency of such offers or sales." (Carey Decl., Ex. C at 3).

Defendant further made clear in its moving brief that the TUPs' public-sale limitation conforms with the federal aviation regulatory regime. (Def. Br. at 19-20 (citing Carey Decl., Ex. AN; 14 C.F.R. § 110.2)). Defendant also explained that the "nine-seat break point has been an

22

aviation industry standard since the 1970s." (Def. Br. at 19 (citing Carey Decl., Ex. AL ("size of aircraft operated by air commuters could be grouped into three convenient categories: 0-9 seats, 10-19 seats, and 20-30 seats"); 14 C.F.R. § 135.411 (nine-seat break point); 49 U.S.C. § 44706(a)(1) (recognizing a "9 passenger seat" break point with respect to airport operating certificates))). Plaintiffs, in opposition, respond only by stating that "the County has never articulated a rationale for the nine-seat limitation or the distinction between private and public other than to use these arbitrary standards to negatively impact Plaintiffs' ability to operate out of HPN." (Pl. Opp. at 24). In other words, Plaintiffs fail to substantively respond to Defendant's explanation for the rationality of the legislative classification and have not met their burden on this score.

Accordingly, Defendant is entitled to summary judgment dismissing the Third Claim for Relief.

IV.   Fourth Affirmative Defense: Laches

Defendant also seeks dismissal of "Plaintiffs' equitable defenses." (Def. Br. at 22).[11] Plaintiffs' fourth affirmative defense alleges that Defendant's Counterclaims are "barred by the doctrines of waiver, estoppel, laches, and/or other equitable defenses." (Doc. 62). Defendant argues that as a government entity discharging its statutory duties, it is not subject to equitable

---

[11] Local Rule 7.1(a)(1) provides that "[a] notice of motion . . . shall specify the applicable rules or statutes pursuant to which the motion is brought, and shall specify the relief sought by the motion." Defendant's Notice of Motion seeks "an order pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the Complaint as against Defendant with prejudice, granting Defendant's first counterclaim seeking a declaratory judgment, and for such other relief as this Court deems just and proper." (Doc. 111). That notice does not identify that Defendant seeks summary judgment dismissing any of the affirmative defenses asserted in Plaintiff's Answer to the Counterclaims. While failure to comply with the Local Rules is, on its own, a sufficient ground to warrant denial of a motion, the Court has discretion to overlook a failure to comply with Local Rule 7.1 and exercises such discretion on this motion, as the parties have fully briefed the propriety of dismissing the laches affirmative defense. *See Singer v. Massachusetts Mut. Life Ins. Co.*, No. 21-CV-08450, 2023 WL 3506404, at *1 (S.D.N.Y. May 17, 2023), *aff'd*, No. 23-0863, 2024 WL 1172893 (2d Cir. Mar. 19, 2024).

defenses that could ordinarily be invoked against a private actor. (Def. Br. at 20-22). Plaintiffs counter that laches applies to the government where Defendant is seeking to enforce a right akin to a private one.[12] (Pl. Br. at 21-23).

Plaintiffs have not argued, however, that the TUPs involve a private interest. (*See id.*). Their sole argument is that Defendant knew that Plaintiffs were developing their business over the past few years while they were operating openly at HPN, only first raised an issue regarding single seat charter operations in 2018, and waited until November 2021 to notify Plaintiffs that their operations were in violation of the TUPs. (*Id.*). They argue that this "unexplained and prejudicial delay" should permit a laches defense against the municipality. (*Id.* at 23).

Defendant, in enforcing the TUPs, is "acting in a law enforcement capacity in [its] role[ ] as [a] government entit[y]." *State of New York v. United Parcel Serv., Inc.*, 160 F. Supp. 3d 629, 647 (S.D.N.Y. 2016), *vacated on other grounds in part on reconsideration sub nom. New York v. United Parcel Serv., Inc.*, No. 15-CV-01136, 2016 WL 10672074 (S.D.N.Y. June 21, 2016). When local government entities act in such a capacity as to which they have broad discretion, and not in a capacity akin to that of a private entity—such as a municipality's enforcement of an ordinary contract—equitable defenses do not apply. *Id.*; *see also United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002) ("[L]aches is not available against the federal government when it undertakes to enforce a public right or protect the public interest."). Plaintiffs are undoubtedly troubled that Defendant previously failed to enforce its restrictions against them until 2021, but "laches or estoppel do not bar a municipality from enforcing ordinances that have been allowed to lie fallow." *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 111 (2d Cir. 2010) (quoting

---

[12] Plaintiffs' failure to respond to Defendant's arguments concerning equitable defenses other than laches amounts to abandonment of those non-laches equitable defenses. *See Tyson*, 677 F. Supp. 3d at 183, n.7; *Ventillo v. Falco*, No. 19-CV-03664, 2020 WL 7496294, at *12 (S.D.N.Y. Dec. 18, 2020); *Allegrino*, 2021 WL 429121, at *5.

*LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)).

Accordingly, Defendant is entitled to summary judgment dismissing Plaintiffs' fourth affirmative defense alleged in their Answer to the Counterclaims.

V.    <u>Defendant's First Counterclaim</u>

Defendant's First Counterclaim is brought pursuant to Rule 3001 of the New York Civil Practice Law and Rules ("N.Y. C.P.L.R."), which permits a court to "render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy . . ." As an initial matter, N.Y. C.P.L.R. 3001 is a state law, not a federal statute. Because "[f]ederal courts apply federal procedural rules, not state rules" this Court cannot grant relief under N.Y. C.P.L.R. 3001. *Gustavia Home, LLC v. Rutty*, No. 16-CV-02823, 2018 WL 2198742, at *5 (E.D.N.Y. May 14, 2018), *aff'd*, 785 F. App'x 11 (2d Cir. 2019). This reality sounds the death knell to this counterclaim. In any event, if the Court could grant declaratory relief to Defendant, it now has—for all intents and purposes—secured the relief sought to the extent the First Counterclaim seeks a declaration that the 2005 Law is not preempted under ANCA or the ADA, based upon the Court's findings herein.

Defendant, perhaps anticipating this determination, explains in its moving brief that if the Court grants summary judgment dismissing the Complaint, "there is still the possibility that other air carriers at some future date—perhaps twenty years in the future—will, like Plaintiffs, emerge and challenge the TUP." (Def. Br. at 23). Thus, Defendant asks for a declaration "that the TUP is not precluded under the ADA or ANCA" in order "[t]o prevent future suits challenging the TUP." (*Id.*). "Declaratory relief is available only when 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-CV-02725, 2015 WL

5188812, at *3 (S.D.N.Y. Sept. 4, 2015) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). A declaratory judgment is available to adjudicate a present substantial controversy, not for relief from speculation regarding future injury. Any potential impact that a declaratory judgment might have on Defendant's future relationship with other non-parties who have yet to—and may never—materialize, "is just that—potential and speculative. In order for a declaratory judgment claim to 'satisfy the case-or-controversy requirement,' the dispute must be 'definite and concrete, touching the legal relations of parties having adverse legal interests . . . as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id*. at *4 (quoting *MedImmune, Inc.*, 549 U.S. at 127); *see also Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (Nathan, J.) ("As with any federal action, courts may not entertain actions for declaratory judgment 'when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments, and when there is no standing to maintain the action.'" (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968))). A potential and future fight over preemption does not satisfy the case-or-controversy requirement.

Accordingly, the Court, pursuant to Rule 56(f), grants summary judgment to Plaintiff dismissing Defendant's First Counterclaim.

VI.   Defendant's Second Counterclaim

Defendant's Second Counterclaim is a standalone claim for a permanent injunction which seeks an order "permanently enjoining the Plaintiffs from violating the TUPs" on the grounds that Plaintiffs have repeatedly violated the "the local laws in question." (Ans. ¶¶ 207-212). This

purported claim for relief[13] does not raise an issue of federal law, for it alleges only a violation of local law, which is not sufficient to establish federal question jurisdiction. *See, e.g., New York v. Shinnecock Indian Nation*, 686 F.3d 133, 138 (2d Cir. 2012) ("A cause of action raises an issue of federal law only when a right or immunity created by the Constitution or laws of the United States is an essential element of the cause of action." (cleaned up)).

Neither party moved with respect to Defendant's Second Counterclaim. Nevertheless, federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 237 (S.D.N.Y. 2019) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). Having dismissed all claims over which this Court has original jurisdiction, the Court declines to exercise jurisdiction over any outstanding state or local law claims. *See McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 158 n.6 (2d Cir. 2017) ("Of course, a district court may decline to exercise supplemental jurisdiction over state and local law claims if it has dismissed all claims over which it has original jurisdiction."); s*ee also Offor v. Mercy Med. Ctr.*, No. 17-CV-01872, 2018 WL 2947971, at *7 (S.D.N.Y. May 31, 2018) ("A federal district court may decline to exercise supplemental jurisdiction over pendent state law claims when it 'has dismissed all claims over which it has original jurisdiction.'" (quoting 28 U.S.C. § 1367(c)(3))).

