## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC.,

      Plaintiffs - Counter-Defendants - Appellants,

  -v-

COUNTY OF WESTCHESTER, NEW YORK, a charter county; APRIL GASPARRI, in her official capacity as AIRPORT MANAGER; and AVPORTS, LLC,

      Defendants - Counter-Claimants - Appellees.

Civil Action No.: 24-1895

## BRIEF FOR AMICI CURIAE
## THE NATIONAL BUSINESS AVIATION ASSOCIATION, INC.,
## THE NATIONAL AIR TRANSPORTATION ASSOCIATION, INC.,
## CORPORATE FLIGHT MANAGEMENT, INC. D/B/A CONTOUR
## AVIATION, AND PRIME JET LLC, IN SUPPORT OF
## THE PLAINTIFFS - COUNTER-DEFENDANTS - APPELLANTS

KMA ZUCKERT LLP

David Y. Loh, Esq.
Nicholas E. Pantelopoulos, Esq.
1350 Broadway, Suite 2410
New York, NY 10018
dloh@kmazuckert.com
nep@kmazuckert.com
tel. (212) 922-0450

Jolyon ("Jol") A. Silversmith, Esq.
Barbara M. Marrin, Esq.
888 17th Street, N.W., Suite 620
Washington, D.C. 20006
jsilversmith@kmazuckert.com

LARS LIEBELER PC

Lars H. Liebeler, Esq.
900 Seventh Street, N.W., Suite 725
Washington, DC 20001
tel. (202) 774-1510
lliebeler@lhl-lawfirm.com

Counsel for *Amicus Curiae* the National Air Transportation Association, Inc.

bmarrin@kmazuckert.com
tel. (202) 298-8660

Counsel for *Amici Curiae* the National
Business Aviation Association, Inc. the
National Air Transportation Association,
Inc., Corporate Flight Management, Inc.
d/b/a Contour Aviation, and Prime Jet LLC

## **Corporate Disclosure Statement**

Pursuant to Fed. R. App. Proc. 26.1, counsel for Amici Curiae the National Business Aviation Association, Inc. ("NBAA"), the National Air Transportation Association, Inc. ("NATA"), Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), and Prime Jet LLC ("Prime Jet") states as follows: NBAA and NATA are both non-stock corporations and do not have parent corporations. Contour has no parent corporation, but more than 10% of its stock is held by SkyWest, Inc., a publicly-held corporation. Prime Jet has no parent corporation and no publicly-held corporation owns 10% or more of its stock.

/s/ David. Y. Loh

Counsel for *Amici Curiae* the National Business Aviation Association, Inc., the National Air Transportation Association, Inc., Corporate Flight Management, Inc. d/b/a Contour Aviation, and Prime Jet LLC

i

**<u>Table of Contents</u>**

Corporate Disclosure Statement .................................................................... i

Table of Contents ....................................................................................... ii

Table of Authorities .................................................................................. iii

Statement of Interest ................................................................................. 1

Argument ................................................................................................... 3

    I.      Part 135 Carriers Play a Critical Role in the National Airspace System ... 4

    II.    Part 135 Carriers Support the Congressional Goals of the Airline
          Deregulation Act ......................................................................... 7

    III.   This Case has National Implications for the Preemption of Operations by
          Part 135 Carriers .......................................................................... 9

    IV.   The County's Requirements Additionally Are Inconsistent with ANCA
          ....................................................................................................... 10

Conclusion ................................................................................................ 12

Certificate of Service ................................................................................ 15

Certificate of Compliance ......................................................................... 16

## Table of Authorities

**Cases**

*Arapahoe County Public Airport Authority v. FAA*, 242 F.3d 1213 (10th Cir. 2001) ................................................................................................................. 10

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133 (2d Cir. 2016) ................................................................................. 12

*Huntleigh Corp. v. Louisiana State Board of Private Security Examiners*, 906 F. Supp. 357 (M.D.La. 1995) ............................................................. 8

*McLaughlin v. TWA Getaway Vacations, Inc.*, 979 F. Supp. 174 (S.D.N.Y. 1987) ................................................................................................................. 4

