# 24-1895-cv

## United States Court of Appeals
## for the Second Circuit

DELUX PUBLIC CHARTER, LLC, DBA JSX AIR, DBA JETSUITEX, INC.,
XO GLOBAL, LLC, BLADE URBAN MOBILITY, INC.,

*Plaintiffs-Counter-Defendants-Appellants,*

v.

COUNTY OF WESTCHESTER, NEW YORK, A CHARTER COUNTY,

*Defendant-Counter-Claimant-Appellee,*

APRIL GASPARRI, IN HER OFFICIAL CAPACITY AS AIRPORT MANAGER,
AVPORTS, LLC,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### BRIEF FOR APPELLEE COUNTY OF WESTCHESTER

JOHN M. NONNA
Westchester County Attorney
JUSTIN R. ADIN
Asst. Chief Deputy County Attorney
148 Martine Avenue
600 Michaelian Office Building
White Plains, New York 10601
Telephone: (914) 995-2893
Attorneys for Westchester County

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF JURISDICTION .............................................................. 3

STATEMENT OF THE ISSUES .................................................................... 3

STATEMENT OF FACTS .............................................................................. 4

    I. Federal Regulatory Scheme—The ADA and ANCA ................................. 4

        A. The Airline Deregulation Act of 1978 ............................................. 4

        B. The Airport Noise and Capacity Act of 1990 ................................. 5

    II. History of The Terminal Use Procedures ................................................ 5

        A. The *Midway* Litigation ...................................................................... 6

        B. The TUPs and Initial Implementation ............................................ 7

        C. The 2004 Codification ....................................................................... 8

        D. The 2005 Amendment ....................................................................... 9

    III. The Relevant Specific Amendments ..................................................... 10

    IV. Appellants Operate at HPN ................................................................. 11

    V. Litigation .............................................................................................. 13

SUMMARY OF ARGUMENT ...................................................................... 18

STANDARD OF REVIEW ............................................................................ 20

ARGUMENT .................................................................................................. 21

    I. The 2005 TUPs Are Not Preempted By ANCA .............................. 21

## TABLE OF CONTENTS
### (Continued)

Page

A. The 2004 TUPs Are Grandfathered.................................................. 21

B. The TUPs Always Applied to Part 380 Operators ......................... 23

C. The 2005 Amendments Arguably Reduced Restrictions ............................. 26

    1. The History and Purpose of the TUPs ................................. 27

    2. The 2004 TUPs Differentiated by Type of Service ............................ 29

D. There Was No Reduction or Limitation of Aircraft Operation................... 32

II. THE 2005 TUPS ARE NOT PREEMPTED UNDER THE ADA ............................... 33

A. The Breadth of the Proprietor's Exemption.................................... 34

B. The 2005 TUPs Fall Within the Proprietor's Exemption............................. 36

C. The 2005 TUPs Are Reasonable and Nonarbitrary ....................................... 39

III. APPELLANTS' POLICY ARGUMENTS ARE MISPLACED ......................................... 44

IV. THERE IS NO EQUAL PROTECTION VIOLATION ................................................. 47

A. Comparators.................................................................... 48

B. Rational Basis............................................................... 51

CONCLUSION .......................................................................... 54

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Am. Airlines, Inc. v. DOT*, 202 F.3d 788 (5th Cir. 2000), *cert. denied*, 530 U.S. 1274 (2000) ................................................................................................35, 36, 37

*Boykin v. KeyCorp*, 521 F.3d 202 (2d Cir. 2008) .................................................. 22

*Clubside, Inc. v. Valentin*, 468 F.3d 144 (2d Cir. 2006) ....................................... 47

*Cnty. of Westchester v. Blade Urban Air Mobility, et al.*, Index No. 57179/2022 (Sup. Ct. Westchester Cnty.) ................................................................................... 13

*Condor Corp. v. City of St. Paul*, 912 F.2d 215 (8th Cir. 1990) ............................ 33

*Dig. Realty Trust, Inc. v. Somers*, 583 U.S. 149 (2018) ....................................... 30

*Ehrens v. Lutheran Church*, 385 F.3d 232 (2d Cir. 2004) ..................................... 20

*F.C.C. v. Beach Communications*, 508 U.S. 307 (1993) ....................................... 53

*Fappiano v. City of N.Y.*, 640 F. App'x 115 (2d Cir. 2016) ................................... 20

*Fourth Quarter Props. IV v. City of Concord*, 127 F. App'x 648 (4th Cir. 2005) ................ 33

*Global Int'l Airways Corp. v. Port Auth. of N.Y. & N.J.*, 727 F.2d 246 (2d Cir. 1984) ...............................................................................................40, 43

*Gustafson v. City of Lake Angelus*, 76 F.3d 778 (6th Cir. 1996) ............................ 33

*Hoagland v. Tn. of Clear Lake*, 415 F.3d 693 (7th Cir. 2005) ............................... 33

*Hu v. City of N.Y.*, 927 F.3d 81 (2d Cir. 2019) ...............................................48, 50

*In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171 (2d Cir. 2021) ..................... 24

*Johnson v. Baker*, 108 F.3d 10 (2d Cir. 1997) ..................................................... 53

*Jones v. Goodrich Pump & Engine Control Sys.*, 86 F.4th 1010 (2d Cir. 2023) ................... 25

*Loesel v. City of Frankenmuth*, 692 F.3d 452 (6th Cir. 2012) ............................... 48

*Louisville Gas & Electric Co. v. Coleman*, 277 U.S. 32 (1928) ............................. 44

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................................... 21

*Marine Carriers Corp. v. Fowler*, 429 F.2d 702 (2d Cir. 1970) ........................................29, 32

*McKinney v. City of Middletown*, 49 F.4th 730 (2d Cir. 2022) .............................................. 49

*Midway Airlines, Inc. v. Cnty. of Westchester*, 584 F. Supp. 436 (S.D.N.Y. 1984) ................. 6

*Neilson v. D'Angelis*, 409 F.3d 100 (2d Cir. 2005) ................................................................. 48

*NLRB v. Lion Oil Co.*, 352 U.S. 282 (1957) ........................................................................... 29

*Palm Beach Cnty. v. Fed. Aviation Adm'r*, 53 F.4th 1318 (11th Cir. 2022) ........................ 22

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) .............................................................. 29

*Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152 (2d Cir. 2003) ........................... 31

*Progressive Credit Union v. City of N.Y.*, 889 F.3d 40 (2d Cir. 2018) .............................51, 53

*Russello v. United States*, 464 U.S. 16 (1983) ....................................................................... 25

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ...................................................................... 22

*Skysign Int'l v. City & County of Honolulu*, 276 F.3d 1109 (9th Cir. 2002) ........................ 33

*Sosa v. Alvarez-Machain*, 542 U.S. 711 (2004) ...................................................................... 25

*Tolbert v. Smith*, 790 F.3d 427 (2d Cir. 2015) ....................................................................... 20

*United States v. Sineneng-Smith*, 590 U.S. 371 (2020) ........................................................ 45

*W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 658 F. Supp. 952 (S.D.N.Y. 1986), *aff'd*, 817 F.2d 222 (2d Cir. 1987), *cert. denied sub nom Delta Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 485 U.S. 1006 (1988) ......................passim

**Statutes**

28 U.S.C. § 1291 ....................................................................................................................... 3

28 U.S.C. § 1331 ....................................................................................................................... 3

28 U.S.C. § 1343 ....................................................................................................................... 3

49 U.S.C. § 41713 ..................................................................................................................... 4

49 U.S.C. § 44706 ................................................................................. 44

49 U.S.C. § 47521 ................................................................................... 5

49 U.S.C. § 47523 ................................................................................... 5

49 U.S.C. § 47524 ................................................................ 5, 21, 22, 23

49 U.S.C. § 47533 ................................................................................... 5

9 U.S.C. § 41713 ................................................................................... 33

Laws of Westchester Cnty. § 107.11 ....................................................... 9

Laws of Westchester Cnty. § 107.31 ....................................................... 9

Laws of Westchester Cnty. § 712.462 ............................................. 5, 8, 41

Pub. L. No. 95-504, 92 Stat. 1705 (1978) ............................................... 4

Westchester Cnty. Local Law 21-2005 ................................................... 9

**Other Authorities**

Congressman Nick Langworthy Introduces Bipartisan Safer Skies Act to Close
      Loopholes in Airport Security (Aug. 5, 2024),
      https://langworthy.house.gov/media/press-releases/congressman-nick-
      langworthy-introduces-bipartisan-safer-skies-act-close (last visited
      December 3, 2024) ..................................................................... 47

M. Patke & J. Robinson, Modern Currency PR, *Award-winning Air Carrier JSX
      Launches New Sun & Ski Routes to Florida and Salt Lake City Starting in Late
      2024*, BUSINESSWIRE (June 26, 2024),
      https://www.businesswire.com/news/home/20240626387463/en/ (last
      visited Dec. 3, 2024) ................................................................. 42

Safer Skies Act of 2024, H.R. 9268, 118th Cong. (2024) ....................... 47

U.S. DEP'T OF TRANSP., FAA Ensuring Safe Public Charter Flights, Exploring
      Future Solutions for All Flyers (June 17, 2024),
      https://www.faa.gov/newsroom/faa-ensuring-safe-public-charter-
      flights-exploring-future-solutions-all-flyers (last visited Dec. 3, 2024) .............. 46

## Rules

FED. R. CIV. P. 56 ................................................................................. 20

FRAP 30 .............................................................................................. 4

## Regulations

14 C.F.R. § 135.411 ........................................................................... 44

14 C.F.R. § 212.5 .............................................................................. 50

14 C.F.R. Part 119 ............................................................................ 10

14 C.F.R. Part 121 ............................................................................ 10

14 C.F.R. Part 135 ............................................................................ 10

14 C.F.R. Part 91 .............................................................................. 50

60 Fed. Reg. 65832 ........................................................................... 24

60 Fed. Reg. 65916 ........................................................................... 24

Airport Improvement Program (AIP) Grant Assurances,
    79 Fed. Reg. 18,755 (Apr. 3, 2014) ............................................ 38

Regulatory Definitions of On-Demand Operation, Supplemental Operation,
    and Scheduled Operation, 88 Fed. Reg. 59480, 59481 (proposed Aug. 29,
    2023) (to be codified at 14 C.F.R.pt. 110) ............................................ 46

## PRELIMINARY STATEMENT

In enacting the Airline Deregulation Act ("ADA") and the Airport Noise and Capacity Act ("ANCA"), Congress twice set forth comprehensive regulations governing airports and airlines. In those acts, Congress also twice intentionally left space for local regulations—through the proprietor's exemption in the ADA and the grandfathering provision in ANCA.