Accordingly, the Court *sua sponte* dismisses without prejudice the Second Counterclaim on the ground that the Court lacks subject matter jurisdiction under Federal Rule of Civil Procedure 12(h)(3).

---

[13] The Court notes that the Second Counterclaim may not be a viable claim for relief in any event. "[A] request for injunctive relief is not a separate cause of action . . . . [R]ather, the injunction is merely the remedy sought for the legal wrongs alleged in the . . . substantive counts." *Milligan v. GEICO Gen. Ins. Co.*, No. 20-3726-CV, 2022 WL 433289, at *6 (2d Cir. Feb. 14, 2022). As all substantive claims have been dismissed, there no longer exists a basis for the injunctive remedy sought.

SPA-28

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's motion for summary judgment is GRANTED IN PART (Doc. 111). The motion is granted to the extent that the claims for relief alleged in the Complaint and Plaintiffs' fourth affirmative defense alleged in the Answer to the Counterclaims are dismissed. Defendant's motion is denied to the extent it sought summary judgment granting relief on its First Counterclaim. The Court grants summary judgment to Plaintiffs dismissing Defendant's First Counterclaim. The Court declines to exercise supplemental jurisdiction over Defendant's Second Counterclaim and dismisses it without prejudice.

Plaintiffs' request for oral argument (Doc. 118) is denied as unnecessary.

The Clerk of Court is respectfully requested to terminate the pending motions (Doc. 111 and Doc. 118) and close this case.

SO ORDERED:

Dated: White Plains, New York
      July 1, 2024

_____
Philip M. Halpern
United States District Judge

28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
DELUX PUBLIC CHARTER, LLC d/b/a JSX
AIR, et al.,

                           Plaintiffs,

          -against-                                  22 **CIVIL** 1930 (PMH)

                                               <u>**JUDGMENT**</u>

COUNTY OF WESTCHESTER, NEW YORK,
a charter county,
                             Defendant.
------------------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated July 1, 2024, Defendant's motion for summary

judgment is GRANTED IN PART (Doc. 111). The motion is granted to the extent that the claims

for relief alleged in the Complaint and Plaintiffs' fourth affirmative defense alleged in the

Answer to the Counterclaims are dismissed. Defendant's motion is denied to the extent it sought

summary judgment granting relief on its First Counterclaim. The Court has granted summary

judgment to Plaintiffs dismissing Defendant's First Counterclaim. The Court has declined to

exercise supplemental jurisdiction over Defendant's Second Counterclaim and it is dismissed

without prejudice. Plaintiffs' request for oral argument (Doc. 118) is denied as unnecessary;

accordingly, the case is closed.

**Dated:** New York, New York

      July 2, 2024

                                          **DANIEL ORTIZ**
                               _____
                                **Acting Clerk of Court**

           **BY:**        K. Mango
                                _____
                                   **Deputy Clerk**

SPA-30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
DELUX PUBLIC CHARTER, LLC, et al.,

                        Plaintiffs,

             -against-

COUNTY OF WESTCHESTER, et al.,

                        Defendants.
-----------------------------------------------------------X

**<u>ORDER</u>**

22-CV-01930 (PMH)

PHILIP M. HALPERN, United States District Judge:

On July 1, 2024, this Court entered an Opinion and Order that, *inter alia*, granted summary judgment to Defendant dismissing Plaintiffs' Complaint, granted summary judgment to Plaintiffs dismissing Defendant's First Counterclaim, and declined to exercise supplemental jurisdiction over Defendant's Second Counterclaim. (Doc. 120).[1] Plaintiffs filed a notice of appeal on July 12, 2024 (Doc. 123) and on July 19, 2024, filed a motion to stay the Court's Opinion and Order pending appeal or alternatively, for an injunction pending appeal and/or a temporary administrative stay (Doc. 124).[2]

The Court assumes the parties' familiarity with the underlying facts and procedural history of this case.[3]

Plaintiffs seek this relief because Defendant has demanded that by July 29, 2024, Plaintiffs commit to complying with the TUPs by October 31, 2024. "The standard in this circuit for a stay

---

[1] This decision is available on commercial databases. *Delux Pub. Charter, LLC v. Cnty. of Westchester, New York*, No. 22-CV-01930, 2024 WL 3252948 (S.D.N.Y. July 1, 2024).