*Med-Trans Corp. v. Benton*, 581 F. Supp.2d 721 (E.D.N.C. 2008) ................... 8

*Morales v. Trans World Airlines*, 504 U.S. 374, 378 (1992) .......................... 9

*Valley Med Flight, Inc. v. Dwelle*, 171 F. Supp.3d 930 (D.N.D. 2016) ............ 8

**Statutes**

49 U.S.C. § 40101 ............................................................................................. 7

49 U.S.C. § 41713 (Airline Deregulation Act of 1978) .......................... *passim*

49 U.S.C. § 47524 (Airport Noise and Capacity Act of 1990) ......... 3, 10, 11, 12

**Regulations**

14 C.F.R. Part 121 ..................................................................................... 4, 5, 8

14 C.F.R. Part 135 ...................................................................................... *passim*

14 C.F.R. Part 161 ........................................................................................... 10

14 C.F.R. § 161.7 ........................................................................................... 12

14 C.F.R. Part 380 .................................................................................. 2, 4, 5, 12

49 C.F.R. Part 1542 .................................................................................................... 9

**Rules**

Fed. R. App. Proc. 29 ................................................................................................... 1

**Federal Register Notices**

*Regulatory Review Program; Air Taxi Operators and Commercial Operators*,
    Final Rule, 43 Fed. Reg. 46742 (October 10, 1978) ........................................ 5

**Administrative Materials**

*Forman v. Palm Beach County, Florida*, FAA Docket No. 16-17-13, Final Agency
    Decision (January 10, 2021) ................................................................................ 11

*General Aviation and Part 135 Activity Survey* (January 25, 2022) ...................... 6

*Report to Congress:* Updated *Study of Operators Regulated Under Part 135*
    (March 28, 2023) .................................................................................................... 6

Letter from Susan L. Kurland, Associate Administrator for Airports, FAA, to John
    Ferraro, President, Council of the City of Los Angeles (July 17, 1996) ....... 11

*TSA by the Numbers* (May 19, 2021) ......................................................................... 6

**Congressional Materials**

H. Rept. 95-1779 (October 12, 1978) ........................................................................... 7

## Statement of Interest

The National Business Aviation Association, Inc. ("NBAA"), the National Air Transportation Association, Inc. ("NATA"), Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), and Prime Jet LLC ("Prime Jet") respectfully submit this Brief pursuant to Fed. R. App. Proc. 29 in support of the Plaintiffs - Counter-Defendants – Appellants ("Appellants").[1] All of the Appellants are members of NBAA; the Appellants Delux Public Charter, LLC and XO Global, LLC are members of NATA and all of the Appellants are business partners of multiple members of NATA; and Contour and Prime Jet have business relationships with the Appellant XO Global, LLC.

NBAA, NATA, Contour, and Prime Jet submit the Brief to assist this Court by virtue of their experience and perspective regarding the important role air carriers authorized to operate under Part 135 of the Federal Aviation Regulations ("FARs") play in the national airspace system ("NAS") – and the national policy implications of a local airport adopting regulations that potentially could impede the safe and efficient use of the NAS.[2]

---

[1] Amici certify, as required by Fed. R. App. Proc. 29(a)(4)(E), that their counsel has authored the Brief and no other person, including the parties or their counsel, have contributed money intended to fund preparing or submitting the Brief.

[2] All parties have consented to the filing of this Brief, so Amici understand that no motion is required, consistent with Fed. R. App. Proc 29(a)(2).

Founded in 1947, NBAA is a nationally-recognized, non-profit trade association which represents the interests of more than 11,000 members that collectively operate more than 11,000 aircraft in connection with their business or are otherwise involved in business aviation. NBAA, its membership, its history, its mission, and its activities are described in detail at http://www.nbaa.org.

Founded in 1940, NATA is a nationally-recognized, non-profit trade association which represents the interests of more than 3,700 businesses which provide support services to general aviation, including but not limited to fixed-base operations, charter operations, and flight training. NATA, its membership, its history, its mission, and its activities are described in detail at http://www.nata.aero.