The County of Westchester (the "County"), as proprietor of the Westchester County Airport ("HPN" or the "Airport"), created and enacted Terminal Use Procedures ("TUPs") for HPN that fall squarely within the federal exemptions. The County first established the TUPs in 1985, as a result of a federal court order which the Federal Aviation Administration ("FAA") agreed to. In 2004, the County codified the TUPs in its body of local laws, and the FAA determined the TUPs were grandfathered under ANCA and in compliance with the County's grant assurances. In 2005, the County amended the TUPs to clarify certain provisions.

The TUPs, as created in 1985, codified in 2004, and clarified in 2005, apply to all commercial passenger operations where tickets are sold to the general public on aircraft designed for more than nine passenger seats. They require such operations to fly out of the main commercial terminal at HPN, rather than flying from fixed-base operator ("FBO") facilities that service general aviation operators.

1

This appeal presents straightforward questions: (1) Are the TUPs—solely amended in 2005[1]—preempted under either the ADA or ANCA? (2) If not, does a question of fact exist as to whether the County sought to enforce the TUPs in a manner that violated equal protection? Rather than face those questions head-on, Appellants waste thousands of words boasting about their business models and citing customer surveys, which have no bearing on the actual legal issues presented.

Perhaps all the puffery is unsurprising, since the law is on the County's side. As the District Court held, the TUPs fit squarely within the proprietor's exemption contained in the ADA, and are not preempted by that statute. Further, the TUPs are grandfathered under ANCA, as confirmed by the FAA—and the 2005 amendments do not change that calculus. Finally, Appellants' equal protection arguments fall similarly flat. Appellants cannot point to a true comparator. They trivialize meaningful distinctions between themselves and other carriers, and argue that disputes of fact preclude summary judgment based simply on their say-so. Appellants also claim the TUPs are irrational simply because they do not like the impact on their preferred business model. Their dissatisfaction, an equal protection claim does not make.

Appellants thus take another tack, pontificating about policy and positing that the public would be better served by Appellants' business model. Those are arguments

---

[1] Appellants withdrew any claims regarding the validity of the TUPs as they existed in 2004. (SPA5).

better directed to Congress and the FAA, as the policy-maker and regulatory agency responsible for effectuating national civil aviation policies. The clear terms of ADA and ANCA provide all the information this Court needs to affirm the District Court's conclusion that the TUPs are valid, lawful, and not preempted.

## STATEMENT OF JURISDICTION

Appellants' underlying complaint contains federal claims giving the District Court jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291. Final judgment was entered by the District Court on July 2, 2024, and a notice of appeal was timely filed on July 12, 2024. (A20).

## STATEMENT OF THE ISSUES

I. Whether the TUPs are valid under the grandfathering provision of the Airport Noise and Capacity Act.

II. Whether the TUPs are a valid exercise of the powers granted to airport sponsors under the proprietor's rights exemption in the Airline Deregulation Act.

III. Whether the District Court properly found that Appellants' equal protection claim fails because Appellants cannot identify an appropriate comparator and because the County's actions were rational.

## STATEMENT OF FACTS[2]

### I.   FEDERAL REGULATORY SCHEME—THE ADA AND ANCA

Over the years, Congress has enacted a variety of federal laws governing aviation, including the regulation of airports and commercial activity. The two laws at issue here are the Airline Deregulation Act of 1978 and the Airport Noise and Capacity Act of 1990.

#### A.   The Airline Deregulation Act of 1978

The ADA amended the Federal Aviation Act of 1958, in order "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services, and for other purposes." Pub. L. No. 95-504, 92 Stat. 1705 (1978). As part of that amendment, the ADA included an express preemption provision that states that other governments "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under" the ADA. 49 U.S.C. § 41713(b)(1). However, Congress expressly

---

[2] Citations preceded by "A" refer to the Appendix (two volumes) filed by Appellants. Citations preceded by "SPA" refer to the Special Appendix filed by Appellants. Citations preceded by "Supp." refer to the Supplemental Appendix (one volume) filed by Appellee herewith. Appellee notes that Appellants failed to comply with Federal Rule of Appellate Procedure ("FRAP") 30—they did not seek input on the contents of the appendix, did not serve a designation on the County under FRAP 30(b)(1), and instead simply excluded hundreds of pages of materials submitted as part of the County's motion for summary judgment—the very motion at issue on this appeal. Appellants instead included approximately 200 pages of material relating to a temporary injunction motion that was denied and is not on appeal, and their post-judgment motion for a stay, all of which is irrelevant to a review of the summary judgment decision.

excluded from the preemption provision the State and municipal owners and operators of airports which are "carrying out [their] proprietary powers and rights." 49 U.S.C. § 41713(b)(3).

**B.    The Airport Noise and Capacity Act of 1990**

ANCA was enacted to create a national policy to manage aviation noise, to protect the national air transportation system. 49 U.S.C. § 47521. It directed that the Secretary of Transportation establish such a policy by regulation. 49 U.S.C. § 47523. Congress expressly provided, however, that local regulations on airport noise that were in effect on or before November 5, 1990, would not be affected by ANCA. 49 U.S.C. § 47533(1); 49 U.S.C. § 47524(d). Similarly, a post-1990 amendment to a grandfathered regulation remains grandfathered so long as the amendment "does not reduce or limit aircraft operations or affect aircraft safety." 49 U.S.C. § 47524(d)(4).

**II.    HISTORY OF THE TERMINAL USE PROCEDURES**

The County's TUPs are codified at Section 712.462 of the Laws of Westchester County ("LWC").[3] (*See* A343-359). The TUPs were enacted as a result of litigation regarding use of the terminal at HPN, and were later codified, and amended for clarification.

---

[3]    The Laws of Westchester County are available online at https://library.municode.com/ny/westchester_county/codes/code_of_ordinances.

## A.   The *Midway* Litigation

In 1984, litigation was commenced against the County relating to applications to fly in and out of the "terminal" at HPN, which at the time was simply a Quonset hut. The lawsuit was brought by Midway Airlines, and both the FAA and the United States Department of Transportation intervened on behalf of Midway. *See Midway Airlines, Inc. v. Cnty. of Westchester*, 584 F. Supp. 436, 437 (S.D.N.Y. 1984). Midway commenced the action and sought preliminary equitable relief when the County suspended its issuance of determinations allowing air carriers to access the main terminal, while it studied and developed a comprehensive use policy for HPN. *Id.* at 437-38.

> Denying the preliminary injunction, the District Court recognized that,
>
> [a]part from the litigants, various other parties may be affected by the disposition. These include other carriers, which, under law, have equal rights of access to the airport facilities, residents of the immediate area who have, over the years, been concerned with noise abatement and other environmental problems, corporate jet owners and others who use the landing and navigational facilities, as well as passengers who regularly avail themselves of the services provided by the airport and its scheduled carriers.

*Id.* at 437. The District Court ordered a timeline for the County to conclude its study and promulgate rational and nondiscriminatory rules regarding terminal use. *Id.* at 441.

### B. The TUPs and Initial Implementation

On June 7, 1984, the County first promulgated its TUPs. (Supp. 24, 149-155). Thereafter, the parties[4] to the *Midway* litigation entered into a settlement, agreeing to certain specific use restrictions for HPN, with expiration provisions. (Supp. 25-27). The settlement was effectuated through resolutions of the County Board of Legislators (the "County Board"), including a repeal of the 1984 TUPs and replacement with the 1985 TUPs. (A361-73, Supp. 25, 27-28).

In enacting the TUPs in 1985, the County Board specifically noted that, while the *Midway* litigation related to promulgating a plan for access "among airlines conducting operations pursuant to Part 121" of the FAA regulations, the TUPs instead "established an allocation mechanism to be applied to *all airlines* seeking to conduct operations at" HPN. (A364) (emphasis added). That mechanism—the lottery for slots at the terminal—applied to "scheduled airlines." (A365).

Following the 1985 adoption, the County and the carriers then serving HPN entered into the 1988 Terminal Capacity Agreement ("TCA"). (Supp. 33-34). The TCA was to continue the terms of the *Midway* settlement, including applying them to a new, true terminal that would be built to replace the existing Quonset hut. (Supp. 18, 33, 37). Before it was set to expire on January 1, 1995, the TCA was renewed on the same terms,

---

[4] By this juncture, a number of additional parties had intervened, including additional carriers. The settlement agreement was signed by the County, the FAA, thirteen carriers, and remarkably, the National Business Aviation Association, who has appeared as Appellants' amicus on appeal. (Supp. 25).

for 10 additional years. (Supp. 39-40). The FAA reviewed and approved the TCA as part of the process. (A381–82; Supp. 41).

### C. The 2004 Codification

Beginning in 2003, the County began reviewing the restrictions in place at HPN, which were contained in a variety of resolutions from the County Board, setting forth both regulations and policy statements. In 2004, a draft local law was introduced to codify the TUPs. This law, ultimately enacted as Local Law 15-2004, codified the TUPs as Section 712.462 of the Laws of Westchester County. (A320-334).

Prior to enacting the 2004 TUPs, the County sent the draft law, together with supporting documents, to the FAA for review. (A375-77, Supp. 15-146). The FAA's Office of the Chief Counsel responded, "find[ing] nothing in the proposed actions by the County—codifying and clarifying existing legal restrictions, extending and renewing the existing Airport terminal use agreements with the air carriers, and codifying and modifying existing technical specifications and procedures for allocation of terminal space and gates—that is inconsistent at this time with its grant assurances," including "the obligation to provide access by air carriers on reasonable and not unjustly discriminatory terms." (A383). Further, the FAA reviewed the proposed TUPs, embodied in the draft local law, and determined that: (1) they were grandfathered under ANCA; (2) any modifications did not reduce or limit aircraft operations or affect safety;

and (3) the TUPs therefore were exempt from any approval requirements under ANCA. (A382).