[2] Plaintiffs do not specify in the Notice of Motion (Doc. 124) any rule or statute under which the motion is brought and the relief is sought, as required by Local Civil Rule 7.1(a).

[3] Unless otherwise indicated, defined terms have the same meanings and utilize the same format ascribed to them in the Opinion and Order.

SPA-31

or injunction pending appeal is (1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected." *LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir. 1994) (internal quotation marks omitted). "The 'probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay.'" *1199SEIU United Healthcare Workers E. v. PSC Cmty. Servs.*, 597 F. Supp. 3d 557, 570 (S.D.N.Y. 2022) (quoting *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002)). The probability of success on appeal and irreparable harm are "the two most critical factors." *Doe v. Trump Corp.*, No. 18-CV-09936, 2020 WL 2538400, at *6 (S.D.N.Y. May 18, 2020).

With respect to irreparable injury, Plaintiffs argue that in the absence of a stay or injunction, they will suffer irreparable harm if their appeal is ultimately successful, because Delux, JetSuiteX, and XO Global will be forced to cease their operations out of the Airport in the interim. (*See* Doc. 126, "Edmondson Decl." ¶¶ 49-51; Doc. 127, "Khurana Decl." ¶ 33).[4] They argue that will result in cancellation of hundreds of flights through March 2025, which will harm their reputation and goodwill, and require termination of contracts with local vendors. (Edmondson Decl. ¶¶ 51-52; Khurana Decl. ¶¶ 31-32, 41). Plaintiffs also contend that Defendant's enforcement of the TUPs violates their equal protection rights which constitutes a per se irreparable injury.

Plaintiffs fail to make the required showing of irreparable injury in the absence of the requested stay or injunction. First, the issue of whether the TUPs apply to Plaintiffs was not

---

[4] Blade provided written notice of its "intent to continue to comply with the TUPs" as it has not sold any scheduled, by-the-seat flights utilizing aircraft of more than 9 seats from HPN's FBOs since April 30, 2023 and continues to not sell any such flights. (Doc. 130-2). As such, no argument has been or could be made that Blade would suffer irreparable harm absent a stay.

determined in the Opinion and Order. This Court did not direct the enforcement of the TUPs against Plaintiffs—it simply determined that the 2005 Law is not preempted by the ADA or ANCA, such that there is no basis under those laws on which to enjoin Defendant from enforcing the TUPs; and that Plaintiffs failed to establish that the County violated their equal protection rights. (*See* Doc. 120). Other than the County, no one has determined that the TUPs apply to these Plaintiffs and in fact, this Court dismissed the First Counterclaim which arguably sought such a declaration. (*Id.*). Plaintiffs, by their instant motion, are seeking relief beyond the scope of that which is before this Court, without any authority or rule cited for the propriety of granting such relief.[5]

Second, and as a practical matter, Defendant's enforcement of the TUPs does not require Plaintiffs to cease operations out of the Airport or even to modify their operations if necessary until October 31, 2024. Rather, Plaintiffs could either operate out of the Airport in a manner that is exempt from the TUPs, like Blade, or utilize the Terminal in accordance with the TUPs. "[I]rreparable harm does not exist where alternatives are available to a movant, even if 'these alternatives are less convenient.'" *Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC*, No. 20-CV-05240, 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) (quoting *Molloy v. Metro Transp. Auth.*, 94 F.3d 808, 813 (2d Cir. 1996)); *see also Jayaraj v. Scappin*i, 66 F.3d 36, 39 (2d Cir. 1995) (noting injuries such as expenditures of money, time, and energy, are not enough to warrant preliminary injunction). Plaintiffs have not demonstrated the sort of destruction to their business that could not be remedied by money damages in the event Plaintiffs were to ultimately

---

[5] Plaintiffs is reading into the Court's holding that because the TUPs are not preempted, the Court impliedly found that the TUPs apply to these Plaintiffs. The Court ruled on the arguments presented to it by the parties, as limited by the parties' narrowing of the claims and theories. (*See, e.g.,* Doc. 120 at 5-6). To the extent Plaintiffs take that holding concerning preemption as this Court authorizing or directing the County to enforce the TUPs against Plaintiffs, they are mistaken. The Court issued no such ruling in the Opinion and Order. The applicability of the TUPs to Plaintiffs can and should be the subject of a plenary action; and not a motion for a stay or injunction pending appeal of this Court's Opinion and Order here.