Corporate Flight Management, Inc. was established in 1982 and under the Contour Aviation brand organizes public charters operated pursuant to 14 C.F.R. Part 135 and marketed pursuant to 14 C.F.R. Part 380, including in coordination with one of the Appellants, XO Global, LLC. Contour, its history, and its activities are described in detail at https://www.contouraviation.com.

Prime Jet LLC ("Prime Jet") was established in 2002 and provides aircraft charter, management, and other services, including the operation of aircraft under 14 C.F.R. Part 135 in support of public charters marketed pursuant to 14 C.F.R. Part 380 by one of the Appellants, XO Global, LLC. Prime Jet, its history, and its activities are described in detail at https://primejets.com.

2

NBAA and NATA both routinely engage with issues related to Part 135 operations at the national, state, and local levels, including the importance of preserving access to airports throughout the United States. Those airports and that access are increasingly under threat, to the detriment of the public interest. In many cases, the restrictions on the use of an airport have been shown to be both unnecessary and illegal, based upon a full and fair understanding of the underlying facts and law. In addition to other advocacy, NBAA and NATA frequently have participated in court and administrative litigation to prevent the limitation of operations at airports. Protection of the safe and efficient use of the NAS is of significant concern to NBAA and NATA. Contour and Prime Jet also share those interests as Part 135 operators, as well as an interest in the outcome of this litigation, including because of their business relationships with one of the Appellants, XO Global, LLC.

## Argument

At issue in this case is a matter of national importance – whether an airport may impose restrictions that would effectively enable the disassembly of the national airspace system, allowing parochial decisions to override federal law, by limiting the operations of air carriers that benefit consumers and competition. The Airline Deregulation Act of 1978 and the Airport Noise and Capacity Act of 1990

were specifically intended to prevent such restrictions, and accordingly the judgment below should be reversed, for the reasons further stated below.

## I. Part 135 Carriers Play a Critical Role in the National Airspace System

Part 135 of Title 14 of the Code of Federal Regulations establishes the operating requirements for commuter and on-demand air carrier operations, in addition to and in contrast to mainline airline operations, which are regulated under Part 121 instead. Part 135 carriers – including on-demand operators such as the Appellants – provide vital services to underserved communities, linking them to larger communities and airports, such as Westchester County Airport ("HPN"). As background, Part 135 on-demand operations are conducted using aircraft with 30 seats or less with a maximum payload capacity of 7,500 pounds. These services can be marketed to the public as charter operations via 14 C.F.R. Part 380 – essentially, the "economic" regulations which work in parallel with the "technical" requirements of Part 135 – as the Appellants do.[3]

In order to receive Part 135 authority, operators must apply to the FAA for a certificate, which sets forth requirements for matters such as operational control,

---

[3] Amici understand that certain Appellants are not themselves Part 135 operators but instead contract with Part 135 operators, and themselves hold out services to the public under 14 C.F.R. Part 380 as indirect air carriers. But the same principles – of preemption and otherwise – are applicable. *See, e.g., McLaughlin v. TWA Getaway Vacations, Inc.*, 979 F. Supp. 174, 176 (S.D.N.Y. 1997). For simplicity this Brief refers to Part 135 air carriers throughout this Brief.

training, crewmember qualifications, and equipment. Additionally, the Transportation Security Administration ("TSA") sets forth the security requirements for the operation of aircraft in the United States, including requirements to operate into and out of a "sterile" area at an airport. However, the TSA does *not* require Part 135 on-demand operators (and any associated Part 380 public charter programs) to operate in and out of a sterile area at an airport, in contrast to the more detailed requirements applicable to Part 121 carriers. Therefore, Part 135 on-demand operations are an attractive business model for many corporate aviation departments as well as for other operators, including to hold out small-scale passenger services to the general public – as do the Appellants in this case.

The FAA long has recognized the importance of Part 135 carriers in the NAS. In updating Part 135 in 1978 to enhance the safety standards under which those carriers operate, the FAA noted that "the commuter air carrier industry has become an increasingly important part of the Nation's air transportation system," stating that they fill a vital role in service to smaller communities when larger carriers withdraw service. *See Regulatory Review Program; Air Taxi Operators and Commercial Operators*, Final Rule, 43 Fed. Reg. 46742, 46742 (October 10, 1978).