### D. The 2005 Amendment

In 2005, the County Board adopted Local Law 21-2005, which amended the TUPs for the express purposes of clarifying "several unintended ambiguities" so that the application of the TUPs "is consistent with the legislative intent which prompted their enactment." (A336, 338). The County Board noted that some of the ambiguity in the prior TUPs arose from "closely follow[ing] the language that had been in use in various forms since 1984." (A338). Consistent with original versions of the TUPs (*see* A364), the TUPs were "clearly intended to include all commercial passenger operations, including those that provide infrequent or special purpose services, such as those now authorized under Part 380 of the FAA's regulations." (A338).

Notably, this amendment was made by the same term of the County Board that passed the 2004 TUPs. *See* LWC §§ 107.11(1) (two-year terms starting on January 1st after election); 107.31(5) (elections held in odd years). Thus, the County Board amending the law in 2005 was unquestionably aware of what its own legislative intent had been in enacting the 2004 TUPs.

The TUPs, as amended in 2005, remain in effect today. They have not been amended since, other than a minor technical amendment to update the name of the County Department that oversees the Airport.

9

### III. THE RELEVANT SPECIFIC AMENDMENTS

The 2005 amendments made several changes to the TUPs. Those relevant to the instant action are as follows:

| 2004 TUPs | 2005 TUPs |
|---|---|
| 1. **Applicability.** This Section shall apply to all use of the passenger terminal ("terminal") and the terminal ramp at the Westchester County Airport ("Airport") by Airlines providing scheduled passenger service. The terminal ramp shall be for the exclusive use of Airlines providing scheduled passenger service. This Section does not apply to any activities by Airport users not providing passenger service or not using the terminal building or terminal ramp. | 1. **Applicability.** This Section shall apply to all use of the passenger terminal ("terminal") and the terminal ramp at the Westchester County Airport ("Airport") by Airlines providing Passenger Service, as that term is defined herein. The terminal ramp shall be for the exclusive use of Airlines providing Passenger Service. This Section does not apply to any activities by Airport users not providing Passenger Service. All Passenger Service provided at the Airport shall be provided at the Terminal. |
| 2(a). "Airline" shall mean any person providing scheduled passenger air service, including but not limited to, any air carrier or other operator certificated to provide scheduled passenger service under Part 119, 121 or 135[5] of the Federal Aviation Regulations, Title 14, Code of Federal Regulations. | 2(a). "Airline" shall mean any person providing Passenger Service in aircraft designed for more than (9) passenger seats, including but not limited to, any air carrier or other operator certificated to provide Passenger Service under Part 119, 121 or 135 of the Federal Aviation Regulations, Title 14, Code of Federal Regulations. |
| [No definition of scheduled passenger service] | 2(j). "Passenger Service" shall mean any air service to or from the Airport for which seats are individually offered or sold to the |

---

[5] 14 C.F.R. Parts 119, 121, and 135 set forth operating requirements for various U.S.-certificated air carrier operations.

| | public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity. |
| --- | --- |

(A343-45).

As can be seen, one of the primary changes was removing the undefined term "scheduled passenger service" and replacing it with the defined term "Passenger Service." (*See, e.g.*, A291 ¶¶ 43, 47). Another was to make it clear that "Passenger Service" was required to use the terminal and terminal ramp. (A338-39, 343).

These clarifications made express that any flights, on planes with more than nine seats, where individual tickets were sold to the general public, were required to fly out of the terminal at HPN. This "clarif[ied the] long-standing practice under which the County requires that all commercial passenger service providers, including those that offer their services on an infrequent basis, use the main Airport terminal and terminal ramp." (A339).

## IV. APPELLANTS OPERATE AT HPN

Beginning at least a decade after the 2005 TUPs were enacted, Appellants started offering services from HPN. Blade and XO assert that they have been providing such services since in or about 2015,[6] and JSX since 2020. (App. Br. 23). Each Appellant sells

---

[6] It is not entirely clear that Blade and XO (through a "sister" company) were acting in violation of the 2005 TUPs as far back as 2015. However, the exact start dates and times are immaterial, particularly given that the District Court dismissed Appellants' laches defense, and

seats to the public on aircraft designed for more than nine (9) passenger seats at HPN and does not operate out of the terminal. (A281-82 ¶ 3). Instead, each flies out of FBOs. (A282 ¶ 4).[7]

Appellants schedule flights on set dates and times, and then members of the public can purchase individual seats on those planes through Appellants' websites, just like booking a ticket on United, JetBlue, or any other major commercial carrier operating under Part 121. Appellants bear the risk of loss of flying with unsold seats. (App. Br. at 15). Thus, while Appellants' amici refer to these operations as "on-demand" (Brief for Amici National Business Aviation Association, et al. ("Am. Br.") 4), they are not.

In 2020, during the COVID-19 pandemic, sales of HPN flights to the public by Blade and XO spiked. (A283 ¶ 11). This increase in sales by Blade and XO coincided with JSX's commencement of activity at HPN. Local community leaders voiced concerns to the County administration about these activities in 2021. (A283-84 ¶¶ 12-

---

Appellants have not appealed from that part of the decision. (*See generally* App. Br. (no mention of laches defense)).

[7] To be clear, Part 380 operators—Appellants included—may engage in various operations out of FBOs in accordance with the TUPs. This litigation only involves a subset of their operations—flights with individual seats being sold to the general public on aircraft designed for more than nine passenger seats. References throughout this brief to the applicability of the TUPs to Part 380 operators, unless otherwise noted, refer to these regulated activities.

13). The County investigated to determine if operators—including Appellants—were operating in violation of the 2005 TUPs. (A284 ¶ 14).[8]

Following its investigation, the County attempted to resolve Appellants' violations of the 2005 TUPs through the issuance of Policy No. 1, which provided Appellants (and others) the opportunity to work out operational plans that were principally consistent with the 2005 TUPs. (A138-39). Included in Policy No. 1 were options to expedite Transportation Security Administration ("TSA") screening, options to utilize more private areas of the terminal, and the possibility of using the terminal for departures, but not arrivals—which would accommodate flights to and from both Security Identification Display Areas ("SIDA") and non-SIDA locations. (*Id.*). Appellants refused to operate in accordance with this policy.

## V.   LITIGATION

The County commenced a state court action on March 7, 2022. That action sought a permanent injunction to bring Appellants into compliance with the 2005 TUPs. *See Cnty. of Westchester v. Blade Urban Air Mobility, et al.*, Index No. 57179/2022 (Sup. Ct. Westchester Cnty.). Later that day, Appellants filed the instant proceeding,

---

[8] Appellants claim that "in 2021, the County suddenly and inexplicably sought to enforce a law that had been on the books since 2005, and that the County had never before attempted to apply against public charters." (App. Br. 3). First, Appellants have never identified *any* charterer acting in violation of the TUPs prior to their own actions beginning sometime around 2015. Second, the distinct uptick in 2020 brought this issue clearly to the County's attention, and it proceeded diligently thereafter.

challenging the validity of the TUPs, and seeking preliminary and permanent injunctive relief of their own. (*See* A147).

In their complaint, Appellants brought claims that the TUPs were: (1) preempted by the ADA; (2) preempted by ANCA; and (3) being applied in violation of the Equal Protection Clause. (A50-56). The County asserted two counter-claims, requesting: (1) a declaratory judgment that the TUPs were valid; and (2) a permanent injunction prohibiting Appellants from violating the TUPs. (A276-79). Appellants answered the counter-claims and asserted equitable defenses, including waiver, estoppel, and laches. (SDNY ECF No. 62; A13).

On March 8, 2022, the County notified the FAA that it had "filed a legal claim against [Appellants] for conducting Single Seat public sales and operations on aircraft with greater than nine seats and while operating out of FBOs." (Supp. 167, 187-90). Unlike in the *Midway* litigation, the FAA did not seek to intervene in these actions on Appellants' behalf.

After some initial motion practice, the parties entered into three stipulated orders. The first was a standstill agreement—the County agreed to not enforce the 2005 TUPs against Appellants pending resolution of the action before the District Court.[9] (A140-43). The second dismissed Avports (the County's management company for

---

[9] Appellants did not withdraw their request for a preliminary injunction, despite this agreement. Rather, the District Court ultimately denied the preliminary injunction. (*See* SDNY ECF No. 57; A12).

HPN) and April Gasparri (then-Airport manager for Avports) from the litigation. (A144-46). The third—after the District Court denied the County's request for abstention—resulted in the dismissal of the state court action, without prejudice. (A147-49).

Following discovery, the County moved for summary judgment dismissing Appellants' claims, granting the County's counter-claims, and dismissing Appellants' affirmative defenses. (Supp. 1-2). Appellants opposed summary judgment. (A475-516). While they did not file a separate summary judgment motion, at Appellants' request, the District Court put all parties on notice that it would search the record and determine if Appellants were entitled to summary judgment on any of their claims, as part of consideration of the County's motion. (SPA8, n.6). On July 1, 2024, the District Court entered its decision and order. (SPA1).

As a threshold matter, the District Court determined that Appellants abandoned or withdrew a number of their claims:

- Appellants withdrew all claims relating to Policy No. 1 (SPA5);

- Appellants withdrew any request for relief from the 2004 TUPs, and only sought relief with respect to the 2005 TUPs (SPA5);

- Appellants abandoned any argument that the 2004 TUPs were outside the proprietor's exemption under the ADA (SPA15);

- Appellants abandoned any comparators for their equal protection claim other than Bakers Bay, NetJets, and Wheels Up (SPA18); and

- Appellants abandoned all equitable defenses to the County's counter-claims other than laches (SPA24).

With respect to the merits of the claims, the District Court found largely in favor of the County. As to ANCA preemption, the District Court noted that Appellants were no longer challenging the grandfathering of the 2004 TUPs, and thus focused on whether the 2005 amendments materially changed the 2004 TUPs or were a clarification. (SPA9-11). The District Court ultimately found that the amendments were simply a clarification, and that the TUPs applied to Part 380 operators going back to the *Midway* settlement. (SPA12-13).

As to ADA preemption, the District Court found that the TUPs fell within the proprietor's exemption. (SPA13-16). Again, the District Court noted that Appellants expressly abandoned any argument that the 2004 TUPs were outside of the proprietor's exemption, and thus the only question was whether the 2005 amendments brought the TUPs outside of the exemption. (SPA15). The District Court also found that there was "no genuine dispute that the 2005 Law was meant to regulate airport access so as to allocate scarce space and landing and takeoff slots" and that fell "wholly within [the County's] proprietary rights and powers." (SPA15). Appellants also failed to identify

16

anything unreasonable, arbitrary, or discriminatory about the 2005 amendments. (SPA16). Thus, the 2005 TUPs were not preempted under the ADA.