SPA-33

succeed on appeal. Indeed, Plaintiffs have not established that they would be put entirely out of business if they did cease operating at the Airport, as Plaintiffs appear to offer flights at airports other than HPN. (*See, e.g.,* Edmondson Decl. ¶ 19 ("JSX [Delux and JetSuiteX] is uniquely qualified to serve 4,500 public use airports that are not served by any major carriers and that do not have an airline terminal at all.")). With respect to Plaintiffs' argument concerning the presumption of irreparable injury arising from an allegation of a constitutional violation, "once the Court considers and concludes that the likelihood of success element has not been met, as it does here, the mere allegation of a constitutional violation is insufficient to establish irreparable harm." *Students for Fair Admissions v. United States Mil. Acad. at W. Point*, No. 23-CV-08262, 2024 WL 36026, at *12 (S.D.N.Y. Jan. 3, 2024). Accordingly, this factor weighs against issuance of a stay or injunction.

"Because allowing the Judgment to remain in effect pending appeal will not cause any serious irreparable harm, it would take a strong showing of likelihood of success in the circuit court to justify a stay or injunction." *United States v. New York City Bd. of Educ.*, 620 F. Supp. 2d 413, 417 (E.D.N.Y. 2009). Plaintiffs, in that regard, argue that they have presented "serious questions of federal law over which there is at least a substantial possibility the Second Circuit will disagree with the Court." (Doc. 125 at 15). Plaintiffs rehash certain arguments that were previously argued and rejected in the Court's Opinion and Order. They argue that if the 2005 Law is read to apply to them it reduces or limits their operations and therefore falls outside the scope of ANCA's grandfather clause. As the Court explained in careful detail in the Opinion and Order, however, that argument is not supported by the record, especially in light of the context of the issues as framed by Plaintiffs themselves. (*See* Doc. 120 at 10-13). Plaintiffs also argue that the Proprietor Exception to the ADA express preemption clause is narrowly applied to regulations of

4

noise and environmental concerns and not necessarily to regulations outside of those areas. However, as set forth in the Opinion and Order, that argument is not supported by the law in this Circuit. (*See id.* at 14-16). With respect to the equal protection claim, Plaintiffs misconstrue and cherry-pick from the Opinion and Order: the Court did not weigh credibility. It explained that Plaintiffs' denials in the Rule 56.1 Statement failed to create an issue of fact where they either did not actually respond to the stated fact or cited to evidence that, upon review, actually supported Defendant's stated fact. (Doc. 120 at 18-21 & n.8). The Court did not, as Plaintiffs argue, read the evidence to favor the County. This was not a choice "between two interpretations of the same evidence." (*Id.* at 19).

Plaintiffs also argue that there is at least a substantial possibility the Circuit will conclude that the 2005 Law is preempted by ANCA because there is "little direct guidance" about the scope of the grandfather clause (Doc. 125 at 17) and whether a regulation forcing an air carrier to operate out of a main terminal rather than an FBO is preempted by the ADA is a question of first impression in the Second Circuit (*id.* at 20). As to these arguments, Plaintiffs do not contend, nor could they, that Defendant lacks colorable arguments to present to the Circuit. The sheer possibility of a reversal—a possibility that exists in every appeal—is insufficient for the Court to find an injunction, stay, or administrative stay is necessary here. Indeed, that argument is a far cry from "a strong showing of likelihood of success in the circuit court to justify a stay or injunction." *Id.* Accordingly, this factor too weighs against issuance of a stay or injunction.

Plaintiffs further argue that issuance of the stay will not substantially injure Defendant because it went several years without taking any action to enforce the 2005 Law against Plaintiffs and therefore there is no "urgent need for the County to cancel Plaintiffs' popular services." (Doc. 132 at 7). Defendant does not appear to offer any argument to the contrary, except to maintain that

SPA-35

Plaintiffs' position is "merely laches with a different label" which this Court previously rejected. (Doc. 120 at 24). As Defendant has not identified an injury – let alone a substantial injury – that a stay or injunction would cause, this factor weighs in favor of Plaintiffs. As to the public interest, while the County has a proprietary right to regulate ground congestion, passenger safety, and allocate space at the Airport, weighing against issuance of a stay or injunction, the public also has an interest in the execution of air travel as planned, and canceling hundreds of flights through March 2025 would significantly disrupt that planned air travel.

Because at least the two most critical factors weigh against granting a stay, injunction, or administrative stay, the motion for a stay, injunction, and/or administrative stay pending appeal is DENIED.

The Clerk of Court is respectfully requested to terminate the pending motion (Doc. 124).

Dated: White Plains, New York
       July 25, 2024

SO ORDERED:

_____
Philip M. Halpern
United States District Judge