And the importance of Part 135 operators has only increased since 1978. FAA data supports the proposition that Part 135 operators offer valuable connectivity to smaller communities. According to an FAA study, in Fiscal Year 2016, 3,285 airports in the U.S. reported enplanements by on-demand Part 135 carriers, while only 675 airports in the U.S. reported scheduled passenger service. *See Report to Congress: Updated Study of Operators Regulated Under Part 135*, at 21 (March 28, 2023) (https://www.faa.gov/sites/faa.gov/files/PL_115-141_Study_of_Operators_Regulated_Under_Part_135.pdf). In other words, Part 135 operations provide access to the vast majority of U.S. airports, which do not have mainline airline service (and/or TSA security).[4] Likewise, even at the height of the COVID-19 pandemic, Part 135 on-demand carriers operated over six thousand aircraft for over 2.3 million hours of flight time. *See General Aviation and Part 135 Activity Survey*, Chapter 1 (January 25, 2022) (https://www.faa.gov/data_research/aviation_data_statistics/general_aviation/cy2020).

Recognizing that Part 135 operations are important to the U.S. economy, but also are distinct from mainline airline operations, FAA and TSA have developed

---

[4] In fact, TSA itself indicates (and the Court may take notice) that the agency operates at only 440 airports, so the percentage of airports that have access to the world primarily or only via Part 135 appears to actually be even higher. *See TSA by the Numbers*, https://www.tsa.gov/news/press/factsheets/tsa-numbers (May 19, 2021).

separate regulatory regimes to ensure that they are both safe and secure. Allowing an airport proprietor to impose requirements on Part 135 operations that the federal government has deemed to be unnecessary could have far-reaching implications for this important class of air carriers, restricting and reducing consumer access to air transportation.

To assist the Court, we first briefly discuss the history of the Airline Deregulation Act of 1978 ("ADA") – and then the history of airport proprietors attempting to impose access restrictions against Part 135 operators, which typically have been followed by FAA and court rulings that such restrictions are inappropriate and illegal.

## II. Part 135 Carriers Support the Congressional Goals of the Airline Deregulation Act

In 1978, when President Carter signed the ADA – including the preemption language now specifically codified at 49 U.S.C. § 41713(b) – into law, a guiding principle for the transformation of aviation was "the encouragement of air service at major urban areas through secondary or satellite airports" and "placing maximum reliance on competition in providing air transportation services." *See* H. Rept. 95-1779 (October 12, 1978). Congress codified these goals as national public policy at 49 U.S.C. § 40101(a)(6).

Since this mandate was adopted, Part 135 carriers have been providing unique, competitive service to secondary and satellite airports, fulfilling one of

7

Congress' key goals in the deregulation of the airline industry. The courts have recognized that Part 135 air carriers are as much within the scope of the ADA as Part 121 air carriers. *See, e.g., Valley Med Flight, Inc. v. Dwelle*, 171 F. Supp.3d 930, 933-34 (D.N.D. 2016); *Med-Trans Corp. v. Benton*, 581 F. Supp.2d 721, 732 (E.D.N.C. 2008).

Airports routinely have attempted to limit access to their facilities, in some cases with good intentions. But the safety and security of air carriers, as well as their economics, is firmly a federal interest and governed exclusively by federal law. Endeavors to limit the services of Part 135 carriers fall squarely within the preemption provisions of the ADA, found at 49 U.S.C. § 41713(b), which prohibit states and municipalities from enforcing laws that affect an air carrier's rates, routes, or services. By requiring a Part 135 air carrier to depart or arrive at a sterile area at HPN, the municipality is affecting the services that may be offered by such carriers and inappropriately interfering with the national public policy to place maximum reliance on competitive market forces in the NAS. *See, e.g.*, *Huntleigh Corp. v. Louisiana State Board of Private Security Examiners*, 906 F. Supp. 357, 362 (M.D.La. 1995) (holding regulation of pre-departure security screening to be preempted).