As for the equal protection claim, the District Court noted that Appellants were proceeding under a "class-of-one" theory, and thus needed a high degree of similarity with comparators. (SPA17). While the complaint did not identify any comparators, discovery yielded seven purported categories of comparators. (SPA18). The County addressed all seven categories in its motion; Appellants only addressed three specific companies within those seven categories—Bakers Bay, NetJets, and Wheels Up—in their opposition. (SPA18). The District Court considered the specific evidence presented and determined that Appellants presented no evidence to establish an issue of fact regarding whether any of these companies were appropriate comparators—they were not. (SPA19-22). The District Court further found that Appellants had not met their burden to show that the County's application of the 2005 TUPs was irrational, as required to sustain their equal protection claim. (SPA22).

Turning to the County's counter-claims, the District Court first addressed the equitable defenses raised by Appellant. The County sought dismissal of all equitable defenses, but Appellants only argued against dismissal of the laches defense, abandoning the rest. (SPA23-24). With respect to laches, the District Court found the County could not be equitably barred from enforcing local ordinances, and thus dismissed the equitable defenses. (SPA24).

The District Court then denied the County's request for a declaratory judgment, as the County "now has—for all intents and purposes—secured the relief sought to the extent the First Counterclaim seeks a declaration that the 2005 Law is not preempted under ANCA or the ADA, based upon the Court's findings herein." (SPA25). With respect to the County's request for a permanent injunction, the District Court *sua sponte* determined it lacked subject matter jurisdiction and dismissed the claim without prejudice. (SPA27).

This appeal followed.[10]

## SUMMARY OF ARGUMENT

**I.** The TUPs—as codified in 2004 and amended in 2005—share the same meaning and understanding that existed in 1985 when they were first enacted. As the TUPs existed in 1985, Part 380 operators who sold seats to the public on scheduled flights (and the Part 135 carriers that operated those flights) were subject to the same rules as any other commercial carrier, and were required to use the terminal. The FAA, in 2004, found that the TUPs were grandfathered under ANCA, and the 2005

---

[10] Appellants include information in their brief (App. Br. 31-32) and their appendix (A517-61) relating to proceedings occurring after the filing of the notice of appeal, that have no bearing on the issues before this Court. It is sufficient to say that Appellants sought a stay of the District Court's order pending appeal, were denied, and never sought such relief before this Court. There is an ongoing plenary proceeding in state court relating to enforcement of the TUPs; in that proceeding, the County had sought a preliminary injunction, but withdrew the motion. However, none of those items provides any insight or information as to whether the 2005 TUPs are valid, or whether the County is violating equal protection in their application.

amendments were simply clarifications—the scope of the TUPs was not expanded at all. In fact, the scope of the TUPs was arguably lessened in 2005, when the TUPs excluded planes designed for nine or fewer seats.

II.    Given that the 2005 TUPs had the same application as the 2004 TUPs, and that Appellants waived any claims regarding the validity of the 2004 TUPs, this Court need not review compliance with the proprietor's exemption under the ADA. Regardless, the TUPs in all iterations fall within the proprietor's exemption to ADA preemption. The County has the authority to enact reasonable, nonarbitrary regulations that regulate noise, congestion, and environmental impact at the Airport. While Appellants try to limit the County's concern to congestion at the terminal, the history of the TUPs clearly shows that the County's concern has been congestion at the Airport as a whole, which includes Appellants' current usage. Limiting Appellants to operations at the terminal, and compliance with the terminal use limitations attendant thereto, advances the County's proprietary interests, and the TUPs are therefore not preempted.

III.    This Court need not consider the policy questions raised by Appellants. The only relevant questions are whether the TUPs fall within the grandfathering clause of ANCA and the proprietor's exemption of the ADA. Policy considerations do not change the straightforward legal questions presented to this Court. Moreover, to the extent this Court examines policy concerns, public policy appears to be turning against

Appellants: the FAA and Congress are considering rulemaking and legislation, respectively, to curtail the very operations of Appellants underlying this litigation.

IV.     There was no equal protection violation. Appellants have not identified a true comparator, which, under their "class-of-one" theory, must be extraordinarily similar. The comparators identified have significant distinguishing characteristics, and even if they did not, there are rational reasons for the County treating them differently from Appellants. Appellants bore the burden of supporting their equal protection claim and did not.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015). The Court "may affirm on any basis that finds support in the record." *Id.* Summary judgment is appropriate if there are no genuine issues of material fact. *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). In determining if summary judgment is appropriate, only admissible evidence may be considered. *Id.*

The party opposing summary judgment cannot "rely[ ] on mere speculation or conjecture as to the true nature of the facts because conclusory allegations or denials . . . cannot . . . create a genuine issue of material fact." *Fappiano v. City of N.Y.*, 640 F. App'x 115, 117 (2d Cir. 2016) (internal quotation marks omitted). The party asserting that a fact is genuinely disputed must support this with citations to "particular parts of materials in the record." FED. R. CIV. P. 56(c)(1). As the Supreme Court has explained,

> At the pleading stage, general factual allegations . . . may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal citations, quotation marks, and alterations omitted).

## ARGUMENT

### I. THE 2005 TUPS ARE NOT PREEMPTED BY ANCA

ANCA, enacted in 1990, sets forth procedural requirements for enacting "airport noise and access restrictions." 49 U.S.C. § 47524(a). However, ANCA includes an explicit "nonapplication" provision, allowing for noise and access restrictions to remain in effect if they were in effect prior to November 5, 1990. 49 U.S.C. § 47524(d), commonly referred to as a "grandfathered" restriction. Further, amendments to grandfathered restrictions are permitted so long as they do "not reduce or limit aircraft operations or affect aircraft safety." *Id.* Any restrictions not complying with either the procedural or grandfathering requirements are preempted.

### A. The 2004 TUPs Are Grandfathered

Here, there is no dispute—nor can there be—that the 2004 TUPs are grandfathered under ANCA. The County, in looking to codify the 2004 TUPs, sent extensive documentation, including the proposed TUPs themselves, to the FAA for review. (Supp. 15-147). The FAA responded:

Specifically, the County proposes to take the following actions: (1) codify and clarify existing legal restrictions; (2) extend and renew the existing Airport terminal use agreement with air carriers who use the commercial passenger terminal by entering into a new terminal use agreement; and (3) codify and modify existing technical specifications and procedures for allocation of Airport capacity. According to the County, all changes will make the limitations less restrictive that [*sic*] those in effect today.

In this letter, we conclude that the proposed County actions are exempt from the Airport Noise and Capacity Act of 1990 (ANCA) since the actions relate to airport noise or access restrictions that were in effect on November 5, 1990 and would not "reduce or limit aircraft operations or affect aircraft safety." 49 U.S.C. § 47524(d)(4).

(A375-76).[11] Given that the FAA is charged with determining ANCA compliance, its determination that the 2004 TUPs were grandfathered should end that portion of the inquiry. *See Palm Beach Cnty. v. Fed. Aviation Adm'r*, 53 F.4th 1318, 1332 (11th Cir. 2022) (reviewing FAA grandfathering decision under APA standards). Indeed, Appellants—in abandoning any arguments relating to the 2004 TUPs (*see* SPA5)—have effectively conceded as much.[12]

Of note, the FAA's conclusions regarding grandfathering acknowledge that the County was intending to "clarify" the TUPs. (A375). The FAA similarly acknowledged that the TUPs limited "Commercial air carriers" to "four operations per half-hour to correspond to the four gate positions in the terminal." (A383).

---

[11] The County provided appropriate records substantiating the authenticity of the FAA's letter. (Supp. 169-84).

[12] If this Court were to revisit the analysis in the FAA's letter, the FAA's determination is subject to at least *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944); *Boykin v. KeyCorp*, 521 F.3d 202, 208 (2d Cir. 2008).

**B.     The TUPs Always Applied to Part 380 Operators**

Given that the 2004 TUPs are indisputably grandfathered, the only remaining question is whether the 2005 amendments "reduce or limit aircraft operations" from what was allowed under the 2004 TUPs. *See* 49 U.S.C. § 47524(d)(4). It is clear they do not.

Appellants' argument is that Part 380 operators were never required to use the terminal before 2005. That is incorrect. In its original iteration—in 1985—the TUPs applied to "any airline which conducted scheduled operations." (*See* A365). At that time, the FAA defined "scheduled operations" to mean "operations that are conducted in accordance with a published schedule for passenger operations which includes dates and times (or both) that is openly advertised or otherwise made readily available to the general public." (Supp. 240). Even more to the point, the FAA explicitly stated in its rulemaking that

> While, on occasion, "charter" flights are "announced" in advance, the charter operator normally does not commit to having the flight operate unless a minimum load of passengers is booked in advance. Thus, the general public cannot depend upon a chartered flight maintaining a schedule (for example there may be a last minute flight cancellation because not enough passengers signed up for the flight) as they can on a scheduled flight. An operator who attempts to hold itself out as a charter operator but who, in fact, announces regularly scheduled flights to the public would be considered a scheduled operator and would have to comply with the regulations for scheduled operations under Part 121 or Part 135, as appropriate.

(Supp. 237). There can be no dispute this is the exact business model Appellants operate.[13]

As Appellants note, "Courts are supposed to construe the text of a statute in accord with its commonly understood meaning 'at the time [the legislature] enacted the statute.'" (App. Br. 66 (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 186 (2d Cir. 2021)) (alteration in original)). Thus, this Court should interpret the 1985 TUPs in accordance with the meaning of "scheduled operation" at that time. Under that common understanding—*i.e.*, the FAA regulation in place when the TUPs were originally established—the term clearly applied (and applies) to the business model here.

Subsequently, beginning in 1995, the FAA modified its regulatory definitions to ultimately exclude Part 380 carriers from "scheduled operations." *See* 60 Fed. Reg. 65832, 65916 (Dec. 20, 1995). Appellants argue that this change means this Court must apply that definition to the TUPs when they were codified in 2004. That is not so.[14]

In 2004, the TUPs were codified and, as the FAA noted, clarified. The 2004 TUPs did not use the term "scheduled operations." Rather, the 2004 TUPs referred to "scheduled passenger service." (A320). Indeed, just as a court should construe the text

---

[13] Indeed, Appellants specifically note that they "bear[ ] any risk of loss from unsold seats." (App. Br. 15). In other words, they do not cancel unfilled flights—they fly with empty seats like any commercial carrier.