Indeed, applying the local regulations at issue not only would force a Part 135 air carrier to comply with requirements that the federal authorities have

8

determined that they do not need to meet, but would actually prohibit them from operating services to HPN that depart from smaller airports which do not have sterile areas, because intermixing such traffic is prohibited by TSA. *See generally* 49 C.F.R. Part 1542. The Appellee does not dispute that. However, consequentially it is not just burdening Part 135 aviation but actively substituting its own judgment in place of the national aviation policy as to what operations can and should be allowed at HPN at all (including from underserved communities). FAA and TSA, the expert agencies, have carefully crafted regulations to govern Part 135 carriers – and many operators have developed their business model around these regulations. Their work must be given deference and a municipality should not allowed to set a precedent that would not only harm consumers and competition locally, but also help effectuate the piecemeal disassembly of the NAS, if the same strategy should be adopted by other airports.

## III. This Case has National Implications for the Preemption of Operations by Part 135 Carriers

The reasoning behind the federal policy of promoting competitive aviation services without local interference is well-established and soundly-based. "To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision." *Morales v. Trans World Airlines*, 504 U.S. 374, 378 (1992). Airport operators across the country, cognizant

9

of the reach of the ADA, routinely have attempted to limit access to their airports – and those efforts typically have been denied in short order.

Although municipalities may exercise some proprietary powers over airport operations – such as restrictions on noise generated by ground equipment – such powers nevertheless must be exercised consistent with applicable statutes and in a manner that is "reasonable, nondiscriminatory, nonburdensome to interstate commerce." *See Arapahoe County Public Airport Authority v. FAA*, 242 F.3d 1213, 1222 (10th Cir. 2001). In *Arapahoe County*, the airport proprietor tried to prohibit "commercial" operations at its airport. The Tenth Circuit determined that the local ordinance was preempted, in part because the prohibition affected "route determinations because the carrier cannot conduct regular operations over any route involving the banned airport." *Id.* Similarly, when an airport proprietor requires a Part 135 operator to undertake security procedures that are not required by TSA in order to operate to or from the airport, the airport is necessarily affecting both route and service decisions that are exclusively within the purview of the operator. It is therefore important not just locally but nationally that the restrictions at issue in this case be confirmed to be preempted and unenforceable.

## IV. The County's Requirements Additionally Are Inconsistent with ANCA

Business and general aviation unfortunately are regularly under attack by localities that seek to limit access to aircraft operators due to perceived issues,

often invoking complaints about noise or the environment. In 1990, Congress established a regulatory regime for airport proprietors seeking to propose certain restrictions. Working within the confines of the processes authorized by the Airport Noise and Capacity Act ("ANCA"; 49 U.S.C. § 47524, *et seq.*) and promulgated at 14 C.F.R. Part 161 to institute restrictions, airport proprietors have the option to impose access restrictions legally. That process is deliberately designed to ensure that any restrictions are justified and as limited as possible, as well as to encourage proprietors to coordinate with their tenants and users to find workable solutions.

In this case, the Appellee argues that the restrictions purportedly applicable to the Appellants are "grandfathered" under ANCA – *i.e.*, exempted from the FAA approval process because they were in effect before ANCA was adopted. But the grandfathering provisions must be narrowly interpreted – and also only would be exemptions from ANCA, not the ADA. *See, e.g., Forman v. Palm Beach County, Florida*, FAA Docket No. 16-17-13, Final Agency Decision, at 6 (January 10, 2021) ([https://downloads.regulations.gov/FAA-2017-0854-0039/attachment_1.pdf](https://downloads.regulations.gov/FAA-2017-0854-0039/attachment_1.pdf)) (FAA will analyze grandfathering only via the lens of enacted ordinances, not local practices). *See also* Letter from Susan L. Kurland, Associate Administrator for Airports, FAA, to John Ferraro, President, Council of the City of Los Angeles (July 17, 1996) (advising that curfew extension did not qualify for grandfathering)

(https://www.faa.gov/sites/faa.gov/files/airports/environmental/airport_noise/part_161/Van_Nuys_7_17_96.pdf).