[14] Appellants' position appears to be that grandfathered laws under ANCA should be read in accordance with FAA rule changes after ANCA's enactment. (App. Br. 67-68). This would allow the FAA to do by regulation what Congress said it cannot do—modify or overrule laws that are exempt from ANCA preemption.

of a statute in accordance with the meaning of words when it was enacted, a court should "assume[ ] different meanings were intended" when different words are used. *Sosa v. Alvarez-Machain*, 542 U.S. 711, n.9 (2004) (quotation marks and citation omitted); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."). Thus, this Court should consider the change intentional—instead of maintaining the phrase "scheduled operation" (which might be unintentionally construed by the then-new FAA definition), the County Board used a different phrase, in order to maintain the understanding that had been in effect since 1985.

Even the FAA noted that the standard access limits were not changing in the 2004 codification—the only changes were to increase the size of planes allowed to use the runway and terminal.[15] (A382-83). This comports with the County's use of a different phrase to maintain the same meaning that was in place in 1985. "Commercial air carriers"[16] remained "limited to four operations per half hour." (A383).

---

[15] Given Appellants' abandonment of any argument regarding the 2004 TUPs, much of Appellants' arguments distill down to what the FAA considered grandfathered. While the County believes that the record clearly demonstrates the validity of its position, it is respectfully suggested that the Court may wish to ask the FAA to weigh-in on whether its determination in 2004 covered the restrictions as articulated in the 2005 amendments. *See Jones v. Goodrich Pump & Engine Control Sys.*, 86 F.4th 1010, 1016 (2d Cir. 2023) (the Court requested the FAA's views on whether a field preemption included a specific restriction).

[16] Appellant Delux is a Part 135 air carrier that operates commercial flights on behalf of JSX. (A27 ¶ 15). Appellants Blade and XO partner with Part 135 air carriers to operate their commercial flights. (A28-9 ¶¶ 17, 19).

Given the FAA definition of "scheduled operation" in 1985 when the TUPs were enacted, it is clear the TUPs applied to Part 380 operators in 1985. The County's use of "scheduled passenger service" when codifying the TUPs after the change in the FAA definition of scheduled operations, makes it clear that the TUPs continued to apply to them in 2004.

### C. The 2005 Amendments Arguably Reduced Restrictions

Amending the TUPs in 2005, the County Board noted that it was seeking to clarify the 2004 TUPs, not to change them. (A338-39). Indeed, the County Board affirmed that "the scope of the Airport Procedures was clearly intended to apply to all commercial passenger operations, including those that provide infrequent or special purpose services, such as those now authorized under Part 380 of the FAA's regulations," but that there was not "explicit language" in the TUPs to that effect. (A338-39).

In order to make it clear, the County Board amended the TUPs to replace the undefined term "scheduled passenger service" with the now-defined term "Passenger Service." "Passenger Service" was defined in accordance with the 1985 understanding of "scheduled operations"—where tickets for flights were individually sold to members of the general public. (A345). That defined term was used in the definition of "Airline"—a term that was arguably made less restrictive in 2005. "Airline" had previously been defined as "any person providing scheduled passenger air service."

26

(A343). Now, the definition was amended to "any person providing Passenger Service *in aircraft designed for more than (9) passenger seats*." (*Id.* (emphasis added)). In other words, the prior definition of Airline included planes with nine or fewer seats; now they were excluded, making it less restrictive.

The 2005 amendments additionally included the specific notation that "All Passenger Service provided at the Airport shall be provided at the Terminal." (A343). While Appellants assert that this was a change, and that it increased the level of restriction (*see* App. Br. 62-63), that goes against the history and entire purpose of the TUPs, as well as the language of the 2004 TUPs.

1. *The History and Purpose of the TUPs*

Going back to 1985, the purpose of the TUPs was to "establish[ ] an allocation mechanism to be applied to *all airlines* seeking to conduct operations at" HPN. (A364) (emphasis added). This was necessary to "ensure that commercial use at [HPN] is regulated in a well-defined, equitable and consistent manner and that it continues to be regulated for the protection of the environment and preservation of the quality of life of the residents who live and work in the vicinity of the airport." (A319). Appellants' assertion—that the TUPs only applied if an airline wanted to use the terminal, but that they "did not affirmatively require *anyone* to use the terminal" (App. Br. 62) is nonsensical. If that were the case, there would be *no* ability by the County to regulate

commercial use, nor would the passenger capacity limits have any meaning. Indeed, the FAA's 2004 letter confirms this understanding:

> As noted above, the current restrictions at the **Airport** are as follows:
>
> - The use of the **Airport terminal** is limited to 240 passengers per half-hour;
> - Commercial air carriers are limited to four operations per half-hour to correspond to the four gate positions in the terminal. Two of these positions have historically been designated for aircraft with fuselages no longer than 85 feet and two for aircraft with fuselages up to 126 feet in length; and
> - Aircraft may not exceed 120,000 pounds maximum gross takeoff weight with dual landing gear.

(A382-83 (emphases added)). The FAA—a signatory to the *Midway* settlement that led to the original TUPs—already understood that commercial air carriers were limited to usage of the terminal, as Airport-wide they were "limited to four operations per half-hour," and that the TUPs governed usage of the airport, *not* just the terminal. The FAA noted that the *Midway* settlement

> set forth the following restrictions on the use of the **Airport**:
>
> - Passenger throughput was to be limited to 240 passengers per half-hour; [and]
> - Passenger capacity was to be allocated through a slot-lottery mechanism.

(A379 (emphasis added)). Again, the FAA acknowledged that these were airport limitations, not terminal limitations. Thus, Appellants' contention—that the TUPs never required *anyone* to use the terminal—conflicts with what both the County and the FAA understood the TUPs to mean.

This Court is unquestionably aware

> that "the meaning of a statute is to be looked for, not in any single section, but in all the parts together and in their relation to the end in view." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 439 (1935) (Cardozo, J., dissenting). *See also NLRB v. Lion Oil Co.*, 352 U.S. 282 (1957) (Frankfurter, J.) (a court must "find that interpretation which can most fairly be said to be embedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that [the legislative body] manifested").

*Marine Carriers Corp. v. Fowler*, 429 F.2d 702, 706-07 (2d Cir. 1970) (alteration in original). Here, the end in view was to control the amount of commercial air traffic at HPN, to maintain its "principal function at present and in the foreseeable future . . . of accommodating general aviation with an emphasis on business use; by comparison its commercial service function is relatively modest." (A365). Appellants' interpretation—that anyone could choose to avoid the terminal at HPN, and thus avoid any restrictions on the number of their flights or passengers—flies in the face of the purpose expressed by the County Board and agreed to by the FAA.

### 2. The 2004 TUPs Differentiated by Type of Service

Further undercutting Appellants' argument is the actual language used in the 2004 TUPs, which differentiated the TUPs' application by types of service. The relevant provision in the 2004 TUPs reads as follows: "The terminal ramp shall be for the exclusive use of Airlines providing **scheduled passenger service**. This Section does not apply to any activities by Airport users not providing **passenger service** or not using the Terminal building or Terminal Ramp." (A320 (emphases added)).

29

The 2004 TUPs delineated three different categories of users: those providing scheduled passenger service, those not providing any passenger service, and those providing *non-scheduled* passenger service. The first category was required to use the terminal; the other two were not. Thus, non-scheduled passenger service—such as corporate jets or traditional chartered flights (i.e., where a family or group of friends charter a whole aircraft together)—were not required to use the terminal building, despite providing passenger service.[17]

To the extent there is any lack of clarity, the legislative history renders the intent of the language clear. *Dig. Realty Trust, Inc. v. Somers*, 583 U.S. 149, 171 (2018) (Sotomayor, J. concurring) ("Legislative history can be particularly helpful when a statute is ambiguous or deals with especially complex matters."). Here, two significant pieces of legislative history can be reviewed to discern the intent. First, the committee report in support of the 2004 TUPs makes it clear that the TUPs were to be "applied to all commercial users," that they would "prohibit scheduling more than four [commercial] aircraft per half hour for emplaning or deplaning passengers," and that

---

[17] Appellants assert that "Passenger service that was not 'scheduled' was *not within* the scope of" the 2004 TUPs, but "*is within* the scope of" the 2005 TUPs. (App. Br. 64 (emphases in original)). The first part is correct, the second is not. Appellants do not seem to grasp that the meaning of "scheduled" in the TUPs is the 1985 meaning of scheduled, not the FAA's current definition of "scheduled operation"—a term that does not appear in the 2004 or 2005 TUPs. Under the 2005 TUPs, flights are exempt where they do not sell individual seats to the general public. This is the gravamen of a true charter operation—someone, or some group, deciding when they want to fly, and to where, rather than selecting from a preset schedule of flights like those Appellants run.

these were necessary to protect against expansion of the airport. (A312-14). Second, the very same County Board, just one year later, recognized the "unintended ambiguities," and amended the TUPs to "ensure that the practical application of the Airport Procedures is consistent with the legislative intent which prompted their enactment." (A338). The County Board expressed its clear intent that the scope of the TUPs included *all* commercial operations, including Part 380 operators, and that was the intention all along. (*Id.*).

Conversely, reading that section in the way advanced by Appellants would have the effect of reading words out of the statute. Appellants' erroneous interpretation is to read the section, in sum and substance, as follows: "The terminal ramp shall be for the exclusive use of Airlines providing scheduled passenger service. This Section does not apply to any activities by Airport users not using the terminal building or terminal ramp." (*See* App. Br. 24, 62). There is no question the terminal is exclusive to scheduled passenger service. As such, the exclusions—"not providing passenger service or not using the terminal building or terminal ramp"—must refer to two different things from scheduled passenger service. Otherwise, "not providing passenger service" would be automatically subsumed in "not using the terminal." Courts "read statutes to avoid rendering any words wholly superfluous." *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 157 (2d Cir. 2003). Appellants' reading would render "not providing

passenger service" wholly superfluous—as directly evidenced by their own references in their brief (*see* App. Br. 24, 62)—and thus should be avoided.