In this case, certain restrictions adopted by the County prior to ANCA – subsequently recognized by the FAA to be grandfathered – were not intended to apply to Part 135 operators or Part 380 operations. The County seemingly agrees. Instead, the County relies on the terms of a later amendment to purportedly sweep such operators and operations within the scope of the HPN restrictions. But those later-in-term amendments would reduce or limit aircraft operations without the FAA's approval, and thus were improperly enacted by the County without compliance with ANCA's procedural thresholds (*see, e.g.*, 49 U.S.C. § 47524(d)(4) and 14 C.F.R. § 161.7(b)(4)). As a result, ANCA also renders them unenforceable. *See Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 147 (2d Cir. 2016).

## Conclusion

This case has national implications. Airport proprietors often try to implement rules and regulations to limit certain kinds of air traffic that they consider to be undesirable. The nation's airports are watching this case, to see if it provides a means to circumvent the ADA, ANCA, and other federal requirements.

But that would contravene public policy and Congressional intent, and should not be sanctioned by this Court. In this case, the airport proprietor

apparently does not deny that a deliberate access restriction is at issue. If allowed to stand, other airports will certainly attempt to likewise curtail Part 135 operations. But allowing all operators to function within the confines of their FAA and TSA authority is a bedrock principle of the NAS, as implemented through the ADA and ANCA. Encouraging alternative operations, to include scheduled and on-demand Part 135 services is consistent with Congressional public policy, is within the public interest, and should and must be allowed to continue without interference at HPN.

Respectfully submitted,

Dated:  New York, New York
        September 10, 2024          KMA ZUCKERT LLP

                                    /s/ David Y. Loh
                                    David Y. Loh, Esq.
                                    Nicholas E. Pantelopoulos, Esq.
                                    1350 Broadway, Suite 2410
                                    New York, New York 10018
                                    Tel. (212) 922-0450
                                    dloh@kmazuckert.com
                                    nep@kmazuckert.com

                                    -and-

                                    Jolyon ("Jol") A. Silversmith, Esq.
                                    Barbara M. Marrin, Esq.
                                    888 17th Street, N.W., Suite 620
                                    Washington, D.C. 20006
                                    Tel. (202) 298-8660
                                    jsilversmith@kmazuckert.com
                                    bmarrin@kmazuckert.com

                                    Counsel for *Amici Curiae* the National
                                    Business Aviation Association, Inc., the
                                    National Air Transportation Association,
                                    Inc., Corporate Flight Management, Inc.
                                    d/b/a Contour Aviation, and Prime Jet LLC

                                    LARS LIEBELER PC

                                    Lars H. Liebeler, Esq.
                                    900 Seventh Street, N.W., Suite 725
                                    Washington, DC 20001
                                    Tel. (202) 774-1510
                                    lliebeler@lhl-lawfirm.com

                                    Counsel for *Amicus Curiae* the National Air
                                    Transportation Association, Inc.

14

**<u>Certificate of Service</u>**

On September 10, 2024, this brief was served via CM/ECF on all registered

counsel and transmitted to the Clerk of the Court.

<u>/s/ David Y. Loh</u>

Counsel for *Amici Curiae* the National
Business Aviation Association, Inc., the
National Air Transportation Association,
Inc., Corporate Flight Management, Inc.
d/b/a Contour Aviation, and Prime Jet LLC

## <u>Certificate of Compliance</u>

This brief complies with: (1) the type-volume limitation of Local Rule 32.1(a)(4)(A) and Fed. R. App. Proc. 32(a)(7)(B) because it contains 2,794 words, excluding the parts of the brief exempted by Fed. R. App. Proc. 32(f); and (2) the typeface requirements of Fed. R. App. Proc. 32(a)(5) and the type style requirements of Fed. R. App. Proc. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

<u>/s/ David Y. Loh</u>

Counsel for *Amici Curiae* the National Business Aviation Association, Inc., the National Air Transportation Association, Inc., Corporate Flight Management, Inc. d/b/a Contour Aviation, and Prime Jet LLC