Considering the sections of the law in total, together with the history and intent (*Marine Carriers Corp.*, 429 F.2d at 706-07), results in but one reasonable reading: that the 2004 TUPs already required usage of the terminal for commercial air carrier operations like Appellants', and the 2005 amendments merely clarified that. That reading renders nothing superfluous, and comports with the broad swath of information that was before the FAA and the County Board, and which is now before this Court.

### D. There Was No Reduction or Limitation of Aircraft Operation

Appellants assert that the 2005 amendments reduce or limit aircraft operations, thereby running afoul of ANCA's grandfathering provision. That is erroneous. The 2004 TUPs—like the 1985 TUPs—applied to Part 380 operators (*see* Point I(B), *supra*). Clarifying the language did not change how or what operations could occur. An amendment that allows the same level of service as the regulation being amended cannot be read to reduce to limit operations.

Additionally, Appellants were not operating at the Airport until a decade or more after the 2005 TUPs were enacted. Despite robust discovery, they presented no evidence that there was *anyone* impacted in 2005 when the TUPs were amended. Thus,

the 2005 amendments did not limit or reduce operations at the Airport, and accordingly would not fall outside of the grandfathering provisions of ANCA.

## II. THE 2005 TUPs ARE NOT PREEMPTED UNDER THE ADA

While the ADA preempts local regulations "related to a price, route, or service of an air carrier," this preemption does not apply to a local government that owns or operates an airport which is "carrying out its proprietary powers and rights." 49 U.S.C. § 41713. Known as the proprietor's exemption, it permits certain local regulations, even if they touch on a price, route, or service.

In determining if the ADA preempts a local regulation, this Court has historically focused on the proprietor exemption first—if the regulation falls within the proprietor's rights, there is no need to determine if it relates to a price, route, or service. *See*, *e.g.*, *W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 226 (2d Cir. 1987) .[18]

---

[18] As the ultimate question before this Court is whether the TUPs fit within the proprietor's exemption, there is no need to address the price, routes, and services question. Appellants' arguments regarding their routes and services (including to where they choose to fly) (*see* App. Br. 18, 21, 26-27, 42-44) are irrelevant to the question before this Court. However, the County would be remiss not to address the breadth of "routes." Appellants' position that "routes" is so broad that it would include a "change [in] the starting and ending points of their flights—from the FBOs to the terminal" (App. Br. 43)—resulting in an untenable read (and reach) of the ADA. If that reading were correct, airport proprietors would not be able to move, add, or remove runways; modify the physical siting of terminals, FBOs, or other buildings; or make any other adjustments to the physical layout of an airport, as it might require a plane to land or taxi 100 feet from where it had been already. No court has interpreted the ADA's preemption provision so broadly. Indeed, "the regulation of aircraft in flight is distinguishable from the regulation of the designation of plane landing sites, which involves local control of land." *Gustafson v. City of Lake Angelus*, 76 F.3d 778, 783 (6th Cir. 1996); *accord Hoagland v. Tn. of Clear Lake*, 415 F.3d 693, 698 (7th Cir. 2005); *Fourth Quarter Props. IV v. City of Concord*, 127 F. App'x 648, 656 (4th Cir. 2005); *Skysign Int'l v. City & County of Honolulu*, 276 F.3d 1109, 1117 (9th Cir. 2002); *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 219 (8th Cir. 1990).

33

As a threshold matter, Appellants have abandoned any claim of invalidity regarding the 2004 TUPs. (*See* A493, SPA6). Thus, if this Court finds that the 2005 TUPs simply clarified the 2004 TUPs, it need not go any further, as Appellants can no longer assert the invalidity of the 2004 TUPs.

## A.       The Breadth of the Proprietor's Exemption

The proprietor's exemption is *not*, contrary to Appellants' position, limited solely to aircraft noise and environmental concerns. (*See* App. Br. 46-47). Rather, "although questions of permissible noise regulation predominate in the courts a . . . . [a] proprietor's interest in regulating ground congestion at its airports would appear to be at the core of the proprietor's function as airport manager, perhaps even more so than the regulation of noise." *W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.* ("*Western*"), 658 F. Supp. 952, 957 (S.D.N.Y. 1986), *aff'd on op. of the district court*, 817 F.2d 222, 226 (2d Cir. 1987) ("Turning to the merits, we affirm on the basis of Judge Cannella's well-reasoned opinion, to which we refer the reader, holding that the Authority's perimeter rule is not preempted."), *cert. denied sub nom Delta Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 485 U.S. 1006 (1988).

Indeed, the perimeter rule upheld in *Western* was put in place

> to reduce groundside congestion and maintain LaGuardia as a short and medium haul airport, and an airport catering to business customers. The Port believes that opening LaGuardia to long range aircraft, and with it the leisure traveler, would reduce runway capacity, increase delays, result in increasing congestion at the gates, place a heavier demand on ticketing, baggage claim facilities and public areas, increase use of parking lot

facilities and cause roadway and terminal frontage access to become more congested.

658 F. Supp. at 959. This was not a pure noise or environmental regulation; rather it was an airport management regulation.

"[C]ourts have permitted airport proprietors to enact regulations aimed at monitoring noise levels, tempering environmental concerns, and managing congestion." *Am. Airlines, Inc. v. DOT*, 202 F.3d 788, 806 (5th Cir. 2000) (citations omitted), *cert. denied*, 530 U.S. 1274 (2000). This has included eliminating operations on certain days, and requiring overall reductions in the number of flights allowed. *See Nat'l Helicopter*, 137 F.3d at 89-91.

As the Fifth Circuit has noted,

> The fact that the restrictions in the Ordinance do not advance a local interest articulated in prior case law is not dispositive of this issue. We do not limit the scope of proprietary rights to those which have been previously recognized. *Cf. Western Air Lines*, 658 F. Supp. at 957 ("Section 1304(b)(1) [recodified as 41713(b)(1)] does not expressly limit proprietary powers to the regulation of noise, although presumably Congress would have so limited the section if that is what it had in mind."). Thus, we are open to assessing whether the restrictions in the Ordinance are reasonable and non-discriminatory rules aimed at advancing a previously unrecognized local interest.

*Am. Airlines*, 202 F.3d at 808.

**B.    The 2005 TUPs Fall Within the Proprietor's Exemption**

The TUPs were created as a result of the *Midway* litigation, where the Court specifically noted that the County could "develop rational and nondiscriminatory rules for allocating scarce space and landing and takeoff slots" without running afoul of the ADA. 584 F. Supp. at 440. Moreover, controlling congestion clearly falls within the rights afforded to airport proprietors. *Am. Airlines*, 202 F.3d at 806-08; *Western*, 658 F. Supp. at 959.

The County Board, in codifying the TUPs, provided detailed reasons *why* such limitations and restrictions are necessary. The TUPs

> represent a careful balance between competing interests at the Airport. Moreover, the County has consistently worked to balance the need of Airport users against the need to protect the fragile ecosystem in which the Airport is located, as well as to preserve the quality of life for the residents who live and work in the vicinity of the Airport. Further, as most recently affirmed by this Honorable Board in Resolution 245-2003, the County has had a long-standing policy against expansion of the Airport and/or increases in capacity of the Airport's runways, taxiways, ramps, gates, hangars, terminal, motor vehicle parking areas, or access roads, excepting measures necessary for the security of the Airport facility. Thus, the restrictions set forth in the [2004 TUPs] would preserve this policy against expansion while balancing the need to allow carefully controlled commercial airline traffic at the Airport.

(A314). This overall control—and prevention of expansion—is necessary given the nature and character of HPN. As noted by the County Board during the *Midway* litigation, HPN's role is "primarily serving general aviation and corporate aviation, now and for the foreseeable future, and of having only a limited commercial service

function." (A362). Indeed, "[t]he County and the United States . . . agree that the Airport's principal function at present and in the foreseeable future is one of accommodating general aviation with an emphasis on business use; by comparison its commercial service function is relatively modest." (A365).

HPN is a small regional airport, located in the towns of Harrison and North Castle, and the village of Rye Brook, which are primarily residential communities in the middle of Westchester. (A319). The Airport is located in close proximity to the Kensico Reservoir, which is a significant source of drinking water for both Westchester and New York City. (*Id.*). Enacting use restrictions on HPN would "ensure that commercial use at [HPN] is regulated in a well-defined, equitable and consistent manner and that it continues to be regulated for the protection of the environment and preservation of the quality of life of the residents who live and work in the vicinity of the airport." (*Id*). Appellants attempt to disparage the County by labeling it too "parochial" in its outlook (App. Br. 2, 6, 8, etc.), but the County's need to protect the environment, to preserve the quality of life for local residents, and to manage congestion—by requiring compliance with flight and passenger limitations—squarely falls with the rights possessed by a proprietor. *Am. Airlines*, 202 F.3d at 806; *Nat'l Helicopter*, 137 F.3d at 89-91.

The factual underpinnings of the TUPs—including technical analysis, the history of use restrictions at HPN, and terminal and ramp use allocations—were compiled in

advance of the 2004 codification, and provided to the FAA.[19] (Supp. 15-147). The FAA, in turn, relied on these materials in determining that the TUPs were grandfathered under ANCA (*see* Point I(A), *supra*), and that they would not violate the County's obligation under the grant assurances "to provide access by air carriers on reasonable and not unjustly discriminatory terms." (A383). The FAA also confirmed that it found nothing in the 2004 TUPs "that is inconsistent at this time with [the] grant assurances." (*Id.*). Those grant assurances included then and include now the obligation to comply with all applicable federal laws, including but not limited to the ADA. *See* Airport Improvement Program (AIP) Grant Assurances, 79 Fed. Reg. 18,755, 18,755 (Apr. 3, 2014) (noting that a "complete list of the current grant assurances can be viewed" at https://www.faa.gov/airports/aip/grant_assurances).

Of course, Appellants "do <u>not</u> seek to 'invalidate' the" TUPs, and "seek no relief with regard to the 2004 TUP." (A493) (emphasis in original). Rather, they *only* challenge the inclusion of Part 380 and Part 135 operators in the 2005 amendment. (*Id.*). First, Part 135 operators were expressly included in the definition of "Airline" in the 2004 TUPs. (A320) ("'Airline' shall mean any person providing scheduled passenger air service, including but not limited to, any air carrier or other operator certificated to provide scheduled passenger service under Parts 119, 121 **or 135**") (emphasis added).

---

[19] These documents were among the many exhibits relied upon by the District Court (*see* SPA15) that Appellants failed to include in their appendix.

Second, as explained by the County Board regarding the 2005 amendments,

> the proposed amendment to the provisions of [the 2004 TUPs] will clarify long-standing practice under which the County requires that all commercial passenger service providers, including those that offer their services on an infrequent basis, use the main Airport terminal and terminal ramp and be subject, among other things, to the four primary limitations[20] set forth in the Airport Procedures.

(A339-40). Thus, there was no new inclusion of Part 380 operators in the 2005 amendments. The amendments simply made explicit what was already implicit—that commercial carriers, flying scheduled flights (as that term was understood when the TUPs were first established in 1985), are subject to the TUPs.

## C. The 2005 TUPs Are Reasonable and Nonarbitrary

If the County has the authority to enact the TUPs under the proprietor's exemption—which it clearly does—the question simply becomes whether the TUPs are reasonable. *Nat'l Helicopter*, 137 F.3d at 91 ("We do not require that studies offered as empirical support for a proprietor's actions be conducted pursuant to any one specific methodology, accepted in scientific communities as the *most* appropriate way of conducting an analysis. Rather, the test is one of reasonableness." (emphasis in original)). All that is needed is "the reasonable prospect of a beneficial effect" to uphold such a regulation. *Global Int'l Airways Corp. v. Port Auth. of N.Y. & N.J.*, 727 F.2d 246,

---

[20] The four limitations are the aircraft capacity limit, the passenger capacity limit, the lottery system for gate slots, and the County's operating control of the ramp. (A340).

251 (2d Cir. 1984); *accord Nat'l Helicopter*, 137 F.3d at 91 (citing *Global* for that proposition).

There is no question that airports have outer limits on the number of flights that can take off and land each day. This includes the full gamut of aviation—such as commercial passenger flights, non-passenger flights (*e.g.*, cargo planes), corporate flights, non-scheduled charter flights, and small personal aircraft. And there can be no question that regulations can be aimed at the *cumulative* effect of these flights. *Global Int'l*, 727 F.2d at 250-51.

Here, the TUPs have, since their inception, limited the number of commercial passenger flights that can take off on any given day from the airport, capping both the number of planes and the number of passengers. The TUPs then further provide a mechanism to allocate those available slots "to ensure that limited terminal and apron capacity is made available to all carriers." (A383). Applying the TUPs to Appellants will reasonably serve the County's interest "to balance the need of Airport users against the need to protect the fragile ecosystem in which the Airport is located, as well as to preserve the quality of life for the residents who live and work in the vicinity of the Airport." (A314).

Appellants' asserted parade of potential horribles (App. Br. 53-54) does not compel a different conclusion. For instance, Appellants seem to argue that the County made a damaging concession when, during a deposition, the County's Director of

Operations admitted that adding people to the main terminal's TSA line would make that line longer, and that, on the other side of the coin, having nine noncommercial or nonpassenger flights take off from an FBO would amount to more congestion than a single flight departing from that FBO. (*Id.* at 54). But these questions and answers reveal a fundamental misunderstanding about the effect of the TUPs. As to the number of people waiting in line, the combination of the passenger limit and the aircraft limit at the main terminal will prevent any meaningful change in the number of people flying at any given time. The application of the TUPs also will not result in a massive increase in the number of flights out of FBOs—quite the opposite.

First, Appellants' claim that they "can operate the very *same* aircraft at FBOs so long as they only sell 9 of the 30 seats onboard" is flatly wrong. (App. Br. 53) (emphasis in original). The TUPs apply to "aircraft *designed* for more than (9) passenger seats." LWC § 712.462(2)(a) (emphasis added); (*accord* A540 "the method by which it intends to achieve compliance (*e.g.*, by operating aircraft with nine seats or fewer)"). Thus, it is clear that Appellants cannot simply sell fewer seats, on the same planes, and operate out of the FBOs.[21] Second, Appellants' own concession in their brief demonstrates that the consequence of compliance with the TUPs is *not* an exponential multiplication of flights from FBOs. Appellants assert that JSX lost significant money operating

---

[21] To the extent Appellants attempt to rely on discussions between the parties regarding possible interim compliance measures in lieu of a stay application, that is irrelevant to what compliance actually requires.

compliant flights out of the FBOs. (App. Br. 28 n.14). Thus the only thing "irrational" about the nine-seat exception (*id.* at 53) is Appellants' intimation that they will fly nine times as many planes out of the FBOs if they must fly smaller planes.

Indeed, it is far more likely that Appellants will continue to increase the number of flights from HPN absent enforcement of the TUPs. For example, less than one week before the District Court's decision, JSX announced two new seasonal routes from HPN, adding 12 flights per week to its schedule starting on November 21st of this year.[22] Per Appellants' brief, JSX "will fly an average of at least 28 flights per week into and out of FBOs" at HPN. (App. Br. 23). Thus, the 12 new seasonal flights are either a 40% increase in flights or a 75% increase in flights (depending on whether they were in addition to or included in the 28, respectively). It is therefore not compliance with the TUPs that will result in increased flights; the indisputable facts demonstrate that *noncompliance* will increase the number of flights at the Airport, along with the attendant noise, congestion, and environmental impact. Appellants' own papers even rely on the fact that more flights from FBOs (exactly what they wish to occur) increases congestion. (*See* App. Br. at 54).

---

[22] *See* M. Patke & J. Robinson, Modern Currency PR, *Award-winning Air Carrier JSX Launches New Sun & Ski Routes to Florida and Salt Lake City Starting in Late 2024*, BUSINESSWIRE (June 26, 2024), https://www.businesswire.com/news/home/20240626387463/en/ (last visited Dec. 3, 2024).

As such, there is a "reasonable prospect" that compliance with the TUPs will result in reduced congestion at the Airport. *Global Int'l*, 727 F.2d at 251. That alone is sufficient to determine that the TUPs are reasonable. *See Western*, 658 F. Supp. at 960.

The TUPs are also not arbitrary. There is a reasonable distinction between Passenger Service as defined in the TUPs and non-Passenger Service. Appellants, in selling seats to the general public, are acting substantially the same as standard commercial airlines operating under Part 121—an individual can go onto a website, book a single seat on a plane full of strangers, which is set to depart on a given date and time, regardless of the number of tickets sold. (*See* Supp. 236-37 (FAA's view that this is akin to a normal commercial flight, not a charter flight)). It is not arbitrary to treat all regularly scheduled commercial flights the same, particularly given the Airport's intended operation of only having limited commercial service. Nor is the nine-seat cutoff "arbitrary" within the meaning of the proprietor's exemption. Where, as here, there is adequate support for a rule's bright-line number, the rule will be upheld as reasonable and nonarbitrary. As this Court noted in *Nat'l Helicopter*, because "[i]t is unrealistic to insist that a proprietor justify by some scientific method a specific [bright-line number]" to achieve a general end, it is "difficult to imagine how whatever [number] that is chosen . . . would not be considered arbitrary." 137 F.3d at 91.

> "Looked at by itself, without regard to the necessity behind it, the line or point seems arbitrary. It might as well, or nearly as well, be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely,

the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark."

*Western*, 658 F. Supp. at 960 (quoting *Louisville Gas & Electric Co. v. Coleman*, 277 U.S. 32, 41 (1928) (Holmes, J., dissenting)). The nine-seat breakpoint has been an industry standard since at least the 1970s, and is used in federal statutes and regulations. *See, e.g.*, 49 U.S.C. § 44706(a)(2); 14 C.F.R. § 135.411(a); (Supp. 203 (noting that these breakpoints relate to differing regulatory requirements)). Thus, it is reasonable to use this breakpoint, making it nonarbitrary.

## III.   APPELLANTS' POLICY ARGUMENTS ARE MISPLACED

Appellants spend much of their brief making policy arguments as to why they should be allowed to continue their business models in contravention of the TUPs. However, the question before this Court is whether the TUPs are valid, given: (1) Congress's policy determination to allow certain local regulations through the ADA's proprietor's rights exemption and ANCA's grandfathering clause; (2) the FAA's determination that the 2004 TUPs were grandfathered and did not violate the County's grant assurances; and (3) the unequivocal documented history of the TUPs which shows the 2005 amendments merely clarified the prior TUPs.

Thus, it is irrelevant that JSX has won awards (App. Br. 21), or that Appellants make it more palatable for certain people to fly (*id.* at 44-45). Moreover, it is unnecessary to consider that the FAA is currently considering prohibiting Appellants' exact business

model. (*Id.* at 65).[23] Indeed, "policy considerations [are] the work of legislatures" not the courts. *United States v. Sineneng-Smith*, 590 U.S. 371, 385 (2020) (Thomas, J., concurring).

As a threshold matter, it is important to consider the scope of the issues here. Appellants assert that the District Court's ruling—which applies to a single set of regulations at a small regional airport—will "upend air carrier routes nationwide and stifle innovation in the air transportation industry." (App. Br. i., Statement Regarding Oral Argument). There is no evidence in the record that *any* other airport in the nation has a similar regulation to the TUPs, nor is the County aware of any. As such, there would not be another grandfathered regulation imposing similar restrictions, and the FAA would have to otherwise approve such a regulation under ANCA. Appellants' Amici fall into the same trap, and assert national implications "*if* the same strategy should be adopted by other airports." (Am. Br. 9 (emphasis added)). Combined with Appellants' Amici's hyperbolic claim that "[t]he nation's airports are watching this case, to see if it provides a means to circumvent the ADA, ANCA, and other federal requirements" (Am. Br. 12), this demonstrates a fundamental misunderstanding of how

---

[23] Amazingly, Appellants accuse the County of trying "to jump out in front of [the FAA's rulemaking] process" and assert that doing so is "improper." (App. Br. 65, n.22). Given that the County has had these TUPs in effect for approximately 40 years, and that the last amendment on this issue was 19 years ago, Appellants are assigning an extraordinary level of prescience to the County. The County did not know in 1985, 2004, or 2005 that—in 2023—the FAA would seek comments regarding the loophole that Appellants are exploiting.

grandfathering works. The County's law is grandfathered under ANCA—that does not mean any other airport can simply adopt it.

Further, to the extent that Appellants wish to focus on national policy, their claim that they are "innovative carrier[s]" (App. Br. 5) seems woefully insufficient—as both the FAA and Congress are considering curtailing Appellants' practice.

The FAA, on August 23, 2023, stated that it

> intends to initiate a rulemaking to amend title 14, Code of Federal Regulations (14 CFR), part 110 to address these public charter operations that, in light of recent high-volume operations, appear to be offered to the public as essentially indistinguishable from flights conducted by air carriers as supplemental or domestic operations under 14 CFR part 121.

Regulatory Definitions of On-Demand Operation, Supplemental Operation, and Scheduled Operation, 88 Fed. Reg. 59480, 59481 (proposed Aug. 29, 2023) (to be codified at 14 C.F.R.pt. 110). On June 17, 2024, having received and reviewed approximately 60,000 comments, the FAA again announced that it would move forward with rulemaking. U.S. DEP'T OF TRANSP., FAA Ensuring Safe Public Charter Flights, Exploring Future Solutions for All Flyers (June 17, 2024), https://www.faa.gov/newsroom/faa-ensuring-safe-public-charter-flights-exploring-future-solutions-all-flyers (last visited Dec. 3, 2024).

On August 2, 2024, a bipartisan group of Members of the House of Representatives introduced H.R.9268, the Safer Skies Act of 2024. This bill—currently with 27 sponsors—would require Appellants, and others engaged in similar business

models, to operate through SIDA locations, which would require use of the main terminal at HPN. Safer Skies Act of 2024, H.R. 9268, 118th Cong. (2024). The bill is supported by myriad aviation groups, including the National Air Carriers Association, and at least eight organizations representing airline personnel. *See* Congressman Nick Langworthy Introduces Bipartisan Safer Skies Act to Close Loopholes in Airport Security (Aug. 5, 2024), https://langworthy.house.gov/media/press-releases/congressman-nick-langworthy-introduces-bipartisan-safer-skies-act-close (last visited December 3, 2024). In other words, public policy is against Appellants' practice, not for it.[24]

## IV.    THERE IS NO EQUAL PROTECTION VIOLATION

Appellants brought a "class-of-one" equal protection claim against the County. In order to sustain such a claim, they were required to "show an *extremely high degree* of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (emphasis added).

> More precisely, a plaintiff must establish that he and a comparator are "*prima facie* identical" by showing that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake."

---

[24] This is another area where the Court may wish to ask FAA for its views. *See* n.15, *supra*.

47

*Hu v. City of N.Y.*, 927 F.3d 81, 92 (2d Cir. 2019) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)). In other words, Appellants would need to show that there is not a single characteristic that is different between them and their alleged comparators, thus making the application of the TUPs to Appellants, and not the others, unjust.[25] They did not—and cannot—do so.

### A.      Comparators

First, Appellants challenge the District Court's decision to only consider Baker's Bay, NetJets, and Wheels Up as comparators. The District Court was correct to do so. As noted in the District Court's decision, the comparators were delineated into seven groups—these three comparators represent three of the seven groups. (SPA18). With respect to one of the remaining four subgroups, it was undisputed that Appellants did not identify any Part 91 operators that operated in violation of the TUPs. (A299 ¶ 73). With respect to another, Appellants admitted they did not identify any corporate jets selling seats to the public. (A298 ¶ 70). Looking at the others, it is clear that the evidence cited by Appellants did not support the statement made in opposition in the 56.1 statement. For example, with respect to subgroup 2, Appellants disputed that they had failed to identify political campaigns, sports teams, or other common-purpose groups that were selling seats to the public on aircraft with more than 9 passenger seats. (A298

---

[25] To the extent Appellants rely on *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012), to claim that it is a less demanding standard, this Court's decisions requiring *prima facie* identical comparators (*see Hu*, 927 F.3d at 92) clearly control.

¶ 69). The deposition transcripts cited, however, do not support that dispute. Rather, those transcripts either admit that the planes had fewer than 9 seats (*see*, *e.g.*, A438-41) or that the air carriers were not selling individual seats, but rather people were chartering the entire plane together (*see*, *e.g.*, A431-33).

Thus, not only did Appellants fail to counter the County's arguments with respect to many of the comparators, they also failed to advance legitimate disputes. "[R]ather than merely deny the moving party's allegations in a general way, the party opposing summary judgment must present competent evidence that creates a genuine issue of material fact." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted). As such, the District Court did not err in dismissing them as comparators.

With respect to the three comparators remaining, Appellants do the same thing here that they did before the District Court—wave their hands and say the differences that do exist do not matter. But it is clear that they do. Appellants fly regularly scheduled flights, on fixed dates and times, that can be booked one seat at a time, by any member of the public willing to pay Appellants' rates. Whether the planes have one passenger or thirty, they will fly, and Appellants bear the risk of loss. That is not the case for the comparators:

- Baker's Bay is a community group. As the testimony of Appellants' own witnesses established, Baker's Bay is residential community in the Bahamas; this

group operates under a different FAA regulation (14 C.F.R. § 212.5) that limits the sale of tickets to bona fide members of the organization, not to the general public.

- NetJets is a fractional jet ownership program. In other words, individuals are not buying seats on individual flights. They are either purchasing or leasing part of an airplane. They operate under an entirely different part of the FAA regulations (14 C.F.R. Part 91, Subpart K).

- Wheels Up, as understood by the County, sells individual seats on aircraft with nine seats of fewer.[26] This understanding was based on the knowledge of Peter Scherrer, who had been manager of the Airport, and responsible for its day-to-day operations.

---

[26] An example of the purported "error" identified by Appellants was a reference to deposition testimony from Jennifer Lozado, XO's 30(b)(6) witness, that Wheels Up owned aircraft of various sizes, citing A437. (App. Br. 72). However, that testimony does not create an issue of material fact as it: (1) is relied upon *only* in response to the statement about "political campaigns, sports teams, or other common-purpose groups that were selling seats to the public;" and (2) does not actually establish that Wheels Up sells individual seats on those larger planes. (A298, ¶ 69; A435-37). Indeed, the witness testified that she did not know "the working of their organization" and did not know where they fly. (A436). The District Court found that Appellants did not cite any evidence to contradict the County's understanding, with respect to the relevant fact contained in the 56.1 statement. (SPA21). Moreover, as set forth in the County's response below (Supp. 283-84), at worst it is an issue of mistake, not intentional discrimination, and thus Appellants have not demonstrated facts that make it clear that it could not be a mistake—as is their burden. *Hu*, 927 F.3d at 92.

Thus, it is clear that none of these identified comparators is "*prima facie* identical" to Appellants.[27]

## B. Rational Basis

Even if one of these entities was a suitable comparator, there merely needs to be a *conceivably* rational basis for the different treatment. Moreover, it is Appellants' "burden to negative every conceivable basis" to support their claim. *Progressive Credit Union v. City of N.Y.*, 889 F.3d 40, 49 (2d Cir. 2018) (internal quotation marks omitted). They did not, and cannot, do so.

In their attempt to do so, Appellants cherry-pick the "legitimate government policy" at play here. The TUPs were enacted to regulate and allocate limited terminal space, while ensuring HPN's role remained "primarily serving general aviation and corporate aviation, now and for the foreseeable future, and of having only a limited commercial service function." (A362; Supp. 158). The District Court acknowledged this in setting forth the County's policy. (SPA22). Appellants, however, trim the thirteen-line paragraph to five words—"the allocation of scarce space"—to fit their argument, rather than justify their argument to the actual policy. (App. Br. 73).

Looking at the overall policy, it is clear why these comparators are different. At the forefront, they are treated differently by the FAA. That the FAA, which—as

---

[27] To the extent the Court wishes to consider other purported comparators identified by Appellants, detailed explanations as to why they are not comparable can be found in Appellee's Supplemental Appendix. (*See* Supp. 263-66).

Appellants repeatedly note—has extensive policy authority over aviation, treats them differently should be a sufficiently "conceivably rational basis" to defeat the claim. But there are more reasons than that.

Appellants go to great lengths to demonstrate how much traffic they generate at the Airport. JSX flew 15,000 passengers through the Airport in 8 months; XO 17,000 passengers over 18 months. (App. Br. 23). Combined, those two carriers average over 700 passengers per week. That is significant commercial activity at an airport that has a 240-person per half hour passenger cap. However, there is no legitimate argument (and certainly no evidence) that there are hundreds of people flying each week between HPN and Baker's Bay. Further, given that Baker's Bay is a closed community, there is a natural limit on the number and size of flights that will occur. Appellants, however, continue to expand operations, and there is not a closed universe in which they operate. Thus, treating Baker's Bay differently from Appellants is rational.

As for NetJets, there is a clear distinction between owning/leasing part of a plane (even for a limited period of time) and just buying a seat. To analogize, it is the difference between owning a time share, and renting an Airbnb. Private jets—which is how fractional jet ownership is classified under Part 91—are different from ticket sales to the public occurring on Part 135 planes. Moreover, Appellants again failed to demonstrate that there is remotely the same volume of NetJets flights as they engage in.

With respect to Wheels Up, Appellants' argument is simply that the nine seat limit is irrational. As set forth in Point IV(A), *supra*, that is just not so. Moreover, for purposes of equal protection, it is Appellants who have the burden of demonstrating that it is irrational—they cannot simply point to a lack of evidence support the limit.

> [W]hether a conceivable reason for enacting a statute actually motivated or was considered by the legislature is "entirely irrelevant for constitutional purposes," because legislatures are not required to articulate their reasons for enacting statutes and a "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."

*Progressive*, 889 F.3d at 49 (quoting *F.C.C. v. Beach Communications*, 508 U.S. 307, 315 (1993)). Indeed, "the court may hypothesize a legitimate, rational governmental purpose." *Id.* at 50 (citing *Johnson v. Baker*, 108 F.3d 10, 11-12 (2d Cir. 1997)). Aligning portions of the TUPs, where the legislature so chooses, with FAA regulations and industry standards, is rational, and thus is sufficient grounds to defeat Appellants' equal protection claim.

## **CONCLUSION**

For the foregoing reasons, the County respectfully requests that this Court affirm

the decision of the District Court in its entirety.

Dated:  December 3, 2024          Respectfully submitted,

*John M. Nonna*

 John M. Nonna
 Westchester County Attorney

JUSTIN R. ADIN
Asst. Chief Deputy County Attorney

SHAWNA C. MACLEOD
Senior Assistant County Attorney

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4) because it contains 13,703 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

The foregoing brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Garamond font and 13-point font for footnotes, using Microsoft Word 2016.

Dated: White Plains, New York
       December 3, 2024

*John M. Nonna*
John M. Nonna
Westchester County Attorney